

## HM Courts & Tribunals Service

**ROYAL COURTS OF JUSTICE GROUP**
**Queen's Bench Division**
Foreign Process Section
Room E16
Royal Courts of Justice
Strand, London
WC2A 2LL

**DX** 44450 Strand

**T** 020 7947 7772
**F** 0870 324 0025
**E** ForeignProcess.RCJ@justice.gov.uk

**Text Phone** 18001 020 7947 7772
(Helpline for the deaf and hard of hearing)

**www.justice.gov.uk**

**Kelly Hagedorn**
**Jenner & Block LLP**
**25 Old Broad Street**
**London EC2N 1HQ**

Our ref:   QF-2019-002119
Your ref:

Date: 17-09-2019

Dear Ms Hagedorn

### RE: USA v Modi

Please find enclosed the Return documents and Certificate of Service in relation to service of documents on Mr Modi at HMP Wandsworth.

Yours faithfully,

Jennifer Foley
**Foreign Process Section**

**From:** Adele, Ikechi [HMPS] [mailto:Ikechi.Adele@justice.gov.uk]
**Sent:** 12 September 2019 14:08
**To:** Harbert, Elaine <Elaine.Harbert1@Justice.gov.uk>; Shoulder, David
<David.Shoulder@justice.gov.uk>
**Cc:** Madsen, Maria <Maria.Madsen@justice.gov.uk>
**Subject:** Serving of papers; Mr Modi

Dear Senior Master Fontaine

I will like to confirm that the papers from Wandsworth County Court were served, by myself, on Mr
Nirav Deepak Modi yesterday 11/09/2019 at 14:46hrs.

Please do not hesitate to contact me if you have any further queries.

Kind regards

Ikechi

**Ikechi Adele | Head of Offender Management Unit**
HMP Wandsworth | Heathfield Road | London SW18 3HS
02085883966 | ikechi.adele@justice.gov.uk

Official/Official-Sensitive/Secret

---

This e-mail and any attachments is intended only for the attention of the addressee(s). Its unauthorised
use, disclosure, storage or copying is not permitted. If you are not the intended recipient, please
destroy all copies and inform the sender by return e-mail. Internet e-mail is not a secure medium. Any
reply to this message could be intercepted and read by someone else. Please bear that in mind when
deciding whether to send material in response to this message by e-mail. This e-mail (whether you are
the sender or the recipient) may be monitored, recorded and retained by the Ministry of Justice.
Monitoring / blocking software may be used, and e-mail content may be read at any time. You have a
responsibility to ensure laws are not broken when composing or forwarding e-mails and their
contents.

F.P ref:  **QF-2019-002119**
T.A Ref:  Kelly

Hagedorn**«Reference»**

CERTIFICATE - ATTESTATION

The undersigned authority has the honour to certify, in conformity with article 6 of the Convention
L'autorite soussignee a l'honneur d'attester conformenent a l'article 6 de ladite Convention.

1) that the document has been served the (date) **11-09-2019**
que le demande a ete executee        le (date)

  -at (place, street, number)    **Nirav Deepak Modi, HMP Wandsworth, Heathfield Rd,**
  -a (localite, rue, numero)     **London, SW18 3HU**

- in one of the following methods authorised by article 5:
-dans une des formes suivantes prevues a l'article 5:
a) in accordance with the provisions of sub-paragraph (a) of the first paragraph of article 5 of the convention
selon les formes legales (article 5, alinea premier, lettre a)

  b) in accordance with the following particular method    **On Mr Ikechi Adele an Administrative**
  selon la forme particuliere suivante     **Officer who served Mr Nirav Deepak Modi 11th September 2019**

c) by delivery to the addressee, who accepted it voluntarily
par remise simple
The documents referred to in the request have been delivered to:

Les documents mentionnes dans la demande ont ete remis a:
- (identity and description of person)
- (identite et qualite de la personne)

  - relationship to the addressee (family, business or other)
  - liens de parente de subordination ou autres avec le desinataire de l'acts

2) that the document has not been served, by reason of the following facts:
que la demande n'a pas ete executee, en raison des faits suivants:

in conformity with the second paragraph of article 12 of the Convention, the applicant is requested to pay the expenses details in the attached statement.
Conformement a l'article 12, alinea 2 de ladite Convention, le requerant est prie de payer ou de rembourser les frais dont le detail figure au memoire ci-joint

Annexes
Documents returned
Pieces renvoyees

in appropriate cases, documents establishing the service:
le cas echeant, les documents justicatifs de l'execution:

Done at London
fait a

the **17-09-2019**



Signature and/or stamp:
Signature et/ou cachet:

## SUMMARY OF THE DOCUMENT TO BE SERVED
### ÉLÉMENTS ESSENTIELS DE L'ACTE

**Convention on the Service Abroad of Judicial and Extrajudicial Documents in
Civil or Commercial Matters, signed at The Hague, the 15th of November 1965 (Article 5, fourth
paragraph).**

Convention relative à la signification et à la notification à l'étranger des actes judiciaires ou
extrajudiciaires en matière civile ou commerciale, signée à La Haye le 15 novembre 1965
(article 5, alinéa 4).

| | |
|---|---|
| **Name and address of the requesting authority:**<br>Nom et adresse de l'autorité requérante : | Honorable Sean H. Lane<br>United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York, 10004-1408, United States of America |

| | |
|---|---|
| **Particulars of the parties\*:**<br>Identité des parties\* :<br> | Firestar Diamond, Inc. f/k/a Firestone, Inc. (Debtor)<br>c/o Richard Levin, Chapter 11 Trustee<br>Jenner & Block LLP<br>919 Third Avenue, New York NY 10022, USA<br>+1 (612) 891-1601<br><br>Fantasy, Inc. (Debtor)<br>c/o Richard Levin, Chapter 11 Trustee<br>Jenner & Block LLP<br>919 Third Avenue, New York NY 10022, USA<br>+1 (612) 891-1601<br><br>Old AJ, Inc. f/k/a A. Jaffe, Inc. f/k/a Sandberg & Sikorski Corp. (Debtor)<br>c/o Richard Levin, Chapter 11 Trustee<br>Jenner & Block LLP<br>919 Third Avenue, New York NY 10022, USA<br>+1 (612) 891-1601<br><br>Richard Levin (Plaintiff) represented by Jenner & Block LLP, 919 Third Avenue, New York, New York 10022, USA; contactable through his attorneys: Angela Allen, aallen@jenner.com +1 (312) 222-9350, and Carl Wedoff, cwedoff@jenner.com, +1 (202) 891-1600<br><br>Nirav Deepak Modi (Defendant)<br>HMP Wandsworth<br>Heathfield Road, London, SW18 3HU<br>United Kingdom<br><br>Mihir Bhansali (Defendant)<br>c/o White & Williams LLP<br>attn: Thomas E. Butler, Esq.<br>7 Times Square Ste. 2900<br>New York NY 10036, USA<br><br>Ajay Gandhi (Defendant)<br>c/o Serpe Ryan LLP<br>attn: Silvia L. Serpe<br>16 Madison Square West<br>New York, New York 10010, USA |

\* If appropriate, identity and address of the person interested in the transmission of the document
S'il y a lieu, identité et adresse de la personne intéressée à la transmission de l'acte

☒ **JUDICIAL DOCUMENT\*\***
ACTE JUDICIAIRE\*\*

| | |
|---|---|
| **Nature and purpose of the document:**<br>Nature et objet de l'acte : | The Order attached as Exhibit 3 requires Nirav Deepak Modi, as a Defendant in the proceedings, to respond to the Complaint within 30 days after service of the Complaint [Exhibit 1] and Summons [Exhibit 2]. |
| **Nature and purpose of the proceedings and, when appropriate, the amount in dispute:**<br>Nature et objet de l'instance, le cas échéant, le montant du litige : | This is an action against the Defendant Nirav Deepak Modi, the former indirect controlling majority shareholder and de facto director, officer or controlling person of the Debtors; Mihir Bhansali, who served as the Debtors' sole director and as the Chief Executive Officer of each Debtor; and Ajay Gandhi, who sreved as the Chief Financial Officer of each Debtor. This action seeks to recover from the Defendants the damages the Debtors and their estates suffered as a result of their six year, extensive international fraud, money-laundering, and embezzlement scheme, that resulted in the accrual of claims against the Debtors of over $1 billion in favour of Punjab National Bank, the diversion of millions of dollars of the Debtor's assets for Mr. Modi's personal benefit, and the collapse of the Debtors and the resulting loss of value of their business. |
| **Date and Place for entering appearance**:**<br>Date et lieu de la comparution** : | |
| **Court which has given judgment**:**<br>Juridiction qui a rendu la décision** : | United States Bankruptcy Court<br>Southern District of New York<br>One Bowling Green<br>New York, NY 10004-1408 |
| **Date of judgment**:**<br>Date de la décision** : | 18 April 2019 |
| **Time limits stated in the document**:**<br>Indication des délais figurant dans l'acte** : | Under the Order attached as Exhibit 3, Nirav Deepak Modi is required to submit a motion or answer to the Complaint to the clerk of the bankruptcy court within 30 days after Service of the Complaint and Summons. |

** if appropriate / s'il y a lieu

☐ **EXTRAJUDICIAL DOCUMENT****
ACTE EXTRAJUDICIAIRE**

| | |
|---|---|
| **Nature and purpose of the document:**<br>Nature et objet de l'acte : | 11. Describe the nature and purpose of the document |
| **Time-limits stated in the document**:**<br>Indication des délais figurant dans l'acte** : | 12. Specify limits |

** if appropriate / s'il y a lieu

Permanent Bureau July 2017

**Exhibit 1**

Complaint

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>FIRESTAR DIAMOND, INC., *et al.*<br><br>Debtors. | Chapter 11<br><br>No. 18-10509 (SHL)<br><br>(Jointly Administered) |
| RICHARD LEVIN, Chapter 11 Trustee of<br>FIRESTAR DIAMOND, INC., FANTASY, INC.,<br>and OLD AJ, INC. f/k/a A. JAFFE, INC.,<br><br>Plaintiff,<br><br>v.<br><br>NIRAV DEEPAK MODI, MIHIR BHANSALI,<br>and AJAY GANDHI,<br><br>Defendants. | Adv. Proc. No. 19-_____ (SHL) |

**COMPLAINT AGAINST INSIDERS FOR BREACH OF FIDUCIARY DUTY, AIDING AND ABETTING BREACH OF FIDUCIARY DUTY, CORPORATE WASTE, AND VIOLATIONS OF THE RACKETEERING INFLUENCED CORRUPT ORGANIZATIONS ACT**

Plaintiff Richard Levin, not individually but solely as chapter 11 trustee ("**Trustee**" or "**Plaintiff**") for Debtors Firestar Diamond, Inc., Fantasy, Inc., and Old AJ, Inc. f/k/a A. Jaffe, Inc. (collectively, the "**Debtors**"), for his Complaint alleges as follows:

**NATURE OF THE ACTION**

1.      This is an action against Defendant Nirav Deepak Modi ("**Modi**"), the former indirect controlling majority shareholder and *de facto* director, officer, or controlling person of the Debtors; Mihir Bhansali ("**Bhansali**"), who served as the Debtors' sole director and as the Chief Executive Officer ("**CEO**") of each Debtor; and Ajay Gandhi ("**Gandhi**"), who served as the Chief Financial Officer ("**CFO**") of each Debtor. This action seeks to recover from the Defendants the damages the Debtors and their estates suffered as a result of their six-year, extensive international

1

fraud, money laundering, and embezzlement scheme, that resulted in accrual of claims against the Debtors of over $1 billion in favor of Punjab National Bank, the diversion of millions of dollars of the Debtors' assets for Modi's personal benefit, and the collapse of the Debtors and the resulting loss of value of their businesses.

## JURISDICTION AND VENUE

2.       This Court has jurisdiction over the subject matter of this adversary proceeding under 28 U.S.C. § 1334(b) because this adversary proceeding arises under Title 11 and arises in and is related to the chapter 11 cases *In re Firestar Diamond, Inc., et al*, Case No. 18-10509 (SHL), which are pending in this Court.

3.       This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2).

4.       The Trustee consents to entry of final order or judgment by this Court.

5.       Venue of this adversary proceeding is proper in this district under 28 U.S.C. § 1409.

## THE PARTIES

6.       Plaintiff Richard Levin is the chapter 11 trustee for the Debtors, duly appointed under section 1104(a) of the Bankruptcy Code by the United States Trustee for Region 2 on June 14, 2018, whose appointment was approved by this Court by order entered the same day.

7.       The Trustee brings this action, not individually, but solely in his capacity as Trustee.

8.       Debtor Firestar Diamond, Inc. (f/k/a Firestone, Inc.) ("**Firestar**") is a privately-held Delaware corporation, with its principal place of business in New York. While in operation, Firestar principally operated a wholesale diamond business. Firestar Group, Inc., a Delaware corporation ("**Group**"), owns 100% of the equity interests in Firestar.

9.      Debtor Fantasy, Inc. ("**Fantasy**") is a privately-held Delaware corporation, with its principal place of business in New York. While in operation, Fantasy was principally a wholesale diamond business. Firestar owns 100% of the equity interests in Fantasy.

10.     Debtor Old AJ, Inc. (f/k/a A. Jaffe, Inc., f/k/a Sandberg & Sikorski Corp.) ("**Jaffe**") is a privately-held New York corporation, with its principal place of business in New York. While in operation, Jaffe was principally a bridal jewelry business.

11.     Synergies Corporation is a Delaware corporation that owns 95% of the equity interests in Jaffe and 100% of the equity interests in Group. Firestar Holdings Ltd., a Hong Kong company ("**Firestar Hong Kong**"), owns 100% of the equity interests in Synergies Corporation.

12.     Firestar International Limited (f/k/a Firestar International Private Limited, f/k/a Firestone International Private Limited, f/k/a Diamond 'R' Us) ("**FIL**") holds 100% of the equity interest in Firestar Hong Kong and is the ultimate holding company of numerous other Firestar entities (collectively, including the Debtors, Group, Synergies Corporation, Firestar Hong Kong, and FIL, the "**Firestar Entities**").

13.     At all relevant times, Modi owned or controlled approximately 94.88% of the equity interests in FIL and was a director of FIL. Upon information and belief, Modi is a citizen of India and traveled frequently to the United States, including the New York, to conduct business in New York through the Debtors and through other Firestar Entities.

14.     At all relevant times, Bhansali served as the sole director and CEO of each Debtor in New York and resided and continues to reside in New York.

15.     At all relevant times, Gandhi served as the Chief Financial Officer CFO of each Debtor in New York and resided and continues to reside in New York.

3

## FACTS

**Modi's Diamond Businesses**

16.    Modi entered the diamond business around 2000 through FIL, then known as Diamonds 'R' Us, which operated as a diamond trading company in India specializing in loose diamonds and gems for use in retailers' assembled products. In or about 2010, Modi entered the luxury retail business through one or more of the Firestar Entities and began to sell high-end finished jewelry he designed. Over time, Modi expanded his diamond and jewelry business, with retail, wholesale, and manufacturing locations in Antwerp, Armenia, Beijing, Belgium, Dubai, Hong Kong, India, Johannesburg, London, Macau, Moscow, Paris, and the United States.

17.    Modi, acting through the FIL, acquired Firestar (then known as Firestone, Inc.) in 2005, acquired a 95% interest in Jaffe (then known as Sandberg & Sikorski Corp.) in 2007, and incorporated Fantasy in 2012.

**The Punjab National Bank Fraud**

18.    From approximately early 2011 to early 2018 (the "**Relevant Period**"), Modi orchestrated and directed a scheme to obtain loans, credits, or other funds under false pretenses and without collateral from Punjab National Bank ("**PNB**"), a publicly-owned Indian bank majority owned by the central government of India, as described below (the "**PNB Fraud**").

19.    Modi and others he directed, acting through at least three entities under Modi's control—Diamonds 'R' Us, Solar Exports, and Stellar Diamonds—obtained from PNB Letters of Undertaking ("**LOUs**"), which are guarantees under which PNB allows its customers to obtain short-term credit from other Indian banks' foreign branches to engage in foreign import transactions into India without providing ordinarily-required collateral. Typically, upon presentation of an LOU, the foreign branch pays the exporter and seeks reimbursement from the LOU issuer, in this case PNB, who then charges its customer. However, in this case, the entities

4

under Modi's control who obtained the LOUs did not provide any collateral, and PNB failed to properly record the LOUs in its core banking system.

20.     PNB advanced amounts equal to over US$1 billion under LOUs for the benefit of entities under Modi's control against imports to India without the ordinarily-required collateral and, in some cases, generated by circular trading (also known as "round tripping"), a fraudulent practice whereby the same diamonds are exported from and re-imported back into India multiple times at varying and often inflated prices, in transactions involving various Firestar Entities and more than twenty foreign shell companies secretly controlled by Modi (the **"Shadow Entities"**) to give the appearance of multiple distinct transactions.

21.     Modi and others at his direction used the Shadow Entities to create the appearance that independent entities were engaging in transactions with the Firestar Entities.

22.     The Debtors' records reflect sales by the Debtors to Shadow Entities totaling approximately $214 million during the Relevant Period and cash transfers to and from the Debtors and the Shadow Entities totaling approximately $227 million during the seven-year period from 2011 and 2018.

23.     When a diamond was imported or re-imported into India through a circular trading transaction among the Firestar Entities or the Shadow Entities, was often connected to a Firestar Entity drawing funds from a foreign bank under a PNB-issued LOU.

24.     To facilitate the issuing of the LOUs and to prevent detection, Modi and others at his direction worked with two PNB employees, including Gokulnath Shetty, who authorized the issuance of the LOUs without securing collateral and without properly recording the LOUs in PNB's records.

25.     The PNB Fraud orchestrated by Modi has resulted in several investigations and criminal enforcement actions against Modi, Bhansali, and others by Indian governmental

5

authorities, including the Central Bureau of Investigation; the Directorate of Enforcement; the Income Tax Department; and the Serious Fraud Investigation Office. On or about March 12, 2019, the Indian government issued an extradition request to the government of the United Kingdom on the basis of an arrest warrant issued against Nirav Modi by an Indian Court. In response to that request, Modi was arrested in London on or about March 20, 2019 and is currently incarcerated in London.

26.     In his Declaration filed with this Court on February 28, 2018, referencing the revelation of the PNB Fraud in India, Bhansali stated under penalty of perjury:

> 40. The supply chain disruption and negative publicity have dramatically impaired the Debtors' business operations in the short term and have created a great deal of uncertainty and confusion in the market about the Debtors' ability to continue to operate their business as a going concern.
>
> 41. Without greater certainty and assurances, certain vendors have expressed a reluctance to continue doing business with the Debtors and certain customers have begun to explore moving certain of the Debtors' programs to other suppliers.
>
> 42. As such, the Debtors filed these Chapter 11 cases in an effort to preserve the going concern value of their businesses and effectuate a sale or other transaction that will provide the resources necessary to allow the Debtors' successful brands to continue to thrive.

27.     The PNB Fraud coordinated and overseen by Modi and others at his direction resulted in a total loss to PNB of exceeding US$1 billion. As a result of the PNB Fraud, PNB has asserted significant claims against the Debtors on the grounds that a substantial portion of the proceeds of the PNB Fraud were transferred to the Debtors.

**Debtors' Involvement in the PNB Fraud**

28.     At Modi's direction, the Debtors were involved in the PNB Fraud and were exporters and direct beneficiaries of at least six LOUs totaling $10,192,303. The Debtors also engaged in circular trading that facilitated the issuance and presentation of additional LOUs and the resulting payments to the Shadow Entities and to Firestar Entities.

6

29.     As one example, the Debtors exported the same 3.27 carat Fancy Vivid Yellow Orange Cushion Cut SI1 diamond three times and imported it once between August 8 and September 13, 2011, a period of five weeks. On August 8, 2011, Firestar (then Firestone, Inc.) sold the diamond to Fancy Creations Company, Ltd., a Shadow Entity for $1,098,802. Approximately three weeks later, Solar Exports, a Modi-controlled entity, exported the diamond to Firestar for $183,087 — approximately $900,000 less, although much closer to its actual value. Six days later, Firestar exported the diamond back to Fancy Creations Company, Ltd. for $1,156,043, now in excess of the original inflated price. Finally, two weeks later, Jaffe sold the diamond to World Diamond for $1,218,991, a Shadow Entity whose operations were managed by an employee of the Firestar Entities in India, Sandeep Mistry.

30.     As another example, later in 2011, the Debtors engaged in the circular trading of a diamond that was recorded as a 1.04 carat Fancy Intense Pink Emerald Cut SI2 diamond. The diamond appeared in the Debtors' records in three transactions within six weeks of each other and was valued at a different price each time, averaging $644,453 over the three purported transactions, well above the 2011 market value for such a diamond of $300,000 per carat. On information and belief, there was at most only one such diamond. The Debtors' records reflect a shipment of a diamond of this description on August 19, 2011, with an Indian Firestar Entity sending it to Firestar for $608,400. As with the 3.27 carat Fancy Vivid Yellow Orange Cushion Cut SI1, Sandeep Mistry sent shipping instructions and a spreadsheet accompanied by invoices created in India. Consistent with Mistry's instructions, Firestar sold it to SDC Designs LLC (on information and belief, a New York company with connections to Modi) for $642,200. Jaffe shipped a diamond with the same description one month later to Diamonds 'R' Us in India for $682,760.

7

31.     One of the purported transactions that is recorded as involving this 1.04 carat Fancy Intense Pink Emerald Cut SI2 diamond occurred in October 2011. On October 4, 2011, the diamond was among a package of twenty-six fancy-colored loose diamonds shipped from Jaffe to Diamonds 'R' Us in India. Diamonds 'R' Us sought an LOU from PNB for $1,921,079 to purchase the diamonds from Jaffe. Gokulnath Shetty, a PNB employee working with Modi, authorized the issuance of this LOU at the PNB Brady House branch. Shetty did not properly record the LOU in PNB's records, and Diamonds 'R' Us did not provide the ordinarily-required collateral to PNB for the LOU. PNB coordinated with its Hong Kong branch, which deposited money into PNB's Deutsche Bank nostro account in New York, New York. PNB paid Jaffe for the diamonds from the nostro account on October 13, 2011. On the same day, after receiving the $1,921,079 from the bank, Jaffe transferred $1,832,700 to Firestar Entities in India.

32.     At least six PNB LOUs were issued where a Debtor was the exporting entity and direct beneficiary of the LOU funds. The funds drawn under each of these LOUs were received by the Debtors and in each case were either returned to a Firestar Entity in India or used by the Debtors or Shadow Entities.

33.     Additionally, funds generated by many of the fraudulent LOUs went through the Debtors, which received the funds from one or more of the Shadow Entities.

**Involvement of Debtors' Directors and Officers in the PNB Fraud**

34.     At the direction of Modi, certain of Debtors' directors and officers participated in and advanced the PNB Fraud, including Bhansali and Gandhi.

**Mihir Bhansali**

35.     As director of the Debtors and the Debtors' CEO, and in coordination with or at the direction of Modi, Bhansali coordinated and directed fraudulent transactions among the

8

Debtors and Shadow Entities involving hundreds of millions of dollars. These transactions were integral to the PNB Fraud.

36.     Bhansali managed the Debtors' "house accounts," the accounts in which proceeds of loose diamond sales were segregated from regular sales accounts for purposes of computing commissions. The Debtors engaged in loose diamond sales primarily with Shadow Entities. The Debtors received approximately $155 million in cash transfers from Shadow Entities during the Relevant Period and paid approximately $72 million out to Shadow Entities. The vast majority of these transactions involved the purchase and sale of tens of millions of dollars-worth of loose diamonds per year, which is not consistent with Debtors' stated business purpose.

37.     At least in 2012, Jaffe maintained two sets of books and records: "core" financials, which did not include loose diamond transactions, and "regular" financials, which did, which reflected transactions executed to further the PNB fraud, and which existed to hide those transactions.

38.     Bhansali coordinated and directed a number of the circular transactions involving the Debtors. For example, in a 2012 email, Kurian Matthews, a Firestar Entity employee in Dubai, relayed a conversation he had with Bhansali in which they set up a circular transaction starting at Fantasy, going through Radashir Jewelry Co. Pvt. Ltd. (on information and belief, a Shadow Entity), FIL, and Firestar and ending back at Fantasy. The purpose was to "clear the old invoices of Radashir on FDC" because a bank was inquiring about the old invoices.

39.     Similarly, in December 2012, Bhansali and Kurian Mathews discussed wiring money to Radashir and back to the Debtors against Radashir's accounts payables to "use [the money] for NM [Modi]."

40.     In March 2016, Evelyn Kosiec, the Jaffe operations manager, asked Bhansali where to re-export loose diamonds, and an hour later she emailed Gandhi, "Mihir informed to ship this

to Eternal diamonds [a Shadow Entity] in Hong Kong, the same price, rounded to the nearest 5 120 day terms."

41.    Bhansali oversaw and directed the use of different sales and inventory practices for Debtors' transactions with Shadow Entities as compared to those used with retailer customers. For instance, each diamond or gem received by the Debtors for use in an ordinary retail transaction was unpacked, compared to its packing slip, scanned for quality control, and logged as "ready to ship." Goods received from Firestar Entities or Shadow Entities as part of the loose diamond transactions often were re-shipped within several days, often to the country from which they originated. Consistent with instructions from Firestar Global Entities, these goods were either re-shipped without being opened or, if they were opened, they were inventoried in bulk, not individually.

42.    Bhansali was intimately involved in and managed the transactions between the Debtors and the Shadow Entities. He had a copy on his office computer of a spreadsheet entitled "AR-AP (Jan'18)" with a document date in early February 2018. The spreadsheet identified payables and receivables as between each of the Modi-controlled entities and the Firestar Entities on the one hand, which were listed on the horizontal axis, and the Shadow Entities on the other hand, which were listed on the vertical axis. The spreadsheet tracks millions of dollars in accounts receivable and accounts payable balances between the Shadow Entities and Firestar Entities but did not list any customers known to be legitimate, foreign of otherwise.

43.    Many of the Shadow Entities directors were current or former employees of Firestar Entities. In addition, many Shadow Entity employees were current or former employees of Firestar Entities, which was reflected on the "AR-AP (Jan'18)" spreadsheet Bhansali had on his computer.

10

44.     Bhansali coordinated and directed the operations of various Shadow Entities. In fact, Bhansali, along with Modi, directed the establishment and controlled some of the Shadow Entities that engaged in the circular trading, including Empire Gems, Unique Diamond and Jewelry, Pacific Diamonds, Universal Fine Jewelry, Vista Jewelry, and Tri Color Gems.

45.     On September 7, 2011, Firestar Dubai employee Kurian Mathews forwarded an email to Bhansali containing fee quotes from accountants for proposed audits of two Hong Kong Shadow Entities, Auragems Company Ltd. and Fancy Creations Company Ltd. Mathews stated the fees may have been higher than Firestar Diamond in Hong Kong "due to the complexity of the transactions in these entities." Mathews then sought Bhansali's instruction as to "how to proceed further on this[.]"

46.     On February 4, 2013, Sridhar Krishnan, the manager of SDC Designs, LLC wrote to Bhansali and Modi partner Hemant Bhatt using personal email addresses. Krishman told Bhatt and Bhansali, "you should expect 1.4 million in Universal fze today. Please wire the same to A Jaffe." Two days later, Bhatt confirmed that Universal Fine Jewelry FZE had received the funds and that "Empire paid US $1,391,570 to A Jaffe value 05 Feb 13."

47.     On August 19, 2017, a manager of Universal Fine Jewelry FZE emailed Bhansali enclosing a profile of three Shadow Entities—Universal Fine Jewelry FZE, Empire Gems FZE, and Diagems Inc.—and asking Bhansali to "review and advice [sic]." The manager's email signature stated he was also the General Manager of Firestar Diamond in Dubai.

48.     Bhansali also oversaw and directed the operations of other Firestar Entities, often including minute details involving day-to-day operations. For example, on April 26, 2011, an employee of a Firestar Entity sought Bhansali's permission to make wire transfers from a Firestar Entity in Hong Kong to Firestar and Brilliant Diamonds. On September 14, 2017, a former Firestar employee asked for Bhansali's approval before changing the authorized signatory for Firestar

11

Hong Kong. On December 14, 2017, a request from a Dubai employee for a tablet computer was directed to Bhansali.

### Ajay Gandhi

49.     As CFO of the Debtors, Gandhi coordinated and directed transactions among the Debtors and Shadow Entities totaling hundreds of millions of dollars. These transactions were integral to the PNB Fraud.

50.     During the Relevant Period, Gandhi controlled the finances of the Debtors. He had authority to approve loose diamond transactions among the Debtors and the Shadow Entities totaling hundreds of millions of dollars.

51.     Gandhi did not distinguish the relationship of the Shadow Entities to the Firestar Entities from the relationship of the Debtors to the Firestar Entities and directed the use of the Debtors' funds for payment of expenses of the Shadow Entities. For example, on March 18, 2014, Ajay Gandhi directed $150,000 to be wired from Firestar's account to Unique Diamond & Jewelry, a purportedly-independent entity that was in fact a Shadow Entity, for the payment of Unique's back office expenses for the period of October 2013 to March 2014. Similarly, on February 15, 2015, Gandhi emailed two Firestar India back office employees and instructed them to pay "$300,000 from Firestar Diamond, Inc to Eternal Diamond. (Back office Expense)" for this Shadow Entity.

52.     Additionally, on January 19, 2010, Gandhi stated in his request for an aging report from the Firestar Entities' back office in India, "You can exclude affiliates such as FIPL [FIL], FS, FC, JS, Sandberg, Unique[,]" thereby referring to Unique Diamond & Jewelry as an affiliate of the Debtors.

53.     On May 5, 2017, Gandhi sent a list of Shadow Entities to Altamash Ansari, a back office employee in India, and stated "Use names from attached for Eternal, Pacific & Tri Color. (Do not share this pdf with anyone.)."

54.     Gandhi had access to the books of various Shadow Entities. On August 6, 2013, Gandhi sent an email to Bhavesh Patel, a Firestar back-office employee in India, attaching a spreadsheet titled "FS-Inc from Kurian June 2013." The spreadsheet contained purchase and sales ledgers of four Shadow Entities—Fancy Creations Company Limited, Brilliant Diamonds Limited, Eternal Diamond Limited and Unique Diamond & Jewelry—showing these entities' accounting for transactions with Firestar. There appears to be no legitimate reason why Gandhi would be in possession of the internal books and records of multiple Shadow Entities, absent having control or orchestration of their records.

55.     On June 10, 2013, to hide their involvement in the PNB Fraud, Modi's personal assistant instructed Gandhi to communicate with her regarding Shadow Entities only on Gmail or Panemail, a program that automatically deletes messages, rather than on the Debtors' regular email system.

56.     The PNB Fraud coordinated and directed by Modi, Bhansali, and Gandhi has resulted in substantial creditor claims against the Debtors, including a substantial claim by PNB, and caused the collapse and resulting loss of value of the Debtors' and their businesses.

**Modi, Bhansali and Gandhi Coordinated their Actions**

57.     Modi coordinated and directed the execution of the PNB Fraud with senior officers and directors of the Debtors, including Bhansali and Gandhi.

58.     Throughout the Relevant Period, Modi sent hundreds of emails to Bhansali and Gandhi, had numerous telephone conversations with them, and met with them at the Debtors' premises and elsewhere. Through many of these emails, telephone conferences, and visits, Modi directed Bhansali and Gandhi and exerted total ultimate control over Debtors' affairs, including in regard to day-to-day details. One means of Modi's omnipresent oversight and control over the

Debtors consisted of the dozens of flash reports regarding the Debtors' financials that he received throughout the Relevant Period.

59.     Examples from a short period in 2009 illustrate Modi's total ultimate control over the Debtors. On February 22, 2009, Modi conveyed his preferences to Bhansali regarding which of the Debtors should contribute to a charity dinner. On June 10, 2009, Modi wrote to Gandhi, "Please confirm that shipments made after bankruptcy to Robbins and Western Stone are not in Tab 3 [of the spreadsheet.]" On March 17, 2009, Modi instructed Bhansali and Gandhi, "Pls don't pay further draws/reimbursement to A.Jaffe [sic] salespeople unless I approve. Pls confirm[.]" And on March 20, 2009, Modi requested additional information from Gandhi regarding the Jaffe medical plan and the legality of implementing a method to decrease the medical costs. On June 8, 2009, upon reviewing Jaffe's accounts receivable, Modi instructed Gandhi, "If [the customers] always have been late, we should analyze their business prospects on a going forward basis." On June 17, 2009, Modi weighed in on an "Inventory Reduction Plan" for Jaffe, and on July 9, 2009, Bhansali wrote to Modi, "This was the summary of our plan for Jaffe, that Sam, you and I finalized with Ajay the Friday evening in your house." On July 15, 2009, Modi reviewed a Jaffe budget and commented, "I have deleted some line items[,]" and instructed Gandhi, "When planning, pls review moving to a 4 day week for Jaffe and/or salary cuts . . . for remaining people." On August 14, 2009, Modi instructed Gandhi to respond to an auditor's question with "4.2 million" as the inventory number for Jaffe.

60.     Examples from a short period in 2015 show Modi's total ultimate control over the Debtors persisted throughout the Relevant Period. On January 5, 2015, Gandhi wrote to Modi, "Based on my cash flow, I can pay $ 3 million in India in January 2015. Please let me know if I can ask for a list from Manish to pay India[,]" to which Modi responded, "Yes[.]" Similarly, on February 9, 2015, Gandhi told Modi, "February cash flow has improved in the last week. I have

14

$ 2.0 m of Borrowing Cushion. Please let me know if I should pay India - $ 1.5 m this month after keeping $ 500k as cushion[,]" to which Modi responded, "Pls pay $2 m; don't keep cushion." Then, on February 19, 2015, Gandhi told Modi, "Received funds from HK. Now I can pay additional $ 1.5 m this month [to India] this month. Can I ask Manish for a list to pay?" to which Modi responded, "Yes[.]" And on March 2, 2015, Gandhi relayed to Modi that, "Based on my cash flow, I can pay $ 3 m to India in March 2015. Should I ask Manish for a list?" to which Modi responded, "Yes[.]"

61. Furthermore, Modi treated Gandhi in some respects as a personal accountant. For instance, on February 28, 2017, Modi directed Gandhi to prepare "all financial related parts" of Modi's personal application to live in the River House in New York City, a process which included gathering information concerning Modi's wife, Ami Modi.

62. Modi, Bhansali, and Gandhi communicated frequently concerning the PNB Fraud and to advance the PNB Fraud. For instance, on August 14, 2009, Modi directed Gandhi to make payments totaling $2,293,326 to Shadow Entities Brilliant Diamonds Ltd. and Diagem Inc. On June 16, 2010, Modi instructed Gandhi, "Unique [a Shadow Entity] has wired $250,000 today to Synergies. Please wire to the account Mehul bhai wants."

63. On October 21, 2010, in furtherance of a circular trade, Modi and Gandhi communicated by email about the shipment of a diamond to a Shadow Entity. Modi stated, "send the 70 ct vivid yellow to Firestone Dubai @51,500 and not Firestone HK." Gandhi responded, "Firestone, Dubai confirmed (Not Unique)[,]" to which Modi clarified, "Sorry Unique[,]" in reference to the Shadow Entity. Gandhi responded with "Glad I asked!!!"

64. Modi, Bhansali, and Gandhi coordinated their communications to prevent detection of the PNB Fraud. For instance, on September 7, 2011, in addressing an inquiry from Standard Chartered Bank regarding transactions with certain Shadow Entities, which the bank

15

believed were independent customers, Gandhi represented that these entities were not in fact customers but that Firestar would buy large diamonds from them as vendors. Gandhi explained, "sometimes these goods need to be returned but due to the terms of the original sale, the vendors instruct us to ship these goods to another companies, that they select who are not located in India. We record these transfers as a reduction to purchases and an increase to accounts receivable at the original purchase cost of the diamonds/ jewelry." Bhansali, who was included on the email from Gandhi, forwarded this response to Modi. Modi then responded, noting "As SC is a common bank in India, Antwerp and NY. It might be a good idea that Ajay and you discuss all responses [sic]."

**Modi Used the Debtors' Funds to Purchase Personal Assets**

65.     Just as he orchestrated the circular trades at the heart of the PNB Fraud, Modi also orchestrated transactions to divert assets from the PNB Fraud and the Debtors for the benefit of himself and his family.

### The Ithaca Trust

66.     On August 23, 2017, Modi's sister Purvi Mehta ("**Mehta**") established the Ithaca Trust, an irrevocable trust for the benefit of Modi's wife, Ami Modi, and their three children. The Ithaca Trust's investment advisor was Abhay Dinesh Javeri, Ami Modi's brother. The trustee was Commonwealth Trust Corporation ("**Commonwealth**"). Attorneys from the law firm of Day Pitney LLP ("**Pitney**") were the principal drafters of the Ithaca Trust agreement and served as advisors for the creation of the trust.

67.     Ostensibly, the Ithaca Trust was funded with $23 million in cash from Mehta, but Commonwealth's records show that Modi was behind the initial funding. In an August 24, 2017 email regarding the Ithaca Trust's formation, Modi informed Pitney attorneys that "[t]he funds are in place with Purvi [Mehta]. Please let me know account details to wire the money . . . ."

16

68.     Commonwealth's records also show that those funds Modi placed with Mehta to establish the Ithaca Trust were funneled to Mehta from the PNB Fraud. Mehta revealed in disclosure forms to Commonwealth that she funded the Ithaca Trust using "dividends" she received from Fine Classic FZE, a Shadow Entity of which Mehta was the 100% owner. Like the other Shadow Entities, Fine Classic FZE operated as part of the PNB Fraud.

69.     Further, throughout 2017, tens of millions of dollars passed between Ami Modi's HSBC account and Mehta's Bank of Singapore account. A bank statement for Ami Modi for September 2017 shows $31,506,701 disbursed, almost all of which went to Mehta.

### The Ritz Carlton Apartment

70.     The purpose of the Ithaca Trust was to hold Manhattan real estate for Modi and his family. The initial $23 million in trust funding was used to purchase an apartment at the Ritz Carlton residences, 50 Central Park South, Unit 33, New York, New York (the "**Ritz Carlton Apartment**") for the sole use of Modi and his family.

71.     On August 30, 2017, Modi emailed Pitney attorneys and other professionals informing them that $23 million had been wired from Mehta to Commonwealth and directing Commonwealth to further wire the funds to attorneys at Katz Matz to execute the purchase of the Ritz Carlton Apartment. Mehta was not on the email thread.

72.     That same day, Katz Matz attorney Steven Matz emailed Modi and others with instructions for the September 7, 2017 closing of the Ithaca Trust's purchase of the Ritz Carlton Apartment. Once again, Mehta was not on the email thread.

73.     On September 7, 2017, the Ithaca Trust closed on the purchase of the Ritz Carlton Apartment. The Ithaca Trust paid $25 million to the seller through Central Park South 50 Properties LLC ("**CPS50**"), an entity the Ithaca Trust owns. Mehta signed the contract of sale. Of the purchase price, $2.5 million was wired from an Ami Modi HSBC account into an escrow

account at the Katz Matz law firm, which handled the sale. The remaining $23 million was paid with funds that Modi had funneled to Mehta from the PNB Fraud.

### The Essex House Apartment

74.    Modi also used the Ithaca Trust to obtain real estate that previously had been owned indirectly by Firestar.

75.    On February 15, 2007, Central Park Real Estate LLC ("**CPRE**") was formed under Delaware law. CPRE was owned by Firestar until approximately the end of 2009, when it was transferred to Group.

76.    On March 26, 2007, CPRE purchased an apartment at the Essex House, 160 Central Park South (the "**Essex House Apartment**"); Bhansali signed the deed on behalf of CPRE. The Essex House Apartment was also used by Modi and as a personal residence.

77.    Based on direction from Modi and Gandhi, Firestar funded $2 million of the approximately $5 million purchase price of the Essex House Apartment. The balance was financed by an approximately $3 million mortgage from HSBC. Firestar also made at least $856,335 of the monthly payments on the mortgage between 2011 and 2018 and paid JW Marriott Essex House NY $15,828.35 in January 2018, after CPRE had been transferred from Group to the Ithaca Trust.

78.    On December 5, 2008, Modi emailed Bhansali and Gandhi that, "*I bought Essex House at $4,995,000 and took a loan of $3 million*" (emphasis added). Modi and Gandhi then discussed by email, with Bhansali copied, the fact that Firestar had funded part of the Essex House purchase.

79.    In March 2017, Gandhi emailed Modi that HSBC requested more information on the ownership structure of CPRE "going up thru the ladder to FILP, India[,]" including the "Source of Wealth" of "Purvi Modi[.]" Gandhi relayed that he "avoided giving these [sic]

18

information and told them that we may do restructuring of Central Park and may change ownership etc." but that the "only way, we can avoid is only if we pay-off the $ 3 m mortgage in next few months." Modi responded, "There will be a change in ownership in May end so better to explain that."

80.     On December 4, 2017, by email, Modi told Gandhi to pay off the HSBC mortgage in full. On December 5, 2017, Firestar paid off the approximately $3 million balance on the Essex House Apartment mortgage, using funds from Jaffe and Fantasy as well as from its own account and from a Firestar HSBC line of credit.

81.     On December 15, 2017, one of Modi's accountants emailed Modi with three potential options for minimizing transfer taxes on "the movement of CPRE." The first option was having Modi purchase CPRE directly from Group, the second was having Ami Modi purchase CPRE directly, and the third was using the Ithaca Trust to make the purchase by having Mehta contribute more cash to the trust. The accountant explained that, "since [Modi] prefer[red] to fast track the transaction," the existing trust could be used and then the trustee could "move the LLC to another trust in due time."

82.     Modi chose the third option. On December 29, 2017, the Ithaca Trust purchased CPRE from Group for $6 million. On January 2, 2018, Mehta transferred $6 million to the Commonwealth Trust Company, as trustee of the Ithaca Trust. The Ithaca Trust then wired $6 million to Group's HSBC account for the purchase of CPRE.

83.     By this time, Commonwealth had flagged the Ithaca Trust as a "high risk trust" and internally expressed concern about serving as trustee. On March 13, 2018, Commonwealth emailed Pitney attorneys to inform them that its trust committee had decided that Commonwealth should resign as trustee of the Ithaca Trust.

19

84. On May 25, 2018, Nehal Deepak Modi, the protector of the Ithaca Trust and Modi's brother, appointed Trident Trust Company (South Dakota) Inc., as successor trustee of the Ithaca Trust.

**Events After the Petition Date**

85. On February 28, 2018, while still serving as the Debtors' CEO, Bhansali submitted to this Court a declaration under penalty of perjury that contained material falsehoods, including that the Shadow Entities were unaffiliated unsecured creditors of the Debtors. In addition, during the early weeks of the chapter 11 cases, Bhansali, as the Debtors' CEO, made other representations formally and informally, explicitly and implicitly, to this Court, to the United States Trustee, and to creditors, regarding the Debtors' involvement in the PNB Fraud. Bhansali led the bankruptcy court and other parties to believe that the Debtors were not involved in the PNB Fraud and that they were innocently caught up in an overseas matter. For example, at the outset of the cases Bhansali declared under penalty of perjury: "The Debtors and their dedicated employees have worked tirelessly over the past week or so to … reassure their vendors and customers that they had no involvement in the alleged wrongful conduct."

86. Modi was involved in the Debtors' bankruptcy filings. Bhansali and the Debtors' counsel had a conversation with Modi on February 24, 2018, two days pre-petition, concerning the decision to file the chapter 11 cases. In addition, Modi had at least one conversation with Bhansali between the Petition Date and March 15, 2018. The revelation of this conversation ultimately derailed the going-concern sale process of all or part of the Debtors' businesses. The postponement of the sale process resulted in a decrease in value from the original sales price of Jaffe's assets to the ultimate sales price for those assets approximately two months later.

19-01102-shl    Doc 4    Filed 03/27/19    Entered 03/27/19 16:18:23    Main Document
Pg 27 of 50

## CLAIMS FOR RELIEF

## COUNT 1

### Breach of Fiduciary Duty
### (Nirav Modi)

87.     Plaintiff restates and re-alleges paragraphs 1 through 86 of this Complaint as though fully set forth herein.

88.     Through numerous emails, telephone conversations with Bhansali and Gandhi, among others, and visits to the Debtors' offices, Modi directed the Debtors to participate in the PNB Fraud, including by making payments to the Shadow Entities and other Firestar Entities, exercised dominion and ultimate total control over the Debtors and their directors and officers, and was the ultimate authority for the Debtors.

89.     As a result of Modi's dominion and total control over the Debtors and as the ultimate authority for the Debtors, Modi was a *de facto* director, officer, or person in control of the Debtors.

90.     As a *de facto* director, officer, or person in control of the Debtors, Modi owed fiduciary duties of due care and loyalty to the Debtors and was required to discharge his duties in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner he reasonably believed to be in the best interests of the Debtors.

91.     Modi breached his fiduciary duties as a *de facto* director, officer, or person in control of the Debtors by, among other things, (a) directing the Debtors and their *de jure* directors and officers to engage in the PNB Fraud, including by entering into circular trading transactions with Shadow Entities and Firestar entities, in violation of his duties of due care, loyalty, and good faith and (b) directing the Debtors and their officers to use corporate assets to acquire properties

21

for the personal benefit of Modi and his family, also in violation of his duties of due care, loyalty, and good faith.

92.     Modi's breaches of fiduciary duty, including his breaches of the duties of due care, loyalty, and good faith, proximately caused the Debtors to suffer injury by, among other things, increasing the creditor claims against the estate and causing the collapse and resulting loss of value of the Debtors' and their businesses.

## COUNT 2

### Breach of Fiduciary Duty
### (Mihir Bhansali and Ajay Gandhi)

93.     Plaintiff restates and re-alleges paragraphs 1 through 92 of this Complaint as though fully set forth herein.

94.     As a director and officer of the Debtors, Bhansali owed fiduciary duties of due care and loyalty to those entities and was required to discharge his duties in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner he reasonably believed to be in the best interests of the Debtors.

95.     Bhansali breached his fiduciary duties by, among other things, (a) allowing Modi to usurp Bhansali's management responsibilities and decision-making authority, in violation of his duty of care, (b) causing the Debtors to engage in the PNB Fraud, including by entering into circular trading transactions with Shadow Entities and Firestar entities, in violation of his duties of due care and loyalty, and (c) causing the Debtors to expend corporate assets to acquire properties for the personal benefit of Modi and his family, in violation of his duties of due care and loyalty.

96.     As an officer of the Debtors, Gandhi owed fiduciary duties to those entities and was required to discharge his duties in good faith, with the care an ordinarily prudent person in

22

a like position would exercise under similar circumstances, and in a manner he reasonably believed to be in the best interests of the Debtors.

97.     Gandhi breached his fiduciary duties by, among other things, (a) allowing Modi to usurp Bhansali's management responsibilities and decision-making authority, in violation of his duty of care, (b) causing the Debtors to engage in the PNB Fraud, including by entering into circular trading transactions with Shadow Entities and Firestar entities, in violation of his duties of due care and loyalty, and (c) causing the Debtors to expend corporate assets to acquire properties for the personal benefit of Modi and his family, in violation of his duties of due care and loyalty.

98.     The breaches of fiduciary duty by Bhansali and Gandhi proximately caused the Debtors to suffer injury by, among other things, increasing the creditor claims against the estate and causing the collapse and resulting loss of value of the Debtors' and their businesses.

## COUNT 3

### Aiding and Abetting Breach of Fiduciary Duty
### (Nirav Modi)

99.     Plaintiff restates and re-alleges paragraphs 1 through 98 of this Complaint as though fully set forth herein.

100.    In the alternative to Count 1 above, assuming (but not admitting) that Modi did not owe a fiduciary duty to the Debtors, Modi aided and abetted breaches of fiduciary duties by the *de jure* directors and officers of the Debtors, including Bhansali and Gandhi.

101.    As alleged in Count 2 above, Bhansali—as director and officer of the Debtors—and Gandhi—as officer of the Debtors—owed fiduciary duties to the Debtors and breached those fiduciary duties.

23

102.    Modi knew that that Bhansali and Gandhi had fiduciary duties as directors and officers of the Debtors and knew they were breaching their fiduciary duties because, among other things, (a) Modi communicated with them about transactions between the Debtors and Shadow Entities, and (b) Modi communicated with them about expending corporate funds on personal assets for Modi and his family.

103.    Modi induced, participated, and assisted the breaches of fiduciary duties by Bhansali and Gandhi by, among other things, (a) directing Bhansali and Gandhi to engage in the PNB fraud, including by entering into circular trading transactions with Shadow Entities and Firestar entities, and (b) directing Bhansali and Gandhi to expend corporate assets to acquire properties for the personal benefit of Modi and his family.

104.    The breaches of fiduciary duty by Bhansali and Gandhi, aided and abetted by Modi, proximately caused the Debtors to suffer injury by, among other things, increasing the creditor claims against the estate and causing the collapse and resulting loss of value of the Debtors' and their businesses.

## COUNT 4

### Corporate Waste
### (Nirav Modi)

105.    Plaintiff restates and re-alleges paragraphs 1 through 104 of this Complaint as though fully set forth herein.

106.    As a *de facto* director, officer, or person in control of the Debtors, Modi had the duty to the Debtors to preserve and protect their assets from undue waste or loss.

107.    Modi committed waste of the Debtors' assets by directing the Debtors and their officers to use corporate assets to acquire properties for the personal benefit of Modi and his family.

24

108. The corporate waste committed by Modi proximately caused the Debtors to suffer injury by losing the millions of dollars spent for the personal benefit of Modi and his family.

## COUNT 5

### Corporate Waste
### (Mihir Bhansali and Ajay Gandhi)

109. Plaintiff restates and re-alleges paragraphs 1 through 108 of this Complaint as though fully set forth herein.

110. As a director and officer of the Debtors, Bhansali had the duty to the Debtors to preserve and protect their assets from undue waste or loss.

111. Bhansali committed waste of the Debtors' assets by directing the Debtors and their officers to use corporate assets to acquire properties for the personal benefit of Modi and his family or by facilitating or permitting such use.

112. As an officer of the Debtors, Gandhi had the duty to the Debtors to preserve and protect their assets from undue waste or loss.

113. Gandhi committed waste of the Debtors' assets by directing the Debtors and their officers to use corporate assets to acquire properties for the personal benefit of Modi and his family or by facilitating or permitting such use.

114. The corporate waste committed, facilitated, or permitted by Bhansali and Gandhi proximately caused the Debtors to suffer injury by losing the millions of dollars expended for the personal benefit of Modi and his family.

COUNT 6

**Racketeering Influenced Corrupt Organizations Act ("RICO")**
**18 U.S.C. § 1962(c)**
**(Nirav Modi, Mihir Bhansali, Ajay Gandhi)**

115.    Plaintiff restates and re-alleges paragraphs 1 through 114 of this Complaint as though fully set forth herein.

116.    Defendants Modi, Bhansali, and Gandhi are each a "person" capable of holding legal or beneficial interest in property within the meaning of 18 U.S.C. § 1962(c) and 18 U.S.C. § 1961(3).

117.    Defendants Modi, Bhansali, and Gandhi each violated 18 U.S.C. § 1962(c) by their respective acts, described in the prior paragraphs and as further described below.

118.    Defendants Modi, Bhansali, and Gandhi each had the specific intent to violate 18 U.S.C. § 1962(c) and to commit each underlying predicate act alleged below.

119.    Defendants Modi, Bhansali, and Gandhi each committed at least two predicate acts of racketeering, as more specifically alleged below. The acts of racketeering were not isolated; rather, they were related in that they had the same or similar purpose and result, participants, victims, or method of commission. Further, the acts of racketeering have been continuous, spanning the period from at least early 2011 to early 2018.

### The RICO Enterprise

120.    Defendants Modi, Bhansali, and Gandhi, together with all Modi owned or controlled entities, form an association-in-fact engaged in and affecting interstate and foreign commerce for a common and continuing purpose of formulating and implementing a common scheme to defraud PNB for the Defendants' personal enrichment through a pattern of fraud, lies, deceit, and corruption (hereinafter the "**RICO Enterprise**").

26

121.    At all relevant times, Defendants Modi, Bhansali and Gandhi each were employed by or associated with the RICO Enterprise, and each conducted or participated, directly or indirectly, in the conduct of the RICO Enterprise's affairs through a pattern of racketeering activity.

122.    The Rico Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which the Defendants engage.

123.    The RICO Enterprise, as an association-in-fact, constitutes an "enterprise" within the meaning of 18 U.S.C. § 1961(4), and it was or is engaged in, and its activities affected, interstate and foreign commerce.

124.    The RICO Enterprise's repeated, continuous, and flagrant violations of federal criminal law constitute a "pattern of racketeering activity" in violation of RICO, 18 U.S.C. § 1961, *et seq.*

125.    The RICO Enterprise's common purpose came into existence no later than early 2011, when Defendants Modi, Bhansali, Gandhi implemented a scheme to defraud PNB by fraudulently obtaining LOUs by exploiting the web of Shadow Entities and other Modi owned or controlled entities.

126.    Defendants Modi, Bhansali, and Gandhi are central and controlling figures in the RICO Enterprise, have been responsible for oversight of the scheme to defraud PNB, and have directed other conspirators to take actions necessary to accomplish the overall aims of the RICO Enterprise.

### The Pattern of Racketeering Activity

127.    The RICO Enterprise, as conducted and controlled by Defendants Modi, Bhansali, and Gandhi, engaged in a pattern of racketeering activity, as defined by 18 U.S.C. § 1961(1) and

27

(5), consisting of multiple acts of racketeering by members of the enterprise that are interrelated, not isolated, and perpetrated for the same or similar purposes by the same persons.

**Predicate Acts: Mail and Wire Fraud, Violations of 18 U.S.C. § 1341, 1343**

128.    The RICO Enterprise's pattern of racketeering included mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343.

129.    The RICO Enterprise, as conducted and controlled by Defendants Modi, Bhansali, and Gandhi, engaged in a criminal scheme to defraud PNB, launder the fraudulently procured funds, and enrich the Defendants.

130.    In furtherance of their scheme, the RICO Enterprise, as conducted and controlled by Defendants Modi, Bhansali, and Gandhi, willfully and knowingly transmitted, or caused to be transmitted, by means of (1) causing matters and things to be placed in any post office or authorized depository, or deposited or caused to be deposited matters or things to be sent or delivered by a private or commercial interstate carrier or (2) by means of wire communications in interstate or foreign commerce, writings, signs, signals, pictures, and sounds, including without limitation the following:

   a.    The shipping in August and September of 2011 of a purported 3.27 carat Fancy Vivid Yellow Orange Cushion Cut SI1 diamond;

   b.    The shipping in October 2011 of a purported 1.04 carat Fancy Intense Pink Emerald Cut SI2 diamond;

   c.    An August 14, 2009, email communication from Modi to Ghandi in which Modi directed Gandhi to make payments totaling $2,293,326 to Shadow Entities Brilliant Diamonds Ltd. and Diagem Inc.;

   d.    A June 16, 2010, email communication in which Modi instructed Gandhi, "Unique [a Shadow Entity] has wired $250,000 today to Synergies. Please wire to the account Mehul bhai wants[;]"

   e.    An October 21, 2010, email communication in which Modi and Gandhi discussed the shipment of a diamond to a Shadow Entity;

28

f.   A September 7, 2011, email communication in which Modi, Bhansali, and Gandhi coordinated their communications to prevent detection of the PNB Fraud;

g.   A November 20, 2012, email communication between Bhansali, Gandhi, and Kurian Matthews in which Bhansali instructed Gandhi to cycle approximately $750,000 from Fantasy through FIL and Firestar and back to Fanstasy to clear old invoices drawing unwanted attention from bankers;

h.   A March 18, 2014, email communication in which Gandhi directed $150,000 be transferred from Firestar to Unique Diamond & Jewelry;

i.   A February 15, 2015, email communication in which Gandhi directed $300,000 be transferred from Firestar to Eternal Diamond;

j.   All wire transfers involving funds obtained as a result of the PNB Fraud, including, but not limited to:  the wire transfer of $23 million from Mehta's bank account for the creation of the Ithaca Trust; the wire transfer on or about September 7, 2017, of $25 million from CPS50 to purchase the Ritz Carlton Apartment; the wire transfers of $2.5 million from Ami Modi's HSBC account and of $23 million from Mehta's bank account to fund CPS50; the wire transfer on January 2, 2018, of $6 million from Mehta's bank account to Commonwealth Trust Company for the purchase of CPRE.

131.   The use of interstate and international mail and wires to connect this international racketeering conspiracy was foreseeable.

132.   Accordingly, the RICO Enterprise, as conducted and controlled by Defendants Modi, Bhansali, and Gandhi, committed numerous violations of mail and/or wire fraud in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1343.

133.   By enabling, facilitating, and promoting the PNB Fraud, the RICO Enterprise's violations of 18 U.S.C. §§ 1341 and 1343 directly and proximately caused injury to each Debtor's business and property by destroying each Debtor's going-concern value and rendering each Debtor insolvent.

29

**Predicate Acts: National Stolen Property Act, Violations of 18 U.S.C. §§ 2314, 2315**

134.    The RICO Enterprise's pattern of racketeering included numerous violations of the National Stolen Property Act, 18 U.S.C. §§ 2314, 2315.

135.    On numerous occasions during the Relevant Period, the RICO Enterprise, as conducted and controlled by Defendants Modi, Bhansali, and Gandhi, willfully and knowingly transported, transmitted, or transferred in interstate or foreign commerce—or received, possessed, concealed, stored, bartered, sold, disposed of, or pledged as security for a loan—goods, wares, merchandise, securities, or money that crossed an interstate or international boundary after being stolen, converted, or taken by fraud (the "**Stolen Property Transfers**"), including without limitation:

a.    On March 8, 2011, Firestar received $1,863,220.65 in fraudulently procured LOU funds from PNB's "nostro" account at the New York branch of Deutsche Bank Trust Co. Americas (the "**PNB Nostro Account**"). The applicable LOU was fraudulently obtained by FIL.

b.    On May 6, 2011, Firestar received $1,858,183.50 in fraudulently procured LOU funds from the PNB Nostro Account. The applicable LOU was fraudulently obtained by Solar Exports.

c.    On August 22, 2011, Firestar received $1,499,700.75 in fraudulently procured funds from the PNB Nostro Account. The applicable LOU was fraudulently obtained by FIL.

d.    On October 4, 2011, Firestar received $1,803,213.75 in fraudulently procured LOU funds from the PNB Nostro Account. The applicable LOU was fraudulently obtained by FIL.

e.    Also on October 4, 2011, Firestar separately received $1,246,730.60 in fraudulently procured funds from the PNB Nostro Account. The applicable LOU was fraudulently obtained by FIL.

f.    On October 13, 2011, Jaffe received $1,921,043.65 in fraudulently procured LOU funds from the PNB Nostro Account. The applicable LOU was fraudulently obtained by Diamonds 'R' Us.

g.    On February 7, 2013, Firestar received $931,965 in fraudulently procured LOU funds from Pacific Diamonds FZE, a Shadow Entity located in the United Arab Emirates. These funds were derived

from an LOU that was fraudulently obtained by Diamonds 'R' Us in which Pacific Diamonds FZE was the exporter.

h.   On February 11, 2013, Firestar received $980,805 in fraudulently procured LOU funds from Pacific Diamonds FZE. These funds were derived from the same LOU fraudulently obtained by Diamonds "R" Us in which Pacific Diamonds FZE was the exporter.

i.   On March 19, 2013, Firestar received $191,501.35 in fraudulently procured LOU funds from Auregem Company Ltd., a Shadow Entity located in Hong Kong. These funds were derived from an LOU that was fraudulently obtained by Diamonds 'R' Us in which Auragem Company Ltd. was the exporter.

j.   On March 19, 2013, Firestar received $236,078.45 in fraudulently procured LOU funds from Fancy Creations Company Ltd., a Shadow Entity located in Hong Kong. These funds were derived from the same LOU referenced in subparagraph (i) above

k.   On May 6, 2013, Firestar received $21,393.98 in fraudulently procured LOU funds from Fancy Creations Company Ltd. These funds were derived from an LOU that was fraudulently obtained by Stellar Diamonds.

l.   On March 27, 2015, Fantasy received $1,522,451 in fraudulently procured LOU funds from Pacific Diamonds FZE. That same day, Fantasy transferred these funds to Firestar.

m.   On May 3, 2016, Firestar received $399,962 in fraudulently procured LOU funds from Tri Color Gems FZE, a Shadow Entity located in the United Arab Emirates. These funds were derived from an LOU that was fraudulently obtained by Solar Exports in which Tri Color Gems FZE was the exporter.

n.   On December 19, 2016, Firestar received $599,972 in fraudulently procured LOU funds from Pacific Diamonds FZE. These funds were derived from an LOU that was fraudulently obtained by Stellar Diamonds in which Tri Color Gems was the exporter.

o.   On December 6, 2012, Fantasy executed a security agreement in favor of HSBC Bank USA pledging substantially all of its assets— at least some of which were traceable to the fraudulently procured LOU funds—as collateral for a line of credit issued by HSBC Bank USA. Gandhi executed the security agreement in his capacity as chief financial officer of Fantasy. Bhansali signed as a witness to the security agreement in his capacity as president of Fantasy.

31

p.   On December 12, 2012, Firestar and Fantasy each executed a security agreement in favor of Israel Discount Bank of New York pledging substantially all of their respective assets—at least some of which were traceable to the fraudulently procured LOU funds—as collateral for a line of credit issued by Israel Discount Bank of New York. Gandhi executed each security agreement in his capacity as chief financial officer for Firestar and Fantasy, respectively.

136.   For each Stolen Property Transfer, the RICO Enterprise, through Defendants Modi, Bhansali, or Gandhi, knew that the money or property transferred, received, or disposed of had been stolen, converted, or taken by fraud.

137.   Each Stolen Property Transfer involved money or property having a value of $5,000 or more.

138.   Accordingly, the RICO Enterprise, as conducted and controlled by Defendants Modi, Bhansali, and Gandhi, committed numerous violations of the National Stolen Property Act, 18 U.S.C. §§ 2314, 2315.

139.   By enabling, facilitating, and promoting the PNB Fraud, the RICO Enterprise's violations of 18 U.S.C. §§ 2314 and 2315 directly and proximately caused injury to each Debtor's business and property by destroying each Debtor's going-concern value and rendering each Debtor insolvent.

**Predicate Acts: Money Laundering, Violations of 18 U.S.C. §§ 1956, 1957.**

140.   The RICO Enterprise's pattern of racketeering included numerous acts of money laundering in violation of 18 U.S.C. §§ 1956, 1957.

141.   The PNB Fraud constitutes an offense against India, a foreign nation, involving fraud, or a scheme or attempt to defraud, against PNB, a foreign bank.

142.   Certain of the financial transactions underlying or comprising the PNB Fraud occurred, in whole or in part, in the United States in that certain of the LOU transactions

32

underlying or comprising the PNB Fraud involved the movement of funds by wire or other means from the PNB Nostro Account at the New York branch of Deutsche Bank Trust Company Americas to the Debtors' bank accounts at the New York branches of HSBC Bank USA and Israel Discount Bank of New York. Additionally, the RICO Enterprise's circular trading of the same diamonds and other goods among Modi owned or controlled entities — including the Debtors and their U.S. affiliates — for the purpose of artificially inflating the volume of imports  to secure additional LOUs and obtaining liquidity to repay other LOUs occurred, in part, within the United States.

143.     The money, diamonds, and other goods and property derived from or obtained or retained, directly or indirectly, through the PNB Fraud constitute the proceeds of an "unlawful specified activity" within the meaning of 18 U.S.C. § 1956(c)(7)(B)(iii).

144.     On numerous occasions during the Relevant Period, the RICO Enterprise, as conducted and controlled by Defendants Modi, Bhansali, and Gandhi, willfully and knowingly conducted financial transactions involving the proceeds of the PNB Fraud (the "**Money Laundering Transactions**"), including without limitation:

    a.   Each of the transactions identified in paragraphs 135(a)-(p) above.

    b.   Each sham transaction whereby the Debtors exported diamonds and other goods to Shadow Entities or other Modi-owned entities in exchange for funds transferred by wire or other means for the purpose of artificially inflating the volume of exports to secure additional LOUs, thereby promoting or carrying on the PNB Fraud.

    c.   Each sham transaction whereby the Debtors transferred funds by wire or other means in exchange for imported diamonds and other goods from Shadow Entities or other Modi-owned entities for the purpose of providing those entities' with liquidity to repay the LOU obligations, thereby promoting or carrying on the PNB Fraud.

    d.   All other transfers, by wire or other means, of funds obtained as a result of the PNB Fraud, including, but not limited to: the wire transfer of $23 million from Mehta's bank account for the creation of the Ithaca

33

> Trust; the wire transfer on or about September 7, 2017, of $25 million
> from CPS50 to purchase the Ritz Carlton Apartment; the wire transfers
> of $2.5 million from Ami Modi's HSBC account and of $23 million from
> Mehta's bank account to fund CPS50; the wire transfer on January 2,
> 2018, of $6 million from Mehta's bank account to Commonwealth Trust
> Company for the purchase of CPRE.

145.    The RICO Enterprise, as conducted and controlled by Defendants Modi, Bhansali, and Gandhi, knew that the property involved in each Money Laundering Transaction represented the proceeds of the PNB Fraud.

146.    Each Money Laundering Transaction involved a monetary transaction in criminally derived property of a value of greater than $10,000 and derived from specified unlawful activity.

147.    Many of the Money Laundering Transactions involved the transfer of funds from a place outside of the United States to a place within the United States, or vice versa, including without limitation the transfers described in paragraph 144(b)-(c) above.

148.    The RICO Enterprise, as conducted and controlled by Defendants Modi, Bhansali, and Gandhi, conducted each Money Laundering Transaction with the intent to promote the carrying on of the PNB Fraud.

149.    The RICO Enterprise, as conducted and controlled by Defendants Modi, Bhansali, and Gandhi, conducted each Money Laundering Transaction with the knowledge that such Money Laundering Transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the PNB Fraud.

150.    Accordingly, the RICO Enterprise, as conducted and controlled by Defendants Modi, Bhansali, and Gandhi, committed numerous acts of money laundering in violation of 18 U.S.C. §§ 1956 and 1957.

151.    By enabling, facilitating, and promoting the PNB Fraud, the RICO Enterprise's violations of 18 U.S.C. §§ 1956 and 1957 directly and proximately caused injury to each Debtor's business and property by destroying each Debtor's going-concern value and rendering each Debtor insolvent.

### Continuity of Conduct

152.    Defendants' violations of law as set forth herein, each of which directly and proximately injured the Debtors, constituted a continuous course of conduct in the United States beginning in no later than early 2011 and continuing at least through the date of the filing of the chapter 11 petitions commencing these cases, which was intended to obtain economic gain through false representations, fraud, deceit, and other improper and unlawful means. Therefore, the violations were a part of pattern of racketeering activity under 18 U.S.C. §§ 1961(1) and (5).

### The RICO Enterprise Caused Injury to Debtors

153.    Each Debtor has been injured in its business or property as a direct result and proximate result of the Rico Enterprise's violations, described above, of 18 U.S.C. § 1962(c), including any injury by reason of the predicate acts constituting the pattern of racketeering activity.

154.    Before Defendants hatched their scheme to defraud PNB, each of the Debtors operated as a legitimate business built on fruitful relationships with reputable customers.

155.    Firestar was incorporated in 2004 for the purposes of acquiring Frederick Goldman, Inc., which was one of FIL's U.S. customers. Firestar historically operated as a distributor and wholesaler of finished gold and diamond jewelry. Its customer base consisted of legitimate jewelry retailers such as Zales, JCPenney, and Macy's.

156.    Fantasy was incorporated in 2012 for the purpose of holding the exclusive license from Chicago-based Fantasy Diamond Corp. to supply the Endless Diamond Brand to U.S.

35

retailers. Fantasy was created primarily to conduct business with Costco Wholesale Corporation based on sales attributable to the Endless Diamond Brand. Fantasy's other customers include Zales, Sam's Club, and Walmart. Fantasy sold finished jewelry, generally at a higher price point than Firestar.

157.     Jaffe is the successor to New York-based Sandberg & Sikorksi Corporation, whose predecessors date back to 1892. Sandberg & Sikorski historically consisted of two divisions, one that sold to major U.S. retailers and A. Jaffe, a luxury bridal line that supplied assembled pieces of jewelry to high-end independent jewelry retailers. In 2007, FIL purchased a 95% stake in Sandberg & Sikorski. Sandberg & Sikorski was renamed A. Jaffe, Inc. in 2011. It did not become fully integrated within the Firestar group of entities until 2016.

158.     As a result of Defendants' exploitation of the Debtors as part of their scheme to defraud PNB, each Debtor's customer and supplier relationships, industry reputation, and ultimately value as a going concern were destroyed. Defendants' misconduct destroyed each Debtor's financial standing by burdening them with enormous liability to PNB, crippling their ability to operate as legitimate businesses, and forcing them to expend resources on an expensive chapter 11 liquidation.

**Plaintiff's Entitlement to Treble Damages**

159.     As a result of the violations of 18 U.S.C. § 1962(c) by the RICO Enterprise, each Debtor has suffered substantial damages in an amount to be proven at trial.

160.     Under 11 U.S.C. §§ 323, 541(a)(1) and 1106(a), Plaintiff has standing to bring all claims alleged in this Complaint on behalf of each of the Debtors' chapter 11 estates.

161.     Under 18 U.S.C. § 1964(c), Plaintiff is entitled to recover treble the Debtors' general and special compensatory damages, plus interest, costs, and attorneys' fees caused by reason of Defendants' violations of 18 U.S.C. § 1962(c).

## COUNT 7

### Racketeering Influenced Corrupt Organizations Act
### 18 U.S.C. § 1962(d)
### (Nirav Modi, Mihir Bhansali, Ajay Gandhi)

162.    Plaintiff restates and re-alleges paragraphs 1 through 161 of this Complaint as though fully set forth herein.

163.    Since at least early 2011, the Defendants together with others known and unknown, being persons employed by and associated with the RICO Enterprise, have unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with others to violate 18 U.S.C. § 1962(c), as described above, in violation of 18 U.S.C. § 1962(d).

164.    The Defendants knew that they were engaged in a conspiracy to commit the predicate acts and knew that the predicate acts were part of such racketeering activity, and the participation and agreement of each of them was necessary to allow the commission of this pattern of racketeering activity. This conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

165.    The Defendants agreed to conduct or participate in, directly or indirectly, the conduct, management, or operation of the RICO Enterprise's affairs through a pattern of racketeering activity, including but not limited to the acts of racketeering set forth above in Count 6 of this Complaint.

166.    As part of the conspiracy, each Defendant, at times acting through certain of its officers, agents, and representatives or co-conspirators, committed at least two predicate acts of racketeering in the conduct of the RICO Enterprise's affairs.

167.    As a direct and proximate result of the Defendants' conspiracy, the racketeering activity of the RICO Enterprise, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), each of the Debtors has been injured in its business and property.

37

168.    Under 18 U.S.C. § 1964(c), Plaintiff is entitled to recover treble its general and special compensatory damages, plus interest, costs, and attorneys' fees incurred by reason of Defendants' violations of 18 U.S.C. § 1962(d).

WHEREFORE, Plaintiff, as chapter 11 trustee of the Debtors, respectfully requests that the Court enter judgment:

    a.  On Counts 1, 2, and 3, in favor of Plaintiff and against Defendants Modi, Bhansali, and Gandhi, jointly and severally, in the amount of damages to be proven at trial that were suffered by the Debtors and their estates as a result of the Defendants' breaches of fiduciary duty and aiding and abetting breaches of fiduciary duty, plus interest, costs and attorneys' fees, and such other equitable relief as may be just and proper.

    b.  On Counts 4 and 5, in favor of Plaintiff and against Defendants Modi, Bhansali, and Gandhi, jointly and severally, in the amount of damages to be proven at trial that were suffered by the Debtors and their estates as a result of the corporate waste committed, permitted, or suffered by Defendants, plus interest, costs and attorneys' fees, and such other equitable relief as may be just and proper.

    c.  On Counts 6 and 7, in favor of Plaintiff and against Defendants Modi, Bhansali, and Gandhi, jointly and severally, in treble the amount of damages to be proven at trial that were suffered by the Debtors and their estates as a result of the Defendants' violation of the Racketeering Influenced Corrupt Organizations Act,

plus interest, costs and attorneys' fees, and such other equitable relief as may be

just and proper.

Dated: March 27, 2019,
     New York, New York

Respectfully submitted,

**JENNER & BLOCK LLP**

By: /s/ Vincent E. Lazar
Vincent E. Lazar
Angela M. Allen (*pro hac vice* pending)
353 North Clark Street
Chicago, Illinois 60654
(312) 222-9350
vlazar@jenner.com
caallen@jenner.com

Carl N. Wedoff
Nicolas G. Keller
919 Third Avenue
New York, New York 10022
(212) 891-1600
cwedoff@jenner.com
nkeller@jenner.com

*Counsel for the Chapter 11 Trustee*

## Exhibit 2

Summons

# UNITED STATES BANKRUPTCY COURT
## Southern District of New York

In re: Firestar Diamond, Inc. and Fantasy, Inc.

Bankruptcy Case No.:
18−10509−shl

Richard Levin Chapter 11 Trustee of Firestar Diamond, Inc., Fantasy, Inc., and
Old AJ, Inc. f/k/a A. Jaffe, Inc.

                          Plaintiff(s),

                                                    Adversary Proceeding No.
                                                         19−01102−shl
−against−

Nirav Deepak Modi
Mihir Bhansali
Ajay Gandhi

                          Defendant(s)

## SUMMONS AND NOTICE OF PRETRIAL CONFERENCE
## IN AN ADVERSARY PROCEEDING

YOU ARE SUMMONED and required to submit a motion or answer to the complaint which is attached to this summons to the clerk of the bankruptcy court within 30 days after the date of issuance of this summons, except that the United States and its offices and agencies shall submit a motion or answer to the complaint within 35 days, to:

| Address of Clerk: |
| --- |
| **Clerk of the Court** <br> **United States Bankruptcy Court** <br> **Southern District of New York** <br> **One Bowling Green** <br> **New York, NY 10004−1408** |

At the same time, you must also serve a copy of the motion or answer upon the plaintiff's attorney.

| Name and Address of Plaintiff's Attorney: |
| --- |
| **Carl N Wedoff** <br> **Jenner & Block LLP** <br> **919 Third Avenue** <br> **New York, NY 10022** |

If you make a motion, your time to answer is governed by Fed. R. Bankr. P. 7012.

YOU ARE NOTIFIED that a pretrial conference of the proceeding commenced by the filing of the complaint will be held at the following time and place:

| United States Bankruptcy Court <br> Southern District of New York <br> One Bowling Green <br> New York, NY 10004−1408 | Room: Courtroom 701, One Bowling Green, New York, NY 10004−1408 <br><br> Date and Time: 5/16/19 at 10:00 AM |
| --- | --- |

IF YOU FAIL TO RESPOND TO THIS SUMMONS, YOUR FAILURE WILL BE DEEMED TO BE YOUR CONSENT TO ENTRY OF A JUDGMENT BY THE BANKRUPTCY COURT AND JUDGMENT BY DEFAULT MAY BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT.

Dated: 3/28/19

Vito Genna

*Clerk of the Court*

By: /s/ Carmen Ortiz

*Deputy Clerk*

**Exhibit 3**

Rule 7012(a) Order

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>FIRESTAR DIAMOND, INC., *et al.*<br><br>     Debtors. | Chapter 11<br><br>No. 18-10509 (SHL)<br><br>(Jointly Administered) |
| RICHARD LEVIN, Chapter 11 Trustee of<br>FIRESTAR DIAMOND, INC., FANTASY, INC.,<br>and OLD AJ, INC. f/k/a A. JAFFE, INC.,<br><br>     Plaintiff,<br><br>  v.<br><br>NIRAV DEEPAK MODI, MIHIR BHANSALI,<br>and AJAY GANDHI,<br><br>     Defendants. | Adv. Proc. No. 19-1102 (SHL) |

## ORDER SETTING FOREIGN DEFENDANT
## NIRAV DEEPAK MODI'S TIME TO RESPOND TO THE COMPLAINT

Upon the motion (the "**Motion**")[1] of Richard Levin, not individually but solely in his

capacity as chapter 11 trustee (the "**Trustee**") for Firestar Diamond, Inc. ("**Firestar**") for an order

setting the Defendants' time to respond to Complaint under Bankruptcy Rule 7012(a) to thirty

days after service of the Complaint and Summons; and the Court having conducted a hearing on

the Motion on April 15, 2019 (the "**Hearing**"); and the Court having considered the Motion,

all responses filed thereto, if any, as well as any evidence presented at the hearing; and the Court

having jurisdiction to consider and determine the Motion in accordance with 28 U.S.C. §§ 157 and

1334; and appropriate notice under the circumstances of the Motion having been provided, and

---

[1] Capitalized terms not defined herein shall have the meaning ascribed to them in the Motion.

it appearing that no other or further notice need be provided; and after due deliberation and sufficient cause appearing therefor,

IT IS ORDERED:

1.    Defendant Nirav Deepak Modi is required to submit a motion or answer to the Complaint to the clerk of the bankruptcy court within 30 days after service of the Complaint and Summons.

2.    *This Order shall be served on Defendant Nirav Deepak Modi when he is served with the complaint in this adversary proceeding.*

Dated: April 18, 2019

                                                  */s/ Sean H. Lane*
                                                  The Honorable Sean H. Lane
                                                  United States Bankruptcy Judge