## EXHIBIT A

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| FIRESTAR DIAMOND, INC., *et al.* | No. 18-10509 (SHL) |
| Debtors. | (Jointly Administered) |
| RICHARD LEVIN, Chapter 11 Trustee of FIRESTAR DIAMOND, INC., FANTASY, INC., and OLD AJ, INC. f/k/a A. JAFFE, INC., | Adv. Proc. No. ~~19-_____~~ 19-1102 (SHL) |
| Plaintiff, | |
| v. | |
| NIRAV DEEPAK MODI, MIHIR BHANSALI, and AJAY GANDHI, | |
| Defendants. | |

**FIRST AMENDED COMPLAINT AGAINST INSIDERS FOR BREACH OF FIDUCIARY**
**DUTY, AIDING AND ABETTING BREACH OF FIDUCIARY DUTY, CORPORATE**
**WASTE, AND VIOLATIONS OF THE RACKETEERING INFLUENCED CORRUPT**
**ORGANIZATIONS ACT**

Plaintiff Richard Levin, not individually but solely as chapter 11 trustee ("**Trustee**" or

"**Plaintiff**") for Debtors Firestar Diamond, Inc., Fantasy, Inc., and Old AJ, Inc. f/k/a A. Jaffe, Inc.

(collectively, the "**Debtors**"), for his First Amended Complaint alleges as follows:

**NATURE OF THE ACTION**

1.      This is an action against Defendant Nirav Deepak Modi ("**Modi**"), the former

indirect controlling majority shareholder and ~~/~~ or *de facto* director, officer, or controlling person

of the Debtors; Mihir Bhansali ("**Bhansali**"), who served as the ~~Debtors'~~ sole director and ~~as the~~

Chief Executive Officer ("**CEO**") of each Debtor; and Ajay Gandhi ("**Gandhi**"), who served as the

Chief Financial Officer ("**CFO**") of each Debtor. This action seeks to recover from the Defendants

the damages the Debtors and their estates suffered as a result of ~~their~~ the Defendants' six-year, extensive international fraud, money laundering, and embezzlement scheme~~,~~ that resulted in accrual of claims against the Debtors of over $1 billion in favor of Punjab National Bank, the diversion of millions of dollars of the Debtors' assets for ~~Modi's personal~~ the benefit of the family of Nirav Modi and Mihir Bhansali, and the collapse of the Debtors and the resulting loss of value of their businesses.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over the subject matter of this adversary proceeding under 28 U.S.C. § 1334(b) because this adversary proceeding arises under Title 11 and arises in and is related to the above-captioned chapter 11 cases ~~In re Firestar Diamond, Inc., et al, Case No. 18-10509 (SHL)~~, which are pending in this Court.

3.      This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2).

4.      The Trustee consents to entry of final order or judgment by this Court.

5.      Venue of this adversary proceeding is proper in this district under 28 U.S.C. § 1409.

## THE PARTIES & OTHER RELEVANT ENTITIES

*A.*      *The Debtors*

~~6.      Plaintiff Richard Levin is the chapter 11 trustee for the Debtors, duly appointed under section 1104(a) of the Bankruptcy Code by the United States Trustee for Region 2 on June 14, 2018, whose appointment was approved by this Court by order entered the same day.~~

~~7.      The Trustee brings this action, not individually, but solely in his capacity as Trustee.~~

6.      ~~8.~~Debtor Firestar Diamond, Inc. (f/k/a Firestone, Inc.) (~~"Firestar~~"FDI") is a privately-held Delaware corporation, with its principal place of business in New York. While in

operation, ~~Firestar~~ FDI principally operated a wholesale diamond business. ~~Firestar Group, Inc., a Delaware corporation ("Group"), owns 100% of the equity interests in Firestar.~~

7. ~~9.~~Debtor Fantasy, Inc. ("**Fantasy**") is a privately-held Delaware corporation, with its principal place of business in New York. While in operation, Fantasy was principally a wholesale diamond business. ~~Firestar~~ FDI owns 100% of the equity interests in Fantasy.

8. ~~10.~~Debtor Old AJ, Inc. (f/k/a A. Jaffe, Inc., f/k/a Sandberg & Sikorski Corp.) ("**Jaffe**") is a privately-held New York corporation, with its principal place of business in New York. While in operation, Jaffe was principally a bridal jewelry business.

### B.    *The Debtors' U.S. Affiliates*

9.    Firestar Group, Inc. ("**FGI**"), a Delaware corporation, is a holding company that owns approximately 95% of the equity interests in FDI. Samuel Sandberg owns the remaining approximately 5% of FDI.

10. ~~11.~~Synergies Corporation ~~is~~ ("**Synergies**"), a Delaware corporation~~,~~ is a holding company that owns approximately 95% of the equity interests in Jaffe and 100% of the equity interests in ~~Group. Firestar Holdings Ltd., a Hong Kong company ("Firestar Hong Kong")~~ owns 100% of the equity interests in Synergies ~~Corporation.~~ FGI. Samuel Sandberg owns the remaining approximately 5% of Jaffe.

11.    Firestar Diamond International, Inc. ("**FDII**"), a Delaware corporation, operated primarily as a loose diamond trading business.

12.    Nirav Modi, Inc. (f/k/a Firestar Jewelry, Inc.) ("**NMI**," together with FGI, Synergies, and FDII, the "**U.S. Affiliates**;" the U.S. Affiliates, together with the Debtors, the "**U.S. Entities**"), a Delaware corporation, operated *Nirav Modi*-branded retail boutiques in New York, Los Angeles, Las Vegas, and Honolulu.

**C.**    **_The Debtors' Foreign Affiliates_**

13.    Nirav Modi Ltd. ("**NML**"), a Hong Kong company, owns 100% of the equity interests in NMI. Upon information and belief, NML is the principal holding company for subsidiaries operating _Nirav Modi_-branded boutiques around the globe.

14.    Firestar Holdings Ltd. ("**FHL**"), a Hong Kong company, owns 100% of the equity interests in Synergies, FDII, and NML.

15.    Firestar Diamond International Private Limited ("**FDIPL**"), an India company, operated factories in India. Upon information and belief, FDIPL manufactured a significant percentage of the jewelry marketed and sold by the Debtors and other Modi-Controlled Entities (as defined below).

16.    ~~12.~~Firestar International Limited (f/k/a Firestar International Private Limited~~, f/k/a Firestone International Private Limited, f/k/a Diamond 'R' Us) ("FIL")~~) ("**FIL**" or "**FIPL**"), and India company, holds 100% of the equity ~~interest in Firestar Hong Kong~~ interests in FHL and FDIPL and is the ultimate holding company of numerous other Firestar entities (collectively, including the Debtors, ~~Group~~U.S. Affiliates, ~~Synergies Corporation~~FHL, ~~Firestar Hong Kong~~NML, FDIPL, and FIL, the "**Firestar Entities**").

**D.**    **_The Parties_**

17.    Plaintiff Richard Levin is the chapter 11 trustee for the Debtors, duly appointed under section 1104(a) of the Bankruptcy Code by the United States Trustee for Region 2 on June 14, 2018, whose appointment was approved by this Court by order entered that same day. The Trustee brings this action, not individually, but solely in his capacity as Trustee.

18.    ~~13.At~~Defendant Nirav Modi, at all relevant times, ~~Modi~~owned or controlled approximately 94.88% of the equity interests in FIL and was a director of FIL. Upon information and belief, Modi is a citizen of India and traveled frequently to the United States, including ~~the~~

4

to New York, to conduct business in New York through the Debtors and ~~through other Firestar Entities~~the U.S. Affiliates.

19.   ~~14.At~~Defendant Mihir Bhansali, at all relevant times, ~~Bhansali~~served as the sole director and CEO of each Debtor in New York and resided and continues to reside in New York. Bhansali also served as the sole director of each U.S. Affiliate, as well as the Chief Executive Officer of Synergies, FGI, and NMI. Upon information and belief, Bhansali is Nirav Modi's cousin. For example, in a guest list recovered from Nirav Modi's computer for the wedding of Nirav Modi's brother, Neeshal Modi, Mihir Bhansali is described as a "Maternal Cousin." In the context of the Bank Fraud described below, Bhansali served as Nirav Modi's right-hand man and de facto second-in-command.

20.   ~~15.At~~Defendant Ajay Gandhi, at all relevant times, ~~Gandhi~~served as the Chief Financial Officer ~~CFO~~ of each ~~Debtor in New York~~of the Debtors and U.S. Affiliates and resided and continues to reside in New York.

~~FACTS~~

**BACKGROUND**

*A.* ***Modi's Diamond Businesses***

21.   ~~16.~~Modi entered the diamond business around 2000 ~~through FIL~~under the name Diamonds 'R' Us, ~~then known as~~ an India partnership formed by Modi, Modi's uncle Mehul Choksi, and Modi's business partner Hemant Bhatt. Diamonds 'R' Us~~, which~~ operated as a diamond trading company in India specializing in loose diamonds and gems for use in retailers' assembled products. In or about 2010, Modi entered the luxury retail business through one or more of the Firestar Entities and began to sell high-end finished jewelry he designed under the *Nirav Modi* brand. Over time, Modi expanded his diamond and jewelry business, with retail,

5

wholesale, and manufacturing ~~locations in Antwerp,~~ operations in Armenia, Beijing, Belgium, Dubai, Hong Kong, India, Johannesburg, London, Macau, Moscow, Paris, and the United States.

22.     ~~17.~~Modi, acting through ~~the~~ FIL and its subsidiaries, acquired ~~Firestar~~ FDI (then known as Firestone, Inc.) in 2005, acquired a 95% interest in Jaffe (then known as Sandberg & Sikorski Corp.) from Samuel Sandberg in 2007, and incorporated Fantasy in 2012. In connection with Modi's indirect acquisition of Jaffe, Samuel Sandberg received an equity interest in FDI.

**B.    ~~The Punjab National~~ *Mechanics of the* Bank Fraud**

23.     ~~18.~~From approximately early 2011 to early 2018 (the "**Relevant Period**"), Modi orchestrated and directed a scheme to obtain loans, credits, or other funds under false pretenses and without collateral from numerous banks, including Punjab National Bank ("**PNB**"), a publicly-owned Indian bank majority owned by the central government of India~~, as described below (the "PNB Fraud").~~ (as set forth in more detail below, the "**Bank Fraud**").

24.     The Bank Fraud involved the fraudulent procurement of buyer's credit issued under letters of undertaking ("**LOUs**"), a financial instrument unique to India designed to facilitate efficient import transactions.

25.     When used legitimately, LOUs allow an importer to forego the expense an importer would otherwise incur by borrowing Indian currency and then converting it to a foreign currency to pay foreign suppliers. Instead, the importer obtains short-term credit from its bank in India, secured by invoices for the to-be imported goods. The issuing bank, in turn, enters into the foreign currency transaction: it requests a foreign branch of another Indian bank to transmit funds into the issuing bank's own account (referred to as its nostro— "our" — account) at the foreign branch of a third bank to pay the exporter in its local currency. The issuing bank then repays the intermediary bank and recoups the loan from the importer (or the imported goods serving as its collateral).

26.     Since each LOU requires an import transaction, an importer's LOU borrowing capacity is tied directly to its import volume—the more imports, the more LOU funding available.

27.     Modi and his co-conspirators conspired to take advantage of this feature by artificially inflating the import volume of Modi's India-based companies—most notably Diamonds 'R' Us ("**DRUS**"), Solar Export ("**Solar**"), and Stellar Diamond ("**Stellar**") (collectively, the "**LOU Entities**")—with sham transactions so as to obtain more and more LOU funding. Upon information and belief, DRUS is separate from the similarly named partnership discussed above, which, upon information and belief, ultimately became FIPL.

19.     Modi and others he directed, acting through at least three entities under Modi's control—Diamonds 'R' Us, Solar Exports, and Stellar Diamonds—obtained from PNB Letters of Undertaking ("**LOUs**"), which are guarantees under which PNB allows its customers to obtain short-term credit from other Indian banks' foreign branches to engage in foreign import transactions into India without providing ordinarily-required collateral. Typically, upon presentation of an LOU, the foreign branch pays the exporter and seeks reimbursement from the LOU issuer, in this case PNB, who then charges its customer. However, in this case, the entities under Modi's control who obtained the LOUs did not provide any collateral, and PNB failed to properly record the LOUs in its core banking system.

28.     20.PNB PNB and other banks advanced amounts equal to over US$1 $1 billion under LOUs for the benefit of entities under Modi's control against in connection with imports to India without the ordinarily-required collateral and, in some cases, generated by circular trading (also known as "round tripping"), a fraudulent practice whereby the same diamonds are exported from and re-imported back into India multiple times at varying and often inflated prices, in transactions involving various Firestar Entities and more than twenty foreign shell

companies secretly controlled by Modi (the "**Shadow Entities**") to give the appearance of multiple distinct transactions. .

29.    To carry out this scheme, Modi and his co-conspirators utilized a web of shadow entities to engage in fraudulent and fictitious import transactions, including *inter alia*:  Auragem Company Ltd. ("**Auragem**"), Brilliant Diamonds Ltd. ("**Brilliant**"), Eternal Diamonds Corporation Ltd. ("**Eternal**"), Fancy Creations Company Ltd. ("**Fancy Creations**"), Sino Traders Ltd. ("**Sino**"), Sunshine Gems Ltd. ("**Sunshine**"), Unique Diamond and Jewellery FZC ("**Unique**"), World Diamond Distribution FZE ("**World Diamond**"), Vista Jewelry FZE ("**Vista**"), Empire Gems FZE ("**Empire**"), Universal Fine Jewelry FZE ("**Universal**"), Diagems FZC ("**Diagems**"), Tri Color Gems FZE ("**Tri Color**"), Pacific Diamonds FZE ("**Pacific**"), Himalayan Traders FZE ("**Himalayan**"), and Unity Trading, FZE ("**Unity**") (collectively, the "**Shadow Entities**," together with the Firestar Entities, LOU Entities, and all other entities controlled by Nirav Modi and his family members, the "**Modi-Controlled Entities**").

30.    Though designed to look like legitimate independent businesses, the Shadow Entities were no more than shell companies controlled by Modi and his co-conspirators. They conducted virtually no legitimate business, but instead existed only to further the Bank Fraud by conducting bogus transactions with the LOU Entities, Firestar Entities, and other Modi-Controlled Entities and laundering the ill-gotten proceeds.

31.    The two primary clusters of Shadow Entities operated from Hong Kong and Dubai. The Hong Kong-based Shadow Entities included Auragem, Brilliant, Eternal, Fancy Creations, Sino, and Sunshine. The Dubai-based Shadow Entities included Unique, World Diamond, Vista, Empire, Universal, Diagems, Tri Color, Pacific, Himalayan, and Unity.

32.    The Shadow Entities are mostly registered at either small, unoccupied offices or at single, leased desks within shared offices. They have almost identical websites with similar

backgrounds, fonts, contact pages, and language. They are located in Special Economic Zones ("**SEZ**") and Free Trade Zones ("**FTZ**"), which are areas within a country that enjoy trade incentives, such as reductions in trade controls and enforcement, and whose reduced oversight makes them havens for fraudulent schemes and money launderers.

33.    Upon information and belief, the LOU Entities and Shadow Entities traded exclusively or nearly exclusively with other Modi-Controlled Entities. For example, as alleged below, Mihir Bhansali's laptop computer contained a spreadsheet listing, among other things, each LOU Entity's sales, costs of goods sold, top customers, and top vendors for fiscal years 2009 to 2017. The top customer and top vendor lists contained only Shadow Entities and Firestar Entities. The following table, which is based on figures in that spreadsheet, reflects the extent to which the LOU Entities traded exclusively with Shadow Entities and Firestar Entities:

| **LOU Entity** | **Fiscal Year 2012 - 2017** | | | | | |
|---|---|---|---|---|---|---|
| | **Sales to Listed Modi-Controlled Entities as % of Gross Sales** | | | **Purchases from Listed Modi-Controlled Entities as % of Total Costs of Goods Sold** | | |
| | *Shadow Entities* | *Firestar Entities* | *Total* | *Shadow Entities* | *Firestar Entities* | *Total* |
| DRUS | 88.4% | 7.5% | 95.9% | 99.7% | 0.4% | 100.1% |
| Stellar | 98.7% | 0.5% | 99.2% | 100.1% | 0.3% | 100.3% |
| Solar | 98.9% | 0.7% | 99.6% | 99.9% | 0.1% | 100.0% |

34.    Upon information and belief, from around 2013 onward, Nirav Modi and his co-conspirators used the Shadow Entities as an intermediary between the LOU Entities and Firestar Entities. PNB and other banks were aware of Nirav Modi's affiliation with the LOU Entities and the Firestar Entities, but not his affiliation with the Shadow Entities.

35.    The Shadow Entity import and export transactions purported to involve arm's-length sales of highly valuable loose diamonds, pearls, gold, silver, and other jewelry. In truth, these transactions had no legitimate economic purpose and routinely involved goods that (i) did not exist, (ii) were never transferred, (iii) were transferred at prices having nothing to do with

market value, but instead based on whatever amounts were necessary to reconcile the Shadow Entities' and Firestar Entities' books and records so as to conceal other transfers made for illegitimate purposes, or (iv) were transferred in "circular transactions," in which the same goods were exported from and re-imported among Modi-Controlled Entities multiple times at varying and often inflated prices to give the appearance of multiple distinct transactions for the sole purpose of artificially increasing the entities' import volume.

36.    Upon information and belief, based on statements made by various Firestar Entity and Shadow Entity employees to Indian authorities:

(i)    FIL, FDIPL, and other India-based Firestar Entities would export jewelry to Shadow Entities in Dubai and Hong Kong, where, at least in some instances, the diamonds would be removed and the precious metals melted and then subsequently re-exported.

(ii)    The jewelry exported from India to the Shadow Entities was never returned as defective or substandard, as would be expected in the course of an arm's length vendor-customer relationship.

(iii)    Orders placed by Shadow Entities frequently lacked the formality, exactness, and diligence that ordinarily would be expected of transactions with a bona fide third party. For example, V. Suresh Ramnath Naidu, a director of Diagems, told Indian authorities that he used to sign blank invoices, but that he never actually saw any of the diamonds or jewelry.

37.    Moreover, when acting as vendors, Modi-Controlled Entities obtained additional funding through packing credit loans, which are short-term working capital loans obtained by vendors to fulfill upcoming orders of goods. In the context of the Bank Fraud, the India-based Modi-Controlled Entities would obtain packing credit loans on the basis of purported orders from other Modi-Controlled Entities overseas. However, packing credit loan proceeds were frequently diverted for other purposes, including the repayment of outstanding LOUs.

38.    Many of the Shadow Entities' directors were current or former employees of Firestar Entities. In addition, many Shadow Entity employees were current or former employees of Firestar Entities.

39.    In the context of the Bank Fraud, transactions between and among Firestar Entities, LOU Entities, and Shadow Entities furthered the Bank Fraud by: (1) inflating the Indian entities' LOU borrowing capacity by artificially inflating their import volumes for LOUs and export volume for packing credit loans; (2) facilitating the repayment of some but not all outstanding LOUs and packing credit loans; (3) laundering the fraudulent proceeds by making them difficult to trace and siphoning them to Modi and his co-conspirators; and (4) making it difficult for auditors, lenders, and regulatory bodies to detect the Bank Fraud.

40.    Transfers for these purposes were concealed in various ways, including: (a) round trip transactions of gems, jewelry, or funds in which Modi-Controlled Entities transferred assets amongst themselves without any legitimate economic purpose; (b) buying and selling gems at inflated or deflated prices (or sending paperwork without sending the gems at all); (c) characterizing transfers as loans or loan repayments or advances against future purchases or returns of such advances; and (d) in some instances, fraudulently doctoring books and records outright.

21.    Modi and others at his direction used the Shadow Entities to create the appearance that independent entities were engaging in transactions with the Firestar Entities.

22.    The Debtors' records reflect sales by the Debtors to Shadow Entities totaling approximately $214 million during the Relevant Period and cash transfers to and from the Debtors and the Shadow Entities totaling approximately $227 million during the seven-year period from 2011 and 2018.

23.    When a diamond was imported or re imported into India through a circular trading transaction among the Firestar Entities or the Shadow Entities, was often connected to a Firestar Entity drawing funds from a foreign bank under a PNB issued LOU.

41.    24.To facilitate the issuing of the LOUs and to prevent detection, Modi and others at his direction, including upon information and belief Manish Bosamiya, Subhash Parab, and Miten Pandya, worked with two certain PNB employees, including Gokulnath Shetty, who authorized the issuance of the LOUs without securing collateral and without properly recording the LOUs in PNB's records.

*C.    Detection and Exposure of the Bank Fraud*

42.    On or around January 20, 2018, a representative of one of the Modi-Controlled Entities solicited issuance of a new LOU from PNB. Unbeknownst to Nirav Modi and his co-conspirators, Gokulnath Shetty had retired. On January 22, 2018, PNB refused to issue the LOU without a 100% cash margin deposit, among other requirements. The Modi representative refused to furnish any margin on the grounds that PNB had never before required a margin to issue an LOU. Alarmed by this revelation, PNB immediately began investigating the borrowing practices of the Modi-Controlled Entities.

43.    Also on January 22, 2018, the same day PNB refused to issue the LOU, Nirav Modi's longtime business partner Hemant Bhatt resigned as an authorized signatory for the three LOU Entities and as director/designated partner of the following entities, each of which, upon information and belief, is a Modi-Controlled Entity:

| Modi-Controlled Entity | Hemant Bhatt's Role |
|---|---|
| NDM Enterprises Pvt Limited | Director |
| Neeshal Trading Pvt Limited | Director |
| Neeshal Marketing Pvt Limited | Director |
| Neeshal Merchandising Pvt Limited | Director |
| Dream Trading Pvt Limited | Director |

| | |
|---|---|
| Ami Merchandising Pvt Limited | Director |
| Firestone Trading Pvt Limited | Director |
| Firestar Diamond Pvt Limited | Director |
| Radashir Jewelry Company Pvt Limited | Director |
| Camelot Enterprises Pvt Limited | Director |
| Camelot Trading Pvt Limited | Director |
| Devdatta Enterprises Pvt Limited | Director |
| Neeshal Enterprises LLP | Designated Partner |
| Paragon Jewellery LLP | Designated Partner |
| Paragon Merchandising LLP | Designated Partner |
| Panchjanya Diamonds LLP | Designated Partner |

44.    In his resignation email to Nirav Modi and Mihir Bhansali, Bhatt stated, "In view of age, health and personal commitments, I am unable to devote my time and attention to the affairs of the following Companies/firms in my non-executive directorship capacity and/or any other matter. I therefore request you to accept my resignation with effect from today." Upon information and belief, Bhatt's resignation was directly related to PNB's refusal to issue the LOU.

45.    25.The PNB The Bank Fraud orchestrated by Modi has resulted in several investigations and criminal enforcement actions against Modi, Bhansali, and others by Indian governmental authorities, including the Central Bureau of Investigation ("CBI"); the Directorate of Enforcement ("ED"); the Income Tax Department; and the Serious Fraud Investigation Office. On or about March 12, 2019, the Indian government issued an extradition request to the government of the United Kingdom on the basis of an arrest warrant issued against Nirav Modi by an Indian Court. In response to that request, Modi was arrested in London on or about March 20, 2019 and is currently incarcerated in London. .

46.    On January 29, 2018, PNB lodged a criminal complaint against Nirav Modi with India's CBI. On February 13, 2018, PNB lodged a complaint against Nirav Modi with India's ED, which subsequently attached various movable and immovable properties belonging to Nirav Modi and various Modi-Controlled Entities.

47.    On information and belief, on February 13, 2018, Nirav Modi sent an email assuring PNB that amounts owed by the LOU Entities would be repaid and further stating "I must add that my intent is to honour all the obligations on my part, Firestar's part and whatever the firms are liable to pay."

48.    On information and belief, on February 17, 2018, Nirav Modi sent an email to PNB suggesting that the sale of assets of, *inter alia*, FIL and FDIPL will be sufficient to settle the amounts owed to PNB.

49.    On July 3, 2018, PNB filed Application No. 119/2018 in the Debts Recovery Tribunal No. I at Mumbai (the "**Indian Debt Tribunal**") against, *inter alia*, Nirav Modi and certain of his family members, each LOU Entity, FIL, and FDIPL.

50.    On or about March 12, 2019, the Indian government issued an extradition request to the government of the United Kingdom on the basis of an arrest warrant issued against Nirav Modi by an Indian court. In response to that request, Modi was arrested in London on or about March 20, 2019 and is currently incarcerated in London.

51.    On July 6, 2019, the presiding officer of the Indian Debt Tribunal issued a judgment against, *inter alia*, Nirav Modi, the LOU Entities, and FIL, based on the admissions of liability and assurances of repayment Nirav Modi made to PNB in communications such as those described above. The judgment was also based on, *inter alia*, the following factual findings (capitalized terms in original):

(i)    Nirav Modi has floated Overseas Companies in Hong Kong and U.A.E. which are dummy/shell Companies. The Directors and share-holders of these Companies are either ex-employees or employees acting under instructions of Nirav Modi.

(ii)    The Overseas Companies and Hong Kong and Dubai deals with the Firestar Group directly or indirectly owned by Nirav Modi who as full control over these Companies through the dummy Directors. The Enforcement Directorate in its Complaint has recorded that the list of top

8 borrowers and top 8 suppliers are none else but the ex-employees of Firestar Group and acting and implementing the instructions given by Nirav Modi and Mihir Bhansali.

(iii)   The fraud has been perpetrated by Nirav Modi in collusion, connivance and with the aid and assistance of the group companies i.e. Firestar International Limited and Firestar Diamond International Pvt. Ltd. along with their affiliates, subsidiaries, Nirav Family Trust, Nirav Modi Family Trust, directors and key managerial personnel.

(iv)   The investigation conducted by the Enforcement Directorate further reveals that the dummy Companies were set up in Hong Kong and Dubai along with the regular Firestar Group Companies [and] acted as nodes for circular transactions to layer and launder money generated by the fraudulent LOUs.

(v)   [Nirav Modi and his family members] are the mastermind[s] behind the perpetration of the fraud. Defendants have laid a complex structure or façade involving several layers of partnership Firms, companies and trusts for the purposes of perpetrating fraud and to isolate themselves from the liability that has arisen from unauthorized LOUs.

(vi)   All of the aforesaid dates and events reveal the systematic fraud was perpetrated by Nirav Modi and moving the US Court for insolvency to avoid the liability. Nirav Modi and his accomplishes [sic] have taken prompt steps before the US Court to avoid the seizer [sic] and attachment of the properties purchased and acquired by Nirav Modi from the proceeds of the fraudulent debt.

26.    In his Declaration filed with this Court on February 28, 2018, referencing the revelation of the PNB Fraud in India, Bhansali stated under penalty of perjury:

40. The supply chain disruption and negative publicity have dramatically impaired the Debtors' business operations in the short term and have created a great deal of uncertainty and confusion in the market about the Debtors' ability to continue to operate their business as a going concern.

41. Without greater certainty and assurances, certain vendors have expressed a reluctance to continue doing business with the Debtors and certain customers have begun to explore moving certain of the Debtors' programs to other suppliers.

42. As such, the Debtors filed these Chapter 11 cases in an effort to preserve the going concern value of their businesses and effectuate a sale or other transaction that will provide the resources necessary to allow the Debtors' successful brands to continue to thrive.

52.    27.The PNB Fraud coordinated and overseen by Modi and others at his direction The Bank Fraud resulted in a total loss to PNB of exceeding US$1 and other banks in excess of $1 billion. As a result of the PNB Bank Fraud, PNB has asserted significant claims against each of the Debtors in excess of $1 billion on the grounds, among others, that a substantial portion of the proceeds of the PNB Bank Fraud were transferred to the Debtors.

### D.    *The* Debtors' Involvement *Role* in the PNB Fraud*Bank Fraud*

53.    Modi, Bhansali, Gandhi, and other co-conspirators funneled millions of dollars in funds and diamonds through the Debtors and their offices in furtherance of the Bank Fraud, both in circular transactions with Shadow Entities and other Modi-Controlled Entities to propagate the Bank Fraud and in noncircular transactions designed to launder the proceeds of the Bank Fraud for the benefit of the family of Nirav Modi and Mihir Bhansali, and other co-conspirators.

54.    In the early stages of the Bank Fraud scheme, from around 2010 to 2012 when the LOU Entities were still trading directly with Firestar Entities, the Debtors were directly involved in import and export transactions underlying fraudulently procured LOUs. For example, in 2011, FDI and Jaffe were the exporters and direct beneficiaries of five LOUs and one LOU, respectively, totaling $10,192,303. The details of the Jaffe LOU transaction are as follows:

(i)    On October 4, 2011, Jaffe shipped a package of twenty-six fancy-colored loose diamonds to DRUS. DRUS sought an LOU from PNB for $1,921,079 to purchase the diamonds from Jaffe. PNB coordinated with its Hong Kong branch, which deposited money into PNB's Deutsche Bank nostro account in New York. PNB paid Jaffe for the diamonds from the nostro account on October 13, 2011. On the same day, after receiving the $1,921,079 from the bank, Jaffe transferred $1,832,700 in payments listed as "L/C Collections," which, upon information and belief, represents payments to Firestar Entities in India through Indian banks.

55.    Other examples of the Debtors' involvement in circular transactions from around this time include:

28.    At Modi's direction, the Debtors were involved in the PNB Fraud and were exporters and direct beneficiaries of at least six LOUs totaling $10,192,303. The Debtors also engaged in circular trading that facilitated the issuance and presentation of additional LOUs and the resulting payments to the Shadow Entities and to Firestar Entities.

(i)    29. As one example From August 8, 2011 to September 13, 2011, a period of five weeks, the Debtors exported the same 3.27 carat Fancy Vivid Yellow Orange Cushion Cut SI1 diamond three times and imported it once between August 8 and September 13, 2011, a period of five weeks. On August 8, 2011, Firestar (then Firestone, Inc.). On August 8, 2011, FDI sold the diamond to Fancy Creations Company, Ltd., a Shadow Entity for $1,098,802. Approximately three weeks later, Solar Exports, a Modi-controlled entity, exported the diamond to Firestar FDI for $183,087—approximately $900,000 less, although much closer to its actual value. Six days later, Firestar FDI exported the diamond back to Fancy Creations Company, Ltd. for $1,156,043, now in excess of the original inflated price. Finally, two weeks later, Jaffe sold the diamond for $1,218,991 to World Diamond for $1,218,991, a Shadow Entity whose operations were managed by an employee of the Firestar Entities in India, Sandeep Mistry.

(ii)    30. As another example, later Later in 2011, the Debtors engaged in the circular trading of a diamond that was recorded as a 1.04 carat Fancy Intense Pink Emerald Cut SI2 diamond. On information and belief, there was at most only one such diamond. The diamond appeared in the Debtors' records in three transactions within six weeks of each other and was valued at a different price each time, averaging $644,453 over the three purported transactions, well above the 2011 market value for such a diamond at a maximum value of $300,000 per carat. On information and belief, there was at most only one such diamond. The Debtors' records reflect a shipment of a diamond of this description on August 19, 2011, with an Indian Firestar Entity sending it to Firestar FDI for $608,400. As with the 3.27 carat Fancy Vivid Yellow Orange Cushion Cut SI1, Sandeep Mistry sent shipping instructions and a spreadsheet accompanied by invoices created in India. Consistent with Mistry's instructions, Firestar sold it to SDC Designs LLC (on information and belief, a New York company with connections to Modi) for $642,200. Jaffe shipped a diamond with the same description one month later to Diamonds 'R' Us DRUS in India for $682,760.

31. One of the purported transactions that is recorded as involving this 1.04 carat Fancy Intense Pink Emerald Cut SI2 diamond occurred in October 2011. On October 4, 2011, the diamond was among a package of twenty-six fancy-colored loose diamonds shipped from Jaffe

to Diamonds 'R' Us in India. Diamonds 'R' Us sought an LOU from PNB for $1,921,079 to purchase the diamonds from Jaffe. Gokulnath Shetty, a PNB employee working with Modi, authorized the issuance of this LOU at the PNB Brady House branch. Shetty did not properly record the LOU in PNB's records, and Diamonds 'R' Us did not provide the ordinarily-required collateral to PNB for the LOU. PNB coordinated with its Hong Kong branch, which deposited money into PNB's Deutsche Bank nostro account in New York, New York. PNB paid Jaffe for the diamonds from the nostro account on October 13, 2011. On the same day, after receiving the $1,921,079 from the bank, Jaffe transferred $1,832,700 to Firestar Entities in India.

32.    At least six PNB LOUs were issued where a Debtor was the exporting entity and direct beneficiary of the LOU funds. The funds drawn under each of these LOUs were received by the Debtors and in each case were either returned to a Firestar Entity in India or used by the Debtors or Shadow Entities.

33.    Additionally, funds generated by many of the fraudulent LOUs went through the Debtors, which received the funds from one or more of the Shadow Entities.

56.    From around 2013 onward, upon information and belief, the Shadow Entities were used as an intermediary between the Firestar Entities and LOU Entities. PNB and other banks were aware of Nirav Modi's affiliation with the Firestar Entities and LOU Entities, but not his affiliation with the Shadow Entities. Applying for financing in connection with transactions among firms known to be controlled by Nirav Modi was therefore more likely to raise suspicion.

57.    Consistent with this shift in roles, from around 2013 onwards, upon information and belief, the Debtors no longer directly participated in import and export transactions underlying LOU issuances. Instead, during this period, the Debtors received LOU proceeds indirectly through Shadow Entities. For example:

(i)     On February 7, 2013, Pacific transferred $931,965 to FDI. Upon information and belief, this transfer was linked to a fraudulent LOU that DRUS obtained from PNB in the amount of $3,097,000 in which Pacific was the exporter. That same day, FDI transferred a total of $710,465 in payments listed as "L/C Collections," which upon information and belief represents payments to India-based Firestar Entities through Indian banks. Also on February 7, 2013, FDI received $643,356.89 from FDII and transferred $643,356.89 to Belgium-based Firestar Diamond BVBA. FDII's bank statements reflect that FDII had received $643,356.89 from Firestar Diamond BVBA on February 6, 2013. Also on February 7, 2013, Eternal transferred $1,321,880 to Stellar and World Diamond transferred $1,191,942.65 to Firestar Diamond FZE.

(ii)    On March 19, 2013, FDI received $191,501.35 from Auragem and $236,078.45 from Fancy Creations. Upon information and belief, these transfers were linked to fraudulent LOUs. DRUS obtained an LOU in the amount of $3,949,000 in which Auragem was the exporter dated March 19, 2013, and DRUS obtained another LOU in the amount of $4,398,000 in which Fancy Creations was the exporter dated March 18, 2013. That same day, FDI transferred $315,000 to FDII, $200,025 to Tri Color.

(iii)   On May 6, 2013, FDI received $21,393.98 from Fancy Creations. Upon information and belief, this transfer was linked to a fraudulent LOU that Stellar obtained from PNB for which Fancy Creations was the exporter. That same day, FDI transferred $1.6 million to Tri Color.

(iv)    On March 27, 2015, Fantasy received $1,522,451 from Pacific, which, upon information and belief, constituted the proceeds of a fraudulent LOU from PNB for which Pacific was the exporter. That same day, Fantasy received $1,001,993 from Empire and Fantasy transferred $2,550,000 to FDI. That same day, FDI transferred $3,010,000 from its HSBC account to its Israel Discount Bank of New York ("**IDB**") account from which, that same day, FDI transferred a total of $3,013,033 in payments listed as "Trade Services." Upon information and belief, the "Trade Services" notation is analogous to the "L/C Collections" notation used by HSBC and indicates transfers to India-based Firestar Entities through Indian banks.

(v)     On May 3, 2016, FDI received $399,962 from Tri Color. Upon information and belief, this transfer was linked to a fraudulent LOU that Solar obtained from PNB for which Tri Color was the exporter.

(vi)    On December 19, 2016, FDI received $599,972 from Pacific. Upon information and belief, this transfer was linked to a fraudulent LOU dated December 8, 2016 that Stellar obtained from PNB in the amount of $2,707,000 for which Tri Color was an exporter. On December 9, 2016, Tri Color received $1,384,000 in LOU proceeds. That same day, Auragem transferred $1,459,000 to Stellar. On December 13, 2016, Tri Color

transferred $1,119,000 to Stellar. On December 15, 2016, Stellar transferred $1,420,000 to Pacific. On December 19, 2016, Pacific transferred the $599,972 to FDI referenced above. That same day, FDI also received $1,593,391.12 from World Diamond and $330,998.54 from Unique. That same day, FDI also transferred $997,514.96 to Firestar Diamond BVBA and $1,889,810 to FDIPL.

58.    Similarly, during this period, the Debtors made numerous transfers to Shadow Entities linked to the repayment of outstanding LOUs. For example:

(i)    On September 24, 2015, FDI borrowed $1,500,000 from HSBC. That same day, FDI received $1,414,865.28 from FDIPL. That same day, FDI transferred $1,840,969 to Auragem, $1,400,000 to Fancy Creations, and $210,128.11 to FIPL. Upon information and belief, on September 28, 2015, Auragem transferred INR 2.88 Cr (worth approximately $473,000) to DRUS. Upon information and belief, on September 29, 2015, DRUS transferred $1,505,000 to Hong Kong-based UCO Bank. Upon information and belief, UCO Bank served as the correspondent bank in connection with a fraudulent LOU dated October 9, 2014 that DRUS obtained from PNB in the amount of $1,479,000 for which Auragem was an exporter. Upon information and belief, the maturity date of this LOU was September 30, 2015.

(ii)    On February 26, 2016, FDI transferred $1,192,106 to Tri Color. Upon information and belief, on March 9, 2016, Tri Color transferred $1,647,000 to Solar. That same day, Solar transferred $2,087,000 to Hong Kong-based Axis Bank. Upon information and belief, Axis Bank served as the correspondent bank in connection with a fraudulent LOU dated March 20, 2015 that Solar obtained from PNB in the amount of $1,758,000 for which Auragem and Sunshine were the exporters. Upon information and belief, the maturity date of this LOU was March 11, 2016. Also on March 9, 2016, upon information and belief, Solar transferred $2,083,000 to DRUS. Upon information and belief, on March 10, 2016, DRUS transferred $2,340,000 to UCO as repayment of another fraudulent LOU.

(iii)    On March 3, 2016, FDI transferred $873,997 to Pacific. On March 9, 2016, Pacific transferred $64,000 to Solar. Upon information and belief, Solar used these funds to make the $2,087,000 transfer to Axis Bank and/or the $2,083,000 transfer to DRUS referenced above on March 9, 2016.

59.    Consistent with these examples and others alleged below, upon information and belief, the Debtors' Shadow Entity-linked transactions from 2013 onwards were effectuated for secondary purposes related the Bank Fraud including to: (a) facilitate repayment of LOUs and

packing credit loans; (b) provide Shadow Entities with the goods and funds the Shadow Entities needed to sell and purchase goods to and from the LOU Entities; (c) clear the Shadow Entities', Firestar Entities', and LOU Entities' accounts receivable and accounts payable so as to avert suspicion from auditors, lenders, and other third parties; and (d) divert the proceeds of the Bank Fraud for the benefit of the family of Nirav Modi and Mihir Bhansali, and other co-conspirators.

60.    The Debtors' records reflect cash transfers to and from the Debtors and the Shadow Entities totaling approximately $227 million during the Relevant Period.

*E.* *Involvement of Debtors' Directors and Officers in the* ~~PNB~~ *Bank Fraud*

34.    At the direction of Modi, certain of Debtors' directors and officers participated in and advanced the PNB Fraud, including Bhansali and Gandhi.

**Mihir Bhansali**

61.    Certain of Debtors' directors and officers, including Bhansali and Gandhi, participated in and advanced the Bank Fraud. As described below, Bhansali and Gandhi, at the direction of and in coordination with Nirav Modi, controlled all aspects of the Debtors' internal and external operations and affairs at all relevant times.

62.    As the ultimate controlling shareholder of all of the Firestar Entities, including the Debtors and U.S. Affiliates, Nirav Modi, in coordination with Bhansali and Gandhi, orchestrated or oversaw fraudulent transactions among the U.S. Entities, Shadow Entities, and other Modi-Controlled Entities involving hundreds of millions of dollars in funds and diamonds. These transactions were integral to the Bank Fraud.

63.    35.As director of the Debtors and the Debtors' CEOAs director of each of the U.S. Entities, and as CEO of FDI, Fantasy, Synergies, FGI, and NMI, and in coordination with or at the direction of Modi, Bhansali coordinated and directed fraudulent transactions among the ~~Debtors and~~ U.S. Entities, Shadow Entities, and other Modi-Controlled Entities involving hundreds of millions of dollars in funds and diamonds. These transactions were integral to the ~~PNB~~ Bank Fraud.

36.    Bhansali managed the Debtors' "house accounts," the accounts in which proceeds of loose diamond sales were segregated from regular sales accounts for purposes of computing commissions. The Debtors engaged in loose diamond sales primarily with Shadow Entities. The Debtors received approximately $155 million in cash transfers from Shadow Entities during the Relevant Period and paid approximately $72 million out to Shadow Entities. The vast majority of

these transactions involved the purchase and sale of tens of millions of dollars worth of loose diamonds per year, which is not consistent with Debtors' stated business purpose.

37. At least in 2012, Jaffe maintained two sets of books and records: "core" financials, which did not include loose diamond transactions, and "regular" financials, which did, which reflected transactions executed to further the PNB fraud, and which existed to hide those transactions.

64. As CFO of each of the U.S. Entities, and in coordination with or at the direction of Modi and Bhansali, Gandhi coordinated and directed fraudulent transactions among the U.S. Entities, Shadow Entities, and other Modi-Controlled Entities involving hundreds of millions of dollars in funds and diamonds. These transactions were integral to the Bank Fraud.

65. At all relevant times, subject to Nirav Modi's broad oversight, Gandhi and Bhansali controlled the finances of the Debtors. Each had authority to approve loose diamond transactions among the U.S. Entities and the Shadow Entities totaling hundreds of millions of dollars. Gandhi and Bhansali were also each a signatory on each of the U.S. Entities' bank accounts and, upon information and belief, were the only persons authorized to effectuate transfers from their accounts, along with Joshua Weinman with respect to FDII and Sumay Bhansali with respect to Jaffe.

66. In addition to the specific examples listed below, Bhansali, Gandhi, and Modi directly participated in, oversaw, or were otherwise responsible for all conduct attributed to the Debtors and other U.S. Entities in this Amended Complaint.

i.    *Oversight and Control of Shadow Entities and LOU Entities*

67. Nirav Modi and Mihir Bhansali, with the assistance of other co-conspirators such as Ajay Gandhi, Hemant Bhatt, Sandeep Mistry, Shyam Wadhwa, Kurian Mathews, Saju Paulose

Parokaran, and Satyendra Shukla, among others, coordinated and directed the operations of the Shadow Entities and LOU Entities to further the Bank Fraud.

68.     Mihir Bhansali's prominent role in orchestrating the Bank Fraud is illustrated by several spreadsheets recovered from Bhansali's work computer. Each of these spreadsheets was saved in January or February 2018 as a .XAR file in the "AppData\Roaming" subfolder of Mihir Bhansali's computer, which is the format and location Microsoft Excel uses to save documents under its "AutoRecover" feature. Bhansali's computer did not contain any versions of these spreadsheets outside of the AppData\Roaming subfolder, suggesting that he did not intend for them to be saved or that he deleted them at some point. These spreadsheets are summarized as follows:

(i)     The spreadsheet saved as ~ar20DE.xar, last modified on February 16, 2018, identified under the heading "AR-AP (Jan'18)" payables and receivables as between each of the LOU Entities and the Firestar Entities, on the one hand, which were listed on the horizontal axis, and the Hong Kong and Dubai-based Shadow Entities, on the other hand, which were listed on the vertical axis. The spreadsheet tracks millions of dollars in accounts receivable and accounts payable balances between the Shadow Entities and LOU Entities/Firestar Entities but did not list any customers known to be legitimate, foreign of otherwise. The far right column listed the names of individuals who, upon information and belief, were the primary contact for each of the Shadow Entities.

(ii)    The spreadsheet saved as ~ar666B.xar, last modified on February 18, 2018 at 7:20 a.m., appears to be a step-by-step guide to the mechanics and economics of the circular transactions. The spreadsheet lists as "Step 1", "Firestar India buys from HK Supplier[.]" It lists as "Step 2", "Firestar sells to Dubai customer[.]" It lists as "Step 3", "DXB customer sells to HK supplier." Below these steps, the spreadsheet provides a hypothetical example of a circular transaction in which the Firestar Entity purchases an item for "98" (no currency specified) from Vista and sells it to World Diamond for "100"; World Diamond then sells the item to Vista for "102". The spreadsheet then lists the net profit/loss for each of the three entities with respect to this transaction (i.e. a profit of "2" for World Diamond and the Firestar Entity and a loss of "-4" for Vista. On the right-hand side of the spreadsheet, there is another set of steps and the beginning of another debit/credit ledger which, upon information belief, describes another type of transaction designed to further the Bank Fraud. It lists as "Step 1", "Party

A sells to SSD[.] It lists as "Step 2", "SSD manufactures and ships back to Party A[.]" Upon information and belief, "Party A" is intended to refer to a Shadow Entity. Upon information and belief, "SSD" refers to the LOU Entities (i.e. **S**olar, **S**tellar, and **D**RUS).  It appears that the auto-save occurred prior to Bhansali completing the debit/credit ledger for the right-hand sequence. Another auto-saved version of this spreadsheet, saved eleven minutes prior at 7:09 a.m., does not contain the right-hand sequence; this demonstrates that Bhansali created the spreadsheet himself.

(iii)    The spreadsheet saved as ~ar6E8E.xar, created on February 12, 2018 and last modified on February 13, 2018, appears to be a "to do" list for various co-conspirators after the exposure of the Bank Fraud. The tasks included:

(a)   For "SM": "List of external vendors – customer clean up[.]"

(b)   For "KM": "How to knock off MM loan and others?"; "FC – AR of 130, AP of 220. How to make AP of 90, none open payables should be in current SSD companies[.]"; "Reduce AR/AP globally[.]"

(c)   For "MB": "Criminal investigation in India – what can happen?"; "Unique to sell to FC[.] FC to sell to current creditors[.] FC to sell Novella shares to Unique[.]"; "SSD debtors to sell goods to Unique and other companies that are not paying Firestar – late orders [.]"; "Forensic accounts for Pacific, Fine Classic, Unique[.]"

(d)   For "SP": "Send all non-Firestar Dubai comps to HK[.]"; "For the past 8 years, all import-export docs, bank statements of SSD (focus on last 1 year), BC application[.]"

Upon information and belief, in the context of this document, "SM" refers to Sandeep Mistry, "KM" refers to Kurian Mathews, "MB" refers to Mihir Bhansali, "SP" refers to Subhash Parab, "FC" refers to Fine Classic or Fancy Creations, "BC application" refers to buyer's credit application, and "SSD" refers to the LOU Entities (i.e. **S**olar, **S**tellar, and **D**RUS). There were several auto-saved iterations of this spreadsheet on Bhansali's laptop, some containing slight changes saved only minutes apart, which suggests that Bhansali authored the list himself.

(iv)    The spreadsheet saved as ~ar6f5.xar, last modified on January 8, 2018, contains three tabs (one for each of the LOU Entities) showing, for the fiscal years 2012 through 2017, each LOU Entity's (a) profits & losses, (b)  "BC open" (which, upon information and belief, refers to "buyer's credit" and indicates the amount of outstanding bank loans), (c) cash flow to trusts benefitting Nirav Modi's family, and (d) volume of transactions with various Shadow Entities and Firestar Entities. As alleged above, this

spreadsheet demonstrates that transactions with Shadow Entities accounted for the overwhelming majority of the LOU Entities' transactions from 2011 through 2017. The spreadsheet also shows that the LOU Entities were transacting at tiny gross margins — frequently less than 1%. After expenses, the LOU Entities were barely breaking even and, in many years, were operating at a loss. Still, the spreadsheet indicates that they transferred massive amounts of money to trusts benefitting the family of Nirav Modi and Mihir Bhansali. For example, the spreadsheet indicates that in fiscal year 2012, DRUS had gross sales of INR 933.11 crore (~$128 million) and a net loss after taxes of INR -22.85 crore (~-$3.1 million), yet it transferred INR 548.44 crore (~$76 million) to the "NDM Family Trust" and INR 32.83 crore (~$4.5 million) to the "MR Family Trust." As alleged below, upon information and belief, the M.R. Family Trust was established by or for the benefit of Mihir R. Bhansali and his family.

69.    Upon information and belief, based on statements made by various Firestar Entity employees to Indian authorities, Mihir Bhansali personally oversaw the creation of the Shadow Entities and LOU Entities and the selection of their principals, directors, officers, and employees.

70.    Bhansali also personally completed performance appraisals for at least some of the individuals involved in the operations of Shadow Entities and LOU Entities. For example, on March 1, 2016, Bhansali emailed Anup Panchal, the chief operations officer of FIL, a list of goals for the 2017 fiscal year, including "People goals – EXIM team, IT head, SSD, Dubai sales, Neeshal's team, Saju's team (all accounts to be in Surat vs. Bombay), Jaipur and Noida factories[.]" On November 4, 2017, Panchal emailed Bhansali his performance review materials. With respect to the goals set by Bhansali, Panchal noted "SSD: separated people, product machinery and made individual functional[.]" Upon information and belief, Panchal was reporting upon his achievements with respect to the operations of the LOU Entities.

71.    Mihir Bhansali's electronic calendar contained several entries, which, upon information and belief, refer to discussions Bhansali had in the course of managing the LOU Entities' operations, including: (a) a meeting scheduled for April 4, 2016 with the subject "SSD

conversation;" and (b) a meeting scheduled for April 6, 2016 with the subject "SSD infrastructure," with an invite to Saju Paulose.

72.     On January 19, 2010, Gandhi emailed Bhavesh Patel, copying Shyam Wadhwa, a request for an aging report for accounts receivables owed to FDI. In the email, Gandhi stated, "You can exclude affiliates such as FIPL, FS, FC, JS, Sandberg, Unique[.]"

73.     On September 7, 2011, Kurian Mathews forwarded an email to Bhansali containing fee quotes from accountants for proposed audits of Auragem and Fancy Creations. Mathews stated, "It seems to be on the higher side when compared with FDL HK, they may be [sic] quoted higher due to the complexity of the transactions in these entities. Audit fees of FDL HK for the year 2010-2011 was HKD 22,000. Audit fees of Brilliant & Eternal for the year 2009-2010 was HKD 27,000 each." Mathews then sought Bhansali's instruction as to "how to proceed further on this."

74.     On March 31, 2013, Bhavesh Patel emailed Mihir Bhansali accounts payable and accounts receivable ledgers of Eternal, Unique, and Brilliant.

75.     On August 6, 2013, Gandhi sent an email to Bhavesh Patel, attaching a spreadsheet titled "FS-Inc from Kurian June 2013." The spreadsheet contained purchase and sales ledgers of four Shadow Entities—Fancy Creations, Brilliant, Eternal, and Unique—showing these entities' accounting for transactions with FDI.

76.     On April 3, 2017, an India-based consultant emailed Mihir Bhansali a spreadsheet summarizing sales from various foreign Firestar Entities, including FIPL and FDIPL, to Dubai-based Shadow Entities, including World Diamond, Universal, Empire, Vista, Unique, and Diagems. The spreadsheet reflected a total of $770,730,000 in sales of rough stones, polished stones, and jewelry by various foreign Firestar Entities to these six Shadow Entities during fiscal year 2015 to 2016, and a total of $454,910,000 in such sales from April 2016 to February 2017.

77.     On May 5, 2017, Gandhi sent a list of Shadow Entities, and contact information for each, to Altamash Ansari, a back office employee in India, and stated "Use names from attached for Eternal, Pacific & Tri Color. (Do not share this pdf with anyone.)."

78.     On August 19, 2017, a manager of Universal emailed Bhansali enclosing a profile of three Shadow Entities—Universal, Empire, and Diagems—and asking Bhansali to "review and advice [sic]." The manager's email signature stated he was also the General Manager of a Firestar Entity in Dubai.

79.     On April 23, 2018, Ajay Gandhi emailed the personal email address of Altamash Ansari, a back office employee of FIPL in India, "Please email what is open AR & AP of non-affiliated AR & AP and their ledger since 2011?" Ansari replied, "I have attached herewith AR-AP of Overseas Non-Affiliates along with Ledger from start (separate tabs for specific parties)." The attachment to the email was an Excel spreadsheet entitled "Overseas Non-Affiliate AR-AP as of 04.22.2018." It contained tabs summarizing the open accounts receivable and accounts payable between Jaffe and Empire, Vista, Eternal, Tri Color, and Universal as of April 22, 2018. It also contained separate tabs reflecting ledgers of purchase and sale transactions between Jaffe and Empire, Vista, Eternal, and Tri Color, respectively.

80.     Bhansali also oversaw and directed the operations of other Modi-Controlled Entities, often including minute details involving day-to-day operations. For example, on April 26, 2011, an employee of a Firestar Entity sought Bhansali's permission to make wire transfers from a Firestar Entity in Hong Kong to FDI and Brilliant Diamonds. On September 14, 2017, a former Firestar employee asked for Bhansali's approval before changing the authorized signatory for FHL. On December 14, 2017, a request from a Dubai employee for a tablet computer was directed to Bhansali.

    *ii.*       *Oversight and Control of Transactions with Shadow Entities*

81.     During the Relevant Period, Modi, Bhansali, and Gandhi exercised direct oversight and control over transactions between the Debtors and Shadow Entities. For example:

(i)     On June 8, 2012, Gandhi emailed Bhavesh Patel and Shyam Wadhwa, "Please email payables to HK and Dubai – all the companies. Firestar, Firestar Diamond Int'l and Jaffe. Need to pay $1m to HK or Dubai hence need name and amounts only." Bhavesh replied, "There is nothing open in Dubai however HK open payables attached herewith for your review." Gandhi replied, "It could be Pacific, World Diamond, etc too." That same day, FDI transferred $1,000,000 to Fancy Creations. This transaction is described as an "advance" in FDI's bank statement.

(ii)    On July 23, 2012, Ajay Gandhi sent a message to Nirav Modi through Panemail, which is a web-based email service that automatically deletes messages, "Niravbhai, please see attached payment plan in 5 parts to clean-up AR and AP of [FDII] for HK, Dubai, Belgium and NY. Funds should come from respective companies. 1. $452k. 2. $1.129m. 3. $1.5m. 4. $828k. 5. $1.05m. If implemented, the attached AR and AP of $4.3 million can be cleaned up. Please let me know if you have different thought." On August 3, 2012, Gandhi forwarded the email to Hemant Bhatt, copying Bhansali, and stated, "I will call you Monday to discuss. We need to move funds in Firestar Diamond International, Inc. per attached. NM/MB is fine so long as money flows from SDC/Tristar and Diamlink to any of HK or Dubai entities." On August 14, 2012, Gandhi followed up, "Hemant, When can I expect payments for the below cycle that we spoke about?" On August 27, 2012, Bhatt replied to Gandhi, copying Bhansali, "Pacific and Unique paid as above. Please pay accordingly." The message contained a list reflecting that Pacific and Unique owed FDII $779,579 and $418,498, respectively, in accounts receivable, and that FDII owed Fancy Creations, FDL, and Diagems $1,063,369, $121,129, and $14,033, respectively, in accounts payable. On August 28, 2012, Hemant Bhatt messaged Ajay Gandhi on Panemail, "Auragem paid $200,000.00 and Brilliant paid $231,175.03. Pleeasse [sic] confirm receipt and pay to Fancy." FDII's bank statements reflect: (a) incoming wires of $779,544.11 and $418,463.00 on August 27, 2012 from Pacific and Unique, respectively; (b) incoming wires of $231,150.03 from Brilliant and $199,975.00 from Auragem on August 28, 2012; and (c) outgoing wires of $1,063,369, $121,129.21, and $14,032.80 on August 28, 2012 to Fancy Creations, FDL, and Diagems, respectively.

(iii)   On August 28, 2012, Gandhi emailed Bhavesh Patel, "Tomorrow, please wire $431,175 to Fancy Creations from [FDII's] Capital Old Account." FDII's bank statement reflects an outgoing wire in the amount of $431,175 to Fancy Creations on August 29, 2012.

(iv)    On September 12, 2012, Gandhi emailed Bhavesh Patel, copying Hemant Bhatt, "Please wire $150,000 to Unique Diamond for back office expenses

from January 2012 thru June 2012 – invoice #'s UD-FI-004 & UD-FI-001." That same day, Patel emailed Gandhi and Bhatt, "Please find attached wire from FSI to Unique as per new bank details for $150k."  Gandhi replied solely to Patel, "Spoke to HB for return of funds?" Patel replied, "I called him today morning. He confirmed and told that, he will require invoice details if any / from which location amount will remit etc[.] so that he will arrange as per your requirement in NY." Gandhi replied, "Ask him from where he can remit and give him details. It could be in FS or Intl."

(v)    On December 4, 2012, Sridhar Krishnan of SDC Designs emailed Gandhi, "You shall receive payment of $1,737,155 . . . from Empire Gems FZE in Firestar Diamond International, part payment against your invoice # 73112 dt 7/31/12[.] Please make payment to SDC Designs LLC against their invoice # 629966 dt 7/30/12." Gandhi replied, "When?" Krishnan replied, "I am wiring today to Universal FZE, so I guess you would get it from Empire gems tomorrow." Gandhi then forwarded the email chain to Mihir Bhansali and asked, "Ok to proceed per below once funds are received?" That same day, Gandhi separately forwarded Krishnan's email to Hemant Bhatt and asked, "Is this OK once funds are received?" Gandhi followed up with Bhatt several hours later, "Do not send email. Please call me to confirm in the morning."

(vi)    On December 10, 2012, Gandhi emailed Bhavesh Patel, "Pay $1m against above invoice to Empire Gems tomorrow from HSBC per attached wire instruction. Also let HB know that $733k is already paid against this invoice. Upon information and belief, "HB" refers to Hemant Bhatt. On December 11, 2012, FDI wired $1,185,025.05 to Empire.

(vii)    On December 13, 2012, Gandhi instructed Bhavesh Patel to "prepare the following wires today: 1. Pay $231,000 to Unique for Back Office expenses from Firestar Diamond Inc. 2. Pay $391,611 to Synergies Corp from Firestar Diamond, Inc. for Interest. 3. Pay $300,000 to Unique from Synergies Corp. for Loan Repayment. 4. Pay $91,000 to Brilliant from Synergies Corp for Loan Repayment. 5. Balance amount tomorrow to Diagem once funds are here in Firestar Diamond, Inc." Later that day, Gandhi followed up, "Money is coming any minute hence wire $552,133.10 to Diagem from Firestar Diamond, Inc. (against open invoice) . . ." The next day, Patel replied, "Based o[n] HB's details, please find wire from FSI to Diagems for $552,133.10. Gandhi replied, "Please tell HB about wires from yesterday and ask if he receives it. Upon information and belief, "HB" refers to Hemant Bhatt.

(viii)    On December 20, 2012, Bhavesh Patel emailed Ajay Gandhi, "Please find attached wire [from FDI] to Diagems ($119k) and Pacific ($652k) as per instructions." Gandhi replied, "Change Empire amount as discussed."

(ix)   ~~Bhansali coordinated and directed a number of the circular transactions involving the Debtors. For example, in~~ In a 2012 email, Kurian Matthews~~, a Firestar Entity employee in Dubai,~~ relayed a conversation he had with Bhansali in which they set up a circular transaction starting at Fantasy, going through Radashir Jewelry Co. Pvt. Ltd. (~~on information and belief, a Shadow Entity~~a Modi-Controlled Entity that has been implicated in the Bank Fraud~~38.~~), FIL, and Firestar and ending back at Fantasy. The purpose was to "clear the old invoices of Radashir on FDC" because a bank was inquiring about the old invoices. ~~39.~~Similarly, in December 2012, Bhansali and Kurian Mathews discussed wiring money to Radashir and back to the Debtors against Radashir's accounts payables to "use [the money] for NM [Modi]."

(x)   On February 4, 2013, Sridhar Krishnan, the manager of SDC Designs, LLC wrote to Bhansali and Modi partner Hemant Bhatt using personal email addresses. Krishman told Bhatt and Bhansali, "You should expect 1.4 million in Universal fze today. Please wire the same to A Jaffe." Two days later, Bhatt confirmed that Universal Fine Jewelry FZE had received the funds and that "Empire paid US $1,391,570 to A Jaffe value 05 Feb 13."

(xi)   On February 6, 2013, Ajay Gandhi emailed Nirav Modi, copying Mihir Bhansali, "Niravbhai, After keeping $3 million buffer, I can pay $1 million to India in February 2013. Please let me know if I should ask Manish/Amit for listing to pay." Modi replied, "Yes pls." One day earlier, Gandhi emailed Manish Bosamiya, Miten Pandya, and Amit Magia, "We can pay $1.0 million to India in the month of February 2013. Please email me a list to pay." As alleged above, Manish Bosamiya and Miten Pandya were among the individuals directly involved in obtaining LOU funding from PNB. Thus, upon information and belief, the purpose of Gandhi's emails was to inform Modi, Bosamiya, and Pandya the amount Gandhi would be able to send to facilitate repayment of LOUs.

(xii)   On February 19, 2013, Shyam Wadhwa emailed Ajay Gandhi, "Kindly clarify details of open vendor bills against which inward wire receipt of $2[,]006,987.25 on 29th May '12 has been applied. Gandhi replied, "$2m was received & wired back to FIPL and Radashir." His email included a table reflecting that, on May 19, 2012, $2,006,949.25 received from Pacific was sent to FIPL ($1,953,990) and Radashir ($126,010).

(xiii)   On February 22, 2013, Bhavesh Patel emailed Ajay Gandhi a wire confirmation reflecting a $503,501.41 transfer from FDI to Pacific.

(xiv)   On October 23, 2013, Ajay Gandhi emailed Bhavesh Patel, "Pay $150,000 to Pacific Diamonds per the attached from Firestar Diamond, Inc. – HSBC." Patel replied with the wire confirmation and stated, "Please find attached wire from FSI to Pacific as Professional Fees."

(xv)     On October 30, 2013, Bhavesh Patel emailed Ajay Gandhi, copying Altamash Ansari and Shyam Wadhwa, "Please find attached internal transfer as well as wire document for your reference. 1. FSI to Jaffe, Amount $1,768,385.00 (Internal) 2. Jaffe to Pacific, Amount $2,455,036.00 (Abu Dhabi Bank). A few hours later, Patel followed up to ask Gandhi to "please approve attached wires as discussed."

(xvi)    On December 31, 2013, Mihir Bhansali emailed Ajay Gandhi, "As discussed, FSI will pay to Sangam Diamonds Corp. on behalf of Fancy Creation Company Limited (HK) (Invoice # 100773 Dt. 19.12.2013). Attached are Invoice of Sangam Diamonds Corp Sale to Fancy and Sangam's bank info. Please make wire today." Gandhi replied, copying Bhavesh Patel, "Bhavesh, please set-up wire from Firestar to Sangam Diamond – NY." Patel then replied with the wire confirmation reflecting a $1,247,746 payment to Sangam Diamonds Corp. On January 8, 2014, Gandhi forwarded Bhansali's December 31, 2013 email to Hemant Bhatt, stating "I paid $1.24m on 12/31/13 to Fancy per attached. This funds never came back hence I will pay $575k today. Please call me if needed."

(xvii)   On February 5, 2014, Altamash Ansari emailed Ajay Gandhi, with a copy to Shyam Wadhwa and Bhavesh Patel, a table of "Receipts & Payments for the month in which [Jaffe] received money from Pacific." The table listed amounts Jaffe received from and paid to Pacific, Empire, Twin Fields, and various Firestar Entities. Replying solely to Shyam Wadhwa, Gandhi stated, "Pacific got paid more than they send funds !!!!!" Wadhwa replied, "Please ignore below email. To answer your question, A. Jaffe had received Funds through Pacific which were lying as ADVANCE in books. Post shipment of diamonds, advance has got adjusted." On February 12, 2014, Gandhi replied, "Anything I need to do?" Wadhwa replied, "Manish Bosamiya would be requiring $ 4M funds against India billing on A. Jaffe." As noted above, upon information and belief, Manish Bosamiya was one of the individuals directly involved in obtaining LOU funding from PNB, which suggests that the $4 million Wadhwa requested from Jaffe was directly related to repaying an LOU. Gandhi replied, "Spoke to MB [upon information and belief, Mihir Bhansali]. Let's talk tomorrow or Friday. He prefers outgoing shipment from Jaffe to Firestar BVBA as oppose to anywhere."

(xviii)  On March 18, 2014, Ajay Gandhi emailed Bhavesh Patel, copying Hemant Bhatt, instructions to wire $150,000 from FDI to Unique for "back office expenses," $123, 097 from FDI to Synergies for "Interest," and $123,000 from Synergies to Brilliant for "Loan repayment." Patel replied with the wire confirmations.

(xix)    On March 25, 2014, Shyam Wadhwa emailed Ajay Gandhi, copying Bhavesh Patel, "FHL has remitted sub-debt funds [of] USD [$]4,058,500 to Firestar Diamond Inc and USD [$]1,800,000 to Firestar Group Inc. Please

remit funds to Brilliant from both companies and confirm." Patel then sent Gandhi wire confirmations reflecting a transfer of $4,058,500 from FDI to Brilliant and a transfer of $1,800,000 from FGI to Brilliant.

(xx)     On August 4, 2014, Sridhar Krishnan of SDC Designs emailed Ajay Gandhi, "Did you wire to Empire. Please advise." Gandhi replied, "I need to pay overseas. I have asked for a listing to pay. I will let you know once it is wired." Krishnan replied, "I need the funds by tomorrow. Please expedite."

(xxi)    On September 18, 2014, Manish Bosamiya emailed Ajay Gandhi, copying Bhavesh Patel, "Firestar Diamond Intl Inc will receive US $550,000.00 from Firestar Diamond Ltd (HK) in Capital One Bank." Patel then emailed Gandhi, "Please approve below wire from Capital Old [one of FDII's Capital One bank accounts] to Pacific for $550,000.00 as POA."

(xxii)   On December 16, 2014, Gandhi emailed Avinash Oza and Altamash Ansari, "Please pay $1,240,273.54 to Auragem, HK tomorrow for their invoice #2580001314 from Firestar Diamond, Inc. (Part payment)." Oza replied with the wire confirmation. Gandhi replied, "Bank information confirmed with Sandeep?" Upon information and belief, Gandhi was referring to Sandeep Mistry, one of the key co-conspirators in the Bank Fraud.

(xxiii)  On February 19, 2015, Ajay Gandhi emailed Hemant Bhatt, "I would like to pay $300k for back-office expenses. Pay to Unique? Please email me wire information. Also, I would like to pay $180k from Synergies to Brilliant. Please email me wire confirmation." On February 20, 2015, Ajay Gandhi emailed Arpan Doshi and Avinash Oza instructions to wire $186,871 from FDI to Synergies as "Interest", $300,000 from FDI to Eternal as "Back Office Expense," and $180,000 from Synergies to Brilliant as "Loan Repayment." Doshi replied with the wire confirmations.

(xxiv)   On March 2, 2015, Gandhi emailed Avinash Oza and Arpan Doshi instructions to wire $300,000 from FDI to Unique and $180,000 from Synergies to Brilliant. Doshi replied with the wire confirmations.

(xxv)    On June 26, 2015 Ajay Gandhi emailed Arpan Doshi and Avinash Oza instructions to wire $300,000 from FDI to Pacific. FDI's bank statement reflects a transfer from FDI to Pacific of $1,438,270.60 on that day.

(xxvi)   On September 28, 2015, Ajay Gandhi emailed Avinash Oza, "Please wire $1,017,000 from Firestar Diamond, Inc to Pacific Diamond – on account." Oza replied with the wire confirmation. Gandhi replied, please wire $54,000 to Pacific D from Firestar Diamond, Inc." Gandhi then emailed Operation 1, in reply to an email earlier that day in which Operation 1 sent Gandhi Pacific's bank details, "$1.017m wired. I thought it was $1.017m

33

but I received $1.071m. Will wire balance tomorrow - $54k." FDI's bank statements reflect these transfers.

(xxvii)   On February 26, 2016, Ajay Gandhi emailed Avinash Oza and Arpan Doshi instructions to wire $1,192,105.55 from FDI to Tri Color. Doshi replied with the wire confirmation.

(xxviii)   40.In March 2016, Evelyn Kosiec, the Jaffe operations manager, asked Bhansali where to re-export loose diamonds, and an hour later she emailed Gandhi, "Mihir informed to ship this to Eternal diamonds [a Shadow Entity] in Hong Kong, the same price, rounded to the nearest 5 120 day terms."

41.   Bhansali oversaw and directed the use of different sales and inventory practices for Debtors' transactions with Shadow Entities as compared to those used with retailer customers. For instance, each diamond or gem received by the Debtors for use in an ordinary retail transaction was unpacked, compared to its packing slip, scanned for quality control, and logged as "ready to ship." Goods received from Firestar Entities or Shadow Entities as part of the loose diamond transactions often were re-shipped within several days, often to the country from which they originated. Consistent with instructions from Firestar Global Entities, these goods were either re-shipped without being opened or, if they were opened, they were inventoried in bulk, not individually.

42.Bhansali was intimately involved in and managed the transactions between the Debtors and the Shadow Entities. He had a copy on his office computer of a spreadsheet entitled "AR-AP (Jan'18)" with a document date in early February 2018. The spreadsheet identified payables and receivables as between each of the Modi-controlled entities and the Firestar Entities on the one hand, which were listed on the horizontal axis, and the Shadow Entities on the other hand, which were listed on the vertical axis. The spreadsheet tracks millions of dollars in accounts receivable and accounts payable balances between the Shadow Entities and Firestar Entities but did not list any customers known to be legitimate, foreign of otherwise.

43.    Many of the Shadow Entities directors were current or former employees of Firestar Entities. In addition, many Shadow Entity employees were current or former employees of Firestar Entities, which was reflected on the "AR-AP (Jan'18)" spreadsheet Bhansali had on his computer.

44.    Bhansali coordinated and directed the operations of various Shadow Entities. In fact, Bhansali, along with Modi, directed the establishment and controlled some of the Shadow Entities that engaged in the circular trading, including Empire Gems, Unique Diamond and Jewelry, Pacific Diamonds, Universal Fine Jewelry, Vista Jewelry, and Tri Color Gems.

45.    On September 7, 2011, Firestar Dubai employee Kurian Mathews forwarded an email to Bhansali containing fee quotes from accountants for proposed audits of two Hong Kong Shadow Entities, Auragems Company Ltd. and Fancy Creations Company Ltd. Mathews stated the fees may have been higher than Firestar Diamond in Hong Kong "due to the complexity of the transactions in these entities." Mathews then sought Bhansali's instruction as to "how to proceed further on this[.]"

46.    On February 4, 2013, Sridhar Krishnan, the manager of SDC Designs, LLC wrote to Bhansali and Modi partner Hemant Bhatt using personal email addresses. Krishnan told Bhatt and Bhansali, "you should expect 1.4 million in Universal fze today. Please wire the same to A Jaffe." Two days later, Bhatt confirmed that Universal Fine Jewelry FZE had received the funds and that "Empire paid US $1,391,570 to A Jaffe value 05 Feb 13."

47.    On August 19, 2017, a manager of Universal Fine Jewelry FZE emailed Bhansali enclosing a profile of three Shadow Entities – Universal Fine Jewelry FZE, Empire Gems FZE, and Diagems Inc. – and asking Bhansali to "review and advice [sic]." The manager's email signature stated he was also the General Manager of Firestar Diamond in Dubai.

48.      Bhansali also oversaw and directed the operations of other Firestar Entities, often including minute details involving day-to-day operations. For example, on April 26, 2011, an employee of a Firestar Entity sought Bhansali's permission to make wire transfers from a Firestar Entity in Hong Kong to Firestar and Brilliant Diamonds. On September 14, 2017, a former Firestar employee asked for Bhansali's approval before changing the authorized signatory for Firestar Hong Kong. On December 14, 2017, a request from a Dubai employee for a tablet computer was directed to Bhansali.

### Ajay Gandhi

49.      As CFO of the Debtors, Gandhi coordinated and directed transactions among the Debtors and Shadow Entities totaling hundreds of millions of dollars. These transactions were integral to the PNB Fraud.

50.During the Relevant Period, Gandhi controlled the finances of the Debtors. He had authority to approve loose diamond transactions among the Debtors and the Shadow Entities totaling hundreds of millions of dollars.

51.      Gandhi did not distinguish the relationship of the Shadow Entities to the Firestar Entities from the relationship of the Debtors to the Firestar Entities and directed the use of the Debtors' funds for payment of expenses of the Shadow Entities. For example, on March 18, 2014, Ajay Gandhi directed $150,000 to be wired from Firestar's account to Unique Diamond & Jewelry, a purportedly-independent entity that was in fact a Shadow Entity, for the payment of Unique's back office expenses for the period of October 2013 to March 2014. Similarly, on February 15, 2015, Gandhi emailed two Firestar India back office employees and instructed them to pay "$300,000 from Firestar Diamond, Inc to Eternal Diamond. (Back office Expense)" for this Shadow Entity.

52.      Additionally, on January 19, 2010, Gandhi stated in his request for an aging report from the Firestar Entities' back office in India, "You can exclude affiliates such as FIPL [FIL], FS,

FC, JS, Sandberg, Unique[,]" thereby referring to Unique Diamond & Jewelry as an affiliate of the Debtors.

53.    On May 5, 2017, Gandhi sent a list of Shadow Entities to Altamash Ansari, a back office employee in India, and stated "Use names from attached for Eternal, Pacific & Tri Color. (Do not share this pdf with anyone.)."

54.    Gandhi had access to the books of various Shadow Entities. On August 6, 2013, Gandhi sent an email to Bhavesh Patel, a Firestar back-office employee in India, attaching a spreadsheet titled "FS-Inc from Kurian June 2013." The spreadsheet contained purchase and sales ledgers of four Shadow Entities – Fancy Creations Company Limited, Brilliant Diamonds Limited, Eternal Diamond Limited and Unique Diamond & Jewelry – showing these entities' accounting for transactions with Firestar. There appears to be no legitimate reason why Gandhi would be in possession of the internal books and records of multiple Shadow Entities, absent having control or orchestration of their records.

55.    On June 10, 2013, to hide their involvement in the PNB Fraud, Modi's personal assistant instructed Gandhi to communicate with her regarding Shadow Entities only on Gmail or Panemail, a program that automatically deletes messages, rather than on the Debtors' regular email system.

56.    The PNB Fraud coordinated and directed by Modi, Bhansali, and Gandhi has resulted in substantial creditor claims against the Debtors, including a substantial claim by PNB, and caused the collapse and resulting loss of value of the Debtors' and their businesses.

**Modi, Bhansali and Gandhi Coordinated their Actions**

57.    Modi coordinated and directed the execution of the PNB Fraud with senior officers and directors of the Debtors, including Bhansali and Gandhi.

58.    Throughout the Relevant Period, Modi sent hundreds of emails to Bhansali and Gandhi, had numerous telephone conversations with them, and met with them at the Debtors' premises and elsewhere. Through many of these emails, telephone conferences, and visits, Modi directed Bhansali and Gandhi and exerted total ultimate control over Debtors' affairs, including in regard to day-to-day details. One means of Modi's omnipresent oversight and control over the Debtors consisted of the dozens of flash reports regarding the Debtors' financials that he received throughout the Relevant Period.

59. Examples from a short period in 2009 illustrate Modi's total ultimate control over the Debtors. On February 22, 2009, Modi conveyed his preferences to Bhansali regarding which of the Debtors should contribute to a charity dinner. On June 10, 2009, Modi wrote to Gandhi, "Please confirm that shipments made after bankruptcy to Robbins and Western Stone are not in Tab 3 [of the spreadsheet.]" On March 17, 2009, Modi instructed Bhansali and Gandhi, "Pls don't pay further draws/reimbursement to A.Jaffe [sic] salespeople unless I approve. Pls confirm[.]" And on March 20, 2009, Modi requested additional information from Gandhi regarding the Jaffe medical plan and the legality of implementing a method to decrease the medical costs. On June 8, 2009, upon reviewing Jaffe's accounts receivable, Modi instructed Gandhi, "If [the customers] always have been late, we should analyze their business prospects on a going forward basis." On June 17, 2009, Modi weighed in on an "Inventory Reduction Plan" for Jaffe, and on July 9, 2009, Bhansali wrote to Modi, "This was the summary of our plan for Jaffe, that Sam, you and I finalized with Ajay the Friday evening in your house." On July 15, 2009, Modi reviewed a Jaffe budget and commented, "I have deleted some line items[,]" and instructed Gandhi, "When planning, pls review moving to a 4 day week for Jaffe and /or salary cuts . . . for remaining people." On August 14, 2009, Modi instructed Gandhi to respond to an auditor's question with "4.2 million" as the inventory number for Jaffe.

60.    Examples from a short period in 2015 show Modi's total ultimate control over the Debtors persisted throughout the Relevant Period. On January 5, 2015, Gandhi wrote to Modi, "Based on my cash flow, I can pay $ 3 million in India in January 2015. Please let me know if I can ask for a list from Manish to pay India[,]" to which Modi responded, "Yes[.]" Similarly, on February 9, 2015, Gandhi told Modi, "February cash flow has improved in the last week. I have $ 2.0 m of Borrowing Cushion. Please let me know if I should pay India - $ 1.5 m this month after keeping $ 500k as cushion[,]" to which Modi responded, "Pls pay $2 m; don't keep cushion." Then, on February 19, 2015, Gandhi told Modi, "Received funds from HK. Now I can pay additional $ 1.5 m this month [to India] this month. Can I ask Manish for a list to pay?" to which Modi responded, "Yes[.]" And on March 2, 2015, Gandhi relayed to Modi that, "Based on my cash flow, I can pay $ 3 m to India in March 2015. Should I ask Manish for a list?" to which Modi responded, "Yes[.]"

61.    Furthermore, Modi treated Gandhi in some respects as a personal accountant. For instance, on February 28, 2017, Modi directed Gandhi to prepare "all financial related parts" of Modi's personal application to live in the River House in New York City, a process which included gathering information concerning Modi's wife, Ami Modi.

(xxix)    On March 4, 2016, Gandhi emailed Avinash Oza and Arpan Doshi instructions to wire $300,000 from FDI to Unique. Oza replied with the wire confirmation.

(xxx)    On March 9, 2016, Ajay Gandhi emailed Avinash Oza and Arpan Doshi instructions to wire $247,551 from FDI to Synergies and $250,000 from Synergies to Brilliant. Doshi replied with the wire confirmations.

(xxxi)    On March 15, 2016, Ajay Gandhi emailed Avinash Oza and Arpan Doshi instructions to wire $700,000 from Jaffe to Pacific. Oza replied with the wire confirmation.

(xxxii)    On March 21, 2016, Ajay Gandhi emailed Avinash Oza and Arpan Doshi instructions to wire $1 million from Jaffe to Pacific. Doshi replied with the wire confirmation.

(xxxiii)   On March 24, 2016, Ajay Gandhi emailed Avinash Oza and Arpan Doshi instructions to wire $1 million from Jaffe to Pacific. Oza replied with the wire confirmation.

(xxxiv)   On March 25, 2016, Ajay Gandhi emailed Avinash Oza and Arpan Doshi instructions to wire $1.4 million from Jaffe to NMI, and then $613,069 from NMI to Auragem and $787,000 from NMI to Nirav Modi Ltd. Doshi replied with the wire confirmations.

(xxxv)   On March 31, 2016, Ajay Gandhi emailed Avinash Oza and Arpan Doshi instructions to wire $301,540 from Fantasy to Tri Color Gems. Oza replied with the wire confirmation.

(xxxvi)   On April 5, 2016, Gandhi emailed Avinash Oza and Arpan Doshi instructions to wire $500,000 from Jaffe to Pacific. Doshi replied with the wire confirmation.

(xxxvii)   On May 6, 2016, Gandhi emailed Avinash Oza, Arpan Doshi, and Altamash Ansari instructions to wire $2 million from Jaffe to Pacific. Oza replied with the wire confirmation.

(xxxviii)   On June 1, 2016, Gandhi emailed Avinash Oza and Arpan Doshi instructions to wire $815,000 from Jaffe to Pacific. Doshi replied with the wire confirmation. Jaffe's bank statements reflect this wire transfer.

(xxxix)   On June 29, 2016, Ajay Gandhi emailed Altamash Ansari and Vishal Popat a bank statement reflecting a $599,972 wire transfer from Pacific to Jaffe on June 29, 2016. Gandhi instructed them to "show as advance if no open AR from Pacific."

(xl)   On July 18, 2016, Ajay Gandhi emailed Avinash Oza instructions to wire $200,000 from FDI to Jaffe, $200,000 from Jaffe to Fancy Creations, $150,000 from FDI to FDII, and $150,000 from FDII to Fancy Creations. Oza replied with the wire confirmations.

(xli)   On July 19, 2016, Ajay Gandhi Emailed Avinash Oza instructions to wire $1,809,528 from FDI to Fancy Creations. Oza replied with the wire confirmation.

(xlii)   On July 22, 2016, Gandhi emailed Avinash Oza and Arpan Doshi instructions to wire "$715k from Firestar to Fancy – Purchases[;] $200k from Firestar to Jaffe[;] $200k from Jaffe to Fancy – Purchases[.]" Oza replied with the wire confirmations.

(xliii)   On March 22, 2017, Ajay Gandhi emailed Avinash Oza and Kunal Patel instructions to wire $300,000 from FDI to Unique for "Back-Office

(xliv)   expenses" and $240,000 from Synergies to Brilliant for "Repayment of Loan." Oza replied with the wire confirmations.

(xliv)   On January 3, 2018, Gandhi emailed Avinash Oza instructions to wire $483,620.05 from FDI to Pacific, $2,188,769.43 from FDII to Pacific, and $530,000 from Jaffe to Pacific. Oza replied with the wire confirmations. Gandhi then forwarded this email to Subhash Parab and Shyam Wadhwa stating, with respect to the $2,188,769.43 transfer to Pacific, "We have wired these funds from FSI but please apply this amount to FSII (Pacific) due to bank error in Capital One." Consistent with Gandhi's email, FDI's bank statements confirm that FDI wired both $483,620.05 and $2,188,769.43 to Pacific on January 3, 2018.

(xlv)   On January 31, 2018, Avinash Oza emailed Ajay Gandhi wire confirmations reflecting transfers of $2,466,015 and $525,000 from FDII to Fancy Creations. Gandhi forwarded the wire confirmations to Shyam Wadhwa and stated, "Please let your vendor know of this payment and clear any AR from HK."

82.   62.Modi, Bhansali, and Gandhi communicated frequently with each other and various other co-conspirators concerning the ~~PNB~~ Bank Fraud and to advance the ~~PNB~~ Bank Fraud. For ~~instance, on August 14, 2009, Modi directed Gandhi to make payments totaling $2,293,326 to Shadow Entities Brilliant Diamonds Ltd. and Diagem Inc. On June 16, 2010, Modi instructed Gandhi, "Unique [a Shadow Entity] has wired $250,000 today to Synergies. Please wire to the account Mehul bhai wants."~~ example:

(i)   On August 14, 2009, Modi directed Gandhi to make payments totaling $2,293,326 to Brilliant and Diagem. On June 16, 2010, Modi instructed Gandhi, "Unique has wired $250,000 today to Synergies. Please wire to the account Mehul bhai wants."

(ii)   On August 26, 2010, Nirav Modi emailed Ajay Gandhi to ask, "What will be the week-by-week payment plan for September to India?" On August 27, 2010, Gandhi replied, attaching two spreadsheets containing two possible scenarios, and noting "to cover August borrowing base – I have asked India to remit $1 m for one day & I will remit back on September 1. Substantial amount of inventory was shipped to India & HK hence inventory & AR became ineligible." On August 29, 2010, Gandhi forwarded this email chain to Mihir Bhansali.

(iii)   63.On October 21, 2010, in furtherance of a circular trade, Modi and Gandhi communicated by email about the shipment of a diamond to a Shadow

Entity. Modi stated, "~~send~~ Send the 70 ct vivid yellow to Firestone Dubai @51,500 and not Firestone HK." Gandhi responded, "Firestone, Dubai confirmed (Not Unique)[,]" to which Modi clarified, "Sorry Unique[,]" in reference to the Shadow Entity. Gandhi responded with "Glad I asked!!!"

(iv)    On December 20, 2013, Ajay Gandhi emailed Manish Bosamiya, Miten Pandya, and Amit Magia, "I can pay $600k from Capital One – Diamond Division or A. Jaffe – HSBC." On December 23, 2013, Bosamiya replied, "Please find attached open invoice of $602,761.39 from FSI." Patel replied to Gandhi, "They don't have anything most recent open from Jaffe or diamond division so they gave listing from FSI for $603k. Please let me know if we can pay from FSI so that I will prepare wires as per that." Gandhi replied, "Transfer to H[s]bc but do not pay from this list but pay other list [o]f Manish around $1.8m."

(v)    On January 9, 2014, Ajay Gandhi emailed Miten Pandya, Manish Bosamiya, and Amit Magia, "I can pay $5 million in January 2014 to India. Please email me a listing of invoices so that I can wire funds on a weekly basis or so." Bosamiya replied with the allocation of the $5 million among various Firestar Entities. On January 13, 2014, Gandhi replied, "$5m wired per below. Please acknowledge receipt of these wires." On January 21, 2014, Bosamiya replied, copying Bhavesh Patel, "Boi – London [upon information and belief, "Boi" refers to "Bank of India] informed yesterday that they have not received $2,157,359.90 as the concern [sic] person was on leave last week and they have only received the message that funds are coming but Nostro is not credited. Please provide the swift message." Later that day, Patel replied to Gandhi, "Manishbhai called me and they received fund." Gandhi then replied to Bosamiya, "Bhavesh emailed me that funds were received. Please let me know otherwise."

(vi)    On April 1, 2014, Gandhi emailed Manish Bosamiya, "I can pay $4 million in April 2014 to India. Please email me a listing of invoices so that I can wire funds on a weekly basis or so." Bosamiya replied with instructions to wire $1,763,644.60 from FDI to FIL and $2,250,858.36 from FDI to FDIPL. On April 2, 2014, Gandhi replied, "1.76m wired today." On April 14, 2014, Gandhi followed up, "$240k and $341k wired today."

(vii)    On April 6, 2016, Shyam Wadhwa emailed Ajay Gandhi and Mihir Bhansali asking them to send $2.7 million from Jaffe to FIL to clear outstanding accounts receivable and stating "our fund position is tight in India, else would have wired funds to you against our payables of about USD 1M from FDIPL for clearing AR/AP between India and NY." Gandhi replied, copying Bhansali, "We have Overseas AR of around $8.5m in Firestar Diamond, Inc. – If I get funds in FD, Inc then we can wire funds to India this month." The next day, Gandhi followed up, "I can wire $1m this month from Jaffe thru FS. Can it come back to FS?"

83.    Ajay Gandhi sent numerous substantially similar emails to Nirav Modi, Miten Pandya, Manish Bosamiya, Amit Magia, Shyam Wadhwa, and others advising them of his ability to wire funds from the U.S. Entities to India throughout the Relevant Period.

*iii.*    *Suspicious Accounting, Finance, and Inventory Management Practices*

84.    During the Relevant Period, Gandhi and Bhansali engaged in and oversaw suspicious accounting, corporate finance, and inventory management practices which, upon information and belief, were for the purpose of furthering and concealing the Bank Fraud.

85.    For example, Gandhi and Bhansali maintained two sets of books and records for Jaffe: "core" financials, which did not include loose diamond transactions outside the normal course of Jaffe's business, and "regular" financials, which did reflect transactions with Shadow Entities and other Firestar Entities to further the Bank Fraud.

86.    For example, Jaffe's federal tax return for the fiscal year ending March 31, 2012 listed sales of only $9,090,661. However, Jaffe's sales journal, as well as the Jaffe financial statements originally provided by Gandhi to the Examiner, indicates that, during that same time period, Jaffe's sales totaled $49,628,873.

87.    Once Gandhi was questioned by the Examiner about the significant difference between the tax return sales of around $9 million and the "original" financial statements and sales journal which both reflected $49 million of sales, Gandhi produced a second set of financial statements, which he called the "core" set. This "core" set reflected sales at $10 million. Gandhi did not provide any real explanation as to why he maintained two sets of financial statements. The difference between these financials was primarily loose diamond sales between Jaffe and various Shadow Entities.

88.    Bhansali managed the Debtors' "house accounts," the accounts in which proceeds of loose diamond sales were segregated from regular sales accounts for purposes of computing

43

commissions. Upon information and belief, the difference between the amounts reported in the Jaffe's tax returns versus the amounts reflected in its sales journals primarily relates to such transactions.

89.    Upon information and belief, Bhansali and Gandhi also oversaw and directed the use of different sales and inventory practices for Debtors' transactions with Shadow Entities as compared to those used with retailer customers.

90.    For example, each diamond or gem received by the Debtors for use in an ordinary retail transaction would be unpacked, compared to its packing slip, scanned for quality control, and logged as "ready to ship."

91.    These practices were not employed with respect to Shadow Entity-related transactions. For those transactions, a Shadow Entity or foreign Firestar Entity would often send bulk shipments of loose diamonds accompanied by email instructions to export them immediately upon receipt to either another Firestar Entity or a Shadow Entity at specified prices and quantities. Packing slips and invoices for the subsequent exports often accompanied these email instructions. Consistent with instructions from overseas Modi-Controlled Entities, these goods were either re-shipped without being opened or, if they were opened, they were inventoried in bulk, not individually.

     *iv.*       *Efforts to Manipulate or Deceive Auditors and Lenders*

92.    On numerous occasions, Bhansali and Gandhi sidestepped auditors' inquiries concerning the U.S. Entities' dealings with Shadow Entities by offering a farfetched explanation, feigning ignorance, or, in some cases, ignoring the question altogether.

93.    For example, on November 10, 2016, Trupti Naag, a senior analyst at accountancy Manish Modi & Associates, emailed Gandhi requesting additional information regarding entries on a spreadsheet summarizing "AR/AP of Various Foreign Companies as of October 31, 2016."

94.     The spreadsheet purported to show accounts receivable and accounts payable balances between Firestar, FDII, NMI, Jaffe, and Synergies (on the horizontal axis) and Shadow Entities Pacific, Unique, World Diamond, Auragem, Empire, Fancy Creations, Sino Traders, Eternal, Universal, Vista, Tri Color, and Brilliant (on the vertical axis).

95.     The spreadsheet, Naag's inquiries, and Gandhi's responses demonstrate the extent to which the supposed pretexts for the movement of funds among the various Firestar Entities and Shadow Entities—frequently accounted for as loans, sales, and advances against future sales—lacked legitimate business sense. For example:

(i)     The spreadsheet listed Pacific as owing FDII $244,548 in accounts receivable. With respect to this entry, Naag asked, "As per the sale register up to Sep 2016, there has been no transaction with Pacific diamonds, is this receivable against sale or advance given for purchase?" Gandhi responded "AR for Sale in March 2016."

(ii)    The spreadsheet listed FDII as owing a total of $13,484,957 in accounts payable to Pacific, Auragem, Empire, Fancy, and Sino Traders. With respect to these entries, Naag asked, "There were no purchase transactions with these parties up to Sep 2016, what is the nature of these payables?" Gandhi responded "There is a purchase of $1.3m in August 2015." He had no explanation for the remaining more than $12.2 million in purported accounts payable from FDII to Shadow Entities.

(iii)   The spreadsheet listed Jaffe as being owed a total of $839,278 in accounts receivable from Pacific, Empire, Eternal, and Vista. With respect to these entries, Naag asked, "There are no sale transactions to Pacific, Eternal, and Vista. Are these advances given for purchases?" Gandhi responded, "Yes[.]"

(iv)    The spreadsheet listed Jaffe as owing a total of $6,998,488 in accounts payable to Pacific, Eternal, Universal, and Tri Color. With respect to these entries, Naag asked, "There have been no purchases from these parties up to Sep 2016. Have purchases been made in Oct?" Gandhi responded, "For Future[.]"

(v)     The spreadsheet listed Synergies as owing Brilliant $1,287,000 in accounts payable. With respect to this entry, Naag asked, "Is this advance received against sale or borrowings?" Gandhi responded, "Borrowing[.]" Upon information and belief, this entry related to the same purported $1,287,000 "loan" from Brilliant to Synergies alleged below, for which a term sheet

was not executed until July 2017 when the issue was "holding up" Synergies' audit.

96.     As another example, on April 22, 2017, Rutvi Mehta of Sampat & Mehta emailed Kunal Patel, copying Ajay Gandhi: "This invoice of Fancy Creation is in the name of Firestar Diamond, Inc. and purchased i.e. the 1st three products are booked in the books of Firestar Jewellery INC. Why invoice is booked in Firestar Jewellery Inc.?" Trushit Shah, also of Sampat & Mehta, followed up: "Ajaybhai, We were under the impression that splitting of invoice between US entities is done only in case of Group companies transaction. However, in this case splitting is done with outsider as well." Gandhi replied, "Vendor error." A few minutes later, apparently deciding that excuse was not sufficient, he equivocated, "Also to save freight, they ship together as one invoice. Difficult to fight with them."

97.     As another example, in a June 16, 2011 email, John Regan at HSBC Bank asked Ajay Gandhi why Synergies would be wiring funds to Unique. Gandhi replied: "Unique loaned to Synergies Corp. Synergies Corp loaned to Twin Fields. Twin Fields paid back loan after 3 days to Synergies Corp. Synergies Corp paid back funds to Unique." Regan replied, "Unique is affiliated correct? Does Nirav own it? Is this why there are loans back and forth?" Gandhi replied, "Unique is not an affiliated company but Nirav has a very good relationship with them." Regan then asked, "Why is each company lending to the other?" Gandhi replied, "I am sure there were business reasons. What is the concern for the bank?"

98.     As another example, on March 31, 2010, Oakley Champine, a Vice President of Antwerp Diamond Bank, asked Ajay Gandhi several questions relating to transactions among Firestar Entities and Shadow Entities. She asked, "[w]hat is the reason for the large negative accounts payable balances between Firestone and affiliated companies (Firestone Group India, S&S)?" Gandhi replied, "Mostly advance given against purchases."

99. In some instances, Gandhi sought Bhansali's advice on how to respond to auditor inquires. For example, on April 26, 2017, Ajay Gandhi forwarded an auditor's inquiries into the U.S. Entities' A/R and A/P balances with Shadow Entities to Mihir Bhansali. Gandhi stated: "Point 2 [regarding the Shadow Entities] - lets discuss." Bhansali replied: "Pls speak to Shyam [Wadhwa] on this, thank you. Let me know when we can clear at least the $4m." (FDII's A/P included $4,702,350 owed to Auragem and $4,147,816 owed to Fancy Creations).

100. As another example, on September 7, 2011, a banker at Standard Chartered Bank emailed Ajay Gandhi, "We understand that Firestar in NY sales [sic] mostly to big retailers in the US but the recent A/R outstanding shows more concentration on companies such as Unique Diamond, Empire Gem and SDC Designs. Can we get YTD sales data of 2010 and 2011 of the top 10 accounts for each year on year comparison?" She further stated, "Also, in the AR ageing it shows Firstar has given Steller [sic] diamonds and Unique diamonds $11m limits each—and Brilliant, Fancy creations $2m each. We understand that these foreign bills we are not discounting them, but we'd like to get more background info on these accounts given the size of exposures."

101. 64.Modi, Bhansali, and Gandhi coordinated their communications to prevent detection of the PNB Fraud. For instance, on September 7, 2011, in addressing an inquiry from Standard Chartered Bank regarding transactions with certain Shadow Entities, which the bank believed were independent customers, Gandhi represented that these entities were not in fact customers but that Firestar would buy large diamonds from them as vendors. Gandhi explained, "sometimes these goods need to be returned On September 12, 2011, Gandhi replied, "Various overseas companies that you have mentioned are not our customers. We buy unique large diamonds/jewelry pieces from various vendors in India and sometimes these goods need to be returned, but due to the terms of the original sale, the vendors instruct us to ship these goods to another companies [sic], that they select, who are not located in India. We record these transfers

as a reduction to purchases and an increase to accounts receivable at the original purchase cost of the diamonds/ jewelry." ~~Bhansali, who was included on the email from Gandhi, forwarded this response to Modi. Modi then responded, noting "As SC is a common bank in India, Antwerp and NY. It might be a good idea that Ajay and you discuss all responses [sic]."~~ Gandhi further stated, "Such activities are gradually transferred to a new corporation we have established recently." Upon information and belief, FDIL, which was incorporated in May 2011, was the "new corporation" Gandhi was referring to. Gandhi also provided mailing addresses for Vista and Empire.

102.    Bhansali, who was included on the email from Gandhi, forwarded this response to Modi, stating "Nirav, Please read this email below from SCB last week, and Ajay's reply. Just an FYI." Modi then forwarded the email to V Srinivasan, who upon information and belief is the former deputy managing director of Axis Bank's corporate banking division, and stated, "As SC is a common bank in India, Antwerp and NY. It might be a good idea that Ajay and you discuss all responses [sic]." Upon information and belief, Axis Bank frequently served as an intermediary bank in connection with LOU transactions underlying the Bank Fraud.

> *v.*    ~~**Modi Used the**~~ *Use of* Debtors' Funds *and Proceeds of the Bank Fraud* to Purchase Personal Assets

103.    ~~65.~~Just as he orchestrated the circular trades at the heart of the ~~PNB~~ Bank Fraud, Modi also orchestrated transactions to divert assets from the ~~PNB~~ Bank Fraud and the Debtors for the benefit of himself and his and Bhansali's family.

### The Ithaca Trust

104.    ~~66.~~On August 23, 2017, Modi's sister Purvi Mehta ("**Mehta**") established the Ithaca Trust, an irrevocable trust for the benefit of Modi's wife, Ami Modi, and their three children. The Ithaca Trust's investment advisor was Abhay Dinesh Javeri, Ami Modi's brother. The trustee was

Commonwealth Trust Corporation ("**Commonwealth**"). Attorneys from the law firm of Day Pitney LLP ("**Pitney**") were the principal drafters of the Ithaca Trust agreement and served as advisors for the creation of the trust.

105. 67.Ostensibly, the Ithaca Trust was funded with $23 million in cash from Mehta, but Commonwealth's records show that Modi was behind the initial funding. In an August 24, 2017 email regarding the Ithaca Trust's formation, Modi informed Pitney attorneys that "[t]he funds are in place with Purvi [Mehta]. Please let me know account details to wire the money . . . ."

106. 68.Commonwealth's records also show that those funds Modi placed with Mehta to establish the Ithaca Trust were funneled to Mehta from the PNB Bank Fraud. Mehta revealed in disclosure forms to Commonwealth that she funded the Ithaca Trust using "dividends" she received from Fine Classic FZE ("**Fine Classic**"), a Shadow Entity of which Mehta was the 100% owner. Like the other Shadow Entities, Fine Classic FZE operated as part of the PNB FraudBank Fraud, and was a recipient of large amounts of fraudulently obtained funds.

107. 69.Further, throughout 2017, tens of millions of dollars passed between Ami Modi's the HSBC bank account of Nirav Modi's wife, Ami Modi, and Mehta's Bank of Singapore account. A bank statement for Ami Modi for September 2017 shows $31,506,701 disbursed, almost all of which went to Mehta.

The Ritz Carlton Apartment

108. 70.The purpose of the Ithaca Trust was to hold Manhattan real estate for Modi and his family. The initial $23 million in trust funding was used to purchase an apartment at the Ritz Carlton residences, 50 Central Park South, Unit 33, New York, New York (the "**Ritz Carlton Apartment**") for the sole use of Modi and his family.

109. ~~71.~~On August 30, 2017, Modi emailed Pitney attorneys and other professionals informing them that $23 million had been wired from Mehta to Commonwealth and directing Commonwealth to further wire the funds to attorneys at Katz Matz to execute the purchase of the Ritz Carlton Apartment. Mehta was not on the email thread.

110. ~~72.~~That same day, Katz Matz attorney Steven Matz emailed Modi and others with instructions for the September 7, 2017 closing of the Ithaca Trust's purchase of the Ritz Carlton Apartment. Once again, Mehta was not on the email thread.

111. ~~73.~~On September 7, 2017, the Ithaca Trust closed on the purchase of the Ritz Carlton Apartment. The Ithaca Trust paid $25 million to the seller through Central Park South 50 Properties LLC ("**CPS50**"), an entity the Ithaca Trust owns. Mehta signed the contract of sale. Of the purchase price, $2.5 million was wired from an Ami Modi HSBC account into an escrow account at the Katz Matz law firm, which handled the sale. The remaining $23 million ~~was paid with~~ came from funds that Modi had funneled to Mehta from the ~~PNB~~ Bank Fraud.

<u>The Essex House Apartment</u>

112. ~~74.~~Modi also used the Ithaca Trust to obtain real estate that previously had been owned indirectly by ~~Firestar~~FDI.

113. ~~75.~~On February 15, 2007, Central Park Real Estate LLC ("**CPRE**") was formed under Delaware law. CPRE was owned by ~~Firestar~~ FDI until approximately the end of 2009, when it was transferred to ~~Group~~FGI.

114. ~~76.~~On March 26, 2007, CPRE purchased an apartment at the Essex House, 160 Central Park South (the "**Essex House Apartment**"); Bhansali signed the deed on behalf of CPRE. The Essex House Apartment was ~~also~~ used by Modi and as a personal residence.

115. ~~77.~~Based on direction from Modi and Gandhi, ~~Firestar~~ FDI funded $2 million of the approximately $5 million purchase price of the Essex House Apartment. The balance was

financed by an approximately $3 million mortgage from HSBC. ~~Firestar~~ FDI also made at least

$856,335 of the monthly payments on the mortgage between 2011 and 2018 and paid JW Marriott

Essex House NY $15,828.35 in January 2018, after CPRE had been transferred from ~~Group~~ FGI to

the Ithaca Trust.

116. ~~78.~~ On December 5, 2008, Modi emailed Bhansali and Gandhi that, "*I bought Essex*

House at $4,995,000 and took a loan of $3 million" (emphasis added). Modi and Gandhi then

discussed by email, with Bhansali copied, the fact that ~~Firestar~~ FDI had funded part of the Essex

House purchase.

117. ~~79.~~ In March 2017, Gandhi emailed Modi that HSBC requested more information

on the ownership structure of CPRE "going up thru the ladder to FILP, India[,]" including the

"Source of Wealth" of "Purvi Modi[.]" Gandhi relayed that he "avoided giving these [sic]

information and told them that we may do restructuring of Central Park and may change

ownership etc." but that the "only way, we can avoid is only if we pay-off the $ 3 m mortgage in

next few months." Modi responded, "There will be a change in ownership in May end so better

to explain that."

118. ~~80.~~ On December 4, 2017, by email, Modi told Gandhi to pay off the HSBC

mortgage in full. On December 5, 2017, ~~Firestar~~ FDI paid off the approximately $3 million balance

on the Essex House Apartment mortgage, using funds from Jaffe and Fantasy as well as from its

own account and from a Firestar HSBC line of credit.

119. ~~81.~~ On December 15, 2017, one of Modi's accountants emailed Modi with three

potential options for minimizing transfer taxes on "the movement of CPRE." The first option was

having Modi purchase CPRE directly from Group, the second was having Ami Modi purchase

CPRE directly, and the third was using the Ithaca Trust to make the purchase by having Mehta

contribute more cash to the trust. The accountant explained that, "since [Modi] prefer[red] to fast

track the transaction," the existing trust could be used and then the trustee could "move the LLC to another trust in due time."

120.   ~~82.~~Modi chose the third option. On December 29, 2017, the Ithaca Trust purchased CPRE from ~~Group~~ FGI for $6 million. On January 2, 2018, Mehta transferred $6 million to the Commonwealth Trust Company, as trustee of the Ithaca Trust. The Ithaca Trust then wired $6 million to ~~Group's~~ FGI's HSBC account for the purchase of CPRE.

121.   ~~83.~~By this time, Commonwealth had flagged the Ithaca Trust as a "high risk trust" and internally expressed concern about serving as trustee. On March 13, 2018, Commonwealth emailed Pitney attorneys to inform them that its trust committee had decided that Commonwealth should resign as trustee of the Ithaca Trust.

122.   ~~84.~~On May 25, 2018, Nehal Deepak Modi, the protector of the Ithaca Trust and Modi's brother, appointed Trident Trust Company (South Dakota) Inc., as successor trustee of the Ithaca Trust.

~~**Events After the Petition Date**~~

**Diversion of Funds to Purvi Mehta**

123.   Throughout the Relevant Period, millions of dollars in proceeds of the Bank Fraud were funneled to Nirav Modi's sister, Purvi Mehta in various ways.

124.   For example, between October 20, 2011 and March 11, 2011, Nirav Modi personally transferred a total of $14,575,000 to Synergies, which Synergies used to pay off purported loans to FIPL. On April 1, 2012, Nirav Modi assigned his interest in the loan to Purvi Mehta. This assignment was described as a gift in numerous emails. For example, on December 22, 2016, Shyam Wadhwa emailed Purvi Mehta's husband, Manish Modi, "Manish – Awaiting Completed gift deed documents from your end for both Synergy loan gift to Purvi and FHL Loan gift to Purvi. Please mail me scanned copy followed by original."

125.    On July 13, 2017, in connection with FHL's acquisition of Synergies as part of a broader restructuring of the Firestar Entities, FHL transferred $20 million to Synergies as a purported capital infusion. That same day, Synergies transferred $650,000 to Jaffe, $1,047,000 to Brilliant (as repayment of the loan alleged above), $3,694,000 to FDIPL (as the purchase price for FGI, which Synergies acquired as part of the 2017 restructuring), and $14,575,000 to Purvi Mehta. The $14,575,000 to Purvi Mehta was transferred under the pretext of paying off the loan Modi had assigned to Mehta.

126.    Additionally, at all relevant times, Purvi Mehta and her and Nirav Modi's father, Deepak Modi, indirectly owned 100% of the equity in Twin Fields Investments Ltd. ("**Twin Fields**"), which in turn owned 100% of the equity in BBB Group, Inc ("**BBB Group**").

127.    Ajay Gandhi, on behalf of Synergies, successfully bid on the intellectual property rights of Bailey Banks & Biddle at a bankruptcy auction in 2009. BBB Group was incorporated in 2010 to operate *Bailey Banks & Biddle*-branded retail stores. Upon information and belief, Nirav Modi's brother, Nehal Modi, was the *de jure* or *de facto* director of BBB Group and Mihir Bhansali was the *de jure* or *de facto* director of Twin Fields.

128.    Twin Fields' bank statements reflect a total of approximately $21.3 million in cash inflows from Jaffe and approximately $26.9 million in cash inflows from Fine Classic and a total of approximately $42.8 million in cash outflows to BBB Group.

#### Diversion of Funds for the Benefit of Mihir Bhansali and His Family

129.    Mihir Bhansali and his family also personally benefitted from the Bank Fraud and from Bhansali's breaches of his fiduciary duties.

130.    For example, upon information and belief, the M.R. Family Trust received INR 32.83 crore (approximately $4.57 million) from DRUS in fiscal year 2011-2012. Upon information and belief, the M.R. Family Trust was created by and for the benefit of members of Mihir

Bhansali's family. For example, upon information and belief, Mihir Bhansali's father, Rashmikant K. Bhansali, is or was the trustee of the M.R. Family Trust. Upon information and belief, Rashmikant K. Bhansali, in his capacity as trustee of the M.R. Family Trust, served as a partner of DRUS from 2007 to 2011.

131.    Upon information and belief, Mihir Bhansali holds or formerly held equity interests in various Modi-Controlled Entities, including without limitation, FDIPL and Jewelry Solutions International Private Limited (which is the name under which FDI was incorporated). As alleged in this Complaint, millions of dollars flowed through FDIPL and FDI during the Relevant Period.

132.    Upon information and belief, Mihir Bhansali's wife, Rakhi Bhansali, holds or formerly held, 99.9% of the equity interests in Neeshal Marketing Private Limited ("**Neeshal Marketing**") and Neeshal Merchandising Private Limited ("**Neeshal Merchandising**").

133.    During the Relevant Period, upon information and belief, millions of dollars in proceeds of the Bank Fraud flowed through Neeshal Merchandising. For example, upon information and belief, Neeshal Merchandising was the direct recipient of at least $11,475,127.67 in LOU funds sourced from PNB during the Relevant Period.

134.    Additionally, Neeshal Merchandising received funds from Shadow Entities on numerous occasions. For example:

    (i)    On October 14, 2010, Fancy Creations transferred $841,944.64 to Neeshal Merchandising.

    (ii)    On December 10, 2010, Fancy Creations transferred $1,408,947.34 to Neeshal Merchandising.

    (iii)    On March 14, 2011, Fancy Creations transferred $1,132,309.59 to Neeshal Merchandising.

    (iv)    On October 18, 2011, Brilliant transferred $661,080.98 to Neeshal Merchandising.

(v)    On April 25, 2012, Fancy Creations transferred $605,608.59 to Neeshal Merchandising.

135.    Additionally, Neeshal Merchandising received funds directly from the Debtors on at least one occasion. For example, on July 28, 2011, FDI transferred $420,478.58 to Neeshal Merchandising.

136.    Nirav Modi's personal financial statements reflect "advances" to Mihir Bhansali of $195,020 in 2016, $629,184 in 2012, and $776,574 in 2011.

137.    On February 24, 2017, Purvi Mehta wired $1,500,000 to Mihir Bhansali's personal checking account at HSBC.

138.    On March 22, 2017, Bhansali and his wife purchased apartment 24A at 50 Riverside Boulevard in New York City for approximately $7.1 million, of which approximately $5.3 million was paid in cash. Bhansali's annual salary from the Debtors was approximately $185,000.

139.    Only two days after the Debtors filed for bankruptcy, Bhansali transferred his interests in the apartment to his wife, Rakhi Bhansali for nominal consideration.

140.    Upon information and belief, this apartment was purchased using proceeds of the Bank Fraud.

141.    On June 29, 2017, Purvi Mehta wired $750,000 to Mihir Bhansali's personal checking account at HSBC.

vi.    *Efforts to Cover Up and Frustrate Investigation of the Bank Fraud Before and After the Debtors' Bankruptcy Filing*

142.    Modi, Bhansali, and Gandhi researched and implemented various tactics to conceal and destroy evidence of their involvement in the Bank Fraud both prior to and after the Bank Fraud's exposure.

143.    On June 10, 2013, to hide their involvement in the Bank Fraud, Modi's personal assistant instructed Gandhi, from her personal email address to Gandhi's personal email address, to communicate with her regarding Shadow Entities only on Gmail or Panemail, a program that automatically deletes messages, rather than on the Firestar Entities' regular email system.

144.    On February 13, 2018, an attorney at Day Pitney LLP emailed Ajay Gandhi to suggest that bank statements for CPS 50 Properties LLC, which was owned by the Ithaca Trust and which held the 50 Central Park South property, be sent directly to Abhay Javeri as manager of CPS Properties LLC. Gandhi forwarded the email to "ajaycpa@yahoo.com", which upon information and belief is Gandhi's personal email address, and stated, "Niravbhai, OK to have CPS 50 Properties LLC bank statement from Citibank sent to Abhay Javeri to his email address or Abby's mailing address?" The fact that Gandhi addressed this email to "Niravbhai" suggests that Nirav Modi was using Ajay Gandhi's personal email account to communicate in the weeks following the exposure of the Bank Fraud.

145.    On March 11, 2018, Ajay Gandhi ran internet searches on the Adelphia Communications fraud case and related bankruptcy. These searches included: "how did adelphia get caught"; "how rigas family were caught in the fraud of adelphia"; and "how adelphia fraud was discovered?"

146.    On March 9, 2018, Bhansali visited an internet article entitled "14 Signal App Tips for Secure Chats," which described tips for sending and erasing secure communications through Signal, an end-to-end encryption application.

147.    On March 12, 2018, Mihir Bhansali visited an internet article entitled "How to Clear Your Cache on Any Browser." The article described methods of deleting internet browsing history on various web browsers. That same day, Bhansali visited an internet article entitled

"How to Hack Wi-Fi Passwords." This article described methods of obtaining access to wireless networks without the required password.

148.    Mihir Bhansali's laptop contained a software program called "Hide My Ass! Pro VPN." Upon information and belief, the purpose of this program is to facilitate anonymous internet usage through virtual private network technology. The software's logs indicate that the program was used as recently as February 11, 2018.

149.    Bhansali's laptop also contained a program called SecurStar DriveCrypt. Upon information and belief, the purpose of this program is to encrypt data on computers.

150.    As alleged above, Bhansali created what appears to be a "to-do" list for various co-conspirators following exposure of the Bank Fraud. The list included instructions to "Send all non-Firestar Dubai comps to HK." Upon information and belief, "comps" refers to "computers."

151.    Upon information and belief, based on statements made by various Firestar Entity and Shadow Entity directors and employees to Indian authorities, around February or March 2018:

(i)    Mihir Bhansali removed approximately 50 kilograms of gold and 2.5 Lac Dirhams (worth approximately $68,000) from a Dubai-based Firestar Entity;

(ii)    Mihir Bhansali and Nirav Modi intimidated and coerced directors and employees of Shadow Entities not to cooperate with investigative authorities. For example, upon information and belief, one of the directors of Unique told the ED that, "When the case registered against Nirav Modi, all of us (directors/owners) wanted to return to India as soon as possible and wanted to cooperate with the agencies to prove our innocence. In March [2018], Mihir Bhansali (close aide of Nirav Modi) told us not to panic and said he is on the job and everything will be under control in a matter of days. . . . he kept us under constant fear that our return to India could result in arrest by the agencies." Similarly, upon information and belief, Nirav Modi, or others operating at Modi and Bhansali's direction, threatened to kill or falsely implicate Ashish Lad, a director of Unity, if he revealed anything to the investigative authorities.

(iii) Nirav Modi's brother, Nehal Modi, upon information and belief acting at the direction of or in coordination with Nirav Modi and Mihir Bhansali, destroyed cell phones of Shadow Entity directors. Upon information and belief, Nehal Modi told the directors that their "mobile phones are easy to track and they are evidence."

(iv) Nehal Modi, upon information and belief acting at the direction of or in coordination with Nirav Modi and Mihir Bhansali, removed 150 boxes of pearls from one of the Hong Kong-based Modi-Controlled Entities. In the "to do" list spreadsheet recovered from Mihir Bhansali's computer, the tasks listed under "MB" included "Pearls – where to keep the inventory?" and "Pearls – original purchase entries."

(v) Nehal Modi, upon information and belief acting at the direction of or in coordination with Nirav Modi and Bhansali, bribed Anish Lad INR 2,000,000 (approximately $28,000) to give false testimony to judicial authorities in Europe.

(vi) Nirav Modi told the Shadow Entity personnel that "it was not safe for [them] in Dubai and [they] must shift to Cairo[, Egypt.]" Once in Cairo, Modi, or others operating at his behest, confiscated the Shadow Entity personnel's passports "on the pretext of some residency permission."

(vii) Nirav Modi, or others operating at his behest, instructed the Shadow Entity personnel to sign an affidavit stating that the Shadow Entities belong to the directors and were in no way related to Nirav Modi before they left Cairo.

ix. *Fraudulent Omissions, Misstatements, and Misrepresentations Made in Connection With The Debtors' Chapter 11 Cases*

152. 85.On February 28, 2018, while still serving as the Debtors' CEO, Bhansali submitted to this Court a declaration under penalty of perjury that contained material falsehoods, including that the Shadow Entities were unaffiliated unsecured creditors of the Debtors. In addition, during On February 26, 2018, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. During the early weeks of the chapter 11 cases, Bhansali and Gandhi, as the Debtors' CEO and CFO, made other representations respectively, made fraudulent omissions, misstatements, and misrepresentations, formally and informally, explicitly and implicitly, to this Court, to the United States Trustee, and to creditors, regarding the Debtors'

involvement in the ~~PNB~~ Bank Fraud and their relationship to various Shadow Entities. ~~Bhansali led the bankruptcy court and other parties to believe that the Debtors were not involved in the PNB Fraud and that they were innocently caught up in an overseas matter. For example, at the outset of the cases Bhansali declared under penalty of perjury: "The Debtors and their dedicated employees have worked tirelessly over the past week or so to … reassure their vendors and customers that they had no involvement in the alleged wrongful conduct."~~

~~86.    Modi was involved in the Debtors' bankruptcy filings. Bhansali and the Debtors' counsel had a conversation with Modi on February 24, 2018, two days pre-petition, concerning the decision to file the chapter 11 cases. In addition, Modi had at least one conversation with Bhansali between the Petition Date and March 15, 2018. The revelation of this conversation ultimately derailed the going-concern sale process of all or part of the Debtors' businesses. The postponement of the sale process resulted in a decrease in value from the original sales price of Jaffe's assets to the ultimate sales price for those assets approximately two months later.~~

153.    For example, in his Declaration filed with this Court on February 28, 2018, Bhansali stated under penalty of perjury, "A list setting forth the twenty (20) largest unsecured creditors, of each of FDI [Fantasy] and [Jaffe], excluding those persons who constitute 'insiders' under Bankruptcy Code section 101(31), is attached hereto as Exhibit B."

154.    Exhibit B to Bhansali's declaration, which purported to list the top 20 unsecured non-affiliated creditors of each Debtor, included: World Diamond as a creditor of FDI in the amount of $79,918.70; Fancy Creations as a creditor of FDI in the amount of $19,617.50; Tri Color as a creditor of Jaffe in the amount of $3,356,165.99; Pacific as a creditor of Jaffe in the amount of $2,922,239.31; Universal as a creditor of Jaffe in the amount of $42,905.00; and Eternal as a creditor of Jaffe in the amount of $31,645.39.

155.    Moreover, Bhansali led the bankruptcy court and other parties to believe that the Debtors were not involved in the Bank Fraud and that they were innocently caught up in an overseas matter. For example, in a declaration filed shortly after the petition date, Bhansali declared under penalty of perjury: "The Debtors and their dedicated employees have worked tirelessly over the past week or so to … reassure their vendors and customers that they had no involvement in the alleged wrongful conduct."

156.    On March 27, 2018, the Debtors filed their bankruptcy schedules and statements of financial affairs ("**SOFA**"), all of which Ajay Gandhi signed under penalty of perjury. The Debtors' statements of financial affairs contained numerous misstatements, misrepresentations, and omissions.

157.    For example, FDI's SOFA did not list any transfers to Shadow Entities in response to Question No. 3, which asks for payments made to creditors within 90 days prior to the petition date, Question No. 4, which asks for transfers of property to insiders of the debtor within 1 year prior to the petition date, or Question No. 13, which asks for any other transfers made outside the ordinary course of business within 2 years prior to the petition date.

158.    In fact, there were substantial transfers by FDI to Shadow Entities that Gandhi personally directed or otherwise participated in during the relevant periods. For example, Gandhi did not disclose FDI's transfers of $483,620.05 and $2,188,769.43 to Pacific on January 3, 2018—only a few weeks prior to the Petition Date. Nor did Gandhi disclose FDI's payment of $300,000 to Unique on March 22, 2017, less than a year prior to the Petition Date.

159.    Additionally, neither Jaffe's bankruptcy schedules nor SOFA disclosed any amounts owed by NMI to Jaffe.

160.    However, Jaffe's and NMI's books and records each reflect significant loan balances owed by NMI to Jaffe as of the Petition Date that have never been repaid. Jaffe's general

ledger account #120250, entitled "Loan Receivable - Firestar Jewelry, Inc.", reflected a loan balance owed by NMI of $11,216,467 as of the Petition Date. Similarly, NMI's balance sheet as of March 31, 2018 reflected an $11,216,467 loan payable to Jaffe.

161.    Rather than call the loan due and have NMI repay Jaffe using the more than $40 million in inventory NMI held as of the Petition Date, Modi, Bhansali, and Gandhi, as alleged below, caused NMI and FDII to ship substantially all of their inventory to Modi-Controlled Entities overseas. Although these shipments were disguised as sales, the parties never intended for the overseas entities to pay for the goods. For example, NMI's books and records reflect aged accounts receivable owed by Nirav Modi Limited to NMI of $23,767,423.39 as of May 15, 2018, of which $16,264,838 was less than 60 days old—well in excess of the $10 million credit limit for Nirav Modi Limited reflected in the report.

162.    On March 23, 2018, the Debtors moved for approval of bidding and sale procedures for the sale of substantially all of their assets under section 363 of the Bankruptcy Code. On March 29, 2018, the Court approved the Debtors' bidding and sale procedures.

163.    On April 20, 2018, the Court appointed John J. Carney as examiner (the "**Examiner**") to investigate the nature and extent of the Debtors' involvement in the Bank Fraud.

164.    Shortly after the Examiner's appointment, the Examiner attempted to interview Bhansali. Bhansali flatly refused to cooperate. When pressed by the Examiner's counsel, Bhansali's counsel acknowledged that Bhansali was in communication with Modi as late as March 15, 2018, and that he and Modi discussed the Debtors' sale and bankruptcy process.

165.    On May 1, 2018, the Debtors adjourned the auction for FDI and Fantasy's assets indefinitely. On May 3, 2018, Parag Diamonds, Inc. was the successful bidder for Jaffe's assets.

166.    On May 15, 2018, at a hearing concerning the approval of the Jaffe sale, the Debtors' chief restructuring officer Mark Samson testified that Mihir Bhansali had been in

communication with Nirav Modi between the commencement of the Debtors' chapter 11 cases and March 15, 2018, and that Bhansali continued to be involved "on a daily basis" as "a key employee" in the sale process after that date.

167.     Following this revelation, the Court asked for the record to be supplemented with additional detail concerning the nature and extent of Bhansali's post-petition communications with Modi and adjourned the hearing to May 23, 2018. On May 19, 2018, the Debtors withdrew the sale motion without prejudice. (Dkt. 177.) At a hastily-arranged Chambers conference on May 18, 2018, Bhansali's counsel advised the Court that Bhansali resigned as director and officer of the Debtors that same day and that Bhansali refused to submit a declaration and appear for cross-examination concerning his post-petition communications with Modi.

168.     On May 17, 2018, Ajay Gandhi sat for an interview with the Examiner's team. In that interview, Gandhi stated that the only thing he knew about the Shadow Entities was that they were Bhansali's customers. In subsequent interviews, Gandhi continued to insist he was not aware that any Shadow Entity was owned or controlled by Modi. When confronted by the Examiner's team with emails indicating that Gandhi was aware that numerous Shadow Entities were related parties, Gandhi repeatedly maintained he did not remember these emails, nor that the Shadow Entities were in any way controlled by Modi.

169.     Additionally, in response to the Examiner's questions regarding Gandhi's involvement in hundreds of millions of dollars in loose diamond transactions, Gandhi told the Examiner that he merely signed packing slips with no verification of the contents of the shipment, its valuation, the profitability, or propriety of such transaction.

170.     Additionally, when the Examiner asked Gandhi whether he ever used his personal email address for Firestar business, Gandhi stated that he did not. In fact, during the Relevant

Period, Gandhi sent numerous emails pertaining to the Debtors and other Modi-Controlled Entities to and from his myriad personal email addresses.

171.    On June 14, 2018, the Court approved the Trustee's appointment, at which time the Trustee assumed control of the Debtors' estates and operations.

172.    On August 7, 2018, the Examiner conducted a deposition of Mihir Bhansali, at which Bhansali invoked his Fifth Amendment right against self-incrimination in response to every question except his name.

**Involvement in Actual Fraudulent Transactions**

173.    Based on, among other things, the facts and circumstances set forth in this Complaint,

(i)    each transfer of property of the Debtors derived from or subsequently transferred to a Shadow Entity or LOU Entity, directly or indirectly, or otherwise linked to or supporting the Bank Fraud, during the six-year period prior to the Petition Date (each an "**Actual Fraudulent Transfer**"); and

(ii)    each obligation incurred by the Debtors to a Shadow Entity or LOU Entity, or otherwise linked to or supporting the Bank Fraud, during the six-year period prior to the Petition Date (each an "**Actual Fraudulent Obligation**", together with each Actual Fraudulent Transfer, the "**Actual Fraudulent Transactions**")

gave rise to a right to avoid such Actual Fraudulent Transactions and to recover the value of such Actual Fraudulent Transfers under applicable bankruptcy and nonbankruptcy law.

174.    Each Actual Fraudulent Transaction was made with actual intent to hinder, delay, or defraud the Debtors' existing or future creditors. For example:

(i)    Each Actual Fraudulent Transaction was made to or for the benefit of an insider of the Debtors.

(ii)    Modi, Bhansali, Gandhi, and their co-conspirators actively endeavored to conceal the existence and nature of the Actual Fraudulent Transactions, both before and after the filing of these chapter 11 cases.

(iii)    Modi, Bhansali, Gandhi, and their co-conspirators retained control over the proceeds of each Actual Fraudulent Transfer.

(iv)    In many cases, the Debtors did not receive reasonably equivalent value in exchange for Actual Fraudulent Transactions, and in some instances, did not receive any consideration at all.

(v)    The Debtors were insolvent at the time each Actual Fraudulent Transaction occurred based on both the figures reflected on their balance sheet and the substantial contingent liability they incurred in the course of their involvement in the Bank Fraud.

(vi)    The Actual Fraudulent Transactions were not made in the ordinary course of the Debtors' businesses and served no legitimate corporate or economic purpose.

(vii)    Many of the Actual Fraudulent Transactions involved Shadow Entities, which constitute dummies or fictitious parties.

(viii)    Nirav Modi absconded after exposure of the Bank Fraud.

175.    In many cases, Modi, Gandhi, and Bhansali caused the U.S. Affiliates, upon receiving Actual Fraudulent Transfers, to subsequently transfer the proceeds of such Actual Fraudulent Transfers to Shadow Entities or other Modi-Controlled Entities. For example:

(i)    On August 30, 2012, FDI wired $1,501,000 to FDII. That same day, Gandhi emailed Bhavesh Patel, "Transfer $1,501,000 from [FDI to FDII]. Pay $21,774 from [FDII] to Fancy Creation." That same day, Gandhi emailed Sridhar Krishnan of SDC Designs to let him know that FDII would issue a check in the amount of $1,500,395 to SDC Designs. On August 31, 2012, FDII issued a check in the amount of $1,500,395 to SDC Designs.

(ii)    On December 11, 2012, Gandhi emailed Bhavesh Patel, "Please keep wire ready for $602,862 to SDC Designs LLC from [FDII's] Capital Old account for invoice 63966." On December 12, 2012, Gandhi emailed a banker at IDB a request for a $500,000 loan, with respect to which FDI was the obligor and FDII the beneficiary. That same day, the $500,000 loan proceeds were disbursed to FDII's Capital One Bank account. That same day, FDII wired $602,862 to SDC Designs.

(iii)    On December 13, 2012, Firestar wired $391,611 to Synergies. That same day, Synergies wired $91,000 to Brilliant. On December 14, 2012, Synergies wired $300,000 to Unique. On December 13, 2012, Ajay Gandhi emailed Bhavesh Patel instructions to make these wires.

64

(iv)  On February 19, 2013, FDI wired $627,000 to FDII. Bhavesh Patel emailed a wire confirmation for this transfer to Ajay Gandhi. That same day, FDII wired $1,266,430 to Fancy Creations and $332,300 to Diagems. That same day, Shyam Wadhwa emailed Bhavesh Patel instructions to make these two wires and stating, "Since Ajaybhai would be traveling tonight . . . please take Ajaybhai signature on wire transfer doc and send it to Mihirbhai for his signature." That same day, Bhavesh Patel emailed Gandhi the wire documents for these transfers. Gandhi forwarded them to Bhansali, stating, "Please print, sign and scan back to me." Bhansali replied, "Done and sent."

(v)  On April 25, 2013, FDI wired $350,000 to FDII. That same day, Jaffe wired $480,000 to FDII. That same day, FDII wired $812,030 to Diagems.

(vi)  On May 6, 2013, FDI wired $652,239 to FDII. That same day, FDII wired $463,389 to Tri Color. The next day, FDII wired $280,005 to Empire.

(vii)  On June 18, 2013, FDI wired $1,525,000 to FDII. That same day, Bhavesh Patel emailed Gandhi the confirmation for this wire, stating "Please find attached wires as per instructions." That same day, FDII wired $1,615,463.93 to Fancy Creations. On June 17, 2018, Bhavesh Patel emailed Gandhi wire documents for this transfer. Gandhi forwarded them to Mihir Bhansali to sign and return.

(viii)  On July 9, 2013, FDI wired $600,000 to FDII. That same day, FDII wired $600,024 to Fancy Creations. That same day, Bhavesh Patel emailed the wire confirmation for this transfer to Gandhi.

(ix)  On October 23, 2013, Firestar transferred $123,744 to Synergies. On October 24, 2013, Synergies transferred $125,000 to Brilliant. On October 23, 2013, Gandhi emailed Bhavesh Patel instructions to make these transfers.

(x)  On March 18, 2014, Firestar transferred $123,097 to Synergies. That same day, Synergies transferred $123,000 to Brilliant. That same day, Gandhi emailed Bhavesh Patel instructions to make these wires.

(xi)  On February 20, 2015, Firestar transferred $186,871 to Synergies. That same day, Synergies transferred $180,000 to Brilliant. That same day, Gandhi emailed instructions to Arpan Doshi and Avinash Oza to make these wires.

(xii)  On September 29, 2015, Jaffe wired $950,000 to FDII. That same day, FDII wired $943,827 to SDC Designs. That same day, Gandhi emailed Avinash Oza and Arpan Doshi instructions to make these transfers.

(xiii)  On March 9, 2016, FDI transferred $247,551 to Synergies. That same day, Synergies transferred $250,000 to Brilliant. That same day, Gandhi emailed Avinash Oza and Arpan Doshi instructions to make these wires.

(xiv)  On March 25, 2016, Jaffe transferred $1,400,000 to NMI. That same day, NMI transferred $613,069 to Auragem and $787,000 to Nirav Modi Ltd. That same day, Gandhi sent an email to Avinash Oza and Arpan Doshi instructing them to make these wires.

(xv)  On March 20, 2017, Firestar transferred $246,871 to Synergies. That same day, Gandhi emailed Avinash Oza instructions to make this wire. On March 22, 2017, Synergies transferred $240,000 to Brilliant. That same day, Gandhi emailed Avinash Oza and Kunal Patel instructions to make this wire.

176.  In addition to the Actual Fraudulent Transfers that occurred prior to the exposure of the Bank Fraud, Bhansali, Gandhi, and Modi continued to orchestrate Actual Fraudulent Transfers to Modi-Controlled Entities in the weeks leading up to the Petition Date. For example:

(i)  On or around January 23, 2018, FDI shipped 2,319.64 carats of loose diamonds with a declared value of $426,320.97 through Malca Amit to Eternal in Hong Kong. Ajay Gandhi was copied on numerous emails sent by Rebecca Chow, FDI's shipping department manager, relating to this shipment. On January 23, 2018, Ajay Gandhi emailed Rebecca Chow, copying Mihir Bhansali, contact information for Ivy Lau, an employee of Eternal.

(ii)  On January 25, 2018, FDI wired $910,278.70 to Dubai-based Firestar Diamond FZE. On January 24, 2018, Subhash Parab emailed Gandhi, copying Shyam Wadhwa, "please clear USD [$]910,278.70." The next day, Gandhi forwarded the email to Avinash Oza and Kunal Patel. Oza replied with the wire confirmation.

(iii)  On February 6, 2018, FDI wired $1,002,836.77 to FIL. That same day, Jaffe wired $505,610.51 to FIL and Fantasy wired $401,471.08 to FIL. That same day, Subhash Parab emailed Ajay Gandhi, copying Shyam Wadhwa, "Please pay following bills to FIPL . . . We have some urgent re-payment from IDBI bank for that [sic] we require below bills in IDBI bank[.]" The email contained a list of amounts owed by FDI and Fantasy totaling $1,002,836.77 and $401,471.08, respectively. Gandhi replied, "I can pay $500k from Jaffe to [sic]. Please email list as needed for Jaffe." Parab replied with a list of amounts owed by Jaffe totaling $505,610.51. Gandhi replied, "Funds wired."

(iv)  On or around February 6, 2018, FDI shipped 4,474.15 carats of loose diamonds with a declared value of $789,140.42 through Malca Amit to Eternal in Hong Kong. Ajay Gandhi was copied on numerous emails relating to this shipment.

66

177.    Additionally, in the weeks leading up to and following the Petition Date, Modi, Bhansali, and Gandhi caused NMI and FDII to move significant amounts of cash and inventory overseas where their creditors, including the Debtors, could not reach them. For example:

(i)     On January 4, 2018, NMI shipped two packages of inventory, with declared values of $585,000 and $65,000, respectively, through Malca Amit to Nirav Modi Ltd. in India.

(ii)    On January 10, 2018, NMI shipped inventory with declared value of $108,550, through Malca Amit to Nirav Modi Ltd. in India.

(iii)   On January 11, 2018, NMI shipped inventory with declared value of $32,370, through Malca Amit to Nirav Modi Ltd. in India.

(iv)    On January 16, 2018, NMI shipped inventory with declared value of $943,800, through Malca Amit to Nirav Modi Ltd. in India.

(v)     On January 19, 2018, NMI shipped three packages of inventory, with declared values of $273,000, $409,500, and $771,680, respectively, through Malca Amit to Nirav Modi Ltd. in India.

(vi)    On January 24, 2018, NMI shipped inventory with a declared value of $1,075,200 through Malca Amit to FDIPL in India.

(vii)   On January 25, 2018, FDII shipped inventory with a declared value of $1,886,922.67 through Malca Amit to Fancy Creations in Hong Kong.

(viii)  On January 26, 2018, NMI shipped inventory with a declared value of $198,750 through Malca Amit to Nirav Modi Ltd. in Hong Kong.

(ix)    On January 29, 2018, NMI shipped inventory with a declared value of $75,050 through Malca Amit to Nirav Modi Ltd. in Hong Kong.

(x)     On January 30, 2018, FDII shipped inventory having a declared value of $570,104.37 through Malca Amit to Firestar Diamond Ltd. in Hong Kong.

(xi)    On January 31, 2018, NMI shipped inventory with a declared value of $660,500 through Malca Amit to Nirav Modi Ltd. in Hong Kong.

(xii)   On January 31, 2018, FDII wired $2,466,015 and $525,000 to Fancy Creations. That same day, Ajay Gandhi forwarded the wire confirmations to Shyam Wadhwa and stated, "Please let your vendor know of this payment and clear any AR from HK."

(xiii)   On February 2, 2018, FDII wired $400,000 to Fancy Creations. That same day, Ajay Gandhi emailed Avinash Oza and Kunal Patel, copying Shyam Wadhwa, "Please wire $400,000 to Fancy from Capital One – Advance Refund." Oza replied with the wire confirmation.

(xiv)   On February 13, 2018, NMI shipped inventory with a declared value of $154,440 through Malca Amit to Nirav Modi Ltd. in Hong Kong.

(xv)   On February 14, 2018, FDII shipped inventory with a declared value of $409,138 through Malca Amit to Firestar Diamond BVBA in Belgium.

(xvi)   On February 16, 2018, NMI shipped inventory with a declared value of $58,825 to Nirav Modi Ltd. in Hong Kong.

(xvii)   On March 6, 2018, FDII shipped inventory with a declared value of $4,325,472.34 through Malca Amit to Firestar Diamond Ltd. in Hong Kong.

(xviii)   On April 6, 2018, FDII shipped inventory with a declared value of $6,804,210.49 through Malca Amit to Firestar Diamond Ltd. in Hong Kong.

(xix)   On May 9, 2018, FDII shipped inventory with a declared value of $2,700,000 million through Malca Amit to Fancy Creations in Hong Kong.

178.   Additionally, in February and March 2018, the NMI boutiques in Las Vegas, Honolulu, Los Angeles, and New York shipped substantially all of their inventory to New York. The inventory was held in storage by Malca Amit, upon information and belief, because its value exceeded the amount of available insurance coverage on items stored in FDI's vault.

179.   On April 5, 2018, Angelina Ypma, the global president of the *Nirav Modi* brand and a director of FIL, emailed Ajay Gandhi, copying Mihir Bhansali, "Nirav has instructed me to work with you to move all of NM US inventory (HJ and core back to HK ASAP.) HK will pay Malca in advance to move the jewels." Gandhi replied by noting that he and Bhansali had resigned from NMI, but that they were "happy to assist as needed should [Ypma] hit any bottleneck."

180.   On or around May 3, 2018, FDII delivered inventory having a declared value of $3,200,000 to Malca Amit, upon information and belief, to be held in storage.

181.    Upon information and belief, Bhansali and Gandhi continued to exercise oversight and control over the NMI inventory after their formal resignation from NMI.

182.    On May 4, 2018, Ypma emailed Gandhi, copying Bhansali, "I shall be coming to NY from Monday 7 till Thursday 10 May to review the NM inventory. Nirav told me that I can work with [FDI employee Shanna Singh] to count the inventory . . . Thank you to give me the support." Gandhi reiterated that he and Bhansali had resigned from NMI and directed Ypma to work with NMI's new management "on the logistics."

183.    Upon information and belief, during Ypma's visit to New York in May 2018, Ypma met with Gandhi and Bhansali and asked them for permission to remove some of the NMI inventory from storage at Malca Amit. Upon information and belief, Gandhi gave Ypma permission to remove items up to a specified total value, which, upon information and belief, was around approximately $2 million. Upon information and belief, Ypma selected items worth well in excess of the limit Gandhi set. Upon information and belief, the items Ypma selected were subsequently shipped to Hong Kong.

184.    On June 1, 2018, Rochelle Miller was appointed as CEO and sole director of each U.S. Affiliate, including NMI and FDII. That same day, Anthony Allicock, the director of FHL, introduced Angelina Ypma to Rochelle Miller over email. On June 2, 2018, Rochelle Miller, acting in her capacity as director/CEO of NMI, contacted Malca-Amit to request shipment to Hong Kong of two lists of NMI inventory: 1) 208 pieces at a declared value of $5,063,914.01; and (2) 53 pieces at a declared value of $2,846,545.

185.    On September 5 and 7, 2018, after confirming Rochelle Miller's appointment as director and CEO of NMI and FDII, Malca Amit released nine parcels to the custody of Rochelle Miller. Eight of these parcels contained NMI inventory and had a total declared value of $41,841,419. The remaining parcel contained the FDII inventory delivered to Malca Amit on May

3, 2018 with a declared value of $3,200,000. Upon information and belief, all of this inventory was subsequently shipped overseas to Modi-Controlled Entities.

186.    The systematic diversion of the U.S. Entities' assets to overseas Modi-Controlled Entities described in the foregoing paragraphs, in combination with the fraudulent omissions and misrepresentations Gandhi and Bhansali made in the context of these chapter 11 cases, has made recovery of millions of dollars in Actual Fraudulent Transfers and loan receivables effectively impossible.

187.    Had Bhansali and Gandhi immediately disclosed the Debtors' involvement in the Bank Fraud and relationship with Shadow Entities, had they disclosed the substantial loan balance owed by NMI to Jaffe, and had they not orchestrated the depletion of the U.S. Affiliates' assets, a chapter 11 trustee would have been appointed immediately to pursue claims against the U.S. Affiliates and could have requested a freeze of the U.S. Affiliates' assets while such litigation was pending.

**F.    *Modi, Bhansali, Gandhi, and Other Conspirators Coordinated their Actions***

188.    Modi coordinated and directed the execution of the Bank Fraud with his family members and various directors, officers, and employees of Firestar Entities, Shadow Entities, and other Modi-Controlled Entities, including Bhansali and Gandhi.

189.    Throughout the Relevant Period, Modi sent hundreds of emails to Bhansali and Gandhi, had numerous telephone conversations with them, and met with them at the Debtors' premises and elsewhere. Through many of these emails, telephone conferences, and visits, Modi directed Bhansali and Gandhi and exerted total ultimate control over Debtors' affairs, including in regard to day-to-day details. One means of Modi's omnipresent oversight and control over the Debtors consisted of the dozens of flash reports regarding the Debtors' financials that he received throughout the Relevant Period.

190.    Examples from a short period in 2009 illustrate Modi's total ultimate control over the Debtors. On February 22, 2009, Modi conveyed his preferences to Bhansali regarding which of the Debtors should contribute to a charity dinner. On June 10, 2009, Modi wrote to Gandhi, "Please confirm that shipments made after bankruptcy to Robbins and Western Stone are not in Tab 3 [of the spreadsheet.]" On March 17, 2009, Modi instructed Bhansali and Gandhi, "Pls don't pay further draws/reimbursement to A.Jaffe [sic] salespeople unless I approve. Pls confirm[.]"

191.    On March 20, 2009, Modi requested additional information from Gandhi regarding the Jaffe medical plan and the legality of implementing a method to decrease the medical costs. On June 8, 2009, upon reviewing Jaffe's accounts receivable, Modi instructed Gandhi, "If [the customers] always have been late, we should analyze their business prospects on a going forward basis." On June 17, 2009, Modi weighed in on an "Inventory Reduction Plan" for Jaffe, and on July 9, 2009, Bhansali wrote to Modi, "This was the summary of our plan for Jaffe, that Sam, you and I finalized with Ajay the Friday evening in your house." On July 15, 2009, Modi reviewed a Jaffe budget and commented, "I have deleted some line items[,]" and instructed Gandhi, "When planning, pls review moving to a 4 day week for Jaffe and /or salary cuts . . . for remaining people." On August 14, 2009, Modi instructed Gandhi to respond to an auditor's question with "4.2 million" as the inventory number for Jaffe.

192.    Examples from a short period in 2015 show Modi's total ultimate control over the Debtors persisted throughout the Relevant Period. On January 5, 2015, Gandhi wrote to Modi, "Based on my cash flow, I can pay $ 3 million in India in January 2015. Please let me know if I can ask for a list from Manish to pay India[,]" to which Modi responded, "Yes[.]"

193.    Similarly, on February 9, 2015, Gandhi told Modi, "February cash flow has improved in the last week. I have $ 2.0 m of Borrowing Cushion. Please let me know if I should pay India - $ 1.5 m this month after keeping $ 500k as cushion[,]" to which Modi responded, "Pls

pay $2 m; don't keep cushion." Then, on February 19, 2015, Gandhi told Modi, "Received funds from HK. Now I can pay additional $ 1.5 m this month [to India] this month. Can I ask Manish for a list to pay?" to which Modi responded, "Yes[.]" And on March 2, 2015, Gandhi relayed to Modi that, "Based on my cash flow, I can pay $ 3 m to India in March 2015. Should I ask Manish for a list?" to which Modi responded, "Yes[.]"

194.    Furthermore, Modi treated Gandhi in some respects as a personal accountant. For instance, on February 28, 2017, Modi directed Gandhi to prepare "all financial related parts" of Modi's personal application to live in the River House in New York City, a process which included gathering information concerning Modi's wife, Ami Modi. Gandhi also maintained spreadsheets tracking Modi's personal net worth from at least 2011 through 2017.

195.    At least some of the coordination of the various Shadow Entities' involvement in manipulating audits, and the Bank Fraud more generally, was conducted through an operation1@firestardiamond.com ("**Operation 1**") email address. Upon information and belief, the Operation 1 account was used by Sandeep Mistry and possibly others.

196.    For example, as part of the audit process, the auditors would email parties listed on the audited company's accounts receivable and accounts payable records to request written confirmation of the amounts reflected in the audited company's books and records. For audits of the U.S. entities, which upon information and belief were conducted together, Ajay Gandhi would be copied on the auditor's emails to Shadow Entities, which Gandhi would often forward to Operation 1 to ask that Operation 1 cause the Shadow Entity to provide confirmation the auditors. For example:

(i)    On June 7, 2017, Ajay Gandhi forwarded to Operation 1 an auditor's request to Fancy Creations. Operation 1 replied, "Today or tomorrow customer will confirm as discussed." Gandhi replied, "There were several emails…" Gandhi was referencing the auditor's requests to several other Shadow Entities, which Gandhi had also forwarded to Operation 1.

(ii)    On July 11, 2017, Gandhi sent an email to Operation 1 asking "Can you please have your customer [Brilliant] sign the attached confirmation for Synergies Corp?"   The attachment was not the typical auditor's confirmation request sheet; instead, it was a term sheet for an unsecured loan from Brilliant to Synergies in the amount of $1,287,000. The term sheet indicated that the loan would be interest free, repayable on demand, dated as of September 30, 2016—nearly one year earlier—and was to be used "for the business purpose of the Company." On July 19, 2017, Gandhi sent an email directly to "accounts@brilliantdiamonds.hk", copying Operation 1, stating, "Please see attached Synergies Confirmation and sign and email to me ASAP. You are holding up my audit. This is balance confirmation as of 9/30/16."   Approximately an hour later, Gandhi forwarded the email to Kurian Matthews asking, "Kurian – can you please have your customer take care of it ASAP per below email?" On July 23, 2017, an employee of Brilliant replied to Gandhi's email, copying Operation 1, attaching the signed loan term sheet.

(iii)    On November 10, 2017, Gandhi forwarded to Operation 1 an auditor's request to Eternal and asked Operation 1 to "Please chase your vendor to confirmed [sic] it. Audit is on hold."   That same day, Gandhi sent substantively identical emails to Operation 1 forwarding auditor requests to Fancy Creations and Sino Traders.

197.    The Operation 1 account was also used to orchestrate transfers of funds and jewels

among Firestar Entities and Shadow Entities. For example:

(iv)    On March 6, 2015, Rebecca Chow emailed Sandeep Mistry, copying Samir Shah and Paresh Mehta, "Please be informed that 1.68.52cts of 1/2ct VS loose diamond that's ready to be shipped. Please provide shipping address so we can process." Later that day, Chow forwarded the email to Operation 1 and stated, "Hi Sandeep, Hope this email reach [sic] you! Please advise below and thanks."

(v)    On September 28, 2015, Ajay Gandhi sent Operation 1 remittance instructions for Jaffe's HSBC bank account ending 2460. The next day, Operation 1 replied, "Universal made payment of 1.4 m Advance Against Invoice[.]"  A few hours later, Gandhi replied, "Received and wired to SDC."  Jaffe's bank statements reflect that, on September 29, 2015, Jaffe received $1,399,962 from Universal Fine Jewelry FZE. That same day, Jaffe transferred $464,050 to SDC Designs LLC and $950,000 to FDII. FDII's bank statements reflect that, on September 29, 2015, FDII transferred $943,827.50 to SDC Designs LLC. Thus, consistent with the email exchange between Ajay Gandhi and Operation 1, the entire approximately $1.4 million Jaffe received from Universal was ultimately paid to SDC Designs, LLC.

(vi)  On January 29, 2016, Dhinakaran Pillai, a finance manager at Firestar International Pvt. Ltd., emailed Ajay Gandhi, "We have remitted today US $405,180.83 in FSI from FIPL invoice details as listed below . . . Once the payment as has been realized in your account, kindly remit the overdue outstanding of US $650,880.00 against our invoices, details as attached for your reference." The email referenced two invoices from FIPL to FDI dated October 22, 2015 and October 23, 2015, respectively. On February 3, 2016, Subhash Parab, who was copied on Pillai's email to Gandhi, forwarded the email to Operation 1 with the note "FYI". Operation 1 then emailed Gandhi, "Ajaybhai, India Team conformed [sic] that $650k is against his plan $405k, so that Please send to Firestar Dubai $650k, which we yesterday talk [sic]. Regards, Sandeep[.]" Gandhi replied, copying Subhash Parab, "I will pay $425k. Please let me know where or what company."

(vii)  On February 1, 2016, Operation 1 emailed Rebecca Chow and Samir Shah, "You will be received [sic] the goods from Tricolor[.] Please coordinate with Samir Bhai in details[.]" The email included a table listing a total of 379.02 carats of mixed diamonds of varying specifications. FDI's purchase ledger reflects a February 22, 2016 purchase of 379.02 carats of loose diamonds from Tri Color Gems for a total price of $400,131.

(viii)  On February 9, 2016, Rebecca Chow emailed Operation 1, copying Ajay Gandhi, "Hi Sandeep, as per our phone conversation, please be informed that package of RE-117 & RE-119 both has [sic] been received in NY. Additionally, there is one shipment received that has no paper work at all."

(ix)  On March 3, 2016, Subhash Parab emailed Ajay Gandhi, copying Operation 1 and Shyam Wadhwa, "Dear Ajaybhai, Kindly wire USD2.00 Mio [sic] payment from A. Jaffe to FIPL as per attached listing." The attachment was a spreadsheet listing several dozen invoices issued by FIPL to Jaffe between March 20, 2015 and September 9, 2015 totaling $2,004,879.70. Gandhi replied, "Just realized cannot pay to Jaffe (Part of $3 m) unless funds are coming in from overseas."

(x)  On March 29, 2017, Operation 1 emailed Ajay Gandhi, "Ajaybhai, We sold goods to Pacific Diamond FZE, and party will wire advice $1.9m[.] Please send to them Proforma Invoice as below details . . . Regards[,] Sales". Gandhi replied with invoice no. 032017, dated March 20, 2017, reflecting a sale by Jaffe to Pacific of 1,691.25 carats of "Mix Diamonds" at a total price of $2,114,062.50. On April 3, 2017, Jaffe received a $1,499,972 transfer from Pacific with a wire reference of "ADVANCE AGAINST PROFORMA INV N032017." That same day, Jaffe transferred $1,510,267.77 to Firestar International Pvt. Ltd.

(xi)  On September 22, 2017, Gandhi sent an email to Operation 1 attaching a report reflecting accounts receivable owed by Brilliant, Unique, and World

Diamond to FDI and asking Operation 1 to "Please have your customer clear these AR - $5.5m on or before September 30, 2017."

## CLAIMS FOR RELIEF

## COUNT 1

### Breach of Fiduciary Duty
### (Nirav Modi)

198.    87. Plaintiff restates and re-alleges paragraphs 1 through 86 197 of this Complaint as though fully set forth herein.

199.    88. Through numerous emails, telephone conversations with Bhansali and Gandhi, among others, and visits to the Debtors' offices, Modi directed the Debtors to participate in the PNB Bank Fraud, including by making payments to the Shadow Entities and other Firestar Entities, exercised dominion and ultimate total control over the Debtors and their directors and officers, and was the ultimate authority for the Debtors.

200.    89. As a result of Modi's dominion and total control over the Debtors and as the ultimate authority for the Debtors, Modi was a *de facto* director, officer, or person in control of the Debtors.

201.    90. As a *de facto* director, officer, or person in control of the Debtors, Modi owed fiduciary duties of due care and loyalty to the Debtors and was required to discharge his duties in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner he reasonably believed to be in the best interests of the Debtors.

202.    91. Modi breached his fiduciary duties as a *de facto* director, officer, or person in control of the Debtors by, among other things, (a) directing the Debtors and their *de jure* directors and officers to engage in the PNB Bank Fraud, including by entering into circular trading transactions with Shadow Entities and Firestar entities, in violation of his duties of due care,

loyalty, and good faith and , (b) directing the Debtors and their officers to use corporate assets to acquire properties for the personal benefit of Modi and his family, also in violation of his duties of due care, loyalty, and good faith; and (c) orchestrating the diversion of the U.S. Entities' assets overseas after exposure of the Bank Fraud, also in violation of his duties of due care, loyalty, and good faith.

203.    92.Modi's breaches of fiduciary duty, including his breaches of the duties of due care, loyalty, and good faith, proximately caused the Debtors to suffer injury, in an amount to be determined at trial, by, among other things, depleting the Debtors' assets through numerous Actual Fraudulent Transactions; looting the recipients of the Actual Fraudulent Transfers so as to impair the Trustee's ability to recover from them; and increasing the creditor claims against the estate and causing the collapse and resulting loss of value of the Debtors' and their businesses.

## COUNT 2

### Breach of Fiduciary Duty
### (Mihir Bhansali and Ajay Gandhi)

204.    93.Plaintiff restates and re-alleges paragraphs 1 through 92 203 of this Complaint as though fully set forth herein.

205.    94.As a director and officer of the Debtors, Mihir Bhansali owed fiduciary duties of due care and loyalty to those entities and was required to discharge his duties in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner he reasonably believed to be in the best interests of the Debtors.

206.    95.Bhansali breached his fiduciary duties by, among other things, (a) allowing Modi to usurp Bhansali's management responsibilities and decision-making authority, in violation of his duty of care, (b) causing the Debtors to engage participate in the PNB FraudBank Fraud, proceeds of which were diverted to Bhansali's family trust and entities owned by Bhansali

and his family members, including by entering into circular trading transactions with Shadow Entities and Firestar entitiesother Modi-Controlled Entities, in violation of his duties of due care and loyalty, and (c; (c) depleting the Debtors' assets through numerous Actual Fraudulent Transfers; (d) looting the recipients of Actual Fraudulent Transfers so as to impair the Trustee's ability to recover from them; (e) making fraudulent misrepresentations and omissions in connection with the Debtors' chapter 11 cases; and (f) causing the Debtors to expend corporate assets to acquire properties for the personal benefit of Modi and his family, in violation of his duties of due care and loyalty.

207.     The breaches of fiduciary duty by Bhansali proximately caused the Debtors to suffer injury, in an amount to be determined at trial, by, among other things, depleting the Debtors' assets through numerous Actual Fraudulent Transfers; delaying the Trustee's appointment and impairing the Trustee's ability to recover on account of claims against their U.S. Affiliates and others; causing the Debtors' estates to incur substantial administrative expenses related to the investigation of information Bhansali failed to disclose and actively endeavored to conceal, destroy, or otherwise render unavailable for use in connection with these chapter 11 cases; and increasing the creditor claims against the estate and causing the collapse and resulting loss of value of the Debtors and their businesses.

## COUNT 3

### Breach of Fiduciary Duty
### (Ajay Gandhi)

208.     Plaintiff restates and re-alleges paragraphs 1 through 207 of this Complaint as though fully set forth herein.

209.     96.As an officer of the Debtors, Gandhi owed fiduciary duties of due care and loyalty to those entities and was required to discharge his duties in good faith, with the care an

77

ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner he reasonably believed to be in the best interests of the Debtors.

210.    97. Gandhi breached his fiduciary duties by, among other things, (a) allowing Modi to usurp Bhansali's Gandhi's management responsibilities and decision-making authority, in violation of his duty of care, (b) causing the Debtors to engage in the PNB Bank Fraud, including by entering into circular trading transactions with Shadow Entities and Firestar entities, other Modi-Controlled Entities in violation of his duties of due care and loyalty, and (c (c) depleting the Debtors' assets through numerous Actual Fraudulent Transactions; (d) looting the recipients of Actual Fraudulent Transfers so as to impair the Trustee's ability to recover from them; (e) making fraudulent misrepresentations and omissions in the context of the Debtors' chapter 11 cases; and (f) causing the Debtors to expend corporate assets to acquire properties for the personal benefit of Modi and his family, in violation of his duties of due care and loyalty.

211.    98. The breaches of fiduciary duty by Bhansali and Gandhi proximately caused the Debtors to suffer injury by, among other things, increasing the creditor claims against the estate, in an amount to be determined at trial, by, among other things, depleting the Debtors' assets through numerous Actual Fraudulent Transactions; delaying the Trustee's appointment and impairing the Debtors' ability to recover on account of claims against their U.S. Affiliates and others; causing the Debtors' estates to incur substantial administrative expenses related to the investigation of information Gandhi failed to disclose and, upon information and belief, actively endeavored to conceal, destroy, or otherwise render unavailable for use in connection with these chapter 11 cases; and increasing the creditor claims against the Debtors' estates and causing the collapse and resulting loss of value of the Debtors' and their businesses.

## COUNT ~~3~~4

### Aiding and Abetting Breach of Fiduciary Duty
### (Nirav Modi)

212.    ~~99.~~Plaintiff restates and re-alleges paragraphs 1 through ~~98~~ 211 of this Complaint as though fully set forth herein.

213.    ~~100.~~In the alternative to Count 1 above, assuming (but not admitting) that Modi did not owe a fiduciary duty to the Debtors, Modi aided and abetted breaches of fiduciary duties by the *de jure* directors and officers of the Debtors, including Bhansali and Gandhi.

214.    ~~101.~~As alleged in Count 2 and Count 3 above, Bhansali—as a director and officer of the Debtors—and Gandhi—as an officer of the Debtors—owed fiduciary duties to the Debtors and breached those fiduciary duties.

215.    ~~102.~~Modi knew that that Bhansali and Gandhi had fiduciary duties as directors and officers of the Debtors and knew they were breaching their fiduciary duties because, among other things, (a) Modi communicated with them about transactions between the Debtors and Shadow Entities, and (b) Modi communicated with them about expending corporate funds on personal assets for Modi and his family.

216.    ~~103.~~Modi induced, participated, and assisted the breaches of fiduciary duties by Bhansali and Gandhi by, among other things, (a) directing Bhansali and Gandhi to engage in the ~~PNB fraud~~Bank Fraud, including by entering into circular trading transactions with Shadow Entities and Firestar entities, ~~and~~ (b) directing Bhansali and Gandhi to deplete the Debtors' assets through numerous Actual Fraudulent Transfers; (c) directing Bhansali and Gandhi to loot the recipients of such Actual Fraudulent Transfers so as to impede the Trustee's ability to recover from them; and (d) directing Bhansali and Gandhi to expend corporate assets to acquire properties for the personal benefit of Modi and his family.

217. 104. The breaches of fiduciary duty by Bhansali and Gandhi, aided and abetted by Modi, proximately caused the Debtors to suffer injury by, among other things, , in an amount to be determined at trial, by, among other things, depleting the Debtors' assets through numerous Actual Fraudulent Transfers; delaying the Trustee's appointment and impairing the Trustee's ability to recover on account of claims against the U.S. Affiliates and others; causing the Debtors' estates to incur substantial administrative expenses related to the investigation of information Bhansali and Gandhi failed to disclose and actively endeavored to conceal, destroy, or otherwise render unavailable for use in connection with these chapter 11 cases; and increasing the creditor claims against the estate and causing the collapse and resulting loss of value of the Debtors' and their businesses.

### COUNT 45

### Corporate Waste
### (Nirav Modi)

218. 105. Plaintiff restates and re-alleges paragraphs 1 through 104 217 of this Complaint as though fully set forth herein.

219. 106. As a *de facto* director, officer, or person in control of the Debtors, Modi had the owed a duty to the Debtors to preserve and protect their assets from undue waste or loss.

220. 107. Modi committed waste of the Debtors' assets by directing the Debtors and their officers to use corporate assets to acquire properties for the personal benefit of Modi and his family and to engage in transactions with Shadow Entities and other Modi-Controlled Entities that served no legitimate corporate or economic purpose.

221. The economics of these transactions were so flawed that no disinterested person of right mind and ordinary business judgment could think such transactions beneficial to the Debtors.

222. 108.The corporate waste committed by Modi proximately caused the Debtors to suffer injury, in an amount to be determined at trial, by losing the millions of dollars spent for the personal benefit of Modi and his family and in transactions with Shadow Entities that served no legitimate economic or corporate purpose.

### COUNT 56

**Corporate Waste**
**(Mihir Bhansali and Ajay Gandhi)**

223. 109.Plaintiff restates and re-alleges paragraphs 1 through 108 222 of this Complaint as though fully set forth herein.

224. 110.As a director and officer of the Debtors, Bhansali had the duty to the Debtors to preserve and protect their assets from undue waste or loss.

225. 111.Bhansali committed waste of the Debtors' assets by directing the Debtors and their officers to use corporate assets to acquire properties for the personal benefit of Modi and his family or by facilitating or permitting such use, and to engage in transactions with Shadow Entities and other Modi-Controlled Entities that served no legitimate corporate or economic purpose.

226. The economics of these transactions were so flawed that no disinterested person of right mind and ordinary business judgment could think such transactions beneficial to the Debtors.

227. The corporate waste committed, facilitated, or permitted by Bhansali proximately caused the Debtors to suffer injury, in an amount to be determined at trial, by losing the millions of dollars expended for the personal benefit of Modi and his family, and in transactions with Shadow Entities that served no legitimate economic or corporate purpose.

## COUNT 7

### Corporate Waste
### (Ajay Gandhi)

228.   Plaintiff restates and re-alleges paragraphs 1 through 227 of this Complaint as though fully set forth herein.

229.   ~~112.~~As an officer of the Debtors, Gandhi had the duty to the Debtors to preserve and protect their assets from undue waste or loss.

230.   ~~113.~~Gandhi committed waste of the Debtors' assets by directing the Debtors and their officers to use corporate assets to acquire properties for the personal benefit of Modi and his family or by facilitating or permitting such use, and to engage in transactions with Shadow Entities and other Modi-Controlled Entities that served no legitimate corporate or economic purpose.

231.   The economics of these transactions were so flawed that no disinterested person of right mind and ordinary business judgment could think such transactions beneficial to the Debtors.

232.   ~~114.~~The corporate waste committed, facilitated, or permitted by ~~Bhansali and~~ Gandhi proximately caused the Debtors to suffer injury, in an amount to be determined at trial, by losing the millions of dollars expended for the personal benefit of Modi and his family, and in transactions with Shadow Entities that served no legitimate economic or corporate purpose.

### COUNT ~~6~~8

### Racketeering Influenced Corrupt Organizations Act ("RICO")
### 18 U.S.C. § 1962(c)
### (Nirav Modi, Mihir Bhansali, Ajay Gandhi)

233.   ~~115.~~Plaintiff restates and re-alleges paragraphs 1 through ~~114~~ 232 of this Complaint as though fully set forth herein.

234.    ~~116.~~Defendants Modi, Bhansali, and Gandhi are each a "person" capable of holding legal or beneficial interest in property within the meaning of 18 U.S.C. § 1962(c) and 18 U.S.C. § 1961(3).

235.    ~~117.~~Defendants Modi, Bhansali, and Gandhi each violated 18 U.S.C. § 1962(c) by their respective acts, described in the prior paragraphs and as further described below.

236.    ~~118.~~Defendants Modi, Bhansali, and Gandhi each had the specific intent to violate 18 U.S.C. § 1962(c) and to commit each underlying predicate act alleged below.

237.    ~~119.~~Defendants Modi, Bhansali, and Gandhi each committed at least two predicate acts of racketeering, as more specifically alleged below. The acts of racketeering were not isolated; rather, they were related in that they had the same or similar purpose and result, participants, victims, or method of commission. Further, the acts of racketeering have been continuous, spanning the period from at least early 2011 to early 2018.

**The RICO Enterprise**

238.    Each of the U.S. Entities is a corporation. Each of the U.S. Entities is therefore an "enterprise" within the meaning of 18 U.S.C. § 1961(4).

239.    Alternatively, the Firestar Entities, collectively, form an association-in-fact engaged in and affecting interstate and foreign commerce for a common and continuing purpose of designing, manufacturing, and selling diamonds and jewelry.

240.    ~~120.~~Alternatively, Defendants Modi, Bhansali, and Gandhi, together with their known and unknown co-conspirators and all Modi ~~owned or controlled entities~~ Controlled Entities, form an association-in-fact engaged in and affecting interstate and foreign commerce for a common and continuing purpose of formulating and implementing a common scheme to defraud PNB for the Defendants' personal enrichment through a pattern of fraud, lies, deceit, and corruption ~~(hereinafter the "RICO Enterprise").~~. Such common purpose came into existence no

later than early 2011, when Defendants Modi, Bhansali, Gandhi implemented a scheme to defraud PNB by fraudulently obtaining LOUs by exploiting the web of Shadow Entities, LOU Entities, and other Modi-Controlled Entities.

241.    Whether conceptualized in the manner described in paragraph 238, paragraph 239, or paragraph 240, there existed during the Relevant Period one or more enterprises within the meaning of 18 U.S.C. § 1964(4) (the "**RICO Enterprise**").

242.    ~~121.~~At all relevant times, Defendants Modi, Bhansali and Gandhi each were employed by or associated with the RICO Enterprise, and each conducted or participated, directly or indirectly, in the conduct of the RICO Enterprise's affairs through a pattern of racketeering activity.

243.    ~~122.~~The ~~Rico~~ RICO Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which the Defendants engage.

244.    ~~123.~~The RICO Enterprise~~, as an association-in-fact,~~ constitutes an "enterprise" within the meaning of 18 U.S.C. § 1961(4), and it was or is engaged in, and its activities affected, interstate and foreign commerce.

245.    ~~124.~~The ~~RICO Enterprise's~~ repeated, continuous, and flagrant violations of federal criminal law alleged in this Complaint constitute a "pattern of racketeering activity" in violation of RICO, 18 U.S.C. § 1961, *et seq.*

~~125.The RICO Enterprise's common purpose came into existence no later than early 2011, when Defendants Modi, Bhansali, Gandhi implemented a scheme to defraud PNB by fraudulently obtaining LOUs by exploiting the web of Shadow Entities and other Modi owned or controlled entities.~~

246.    ~~126.~~Defendants Modi, Bhansali, and Gandhi are central and controlling figures in the RICO Enterprise, ~~have been responsible for oversight of the scheme to defraud PNB,~~ and have

directed ~~other conspirators~~ others to take actions necessary to accomplish the overall aims of the RICO Enterprise.

## The Pattern of Racketeering Activity

247.    ~~127.The RICO Enterprise, as conducted and controlled by~~ Defendants Modi, Bhansali, and Gandhi conducted or participated, ~~engaged in~~ directly or indirectly, in the conduct of the RICO Enterprise's affairs through a pattern of racketeering activity, as defined by 18 U.S.C. § 1961(1) and (5), consisting of multiple acts of racketeering ~~by members of the enterprise~~ that are interrelated, not isolated, and perpetrated for the same or similar purposes by the same persons (the "**RICO Pattern**").

## Predicate Acts: Mail and Wire Fraud, Violations of 18 U.S.C. § 1341, 1343

248.    ~~128.The RICO~~ ~~Enterprise's pattern of racketeering~~ Pattern included numerous acts of mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343.

~~129.    The RICO Enterprise, as conducted and controlled by Defendants Modi, Bhansali, and Gandhi, engaged in a criminal scheme to defraud PNB, launder the fraudulently procured funds, and enrich the Defendants.~~

249.    Modi, Bhansali, and Gandhi voluntarily and intentionally devised and participated in one or more criminal schemes to perpetrate actual fraudulent transfers of the Debtors' and U.S. Affiliates' assets during the Relevant Period, including without limitation, the transfers described in paragraphs 81, 175, 176, and 177 of this Complaint.

250.    ~~130.~~In furtherance of ~~their~~ such scheme or schemes, ~~the RICO Enterprise, as conducted and controlled by Defendants~~ Modi, Bhansali, and Gandhi, willfully and knowingly transmitted, or caused to be transmitted, by means of (1) causing matters and things to be placed in any post office or authorized depository, or deposited or caused to be deposited matters or things to be sent or delivered by a private or commercial interstate carrier or (2) by means of wire

communications in interstate or foreign commerce, writings, signs, signals, pictures, and sounds, including without limitation the following:.

 a. The shipping in August and September of 2011 of a purported 3.27 carat Fancy Vivid Yellow Orange Cushion Cut SI1 diamond;

 b. The shipping in October 2011 of a purported 1.04 carat Fancy Intense Pink Emerald Cut SI2 diamond;

 c. An August 14, 2009, email communication from Modi to Ghandi in which Modi directed Gandhi to make payments totaling $2,293,326 to Shadow Entities Brilliant Diamonds Ltd. and Diagem Inc.;

 d. A June 16, 2010, email communication in which Modi instructed Gandhi, "Unique [a Shadow Entity] has wired $250,000 today to Synergies. Please wire to the account Mehul bhai wants[;]"

 e. An October 21, 2010, email communication in which Modi and Gandhi discussed the shipment of a diamond to a Shadow Entity;

 f. A September 7, 2011, email communication in which Modi, Bhansali, and Gandhi coordinated their communications to prevent detection of the PNB Fraud;

 g. A November 20, 2012, email communication between Bhansali, Gandhi, and Kurian Matthews in which Bhansali instructed Gandhi to cycle approximately $750,000 from Fantasy through FIL and Firestar and back to Fanstasy to clear old invoices drawing unwanted attention from bankers;

 h. A March 18, 2014, email communication in which Gandhi directed $150,000 be transferred from Firestar to Unique Diamond & Jewelry;

 i. A February 15, 2015, email communication in which Gandhi directed $300,000 be transferred from Firestar to Eternal Diamond;

 j. All wire transfers involving funds obtained as a result of the PNB Fraud, including, but not limited to: the wire transfer of $23 million from Mehta's bank account for the creation of the Ithaca Trust; the wire transfer on or about September 7, 2017, of $25 million from CPS50 to purchase the Ritz Carlton Apartment; the wire transfers of $2.5 million from Ami Modi's HSBC account and of $23 million from Mehta's bank account to fund CPS50; the wire transfer on January 2, 2018, of $6 million from Mehta's bank account to Commonwealth Trust Company for the purchase of CPRE.

251. ~~131.~~The use of interstate and international mail and wires to perpetrate these actual fraudulent transfers and to connect this international racketeering conspiracy was foreseeable.

252. ~~132.~~Accordingly, ~~the RICO Enterprise, as conducted and controlled by Defendants~~ Modi, Bhansali, and Gandhi, committed numerous violations of mail and/or wire fraud in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1343.

253. ~~133.~~By enablingModi's, ~~facilitating, and promoting the PNB Fraud, the RICO Enterprise's~~ Bhansali's, and Gandhi's violations of 18 U.S.C. §§ 1341 and 1343 directly and proximately caused injury to each Debtor's business and property by ~~destroying each Debtor's going-concern value and rendering each Debtor insolvent~~unjustifiably and irrevocably depleting their assets in the amount of such transfers, rendering them insolvent, and destroying their value as a going-concern.

**Predicate Acts: National Stolen Property Act, Violations of 18 U.S.C. §§ 2314, 2315**

254. ~~134.~~The RICO ~~Enterprise's pattern of racketeering~~ Pattern included numerous violations of the National Stolen Property Act, 18 U.S.C. §§ 2314, 2315.

255. ~~135.~~~~On numerous occasions during the Relevant Period, the RICO Enterprise, as conducted and controlled by Defendants~~ Based on the transfers by U.S. Affiliates of funds fraudulently received from the Debtors to foreign Modi-Controlled Entities alleged in paragraph 175 of this Complaint (the **"Subsequent Transfers"**), Modi, Bhansali, and Gandhi, willfully and knowingly transported, transmitted, or transferred in interstate or foreign commerce—or received, possessed, concealed, stored, bartered, sold, disposed of, or pledged as security for a loan—goods, wares, merchandise, securities, or money that crossed an interstate or international boundary after being stolen, converted, or taken by fraud ~~(the "Stolen Property Transfers"), including without limitation:~~.

87

a.    On March 8, 2011, Firestar received $1,863,220.65 in fraudulently procured LOU funds from PNB's "nostro" account at the New York branch of Deutsche Bank Trust Co. Americas (the "**PNB Nostro Account**"). The applicable LOU was fraudulently obtained by FIL.

b.    On May 6, 2011, Firestar received $1,858,183.50 in fraudulently procured LOU funds from the PNB Nostro Account. The applicable LOU was fraudulently obtained by Solar Exports.

c.    On August 22, 2011, Firestar received $1,499,700.75 in fraudulently procured funds from the PNB Nostro Account. The applicable LOU was fraudulently obtained by FIL.

d.    On October 4, 2011, Firestar received $1,803,213.75 in fraudulently procured LOU funds from the PNB Nostro Account. The applicable LOU was fraudulently obtained by FIL.

e.    Also on October 4, 2011, Firestar separately received $1,246,730.60 in fraudulently procured funds from the PNB Nostro Account. The applicable LOU was fraudulently obtained by FIL.

f.    On October 13, 2011, Jaffe received $1,921,043.65 in fraudulently procured LOU funds from the PNB Nostro Account. The applicable LOU was fraudulently obtained by Diamonds 'R' Us.

g.    On February 7, 2013, Firestar received $931,965 in fraudulently procured LOU funds from Pacific Diamonds FZE, a Shadow Entity located in the United Arab Emirates. These funds were derived from an LOU that was fraudulently obtained by Diamonds 'R' Us in which Pacific Diamonds FZE was the exporter.

h.    On February 11, 2013, Firestar received $980,805 in fraudulently procured LOU funds from Pacific Diamonds FZE. These funds were derived from the same LOU fraudulently obtained by Diamonds "R" Us in which Pacific Diamonds FZE was the exporter.

i.    On March 19, 2013, Firestar received $191,501.35 in fraudulently procured LOU funds from Auregem Company Ltd., a Shadow Entity located in Hong Kong. These funds were derived from an LOU that was fraudulently obtained by Diamonds 'R' Us in which Auragem Company Ltd. was the exporter.

j.    On March 19, 2013, Firestar received $236,078.45 in fraudulently procured LOU funds from Fancy Creations Company Ltd., a Shadow Entity located in Hong Kong. These funds were derived from the same LOU referenced in subparagraph (i) above

k.      On May 6, 2013, Firestar received $21,393.98 in fraudulently procured LOU funds from Fancy Creations Company Ltd. These funds were derived from an LOU that was fraudulently obtained by Stellar Diamonds.

l.      On March 27, 2015, Fantasy received $1,522,451 in fraudulently procured LOU funds from Pacific Diamonds FZE. That same day, Fantasy transferred these funds to Firestar.

m.      On May 3, 2016, Firestar received $399,962 in fraudulently procured LOU funds from Tri Color Gems FZE, a Shadow Entity located in the United Arab Emirates. These funds were derived from an LOU that that was fraudulently obtained by Solar Exports in which Tri Color Gems FZE was the exporter.

n.      On December 19, 2016, Firestar received $599,972 in fraudulently procured LOU funds from Pacific Diamonds FZE. These funds were derived from an LOU that was fraudulently obtained by Stellar Diamonds in which Tri Color Gems was the exporter.

o.      On December 6, 2012, Fantasy executed a security agreement in favor of HSBC Bank USA pledging substantially all of its assets — at least some of which were traceable to the fraudulently procured LOU funds — as collateral for a line of credit issued by HSBC Bank USA. Gandhi executed the security agreement in his capacity as chief financial officer of Fantasy. Bhansali signed as a witness to the security agreement in his capacity as president of Fantasy.

p.      On December 12, 2012, Firestar and Fantasy each executed a security agreement in favor of Israel Discount Bank of New York pledging substantially all of their respective assets — at least some of which were traceable to the fraudulently procured LOU funds — as collateral for a line of credit issued by Israel Discount Bank of New York. Gandhi executed each security agreement in his capacity as chief financial officer for Firestar and Fantasy, respectively.

256.    136. For each Stolen Property Transfer, the RICO Enterprise, through Defendants Modi, Bhansali, or Gandhi, knew that the money or property transferred, received, or disposed of had For each Subsequent Transfer, Modi, Bhansali, and Gandhi, knew that the funds involved had been fraudulently transferred from the applicable Debtor to the applicable U.S. Affiliate or had otherwise been stolen, converted, or taken by fraud.

257.   137.Each ~~Stolen Property~~ Subsequent Transfer involved money or property having a value of $5,000 or more.

258.   138.Accordingly, ~~the RICO Enterprise, as conducted and controlled by Defendants~~ Modi, Bhansali, and Gandhi, committed numerous violations of the National Stolen Property Act, 18 U.S.C. §§ 2314, 2315.

259.   139.By enablingModi's, ~~facilitating, and promoting the PNB Fraud, the RICO Enterprise's~~ Bhansali's, and Gandhi's violations of 18 U.S.C. §§ 2314 and 2315 directly and proximately caused injury to each Debtor's business and property by ~~destroying each Debtor's going-concern value and rendering each Debtor insolvent~~impairing the Debtors' ability to recover the value of the Subsequent Transfers.

**Predicate Acts: Money Laundering, Violations of 18 U.S.C. §§ 1956, 1957.**

260.   140.The RICO ~~Enterprise's pattern of racketeering~~ Pattern included numerous acts of money laundering in violation of 18 U.S.C. §§ 1956, 1957.

261.   Each Actual Fraudulent Transfer and each Subsequent Transfer supported and furthered the Bank Fraud by, at a minimum: (a) facilitating the reduction of outstanding payables and receivables among Modi-Controlled Entities so as to avert detection of the Bank Fraud; (b) layering the movement of funds so as to make them difficult to trace.

262.   Each Actual Fraudulent Transfer and each Subsequent Transfer occurred, in whole or in part, in the United States.

263.   Each Actual Fraudulent Transfer and each Subsequent Transfer involved or resulted from one or more acts of wire fraud.

264.   141.The PNB Fraud constitutes Accordingly, each Actual Fraudulent Transfer and each Subsequent Transfer constituted, involved, or resulted from an offense against India, a foreign nation, involving fraud, or a scheme or attempt to defraud, against PNB, a foreign bank.

142.Certain of the financial transactions underlying or comprising the PNB Fraud occurred, in whole or in part, in the United States in that certain of the LOU transactions underlying or comprising the PNB Fraud involved the movement of funds by wire or other means from the PNB Nostro Account at the New York branch of Deutsche Bank Trust Company Americas to the Debtors' bank accounts at the New York branches of HSBC Bank USA and Israel Discount Bank of New York. Additionally, the RICO Enterprise's circular trading of the same diamonds and other goods among Modi owned or controlled entities – including the Debtors and their U.S. affiliates – for the purpose of artificially inflating the volume of imports - to secure additional LOUs and obtaining liquidity to repay other LOUs occurred, in part, within the United States.

265.    Additionally, each Actual Fraudulent Transfer was designed to deplete the applicable Debtor's assets through one or more acts of wire fraud so as to hinder, delay, or defraud such Debtor's creditors.

266.    Additionally, each Subsequent Transfer was designed to deplete the applicable U.S. Affiliate's assets through one or more acts of wire fraud so as to hinder, delay, or defraud such U.S. Affiliate's creditors, including the applicable Debtor or Debtors.

267.    Accordingly, each Actual Fraudulent Transfer and each Subsequent Transfer constituted, involved, or was the result of specified unlawful activity within the meaning of 18 U.S.C. § 1956(c)(7).

268.    Each Subsequent Transfer affected interstate or foreign commerce and involved the movement of funds by wire or other means from a place in the United States to or through a place outside of the United States.

269.    143.The money, diamonds, and other goods and property Each Subsequent Transfer involved funds that were derived from or obtained or retained, directly or indirectly,

through the PNB Fraud constitute the proceeds of an "unlawful specified activity" within the meaning of 18 U.S.C. § 1956(c)(7)(B)(iii) from an Actual Fraudulent Transfer and unlawful activity related to such Actual Fraudulent Transfer.

270.    Modi, Bhansali, and Gandhi conducted each Subsequent Transfer with the intent to promote the carrying on of specified unlawful activity, including in relation to: (a) fraudulently depleting the applicable Debtor's and U.S. Affiliate's assets; and (b) the Bank Fraud more generally.

271.    Modi, Bhansali, and Gandhi knew that each Subsequent Transfer was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the funds derived from the Actual Fraudulent Transfer preceding such Subsequent Transfer.

144.    On numerous occasions during the Relevant Period, the RICO Enterprise, as conducted and controlled by Defendants Modi, Bhansali, and Gandhi, willfully and knowingly conducted financial transactions involving the proceeds of the PNB Fraud (the "**Money Laundering Transactions**"), including without limitation:

a.    Each of the transactions identified in paragraphs 135(a)-(p) above.

b.    Each sham transaction whereby the Debtors exported diamonds and other goods to Shadow Entities or other Modi-owned entities in exchange for funds transferred by wire or other means for the purpose of artificially inflating the volume of exports to secure additional LOUs, thereby promoting or carrying on the PNB Fraud.

c.    Each sham transaction whereby the Debtors transferred funds by wire or other means in exchange for imported diamonds and other goods from Shadow Entities or other Modi-owned entities for the purpose of providing those entities' with liquidity to repay the LOU obligations, thereby promoting or carrying on the PNB Fraud.

d.    All other transfers, by wire or other means, of funds obtained as a result of the PNB Fraud, including, but not limited to: the wire transfer of $23 million from Mehta's bank account for the creation of the Ithaca

Trust; the wire transfer on or about September 7, 2017, of $25 million from CPS50 to purchase the Ritz Carlton Apartment; the wire transfers of $2.5 million from Ami Modi's HSBC account and of $23 million from Mehta's bank account to fund CPS50; the wire transfer on January 2, 2018, of $6 million from Mehta's bank account to Commonwealth Trust Company for the purchase of CPRE.

272.    145.The RICO Enterprise, as conducted and controlled by Defendants Modi, Bhansali, and Gandhi, knew that the property involved in each Money Laundering Transaction Subsequent Transfer represented the proceeds of the PNB Fraudsome form of unlawful activity.

273.    146.Each Money Laundering Transaction Subsequent Transfer involved a monetary transaction in criminally derived property of a value of greater than $10,000 and derived from specified unlawful activity.

147.    Many of the Money Laundering Transactions involved the transfer of funds from a place outside of the United States to a place within the United States, or vice versa, including without limitation the transfers described in paragraph 144(b)-(c) above.

274.    Upon information and belief, Modi, Bhansali, and Gandhi agreed, expressly or implicitly, to: (a) effectuate each Actual Fraudulent Transfer and each Subsequent Transfer; (b) fraudulently deplete the Debtors' and U.S. Affiliates' assets; and (c) perpetrate the Bank Fraud.

275.    148.The RICO Enterprise, as conducted and controlled by Defendants Accordingly, Modi, Bhansali, and Gandhi, conducted each Money Laundering Transaction with the intent to promote the carrying on of the PNB Fraud. committed, and conspired to commit, numerous acts of money laundering in violation of 18 U.S.C. §§ 1956 and 1957.

149.    The RICO Enterprise, as conducted and controlled by Defendants Modi, Bhansali, and Gandhi, conducted each Money Laundering Transaction with the knowledge that such Money Laundering Transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the PNB Fraud.

150.    Accordingly, the RICO Enterprise, as conducted and controlled by Defendants Modi, Bhansali, and Gandhi, committed numerous acts of money laundering in violation of 18 U.S.C. §§ 1956 and 1957.

276.    151.By enablingModi's, facilitating, and promoting the PNB Fraud, the RICO Enterprise's Bhansali's, and Gandhi's violations of 18 U.S.C. §§ 1956 and 1957 directly and proximately caused injury to each Debtor's business and property by destroying each Debtor's going-concern value and rendering each Debtor insolvent. impairing the Debtors' ability to recover the value of the Subsequent Transfers.

**Predicate Acts: Obstruction of Justice, Violations of 18 U.S.C. §§ 1503, 1512**

277.    The RICO Pattern included numerous acts of obstruction of justice in violation of 18 U.S.C. §§ 1503 and 1512.

278.    Based on the allegations set forth in paragraph 151 of this Complaint concerning the Dubai-based Shadow Entity personnel, upon information and belief, Modi and Bhansali, or others operating at their direction, knowingly intimidated, threatened, or corruptly persuaded such Shadow Entity personnel, or engaged in misleading conduct toward such Shadow Entity personnel, with the intent to influence, delay, or prevent the testimony of such Shadow Entity personnel in an official proceeding, including these chapter 11 cases, and to cause or induce such Shadow Entity personnel to withhold testimony, or withhold a record, document or other object, from an official proceeding, including these chapter 11 cases.

279.    Additionally, Bhansali corruptly altered, destroyed, mutilated, or concealed records, documents or other objects, or attempted to do so, as demonstrated by the following actions, alleged in more detail above, which Bhansali, or others operating at his and Modi's direction, took in the weeks prior to and following the Petition Date:

(i)     Bhansali researched methods for deleting internet history, browsing the internet anonymously, communicating through encrypted and self-deleting messages, and encrypting computer data;

(ii)    Bhansali downloaded, installed, and, upon information and belief, used software designed for such purposes;

(iii)   Upon information and belief, Bhansali deleted or attempted to delete all copies of the spreadsheets described in paragraph 68 of this Complaint.

(iv)    Upon information and belief, Bhansali directed Subhash Parab to "send all non-Firestar comp[uter]s to HK[.]"

(v)     Upon information and belief, Nehal Modi, operating at the direction of or in coordination with Nirav Modi and Mihir Bhansali, destroyed mobile phones of various Shadow Entity personnel.

280.    Moreover, Bhansali corruptly obstructed, influenced, or impeded an official proceeding, including the Debtors' chapter 11 cases, by, as alleged in more detail above, (a) knowingly and intentionally making material misstatements, misrepresentations, and omissions under penalty of perjury in connection with the Debtors' chapter 11 cases concerning the Debtors' relationship with Shadow Entities and the Debtors' involvement in the Bank Fraud; and (b) refusing to cooperate with the Examiner's investigation.

281.    Moreover, based on the same allegations, Bhansali corruptly endeavored to influence or impede an officer in or of this Court, including the Examiner and the Trustee, in the discharge of his duty.

282.    Moreover, based on the same allegations, Bhansali corruptly endeavored to influence, obstruct, or impede the due administration of justice.

283.    Similarly, Gandhi corruptly obstructed, influenced, or impeded an official proceeding, including the Debtors' chapter 11 cases, by, as alleged in more detail above, (a) knowingly and intentionally signing the Debtors' respective SOFAs under penalty of perjury without disclosing the Debtors' involvement in the Bank Fraud, their relationship with various

Shadow Entities, and the substantial loan balances owed by NMI to Jaffe, or the significant transfers of the Debtors' assets to Shadow Entities and other Modi-Controlled Entities that were required to be disclosed in the SOFAs; and (b) feigning ignorance and outright lying to the Examiner concerning the Debtors' and his personal involvement in the transactions supporting the Bank Fraud.

284.    Moreover, based on the same allegations, Gandhi corruptly endeavored to influence or impede an officer in or of this Court, including the Examiner and the Trustee, in the discharge of his duty.

285.    Moreover, based on the same allegations, Gandhi corruptly endeavored to influence, obstruct, or impede the due administration of justice.

286.    In taking such actions, Bhansali's, and Gandhi's purpose was to impair the integrity or availability of evidence for use in an official proceeding, including these chapter 11 cases, or to otherwise obstruct, influence, or impede an official proceeding, including these chapter 11 cases.

287.    Upon information and belief, Modi, Bhansali, and Gandhi agreed, expressly or implicitly, with each other and others, including Nehal Modi, to commit each of the obstruction of justice offenses alleged in this Complaint.

288.    Accordingly, Modi, Bhansali, Gandhi, and other co-conspirators, including Nehal Modi, committed, and conspired to commit, numerous acts of obstruction of justice in violation of 18 U.S.C. §§ 1503 and 1512.

289.    Modi's, Bhansali's and Gandhi's violations of 18 U.S.C. §§ 1503 and 1512 directly and proximately caused injury to each Debtor's business and property by, among other things, impairing Jaffe's ability to sell its assets at going-concern value; delaying the Trustee's appointment and impairing his ability to recover from U.S. Affiliates; and causing the Debtors'

estates to incur substantial administrative expenses related to the investigation of information Bhansali and Gandhi failed to disclose and, upon information and belief, actively endeavored to conceal, destroy, or otherwise render unavailable for use in connection with these chapter 11 cases.

**Predicate Acts: Bankruptcy Fraud, Violations of 18 U.S.C. § 152**

290.    The RICO Pattern included numerous acts of bankruptcy fraud in violation of 18 U.S.C. § 152.

291.    Based on the allegations set forth in, *inter alia*, paragraphs 280 and 283 of this Complaint, Bhansali and Gandhi each knowingly and fraudulently made one or more false oaths or accounts in or relation to these chapter 11 cases.

292.    Based on those same allegations, Bhansali and Gandhi each knowingly and fraudulently made one or more false declarations, certificates, verifications, or statements under penalty of perjury in or in relation to these chapter 11 cases.

293.    Based on those same allegations, Bhansali and Gandhi, after the filing of these chapter 11 cases, knowingly and fraudulently withheld from a custodian, trustee, marshal, or other officer of this Court, including the Examiner, recorded information relating to the property or financial affairs of the Debtors.

294.    Based on those same allegations, Bhansali and Gandhi knowingly and fraudulently concealed from creditors, the United States Trustee, the Trustee, and this Court property belonging to the Debtors' estates, including the substantial loan receivable owed by NMI to Jaffe.

295.    Accordingly, Bhansali and Gandhi committed numerous acts of bankruptcy fraud in violation of 18 U.S.C. § 152.

296. Bhansali's and Gandhi's violations of 18 U.S.C. § 152 directly and proximately caused injury to each Debtor's business and property by, among other things, impairing Jaffe's ability to sell its assets at going-concern value; delaying the Trustee's appointment and impairing his ability to recover from U.S. Affiliates; and causing the Debtors' estates to incur substantial administrative expenses related to the investigation of information Bhansali and Gandhi failed to disclose and actively endeavored to conceal, destroy, or otherwise render unavailable for use in connection with these chapter 11 cases.

**Continuity of Conduct**

297. ~~152.~~Defendants' violations of law as set forth herein, each of which directly and proximately injured the Debtors, constituted a continuous course of conduct in the United States beginning in no later than early 2011 and continuing at least through the ~~date of~~ weeks after the filing of the chapter 11 petitions commencing these cases, which was intended to obtain economic gain through false representations, fraud, deceit, and other improper and unlawful means. Therefore, the violations were a part of pattern of racketeering activity under 18 U.S.C. §§ 1961(1) and (5).

**The RICO ~~Enterprise~~ Pattern Caused Injury to Debtors**

298. ~~153.~~Each Debtor has been injured in its business or property as a direct result and proximate result of ~~the Rico Enterprise's~~ Modi, Bhansali, and Gandhi's violations, described above, of 18 U.S.C. § 1962(c), including any injury by reason of the predicate acts constituting the ~~pattern of racketeering activity~~RICO Pattern.

299. ~~154.Before Defendants hatched their scheme to defraud PNB~~Prior to Defendants' racketeering activities, each of the Debtors operated as a legitimate business built on fruitful relationships with reputable customers.

300.   ~~155.~~Firestar was incorporated in 2004 for the purposes of acquiring Frederick Goldman, Inc., which was one of FIL's U.S. customers. Firestar historically operated as a distributor and wholesaler of finished gold and diamond jewelry. Its customer base consisted of legitimate jewelry retailers such as Zales, JCPenney, and Macy's.

301.   ~~156.~~Fantasy was incorporated in 2012 for the purpose of holding the exclusive license from Chicago-based Fantasy Diamond Corp. to supply the Endless Diamond Brand to U.S. retailers. Fantasy was created primarily to conduct business with Costco Wholesale Corporation based on sales attributable to the Endless Diamond Brand. Fantasy's other customers include Zales, Sam's Club, and Walmart. Fantasy sold finished jewelry, generally at a higher price point than Firestar.

302.   ~~157.~~Jaffe is the successor to New York-based Sandberg & Sikorksi Corporation, whose predecessors date back to 1892. Sandberg & Sikorski historically consisted of two divisions, one that sold to major U.S. retailers and A. Jaffe, a luxury bridal line that supplied assembled pieces of jewelry to high-end independent jewelry retailers. In 2007, FIL purchased a 95% stake in Sandberg & Sikorski. Sandberg & Sikorski was renamed A. Jaffe, Inc. in 2011. It did not become fully integrated within the ~~Firestar group of entities until 2016.~~ operations of the other Firestar Entities until 2016.

303.   Defendants' violations of federal law in furtherance of their scheme or schemes to loot the Debtors' assets through a series of Actual Fraudulent Transfers and to conceal the nature of such transfers by corruptly impeding, influencing, or obstructing these chapter 11 cases resulted in: (a) each Debtor's assets being unjustifiably and irrevocably depleted in the amount of the applicable Actual Fraudulent Transfers, (b) each Debtor's chapter 11 estate incurring substantial administrative expenses stemming from Defendants' obstruction of the Examiner's

and Trustee's investigations that would not otherwise have been incurred, and (c) the impairment of each Debtor's ability to sell their assets at going-concern value.

158.    As a result of Defendants' exploitation of the Debtors as part of their scheme to defraud PNB, each Debtor's customer and supplier relationships, industry reputation, and ultimately value as a going concern were destroyed. Defendants' misconduct destroyed each Debtor's financial standing by burdening them with enormous liability to PNB, crippling their ability to operate as legitimate businesses, and forcing them to expend resources on an expensive chapter 11 liquidation.

**Plaintiff's Entitlement to Treble Damages**

304.    159.As a result of the violations of 18 U.S.C. § 1962(c) by the RICO EnterpriseModi, Bhansali, and Gandhi, each Debtor has suffered substantial damages in an amount to be proven at trial.

305.    160.Under 11 U.S.C. §§ 323, 541(a)(1) and 1106(a), Plaintiff has standing to bring all claims alleged in this Complaint on behalf of each of the Debtors' chapter 11 estates.

306.    161.Under 18 U.S.C. § 1964(c), Plaintiff is entitled to recover treble the Debtors' general and special compensatory damages, plus interest, costs, and attorneys' fees caused by reason of Defendants' violations of 18 U.S.C. § 1962(c).

**COUNT 79**

**Racketeering Influenced Corrupt Organizations Act**
**18 U.S.C. § 1962(d)**
**(Nirav Modi, Mihir Bhansali, Ajay Gandhi)**

307.    162.Plaintiff restates and re-alleges paragraphs 1 through 161 306 of this Complaint as though fully set forth herein.

308.    163.Since at least early 2011, the Defendants together with others known and unknown, being persons employed by and associated with the RICO Enterprise, have unlawfully,

knowingly, and willfully combined, conspired, confederated, and agreed together and with others to violate 18 U.S.C. § 1962(c), as described above, in violation of 18 U.S.C. § 1962(d).

309. ~~164.~~The Defendants knew that they were engaged in a conspiracy to commit the predicate acts and knew that the predicate acts were part of such racketeering activity, and the participation and agreement of each of them was necessary to allow the commission of this pattern of racketeering activity. This conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

310. ~~165.~~The Defendants agreed to conduct or participate in, directly or indirectly, the conduct, management, or operation of the RICO Enterprise's affairs through a pattern of racketeering activity, including but not limited to the acts of racketeering set forth above in Count ~~6~~ 8 of this Complaint.

311. ~~166.~~As part of the conspiracy, each Defendant, at times acting through certain of ~~its officers,~~ his agents, and representatives~~,~~ or co-conspirators, committed at least two predicate acts of racketeering in the conduct of the RICO Enterprise's affairs.

312. ~~167.~~As a direct and proximate result of the Defendants' conspiracy, the pattern of racketeering activity through which they conducted or participated in the conduct of the affairs of the RICO Enterprise, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), each of the Debtors has been injured in its business and property.

313. ~~168.~~Under 18 U.S.C. § 1964(c), Plaintiff is entitled to recover treble its general and special compensatory damages, plus interest, costs, and attorneys' fees incurred by reason of Defendants' violations of 18 U.S.C. § 1962(d).

WHEREFORE, Plaintiff, as chapter 11 trustee of the Debtors, respectfully requests that the Court enter judgment:

a.  On Counts 1, 2, 3, and 34, in favor of Plaintiff and against Defendants Modi, Bhansali, and Gandhi, jointly and severally, in the amount of damages to be proven at trial, but no less than $15,000,000, that were suffered by the Debtors and their estates as a result of the Defendants' breaches of fiduciary duty and aiding and abetting breaches of fiduciary duty, plus interest, costs and attorneys' fees, and such other equitable relief as may be just and proper.

b.  On Counts 4 5, 6 and 57, in favor of Plaintiff and against Defendants Modi, Bhansali, and Gandhi, jointly and severally, in the amount of damages to be proven at trial, but no less than $15,000,000, that were suffered by the Debtors and their estates as a result of the corporate waste committed, permitted, or suffered by Defendants, plus interest, costs and attorneys' fees, and such other equitable relief as may be just and proper.

c.  On Counts 6 8 and 79, in favor of Plaintiff and against Defendants Modi, Bhansali, and Gandhi, jointly and severally, in treble the amount of damages to be proven at trial, but no less than $15,000,000, that were suffered by the Debtors and their estates as a result of the Defendants' violation of the Racketeering Influenced Corrupt Organizations Act, plus interest, costs and attorneys' fees, and such other equitable relief as may be just and proper.

Dated: ~~March 27~~ September 20, 2019,
New York, New York

Respectfully submitted,

**JENNER & BLOCK LLP**

By: /s/ Vincent E. Lazar
Vincent E. Lazar
Angela M. Allen (admitted *pro hac vice* ~~pending~~)
353 North Clark Street
Chicago, Illinois 60654
(312) 222-9350
vlazar@jenner.com
aallen@jenner.com

Carl N. Wedoff
~~Nicolas G. Keller~~
919 Third Avenue
New York, New York 10022
(212) 891-1600
cwedoff@jenner.com

~~nkeller@jenner.com~~

*Counsel for the Chapter 11 Trustee*