**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>FIRESTAR DIAMOND, INC., *et al.*<br>                          Debtors. | Chapter 11<br><br>No. 18-10509 (SHL)<br><br>Jointly Administered |
| RICHARD LEVIN, Chapter 11 Trustee of<br>FIRESTAR DIAMOND, INC., FANTASY, Inc., and<br>OLD AJ, INC. f/k/a A. JAFFE, INC.,<br><br>                      Plaintiff,<br><br>     vs.<br><br>NIRAV DEEPAK MODI, MIHIR BHANSALI, and<br>AJAY GANDHI,<br><br>                      Defendants. | Adv. Proc. No. 19-1102 (SHL) |

**DEFENDANT NIRAV DEEPAK MODI'S MEMORANDUM OF LAW IN SUPPORT OF
HIS MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036-6710
Tel: (212) 336-2000

*Attorneys for Nirav Deepak Modi*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ iii

Preliminary Statement ........................................................................................................1

Summary of Allegations ......................................................................................................4

    A.    The Diamond Business ................................................................4

    B.    The Alleged Fraud ......................................................................5

    C.    The Alleged Diversion of Funds...............................................7

    D.    The Bankruptcy Filing ..............................................................8

Argument ............................................................................................................................9

I.    The Trustee Does Not Have Standing to Bring Creditor Claims..........................9

II.    The Breach of Fiduciary Duty, Aiding and Abetting, and Corporate Waste Claims Must Be Dismissed Against Nirav Modi ........................................11

    A.    The Trustee's Common-Law Claims Against Modi Are Limited by the Applicable Statute of Limitations ...........................12

    B.    The Trustee's Breach of Fiduciary Duty and Corporate Waste Claims Should Be Dismissed Because Modi Did Not Owe Fiduciary Duties to the Debtors ...............................................15

    C.    The Trustee Fails to Allege a Breach of Fiduciary Duty or Corporate Waste Against Modi .............................................17

III.    The RICO Claims Against Modi Fail to State a Claim on Which Relief May Be Granted And Should Be Dismissed ...............................................18

    A.    The Trustee Lacks Standing to Bring the RICO Claims Against Modi Because the Debtors Did Not Sustain a Direct Injury as a Result of the Alleged RICO Violation .................................20

        1.    Standing under the RICO Statute Is Limited to Parties Directly Injured as a Result of the Alleged Violation..............................20

        2.    The Debtors Were Not Injured By Reason of a Pattern of Racketeering Activity ......................................................22

        3.    PNB Is Better Situated to Pursue Claims.................................24

i

B.      The Trustee's RICO Claims Are Barred by the Doctrine of In Pari Delicto .........26

C.      The Trustee Fails to Allege that Modi Committed Any RICO Predicate
Act.................................................................................................................28

      1.      The Trustee Fails to Plead Mail and Wire Fraud Against Modi................29

      2.      The Trustee Fails to Plead Violations of the National Stolen
Property Act Against Modi .......................................................................31

      3.      The Trustee Fails to Plead Money Laundering Violations Against
Modi ........................................................................................................32

      4.      The Trustee Fails to Plead Obstruction of Justice Against Modi ..............33

D.      The Trustee Cannot Recover Under RICO For Injuries that Accrued
Before March 27, 2015 ........................................................................................34

CONCLUSION.................................................................................................................36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ambac Assurance Corp. v. Countrywide Home Loans, Inc.*,
106 N.E.3d 1176 (N.Y. 2018)..................................................................................13

*Anza v. Ideal Steel Supply Corp.*,
547 U.S. 451 (2006).................................................................................20, 24, 25

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..................................................................................................9

*Bankr. Servs. v. Ernst & Young (In re CBI Holding Co.)*,
529 F.3d 432 (2d Cir. 2008).............................................................................10, 26

*Bateman Eichler, Hill Richards, Inc. v. Berner*,
472 U.S. 299 (1985)................................................................................................27

*Bd. of Managers of Trump Tower at City Ctr. Condo. v. Palazzolo*,
346 F. Supp. 3d 432 (S.D.N.Y. 2018)....................................................................31

*Beard Research, Inc. v. Kates*,
8 A.3d 573 (Del. Ch. 2010).....................................................................................15

*Bell Atl. v. Twombly*,
550 U.S. 554 (2006)..................................................................................................9

*Bernstein v. Misk*,
948 F. Supp. 228 (E.D.N.Y. 1997) ...................................................................32, 33

*Bianco v. Erkins (In re Gaston & Snow)*,
243 F.3d 599 (2d Cir. 2001)....................................................................................12

*Bingham v. Zolt*,
66 F.3d 553 (2d Cir. 1995).......................................................................................35

*Bologna v. Allstate Ins. Co.*,
138 F. Supp. 2d 310 (E.D.N.Y. 2001) ...............................................................33, 34

*Brown Media Corp. v. K&L Gates, LLP*,
586 B.R. 508 (E.D.N.Y. 2018) ...............................................................................13

*Caplin v. Marine Midland Grace Tr. Co.*,
406 U.S. 416 (1972).................................................................................................10

*Casio Comput. Co. v. Sayo*,
   98 Civ. 3772 (WK), 1999 U.S. Dist. LEXIS 14675 (S.D.N.Y. Sept. 20, 1999)....................33

*Cofacredit, S.A. v. Windsor Plumbing Supply Co.*,
   187 F.3d 229 (2d Cir. 1999)...................................................................................................28

*Cohen v. S.A.C. Trading Corp.*,
   711 F.3d 353 (2d Cir. 2013)..............................................................................................29, 32

*In re Colonial Ltd. Pshp. Litig.*,
   178 B.R. 40 (D. Conn. 1994) ................................................................................................11

*DeFalco v. Bernas*,
   244 F.3d 286 (2d Cir. 2001)...................................................................................................28

*DiVittorio v. Equidyne Extractive Indus., Inc.*,
   822 F.2d 1242 (2d Cir. 1987)................................................................................................30

*Econ. Opportunity Comm'n of Nassau Cty., Inc. v. Cty. of Nassau*,
   47 F. Supp. 2d 353 (E.D.N.Y. 1999) ...................................................................................31

*In re Firestar Diamond, et al.*,
   No. 18-bk-10509 (Bankr. S.D.N.Y. Nov. 29, 2018).............................................................26

*First Capital Asset Mgmt. v. Satinwood, Inc.*,
   385 F.3d 159 (2d Cir. 2004)...................................................................................................28

*Geltzer v. Bedke (In re Mundo Latino Mkt.)*,
   590 B.R. 610 (Bankr. S.D.N.Y. 2018)..................................................................................18

*Golden Pac. Bancorp v. FDIC*,
   273 F.3d 509 (2d Cir. 2001)...................................................................................................14

*Grewal v. Cuneo*,
   No. 13-cv-6836 (RA), 2015 U.S. Dist. LEXIS 87755 (S.D.N.Y. July 7, 2015)....................33

*Harris v. NYU Langone Med. Ctr.*,
   No. 12-CV-454, 2013 U.S. Dist. LEXIS 99328 (S.D.N.Y. July 9, 2013) ..............................28

*Hecht v. Commerce Clearing House, Inc.*,
   897 F.2d 21 (2d Cir. 1990)....................................................................................................19

*Hemi Grp., LLC . v. City of New York*,
   559 U.S. 1 (2010)..............................................................................................20, 21, 24, 25

*Hirsch v. Arthur Andersen & Co.*,
   72 F.3d 1085 (2d Cir. 1995)..............................................................................................9, 11

iv

*Holmes v. Secs. Inv'r Prot. Corp.*,
    503 U.S. 258 (1992) ......................................................................................................... *passim*

*IDT Corp. v. Morgan Stanley Dean Witter & Co.*,
    907 N.E.2d 268 (N.Y. 2009) ............................................................................................12, 13

*Jerome M. Sobel & Co. v. Fleck*,
    No. 03-CV-1041, 2003 U.S. Dist. LEXIS 21362 (S.D.N.Y. Dec. 1, 2003) ..........................28

*Jus Punjabi, LLC v. Get Punjabi, Inc.*,
    No. 1:14-cv-3318-GHW, 2015 U.S. Dist. LEXIS 66006 (S.D.N.Y. May 20,
    2015) ....................................................................................................................................32, 33

*Kaplan v. Centex Corp.*,
    284 A.2d 119 (Del. Ch. 1971)...............................................................................................16

*Katzman v. Victoria's Secret Catalogue*,
    167 F.R.D. 649 (S.D.N.Y. 1996) ..........................................................................................19

*Kerik v. Tacopina*,
    64 F. Supp. 3d 542 (S.D.N.Y. 2014)................................................................................35, 36

*Kirschner v. KPMG LLP*,
    938 N.E.2d 941 (N.Y. 2010) .................................................................................................36

*Koch v. Christie's Int'l Pub. Ltd. Co.*,
    699 F.3d 141 (2d Cir. 2012)..................................................................................................34

*Lanza v. Merrill Lynch & Co.*,
    154 F.3d 56 (2d Cir. 1998)....................................................................................................34

*Lundy v. Catholic Health Sys. of Long Island, Inc.*,
    711 F.3d 106 (2d Cir. 2013)..................................................................................................30

*Marketxt Holdings Corp. v. Engel & Reiman, P.C.*,
    693 F. Supp. 2d 387 (S.D.N.Y. 2010)...................................................................................12

*McHale v. Citibank, N.A. (In re 1031 Tax Grp., LLC)*,
    420 B.R. 178 (Bankr. S.D.N.Y. 2009) ..................................................................................11

*Merrill Lynch, Pierce, Fenner & Smith v. Young*,
    No. 91 Civ. 2923, 1994 U.S. Dist. LEXIS 2929 (S.D.N.Y. Mar. 15, 1994)..........................28

*New York v. United Parcel Serv., Inc.*,
    No. 15-CV-1136, 2016 U.S. Dist. LEXIS 105038 (S.D.N.Y. Aug. 9, 2016).........................28

*O'Malley v. N.Y.C. Transit Auth.*,
    896 F.2d 704 (2d Cir. 1990)..................................................................................................33

*Pereira v. EisnerAmper LLP (Waterford Wedgwood USA, Inc.)*,
    529 B.R. 599 (Bankr. S.D.N.Y. 2015) ...............................................................9, 10

*Picard v. JPMorgan Chase & Co.*,
    460 B.R. 84 (S.D.N.Y. October 31, 2011) ................................................10, 11, 36

*Picard v. JPMorgan Chase Bank & Co. (In re Bernard L. Madoff Inv. Sec. LLC)*,
    721 F.3d 54 (2d Cir. 2013) .................................................................................9, 10

*Pinter v. Dahl*,
    486 U.S. 622 (1988) ................................................................................................27

*Pokoik v. Pokoik*,
    115 A.D.3d 428 (N.Y. App. Div. 1st Dep't 2014) ..................................................15

*Republic of Iraq v. ABB AG*,
    768 F.3d 145 (2d Cir. 2014) ........................................................................26, 27, 28

*Russello v. United States*,
    464 U.S. 16 (1983) ..................................................................................................19

*Matter of Salnor Realty Corp.*,
    16 Misc. 2d 189 (N.Y. Sup. Ct. 1959) ...................................................................16

*Sebring v. Rathbun*,
    1 Johns. Case 331 (N.Y. 1800) ..............................................................................27

*Sedima, S. P. R. L. v. Imrex, Co.*,
    473 U.S. 479 (1985) ................................................................................................20

*Shearson Lehman Hutton, Inc. v. Wagoner*,
    944 F.2d 114 (2d Cir. 1991) ...................................................................................10

*Stern v. Gen. Elec. Co.*,
    924 F.2d 472 (2d Cir. 1991) ...................................................................................18

*Stern v. Gen. Electric Co.*,
    No. 86-cv-4055, 1991 U.S. Dist. LEXIS 19091 (S.D.N.Y. Dec. 31, 1991) ...........15

*Stewart v. Wilmington Trust SP Servs.*,
    112 A.3d 271 (Del. Ch. 2015) ................................................................................15

*Stile v. Antico*,
    272 A.D.2d 403 (N.Y. App. Div. 2d Dep't 2000) ..................................................16

*Stone v. Freeman*,
    82 N.E. 571 (N.Y. 1948) .........................................................................................27

*Targum v. Citrin Cooperman & Co., LLP*,
    No. 12-CV-6909, 2013 U.S. Dist. LEXIS 164585 (S.D.N.Y. Nov. 19, 2013)........................19

*Tymoshenko v. Firtash*,
    No. 11-CV-2794, 2015 U.S. Dist. LEXIS 125126 (S.D.N.Y. Sept. 18, 2015)................29, 30

*United States SBA v. Feinsod*,
    347 F. Supp. 3d 147, 159 (S.D.N.Y. 2018)...........................................................................17

*United States v. Dinome*,
    86 F.3d 277 (2d Cir. 1996)..................................................................................................31

*United States v. Guadagna*,
    183 F.3d 122 (2d Cir. 1999)................................................................................................30

*United States v. One Tyrannosaurus Bataar Skeleton*,
    No. 12-cv-4760, 2012 U.S. Dist. LEXIS 165153 (S.D.N.Y. Nov. 14, 2012).........................31

*United States v. Persico*,
    832 F.2d 705 (2d Cir. 1987)................................................................................................29

*United States v. Pierce*,
    224 F.3d 158 (2d Cir. 2000)................................................................................................29

*United States v. Quattrone*,
    441 F.3d 153 (2d Cir. 2006)................................................................................................33

*United States v. Turkette*,
    452 U.S. 576 (1981)............................................................................................................19

*Vaughn v. Air Line Pilots Ass'n, Int'l*,
    604 F.3d 703 (2d Cir. 2010)..................................................................................................9

*In re Walt Disney Co. Derivative Litig.*,
    906 A.2d 27 (Del. 2006) ...............................................................................................15, 17

*In re Walt Disney Co. Derivative Litig.*,
    907 A.2d 693 (Del. Ch. 2005)............................................................................................17

*Warth v. Seldin*,
    422 U.S. 490 (1975)..............................................................................................................9

*Westchester Cty. Indep. Party v. Astorino*,
    137 F. Supp. 3d 586 (S.D.N.Y. 2015)..................................................................................29

*Woori Bank v. Merrill Lynch*,
    923 F. Supp. 2d 491 (S.D.N.Y. 2013), *aff'd*, 542 F. App'x 81 (2d Cir. 2013)......................12

*World Wrestling Entm't, Inc. v. Jakks Pac., Inc.*,
  530 F. Supp. 2d 486 (S.D.N.Y. 2007)....................................................................34

**Statutes**

18 U.S.C. § 1503....................................................................................................33

18 U.S.C. § 1512(a)(2)(A)....................................................................................33

18 U.S.C. § 1515....................................................................................................33

18 U.S.C. § 1956....................................................................................................32

18 U.S.C. § 1957....................................................................................................32


**Other Authorities**

Fed. R. Civ. P. 8..............................................................................................28, 32

Fed. R. Civ. P. 9(b)..............................................................................29, 30, 31, 32

Fed. R. Civ. P. 12(b)(6).............................................................................................9

N.Y. C.P.L.R. § 202..............................................................................................12

N.Y. C.P.L.R. § 203(a)...........................................................................................14

Defendant Nirav Modi respectfully submits this memorandum of law in support of his motion to dismiss the First Amended Complaint (the "FAC"). For the following reasons, Modi's motion should be granted.

### Preliminary Statement

Despite clear Second Circuit law prohibiting a trustee from bringing claims that properly belong to a creditor, the Trustee here asserts causes of action against Modi and others, seeking to recover damages allegedly arising from a "six-year, extensive international fraud, money laundering, and embezzlement scheme" that he concedes was directed at Punjab National Bank ("PNB"). The debtors in this case had no relationship with PNB and, for more than six years, have not engaged in any direct transaction involving funds provided by or on credit from PNB. Firestar Diamond, Inc. ("FDI"), Fantasy Inc. ("Fantasy"), and Old AJ Inc, d/b/a A. Jaffe, Inc. ("Jaffe") (collectively, the "Debtors")—privately-held diamond or jewelry businesses incorporated in Delaware or New York and primarily operating in New York—were not directly injured by the purported fraud; to the contrary, according to the FAC, they played instrumental roles in committing the fraud. Through the FAC, the Trustee is improperly trying to bring claims that only PNB can assert, disguising them as claims belonging to the Debtors. The claims against Modi should be dismissed.

The Trustee brings common law claims of breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and corporate waste against Modi. He also alleges that Modi violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and conspired to do the same. According to the FAC, Modi exercised "broad oversight" over co-defendants, Mihir Bhansali and Ajay Gandhi, who were the chief executive officer and chief financial officer of the Debtors, respectively, and orchestrated a scheme to obtain loans, credit, and funds under false pretenses and without collateral from PNB and other banks. The Trustee alleges that Modi,

1

Bhansali, and Gandhi "funneled millions of dollars in funds and diamonds through the Debtors

and their offices" in furtherance of the bank fraud scheme, though he acknowledges that by

2013, the Debtors role was only indirect—the Debtors no longer directly participated in any

transaction underlying the issuance of credit by PNB or the other institutions.

Despite multiple references to a complex, long-running scheme of international

proportions, the Trustee's only alleged evidentiary support for his claims against Modi consists

of innocuous communications between Modi and his co-defendants regarding routine matters

relating to the Debtors' business operations.  The Trustee does not point to false statements or

representations by Modi, despite the heightened pleading requirement applicable to certain

counts of the FAC, nor does he identify evidence demonstrating that Modi encouraged others to

engage in fraudulent conduct.  What the FAC lacks in particularity and evidentiary support,

however, the Trustee tries to make up for with hyperbole.  He alleges that Modi exercised "total

ultimate control over the Debtors," but supports the allegation by citing a February 2009

communication where Modi expressed a preference regarding which Debtor should contribute to

a charity dinner and other similar interactions.  The Trustee also alleges that Modi orchestrated

transactions to divert assets from the bank fraud scheme and the Debtors to himself and his

family, but the FAC reveals that most of the referenced transactions occurred outside the period

of the relevant statute of limitations or did not seem to involve the Debtors at all.  In the end, the

FAC simply does not state a claim for which relief can be granted.

The FAC should be dismissed for several independent reasons.  *First*, the Trustee

does not have standing to bring claims to recover PNB's losses or any other losses that do not

belong to the Debtors.  The Trustee stands in the shoes of the Debtors and can only assert claims

that the Debtors could have instituted before filing their petitions for bankruptcy.  Here, the

losses for which the Trustee seeks to recover are PNB's losses arising from the alleged

fraudulent scheme.  These claims did not belong to the Debtors before the bankruptcy filings,

and the Trustee cannot bring them now.

*Second*, much of the conduct purportedly giving rise to the Trustee's common-law

and RICO claims occurred outside of the relevant statute of limitations period and, thus, the

claims are time-barred.  The FAC describes conduct extending more than twelve years before the

Trustee filed his original complaint on March 27, 2019.  None of the Trustee's claims carries a

twelve-year statute of limitations or anything close to it.  And as the Debtors' involvement in the

alleged scheme makes clear, they must have been on notice of their alleged injuries and of the

claims from the moment the injuries were sustained and the claims accrued.

*Third*, the breach of fiduciary duty and corporate waste claims against Modi fail

because the FAC does not—and cannot—allege that Modi owed fiduciary duties to the Debtors.

Modi was not a director, officer, or direct shareholder of the Debtors and, therefore, did not owe

them fiduciary duties as a result of any such position.  Nonetheless, the Trustee attempts to

ascribe fiduciary duties to Modi by describing him as a "*de facto*" director and controlling party.

But Modi does not fit within what has been or reasonably could be described as a "*de facto*"

director or officer, and the FAC's conclusory allegations of control are insufficient as a matter of

law to support the imposition of fiduciary duties.

*Finally*, the Trustee's substantive RICO and RICO conspiracy claims are ripe for

dismissal as well.  RICO requires that a plaintiff sustain a direct and proximate injury as a result

of the pattern of racketeering activity, and the Debtors' alleged injuries were only indirect and

incidental to the fraud scheme targeting PNB.  Moreover, because the Debtors were intimately

involved in perpetuating the alleged fraud, the doctrine of *in pari delicto* precludes the Trustee

from recovering on their behalf.  And to adequately plead a RICO cause of action against Modi,

the Trustee must allege that Modi himself engaged in the required predicate acts, and the Trustee

fails to do so here.

For all of these reasons, more fully set forth below, the FAC should be dismissed.

### Summary of Allegations

For purposes of this motion to dismiss, the allegations in the FAC are taken as

true.  Modi does not, however, concede the truth, accuracy, or completeness of the facts as

alleged in the FAC.

### A.   The Diamond Business

Defendant Nirav Modi and other members of his extended family operate a

worldwide diamond and jewelry business.  The business began in 2000, when Modi and others

formed a diamond trading company in India named Diamonds 'R' Us.  That company evolved

into Firestar International Limited ("FIL"), an Indian corporation of which Modi owns

approximately 94.88%.  (FAC ¶ 18).  In the ensuing two decades, Modi's diamond business has

grown to include retail, wholesale, and manufacturing operations in Europe, Asia, Africa, and the

United States.  (FAC ¶ 21).

Among Modi's diamond businesses are several diamond wholesalers in India

alongside Diamonds 'R' Us, including Solar Export ("Solar") and Stellar Diamond ("Stellar").

(FAC ¶ 27).  Outside of India, FIL owns Firestar Holdings, Ltd. ("FHL"), a Hong Kong

corporation, that in turn owns Firestar Diamond International ("FDII"), Synergies Corporation,

("Synergies") and Nirav Modi Ltd. ("NML").  (FAC ¶¶ 10-11, 13-14, 16).  FDII, Synergies, and

NML each own various pieces of the overall business.  For example, NML is the primary owner

of subsidiaries that operated "Nirav Modi"-branded luxury jewelry retail boutiques around the

world.  (FAC ¶ 13).

4

The Debtors are diamond and jewelry companies principally operating in New York that were acquired by Synergies or a subsidiary in the mid-2000s. Firestar Diamond, Inc. ("FDI") is a diamond wholesaler that was 95% acquired by Synergies subsidiary Firestar Group, Inc ("FGI") in 2005. (FAC ¶ 22). Fantasy was incorporated in 2012 as a wholly owned subsidiary of FDI. Old AJ, Inc. ("Jaffe") is principally a bridal jewelry business that was 95% acquired by Synergies in 2007. (FAC ¶ 22). The remaining 5% of both FDI and Jaffe is held by Samuel Sandberg, who fully owned Jaffe prior to selling a 95% interest to Synergies in 2007. (*Id.*). Defendant Mihir Bhansali was the sole director and chief executive officer of each Debtor, and Defendant Ajay Gandhi was the chief financial officer of each Debtor. (FAC ¶ 1). Modi, on the other hand, is not a director or an officer of any Debtor. In fact, he has no position at all with any of the three Debtors and does not draw a salary from any Debtor. He is not a direct owner or shareholder of any of the Debtors.

Notwithstanding Modi's lack of a direct relationship with the Debtors, the Trustee alleges that Modi exercised "total ultimate control" over the Debtors. (FAC ¶ 190). But in support of this allegation, the Trustee has set forth only two examples of Modi's purported "control"—one from 2009 and one from 2015. (*See* FAC ¶¶ 190-194). The 2009 examples include a total of nine e-mail exchanges over an eight-month period reflecting a discussion between Modi, Bhansali, and Gandhi regarding a charity dinner and the benefits package for Jaffe employees, as well as the allocation of a handful of financial transactions. (*Id.*). The 2015 allegations are even thinner: four e-mail exchanges in a six-week period in which Gandhi and Modi discuss the allocation of the Debtors' cash flow. (FAC ¶¶ 193-194).

B.    **The Alleged Fraud**

Much of the FAC is devoted to describing an alleged scheme directed at India-based Punjab National Bank (the "PNB Scheme"), involving letters of undertaking ("LOUs"),

5

which are a form of credit available from banks in India to facilitate import transactions.  (FAC ¶ 24).  Generally, an importer may obtain an LOU from an Indian bank, secured by an invoice for goods that will be imported.  The Indian bank then effectuates payment to the exporter in the exporter's local currency through a network of cooperating banks, and the importer ultimately repays the issuing bank in India.

According to the Trustee, the PNB Scheme was carried out primarily by Indian diamond companies that were allegedly owned by Modi—including Diamonds 'R' Us and others.  (FAC ¶ 27).  These companies, which the FAC defines as the "LOU Entities" allegedly obtained LOUs from PNB based on invoices that overstated the value of the goods to be imported.  The beneficiaries receiving the proceeds of the LOUs were companies outside India allegedly affiliated with Modi's diamond businesses.  According to the Trustee, the relationship between the LOU Entities and the LOU beneficiaries was obscured through illusory transactions by which diamonds were imported and exported multiple times for different amounts.  (FAC ¶¶ 29-33).

The Trustee's allegations regarding the PNB Scheme range from six to nine years old.  The scheme allegedly began in 2010 or 2011, but most of the transactions described in the FAC occurred between 2011 and 2013.  (FAC ¶¶ 54-57).  Indeed, all of the Debtors' alleged direct involvement in the LOU transactions occurred before 2013.  The only LOUs for which proceeds were paid directly to the Debtors were issued in 2011.  (FAC ¶ 54).  After 2012, "the Debtors no longer directly participated in the import and export transactions underlying the LOUs issuances."  (FAC ¶ 57).  To the extent they were involved in the PNB Scheme at all after that time, the Debtors involvement was "secondary."  (FAC ¶ 59).

6

After the Debtors ceased direct involvement in the LOU transactions, the proceeds of the LOUs obtained through the PNB Scheme were paid to a group of diamond companies located in Hong Kong and Dubai that the FAC defines as the "Shadow Entities." (FAC ¶ 57). The Trustee alleges that the Shadow Entities were controlled by Modi and continued to engage in illusory transactions with other Modi-controlled entities . (FAC ¶¶ 34-35). But the FAC does not contain any allegations that Modi was an officer, director, shareholder, or direct owner of the Shadow Entities. Nor are there specific allegations to show that Modi directed the Shadow Entities' transactions with the Debtors (or anyone else).

### C.    The Alleged Diversion of Funds

The Trustee also alleges that Modi extracted the proceeds of the PNB Scheme by diverting funds for personal use. But the allegations regarding the alleged diversion lack a connection to the Debtors. *First*, the Trustee identifies the Ithaca Trust, which allegedly was established for the benefit of Modi's wife and children by Modi's sister, Purvi Mehta. (FAC ¶¶ 104-107). The Trustee alleges that Modi himself, rather than Mehta, was behind the initial funding of the Ithaca Trust. According to the FAC, the funds Modi used to establish the trust were "funneled to Mehta" through the PNB Scheme. Notably, however, there is no allegation that any Debtor was actually connected to these transactions.

*Second*, the Trustee points to an apartment at the Ritz Carlton residences in New York that was allegedly purchased using funds from the Ithaca Trust. (FAC ¶¶ 108-111). The allegations regarding the Ritz Carlton apartment focus on whether Modi himself or Mehta actually controlled the Ithaca Trust. Again, according to the FAC, Modi used funds "funneled to Mehta" to purchase the apartment, but there is no allegation that any of the Debtors was involved with the formation of the Ithaca Trust or the purchase of the Ritz Carlton apartment.

7

*Third*, the Trustee describes Modi's use of Ithaca Trust funds to purchase from FDI's parent company an apartment at the Essex House in New York.  (FAC ¶¶ 112-122).  According to the FAC, FDI funded $2 million of the purchase price of that apartment in 2007 by way of Central Park Real Estate LLC ("CPRE")—a limited liability company owned by FDI.  The remainder was financed by a mortgage from HSBC.  FDI allegedly made $856,335 of the mortgage payments from 2011 to 2017, and paid the $3 million remaining balance at the end of 2017.  Shortly after FDI paid off the mortgage, the Ithaca Trust purchased CPRE from FGI for $6 million.  In sum, the allegations with respect to the Essex House show that the Ithaca Trust paid FDI's direct parent $6 million for CPRE, after FDI had paid slightly less than $6 million for the down payment and mortgage repayment over the course of 11 years.  Nothing in the FAC explains how these transactions were unlawful, unfair, or were demonstrative of an improper diversion of funds belonging to the Debtors.

*Finally*, the Trustee accuses Modi of "diverting" funds to Mehta.  (FAC ¶ 123-128).  In support of this allegation, the FAC describes $14,575,000 that Modi loaned to Synergies in 2011.  Modi later assigned his interest in that loan to Mehta as a gift.  In 2017, following FHL's acquisition of Synergies, FHL paid $14,575,000 to Mehta.  Stripped of the FAC's innuendo , this transaction was simple: Modi loaned $14,575,000 to Synergies, which Synergies's parent company later paid back to the person who had been assigned Modi's interest in the loan.  More importantly for this case, as laid out in the FAC, the Debtors played absolutely no part in this transaction.  Other than serving as a distraction from the real issues in the case, these allegations are irrelevant.

### D.    The Bankruptcy Filing

The FAC also contains several allegations regarding purported misstatements and misrepresentations made in connection with the Debtors' chapter 11 bankruptcy cases.  (FAC

8

¶¶ 152-172).  The only references to Modi in this section, however, consist of allegations that he

remained in contact with Bhansali throughout the bankruptcy process.  There are no allegations

of specific misrepresentations by Modi in connection with the bankruptcy cases, and the

Trustee's articulation of bankruptcy fraud in the FAC does not include allegations against Modi.

## <u>Argument</u>

For purposes of this motion, well pleaded allegations must be accepted as true.

But to survive a motion under Rule 12(b)(6), a plaintiff must allege "enough facts to state a claim

for relief that is plausible on its face."  *Vaughn v. Air Line Pilots Ass'n, Int'l*, 604 F.3d 703, 709

(2d Cir. 2010).  A complaint "that offers 'labels and conclusions' or 'a formulaic recitation of the

elements of a cause of action will not do.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting

*Bell Atl. v. Twombly*, 550 U.S. 554, 555 (2006)).  Nor does a complaint survive "if it tenders

'naked assertions' devoid of 'further factual enhancement'" or offers "threadbare recitals of the

elements of a cause of action, supported by mere conclusory statements."  *Id.* (quoting *Twombly*,

550 U.S. at 557).  Here, taking the well pleaded allegations as true, the Trustee lacks standing to

bring this action and the Trustee's common law and RICO claims should be dismissed in full or

in part.

## I.    The Trustee Does Not Have Standing to Bring Creditor Claims

"Standing is a threshold question in every federal case, determining the power of

the court to entertain the suit."  *Picard v. JPMorgan Chase Bank & Co. (In re Bernard L. Madoff*

*Inv. Sec. LLC)*, 721 F.3d 54, 66 (2d Cir. 2013) (quoting *Warth v. Seldin*, 422 U.S. 490, 498

(1975)); *see also Pereira v. EisnerAmper LLP (Waterford Wedgwood USA, Inc.)*, 529 B.R. 599,

602 (Bankr. S.D.N.Y. 2015).  "The burden to establish standing remains with the party claiming

that standing exists."  *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir. 1995).

In addition to the constitutional standing requirements, "[t]he implied prohibition in Article III against third-party standing applies to actions brought by bankruptcy trustees." *Picard*, 721 F.3d at 67; *see Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 118 (2d Cir. 1991) ("A party must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.") (quotations omitted). A bankruptcy trustee "is empowered to pursue only those claims that properly belonged to the debtor before it entered bankruptcy." *See Picard v. JPMorgan Chase & Co*., 460 B.R. 84, 91 (S.D.N.Y. October 31, 2011); *see also Bankr. Servs. v. Ernst & Young (In re CBI Holding Co.)*, 529 F.3d 432, 454 (2d Cir. 2008) (quotations omitted). A bankruptcy trustee, therefore, has no standing to bring claims that properly belong to creditors. *See Wagoner*, 944 F.2d at 118; *see also Picard*, 460 B.R. 84 at 91 (holding that a trustee did not have standing to bring claims inuring to the benefit of brokerage firm's customers). Put another way, a bankruptcy trustee's "proper task" under federal bankruptcy law "is simply to collect and reduce to money the property of the estates for which (he is trustee)." *Picard*, 721 F.3d at 67 (quoting *Caplin v. Marine Midland Grace Tr. Co.*, 406 U.S. 416, 429 (1972)). Accordingly, "collect[ing] money owed to creditors" exceeds a bankruptcy trustee's legal authority. *Id.* (citing *Caplin*, 406 U.S. at 428-29).

Here, despite limited allegations of injury to the Debtors themselves, the Trustee makes clear that Modi, Bhansali, and Gandhi orchestrated the fraud against PNB, which led to the "accrual of claims against the Debtors of over $1 billion in favor of Punjab National Bank . . . ." (FAC ¶ 1); *see also Pereira*, 529 B.R. at 603 (Bankr. S.D.N.Y. 2015) (noting that relevant factors determining whether "an injury was to a corporation or its creditors" include "what was the injury underlying the claims; who suffered the injury; [and] who would gain from the recovery, or lose out if the recovery were awarded to a different successful plaintiff"). Those

injuries are "particularized as to" PNB, which is "exclusively entitled to pursue [related claims], and the bankruptcy trustee is precluded from doing so." *Hirsch*, 72 F.3d at 1093.  The Trustee "must do more than simply allege damage to the debtors; the facts alleged in the complaint must support this allegation.  If the facts of the complaint suggest that the claims actually belong to the creditors, a blanket allegation of damage to the debtors will not confer standing on the trustee." *In re Colonial Ltd. Pshp. Litig.*, 178 B.R. 40, 43 (D. Conn. 1994).  Because, at bottom, the Trustee "requests damages for money owed" to PNB, the Court should dismiss the FAC for lack of standing.  *McHale v. Citibank, N.A. (In re 1031 Tax Grp., LLC)*, 420 B.R. 178, 196 (Bankr. S.D.N.Y. 2009); *see also Picard*, 460 B.R. at 91 (holding that Trustee claims "premised on a Ponzi scheme of unprecedented scope and duration orchestrated by [the debtor], belong to the creditors, not to [the debtor]").

## II.     The Breach of Fiduciary Duty, Aiding and Abetting, and Corporate Waste Claims Must Be Dismissed Against Nirav Modi

In Counts 1, 4, and 5, the Trustee brings claims against Modi for breach of fiduciary duty, aiding and abetting breaches of fiduciary duty, and corporate waste.  These common law causes of action fail to state a claim, however, because they are largely barred by the relevant statute of limitations and lack a proper factual basis .  Accordingly, the claims should be dismissed.  Moreover, the aiding and abetting breach of fiduciary duty claim against Modi is derivative of the Trustee's breach of fiduciary duty claims against Defendants Bhansali and Gandhi.  Thus, to the extent the Court dismisses the Trustee's claims against Bhansali and Gandhi, the Court should also dismiss the aiding and abetting claims brought against Modi.

11

A.      **The Trustee's Common Law Claims Against Modi Are Limited by the Applicable Statute of Limitations**

In trying to assert viable common law claims against Modi, the Trustee alleges conduct going back more than a decade before this action was commenced.  All of the common law claims against Modi are based, at least in part, on stale conduct.

The determination of the applicable statute of limitations is governed by New York's choice of law rules.  *See Bianco v. Erkins (In re Gaston & Snow)*, 243 F.3d 599, 601-02 (2d Cir. 2001).  Where the plaintiff is a New York resident, courts must apply New York's statute of limitations.  N.Y. C.P.L.R. § 202.  "Courts within the Second Circuit" applying CPLR § 202 "have consistently held that a business entity's residence is determined by its principal place of business."  *Woori Bank v. Merrill Lynch*, 923 F. Supp. 2d 491, 494 (S.D.N.Y. 2013), *aff'd*, 542 F. App'x 81 (2d Cir. 2013) (summary order).  Because the Trustee stands in the shoes of the Debtors and because the principal place of business of each Debtor is New York (FAC ¶¶ 6-8), the statute of limitations for the fiduciary duty, aiding and abetting, and corporate waste claims is governed by New York law.

The Trustee cannot recover on the alleged breach of fiduciary duty and aiding and abetting claims based on conduct that occurred on or before March 27, 2016.  The statute of limitations for breach of fiduciary duty and aiding and abetting breach of fiduciary duty claims is either three years or six years, depending on the nature of the relief sought.  *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 907 N.E.2d 268, 272 (N.Y. 2009); *Marketxt Holdings Corp. v. Engel & Reiman, P.C.*, 693 F. Supp. 2d 387, 393 (S.D.N.Y. 2010).  Where, as here, "the remedy sought is purely monetary in nature," and the fiduciary breach claim does not sound in

12

fraud,[1] a three-year limitations period applies.  *IDT Corp.*, 907 N.E.2d at 272.  A breach of fiduciary duty claim accrues as soon as "the claim becomes enforceable, *i.e.*, when all elements of the tort can be truthfully alleged in a complaint," including damages.  *Id.* at 273.

The Trustee alleges that Modi breached his fiduciary duty by "(a) directing Debtors and their *de jure* directors and officers to engage in the [PNB Scheme], (b) directing Debtors and their officers to use corporate assets to acquire properties for the personal benefit of Modi and his family, and (c) orchestrating the diversion of the U.S. Entities' assets overseas after the exposure of the [PNB Scheme]."  (FAC ¶ 202).  Stripping away the FAC's conclusory allegations, the only allegations that could conceivably support a theory that Modi directed others to engage in the PNB Scheme (many of which fail to show an actual connection to the PNB Scheme) are a handful of emails spanning from in or around August 2009 to in or around February 2015, all of which fall outside the three-year statute of limitations.  (*See* FAC ¶¶ 81-82, 102, 193).  The FAC, moreover, is devoid of facts that show Modi directing Bhansali or Gandhi to engage in the PNB Scheme within the three-year statute of limitations' period.  Consequently, the fiduciary duty claim based on allegedly directing the fraud on PNB must be dismissed as time-barred.  And for the same reason, the aiding and abetting breach of fiduciary duty claim based on the theory that Modi "direct[ed] Bhansali and Gandhi to engage in the [PNB Scheme], including by entering into circular trading transactions with Shadow Entities and Firestar entities," should be dismissed.  (FAC ¶ 216).

---

[1] Notwithstanding the alleged fraud on PNB, the Trustee does not allege that Modi committed a fraud on the Debtors—the entities to whom Modi allegedly owed a fiduciary duty.  *See Brown Media Corp. v. K&L Gates, LLP*, 586 B.R. 508, 526 (E.D.N.Y. 2018) (breach of fiduciary duty claim sounds in fraud where allegations "state a valid cause of action for actual fraud") (quotations omitted).  There are no allegations that Modi made materially false representations to the Debtors, had the requisite intent to defraud the Debtors, or the Debtors reasonably relied on those representations.  *See Ambac Assurance Corp. v. Countrywide Home Loans, Inc.*, 106 N.E.3d 1176, 1182 (N.Y. 2018).

Likewise, many of the allegations pled in support of the breach of fiduciary duty claim based on the diversion of corporate assets are untimely.  The Trustee's claims that Modi purchased the Essex House apartment in 2007 and transferred funds to Purvi Mehta from March 2011 through March 2016 are time-barred.  (FAC ¶¶113-116, 124).  For that reason, the aiding and abetting breach of fiduciary duty claim based on the theory that Modi "direct[ed] Bhansali and Gandhi to expend corporate assets to acquire properties for the personal benefit of Modi and his family" are also partially time-barred and should be dismissed.  (FAC ¶ 216).  In sum, the breach of fiduciary duty and aiding and abetting claims based on alleged conduct and injuries that accrued prior to March 27, 2016 should be dismissed as untimely.

Finally, the Trustee can only recover for corporate waste that occurred on or after March 27, 2013.  The statute of limitations for a corporate waste claim is six years.  *Golden Pac. Bancorp v. FDIC*, 273 F.3d 509, 518 (2d Cir. 2001).  The statute of limitations begins to run when the cause of action accrues.  N.Y. C.P.L.R. § 203(a).  According to the Trustee, Modi committed waste of the Debtors' assets by "(i) directing the Debtors and their officers to use corporate assets to acquire properties for the personal benefit of Modi and his family"; and (ii) "to engage in transactions with the Shadow Entities and other Modi-Controlled Entities that served no legitimate corporate or economic purpose."  (FAC ¶ 220).  Both theories are reformulations of the theories undergirding the breach of fiduciary duty and aiding and abetting breach of fiduciary duty claims.  Thus, the arguments supporting partial dismissal of those claims apply here.  For example, claims based on the acquisition of the Essex House apartment in 2007 (FAC ¶¶ 113-116), mortgage payments paid out before March 2013 (FAC ¶ 115), and transfers to Synergies (FAC ¶ 124) are all untimely.  Also untimely are claims based on alleged communications between Modi and either Bhansali or Gandhi that occurred before March 2013.

(*E.g.*, FAC ¶ 82(i) (August 2009); FAC ¶ 82(ii) (August 2010); FAC ¶ 82(iii) (October 2010);

FAC ¶ 102 (September 2011); FAC ¶ 81(ii) (July 2012); FAC ¶ 81(xi) (February 2013)).  As a

result, the corporate waste claim is time-barred as to conduct occurring prior to March 27, 2013.

> **B.    The Trustee's Breach of Fiduciary Duty and Corporate Waste Claims
> Should Be Dismissed Because Modi Did Not Owe Fiduciary Duties to the
> Debtors**

The Trustee fails to allege a fiduciary duty between Modi and the Debtors.

Claims for both breach of fiduciary duty and corporate waste require a plaintiff to establish that

the defendant owed a fiduciary duty to the alleged victim of the breach.  *Beard Research, Inc. v.

Kates*, 8 A.3d 573, 601 (Del. Ch. 2010) (breach of fiduciary duty); *Pokoik v. Pokoik*, 115 A.D.3d

428, 430 (N.Y. App. Div. 1st Dep't 2014) (breach of fiduciary duty); *In re Walt Disney Co.

Derivative Litig.*, 906 A.2d 27, 74 (Del. 2006) (corporate waste); *Stern v. Gen. Electric Co.*,

No. 86-cv-4055, 1991 U.S. Dist. LEXIS 19091, at *14-15 (S.D.N.Y. Dec. 31, 1991) (corporate

waste).

Here, the Trustee essentially acknowledges that Modi was not a director or officer

of the Debtors, but nonetheless alleges that Modi was a "*de facto* director, officer, or person in

control of the Debtors" as a result of his "dominion and total control over the Debtors as the

ultimate authority for the Debtors."  (FAC ¶ 200).  But the FAC fails to adequately allege a basis

to find that Modi owed fiduciary duties for two reasons.  *First*, the concept of a "*de facto*

director" refers to a person "in possession of and exercising the powers of that office *under claim

and color of an election*, although he is not a director *de jure* and may be removed by proper

proceedings."  *Stewart v. Wilmington Trust SP Servs.*, 112 A.3d 271, 299 n.121 (Del. Ch. 2015).

That doctrine concerns a disputed director's authority to bind a company in relations with third

parties, and does not apply where, as here, there is no basis for an allegation that Modi acted as a

director or officer of the Debtors "under claim and color of an election."  *See id.*  A corporation's

"directors" are only those who have been properly elected or appointed.  *See Stewart*, 112 A.3d

at 298-99; *Stile v. Antico*, 272 A.D.2d 403, 404 (N.Y. App. Div. 2d Dep't 2000) (citing *Matter of*

*Salnor Realty Corp.*, 16 Misc. 2d 189, 191 (N.Y. Sup. Ct. 1959)).  The Trustee does not and

cannot allege that.

     *Second*, the Trustee alleges that Modi owed fiduciary duties to the Debtors as a

"person in control."  For "control" to serve as the basis for a fiduciary duty, however, the Trustee

must allege facts that show actual control of the corporation with respect to the challenged

transactions.  *See Kaplan v. Centex Corp.*, 284 A.2d 119, 122 (Del. Ch. 1971).  A plaintiff "who

alleges domination of a board of directors and/or control of its affairs must prove it."  *Id.*  It is

not enough to merely show influence on corporate decisions.  *Id.*

     The FAC's details regarding Modi's purported control of the Debtors consist of

two sets of examples—one from 2009 and one from 2015—both of which fall outside the three-

year limitations period.  (*See* FAC ¶¶ 190-194).  The 2009 examples consist of e-mail exchanges

over an eight-month period reflecting a discussion between Modi, Bhansali, and Gandhi

regarding a charity dinner, the benefits package for Jaffe employees, and the allocation of a

handful of financial transactions.  (*Id.*).  The 2015 allegations are limited to four e-mail

exchanges in a six-week period in which Gandhi and Modi discuss the allocation of the Debtors'

cash flow.  (FAC ¶¶ 193-194).  Not one of these facts shows anything beyond business in the

normal course, much less Modi's "total ultimate control" of the Debtors within the three-year

limitations period.

     In contrast to the Trustee's sparse allegations regarding Modi's purported control

of the Debtors are the dozens of examples in which the Debtors' actual officers—Gandhi and

Bhansali—directed the Debtors' affairs.  When those pervasive allegations are compared to the

handful of allegations regarding Modi's alleged control, it is clear that the FAC does not

plausibly allege that Modi exercised control over the Debtors, and certainly not within the three-

year limitations period for breach of fiduciary duty claims.  With no basis to establish a duty

flowing from Modi to the Debtors, the Trustee cannot state a claim for a breach of fiduciary duty

or corporate waste against Modi.

### C.    The Trustee Fails to Allege a Breach of Fiduciary Duty or Corporate Waste Against Modi

The Trustee also fails to plead a breach of fiduciary duties or corporate waste

based on the alleged diversion of corporate assets.  The fiduciary duty of care requires fiduciaries

to act with the "degree of care which an ordinarily prudent person would use under similar

circumstances."  *United States SBA v. Feinsod*, 347 F. Supp. 3d 147, 159 (S.D.N.Y. 2018).  And

for Delaware corporations, a breach of the duty of care by a corporate director occurs only in

instances of gross negligence.  *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 750 (Del.

Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006).  The duties of loyalty and good faith are breached

when a director takes a self-interested action that is not in "the best interest of the corporation."

*Id.* at 751.  Similarly, corporate waste occurs only where a transaction "was so one sided that no

business person of ordinary, sound judgment could conclude that the corporation has received

adequate consideration."  *Walt Disney*, 906 A.2d at 74.

The Trustee alleges that Modi breached his duties by "directing the Debtors and

their officers to use corporate assets" for Modi's personal gain.  (*See* FAC ¶ 202).  But according

to the FAC, the Ithaca Trust was established by *Purvi Mehta*, not the Debtors.  (FAC ¶ 107).  In

fact, the Trustee does not allege any participation by the Debtors, Gandhi, or Bhansali in

establishing the Ithaca Trust.  (FAC ¶¶ 104-107).  The absence of allegations connecting the

Debtors to the establishment of the Ithaca Trust is sufficient reason alone to dismiss common law

17

claims against Modi related to that transaction. *See Geltzer v. Bedke (In re Mundo Latino Mkt.)*, 590 B.R. 610, 619 (Bankr. S.D.N.Y. 2018) (holding that a corporate waste claim fails where the complaint does not allege the defendant diverted or used the debtor's assets in the transaction at issue). Claims based on the acquisition of the Ritz Carlton apartment in August 2017 (*see* FAC ¶¶ 108-111) should be dismissed for the same reason: the Trustee fails to allege that the Debtors, Gandhi, or Bhansali participated in acquiring the Ritz Carlton apartment. (*Id*.).

Finally, the Trustee fails to allege that the Essex House apartment did not serve a business purpose, or that adequate consideration was not paid for it. The Essex House apartment was used for periods of time to house Modi, who was an indirect owner of FDI based on his holdings in FIL. (*See* FAC ¶¶ 114-115). Alleging that the Essex House apartment was "for the personal benefit of Modi and his family," without more, is insufficient to allege that it was for an improper business purpose. *See Stern v. Gen. Elec. Co.*, 924 F.2d 472, 476 (2d Cir. 1991) ("To survive a motion to dismiss, . . . [a] complaint must allege that the directors acted fraudulently or in bad faith; allegations of 'waste,' standing alone, will not be enough."). The Essex House-related allegations show, moreover, that the Ithaca Trust paid FDI's direct parent $6 million for CPRE, after FDI had paid slightly less than $6 million for the down payment and mortgage repayment; the Trustee fails to explain how that apparent profit amounts to waste. (FAC ¶¶ 115, 118-120). Indeed, the Debtor was paid in full for the apartment. Thus, the Court should dismiss the fiduciary duty and corporate waste claims based on the alleged diversion of corporate assets.

III.     **The RICO Claims Against Modi Fail to State a Claim on Which Relief May Be Granted And Should Be Dismissed**

In Counts 8 and 9 of the FAC, the Trustee asserts claims against Modi under the RICO statute for allegedly associating with an unlawful enterprise; participating in the enterprise's affairs through a pattern of racketeering activity; and conspiring to do the same.

18

Congress enacted RICO as an "assault upon organized crime and its economic roots." *Russello v. United States*, 464 U.S. 16, 26 (1983); *see also United States v. Turkette,* 452 U.S. 576, 589 (1981).  The statute has a narrow purpose with strict legal requirements, and is not designed as a catch-all "instrument against all unlawful acts."  *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 25 (2d Cir. 1990).  For this reason, it is well settled that "[a] plaintiff's burden is high when pleading RICO allegations."  *Targum v. Citrin Cooperman & Co., LLP*, No. 12-CV-6909, 2013 U.S. Dist. LEXIS 164585, at *18-19 (S.D.N.Y. Nov. 19, 2013).  "[C]ourts should strive to flush out frivolous RICO allegations at an early stage of the litigation." *Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 655 (S.D.N.Y. 1996) (quotations omitted).

The Trustee's RICO claims fail because the *only* entity that sustained a direct injury as a result of the alleged wrongful conduct was PNB, not the Debtors.  Under the alleged circumstances and well-established law, the Debtors lack standing to bring RICO claims against Modi for their purported *indirect* injuries.  Under the doctrine of *in pari delicto*, moreover, the Debtors cannot bring RICO claims against Modi because the Debtors—and their officers and directors—played an integral part in the alleged fraud.  Finally, the Trustee fails to allege conduct by Modi that constitutes a predicate act under the RICO statute, and many of the Trustee's related allegations are time-barred.  For these reasons, the RICO claims must be dismissed.

A.     **The Trustee Lacks Standing to Bring the RICO Claims Against Modi Because the Debtors Did Not Sustain a Direct Injury as a Result of the Alleged RICO Violation**

1.     **Standing under the RICO Statute Is Limited to Parties Directly Injured as a Result of the Alleged Violation**

RICO provides standing to bring a private cause of action to a "person injured in his business or property by reason of" a substantive RICO violation. *Hemi Grp., LLC . v. City of New York*, 559 U.S. 1, 6 (2010); *see also Holmes v. Secs. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992). Standing to sue under the RICO statute is limited to *direct* victims of the racketeering activity. *See Hemi Grp.*, 559 U.S. at 10. Indeed, the Supreme Court has emphasized that there must be "some direct relation between the injury asserted and the injurious conduct alleged," *Id.* at 9-10, and this "direct relationship" does not extend beyond the "first step" of causation between the RICO violation itself and the alleged injury. *Id.* at 10 (quoting *Holmes*, 503 U.S. at 271).

The compensable injury flowing from a RICO violation is "necessarily" limited to the harm caused by a pattern of predicate acts because "'the essence of the violation is the commission of those acts in connection with the conduct of an enterprise.'" *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 457 (2006) (quoting *Sedima, S. P. R. L. v. Imrex, Co.*, 473 U.S. 479, 497 (1985)). Harm indirectly caused by the alleged predicate acts or injury that is an ancillary result of racketeering activity is not what the statute was intended to address. *See Holmes*, 503 U.S. at 271 (holding that injuries caused by "intervening" events or conduct were not sufficient to confer a private right of action under RICO). As a result, a party lacks standing where the direct cause of its alleged harm was a set of actions "distinct from the alleged RICO violation." *Hemi*, 559 U.S. at 10.

On this critical point, the Supreme Court's decision in *Holmes v. Securities Investor Protection Corp.* is instructive.  In *Holmes*, the Securities Investor Protection Corporation ("SIPC") brought RICO claims against an individual accused of, among other things, engaging in a pattern of securities fraud that resulted in $13 million in SIPC payouts based on the liquidation of two broker-dealers that had invested based on the defendant's false statements.  *Holmes*, 503 U.S. at 262-263.  According to the SIPC, the defendant's racketeering activity "caused the broker-dealers' financial difficulties resulting in their eventual liquidation" and ultimately SIPC's advance of nearly $13 million to cover claims against the broker-dealers by customers who had *not* purchased the manipulated securities.  *Id.*  The Court held that, even though the SIPC had paid to cover its members' losses, and the SIPC "may stand in the shoes" of injured customers, the RICO claims were properly dismissed based on the absence of a direct injury resulting from the racketeering activity.  *Holmes*, 503 U.S. at 271.

As the *Holmes* Court explained, "the link is too remote between the stock manipulation alleged and the customers' harm, being purely contingent on the harm suffered by the broker-dealers."  *Id.* at 271.  According to the Court, the customers' injuries were solely derivative to those of the broker-dealers and thus insufficient to confer standing: "the conspirators have allegedly injured these customers only insofar as the stock manipulation first injured the broker-dealers and left them without the wherewithal to pay customers' claims."  *Id*. The Court therefore found that the broker-dealers' customers—and SIPC in their stead—were "not proper plaintiffs" and that "[a]llowing suits by those injured only indirectly would open the door to massive and complex damages litigation, which would not only burden the courts, but also undermine the effectiveness of treble-damages suits."  *Id.* at 274; *see also Hemi*, 559 U.S. at

21

11 (dismissing RICO claims because "the conduct directly causing the harm was distinct from the conduct giving rise to the fraud.")

**2.      The Debtors Were Not Injured By Reason of a Pattern of Racketeering Activity**

Here, contrary to the Trustee's allegation that the Debtors were injured "as a direct result and proximate result" of the alleged RICO violations (FAC ¶ 298), the only direct "victim" of the alleged pattern of racketeering activity was PNB. The FAC alleges that the primary purpose of the alleged RICO enterprise was to "formulat[e] and implement[] a common scheme to defraud PNB for the Defendants' personal enrichment." (FAC ¶ 240). The other alleged purpose of the enterprise—to "design[], manufactur[e], and sell[] diamonds and jewelry"—could not logically have resulted in a compensable RICO injury. (FAC ¶ 239). Neither the purpose nor the direct effect of the alleged racketeering activity was to harm the Debtors.

The Trustee attempts to contrive a direct injury to the Debtors—and thus manufacture standing—by alleging that each "operated as a legitimate business built on fruitful relationships with reputable customers" before the racketeering activity began, but had their assets "depleted" by fraudulent transfers and incurred "substantial administrative expenses" as a result of the bankruptcy proceeding and suffered "impairment" of their ability to sell assets. (FAC ¶¶ 299, 303). But these "injuries" flowed only indirectly, at best, from the alleged scheme to defraud PNB; the Debtors' purported injuries were derivative of the scheme against PNB, and further, they were the result of the Debtors' own participation in the alleged scheme.

The FAC is almost entirely dedicated to describing the alleged fraudulent scheme against PNB. (*See*, *e.g.*, FAC ¶¶ 42-51, 54-55, 57-58, 60). Despite the Trustee's claims of the Debtors' asset depletion and alleged bankruptcy-related injuries in a handful of paragraphs at the

22

end of the FAC, (FAC ¶¶ 298, 303), the Trustee's core allegations make clear that, as in *Holmes*,

those purported injuries were "purely contingent on the harm suffered" by PNB, *Holmes*, 503

U.S. at 271.  The alleged injuries to the Debtors are also belied by the Trustee's allegations that

the pattern of racketeering activity, including the Debtors' own conduct, was aimed at defrauding

PNB and then covering up any evidence of the fraud.  (*See* FAC ¶¶ 240 (the enterprise was

aimed at "formulating and implementing a common scheme to defraud PNB"), 142-151 (alleging

efforts to cover up and frustrate investigation of the PNB Scheme)).  The tangential and indirect

link between the Debtors' alleged injuries and the alleged racketeering activity is highlighted by

the fact that all of the predicate acts alleged against Modi are inextricably intertwined with the

alleged PNB Scheme.

　　　　For instance, the Trustee alleges predicate acts of mail and wire fraud, but the

allegedly fraudulent transactions underlying the mail and wire fraud were designed to "obtain

loans, credits, or other funds under false pretenses and without collateral from numerous banks,

including [PNB]."  (FAC ¶ 23).  The alleged scheme entailed "artificially inflating the import

volume of Modi's India-based companies . . . with sham transactions so as to obtain more and

more LOU funding," which allegedly "resulted in a total loss to PNB and other banks in excess

of $1 billion."  (FAC ¶¶ 27, 52).  The Debtors were not the direct victims of this fraud—PNB

was.  The Debtors' "injury" occurred only after PNB learned of the alleged fraud and sought to

recover its purported losses.  The Debtors, therefore, are without standing to assert RICO claims

based on this alleged conduct.

　　　　The Trustee next alleges violations of the National Stolen Property Act

("NSPA"), but again, the transactions cited in support of this predicate act are part and parcel to

the alleged scheme against PNB.  (FAC ¶¶ 254-259).  According to the FAC, the Debtors

23

transported and received funds that constituted the proceeds of the PNB Scheme.  (FAC ¶¶ 255, 256).  Likewise, in alleging money laundering as a predicate act, the Trustee explicitly pleads that the relevant unlawful transfer of funds "supported and furthered the [PNB Scheme]" by making the detection of the scheme against PNB less likely.  (FAC ¶ 261).  With respect to the obstruction of justice predicate act, the Trustee's allegations all concern purported attempts to cover up the PNB Scheme in light of investigations by government authorities.  And finally, the Trustee alleges bankruptcy fraud as a predicate act (though not against Modi), but the driving force behind the alleged bankruptcy fraud, according to the Trustee, was the PNB Scheme, and the directly injured party was PNB.  (FAC ¶¶ 155-161).

Aside from a "depletion" of funds, the Trustee's other purported direct injuries incurred by the Debtors, *i.e.*, the expenses incurred due to alleged obstruction of the bankruptcy process and the impairment of their ability to sell assets at going-concern value (FAC ¶ 303), are not the result of the alleged predicate acts.  To the contrary, the Debtors' bankruptcy-related expenses and loss of asset value are the results of PNB's efforts to recover its losses from the alleged fraudulent scheme.  Accordingly, the Debtors are not direct victims of the alleged racketeering because the victim of the alleged scheme was PNB.  *See Hemi*, 559 U.S. at 10 (citing *Anza*, 547 U.S. at 458).  Any injury to the Debtors is secondary to the injury inflicted on PNB, and that requires an analysis beyond the "first step" in the causal chain, which the Supreme Court has forbidden.  *See Hemi*, 559 U.S. at 10 (quoting *Holmes*, 503 U.S. at 271).

### 3.    PNB Is Better Situated to Pursue Claims

The Supreme Court has dismissed RICO claims where, as in this proceeding, there is a better-situated injured plaintiff with an incentive to sue.  *Hemi*, 559 U.S. at 10; *Anza*, 547 U.S. at 460; *Holmes*, 503 U.S. at 270.  The Supreme Court has consistently held that the "requirement of a direct causal connection is especially warranted where the immediate victim[]

24

of an alleged RICO violation can be expected to vindicate the laws by pursuing [its] own

claims." *Anza*, 547 U.S. at 460.  Therefore, under controlling case law, a party does not have

standing under RICO where "better situated plaintiffs would have an incentive to sue." *Hemi*,

559 U.S. at 11-12.  As explained by the Supreme Court, the focus on the best-situated plaintiff is

driven by three relevant considerations: (1) the difficulty in ascertaining the amount of damages

attributable to the violation for indirectly injured parties; (2) the complex rules of apportionment

that would be required by allowing claims by parties "removed at different levels of injury from

the violative acts"; and (3) the fact that "directly injured victims can generally be counted on to

vindicate the law as private attorneys general, without any of the problems attendant upon suits

by plaintiffs injured more remotely."  *Holmes*, 503 U.S. at 269-70.

        In this case, all three of the considerations from *Holmes*, described above, counsel

against allowing the Trustee to pursue RICO claims.  *See id.  First*, ascertaining which of the

Debtors' injuries resulted from the alleged fraud scheme, and to what extent, would be nearly

impossible.  The Debtors transferred and received millions of dollars as part of the alleged PNB

Scheme.  Determining how much of the Debtors' assets, if any, were "depleted" as a result of the

alleged RICO violations would require extensive forensic and expert analysis and resolution of

factual disputes regarding the true nature and value of the transactions alleged in the FAC, as

well as the results of a netting analysis to ensure the Debtors would not recover a windfall based

on realized benefits from the purported fraud.

        *Second*, apportioning the injury between PNB and the Debtors would require

precisely the sort of "complicated rules apportioning damages among plaintiffs removed at

different levels of injury from the violative acts" that the Court discouraged.  *See id.*  The Trustee

provides no explanation as to how the Court could divide damages between PNB and the

Debtors, particularly given that the Debtors' entire alleged injury is derivative of harm allegedly suffered by PNB, in part, at the hands of Debtors.

*And third*, the alleged direct victim of the fraud is not only positioned to vindicate its claim, it already has appeared in New York (in this very proceeding) to assert RICO violations against the Debtors. *See, e.g.*, Proof of Claim of Punjab National Bank Against Firestar Diamond, Inc., *In re Firestar Diamond, et al.*, No. 18-bk-10509 (Bankr. S.D.N.Y. Nov. 29, 2018) ¶ 23.[2]  The allegations in PNB's proof of claim mirror the core allegations in the Trustee's FAC.  PNB has thus demonstrated itself capable of vindicating its rights.

**B.      The Trustee's RICO Claims Are Barred by the Doctrine of *In Pari Delicto***

Because the Debtors were critically involved in and instrumentalities of the alleged PNB Scheme, the doctrine of *in pari delicto* forecloses the Trustee's RICO claims against Modi.  The doctrine of *in pari delicto* "reflects the principle that a plaintiff who has participated in wrongdoing equally with another person may not recover from that other person damages resulting from the wrongdoing."  *Republic of Iraq v. ABB AG*, 768 F.3d 145, 160 (2d Cir. 2014).  A bankruptcy trustee stands in the shoes of the bankrupt corporation "and can maintain only those actions that the debtors could have brought prior to the bankruptcy proceedings."  *Bankr. Servs.*, 529 F.3d at 447.  Here, the Trustee can only bring claims that could have been brought by at least one of the Debtors—FDI, Fantasy, or Jaffe.  Based on the *in pari delicto* doctrine, because the Debtors cannot bring RICO claims against Modi, neither can the Trustee.

---

[2] *See also* Proof of Claim of Punjab National Bank Against Old AJ, Inc., f/k/a A. Jaffe, Inc., *In re Firestar Diamond, et al.*, No. 18-bk-10509 (Bankr. S.D.N.Y. Nov. 29, 2018) ¶ 23; Proof of Claim of Punjab National Bank Against Fantasy, Inc., *In re Firestar Diamond, et al.*, No. 18-bk-10509 (Bankr. S.D.N.Y. Nov. 29, 2018) ¶ 23.

*In pari delicto* has two animating purposes. *First*, "courts should not lend their good offices to mediating disputes among wrongdoers." *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 306 (1985). *And second*, "denying judicial relief to an admitted wrongdoer is an effective means of deterring illegality." *Id.* Given these two principles, "[n]o court should be required to serve as the paymaster of the wages of crime, or referee between thieves." *Stone v. Freeman*, 82 N.E. 571, 572 (N.Y. 1948). This principle has been firmly established in the common law for more than two centuries. *See Sebring v. Rathbun*, 1 Johns. Case 331, 332 (N.Y. 1800) ("[B]oth the parties . . . were equally culpable, and *in pari delicto*, and the court will not, therefore, interpose in favor of either.").

The principle effectively bars recovery by a plaintiff who was an "active, voluntary participant in the unlawful activity that is the subject of the suit," and whose fault is "essentially indistinguishable" from the defendant's. *Pinter v. Dahl*, 486 U.S. 622, 635-36 (1988). The Second Circuit has held that *in pari delicto* is a complete defense to civil RICO claims. *See Republic of Iraq*, 768 F.3d at 162-63. In *Republic of Iraq*, the Court of Appeals affirmed a district court's dismissal of civil RICO claims based on the *in pari delicto* defense, recognizing that it "would be anomalous, to say the least, for the RICO statute to make racketeering unlawful in one provision, yet award the violator with treble damages in another provision of the same statute." *Id.* at 167.

Here, the Trustee alleges that the Debtors were active participants in the PNB Scheme. In fact, the FAC is replete with descriptions of the Debtors' central involvement in the alleged scheme to defraud PNB. (*See* FAC ¶¶ 53-60); *see also supra*, p. 6-7. According to the FAC, the Debtors received approximately $24 million in proceeds from the alleged scheme. (*See* FAC ¶¶ 54-55, 57-58, 81, 125, 197). To the extent the Debtors were harmed because their

27

alleged victim discovered the crime and sought to recover losses, the Debtors' injuries arose

from their own wrongdoing. The Debtors' "recovery under RICO would not divest RICO

violators of their ill-gotten gains; it would result in a wealth transfer among similarly situated

conspirators." *Republic of Iraq*, 768 F.3d at 167. The RICO claims should be dismissed on the

basis of *in pari delicto*.

### C.    The Trustee Fails to Allege that Modi Committed Any RICO Predicate Act

In addition to the deficiencies described above, the FAC does not adequately

allege that Modi committed an actionable predicate act, and that failure is another basis to

dismiss the RICO claims again him.[3]  *See Harris v. NYU Langone Med. Ctr.*, No. 12-CV-454,

2013 U.S. Dist. LEXIS 99328, at *26 (S.D.N.Y. July 9, 2013); *Merrill Lynch, Pierce, Fenner &

Smith v. Young*, No. 91 Civ. 2923, 1994 U.S. Dist. LEXIS 2929, at *48-49 (S.D.N.Y. Mar. 15,

1994). To establish a RICO violation, a plaintiff must allege that "*each defendant* committed at

least two predicate acts of racketeering activity" within a ten-year period. *Jerome M. Sobel &

Co. v. Fleck*, No. 03-CV-1041, 2003 U.S. Dist. LEXIS 21362, at *18-19, *25-26 (S.D.N.Y. Dec.

1, 2003) (citing *DeFalco v. Bernas*, 244 F.3d 286, 306 (2d Cir. 2001)) (emphasis added); *see

also Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999).

Moreover, "to comply with Rule 8, a complaint should offer specification as to the particular

activities by any particular defendant" allegedly constituting a RICO predicate act. *See Harris*,

2013 U.S. Dist. LEXIS 99328, at *26. Allegations specific to each individual defendant are

required because the focus of § 1962(c) is on the "individual patterns of racketeering engaged in

---

[3] Because the Trustee fails to plead a substantive RICO violation by Modi, its conspiracy claim must fail
as well. *First Capital Asset Mgmt. v. Satinwood, Inc.*, 385 F.3d 159, 182 (2d Cir. 2004) (RICO
conspiracy claim properly dismissed where "Plaintiffs did not adequately allege a substantive violation of
RICO"); *New York v. United Parcel Serv., Inc.*, No. 15-CV-1136, 2016 U.S. Dist. LEXIS 105038, at *13
(S.D.N.Y. Aug. 9, 2016) ("[A]ny claim under § 1962(d) based on conspiracy to violate the other
subsections of section 1962 necessarily must fail if the substantive claims are themselves deficient.")
(quotations omitted).

by a defendant, rather than the collective activities of the members of the enterprise." *United States v. Persico*, 832 F.2d 705, 714 (2d Cir. 1987).

Here, the Trustee asserts that Modi engaged in four types of racketeering activity: mail and wire fraud, violations of the NSPA, money laundering, and obstruction of justice.[4] Because the alleged mail and wire fraud and NSPA violations sound in fraud, Rule 9(b) requires that they be pled with particularity. *See Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013) (quotations omitted) (requiring complaint to "specify the time, place, speaker, and content of the alleged misrepresentations, explain how the misrepresentations were fraudulent and plead those events which give rise to a strong inference that the defendant[] had an intent to defraud, knowledge of the falsity, or a reckless disregard for the truth").

### 1.    The Trustee Fails to Plead Mail and Wire Fraud Against Modi

To establish the predicate act of mail or wire fraud, a plaintiff must allege, among other things, the existence of a scheme to defraud and that each defendant acted with fraudulent intent. *See United States v. Pierce*, 224 F.3d 158, 165 (2d Cir. 2000); *see also Westchester Cty. Indep. Party v. Astorino*, 137 F. Supp. 3d 586, 600 (S.D.N.Y. 2015). A scheme to defraud requires "(i) the existence of a scheme to defraud, (ii) the requisite scienter (or fraudulent intent) on the part of the defendant, and (iii) the materiality of the misrepresentations." *Pierce*, 224 F.3d at 165 (quotations omitted). To satisfy Rule 9(b) with respect to mail or wire fraud under RICO, a plaintiff must "specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiff[] contend[s] the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." *Tymoshenko v. Firtash*, No. 11-CV-2794, 2015 U.S. Dist. LEXIS 125126, at *12 (S.D.N.Y. Sept. 18, 2015)

---

[4] The Trustee does not allege the predicate act of bankruptcy fraud against Modi. (*See* FAC ¶¶ 290-296).

29

(dismissing predicate acts of mail and wire fraud where plaintiff did not establish how each statement was "fraudulent"). A scheme to defraud, moreover, requires actual participation by each individual defendant. *Id.* Where "there are multiple defendants, a plaintiff must specify how each contributed to the fraud, rather than simply allege general participation in an overall fraudulent scheme." *Id.*; *see also Lundy v. Catholic Health Sys. of Long Island, Inc.*, 711 F.3d 106, 119 (2d Cir. 2013).

It is not sufficient that Modi realized "that [a] scheme is fraudulent and that it has the capacity to cause harm to its victims." *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999). Rather, the Trustee must demonstrate that Modi "had a conscious knowing intent to defraud and that the defendant contemplated or intended some harm to" the property rights of *each individual Debtor*. *Id.* Finally, the Trustee must plead each of these elements with particularity for each Defendant. Fed. R. Civ. P. 9(b); *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987) ("Where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud.").

The Trustee's claim that Modi engaged in mail or wire fraud fails for two reasons. *First*, the alleged communications involving Modi fail to identify a false or otherwise fraudulent statement. The Trustee attempts to support his claim by referring to specific communications (*see* FAC ¶¶ 81, 175-177), but only two of them involve Modi and neither sets forth any statements that the Trustee alleges were false or misleading (*see* FAC ¶¶ 81(ii), 81(xi)). And beyond general statements regarding Modi's alleged control of the Debtors, the Trustee does not make any other specific allegations as to the what, why, when, and how of Modi's alleged participation in any alleged fraudulent scheme. *See Tymoshenko*, 2015 U.S. Dist. LEXIS

30

125126, at *12 (a "plaintiff must specify how each [defendant] contributed to the fraud, rather than simply allege general participation in an overall fraudulent scheme.")

*Second*, the Trustee does not even begin to explain how the cited communications establish Modi having the requisite intent to defraud.  The "crux" of mail and wire fraud is "an intent to defraud."  *Econ. Opportunity Comm'n of Nassau Cty., Inc. v. Cty. of Nassau*, 47 F. Supp. 2d 353, 363 (E.D.N.Y. 1999).  "To establish an intent to defraud, the plaintiff[] must adequately allege that the 'defendants contemplated some actual harm or injury to their victims.'"  *Id.* (quoting *United States v. Dinome*, 86 F.3d 277, 283 (2d Cir. 1996)).  With no allegations supporting an inference of scienter, no specific allegations of the what, where, and when of any false or misleading statements by Modi, and no allegations that Modi intended to harm the Debtors, the Trustee fails to adequately allege that Modi committed the predicate act of mail or wire fraud.[5]

### 2. The Trustee Fails to Plead Violations of the National Stolen Property Act Against Modi

A violation of the NSPA has three elements: "(1) the transportation in interstate or foreign commerce of property, (2) valued at $5,000 or more, (3) with knowledge that the property was stolen, converted, or taken by fraud."  *United States v. One Tyrannosaurus Bataar Skeleton*, No. 12-cv-4760, 2012 U.S. Dist. LEXIS 165153, at *13 (S.D.N.Y. Nov. 14, 2012) (quotations omitted).  Rule 9(b)'s heightened pleading applies to NSPA claims.  *See Bd. of Managers of Trump Tower at City Ctr. Condo. v. Palazzolo*, 346 F. Supp. 3d 432, 456 (S.D.N.Y. 2018).

---

[5] The Trustee also fails to connect the February 6, 2013 email to a civil RICO injury that accrued after March 27, 2015.  For the reasons set forth in Section III.B, a civil RICO claim based on that email would be time-barred.

The Trustee's NSPA claim is based on unspecified "transfers by U.S. Affiliates of funds fraudulently received from the Debtors to foreign Modi-Controlled Entities" (the so-called "Subsequent Transfers").  (FAC ¶ 255).  Despite the conclusory allegation that Modi engaged in Subsequent Transfers "kn[owing] that the funds involved had been fraudulently transferred from the applicable Debtor to the applicable U.S. Affiliate or had otherwise been stolen converted, or taken by fraud," the FAC does not contain a single allegation of fact—and certainly not an allegation consistent with the requirement of Rule 9(b)—on which to base an inference that Modi participated in any of the Subsequent Transfers.  *See Cohen*, 711 F.3d at 359 (allegations sounding in fraud require facts as to "time, place, speaker, and content" that "give rise to a strong inference that the defendant[] had an intent to defraud, knowledge of the falsity, or a reckless disregard for the truth").  The Trustee fails to adequately allege that Modi violated the NSPA.

### 3.    The Trustee Fails to Plead Money Laundering Violations Against Modi

The Trustee also alleges a predicate act of money laundering pursuant to 18 U.S.C. §§ 1956 and 1957.  "Money laundering claims are not subject to the heightened pleading standard of Rule 9(b), but plaintiffs must still adequately plead all elements of the offense in compliance with Rule 8."  *Jus Punjabi, LLC v. Get Punjabi, Inc.*, No. 1:14-cv-3318-GHW, 2015 U.S. Dist. LEXIS 66006, at *18 (S.D.N.Y. May 20, 2015).  To establish a violation of §§ 1956 or 1957, the Trustee must allege that Modi actually participated in a financial transaction that he knew to involve the proceeds of specified unlawful activity.  *See Bernstein v. Misk*, 948 F. Supp. 228, 236 n.2 (E.D.N.Y. 1997).

The Trustee alleges money laundering based on transfers that involved or resulted from alleged acts of wire fraud.  (FAC ¶ 263).  But the Trustee fails to allege any participation by Modi in specific transfers.  (*See* FAC ¶¶ 173-187).  As a result, the Trustee cannot allege that

32

Modi himself "conducted a financial transaction in interstate commerce" or that he "knowingly engaged or attempted to engage in a monetary transaction involving criminally derived property," both of which are bedrock elements of the money laundering statutes. *Bernstein*, 948 F. Supp. at 236 n.2. The Trustee, moreover, does not allege facts to support the conclusory assertions that Modi knew that the property involved in the transactions "represented some form of unlawful activity," or was "criminally derived." *Id.* (holding that "conclusory statements . . . unsupported by any facts in the complaint . . . fail to satisfy the essential elements of the" money laundering statutes). The Trustee cannot plead a money laundering claim based only on wholly conclusory allegations. *See Jus Punjabi*, 2015 U.S. Dist. LEXIS 66006, at *18-22; *Casio Comput. Co. v. Sayo*, 98 Civ. 3772 (WK) (RLE), 1999 U.S. Dist. LEXIS 14675, at *55 (S.D.N.Y. Sept. 20, 1999); *Bernstein*, 948 F. Supp. at 236 n.2.

### 4.    The Trustee Fails to Plead Obstruction of Justice Against Modi

To establish obstruction of justice, in violation of 18 U.S.C. § 1503, a plaintiff must prove that a defendant "acted with the wrongful intent or improper purpose to influence the judicial or grand jury proceeding, whether or not [he] is successful in doing so—that is, that the defendant corruptly intended to impede the administration of that judicial proceeding." *Grewal v. Cuneo*, No. 13-cv-6836 (RA), 2015 U.S. Dist. LEXIS 87755, at *48-49 (S.D.N.Y. July 7, 2015) (quoting *United States v. Quattrone*, 441 F.3d 153, 170 (2d Cir. 2006)). Section 1512, the federal witness tampering statute, prohibits knowing attempts to, among other things, "influence, delay, or prevent the testimony of any person in an official proceeding." 18 U.S.C. § 1512(a)(2)(A). For both statutes, "[t]o constitute an offense under RICO, the act must relate to a proceeding in a federal court of the United States." *Bologna v. Allstate Ins. Co.*, 138 F. Supp. 2d 310, 321 (E.D.N.Y. 2001) (alterations omitted) (quoting *O'Malley v. N.Y.C. Transit Auth.*, 896 F.2d 704, 707 (2d Cir. 1990)); *see* 18 U.S.C. § 1515.

33

The Trustee tries, but fails, to allege obstruction of justice against Modi based on alleged statements made "to Indian authorities around February or March 2018." (FAC ¶¶ 151, 278). The Trustee alleges statements and conduct by multiple individuals, including Modi, but critically, all of those allegations concern conduct before the initiation of these bankruptcy proceedings, and therefore before any "proceeding in a federal court of the United States." *Bologna*, 138 F. Supp. 2d at 321. The Trustee does not (and cannot) allege that these allegations relate to a U.S. federal proceeding. Indeed, the Trustee makes clear that the facts are based on statements made to *Indian* authorities, separate from any U.S. proceeding. (FAC ¶ 151). The Trustee alleges additional facts as to Gandhi and Bhansali regarding conduct allegedly directed to this bankruptcy proceeding, but the FAC contains no allegations as to any act taken by Modi—beyond conclusory allegations of knowledge or control—with respect to alleged obstruction of this bankruptcy proceeding. (*See* FAC ¶¶ 278-289). Accordingly, the Trustee's allegations are insufficient to establish the predicate act of obstruction of justice as to Modi.

### D.     The Trustee Cannot Recover Under RICO For Injuries that Accrued Before March 27, 2015

The RICO claims also should be partially dismissed as time-barred. Civil RICO claims (and related conspiracy claims) are subject to a four-year statute of limitations. *Koch v. Christie's Int'l Pub. Ltd. Co.*, 699 F.3d 141, 148 (2d Cir. 2012) (civil RICO); *World Wrestling Entm't, Inc. v. Jakks Pac., Inc.*, 530 F. Supp. 2d 486, 530 (S.D.N.Y. 2007) (civil RICO conspiracy). A RICO claim accrues when the plaintiff "discovered or should have discovered the injury" from the racketeering conduct. *Koch*, 699 F.3d at 150 (quotations omitted); *see also Lanza v. Merrill Lynch & Co.*, 154 F.3d 56, 60 (2d Cir. 1998). Where a plaintiff alleges that the same pattern of racketeering activity caused multiple injuries over time, "a new claim accrues, triggering a new four-year limitations period, each time plaintiff discover[d], or should have

discovered, a new injury caused by the predicate RICO violations." *Bingham v. Zolt*, 66 F.3d 553, 559 (2d Cir. 1995). But that plaintiff can recover under RICO "only for injuries discovered or discoverable within the four-year 'window' before suit was filed," making claims based on injuries discovered prior to the four-year window time-barred and unsalvageable. *Kerik v. Tacopina*, 64 F. Supp. 3d 542, 558 (S.D.N.Y. 2014) (quoting *Bingham*, 66 F.3d at 560).

In the FAC, the Trustee alleges three types of civil RICO injuries: (1) the depletion of the Debtors' assets as the result of allegedly fraudulent transfers; (2) the incurrence of bankruptcy-related administrative expenses stemming from alleged obstruction of the Trustee's and Examiner's investigations; and (3) the impairment of the Debtors' ability to sell their assets at going-concern value. (*See* FAC ¶ 303).[6]

The first type of injury (*i.e.*, asset depletion) allegedly occurred across a series of transfers, with each transfer giving rise to "a new civil RICO cause of action . . . with a corresponding four-year limitations period." *Bingham*, 66 F.3d at 561 (treating each alleged diversion of assets from the state as a "new and independent legally cognizable injury to the estate"). Though each new injury triggered a new limitations period, those injuries that were discoverable more than four years before the Trustee's initial complaint remain untimely. *Kerik*, 64 F. Supp. 3d at 558.

The Trustee filed his initial complaint on March 27, 2019, so he cannot recover for any injuries that the Debtors discovered or should have discovered on or before March 27, 2015. Here, the Debtors are alleged participants in the scheme to defraud PNB—they were not

---

[6] To the extent the Trustee asserts a fourth type of civil RICO injury (corruption of a previously legitimate business, (FAC ¶¶ 298-302)), such injury accrued before March 27, 2015. The Trustee alleges that each Debtor was involved in a transfer involved in the alleged fraud directed at PNB no later than 2012. (*See* FAC ¶ 54 (FDI, Jaffe), ¶ 81(ix) (Fantasy)). Moreover, the Trustee alleges that the Modi, Bhansali, and Gandhi implemented the scheme to fraudulently obtain LOUs in 2011. (FAC ¶¶ 23, 240). Thus, the Debtors discovered or should have discovered this injury no later than 2012, making a civil RICO claim based on this injury time-barred.

victims of the alleged fraud—and thus were necessarily aware of any injury at the moment it

occurred.  Bhansali was the sole director and CEO of each Debtor and Gandhi was the CFO;

their acts and knowledge as the Debtors' agents are attributable to the Debtors themselves.  (*See*

FAC ¶¶ 19-20); *Kirschner v. KPMG LLP*, 938 N.E.2d 941, 951 (N.Y. 2010) ("Agency law

presumes imputation even where the agent acts less than admirably, exhibits poor business

judgment, or commits fraud.").  As a result, the Debtors discovered or should have discovered

their injuries from any pre-March 27, 2015 transfers on or before that date, and any civil RICO

claim based on those injuries is time-barred.[7]

## CONCLUSION[8]

For the foregoing reasons, the Court should dismiss the claims against Modi in

their entirety.

Dated: New York, New York
      November 20, 2019

Respectfully Submitted,

By: */s/ Daniel S. Ruzumna*
PATTERSON BELKNAP WEBB & TYLER LLP
Daniel S. Ruzumna
Daniel A. Lowenthal
Alejandro H. Cruz
1133 Avenue of the Americas
New York, NY 10036-6710
Tel: (212) 336-2000
Fax: (212) 336-2222
druzumna@pbwt.com
dalowenthal@pbwt.com
acruz@pbwt.com

*Attorneys for Nirav Deepak Modi*

---

[7] Post-petition administrative expenses and alleged losses are not a proper basis for the Trustee's alleged RICO injury because he has standing "to pursue only those claims that properly belonged to the debtor *before it entered bankruptcy*."  *See Picard*, 460 B.R. at 91; *see also supra* Section I.

[8] Modi joins his co-defendants in their motions to dismiss the FAC and hereby asserts the arguments raised in their respective memoranda of law as if set forth herein.