**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Chapter 11 |
| FIRESTAR DIAMOND, INC., *et al.* | No. 18-10509 (SHL) |
| Debtors. | (Jointly Administered) |
| RICHARD LEVIN, Chapter 11 Trustee of FIRESTAR DIAMOND, INC., FANTASY, INC., and OLD AJ, INC. f/k/a A. JAFFE, INC., | Adv. Proc. No. 19-1102 (SHL) |
| Plaintiff, | |
| v. | |
| NIRAV DEEPAK MODI, MIHIR BHANSALI, and AJAY GANDHI, | |
| Defendants. | |

**TRUSTEE'S OPPOSITION TO DEFENDANT AJAY GANDHI'S**
**MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

SUMMARY OF ALLEGATIONS ............................................................................................. 3

I.      The Bank Scheme. ........................................................................................................ 3

II.     The Funnel Scheme. ..................................................................................................... 4

III.    The Exit Scheme. ......................................................................................................... 6

APPLICABLE STANDARDS .................................................................................................. 8

I.      Rule 12(b)(6) Standard ................................................................................................. 8

II.     Rule 9(b) Standard. ...................................................................................................... 8

ARGUMENT ............................................................................................................................ 9

I.      The Trustee Has Standing to Bring the State Law Claims. .......................................... 9

II.     The Amended Complaint States a Valid Claim for Breach of Fiduciary Duty. ............ 12

        A.      The Breach of Fiduciary Duty Claim is Not Time Barred. .......................... 12

        B.      The Amended Complaint States a Claim for Breach of Fiduciary Duty Against
                Gandhi. ....................................................................................................... 14

III.    The Amended Complaint States a Valid Claim for Corporate Waste. ......................... 19

IV.     The Amended Complaint States Valid And Timely RICO Claims. .............................. 20

        A.      The Alleged Injuries Are Sufficiently Direct and Proximate. ...................... 20

        B.      The Trustee's RICO Claims Are Not Time Barred. ..................................... 25

        C.      The Amended Complaint Properly Pleads Each Predicate Act. .................... 27

        D.      The Amended Complaint Properly Pleads RICO Conspiracy. ...................... 36

CONCLUSION ....................................................................................................................... 37

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*287 Franklin Ave. v. Meisels,*
    2015 WL 5457959 (E.D.N.Y. July 20, 2015) .................................................................................. 24

*American Tissue, Inc. v. Donaldson, Lufkin & Jenrette Secs. Corp.,*
    351 F.Supp.2d 79 (S.D.N.Y. 2004) ............................................................................................... 11

*Anhui Green Lighting Co., Ltd. v. Green Logic LED Electrical Supply, Inc.,*
    2019 WL 6498094 (S.D.N.Y. Dec. 3, 2019) .................................................................................. 8

*Armstrong v. McAlpin,*
    699 F.2d 79 (2d Cir. 1983).......................................................................................................... 26

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ................................................................................................................... 8

*Banco de Desarrollo Agropecuario, S.A. v. Gibbs,*
    709 F.Supp. 1302 (S.D.N.Y. 1989)........................................................................................ 13, 14

*Bankers Trust Co. v. Rhoades,*
    859 F.2d 1096 (2d Cir. 1988)............................................................................................ 23, 24, 29

*Barnet v. Drawbridge Special Opportunities Fund LP,*
    2014 WL 3493320 (S.D.N.Y. Sept. 5, 2014) ................................................................................ 26

*Bascuñán v. Elsaca,*
    927 F.3d 806 (2d Cir. 2017)........................................................................................................ 23

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ................................................................................................................... 8

*Benedict v. Amaducci,*
    1993 WL 87937 (S.D.N.Y. March 22, 1993) ................................................................................ 15

*Berk v. Tradewell, Inc.,*
    2003 WL 21664679 (S.D.N.Y. July 16, 2003)......................................................................... 17, 18

*Bivens Gardens Office Bldg., Inc. v. Barnett Banks of Florida, Inc.,*
    140 F.3d 898 (11th Cir. 1998)..................................................................................................... 22

*Capital Inv. Funding LLC v. Field,*
    2014 WL 130468 (D.S.C. Jan. 14, 2014) ..................................................................................... 26

*D'Addario v. D'Addario,*
 901 F.3d 80 (2d Cir. 2018) ............................................................. 21, 22, 24

*Dana Molded Products, Inc. v. Brodner,*
 58 B.R. 576 (N.D. Ill. 1986) ................................................................. 22

*Dowling v. United States,*
 473 U.S. 207 (1985) ............................................................................ 30

*FDIC v. Pellatreau & Pellatreau,*
 965 F.Supp. 381 (E.D.N.Y. 1997) ................................................... 13, 14

*Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC,*
 783 F.3d 395 (2d Cir. 2015) ................................................................... 8

*First Capital Asset Management Inc. v. Brickellbush, Inc.,*
 218 F.Supp.2d 369 (S.D.N.Y. 2002) ..................................................... 24

*Flood v. Makowski,*
 2004 WL 1908221 (M.D. Pa. Aug. 23, 2004) ....................................... 26

*GICC Capital Corp. v. Technology Finance Group, Inc.,*
 30 F.3d 289 (2d Cir. 1994) ......................................................... 22, 23, 25

*Hirsch v. Arthur Anderson & Co.,*
 72 F.3d 1085 (2d Cir. 1995) ................................................................. 11

*In re Adelphia Commc'ns Corp.,*
 365 B.R. 24 (Bankr. S.D.N.Y. 2007) ..................................................... 26

*In re Adelphia Commc'ns Corp.,*
 336 B.R. 610 (Bankr. S.D.N.Y. 2006) .............................................. 15, 30

*In re Ahead by a Length, Inc.,*
 100 B.R. 157 (Bankr. S.D.N.Y. 1989) .............................................. 22, 26

*In re Bennett Funding Group, Inc.,*
 367 B.R. 269 (Bankr. N.D.N.Y. 2007) ................................................... 18

*In re Bernard L. Madoff Inv. Securities LLC,*
 458 B.R. 87 (Bankr. S.D.N.Y. 2011) ..................................................... 19

*In re Everfresh Beverages, Inc.,*
 238 B.R. 558 (Bankr. S.D.N.Y. 1999) ................................................... 26

*In re Felt Mfg.,*
 371 B.R. 589 (Bankr. D.N.H. 2007) ...................................................... 18

*In re Gas Reclamation, Inc. Securities Litig.,*
  659 F.Supp. 493 (S.D.N.Y. 1987) ................................................................................. 28

*In re MF Global Holdings Ltd.,*
  507 B.R. 808 (S.D.N.Y. 2014) ...................................................................................... 14

*In re PHS Group Inc.,*
  581 B.R. 16 (Bankr. E.D.N.Y. 2018) ............................................................................ 19

*In re Scott Acquisition Corp.,*
  344 B.R. 283 (Bankr. D. Del. 2006) ............................................................................. 11

*In re Tribune Co. Fraudulent Conveyance Litig.,*
  2019 WL 294807 (S.D.N.Y. Jan. 23, 2019) ................................................................. 14

*In re Trinsum Group, Inc.,*
  466 B.R. 596 (Bankr. S.D.N.Y. 2012) ..................................................................... 15, 16

*In re TS Employment, Inc.,*
  603 B.R. 700 (Bankr. S.D.N.Y. 2019) ..................................................................... 11, 19

*In re W.J. Bradley Mortgage Capital, LLC,*
  598 B.R. 150 (Bankr. D. Del. 2019) ........................................................................ 19, 20

*In re Welspun Litig.,*
  2019 WL 2174089 (S.D.N.Y. May 20, 2019) ................................................................. 9

*ITT, An International Investment Trust v. Cornfeld,*
  619 F.2d 909 (2d Cir. 1980) .......................................................................................... 13

*Jackson Nat. Life. Ins. Co. v. Litigator,*
  949 F.Supp. 200 (S.D.N.Y. 1996) ....................................................................... 22, 23, 24

*Jerome M. Sobel & Co. v. Fleck,*
  2003 WL 22839799 (S.D.N.Y. Dec. 1, 2003) .......................................................... 28, 30

*John Swann Holdings Corp. v. Simmons,*
  62 F.Supp.3d 304, 310 (S.D.N.Y. 2014) ................................................................. 14, 15

*Limas LS PLC v. PHL Variable Insurance Co.,*
  2013 WL 12286066 (D. Conn. Dec. 17, 2013) ............................................................. 18

*Manson v. Stacescu,*
  11 F.3d 1127 (2d Cir. 1993) .......................................................................................... 22

*McHale v. CitiBank, N.A. (In re 1031 Tax Group, LLC),*
  420 B.R. 178 (Bankr. S.D.N.Y. 2009) ..................................................................... 10, 11

*Meridien Int'l Bank Ltd. v. Gov't of the Republic of Liberia,*
    23 F. Supp. 2d 439 (S.D.N.Y. 1998) ............................................................... 26

*Michelson v. Penney,*
    135 F.2d 409 (2d Cir. 1943) ............................................................................. 13

*Mohr-Lecara v. Oxford Health Ins., Inc.,*
    2019 WL 1409479 (S.D.N.Y. March 28, 2019) ............................................... 28

*Moviecolor Ltd. v. Eastman Kodak Co.,*
    288 F.2d 80 (2d Cir. 1961) .............................................................................. 26

*Patrick v. Allen,*
    355 F. Supp. 2d 704 (S.D.N.Y. 2005) ........................................................ 19, 20

*Ray Larsen Associates, Inc. v. Nikko America, Inc.,*
    1996 WL 442799 (S.D.N.Y. 1996) ................................................................... 35

*Related Companies, L.P. v. Ruthling,*
    2017 WL 6507759 (S.D.N.Y. 2017) ............................................................ 23, 24

*Republic of Colombia v. Diageo N. Am. Inc.,*
    531 F. Supp. 2d 365 (E.D.N.Y. 2007) .............................................................. 31

*Rosner v. Peregrine Finance Ltd.,*
    1998 WL 249197 (S.D.N.Y. May 18, 1998) ..................................................... 26

*Rothstein v. UBS AG,*
    708 F.3d 82 (2d Cir. 2013) ................................................................................. 8

*Scholastic Decisions, Inc. v. DiDomenico,*
    995 F.2d 1158 (2d Cir. 1993) ........................................................................... 24

*Securities Investor Protection Corp. v. Stratton Oakmont, Inc.,*
    234 B.R. 293 (Bankr. S.D.N.Y. 1999) ..................................................... 8, 16, 17

*Shapo v. O'Shaughnessy,*
    246 F. Supp.2d 935 (N.D. Ill. 2002) ................................................................ 26

*St. Paul Fire and Marine Ins. Co. v. PepsiCo, Inc.,*
    884 F.2d 688 (2d Cir. 1989) ........................................................................ 10, 22

*Stein v. New York Stair Cushion Co., Inc.,*
    2006 WL 319300 (E.D.N.Y. 2006) ............................................................. 28, 30

*Stone ex rel. AmSouth Bancorporation v. Ritter,*
    911 A.2d 362 (Del. 2006) ................................................................................. 15

*Sullivan v. Kodsi,*
    373 F.Supp.2d 302 (S.D.N.Y. 2005) ............................................................................ 17

*Sunrise Indus. Joint Venture v. Ditric Optics, Inc.,*
    873 F.Supp. 765 (E.D.N.Y. 1995) ............................................................................. 18

*U.S. Small Business Admin. v. Feinsod,*
    347 F.Supp.3d 147, 160 (E.D.N.Y. 2018) ................................................................. 19

*U.S. Textiles, Inc. v. Anheuser-Busch Companies, Inc.,*
    1988 WL 31479 (N.D. Ill. 1988) ............................................................................... 26

*U.S. v. Appins,*
    637 F.3d 59 (2d Cir. 2011) ......................................................................................... 36

*U.S. v. Autuori,*
    212 F.3d 105 (2d Cir. 2000) ....................................................................................... 27

*U.S. v. Bahel,*
    662 F.3d 610 (2d Cir. 2011) ....................................................................................... 27

*U.S. v. Binday,*
    804 F.3d 558 (2d Cir. 2015) ....................................................................................... 27

*U.S. v. Crisp,*
    306 F.3d 71 (2d Cir. 2002) ......................................................................................... 32

*U.S. v. D'Amato,*
    39 F.3d 1249 (2d Cir. 1994) ....................................................................................... 28

*U.S. v. Pugh,*
    937 F.3d 108 (2d Cir. 2019) ....................................................................................... 33

*U.S. v. Reifler,*
    446 F.3d 65 (2d Cir. 2006) ......................................................................................... 30

*U.S. v. Sampson,*
    898 F.3d 287 (2d Cir. 2018) ................................................................................... 32, 33

*United States v. Agrawal,*
    726 F.3d 235 (2d Cir. 2013) ....................................................................................... 30

*United States v. Maher,*
    108 F.3d 1513 (2d Cir. 1997) ..................................................................................... 31

*Warfield v. Carnie,*
    2007 WL 1112591 (N.D. Tex. April 13, 2007) ......................................................... 26

*Whalen v. Carter,*
  954 F.2d 1087 (5th Cir. 1992)............................................................................. 22

*Wight v. BankAmerica Corp.,*
  219 F.3d 79 (2d Cir. 2000).................................................................................. 28

*Williams v. Affinion Group, LLC,*
  889 F.3d 116 (2d Cir. 2018)................................................................................ 28

*Wooten v. Loshbough,*
  951 F.2d 768 (7th Cir. 1991).............................................................................. 22

*World Wrestling Entertainment, Inc. v. Jakks Pacific, Inc.,*
  530 F.Supp.2d 486 (S.D.N.Y. 2007) .................................................................. 35

*Zimmerman v. Duggan,*
  86 B.R. 47 (E.D. Pa. 1988) ................................................................................ 22

## STATUTES

11 U.S.C. § 108 .................................................................................................. 13, 26

11 U.S.C. § 1104 ...................................................................................................... 32

18 U.S.C. § 152 ........................................................................................................ 36

18 U.S.C. § 1503 ...................................................................................................... 32

18 U.S.C. § 1512 .......................................................................................... 32, 33, 34

18 U.S.C. § 1515 ...................................................................................................... 33

18 U.S.C. § 1956 ...................................................................................................... 31

18 U.S.C. § 1957 ...................................................................................................... 31

18 U.S.C. § 1962 ...................................................................................................... 36

18 U.S.C. § 2314 ...................................................................................................... 30

## OTHER AUTHORITIES

Fed. R. Civ. P. 9 .............................................................................................. 8, 9, 17

Fed. R. Civ. P. 12.......................................................................................................... 8

Plaintiff Richard Levin, not individually but solely as chapter 11 trustee ("**Trustee**" or "**Plaintiff**") for Debtors Firestar Diamond, Inc., Fantasy, Inc., and Old AJ, Inc. f/k/a A. Jaffe, Inc. (collectively, the "**Debtors**"),[1] in opposition to Defendant Ajay Gandhi's motion to dismiss [Dkt. 36] (the "**Motion**" or "**MTD**") the Trustee's First Amended Complaint [Dkt. 28] (the "**Amended Complaint**" or "**FAC**"), respectfully states as follows:

## PRELIMINARY STATEMENT

After filing his original complaint and reviewing Gandhi's prior motion to dismiss, the Trustee investigated further, yielding extensive new information detailing the mechanics of the fraudulent schemes as well as the specific role played by each Defendant in conceiving and executing the schemes. Based on the additional information, the Trustee filed his Amended Complaint, which more directly ties the alleged injuries to the Debtors to the alleged misconduct by focusing on the fraudulent depletion of the Debtors' assets, the frustration of the Debtors' claims against third parties, and the Debtors' payment of professional fees they would not otherwise have paid.

Despite the revisions, Gandhi's new motion to dismiss selectively addresses only some of the new allegations, but ignores far more meaningful allegations altogether. For example, Gandhi repeatedly argues he cannot be held liable for "following the instructions" of his boss. (MTD at 1, 9-10, 13, 21-22.) But, not only is this excuse invalid as a matter of law, the Trustee alleges numerous instances of Gandhi acting unilaterally to further the fraudulent schemes—including

---

[1] Unless otherwise defined, all capitalized terms shall have the meaning ascribed to them in the Amended Complaint. Additionally, with respect to allegations made on information and belief in the Amended Complaint, the Trustee will treat such allegations as true for the purposes of this Opposition. However, nothing in this Opposition should be construed as negating or limiting such qualifications in the Amended Complaint.

after Modi absconded in early 2018. Likewise, Gandhi's assertion that he "has never been charged with any crime" has no bearing on his civil liability.

Gandhi also attacks the Trustee's standing by wrongly portraying the alleged harm as solely encompassing the Debtors' liability to PNB. (MTD at 2, 6-7.) However, the Amended Complaint focuses on fraudulent transfers, which, under well-settled Second Circuit case law, directly injure the looted entity, not its creditors, and thus confer standing on that entity to bring common law and RICO claims.

Gandhi next claims the Trustee's claims are time barred. (MTD at 7-10, 18-19.) But a significant portion of the alleged misconduct (and thus alleged injuries) occurred just before and after the Debtors' bankruptcy filings in February 2018 and are not time barred even under Gandhi's theories. The 2018 allegations alone are sufficient to support the Trustee's claims. Still, even the Trustee's allegations of earlier misconduct remain actionable by operation of equitable tolling principles under both state and federal law, which tolled the limitations periods until Gandhi and his co-conspirators relinquished control of the Debtors in May 2018.

Most of Gandhi's remaining arguments challenge the sufficiency of the Trustee's allegations of Gandhi's knowledge of and participation in the fraud. But Gandhi repeatedly ignores the most damning allegations of his knowledge and participation, including that Gandhi designed and executed dozens of circular transactions involving Shadow Entities, maintained two sets of books and records (only one of which reflected Shadow Entity transactions), repeatedly deceived auditors asking about and seeking balance confirmations from Shadow Entities, and flat out lied to the Examiner about his knowledge of the Shadow Entities and his use of personal email for official business.

Taking the Amended Complaint's allegations as true and construed in the light most favorable to the Trustee, the Trustee has sufficiently alleged plausible claims against Gandhi for

2

breach of fiduciary duty, corporate waste, and civil RICO violations. As such, the Motion should be denied.

SUMMARY OF ALLEGATIONS

While the Amended Complaint, for the sake of simplicity and to avoid unnecessary characterization, used the term "Bank Fraud" as shorthand for the myriad allegations of fraud throughout the Amended Complaint, those allegations are more accurately conceptualized as comprising three distinct, but related fraudulent schemes—each of which the Defendants knew of and participated in directly.

## I.      The Bank Scheme.

The first scheme (the "**Bank Scheme**") involved fraudulently inducing PNB and other banks to extend credit on the basis of circular import and export transactions between LOU Entities and Shadow Entities. (*See generally* FAC ¶¶ 23-41.) Precious gems, metals, and jewelry were transferred in a "loop" between LOU Entities and Shadow Entities as part of the Bank Scheme to fraudulently inflate the LOU Entities' import volume and increase their LOU funding. (*Id.* ¶ 35.) The Bank Scheme began in approximately early 2011 when Modi and his co-conspirators fraudulently solicited issuance of the first bank loan (*id.* ¶ 23) and stopped in late January 2018 when the Bank Scheme was exposed (*id.* ¶ 42).

As Gandhi's primary focus and responsibilities concerned the U.S. Entities (and, to a lesser extent, overseas Firestar Entities), there is not significant evidence of Gandhi's personal participation in the LOU Entities' procurement of fraudulent LOUs or circular transactions between the LOU Entities and Shadow Entities underlying those LOUs. However, Gandhi's general knowledge of the Bank Scheme can be inferred from, among other things, the allegations discussed below in connection with the two separate, but related schemes, which more directly involved the U.S. Entities.

II.     **The Funnel Scheme.**

The second scheme (the "**Funnel Scheme**") involved fraudulent transactions disguised as

sales, loans, and equity investments among Shadow Entities and Firestar Entities (including the

Debtors) designed to funnel cash and inventory into and out of the "loop" comprising the Bank

Scheme. (*See generally id.* ¶¶ 56-60.) Whereas the Bank Scheme was based on circular transactions

between LOU Entities and Shadow Entities, the Funnel Scheme was based on circular

transactions among Shadow Entities and Firestar Entities. The Funnel Scheme principally

spanned from roughly 2013, when the Shadow Entities became the LOU Entities' exclusive

trading partners (*id.* ¶¶ 34, 56), to late January 2018, when the Bank Scheme was exposed (*id.* ¶

42).

Gandhi's knowledge of and participation in the Funnel Scheme are demonstrated by the

following allegations, among others:

- Gandhi, while CFO of each of the Debtors and U.S. Affiliates (FAC ¶ 20), personally directed and approved fraudulent transfers of millions of dollars in cash and inventory from the Debtors and U.S. Affiliates to overseas Shadow Entities and Firestar Entities (*id.* ¶¶ 64, 81*);

- Gandhi maintained two sets of books and records for Jaffe, one which included Shadow Entity transactions and one that did not. (*id.* ¶ 85);

- Gandhi oversaw and directed the use of different sales and inventory practices for Debtors' transactions with Shadow Entities as compared to those used with retailer customers. (*id.* ¶ 89);

- Gandhi regularly emailed Nirav Modi, Miten Pandya, Amit Magia, Shyam Wadhwa, and others advising them of his ability to wire funds from the U.S. Entities to India to advance the fraudulent schemes. (*id.* ¶¶ 82-83);

- During audits, Ajay Gandhi would be copied on the auditor's emails to Shadow Entities, which Gandhi would often forward to Operation 1 to ask that Operation 1 cause the Shadow Entity to provide confirmation to the auditors. (*id.* ¶ 196);

- Gandhi, in coordination with Mihir Bhansali and Nirav Modi, repeatedly sidestepped auditors' inquiries concerning the U.S. Entities' dealings with

Shadow Entities by offering a farfetched explanation, feigning ignorance, or ignoring the question altogether. (*id.* ¶¶ 92-102);

- On May 5, 2017, Gandhi sent a list of Shadow Entities, and contact information for each, to Altamash Ansari, a back office employee in India, and stated "Use names from attached for Eternal, Pacific & Tri Color. (Do not share this pdf with anyone.)" (*id.* ¶ 77);

- Nirav Modi's personal assistant instructed Gandhi, from her personal email address to Gandhi's personal email address, to communicate with her regarding Shadow Entities only on Gmail or Panemail, a program that automatically deletes messages, rather than on the Firestar Entities' regular email system. (*id.* ¶ 143);

- On June 8, 2012, Gandhi emailed Bhavesh Patel and Shyam Wadhwa, "Please email payables to HK and Dubai – all the companies. Firestar, Firestar Diamond Int'l and Jaffe. Need to pay $1m to HK or Dubai hence need name and amounts only." Bhavesh replied, "There is nothing open in Dubai however HK open payables attached herewith for your review." Gandhi replied, "It could be Pacific, World Diamond, etc too." That same day, FDI transferred $1,000,000 to Fancy Creations. This transaction is described as an "advance" in FDI's bank statement. (*id.* ¶ 81(i));

- On October 21, 2010, in furtherance of a circular trade, Modi and Gandhi communicated by email about the shipment of a diamond to a Shadow Entity. Modi stated, "Send the 70 ct vivid yellow to Firestone Dubai @51,500 and not Firestone HK." Gandhi responded, "Firestone, Dubai confirmed (Not Unique)[,]" to which Modi clarified, "Sorry Unique[,]" in reference to the Shadow Entity. Gandhi responded with "Glad I asked!!!" (*id.* ¶ 82(iii));

- On July 23, 2012, Ajay Gandhi sent a message to Nirav Modi through Panemail, which is a web-based email service that automatically deletes messages, "Niravbhai, please see attached payment plan in 5 parts to clean-up AR and AP of [FDII] for HK, Dubai, Belgium and NY. Funds should come from respective companies. 1. $452k. 2. $1.129m. 3. $1.5m. 4. $828k. 5. $1.05m. If implemented, the attached AR and AP of $4.3 million can be cleaned up. Please let me know if you have different thought." On August 3, 2012, Gandhi forwarded the email to Hemant Bhatt, copying Bhansali, and stated, "I will call you Monday to discuss. We need to move funds in Firestar Diamond International, Inc. per attached. NM/MB is fine so long as money flows from SDC/Tristar and Diamlink to any of HK or Dubai entities." On August 14, 2012, Gandhi followed up, "Hemant, When can I expect payments for the below cycle that we spoke about?" On August 27, 2012, Bhatt replied to Gandhi, copying Bhansali, "Pacific and Unique paid as above. Please pay accordingly." The message contained a list reflecting that Pacific and Unique owed FDII $779,579 and $418,498, respectively, in

accounts receivable, and that FDII owed Fancy Creations, FDL, and Diagems $1,063,369, $121,129, and $14,033, respectively, in accounts payable. On August 28, 2012, Hemant Bhatt messaged Ajay Gandhi on Panemail, "Auragem paid $200,000.00 and Brilliant paid $231,175.03. Pleeasse [sic] confirm receipt and pay to Fancy. (*id.* ¶ 81(ii));

- On April 6, 2016, Shyam Wadhwa emailed Ajay Gandhi and Mihir Bhansali asking them to send $2.7 million from Jaffe to FIL to clear outstanding accounts receivable and stating "our fund position is tight in India, else would have wired funds to you against our payables of about USD 1M from FDIPL for clearing AR/AP between India and NY." Gandhi replied, copying Bhansali, "We have Overseas AR of around $8.5m in Firestar Diamond, Inc. – If I get funds in FD, Inc then we can wire funds to India this month." The next day, Gandhi followed up, "I can wire $1m this month from Jaffe thru FS. Can it come back to FS?" (*Id.* ¶ 82(vii)).

### III.   The Exit Scheme.

The third scheme (the "**Exit Scheme**") constituted the conspirators' exit strategy and involved efforts to permanently shield ill-gotten assets from their victims, including the Debtors. The Exit Scheme included: (a) the systematic looting of the Debtors', U.S. Affiliates', and other Firstar Entities' assets in the months leading up to and following exposure of the Bank Scheme (*id.* at ¶¶ 173-187); (b) bribery, witness tampering, destruction of evidence, and bankruptcy fraud designed to buy additional time for such looting (*id.* at ¶¶ 142-172); and (c) the broader diversion of cash, real estate, and other assets for the benefit of the Modi and Bhansali family (*id.* at ¶¶ 103-140). Implementation of the Exit Scheme began as early as April 2012 when Nirav Modi gifted to his sister Purvi Mehta a $14,575,000 loan receivable owed to him by Synergies (which Synergies paid in full to Mehta in July 2017 (*id.* at ¶ 124-25)) and continued through at least September 2018 when over $40 million of NMI and FDII inventory was taken from Malca Amit and shipped to overseas Modi-Controlled Entities (*id.* at ¶ 185).

In addition to the allegations referenced in connection with the Funnel Scheme, Gandhi's knowledge of and participation in the Exit Scheme are further demonstrated by the following allegations, among others:

6

- After the Debtors' bankruptcy filing, Gandhi caused NMI and FDII to ship substantially all of their more than $40 million inventory to Modi-Controlled Entities overseas. (*Id.* ¶ 161.)

- Gandhi met with Angelina Ypma when she visited New York in 2018 and granted her permission to remove NMI inventory from storage at Malca Amit. (*Id.* ¶ 182.)

- Gandhi communicated with Nirav Modi in the weeks following exposure of the Bank Scheme by forwarding emails to Gandhi's own personal email address, which Nirav Modi was apparently using to communicate at that time. (*Id.* ¶ 144.)

- The Debtors' bankruptcy schedules and statements of financial affairs, which Gandhi signed under penalty of perjury, failed to disclose millions of dollars in transfers by FDI to Shadow Entities which Gandhi personally directed or otherwise participated in, nor did Gandhi disclose the more than $11.2 million loan owed by NMI to Jaffe. (*Id.* ¶¶ 156-60.)

- When interviewed by the Examiner, Gandhi lied about his knowledge of the Shadow Entities' connection to Nirav Modi, his knowledge of the loose diamond transactions with Shadow Entities, and whether he ever used his personal email address for Firestar business. (*Id.* ¶¶ 168-70.)

- Modi treated Gandhi in some respects as a personal accountant. For instance, on February 28, 2017, Modi directed Gandhi to prepare "all financial related parts" of Modi's personal application to live in the River House in New York City, a process which included gathering information concerning Modi's wife, Ami Modi. Gandhi also maintained spreadsheets tracking Modi's personal net worth from at least 2011 through 2017. (*Id.* ¶ 194)

- On April 23, 2018, Ajay Gandhi emailed the personal email address of Altamash Ansari, a back office employee of FIPL in India, "Please email what is open AR & AP of non-affiliated AR & AP and their ledger since 2011?" Ansari replied, "I have attached herewith AR-AP of Overseas Non-Affiliates along with Ledger from start (separate tabs for specific parties)." The attachment to the email was an Excel spreadsheet entitled "Overseas Non-Affiliate AR-AP as of 04.22.2018." It contained tabs summarizing the open accounts receivable and accounts payable between Jaffe and Empire, Vista, Eternal, Tri Color, and Universal as of April 22, 2018. It also contained separate tabs reflecting ledgers of purchase and sale transactions between Jaffe and Empire, Vista, Eternal, and Tri Color, respectively. (*Id.* ¶ 79.)

- In March 2017, Gandhi emailed Modi that HSBC requested more information on the ownership structure of CPRE "going up thru the ladder

to FILP, India[,]" including the "Source of Wealth" of "Purvi Modi[.]"
Gandhi relayed that he "avoided giving these [sic] information and told
them that we may do restructuring of Central Park and may change
ownership etc." but that the "only way, we can avoid is only if we pay-off
the $ 3 m mortgage in next few months." Modi responded, "There will be
a change in ownership in May end so better to explain that." (*Id* ¶ 117.)

## APPLICABLE STANDARDS

### I.     Rule 12(b)(6) Standard.

The Court must deny a motion to dismiss where the complaint contains "enough facts to

state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Id.* For a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), the Court must

similarly "accept[] all allegations in the complaint as true, and draw[] all reasonable inferences in

plaintiffs' favor." *Rothstein v. UBS AG*, 708 F.3d 82, 90 (2d Cir. 2013). "Detailed factual allegations"

are not required, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555), and

factual disputes are not resolved on a motion to dismiss. *Fin. Guar. Ins. Co. v. Putnam Advisory Co.,

LLC*, 783 F.3d 395, 405 (2d Cir. 2015).

### II.    Rule 9(b) Standard.

Rule 9(b) requires plaintiffs averring fraud to "state with particularity the circumstances

constituting fraud[.]" Fed. R. Civ. P. 9(b). "Although Rule 9(b) contains a heightened particularity

standard, it also relaxes the standard for pleading fraudulent intent: 'Malice, intent, knowledge,

and other conditions of a person's mind may be alleged generally.'" *Anhui Green Lighting Co., Ltd.

v. Green Logic LED Electrical Supply, Inc.*, 2019 WL 6498094, at *4 (S.D.N.Y. Dec. 3, 2019). A

complaint alleges facts sufficient to give rise to a strong inference of fraudulent intent by either

(a) alleging facts showing that the defendant had both motive and opportunity to commit fraud,

or (b) alleging facts which constitute strong circumstantial evidence of conscious misbehavior or recklessness. *Securities Investor Protection Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293, 310 (Bankr. S.D.N.Y. 1999) (citing *Acito v. IMCERA Grp, Inc.*, 47 F.3d 47, 52 (2d Cir. 1995)).

Rule 9(b) "does not require factual pleadings that demonstrate the <u>probability</u> of wrongdoing . . . At the pleading stage, the alleged fraud need only be <u>plausible</u> based on the complaint, it need not be more likely than other possibilities." *In re Welspun Litig.*, 2019 WL 2174089, at *15 (S.D.N.Y. May 20, 2019) (citing *Lorely Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 170 (2d Cir. 2015)) (emphasis in original).

## ARGUMENT

### I.    The Trustee Has Standing to Bring the State Law Claims.

The Trustee has standing to bring each of the state law claims asserted in the Amended Complaint. Gandhi argues the Amended Complaint does not allege a particularized injury to the Debtors sufficient to create standing because the "majority of the Trustee's claims emanate from the purported Bank Fraud, which is namely an alleged fraud as to PNB, and the resulting injury to that bank." (MTD at 6.) But that is not what the Trustee alleges.

The Trustee narrowly tailored his Amended Complaint to assert only claims premised on injuries sustained by the Debtors. For example, the Trustee alleged that Gandhi's breaches of his fiduciary duties injured the Debtors by:

- depleting the Debtors' assets through numerous Actual Fraudulent Transfers;

- delaying the Trustee's appointment and impairing the Trustee's ability to recover on account of claims against the U.S. Affiliates and others;

- causing the Debtors' estates to incur substantial administrative expenses related to the investigation of information Gandhi failed to disclose and actively endeavored to conceal, destroy, or otherwise render unavailable for use in connection with these chapter 11 cases; and

- increasing creditors' claims against the estate and causing the collapse and resulting loss of value of the Debtors and their businesses.

(*See* FAC ¶¶ 210, 230, 283, 303.)[2] Each of the first three injuries constitutes a direct and particularized injury to the Debtors themselves, not to PNB or any other creditor. Indeed, the Actual Fraudulent Transfers and payment of unnecessary administrative expenses depleted the Debtors' assets, not those of PNB or any other specific creditor. Similarly, Gandhi's looting of the U.S. Affiliates in the months before and after the Petition Date, and his perjury which secured additional time for such looting to occur, destroyed the value of the Debtors' claims against the U.S. Affiliates (i.e. the $11,216,467 and $2,329,930 loan receivables held by Jaffe and FDI, respectively, against NMI, as well as millions of dollars in actual fraudulent transfer claims against NMI and FDII), none of which belonged to PNB or any other specific creditor. Only the fourth injury is in any way derivative of injuries sustained by creditors. But, even then, no one creditor could assert a claim for the "collapse and resulting loss of value of the Debtors' businesses" caused by the increase in creditor claims at large. *See St. Paul Fire and Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 701 (2d Cir. 1989) ("If a claim is a general one, with no particularized injury arising from it, and if that claim could be brought by any creditor of the debtor, the trustee is the proper person to assert the claim[.]").

The cases cited by Gandhi do not undermine the Trustee's standing; just the opposite, they confirm it. For example, in *McHale v. CitiBank, N.A. (In re 1031 Tax Group, LLC)*, 420 B.R. 178 (Bankr. S.D.N.Y. 2009), the debtors' director allegedly misappropriated customer property held by the debtors in a custodial capacity. *Id.* at 194. The court held the trustee lacked standing to

---

[2] Similarly, the Trustee alleges that Gandhi's corporate waste injured the debtors "by losing the millions of dollars expended for the personal benefit of Modi and his family, and in transactions with Shadow Entities that served no legitimate or corporate purpose." For standing purposes, this is analogous to the fraudulent depletion of assets alleged in the breach of fiduciary duty count.

recover damages for injuries sustained by the customers whose property was misappropriated. *Id.* But here, as discussed above, the depleted assets belonged to the Debtors, not PNB or any other creditor, so only the Debtors suffered direct injury from their depletion. Indeed, Judge Glenn recognized this distinction in *1031 Tax Group* in holding that, "[d]espite the [t]rustee's lack of constitutional standing for injuries particular to exchange participants of the 1031 [d]ebtors, the [t]rustee has Article III standing for damages suffered **by the [d]ebtors** as a result of Citibank's alleged aiding and abetting of Okun's breach of fiduciary duty." 420 B.R. at 195-96 (emphasis added); *accord American Tissue, Inc. v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 351 F.Supp.2d 79, 90 (S.D.N.Y. 2004).

Similarly, in *Hirsch v. Arthur Anderson & Co.*, 72 F.3d 1085 (2d Cir. 1995), the trustee sought to recover from the debtors' accountants and law firms for injuries caused by the distribution of misleading private placement memoranda to investors. *Id.* at 1094. The court held that the "claims predicated upon the distribution of misleading PPMs to investors . . . are the property of those investors, and may be asserted only by them[.]" *Id.* Here, none of the injuries alleged by the Trustee are analogous to the distribution of misleading PPMs in *Hirsch*.[3]

In sum, since the Trustee "is not seeking recovery on behalf of an individual or even a class of creditors" but instead "seeks recovery for the bankruptcy corporation itself[,]" Gandhi's "argument that the Trustee lacks standing [should be] rejected." *See In re Scott Acquisition Corp.*, 344 B.R. 283, 291 (Bankr. D. Del. 2006).

---

[3] *Hirsch* also involved professional malpractice claims, which the court held were barred by the *Wagoner* rule. But the *Wagoner* rule is inapplicable here because Gandhi is an insider of the Debtors. *See, e.g., In re TS Employment, Inc.*, 603 B.R. 700, 703 (Bankr. S.D.N.Y. 2019) (collecting cases for the proposition that "*Wagoner* does not apply to the actions of fiduciaries who are insiders in the sense that they either are on the board or in management, or in some other way control the corporation.").

## II.    The Amended Complaint States a Valid Claim for Breach of Fiduciary Duty.

### A.    The Breach of Fiduciary Duty Claim is Not Time Barred.

Gandhi argues the Trustee's breach of fiduciary duty claim is time barred because "it is dominated by allegations that pre-date March 27, 2016 (three years from the filing of the original complaint)." (MTD at 8.) This argument fails for multiple reasons. First, even if Gandhi's calculation of the limitations period were correct, Gandhi ignores numerous allegations against him after March 2016 that are sufficient by themselves to support the Trustee's breach of fiduciary duty claim.

For example, the Amended Complaint alleges that, in 2018 alone, Gandhi: (i) orchestrated Actual Fraudulent Transfers of the Debtors' assets to Modi-Controlled Entities in the weeks leading up to the Debtors' bankruptcy filing (*id.* ¶¶ 176); (ii) caused NMI and FDII to ship substantially all of their more than $40 million in inventory to Modi-Controlled inventory overseas rather than using that inventory to repay the Debtors (*id.* ¶¶ 161, 177-87); (iii) signed the Debtors' bankruptcy schedules under penalty of perjury without disclosing the $11.2 million loan owed by NMI to Jaffe (FAC ¶¶ 159-60); (iv) signed the Debtors' statements of financial affairs under penalty of perjury without disclosing millions of dollars in transfers from the Debtors to Shadow Entities during the applicable periods (*id.* ¶¶ 157-58); (v); met with Angelina Ypma and granted her permission to remove NMI inventory from storage at Malca Amit in May 2018 after he had supposedly resigned from NMI (*id.* ¶ 182); (vi) lied to the Examiner about his knowledge of the Shadow Entities and his use of personal email (*id.* ¶ 168-70); and (vii) remained in contact with Nirav Modi after exposure of the Bank Scheme and allowed Modi to use Gandhi's personal email account (*id.* ¶ 144). For the reasons discussed below, these allegations are sufficient by themselves to state a claim.

Even so, the Trustee's claims premised on earlier conduct remain actionable as well. Indeed, "[w]here an action is brought by a trustee or liquidator on behalf of a corporation that has been looted by persons who completely dominated and controlled it, the statute of limitations is tolled as against the control persons until the appointment of the independent trustee or liquidator." *Banco de Desarrollo Agropecuario, S.A. v. Gibbs*, 709 F.Supp. 1302, 1310 (S.D.N.Y. 1989) (citing *Armstrong v. McAlpin*, 699 F.2d 79, 87 (2d Cir. 1983)); *ITT, An International Investment Trust v. Cornfeld*, 619 F.2d 909, 929-30 (2d Cir. 1980); *Michelson v. Penney*, 135 F.2d 409, 415-16 (2d Cir. 1943)); *see also FDIC v. Pellatreau & Pellatreau*, 965 F.Supp. 381, 388 (E.D.N.Y. 1997) (finding allegations of domination and control sufficient to equitably estop defendant from raising a statute of limitations defense).

The Amended Complaint alleges Gandhi's and his co-Defendants' domination and control over the Debtors in great detail. (*See, e.g.,* FAC ¶¶ 61-91.) As such, the statutes of limitations for the Trustee's common law claims against Gandhi and his co-Defendants was tolled until the Trustee's appointment in June 2018. Since the original complaint was filed in March 2019, less than a year later, the Trustee's claims are not time barred under either the three-year or six-year (in the case of fraud) limitations periods for breach of fiduciary duty.

Moreover, even if the statutes of limitations were not tolled under nonbankruptcy principles, Gandhi's calculation of March 27, 2016 as the cut-off date would still be incorrect. Gandhi ignores section 108(a) of the Bankruptcy Code, which allows the Trustee an additional two years to bring any claim that was timely as of the petition date. *See* 11 U.S.C. § 108(a). Thus, the Trustee has until February 26, 2020 to bring any claim that accrued on or after February 26,

2015 (to the extent the limitations period is three years) or February 26, 2012 (to the extent the limitations period is six years.[4]

### B. The Amended Complaint States a Claim for Breach of Fiduciary Duty Against Gandhi.

The Amended Complaint properly states a claim for Gandhi's breaches of his duty of loyalty and duty of care. "The duty of loyalty requires an officer or director to (1) avoid fiduciary conflicts of interest and (2) act in good faith for the corporation's best interest." *In re MF Global Holdings Ltd.*, 507 B.R. 808, 811 (S.D.N.Y. 2014) (citing *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362 (Del. 2006)); *accord In re Tribune Co. Fraudulent Conveyance Litig.*, 2019 WL 294807, at *11 (S.D.N.Y. Jan. 23, 2019) ("The duty of loyalty requires a corporate director to act in the best interest of the corporation and to remain free of conflicts when making corporate business decisions.").

"A failure to act in good faith may be demonstrated 'where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation, where the fiduciary acts with the intent to violate applicable positive law, or where the fiduciary intentionally fails to act in the face of a known duty to act." *John Swann Holdings Corp. v. Simmons*, 62 F.Supp.3d 304, 310 (S.D.N.Y. 2014) (quoting *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 67 (Del. 2006)). "Most basically, the duty of loyalty proscribes a fiduciary from any means of misappropriation of assets entrusted to his management and supervision." *Id.* (citing *U.S.W., Inc. v. Time Warner, Inc.*, 1996 WL 307445, at *21 (Del. Ch. June 6, 1996)). "Other instances of . . .

---

[4] Moreover, "[w]hile a statute of limitations defense may be raised in a motion to dismiss[,] such a motion should not be granted unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Banco de Desarrollo Agropecuario, S.A. v. Gibbs*, 709 F.Supp. 1302, 1309-10 (S.D.N.Y. 1989) (citing *Ortiz v. Cornetta*, 867 F.2d 146 (2d Cir. 1989)) (internal quotations omitted). If the plaintiff alleges facts sufficient to trigger tolling of the limitations period, for example, dismissal is not appropriate. *See, e.g., FDIC v. Pellatreau & Pellatreau*, 965 F.Supp. 381, 388-89 (E.D.N.Y. 1997) ("[Given] the possibility that certain tolling doctrines may be applicable, the Court declines at this time to dismiss the FDIC's causes of action relating to ventures entered into prior to August, 1986.").

disloyalty include but are certainly not limited to the motives of entrenchment, fraud upon the corporation or the board, abdication of . . . duty, or the sale of one's vote." *Id.* (citing *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993)).

"[T]he fiduciary duty of loyalty is not limited to cases involving a financial or other cognizable fiduciary conflict of interest. It also encompasses cases where the fiduciary fails to act in good faith." *Stone*, 911 A.2d at 370; *see also Benedict v. Amaducci*, 1993 WL 87937, at *5 (S.D.N.Y. March 22, 1993) ("Self-dealing in its classic sense is not the only form of conflict of interest that amounts to a breach of the duty of loyalty.") (applying New York law).

Moreover, in addition to fiduciary duties under state law, the filing of a bankruptcy case independently imposes upon directors and officers of a debtor-in-possession "an obligation to refrain from self-dealing, to avoid conflicts of interests and the appearance of impropriety, to treat all parties to the case fairly, and to maximize the value of the estate." *In re Adelphia Communications Corp.*, 336 B.R. 610, 669-70 (Bankr. S.D.N.Y. 2006).

Finally, "[t]he fiduciary duty of care requires that directors of a Delaware corporation use that amount of care which ordinarily careful and prudent men would use in similar circumstances, and consider all material information reasonably available in making business decisions." *In re Trinsum Group, Inc.*, 466 B.R. 596, 606 (Bankr. S.D.N.Y. 2012) (internal quotations omitted). Breaches of the duty of care are actionable where the defendant's conduct constitutes "reckless indifference to or a deliberate disregard of stockholders" or "actions which are without the bounds of reason." *Id.*

The Trustee alleges Gandhi breached his fiduciary duties to the Debtors in numerous ways both before and after their bankruptcy filings. For example, he alleges Gandhi orchestrated numerous Actual Fraudulent Transfers, both as part of the day-to-day operation of the Funnel Scheme and also to permanently shield assets from creditors as part of the Exit Scheme, during

the eight years preceding the Debtors' bankruptcy filing (FAC ¶¶ 175, 206). He further alleges that, after the Debtors' bankruptcy filing (when Gandhi unquestionably owed fiduciary duties to the Debtors' estates), Gandhi failed to call due the $11.2 million loan balance owed by NMI to Jaffe (which Gandhi failed to disclose in Jaffe's bankruptcy schedules) and have NMI repay Jaffe using the more than $40 million in inventory NMI held as of the Petition Date. (*Id.* ¶ 161). The Trustee alleges Gandhi instead caused NMI and FDII (against which the Debtors had substantial avoidance claims) to ship substantially all of their inventory to Modi-Controlled Entities overseas. (*Id.*) The Trustee further alleges that "although these shipments were disguised as sales, the parties never intended for the overseas entities to pay for the goods." (*Id.*) These allegations plausibly describe Gandhi's divided loyalties, bad faith, and reckless disregard for the interests of the Debtors' estates.

Gandhi disputes the Trustee's breach of fiduciary duty allegations on two grounds.[5] First, Gandhi argues "the Trustee is essentially advancing a fraud claim repackaged as a breach of fiduciary duty." (MTD at 11.) He then claims the Trustee failed to allege that Gandhi "knew the alleged circular transactions were fraudulent," that he "benefitted or even stood to benefit from the alleged fraud," or that he (iii) made misrepresentations during the Debtors' bankruptcy cases "intentional[ly]" or "with fraudulent intent." (MTD at 12.)

But the Trustee alleges numerous facts showing Gandhi's knowledge of the fraudulent schemes and constituting "strong circumstantial evidence of conscious misbehavior or recklessness" sufficient to support Gandhi's fraudulent intent. *See Stratton Oakmont*, 234 B.R. at 310. For example, the Trustee alleges Gandhi: (i) personally designed numerous circular transactions with Shadow Entities (*see, e.g.*, FAC ¶ 81(ii) ("Niravbhai, please see attached payment

---

[5] Gandhi does not distinguish between allegations concerning breach of duty of care and the breach of duty of loyalty. (MTD at 10-13.)

plan in 5 parts to clean up AR and AP of [FDII] for HK, Dubai, Belgium and NY")); (ii) regularly advised Nirav Modi, Manish Bosamiya, and Miten Pandya (who were directly involved in soliciting fraudulent LOUs) of how much money he would be able to send to facilitate repayment of LOUs (*id.* ¶¶ 81(xi), 82-83); (iii) maintained two sets of books and records for Jaffe, one which included Shadow Entity transactions and one that did not (*id.* ¶¶ 85); (iv) oversaw and directed the use of different sales and inventory practices for Debtors' transactions with Shadow Entities as compared to those used with retailer customers (*id.* ¶ 89); (v) often forwarded auditors' requests for confirmations from Shadow Entities to Operation 1 to ask that Operation 1 cause the Shadow Entity to provide confirmation to the auditors (*id.* ¶ 196); (vi) repeatedly deceived auditors inquiring about Shadow Entity transactions (and consulted with Bhansali and Modi on how to do so) (*id.* ¶¶ 92-102); (vii) was instructed by Nirav Modi's personal assistant not to discuss Shadow Entities over the Firestar Entities' regular email system (*id.* ¶¶ 143); and (viii) made demonstrably false statements to the Examiner (FAC ¶ 168-70).

These allegations plausibly support an inference that Gandhi knew of the fraudulent schemes and constitute "strong circumstantial evidence of conscious misbehavior or recklessness." *See Stratton Oakmont*, 234 B.R. at 310. Thus, to the extent Rule 9(b)'s heightened pleading requirements are applicable, they are satisfied by the Amended Complaint.

Moreover, "[w]here facts are peculiarly within the opposing party's knowledge, as might be the case where private, financial transfers are involved, a complaint may base allegations on information and belief, provided that it 'adduce specific facts supporting a strong inference of fraud[.]'" *Sullivan v. Kodsi*, 373 F.Supp.2d 302, 306 (S.D.N.Y. 2005) (quoting *Wexner v. First Manhattan Co.*, 209 F.2d 169, 172 (2d Cir. 1990)); *accord Berk v. Tradewell, Inc.*, 2003 WL 21664679, at *13 (S.D.N.Y. July 16, 2003)). Indeed "[g]reater liberality in the pleading of fraud is particularly appropriate in bankruptcy cases because it is often the trustee, a third party to the fraudulent

transaction, that must plead the fraud on secondhand knowledge for the benefit of the estate and all of its creditors." *In re Bennett Funding Group, Inc.*, 367 B.R. 269, 297 (Bankr. N.D.N.Y. 2007) (quoting *Stratton Oakmont*, 234 B.R. at 310) (alterations and quotations marks omitted). This is particularly true "when the trustee's lack of personal knowledge is compounded with complicated issues and transactions which extend over lengthy periods of time." *Id.* In that circumstance, "the trustee's handicap increases, and courts, therefore, should afford him or her even greater latitude." *Id.* Moreover, "Rule 9(b) is applied more leniently to complaints against corporate insiders." *Berk*, 2003 WL 2003 WL 21664679 at *13 (citing *Allen v. New World Coffee, Inc.*, 2001 WL 293683, at *4 (S.D.N.Y. March 27, 2001)); *accord Limas LS PLC v. PHL Variable Insurance Co.*, 2013 WL 12286066, at *5 (D. Conn. Dec. 17, 2013); *Sunrise Indus. Joint Venture v. Ditric Optics, Inc.*, 873 F.Supp. 765, 772 (E.D.N.Y. 1995). Under these standards, the Trustee's allegations are sufficient.

Gandhi also argues that he "can only be liable for breach of fiduciary duty where he had 'discretionary authority in the relevant functional area and the ability to cause or prevent the complained-of action'" and that "following a direction from his boss" cannot be a basis for breach of fiduciary duty. (MTD at 13.) But the Trustee alleges Gandhi maintained the Debtors' books and records (FAC ¶ 85), "controlled the finances of the Debtors [and] had authority to approve loose diamond transactions among the U.S. Entities and Shadow Entities," "was a signatory on each of the U.S. Entities' bank accounts" and one of "the only persons authorized to effectuate transfers from their accounts" (FAC ¶ 65), and managed external audits of the Debtors (FAC ¶¶ 92-102, 195-96). Gandhi's discretionary authority and responsibilities were consistent with his title as CFO—"the senior member of management charged with the overall responsibility for the accounting systems, including the accuracy of the books and records of the corporation, as well as its accounting and fiscal decisions." *In re Felt Mfg.*, 371 B.R. 589, 612 (Bankr. D.N.H. 2007).

Modi's position and authority did not relieve Gandhi of his duties as CFO or his fiduciary duties

as an officer of the Debtors, nor do they preclude a finding that Gandhi breached those duties.

Nor did Modi's control "mean that other individuals or entities did not also control key aspects

of the business." *In re TS Employment, Inc.*, 603 B.R. 700, 711 (Bankr. S.D.N.Y. 2019); *see also In re*

*PHS Group Inc.*, 581 B.R. 16, 34 (Bankr. E.D.N.Y. 2018) (rejecting argument that defendant could

not be insider because of CEO's control of the debtor); *accord In re Bernard L. Madoff Inv. Securities*

*LLC*, 458 B.R. 87, 124 (Bankr. S.D.N.Y. 2011).

**III.    The Amended Complaint States a Valid Claim for Corporate Waste.**

The Amended Complaint states a valid claim for corporate waste. "[T]he essence of waste

is the diversion of corporate assets for improper or unnecessary purposes." *Patrick v. Allen*, 355 F.

Supp. 2d 704, 714 (S.D.N.Y. 2005). "To survive a motion to dismiss on a corporate waste claim,

Delaware law requires 'pleading of facts that show that the economics of the transaction were so

flawed that no disinterested person of right mind and ordinary business judgment could think

the transaction beneficial to the corporation.'" *In re W.J. Bradley Mortgage Capital, LLC*, 598 B.R.

150, 175 (Bankr. D. Del. 2019). Similarly, "[u]nder New York law, corporate waste occurs when

assets are used in a manner so far opposed to the true interests of the corporation so at to lead to

the clear inference that no one thus acting could have been influenced by any honest desire to

secure such interests." *U.S. Small Business Admin. v. Feinsod*, 347 F.Supp.3d 147, 160 (E.D.N.Y.

2018). A plaintiff states a claim for waste when he can show that the use of corporate property is

inconsistent with the corporate purpose. *Patrick*, 355 F. Supp. 2d at 715.

The Trustee alleges Gandhi committed corporate waste by (i) "directing the Debtors and

their officers to use corporate assets to acquire properties for the personal benefit of Modi and his

family or by facilitating or permitting such use[;]" and (ii) "engag[ing] in transactions with

19

Shadow Entities and other Modi-Controlled Entities that served no legitimate corporate or economic purpose." (FAC ¶ 230.)

Gandhi argues that the Trustee has failed to state a claim for waste with respect to the purchase of the Essex House apartment because the transaction provided a home for Mr. Modi, Firestar's owner, and providing a personal benefit to Modi and his family was not necessarily an "improper or unnecessary purpose." (MTD at 14.) But at the motion to dismiss stage, a claim for waste is stated where no corporate purpose is reflected in the complaint. *See Patrick*, 355 F. Supp. 2d at 715. Moreover, Gandhi fails to address the allegations concerning Actual Fraudulent Transfers to Shadow Entities and other Modi-Controlled Entities at all. (MTD at 23-26.) Indeed, the Actual Fraudulent Transfers constituted transfers of the Debtors' assets outside of the ordinary course of their businesses—frequently to Shadow Entities and other Modi-Controlled Entities Gandhi knew to be fictitious—for inadequate or even no consideration while the Debtors were insolvent. (*See, e.g.*, FAC ¶ 174.) Based on these allegations, "no disinterested person of right mind and ordinary business judgment could think [the Actual Fraudulent Transfers] beneficial to the [Debtors]." *See W.J. Bradley*, 598 B.R. at 175. The Trustee's allegations are thus sufficient to state a claim for corporate waste.

## IV.    The Amended Complaint States Valid And Timely RICO Claims.

### A.    The Alleged Injuries Are Sufficiently Direct and Proximate.

Gandhi argues the Trustee lacks standing to bring the RICO claims asserted in the Amended Complaint because the alleged harm "is derivative and entirely contingent on the

alleged harm to non-debtor PNB." (MTD at 17.) Not true.[6] The Amended Complaint alleges Gandhi and his co-conspirators' RICO violations injured the Debtors in two principal ways, neither of which is derivative or contingent upon harm to PNB or any other third party.

*First*, Gandhi's RICO violations depleted the Debtors' tangible assets through myriad Actual Fraudulent Transfers of cash and inventory both before and after exposure of the Bank Fraud. (*See, e.g.*, FAC ¶¶ 81-82, 173-76.) Then, in the weeks leading up to and following the filing of these Chapter 11 Cases, Gandhi and his co-conspirators cemented this injury by: (a) diverting substantially all of the U.S. Affiliates' assets to Modi-Controlled Entities overseas, including assets received from the Debtors through Actual Fraudulent Transfers (FAC ¶¶ 177-87); (b) submitting false statements under penalty of perjury in these Chapter 11 Cases so as to preserve control of the Debtors and buy additional time for assets to be diverted overseas (FAC ¶¶ 152-60); and (c) concealing estate assets, including the $11,216,467 loan receivable owed by NMI to Jaffe (FAC ¶¶ 159-61).

*Second*, Gandhi's RICO violations caused the Debtors to spend millions of dollars in professional expenses related to the Trustee's and Examiner's investigation of information Gandhi lied about, concealed, or otherwise failed to disclose in connection with these chapter 11 cases. (*See, e.g.*, FAC ¶¶ 156-60, 168-70.) For the reasons set forth below, both of these injuries constitute a direct and proximate injury to the Debtors sufficient to support the Trustee's RICO claims.

---

[6] While Gandhi frames this as a standing issue, the Second Circuit recently explained that "[a]lthough the causation requirement has sometimes been described as necessary to support 'statutory standing,' we think it is better understood as an element essential to the viability of a plaintiff's claim." *D'Addario v. D'Addario*, 901 F.3d 80, 96 n.8 (2d Cir. 2018).

     i.     *The Debtors were Injured by the Depletion of Their Tangible Assets and the Impairment of Their Claims Against U.S. Affiliates.*

In evaluating RICO claims based on looting or fraudulent transfers, courts uniformly attribute the direct injury to the entity whose assets were transferred, and characterize the harm to creditors and other indirect stakeholders as merely derivative of that injury. *See, e.g., D'Addario v. D'Addario*, 901 F.3d 80, 96-97 (2d Cir. 2018) (finding injury suffered by beneficiary of looted probate estate unripe); *Manson v. Stacescu*, 11 F.3d 1127, 1130-31 (2d Cir. 1993) ("The alleged looting of the Company only harmed the [creditor plaintiffs] indirectly."); *Wooten v. Loshbough*, 951 F.2d 768, 771 (7th Cir. 1991) ("The first level of injury is to the corporation, and the creditor only suffers because he has a claim against it."); *accord Bivens Gardens Office Bldg., Inc. v. Barnett Banks of Florida, Inc.*, 140 F.3d 898, 908 (11th Cir. 1998); *Whalen v. Carter*, 954 F.2d 1087, 1092-93 (5th Cir. 1992); *St. Paul Fire and Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 702 (2d Cir. 1989); *Jackson Nat. Life. Ins. Co. v. Litigator*, 949 F.Supp. 200, 205 (S.D.N.Y. 1996); *In re Ahead by a Length, Inc.*, 100 B.R. 157, 172-73 (Bankr. S.D.N.Y. 1989); *Dana Molded Products, Inc. v. Brodner*, 58 B.R. 576, 580-81 (N.D. Ill. 1986); *Zimmerman v. Duggan*, 86 B.R. 47, 50 (E.D. Pa. 1988).

As each Actual Fraudulent Transfer depleted the Debtors' property (*see, e.g.,* FAC ¶ 173(i)), they directly injured the Debtors and only indirectly harmed PNB and other creditors. *See Manson*, 11 F.3d at 1130-31. Moreover, the loss of the Debtors' interest in such property was "reasonably foreseeable or anticipated as a natural consequence" of the Actual Fraudulent Transfers. *See GICC Capital Corp. v. Technology Finance Group, Inc.*, 30 F.3d 289, 293 (2d Cir. 1994).

The Debtors' injury from the Actual Fraudulent Transfers is thus sufficiently direct and proximate to support the Trustee's RICO claims.[7]

So too is the harm the looting of the U.S. Affiliates inflicted upon the Debtors. Notwithstanding the well-settled principle recognized in *Manson* that the looted entity suffers the initial injury, courts have found injuries sustained by creditors of the looted entity sufficiently direct and proximate to support a RICO claim despite the identical harm sustained by the looted entity. *See, e.g., GICC Capital Corp. v. Technology Finance Group, Inc.*, 30 F.3d 289, 293 (2d Cir. 1994); *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1101 (2d Cir. 1988); *Related Companies, L.P. v. Ruthling*, 2017 WL 6507759, at *16 (S.D.N.Y. 2017). The circumstances under which it is appropriate to apply *GICC* rather than *Manson* have been explained as follows:

> In *GICC*, the primary injured party was TFG, the debtor of the plaintiff, but there was no realistic possibility that TFG would bring suit "for the law's vindication." As the Court of Appeals noted, "TFG released the defendant from all claims that TFG might have had against the defendant. TFG's officers and directors resigned. TFG thus was cast adrift without recourse against" the defendant, its subsidiaries, or controlling persons. *GICC* thus represents the anomalous case where the primary injured party lacks the ability to sue. Suit by the derivatively injured party may be the only means to an equitable resolution in such a case; significantly, there exists no risk of double recovery.

*Jackson National Life Insurance Company v. Litigator*, 949 F.Supp. 200, 205 (S.D.N.Y. 1996) (internal quotations, citations, and alterations omitted); *accord Ruthling*, 2017 WL 6507759 at *16 (quoting *Jackson* in stating, "Though *GICC Capital* is an 'anomalous case where the primary injured party lacks the ability to sue,' . . . this is also such a case.")).

---

[7] While PNB and other victims of the fraudulent schemes might be able to bring their own RICO claims against Gandhi on the basis of the Actual Fraudulent Transfers or his other misconduct, *see e.g., Bankers Trust Co.*, 859 F.2d at 1102, that in no way undermines the validity of the Trustee's RICO claim. Moreover, it is not clear PNB could assert any RICO claim because its sole direct injury—its disbursement of fraudulent loans—occurred overseas, and RICO requires a domestic injury. *See Bascuñán v. Elsaca*, 927 F.3d 806, 819 (2d Cir. 2017) ("We ultimately conclude that an injury to tangible property is generally a domestic injury only if the property was physically located in the United States, and that a defendant's use of the U.S. financial system to conceal or effectuate his tort does not, on its own, turn an otherwise foreign injury into a domestic one.").

Such circumstances exist here. Much like the looted companies in *GICC* and *Ruthling*, the U.S. Affiliates remained subject to Modi's and his co-conspirators' control after being looted and have never brought claims against Gandhi, Bhansali, Modi, or any of their other insiders for the harm the insiders inflicted on them. As the U.S. Affiliates cannot be expected to assert claims against Gandhi, "there is no risk of duplicative recovery," and permitting the Trustee to bring RICO claims premised on the looting of the U.S. Affiliates is "the only means to an equitable resolution." *Ruthling*, 2017 WL 6507759 at 16; *Jackson*, 949 F. Supp. at 205. In addition, by causing assets to be moved overseas and actively working to frustrate the Examiner's and Trustee's investigations, the insiders, including Gandhi, sabotaged the Trustee's ability to recover the looted assets through avoidance or comparable remedies. *See, e.g., Scholastic Decisions, Inc. v. DiDomenico*, 995 F.2d 1158, 1165 (2d Cir. 1993) ("As *Bankers Trust* recognized, a debt is 'lost' and thereby becomes a basis for RICO trebling only if the debt (1) cannot be collected (2) 'by reason of' a RICO violation.").

ii.    *The Debtors were Injured by the Unnecessary Payment of Professional Fees.*

It is well-settled that payment of professional fees can constitute a valid RICO injury so long as they are a direct and proximate result of the defendant's RICO violation. *See D'Addario*, 901 F.3d at 96-97; *Bankers Trust Co.*, 859 F.2d at 1106; *287 Franklin Ave. v. Meisels*, 2015 WL 5457959, at *9 (E.D.N.Y. July 20, 2015); *First Capital Asset Management Inc. v. Brickellbush, Inc.*, 218 F.Supp.2d 369, 383 (S.D.N.Y. 2002). That standard is satisfied here. The Amended Complaint alleges that Gandhi's obstruction of justice (including perjury and impeding the Trustee and Examiner in the discharge of their duties) and bankruptcy fraud (including perjury, concealment of assets, and withholding recorded information) (*See, e.g.*, FAC ¶¶ 156-60, 168-70) caused the Debtors to pay substantial professional fees in connection with the Trustee's and Examiner's investigation of information Gandhi lied about, concealed, or otherwise failed to disclose in these proceedings.

But for Gandhi's violations of federal law, not only would the specific information Gandhi concealed have been readily available, a trustee would have been appointed immediately, which would have obviated the need for a separate examiner, and thus, the need to pay for two sets of professionals to conduct two separate investigations. As these professional expenses were "reasonably foreseeable or anticipated as a natural consequence" of Gandhi's obstruction of justice and bankruptcy fraud, their payment by the Debtors constitutes a sufficiently direct and proximate injury for the purposes of RICO. *See GICC Capital Corp. v. Technology Finance Group, Inc.*, 30 F.3d 289, 293 (2d Cir. 1994).

### B.     The Trustee's RICO Claims Are Not Time Barred.

Next, Gandhi argues that the Trustee's RICO claims are time barred because "the Debtors . . . necessarily discovered or should have discovered the alleged RICO injury no later than early 2011 when the purported scheme was implemented." (MTD at 19.) However, as discussed above, two of the principal injuries alleged by the Trustee—the impairment of claims against the U.S. Affiliates and the payment of otherwise unnecessary professional fees—resulted from acts taken within the months leading up to and following the Debtors' bankruptcy filing in February 2018. As the Trustee filed this lawsuit in March 2019, his RICO claims arising from those injuries are timely under RICO's four-year statute of limitations.

Moreover, the Trustee's RICO claims arising from all earlier misconduct, including the depletion of the Debtors' assets through Actual Fraudulent Transfers, are timely as well by operation of the adverse domination tolling doctrine. "Under the doctrine of adverse domination, the statute of limitations is tolled for as long as a corporate plaintiff is controlled by the alleged wrongdoers." *In re Adelphia Commc'ns Corp.*, 365 B.R. 24, 58-59 (Bankr. S.D.N.Y. 2007); *accord Armstrong v. McAlpin*, 699 F.2d 79, 87 (2d Cir. 1983); *Moviecolor Ltd. v. Eastman Kodak Co.*, 288 F.2d 80, 88 (2d Cir. 1961); *Barnet v. Drawbridge Special Opportunities Fund LP*, 2014 WL 3493320, at *13-

14 (S.D.N.Y. Sept. 5, 2014); *Capital Inv. Funding LLC v. Field*, 2014 WL 130468, at *8 (D.S.C. Jan. 14, 2014); *Warfield v. Carnie*, 2007 WL 1112591, at *16-17 (N.D. Tex. April 13, 2007); *Flood v. Makowski*, 2004 WL 1908221, at *6-7 (M.D. Pa. Aug. 23, 2004); *Shapo v. O'Shaughnessy*, 246 F. Supp.2d 935, 953 (N.D. Ill. 2002); *In re Everfresh Beverages, Inc.*, 238 B.R. 558, 577 (Bankr. S.D.N.Y. 1999); *Meridien Int'l Bank Ltd. v. Gov't of the Republic of Liberia*, 23 F. Supp. 2d 439, 447-48 (S.D.N.Y. 1998); *Rosner v. Peregrine Finance Ltd.*, 1998 WL 249197, at *8 (S.D.N.Y. May 18, 1998); *In re Ahead by a Length, Inc.*, 100 B.R. 157, 163 (Bankr. S.D.N.Y. 1989).

The Amended Complaint alleges Gandhi's and his co-Defendants' domination and control over the Debtors in great detail. (*See* FAC ¶¶ 61-91.) On the basis of these allegations, the statute of limitations was tolled until Gandhi and his co-Defendants relinquished control over the Debtors in May 2018. *See, e.g., Adelphia*, 365 B.R. at 58-59. Since all of the misconduct and injuries alleged in the Amended Complaint occurred while Gandhi and his co-Defendants controlled the Debtors, even injuries sustained in 2010 and 2011 remain actionable. And Gandhi again ignores section 108(a) of the Bankruptcy Code, by operation of which the Trustee has until February 28, 2020 to bring RICO claims that accrued since February 26, 2014 (i.e. four years prior to the petition date).

Finally, even to the extent any of the Trustee's allegations pre-date the applicable limitations period, such allegations remain relevant to show the Defendants' knowledge, intent, and pattern of racketeering activity. *See, e.g., U.S. Textiles, Inc. v. Anheuser-Busch Companies, Inc.*, 1988 WL 31479, at *2 (N.D. Ill. 1988) ("The acts occurring outside the limitations period still can be used to show fraud and a pattern of racketeering, but plaintiff can only recover for injuries caused by overt or wrongful acts committed within the limitations period and injury suffered within the limitations period.").

**C.    The Amended Complaint Properly Pleads Each Predicate Act.**

*iii.    The Amended Complaint Properly Pleads Mail and Wire Fraud.*

The Amended Complaint properly pleads mail and wire fraud. "Because the mail and wire fraud statutes use the same relevant language, [courts] analyze them the same way." *U.S. v. Binday*, 804 F.3d 558, 569 (2d Cir. 2015). "The essential elements of both offenses are (1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme." *Id.* (internal quotations omitted). Though not defined by the statutes, a "scheme to defraud" has been described as "a plan to deprive a person of something of value by trick, deceit, chicane or overreaching . . . and is characterized by a departure from community standards of fair play and candid dealings." *U.S. v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000) (internal quotations and citations omitted). "[I]t is not necessary for the defendant to participate personally in the wire transmission [or mailing], as long as it is reasonably foreseeable that the [alleged wire or mailing] would occur in the execution of the scheme." *U.S. v. Bahel*, 662 F.3d 610, 641-42 (2d Cir. 2011) (quoting *Schumuck v. United States*, 489 U.S. 705, 710-11 (1989)).

The Trustee properly alleges these elements. Again, the Amended Complaint extensively describes the mechanics of the fraudulent schemes, the role played by Gandhi in such schemes, the ways in which wires and mailings were used in furtherance of such schemes generally, and dozens of specific examples of such wires and mailings. These allegations are sufficient to establish claims for mail and wire fraud.

Gandhi's attacks on the mail and wire fraud allegations lack merit. First, he argues that, to adequately plead mail or wire fraud, the Trustee is required to allege specific instances of misrepresentation of material facts by each defendant and explain when and where the statements were made, who made them, and why they were false or misleading. (MTD at 20.) But it is well-settled that such specificity is only required where the plaintiff alleges the wires or

mailings themselves contained false or misleading information; by contrast, where facially innocent mails or wires were simply used in furtherance of a master plan to defraud, "a detailed description of the underlying scheme and the connection therewith of the mail and/or wire communications is sufficient to satisfy Rule 9(b)." *Jerome M. Sobel & Co. v. Fleck*, 2003 WL 22839799, at *5-6 (S.D.N.Y. Dec. 1, 2003) (quoting *In re Sumitomo Copper Litig.*, 995 F.Supp. 451, 456 (S.D.N.Y. 1998)); *accord Williams v. Affinion Group, LLC*, 889 F.3d 116, 125 (2d Cir. 2018); *Mohr-Lecara v. Oxford Health Ins., Inc.*, 2019 WL 1409479, at *10 (S.D.N.Y. March 28, 2019); *Stein v. New York Stair Cushion Co., Inc.*, 2006 WL 319300, at *5 (E.D.N.Y. 2006); *In re Gas Reclamation, Inc. Securities Litig.*, 659 F.Supp. 493, 513 (S.D.N.Y. 1987).

Next, Gandhi claims the Trustee "fails to allege with any specificity that Mr. Gandhi had the requisite fraudulent intent to defraud the Debtors." (MTD at 21.) Yet, "[w]hen the necessary result of the actor's scheme is to injure others, fraudulent intent may be inferred from the scheme itself." *U.S. v. D'Amato*, 39 F.3d 1249, 1257 (2d Cir. 1994). As the use of wires and mailings in connection with the schemes to deplete the Debtors' assets through Actual Fraudulent Transfers and to loot the U.S. Affiliates necessarily involved injuring the Debtors, Gandhi's intent to injure the Debtors can be inferred from the facts alleged. Moreover, "while the actual fraud alleged must be stated with particularity[,] the requisite intent of the alleged perpetrator need not be alleged with great specificity." *Wight v. BankAmerica Corp.*, 219 F.3d 79, 91 (2d Cir. 2000) (internal quotations and alterations omitted); *accord Mohr-Lecara*, 2019 WL 1409479 at 10. ("A civil RICO defendant's *mens rea* need not be alleged with great specificity.").

Gandhi attempts to minimize the alleged intent in certain communications. He characterizes an October 21, 2010 email conversation in which Gandhi asked Modi without prompting whether a 70-carat diamond should be shipped to a Shadow Entity, instead of the Firestar Entity Modi originally specified, as an innocent conversation with his boss (MTD at 21).

Similarly, Gandhi misconstrues a September 12, 2011 conversation about obscuring the nature of the Shadow Entity receivables in response to inquiries from Standard Chartered Bank as Modi telling <u>Bhansali</u> that "it might be a good idea that Ajay and you discuss all response" which, Gandhi says, "suggests nothing more than that the CFO in New York communicate with the CEO so that everyone is on the same page." (MTD at 22). But Modi's email was not to Bhansali – it was to V Srinivasn, the former deputy managing director of the corporate banking division of Axis Bank, which frequently served as an intermediary bank in connection with the LOU transactions underlying the Bank Scheme. (FAC ¶ 102.) The fact that Modi told Srinivasan and Gandhi to discuss how Gandhi should respond to another bank's inquiries into the Shadow Entity transactions is suspicious.

In any event, Gandhi makes virtually no effort to address Amended Complaint's extensive factual allegations concerning Gandhi's prolific role in the fraudulent schemes, his attempts to mislead auditors and lenders (FAC ¶¶ 92-101), and his misrepresentations in connection with the Chapter 11 Cases (*id.* ¶¶ 156-61, 168–70). Gandhi's whitewashing of cherry-picked communications does not negate his broader fraudulent intent—certainly not at the pleading stage. *See Bankers Tr. Co. v. Rhoades*, 859 F.2d 1096, 1107 (2d Cir. 1988). ("At this early stage and in the absence of any meaningful discovery, [the plaintiff] has been unable to ascertain fully the extent of the [defendant's] participation in and knowledge of the . . . frauds. Nevertheless, more than enough has been pled to raise an inference of [the defendant's] knowledge and participation."). Regardless, the law is clear that "even 'innocent' mailings or wire transfers may constitute predicate acts so long as they are part of the execution of the scheme." *Adelphia*, 2007 WL 2403553 at *13; *accord U.S. v. Reifler*, 446 F.3d 65, 96 (2d Cir. 2006); *Fleck*, 2003 WL 22839799 at *5; *Stein*, 2006 WL 319300 at *5.

Gandhi also argues that Amended Complaint fails to show Gandhi misrepresented any material fact. (MTD at 22.) As noted above, however, this is not required where facially innocent mails and wires were used in furtherance of a broader scheme to defraud. *See Jerome M. Sobel & Co.*, 2003 WL 22839799, at *5-6. Even so, the Trustee alleges Gandhi lied to the Examiner (FAC ¶¶ 168–70) and committed perjury when certifying the Debtors' schedules and statements of financial affairs (*id.* ¶¶ 156-61). Finally, Gandhi's argument that PNB was the intended victim of the acts underlying the Trustee's allegations of wire fraud and mail fraud (MTD at 22) fails for all of the reasons discussed in response to Gandhi's causation argument.

       iv.    *The Amended Complaint Properly Pleads Violations of the National Stolen Property Act.*

The Amended Complaint properly pleads violations of the National Stolen Property Act, 18 U.S.C. § 2314 ("**NSPA**"). A claim under the NSPA, requires: "first, that the defendant have transported 'goods, wares, [or] merchandise' in interstate or foreign commerce; second, that those goods have a value of '$5,000 or more'; and, third, that the defendant 'kno[w] the same to have been stolen, converted or taken by fraud.'" *Dowling v. United States*, 473 U.S. 207, 214 (1985) (quoting 18 U.S.C. § 2314); *accord United States v. Agrawal*, 726 F.3d 235, 251 (2d Cir. 2013).

Attacking the Trustee's allegations concerning Gandhi's knowledge of the fraudulent nature of the Actual Fraudulent Transfers, Gandhi accuses the Trustee of making "self-serving revisions" to his original complaint "with a few strokes of the keyboard, in a conclusory manner, [to allege] Gandhi has the requisite knowledge [without any] additional factual allegations to support this claim." (MTD at 23 n.14.) While Gandhi correctly notes that the Amended Complaint now alleges the Defendants' knowledge conjunctively, rather than disjunctively, he ignores the extensive new factual allegations justifying that revision. Indeed, for the reasons discussed above, the Trustee's allegations concerning Gandhi's knowledge of the fraudulent nature of the Actual

Fraudulent Transfers are not mere conclusions, but instead solid factual allegations that satisfy Rule 9(b) and for which all reasonable inferences must be drawn in the Trustee's favor.

> v.     *The Amended Complaint Properly Pleads Money Laundering.*

The Amended Complaint properly states claims for money laundering under 18 U.S.C. §§ 1956 and 1957. A claim under section 1956 requires that "(1) the individual conducted a financial transaction in interstate commerce, (2) with knowledge that the property involved in the transaction represented some form of unlawful activity, (3) with the transaction in fact involving the proceeds of specified unlawful activity, (4) with the purpose, in whole or in part, of concealing or disguising the nature, the location, the source, the ownership or the control of the illegally acquired proceeds." *Republic of Colombia v. Diageo N. Am. Inc.*, 531 F. Supp. 2d 365, 438 (E.D.N.Y. 2007); *accord United States v. Maher*, 108 F.3d 1513, 1527-28 (2d Cir. 1997). Section 1957 requires that the defendant "(1) knowingly engaged or attempted to engage in a monetary transaction involving criminally derived property, (2) with such property being valued at more than $10,000, and (3) with such money actually being derived from specified unlawful activity." *Republic of Colombia*, 531 F. Supp. 2d at 438–39.

The Trustee alleges that Gandhi knew the property involved in each Subsequent Transfer represented the proceeds of unlawful activity (e.g., the mail and wire fraud committed in connection with each applicable Actual Fraudulent Transfer). (FAC ¶¶ 173–76, 272.) Gandhi claims this is not enough, arguing that Amended Complaint fails to allege Gandhi knew about the Bank Fraud, knew that the property "represented 'some form of specific unlawful conduct,'" or had the requisite intent to conceal the origin of the funds. (MTD at 24 (quoting *United States v. Gotti*, 457 F. Supp. 2d 411, 422-23 (S.D.N.Y. 2006)).) However, the allegations supporting Gandhi's participation and involvement in the fraudulent schemes, as chronicled at length above, are

sufficient to establish Gandhi's knowledge that the Subsequent Transfers represented the proceeds of some form of unlawful activity and that Gandhi intended to conceal their origin.

> vi.     *The Amended Complaint Properly Pleads Obstruction of Justice.*

The Amended Complaint properly pleads obstruction of justice. 18 U.S.C. § 1503(a) criminalizes, among other things, "corruptly . . . endeavor[ing] to influence, obstruct, or impede" (1) any officer in or of any court of the United States in the discharge of his duty; or (2) the due administration of justice. *See* 18 U.S.C. § 1503(a). A bankruptcy trustee constitutes an officer of the court for the purposes of section 1503(a), *see U.S. v. Crisp*, 306 F.3d 71, 82 (2d Cir. 2002), and so too should a bankruptcy examiner. *See* 11 U.S.C. § 1104(c) (providing for court-appointed examiners in cases involving, *inter alia*, fraud or misconduct).  To establish a violation of section 1503(a), the plaintiff must establish that:

> (1)  there is a pending judicial or grand jury proceeding constituting the administration of justice;
>
> (2)  the defendant knew or had notice of the proceeding; and
>
> (3)  the defendant acted with the wrongful intent or improper purpose to influence the judicial or grand jury proceeding, whether or not the defendant is successful in doing so.

*U.S. v. Sampson*, 898 F.3d 287, 299 (2d Cir. 2018). A plaintiff can prove the requisite intent by showing that the defendant's conduct "had the natural and probable effect of interfering with a judicial or grand jury proceeding." *Id.*

Separately, section 1512(c) criminalizes "corruptly (1) altering, destroying, mutilating, or concealing a record, document, or other object, or attempting to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or (2) otherwise obstructing, influencing, or impeding any official proceeding, or attempting to do so." 18 U.S.C. § 1512(c).

32

In the context of section 1512, the term "official proceeding" includes any proceeding before a bankruptcy judge. *See* 18 U.S.C. § 1515(a)(1). The official proceeding "need not be pending or about to be instituted at the time of the offense[,]" but must be "reasonably foreseeable to the defendant." *See U.S. v. Pugh*, 937 F.3d 108, 120 (2d Cir. 2019); 18 U.S.C. § 1512(f)(1). While the plaintiff must show a "nexus" between the defendant's conduct and the pending or foreseeable official proceeding, such nexus "does not depend on the defendant's knowledge" but instead whether the defendant's acts have "a relationship in time, causation, or logic with the judicial proceedings." *Id.* "In other words, the endeavor must have the natural and probable effect of interfering with the due administration of justice." *Id.* Finally, section 1512 applies to conduct that occurs outside of the United States and also criminalizes conspiring to commit any offense under section 1512. *See* 18 U.S.C. §§ 1512(j)-(k).

The Amended Complaint properly pleads violations of these provisions. It alleges that Gandhi and his co-conspirators: (a) made false and misleading statements under penalty of perjury in the Debtors' bankruptcy cases (*id.* at ¶¶ 152, 156-61); (b) concealed assets in the Debtors' bankruptcy cases, including the $11.2 million loan owed by NMI to Jaffe (*id.*); (c) researched and implemented means of permanently deleting or encrypting electronic data (*id.* at ¶¶ 142-45, 283); and (d) lied to the Examiner (*id.* at ¶¶ 168-70).

Substantially all of the alleged misconduct occurred either after the Debtors' bankruptcy filing or just before. Gandhi and his co-conspirators were therefore aware of or at least could have foreseen these Chapter 11 Cases at the time they engaged in the conduct alleged. *See Pugh*, 937 F.3d at 120. Moreover, the natural and foreseeable consequence of the alleged misconduct was to impede and obstruct the administration of the Debtors' bankruptcy proceedings and the Trustee and Examiner's discharge of their duties. *See U.S. v. Sampson*, 898 F.3d at 299. Thus, the Trustee properly pleaded obstruction of justice.

33

Gandhi's arguments here are unavailing. First, because section 1512 "covers witness tampering and requires knowing use of intimidation, threats, or corrupt persuasion," Gandhi argues the Amended Complaint fails because it did not allege "Mr. Gandhi tampered or attempted to tamper with any witnesses." (MTD at 24.) Although section 1512(b) prohibits witness intimidation, Gandhi's argument ignores the plain statutory text of section 1512(c), which prohibits "otherwise obstructing, influencing, or impeding any official proceeding, or attempting to do so." *See* 18 U.S.C. § 1512(c)(2). Gandhi does not address the substance of these allegations.

Next, Gandhi contends that his actions may have been the result of "a mistake or otherwise not intentional." (MTD at 25.) Given the extensive, detailed allegations regarding Gandhi's prominent role in designing and executing the fraudulent schemes, the Trustee plausibly alleges that Gandhi's failure to disclose the $11.2 million loan owed by NMI to Jaffe in Jaffe's bankruptcy schedules, as well as the substantial pre-petition Shadow Entity transactions in the Debtors' statements of financial affairs, under penalty of perjury was not accidental. Nor is it clear how Gandhi could have mistakenly committed or conspired to commit the myriad other acts alleged by the Trustee.

Next, Gandhi challenges the continuity of the Trustee's obstruction of justice allegations, which he incorrectly claims "occurred well after the alleged racketeering activity had ended[.]" (MTD at 25.) But, as discussed above, the Exit Scheme, in connection with which Gandhi and his co-conspirators diverted assets of the Debtors and U.S. Affiliates to overseas Modi-Controlled Entities after the Bank Scheme's exposure, was still very much in operation during the first half of 2018 when the alleged obstruction of justice occurred. (*See* FAC ¶¶ 173-187.) Indeed, approximately $45 million in NMI and FDII inventory remained in the custody of Malca Amit in New York until September 2018, when it was released to the U.S. Affiliates' director, Rochelle Miller, and subsequently shipped to overseas Modi-Controlled Entities. (*Id.* ¶¶ 178-85.)

As such, this case is distinguishable from the cases cited by Gandhi. In *World Wrestling Entertainment, Inc. v. Jakks Pacific, Inc.*, 530 F.Supp.2d 486 (S.D.N.Y. 2007), "[t]he alleged coverup . . . d[id] not qualify because it post-date[d] — *by a couple of years* — the underlying and completed bribery scheme." *Id.* at 512 (emphasis added). Even so, *World Wrestling* recognized that obstruction of justice can serve as a predicate act where it "furthers the main criminal objectives" of a conspiracy by "lengthening its life" – "such as when conspirators in a kidnaping conspiracy hide while waiting for the delivery of ransom." *Id.* Just as hiding lengthens the life of a kidnaping conspiracy, the alleged obstruction of justice here allowed additional time for the looting of the Debtor and U.S. Affiliates to occur. *See id.*

The other case Gandhi cites, *Ray Larsen Associates, Inc. v. Nikko America, Inc.*, 1996 WL 442799 (S.D.N.Y. 1996), is equally distinguishable. In *Ray Larsen*, the plaintiff alleged a mail and wire fraud scheme spanning October 1987 to March 1989 in its original complaint. *Id.* at 7. In a 1994 amended complaint, the plaintiff alleged acts of obstruction of justice during the pendency of the lawsuit. *Id.* at n.8. The court declined to consider these allegations because the alleged racketeering activity otherwise ceased in 1989. *Id.* In this case, by contrast, Gandhi's acts of obstruction of justice were directly linked, both temporally and logically, to the other alleged racketeering activities.[8]  Gandhi's obstruction of justice arguments therefore fail.[9]

> vii.    *The Amended Complaint Properly Pleads Bankruptcy Fraud.*

The Amended Complaint properly pleads bankruptcy fraud. 18 U.S.C. § 152 criminalizes, among other things, knowingly and fraudulently (1) concealing any property belonging to the

---

[8] Moreover, the plaintiff in *Ray Larsen* relied on the obstruction of justice allegations because its other allegations were insufficient to establish close-ended continuity (which requires long-term criminal conduct). *Id.* at 7. That is not an issue here where the alleged racketeering activity dates back to at least 2010 (and the Exit Scheme to at least 2012).

[9] Gandhi also challenges the causation between the alleged obstruction of justice and the injuries alleged by the Trustee. (MTD at 25-26.) This argument fails for the reasons discussed above.

estate of a debtor; (2) making a false oath or account in or in relation to a bankruptcy case; and (3) making a false declaration, certificate, verification, or statement under penalty of perjury in or in relation to a bankruptcy case. *See* 18 U.S.C. § 152.

The Trustee satisfied these elements by alleging: (1) Gandhi knowingly and fraudulently signed the Debtors' respective bankruptcy schedules and statements of financial affairs under penalty of perjury without disclosing the substantial loan balances owed by NMI to Jaffe or the significant transfers of the Debtors' assets to Shadow Entities and other Modi-Controlled Entities that were required to be disclosed (FAC ¶¶ 156-61, 283); and (2) Gandhi feigned ignorance and lied to the Examiner concerning the Debtors' and his personal involvement in the transactions supporting the Bank Fraud (*id.* ¶¶ 168-70). Rather than address the substance of section 152, Gandhi incorporates his obstruction of justice arguments by reference, which he claims apply equally to the Trustee's bankruptcy fraud allegations. (MTD at 26.) Those arguments are equally inapposite here for all of the reasons discussed above.

### D.   The Amended Complaint Properly Pleads RICO Conspiracy.

The Amended Complaint properly pleads RICO conspiracy. To establish a violation of 18 U.S.C. § 1962(d), the plaintiff need only "prove the existence of an *agreement* to violate RICO's substantive provisions." *U.S. v. Appins*, 637 F.3d 59, 75 (2d Cir. 2011) (emphasis in original). For an agreement to exist, the defendant need only know of the general contours of the conspiracy and agree to its general criminal objective. *Id.* (citing *U.S. v. Zichettello*, 208 F.3d 72, 100 (2d Cir. 2000)). The defendant need not commit any predicate acts so long as they adopt the goal of furthering or facilitating the criminal endeavor. *Id.* A defendant may agree to join a RICO conspiracy without knowing the identities of all of the other conspirators and without full knowledge of all of the details of the conspiracy. *Id.*

The Trustee alleges Gandhi knowingly and willfully agreed with Modi, Bhansali, and others to violate section 1962(c). (*See* FAC ¶ 308.) Gandhi argues the Trustee's RICO conspiracy claim must be dismissed because the Trustee has not adequately pleaded a substantive RICO violation. Since, for all of the reasons discussed above, the Trustee has in fact properly pleaded a violation of section 1962(c), Gandhi's conspiracy argument fails as well.

## CONCLUSION

For reasons set forth in this Opposition, the Trustee respectfully requests the Court deny Defendant Ajay Gandhi's Motion to Dismiss in its entirety.

Dated: December 13, 2019,
        New York, New York                       Respectfully submitted,

                                                 **JENNER & BLOCK LLP**

                                                 By:  /s/ Vincent E. Lazar
                                                 Vincent E. Lazar
                                                 Angela M. Allen (admitted *pro hac vice*)
                                                 William A. Williams (*pro hac vice* pending)
                                                 353 North Clark Street
                                                 Chicago, Illinois 60654
                                                 (312) 222-9350
                                                 vlazar@jenner.com
                                                 aallen@jenner.com

                                                 Carl N. Wedoff
                                                 919 Third Avenue
                                                 New York, New York 10022
                                                 (212) 891-1600
                                                 cwedoff@jenner.com

                                                 *Counsel for the Chapter 11 Trustee*