**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| FIRESTAR DIAMOND, INC., *et al.* | No. 18-10509 (SHL) |
| Debtors. | (Jointly Administered) |
| RICHARD LEVIN, Chapter 11 Trustee of FIRESTAR DIAMOND, INC., FANTASY, INC., and OLD AJ, INC. f/k/a A. JAFFE, INC., | Adv. Proc. No. 19-1102 (SHL) |
| Plaintiff, | |
| v. | |
| NIRAV DEEPAK MODI, MIHIR BHANSALI, and AJAY GANDHI, | |
| Defendants. | |

**TRUSTEE'S OPPOSITION TO DEFENDANT MIHIR BHANSALI'S**
**MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT..........................................................................................1

SUMMARY OF ALLEGATIONS.....................................................................................2

I.      The Bank Scheme. .................................................................................................3

II.     The Funnel Scheme...............................................................................................4

III.    The Exit Scheme. ..................................................................................................5

IV.    Bhansali's Personal Benefit. .................................................................................7

APPLICABLE STANDARDS ............................................................................................7

I.      Rule 12(b)(6) Standard.........................................................................................7

II.     Rule 9(b) Standard. ..............................................................................................8

ARGUMENT........................................................................................................................8

I.      The Trustee Has Standing to Bring the State Law Claims. ..................................8

II.     The State Law Claims Are Not Time Barred......................................................12

III.    The Trustee Has Satisfied The Requirements of Rule 9(b) As To The State Law
Claims. ................................................................................................................14

IV.    The Amended Complaint States a Valid Claim for Breach of Fiduciary Duty. ...16

        A.     Based On The Allegations Of The Amended Complaint, Bhansali Owed
Fiduciary Duties of Loyalty and Care...........................................................16

        B.     The Amended Complaint Properly Alleges Bhansali Breached His Duty
of Loyalty. .....................................................................................................17

        C.     The Amended Complaint Properly Alleges Bhansali Breached His Duty
of Care............................................................................................................20

V.     The Amended Complaint States a Valid Claim for Corporate Waste.................22

VI.    The Amended Complaint States Valid And Timely RICO Claims......................24

        A.     The Alleged Injuries Are Sufficiently Direct and Proximate. ...................24

             i.     Depletion of the Debtors' Tangible Assets and Impairment of
Their Claims Against U.S. Affiliates. ............................................25

ii.    Payment of Professional Fees..........................................................................27

B.    The Trustee's RICO Claims Are Not Time Barred. ....................................................28

C.    The Amended Complaint Properly Pleads Each Predicate Act. ...........................30

i.    The Amended Complaint Properly Pleads Mail and Wire Fraud. ............30

ii.    The Amended Complaint Properly Pleads Violations of the
National Stolen Property Act. ..........................................................................33

iii.    The Amended Complaint Properly Pleads Money Laundering. ...............34

iv.    The Amended Complaint Properly Pleads Obstruction of Justice. ...........35

v.    The Amended Complaint Properly Pleads Bankruptcy Fraud. .................39

D.    The Amended Complaint Properly Pleads RICO Conspiracy. ..............................40

**CONCLUSION** ..................................................................................................................................40

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

CASES

*287 Franklin Ave. v. Meisels,*
  2015 WL 5457959 (E.D.N.Y. July 20, 2015) ............................................................................. 27

*Am. Catholic Educ. Programming Found., Inc. v. Gheewalla,*
  930 A.2d 92 (Del. 2007) ............................................................................................................ 16

*American Tissue, Inc. v. Donaldson, Lufkin & Jenrette Secs. Corp.,*
  351 F.Supp.2d 79 (S.D.N.Y. 2004) ........................................................................................... 10

*Anhui Green Lighting Co., Ltd. v. Green Logic LED Electrical Supply, Inc.,*
  2019 WL 6498094 (S.D.N.Y. Dec. 3, 2019) ............................................................................... 8

*Armstrong v. McAlpin,*
  699 F.2d 79 (2d Cir. 1983) ........................................................................................................ 28

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ..................................................................................................................... 7

*Banco de Desarrollo Agropecuario, S.A. v. Gibbs,*
  709 F.Supp. 1302 (S.D.N.Y. 1989) ........................................................................................... 13

*Bankers Trust Co. v. Rhoades,*
  859 F.2d 1096 (2d Cir. 1988) ........................................................................................ 26, 27, 32

*Barnet v. Drawbridge Special Opportunities Fund LP,*
  2014 WL 3493320 (S.D.N.Y. Sept. 5, 2014) ............................................................................ 28

*Bascuñán v. Elsaca,*
  927 F.3d 806 (2d Cir. 2017) ...................................................................................................... 26

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ..................................................................................................................... 7

*Benedict v. Amaducci,*
  1993 WL 87937 (S.D.N.Y. March 22, 1993) ............................................................................ 18

*Berk v. Tradewell, Inc.,*
  2003 WL 21664679 (S.D.N.Y. July 16, 2003) .......................................................................... 15

*Birnbaum v. Birnbaum,*
  541 N.Y.S.2d 746 (1989) ........................................................................................................... 19

*Bivens Gardens Office Bldg., Inc. v. Barnett Banks of Florida, Inc.*,
    140 F.3d 898 (11th Cir. 1998)................................................................ 25

*D'Addario v. D'Addario*,
    901 F.3d 80 (2d Cir. 2018)........................................................ 24, 25, 27

*Dana Molded Products, Inc. v. Brodner*,
    58 B.R. 576 (N.D. Ill. 1986) ................................................................ 25

*Dowling v. United States*,
    473 U.S. 207 (1985) ............................................................................ 33

*FDIC v. Pellatreau & Pellatreau*,
    965 F.Supp. 381 (E.D.N.Y. 1997) ........................................................ 13

*Financial Guar. Ins. Co. v. Putnam Advisory Co., LLC*,
    783 F.3d 395 (2d Cir. 2015).................................................................... 8

*First Capital Asset Management Inc. v. Brickellbush, Inc.*,
    218 F.Supp.2d 369 (S.D.N.Y. 2002) .................................................... 27

*GICC Capital Corp. v. Technology Finance Group, Inc.*,
    30 F.3d 289 (2d Cir. 1994)........................................................ 25, 26, 28

*Hirsch v. Arthur Anderson & Co.*,
    72 F.3d 1085 (2d Cir. 1995).................................................................. 11

*In re Adelphia Communications Corp.*,
    336 B.R. 610 (Bankr. S.D.N.Y. 2006)........................................ 18, 19, 32

*In re Adelphia Communications Corp.*,
    365 B.R. 24 (Bankr. S.D.N.Y. 2007) .............................................. 28, 29

*In re Ahead by a Length, Inc.*,
    100 B.R. 157 (Bankr. S.D.N.Y. 1989).......................................... 25, 29, 31

*In re Bennett Funding Group, Inc.*,
    367 B.R. 269 (Bankr. N.D.N.Y. 2007) .................................................. 15

*In re BH S&B Holdings LLC*,
    420 B.R. 112 (Bankr. S.D.N.Y. 2009).................................................... 16

*In re CBI Holding Co., Inc.*,
    529 F.3d 432 (2d Cir. 2008).................................................................. 11

*In re Everfresh Beverages, Inc.*,
    238 B.R. 558 (Bankr. S.D.N.Y. 1999).................................................... 29

*In re Gas Reclamation, Inc. Securities Litig.*,
    659 F.Supp. 493 (S.D.N.Y. 1987) ........................................................................... 31

*In re Magnesium Corp. of Am.*,
    399 B.R. 722 (Bankr. S.D.N.Y. 2009) ................................................................... 16

*In re MF Global Holdings Ltd.*,
    507 B.R. 808 (S.D.N.Y. 2014) ............................................................................... 17

*In re PHS Group, Inc.*,
    581 B.R. 16 (E.D.N.Y. 2018) ................................................................................. 11

*In re Scott Acquisition Corp.*,
    344 B.R. 283 (Bankr. D. Del. 2006) ..................................................................... 11

*In re Tribune Co. Fraudulent Conveyance Litig.*,
    2019 WL 294807 (S.D.N.Y. Jan. 23, 2019) ......................................................... 17

*In re Trinsum Group, Inc.*,
    466 B.R. 596 (Bankr. S.D.N.Y. 2012) ............................................................ 20, 21

*In re Tronox Inc.*,
    450 B.R. 432 (Bankr. S.D.N.Y. 2011) ................................................................... 16

*In re Tronox Inc.*,
    503 B.R. 239 (S.D.N.Y. 2013) ............................................................................... 16

*In re W.J. Bradley Mortgage Capital, LLC*,
    598 B.R. 150 (Bankr. D. Del. 2019) ................................................................ 22, 23

*In re Welspun Litig.*,
    2019 WL 2174089 (S.D.N.Y. May 20, 2019) ......................................................... 8

*ITT, An International Investment Trust v. Cornfeld*,
    619 F.2d 909 (2d Cir. 1980) ................................................................................... 13

*Jackson Nat. Life. Ins. Co. v. Litigator*,
    949 F.Supp. 200 (S.D.N.Y. 1996) ............................................................... 25, 26, 27

*Jerome M. Sobel & Co. v. Fleck*,
    2003 WL 22839799 (S.D.N.Y. Dec. 1, 2003) ................................................. 30, 32

*John Swann Holdings Corp. v. Simmons*,
    62 F.Supp.3d 304 (S.D.N.Y. 2014) ................................................................. 17, 18

*Limas LS PLC v. PHL Variable Insurance Co.*,
    2013 WL 12286066 (D. Conn. Dec. 17, 2013) ..................................................... 15

*Manson v. Stacescu,*
  11 F.3d 1127 (2d Cir. 1993) ........................................................................... 25

*McHale v. CitiBank, N.A. (In re 1031 Tax Group, LLC),*
  420 B.R. 178 (Bankr. S.D.N.Y. 2009) ............................................................. 10

*Meridien Int'l Bank Ltd. v. Gov't of the Republic of Liberia,*
  23 F. Supp. 2d 439 (S.D.N.Y. 1998) ............................................................... 29

*Michelson v. Penney,*
  135 F.2d 409 (2d Cir. 1943) ........................................................................... 13

*Mohr-Lecara v. Oxford Health Ins., Inc.,*
  2019 WL 1409479 (S.D.N.Y. March 28, 2019) ........................................ 31, 32

*Moviecolor Limited v. Eastman Kodak Co.,*
  288 F.2d 80 (2d Cir. 1961) ............................................................................. 28

*Patrick v. Allen,*
  355 F. Supp. 2d 704 (S.D.N.Y. 2005) ............................................................. 22

*Pereira v EisnerAmper LLP (In re Waterford Wedgwood USA, Inc.),*
  529 B.R. 599 (Bankr. S.D.N.Y. 2015) ............................................................. 11

*Picard v. JPMorgan Chase Co.,*
  460 B.R. 84 (S.D.N.Y. 2011) ..................................................................... 10, 11

*Ray Larsen Associates, Inc. v. Nikko America, Inc.,*
  1996 WL 442799 (S.D.N.Y. 1996) .................................................................. 38

*Related Companies, L.P. v. Ruthling,*
  2017 WL 6507759 (S.D.N.Y. 2017) ........................................................... 26, 27

*Republic of Colombia v. Diageo N. Am. Inc.,*
  531 F. Supp. 2d 365 (E.D.N.Y. 2007) ............................................................. 34

*Roselink Investors, L.L.C. v. Shenkman,*
  386 F.Supp.2d 209 (S.D.N.Y. 2004) ............................................................... 16

*Rosner v. Peregrine Finance Ltd.,*
  1998 WL 249197 (S.D.N.Y. May 18, 1998) .................................................... 29

*Rothstein v. UBS AG,*
  708 F.3d 82 (2d Cir. 2013) ............................................................................... 7

*Scholastic Decisions, Inc. v. DiDomenico,*
  995 F.2d 1158 (2d Cir. 1993) ......................................................................... 27

*Securities Investor Protection Corp. v. Stratton Oakmont, Inc.*,
    234 B.R. 293 (Bankr. S.D.N.Y. 1999)...................................................................... 8, 31

*Shearson Lehman Hutton, Inc. v. Wagoner*,
    944 F.2d 114 (2d Cir.1991)...................................................................................... 22

*St. Paul Fire and Marine Ins. Co. v. PepsiCo, Inc.*,
    884 F.2d 688 (2d Cir. 1989)................................................................................ 10, 25

*Stein v. New York Stair Cushion Co., Inc.*,
    2006 WL 319300 (E.D.N.Y. 2006) ..................................................................... 31, 32

*Stone ex rel. AmSouth Bancorporation v. Ritter*,
    911 A.2d 362 (Del. 2006)................................................................................... 18, 19

*Sullivan v. Kodsi*,
    373 F.Supp.2d 302 (S.D.N.Y. 2005) ........................................................................ 15

*Sunrise Indus. Joint Venture v. Ditric Optics, Inc.*,
    873 F.Supp. 765 (E.D.N.Y. 1995) ........................................................................... 15

*Teras Int'l Corp. v. Gimbel*,
    2014 WL 7177972 (S.D.N.Y. Dec. 17, 2014) .......................................................... 16

*U.S. Small Bus. Admin. v. Feinsod*,
    347 F.Supp.3d 147, 160 (E.D.N.Y. 2018) ........................................................... 16, 22

*U.S. Textiles, Inc. v. Anheuser-Busch Companies, Inc.*,
    1988 WL 31479 (N.D. Ill. 1988) .............................................................................. 29

*U.S. v. Appins*,
    637 F.3d 59 (2d Cir. 2011) ...................................................................................... 39

*U.S. v. Autuori*,
    212 F.3d 105 (2d Cir. 2000) .................................................................................... 30

*U.S. v. Bahel*,
    662 F.3d 610 (2d Cir. 2011) ............................................................................... 30, 32

*U.S. v. Binday*,
    804 F.3d 558 (2d Cir. 2015) ............................................................................... 29, 30

*U.S. v. Crisp*,
    306 F.3d 71 (2d Cir. 2002) ...................................................................................... 35

*U.S. v. D'Amato*,
    39 F.3d 1249 (2d Cir. 1994) .................................................................................... 31

*U.S. v. Pugh,*
   937 F.3d 108 (2d Cir. 2019) ................................................................................ 36, 37

*U.S. v. Reifler,*
   446 F.3d 65 (2d Cir. 2006) ........................................................................................ 32

*U.S. v. Sampson,*
   898 F.3d 287 (2d Cir. 2018) ................................................................................. 35, 37

*United States v. Agrawal,*
   726 F.3d 235 (2d Cir. 2013) ..................................................................................... 33

*United States v. Maher,*
   108 F.3d 1513 (2d Cir. 1997) ................................................................................... 34

*Whalen v. Carter,*
   954 F.2d 1087 (5th Cir. 1992) .................................................................................. 25

*Wight v. BankAmerica Corp.,*
   219 F.3d 79 (2d Cir. 2000) ....................................................................................... 31

*Williams v. Affinion Group, LLC,*
   889 F.3d 116 (2d Cir. 2018) ..................................................................................... 31

*Wooten v. Loshbough,*
   951 F.2d 768 (7th Cir. 1991) .................................................................................... 25

*World Wrestling Entertainment, Inc. v. Jakks Pacific, Inc.,*
   530 F.Supp.2d 486 (S.D.N.Y. 2007) ........................................................................ 38

*Zimmerman v. Duggan,*
   86 B.R. 47 (E.D. Pa. 1988) ...................................................................................... 25

**STATUTES**

11 U.S.C. § 108 ........................................................................................................ 13, 29

11 U.S.C. § 1104(c) ........................................................................................................ 35

18 U.S.C. § 152 .............................................................................................................. 39

18 U.S.C. § 1503(a) .................................................................................................. 34, 35

18 U.S.C. § 1512 ....................................................................................................... 35, 36

18 U.S.C. § 1515 ............................................................................................................ 36

18 U.S.C. § 1956 ............................................................................................................ 33

18 U.S.C. § 1957 ................................................................................................................... 33

18 U.S.C. § 1962 ................................................................................................................... 39

18 U.S.C. § 2314 ................................................................................................................... 33

**OTHER AUTHORITIES**

Fed. R. Civ. P. 9 .............................................................................................................. 8, 14

Fed. R. Civ. P. 12 ................................................................................................................. 7

Plaintiff Richard Levin, not individually but solely as chapter 11 trustee ("**Trustee**" or

"**Plaintiff**") for Debtors Firestar Diamond, Inc., Fantasy, Inc., and Old AJ, Inc. f/k/a A. Jaffe, Inc.

(collectively, the "**Debtors**"),[1] in opposition to Defendant Mihir Bhansali's motion to dismiss (the

"**Motion**" or "**MTD**") the Trustee's First Amended Complaint (the "**Amended Complaint**" or

"**FAC**"), respectfully states as follows:

## PRELIMINARY STATEMENT

After filing his original complaint and reviewing Bhansali's prior motion to dismiss, the

Trustee investigated further, yielding extensive new information detailing the mechanics of the

fraudulent schemes as well as the specific role played by each Defendant in conceiving and

executing the schemes. Based on the additional information, the Trustee filed his Amended

Complaint, which more directly ties the alleged injuries to the Debtors to the alleged misconduct

by focusing on the fraudulent depletion of the Debtors' assets, the frustration of the Debtors'

claims against third parties, and the Debtors' payment of professional fees they would not

otherwise have paid.

Despite the revisions, Bhansali's new motion to dismiss selectively addresses only some

of the new allegations, but ignores far more meaningful allegations altogether. Bhansali attacks

the Trustee's standing by wrongly portraying the alleged harm as solely encompassing the

Debtors' liability to PNB. (MTD at 10, 29-30.) However, the Amended Complaint focuses on

fraudulent transfers, which, under well-settled Second Circuit case law, directly injure the looted

---

[1] Unless otherwise defined, all capitalized terms shall have the meaning ascribed to them in the Amended
Complaint. Additionally, with respect to allegations made on information and belief in the Amended
Complaint, the Trustee will treat such allegations as true for the purposes of this Opposition. However,
nothing in this Opposition should be construed as negating or limiting such qualifications in the Amended
Complaint.

entity, not its creditors, and thus confer standing on that entity to bring common law and RICO claims.

Bhansali next attacks the Trustee's claims as time barred. (MTD at 12, 27-28.) But a significant portion of the alleged misconduct (and thus alleged injuries) occurred just before and after the Debtors' bankruptcy filings in February 2018 and are not time barred even under Bhansali's theories. The 2018 allegations alone are sufficient to support the Trustee's claims. Still, even the Trustee's allegations of earlier misconduct remain actionable by operation of equitable tolling principles under both state and federal law, which tolled the limitations periods until Bhansali and his co-conspirators relinquished control of the Debtors in May 2018.

Most of Bhansali's remaining arguments challenge the sufficiency of the Trustee's allegations of Bhansali's knowledge of and participation in the fraud. But Bhansali repeatedly ignores the most damning allegations of his knowledge and participation, including that Bhansali "personally oversaw the creation of the Shadow Entities and LOU Entities and the selection of their principals, directors, officers, and employees" (FAC ¶ 69) and that he personally authored "a step-by-step guide to the mechanics and economics of the circular transactions" comprising the fraudulent schemes (FAC ¶ 68(ii)).

Taking the Amended Complaint's allegations as true and construed in the light most favorable to the Trustee, the Trustee has sufficiently alleged plausible claims against Bhansali for breach of fiduciary duty, corporate waste, and civil RICO violations. As such, the Motion should be denied.

## SUMMARY OF ALLEGATIONS

While the Amended Complaint, for the sake of simplicity and to avoid unnecessary characterization, used the term "Bank Fraud" as shorthand for the myriad allegations of fraud throughout the Amended Complaint, those allegations are more accurately conceptualized as

comprising three distinct, but related fraudulent schemes—each of which the Defendants knew of and participated in directly.

## I.      The Bank Scheme.

The first scheme (the "**Bank Scheme**") involved fraudulently inducing PNB and other banks to extend credit on the basis of circular import and export transactions between LOU Entities and Shadow Entities. (*See generally* FAC ¶¶ 23-41.) Precious gems, metals, and jewelry were transferred in a "loop" between LOU Entities and Shadow Entities as part of the Bank Scheme to fraudulently inflate the LOU Entities' import volume and increase their LOU funding. (*Id.* ¶ 35.) The Bank Scheme began in approximately early 2011 when Modi and his co-conspirators fraudulently solicited issuance of the first bank loan (*id.* ¶ 23) and stopped in late January 2018 when the Bank Scheme was exposed (*id.* ¶ 42).

Bhansali's knowledge of and participation in the Bank Scheme are demonstrated by the following allegations, among others:

- Bhansali personally oversaw the creation of the Shadow Entities and LOU Entities and the selection of their principals, directors, officers, and employees (*id.* ¶ 69);

- Bhansali authored (and deleted, shortly after exposure of the Bank Scheme) spreadsheets (i) explaining step-by-step the mechanics of the fraudulent schemes, (ii) tracking payables and receivables among the LOU Entities, Firestar Entities, and Shadow Entities, and (iii) tracking the LOU Entities' finances year-over-year (*id.* ¶ 68);

- Bhansali personally completed performance appraisals for individuals involved in the operations of Shadow Entities and LOU Entities (*id.* ¶ 70);

- Modi's longtime business partner Hemant Bhatt sent Bhansali his resignation from the LOU Entities and various other Modi-Controlled Entities on the day PNB refused to issue a new LOU (*id.* ¶¶ 43-44);

- Bhansali was asked to approve audit fees for Shadow Entities Auragem and Fancy Creations (*id.* ¶ 73.);

3

- Bhansali was asked to review and revise written profiles for Shadow Entities Universal, Empire, and Diagems (*id.* ¶ 78); and

- Bhansali's calendar contained meetings about LOU Entities (*id.* ¶ 71).

## II.    The Funnel Scheme.

The second scheme (the "**Funnel Scheme**") involved fraudulent transactions disguised as sales, loans, and equity investments among Shadow Entities and Firestar Entities (including the Debtors) designed to funnel cash and inventory into and out of the "loop" comprising the Bank Scheme. (*See generally id.* ¶¶ 56-60.) Whereas the Bank Scheme was based on circular transactions between LOU Entities and Shadow Entities, the Funnel Scheme was based on circular transactions among Shadow Entities and Firestar Entities. The Funnel Scheme principally spanned from roughly 2013, when the Shadow Entities became the LOU Entities' exclusive trading partners (*id.* ¶¶ 34, 56), to January 2018, when the Bank Scheme was exposed (*id.* ¶ 42).

In addition to the allegations referenced in connection with the Bank Scheme, Bhansali's knowledge of and participation in the Funnel Scheme are further demonstrated by the following allegations, among others:

- Bhansali, while sole director of each of the Debtors and U.S. Affiliates and CEO of FDI, Jaffe, Fantasy, Synergies, FGI, and NMI (FAC ¶ 19), orchestrated or oversaw fraudulent transfers of millions of dollars in cash and inventory from the Debtors and U.S. Affiliates to overseas Shadow Entities and Firestar Entities over which Bhansali also exercised oversight and control (*id.* ¶¶ 63, 81);

- Bhansali and Gandhi maintained two sets of books and records for Jaffe, one which included Shadow Entity transactions and one that did not. (*id.* ¶ 85);

- Bhansali oversaw and directed the use of different sales and inventory practices for Shadow Entity transactions as compared to legitimate retailer customers. (*id.* ¶¶ 89-91);

- Bhansali managed the Debtors' "house accounts" in which proceeds of loose diamond sales were segregated from regular sales (*id.* ¶ 88);

- Bhansali controlled the finances of the Debtors, had authority to approve loose diamond transactions, and was a signatory on the Debtors' bank accounts (*id.* ¶ 65);

- Bhansali consulted with Gandhi and Modi on how they should respond to auditor inquiries concerning Shadow Entity transactions (*id.* ¶¶ 99-102);

- Gandhi told the Examiner the Shadow Entities were Bhansali's "customers" (*id.* ¶ 168).

## III. The Exit Scheme.

The third scheme (the "**Exit Scheme**") constituted the conspirators' exit strategy and involved efforts to permanently shield ill-gotten assets from their victims, including the Debtors. The Exit Scheme included: (a) the systematic looting of the Debtors', U.S. Affiliates', and other Firstar Entities' assets in the months leading up to and following exposure of the Bank Scheme (*id.* at ¶¶ 173-187); (b) bribery, witness tampering, destruction of evidence, and bankruptcy fraud designed to buy additional time for such looting (*id.* ¶¶ 142-172); and (c) the broader diversion of cash, real estate, and other assets for the benefit of the Modi and Bhansali family (*id.* ¶¶ 103-140). Implementation of the Exit Scheme began as early as April 2012 when Nirav Modi gifted to his sister Purvi Mehta a $14,575,000 loan receivable owed to him by Synergies (which Synergies paid in full to Mehta in July 2017 (*id.* ¶ 124-25)) and continued through at least September 2018 when over $40 million of NMI and FDII inventory was taken from Malca Amit and shipped to overseas Modi-Controlled Entities (*id.* ¶ 185).

In addition to the allegations referenced in connection with the Bank Scheme and Funnel Scheme, Bhansali's knowledge of and participation in the Exit Scheme are further demonstrated by the following allegations, among others:

- Bhansali authored a "to do" list for various co-conspirators in the wake of the Bank Scheme's exposure (*id.* ¶ 68(iii));

- In February or March 2018, Bhansali traveled overseas with Nehal Modi where Bhansali threatened Shadow Entity personnel and removed 50 kilograms of gold and conspired with Nehal Modi to destroy the Shadow Entity personnel's cell phones and remove 150 boxes of pearls (*id.* ¶ 151);

- Bhansali declared under penalty of perjury that various Shadow Entities included in the Debtors' lists of largest creditors were not insiders of the Debtors and that the Debtors had "worked tirelessly . . . to reassure their vendors and customers that they had no involvement in the alleged wrongful conduct." (*id.* ¶¶ 153-55);

- After the Debtors' bankruptcy filing, Bhansali caused NMI and FDII to ship substantially all of their more than $40 million inventory to Modi-Controlled Entities overseas (*id.* ¶ 161);

- Bhansali met with Angelina Ypma when she visited New York in May 2018, where she sought his permission to remove NMI inventory from storage at Malca Amit (*id.* ¶ 182);

- Bhansali remained in contact with Nirav Modi and communicated with him about Debtors' bankruptcy and sale process (*id.* ¶ 164-66);

- When the Court asked Bhansali to provide additional detail concerning his post-petition communications with Modi, Bhansali resigned from the Debtors and refused to submit a declaration or appear for cross examination (*id.* ¶¶ 167);

- When deposed by the Examiner, Bhansali invoked the Fifth Amendment in response to every question except his name (*id.* ¶ 172);

- In March 2018, Bhansali researched methods for secure communication, clearing internet browsing history, and hacking wireless networks (*id.* ¶¶ 146-47);

- Bhansali downloaded and used software designed to encrypt data and facilitate anonymous internet usage (*id.* ¶¶ 148-49); and

- After exposure of the fraud, Bhansali directed all "non-Firestar Dubai" computers to be sent to Hong Kong (*id.* ¶ 150).

**IV.     Bhansali's Personal Benefit.**

Trustee further alleged numerous facts demonstrating or suggesting Bhansali personally

benefitted from his involvement in the fraudulent schemes, including:

- The auto-saved spreadsheet of the LOU Entities' finances indicated that Bhansali's family trust received approximately $4.57 million from LOU Entity DRUS, of which the trust served as a partner from 2007 to 2011 (*id.* ¶ 30);

- Bhansali received $1,500,000 from Purvi Mehta in February 2017 just weeks before Bhansali purchased a $7.1 million apartment (which Bhansali transferred to his wife for nominal consideration two days after the Debtors' filed bankruptcy) and an additional $750,000 from Purvi Mehta in June 2017 (*id.* ¶¶ 137-41);

- Modi's personal financial statements indicate Bhansali received at least $776,574 in "advances" from Nirav Modi (*id.* ¶ 136);

- Bhansali's wife holds or formerly held 99.9% of the equity interests in Neeshal Merchandising Private Ltd., which received over $4 million from Shadow Entities and $420,478.58 from FDI (*id.* ¶ 133-34); and

- Bhansali holds or formerly held equity interests in various Modi-Controlled Entities, including FDIPL and FDI's predecessor (*id.* ¶ 131).

## APPLICABLE STANDARDS

**I.     Rule 12(b)(6) Standard.**

The Court must deny a motion to dismiss where the complaint contains "enough facts to

state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Id.*  For a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), the Court must

similarly "accept[] all allegations in the complaint as true, and draw[] all reasonable inferences in

plaintiffs' favor." *Rothstein v. UBS AG*, 708 F.3d 82, 90 (2d Cir. 2013).  "Detailed factual allegations"

are not required, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555), and

factual disputes are not resolved on a motion to dismiss. *Financial Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 405 (2d Cir. 2015).

## II.    Rule 9(b) Standard.

Rule 9(b) requires plaintiffs averring fraud to "state with particularity the circumstances constituting fraud[.]" Fed. R. Civ. P. 9(b). "Although Rule 9(b) contains a heightened particularity standard, it also relaxes the standard for pleading fraudulent intent: 'Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.'" *Anhui Green Lighting Co., Ltd. v. Green Logic LED Electrical Supply, Inc.*, 2019 WL 6498094, at *4 (S.D.N.Y. Dec. 3, 2019). A complaint alleges facts sufficient to give rise to a strong inference of fraudulent intent by either (a) alleging facts showing that the defendant had both motive and opportunity to commit fraud, or (b) alleging facts which constitute strong circumstantial evidence of conscious misbehavior or recklessness. *Securities Investor Protection Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293, 310 (Bankr. S.D.N.Y. 1999) (citing *Acito v. IMCERA Grp, Inc.*, 47 F.3d 47, 52 (2d Cir. 1995)).

Rule 9(b) "does not require factual pleadings that demonstrate the <u>probability</u> of wrongdoing . . . At the pleading stage, the alleged fraud need only be <u>plausible</u> based on the complaint, it need not be more likely than other possibilities." *In re Welspun Litig.*, 2019 WL 2174089, at *15 (S.D.N.Y. May 20, 2019) (citing *Lorely Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 170 (2d Cir. 2015)) (emphasis in original).

## ARGUMENT

## I.    The Trustee Has Standing to Bring the State Law Claims.

The Trustee has standing to bring each of the state law claims asserted in the Amended Complaint. In arguing that the Amended Complaint does not allege a particularized injury to the Debtors sufficient to create standing, Bhansali claims "the crux of the Amended Complaint is that the allegedly improper conduct was directed at a specific creditor—PNB—and has exposed the

8

Debtors to claims by that creditor, which alleged fraud (when discovered) resulted in the loss of value of the Debtors' businesses." (MTD at 10.) But that is not what the Trustee alleges.

The Trustee narrowly tailored his Amended Complaint to only assert claims premised on injuries sustained by the Debtors. For example, the Trustee alleged that Bhansali's breaches of his fiduciary duties injured the Debtors by:

- depleting the Debtors' assets through numerous Actual Fraudulent Transfers;

- impairing the Trustee's ability to recover on account of claims against the U.S. Affiliates and others;

- causing the Debtors' estates to incur substantial administrative expenses related to the investigation of information Bhansali failed to disclose and actively endeavored to conceal, destroy, or otherwise render unavailable for use in connection with these chapter 11 cases; and

- increasing creditors' claims against the estate and causing the collapse and resulting loss of value of the Debtors and their businesses.

(FAC ¶ 207.)[2] Each of the first three injuries constitutes a direct and particularized injury to the Debtors themselves, not to PNB or any other creditor. Indeed, the Actual Fraudulent Transfers and payment of unnecessary administrative expenses depleted the Debtors' assets, not those of PNB or any other specific creditor. Similarly, Bhansali's looting of the U.S. Affiliates in the months before and after the Petition Date, and his perjury which secured additional time for such looting to occur, destroyed the value of the Debtors' claims against the U.S. Affiliates (i.e. the $11,216,467 and $2,329,930 loan receivables held by Jaffe and FDI, respectively, against NMI, as well as millions of dollars in actual fraudulent transfer claims against NMI and FDII), none of which belonged to PNB or any other specific creditor. Only the fourth injury is in any way derivative of

---

[2] Similarly, the Trustee alleges that Bhansali's corporate waste injured the debtors "by losing the millions of dollars expended for the personal benefit of Modi and his family, and in transactions with Shadow Entities that served no legitimate or corporate purpose." For standing purposes, this is analogous to the fraudulent depletion of assets alleged in the breach of fiduciary duty count.

injuries sustained by creditors. But, even then, no one creditor could assert a claim for the "collapse and resulting loss of value of the Debtors' businesses" caused by the increase in creditor claims at large. *See St. Paul Fire and Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 701 (2d Cir. 1989 ("If a claim is a general one, with no particularized injury arising from it, and if that claim could be brought by any creditor of the debtor, the trustee is the proper person to assert the claim[.]")).

The cases cited by Bhansali do not undermine the Trustee's standing; just the opposite, several of them confirm it. For example, in *McHale v. CitiBank, N.A. (In re 1031 Tax Group, LLC)*, 420 B.R. 178 (Bankr. S.D.N.Y. 2009), the debtors' director allegedly misappropriated customer property held by the debtors in a custodial capacity. *Id.* at 194. The court held the trustee lacked standing to recover damages for injuries sustained by the customers whose funds were misappropriated. *Id.* But here, as discussed above, the depleted assets belonged to the Debtors, not PNB or any other creditor, so only the Debtors suffered direct injury from their depletion. Indeed, Judge Glenn recognized this distinction in *1031 Tax Group* in holding that, "[d]espite the [t]rustee's lack of constitutional standing for injuries particular to exchange participants of the 1031 [d]ebtors, the [t]rustee has Article III standing for damages suffered **by the [d]ebtors** as a result of Citibank's alleged aiding and abetting of Okun's breach of fiduciary duty." 420 B.R. at 195-96 (emphasis added); *accord American Tissue, Inc. v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 351 F.Supp.2d 79, 90 (S.D.N.Y. 2004).

*Picard v. JPMorgan Chase Co.*, 460 B.R. 84 (S.D.N.Y. 2011), also involved misappropriation of customer property and is therefore distinguishable on the same grounds. Moreover, the *Picard* trustee went so far as to include injuries sustained by customers and other creditors in his

damages calculation and sought to recover on their behalf.[3] Here, nothing in the Amended

Complaint seeks to recover anything on PNB's or any other creditor's behalf. Similarly, in *Hirsch*

*v. Arthur Anderson & Co.*, 72 F.3d 1085 (2d Cir. 1995), the trustee sought to recover from the

debtors' accountants and law firms for injuries caused by the distribution of misleading private

placement memoranda to investors. *Id.* at 1094. The court held that the "claims predicated upon

the distribution of misleading PPMs to investors . . . are the property of those investors, and may

be asserted only by them[.]" *Id.* Here, none of the injuries alleged by the Trustee are analogous to

the distribution of misleading PPMs in *Hirsch*.[4]

Bhansali also cites *Pereira v. EisnerAmper LLP (In re Waterford Wedgwood USA, Inc.)*, 529

B.R. 599 (Bankr. S.D.N.Y. 2015), as an example of "unpaid obligations" that did not establish an

injury to the estate, "especially where 'the [d]ebtor appears to have benefitted from the alleged

misconduct.'" (MTD at 11.) But, whereas the alleged injury in *Pereira* involved required employer

contributions owed by the debtor going unpaid, none of the injuries alleged by the Trustee

involve the Debtors' failure to honor any obligation. Nor did the Debtors benefit in any way from

the fraudulent and needless depletion of their assets and other injuries alleged by the Trustee.

*Pereira* is therefore inapposite.

---

[3] Specifically, the *Picard* trustee alleged, "As a result of the Defendants aiding and abetting this breach of fiduciary duty, ***customers, creditors, and/or [the debtor]*** lost billions of dollars. At a minimum, the Defendant's actions resulted in a loss of approximately $19 billion." *(Case No. 11-cv-00913, at Dkt. 50, ¶ 535 (emphasis added)); see also* 460 B.R. at 96 ("The [t]rustee admits that he pursues these claims to recover the net equity of some of the claimants against the BMIS estate.").)

[4] *Hirsch* also involved professional malpractice claims, which the court held were barred by the *Wagoner* rule. But the *Wagoner* rule is inapplicable here because Bhansali is an insider of the Debtors. *See, e.g., In re PHS Group, Inc.*, 581 B.R. 16, 30 (E.D.N.Y. 2018) (collecting cases for the proposition that "[t]he *Wagoner* doctrine . . . does not apply to claims against insiders."). For this reason, *In re CBI Holding Co., Inc.*, 529 F.3d 432 (2d Cir. 2008), which analyzed the applicability of exceptions to the *Wagoner* rule, is similarly inapposite.

In sum, since the Trustee "is not seeking recovery on behalf of an individual or even a class of creditors" but instead "seeks recovery for the bankrupt corporation itself[,]" Bhansali's "argument that the Trustee lacks standing [should be] rejected." *See In re Scott Acquisition Corp.*, 344 B.R. 283, 291 (Bankr. D. Del. 2006).

## II.     The State Law Claims Are Not Time Barred.

Next, Bhansali argues that the Trustee's common law claims are time barred because "substantially all of the alleged bad acts occurred prior to March 27, 2016." (MTD at 12, 26-27.) This argument fails for multiple reasons. First, notwithstanding Bhansali's characterization of four allegations from the original complaint (with citations to their location in the original complaint, rather than the Amended Complaint) as "the only factual assertions involving Bhansali post-March 2016" (MTD at 12), the Amended Complaint contains many other allegations against Bhansali after March 2016.

For example, the Amended Complaint alleges that in 2018 alone, Bhansali: (i) created (and apparently deleted) spreadsheets explaining how the fraudulent schemes worked, tracking their financials, and directing efforts to frustrate their investigation (FAC ¶ 68), (ii) researched and implemented various means of deleting, encrypting, or preventing the creation of electronic data (*id.* ¶¶ 146-150); (iii) traveled overseas with Nehal Modi to intimidate and manipulate potential witnesses, destroy evidence, and remove valuable assets including 50 kilograms of gold (*id.* ¶ 151); (iv) made false and misleading statements in these Chapter 11 Cases under penalty of perjury (*id.* ¶¶ 152-55); (v) remained in contact with Nirav Modi after the Debtors' bankruptcy filing and discussed the Debtors' bankruptcy proceedings and sale efforts with Modi (*id.* ¶¶ 164-67); and (vi) orchestrated the diversion of the Debtors' and U.S. Affiliates' assets overseas following exposure of the Bank Scheme (*id.* ¶¶ 176-87). For the reasons discussed below, these allegations are sufficient by themselves to state a claim.

12

Even so, the Trustee's claims premised on earlier conduct remain actionable as well. Indeed, "[w]here an action is brought by a trustee or liquidator on behalf of a corporation that has been looted by persons who completely dominated and controlled it, the statute of limitations is tolled as against the control persons until the appointment of the independent trustee or liquidator." *Banco de Desarrollo Agropecuario, S.A. v. Gibbs*, 709 F.Supp. 1302, 1310 (S.D.N.Y. 1989) (citing *Armstrong v. McAlpin*, 699 F.2d 79, 87 (2d Cir. 1983)); *ITT, An International Investment Trust v. Cornfeld*, 619 F.2d 909, 929-30 (2d Cir. 1980); *Michelson v. Penney*, 135 F.2d 409, 415-16 (2d Cir. 1943)); *see also FDIC v. Pellatreau & Pellatreau*, 965 F.Supp. 381, 388 (E.D.N.Y. 1997) (finding allegations of domination and control sufficient to equitably estop defendant from raising a statute of limitations defense).

The Amended Complaint alleges Bhansali's and his co-Defendants' domination and control over the Debtors in great detail. (*See, e.g.,* FAC ¶¶ 61-91.) As such, the statutes of limitations for the Trustee's common law claims against Bhansali and his co-Defendants were tolled until the Trustee's appointment in June 2018. Since the original complaint was filed in March 2019, less than a year later, the Trustee's claims are not time barred under either the three-year or six-year (in the case of fraud) limitations periods for breach of fiduciary.

Moreover, even if the statutes of limitations were not tolled under nonbankruptcy principles, Bhansali's calculation of March 27, 2016 as the cut-off date would still be incorrect. Bhansali ignores section 108(a) of the Bankruptcy Code, which allows the Trustee an additional two years to bring any claim that was timely as of the petition date. *See* 11 U.S.C. § 108(a). Thus, the Trustee has until February 26, 2020 to bring any claim that accrued on or after February 26,

2015 (to the extent the limitations period is three years) or February 26, 2012 (to the extent the limitations period is six years.[5]

### III.   The Trustee Has Satisfied The Requirements of Rule 9(b) As To The State Law Claims.

Bhansali argues that, to the extent the Court finds fraud was essential to the alleged breach, the pleading is subject to the heightened requirements of Rule 9(b). He then contends the Trustee failed to allege Bhansali "knew the circular transactions were fraudulent," that Bhansali had any "conceivable motive," that Bhansali "benefited or stood to benefit from any alleged fraud," or "that the specific acts Bhansali allegedly committed were even committed in furtherance of any alleged fraud." (MTD at 20.)

But the Amended Complaint includes each of these allegations. Bhansali's knowledge of the fraudulent nature of the circular transactions is demonstrated by, *inter alia*, the allegations that Bhansali: (i) personally oversaw creation and staffing of the Shadow Entities and LOU Entities whose very purpose was perpetrating the fraud schemes (FAC ¶ 69), and (ii) created spreadsheets detailing the machinations of the fraud schemes and tracking the underlying financials (*id.* ¶ 68). Moreover, Bhansali's potential and actual benefit from his involvement in the fraud, along with his motive, are supported by, *inter alia*, the Trustee's allegations that (i) Bhansali personally received millions of dollars from Nirav Modi and Purvi Mehta (FAC ¶¶ 136-41), (ii) Bhansali's family trust received approximately $4.57 million dollars from LOU Entity DRUS (*id.* ¶ 30), and (iii) Neeshal Merchandising, an entity owned by Bhansali's wife, directly received from

---

[5] Moreover, "[w]hile a statute of limitations defense may be raised in a motion to dismiss[,] such a motion should not be granted unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Banco de Desarrollo Agropecuario, S.A. v. Gibbs*, 709 F.Supp. 1302, 1309-10 (S.D.N.Y. 1989) (citing *Ortiz v. Cornetta*, 867 F.2d 146 (2d Cir. 1989)) (internal quotations omitted). If the plaintiff alleges facts sufficient to trigger tolling of the limitations period, for example, dismissal is not appropriate. *See, e.g., FDIC v. Pellatreau & Pellatreau*, 965 F.Supp. 381, 388-89 (E.D.N.Y. 1997) ("[Given] the possibility that certain tolling doctrines may be applicable, the Court declines at this time to dismiss the FDIC's causes of action relating to ventures entered into prior to August, 1986.").

PNB over $11.4 million in fraudulent LOU proceeds, as well as over $4 million from Shadow Entities and $420,478.58 from FDI (*id.* ¶ 133-34). Thus, to the extent Rule 9(b)'s heightened pleading requirements are applicable, they are satisfied by the Amended Complaint.

Moreover, "[w]here facts are peculiarly within the opposing party's knowledge, as might be the case where private, financial transfers are involved, a complaint may base allegations on information and belief, provided that it 'adduce specific facts supporting a strong inference of fraud[.]'" *Sullivan v. Kodsi*, 373 F.Supp.2d 302, 306 (S.D.N.Y. 2005) (quoting *Wexner v. First Manhattan Co.*, 209 F.2d 169, 172 (2d Cir. 1990)); *accord Berk v. Tradewell, Inc.*, 2003 WL 21664679, at *13 (S.D.N.Y. July 16, 2003)).

Indeed "[g]reater liberality in the pleading of fraud is particularly appropriate in bankruptcy cases because it is often the trustee, a third party to the fraudulent transaction, that must plead the fraud on secondhand knowledge for the benefit of the estate and all of its creditors." *In re Bennett Funding Group, Inc.*, 367 B.R. 269, 297 (Bankr. N.D.N.Y. 2007) (quoting *Stratton Oakmont*, 234 B.R. at 310) (alterations and quotations marks omitted). This is particularly true "when the trustee's lack of personal knowledge is compounded with complicated issues and transactions which extend over lengthy periods of time." *Id.* In that circumstance, "the trustee's handicap increases, and courts, therefore, should afford him or her even greater latitude." *Id.*

Moreover, "Rule 9(b) is applied more leniently to complaints against corporate insiders." *Berk*, 2003 WL 2003 WL 21664679 at *13 (citing *Allen v. New World Coffee, Inc.*, 2001 WL 293683, at *4 (S.D.N.Y. March 27, 2001)); *accord Limas LS PLC v. PHL Variable Insurance Co.*, 2013 WL 12286066, at *5 (D. Conn. Dec. 17, 2013); *Sunrise Indus. Joint Venture v. Ditric Optics, Inc.*, 873 F.Supp. 765, 772 (E.D.N.Y. 1995). Under these standards, the Trustee's allegations are sufficient.

IV.     **The Amended Complaint States a Valid Claim for Breach of Fiduciary Duty.**

       A.     *Based On The Allegations Of The Amended Complaint, Bhansali Owed Fiduciary Duties of Loyalty and Care.*

Bhansali argues he did not owe the Debtors any fiduciary duties on the grounds that, under New York and Delaware law, a director of a wholly owned solvent subsidiary owes a fiduciary duty to its parent company. (MTD at 13-14.) But Bhansali ignores the well-established principle that "once a corporation is insolvent, corporate officers and directors owe a fiduciary duty to preserve corporate assets for the benefit of the creditors." *U.S. Small Bus. Admin. v. Feinsod*, 347 F.Supp.3d 147, 160 (E.D.N.Y. 2018); *In re Magnesium Corp. of Am.*, 399 B.R. 722, 773-74 (Bankr. S.D.N.Y. 2009); *see also In re Tronox Inc.*, 450 B.R. 432, 439 (Bankr. S.D.N.Y. 2011) ("The Delaware Supreme Court has also recognized that a parent owes fiduciary duties to a subsidiary when that subsidiary is insolvent[.]"). And a claim for breach of that duty belongs to the insolvent subsidiary, not its creditors. *Feinsod*, 347 F.Supp.3d at 161; *Teras Int'l Corp. v. Gimbel*, 2014 WL 7177972, at *12 (S.D.N.Y. Dec. 17, 2014); *Magnesium*, 399 B.R. at 773-74; *Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 103 (Del. 2007) ("[I]ndividual creditors of an insolvent corporation have no right to assert direct claims for breach of fiduciary duty against corporate directors.")).

Similarly, "[w]here there are shareholders in addition to the parent company, both the directors of the subsidiary and the parent company, as controlling shareholder, have a duty to consider the interests of the minority shareholders." *Roselink Investors, L.L.C. v. Shenkman*, 386 F.Supp.2d 209, 218 n.3 (S.D.N.Y. 2004); *accord In re Tronox Inc.*, 503 B.R. 239, 325 (S.D.N.Y. 2013); *In re BH S&B Holdings LLC*, 420 B.R. 112, 144 (Bankr. S.D.N.Y. 2009).

The Trustee alleged "[t]he Debtors were insolvent at the time each Actual Fraudulent Transaction occurred based on both the figures reflected on their balance sheet and the substantial

contingent liability they incurred in the course of their involvement in the Bank Fraud." (FAC ¶ 174(v).) Since the alleged Actual Fraudulent Transfers began as early as August 2011 (*see id.* ¶ 55(i)), Bhansali owed fiduciary duties to the Debtors' creditors from at least August 2011 onwards. The Trustee also alleged that Samuel Sandberg owns approximately 5% of both FDI and Jaffe. (*Id.* ¶¶ 9-10.) Consequently, due to both the Debtors' insolvency and the existence of a minority shareholder, Bhansali, as the sole director and CEO of each Debtor and their respective controlling shareholders FGI and Synergies (*see id.* ¶ 19), owed fiduciary duties to the Debtors.[6]

### B.   The Amended Complaint Properly Alleges Bhansali Breached His Duty of Loyalty.

The Amended Complaint properly alleges Bhansali breached his duty of loyalty. "The duty of loyalty requires an officer or director to (1) avoid fiduciary conflicts of interest and (2) act in good faith for the corporation's best interest." *In re MF Global Holdings Ltd.*, 507 B.R. 808, 811 (S.D.N.Y. 2014) (citing *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362 (Del. 2006)); *accord In re Tribune Co. Fraudulent Conveyance Litig.*, 2019 WL 294807, at *11 (S.D.N.Y. Jan. 23, 2019) ("The duty of loyalty requires a corporate director to act in the best interest of the corporation and to remain free of conflicts when making corporate business decisions.").

"A failure to act in good faith may be demonstrated 'where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation, where the fiduciary acts with the intent to violate applicable positive law, or where the fiduciary intentionally fails to act in the face of a known duty to act." *John Swann Holdings Corp. v. Simmons*,

---

[6] Bhansali also argues that, "as to Jaffe, the Trustee utterly fails to allege any damages to support [his breach of fiduciary duty]." (MTD at 14 (emphasis added).) Yet Bhansali then recites the specific damages alleged in paragraph 207 of the Amended Complaint, which he attacks by stating "the Trustee has now stretched the damages to include those purportedly arising from Bhansali's exercise of his constitutional rights." (*Id.*) Bhansali misconstrues the Trustee's allegations. The alleged post-petition damages flow not from Bhansali's silence, but from his myriad affirmative acts, including his submission of false and misleading statements in these Chapter 11 Cases, as well as his failures to act when obligated to do so (*e.g.,* his failure to have NMI and FDII repay amounts owed to the Debtors).

62 F.Supp.3d 304, 310 (S.D.N.Y. 2014) (quoting *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 67 (Del. 2006)). "Most basically, the duty of loyalty proscribes a fiduciary from any means of misappropriation of assets entrusted to his management and supervision." *Id.* (citing *U.S.W., Inc. v. Time Warner, Inc.*, 1996 WL 307445, at \*21 (Del. Ch. June 6, 1996)). "Other instances of director disloyalty include but are certainly not limited to the motives of entrenchment, fraud upon the corporation or the board, abdication of directorial duty, or the sale of one's vote." *Id.* (citing *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993)).

"[T]he fiduciary duty of loyalty is not limited to cases involving a financial or other cognizable fiduciary conflict of interest. It also encompasses cases where the fiduciary fails to act in good faith." *Stone*, 911 A.2d at 370; *see also Benedict v. Amaducci*, 1993 WL 87937, at \*5 (S.D.N.Y. March 22, 1993) ("Self-dealing in its classic sense is not the only form of conflict of interest that amounts to a breach of the duty of loyalty.") (applying New York law).

Moreover, in addition to fiduciary duties under state law, the filing of a bankruptcy case independently imposes upon directors and officers of a debtor-in-possession "an obligation to refrain from self-dealing, to avoid conflicts of interests and the appearance of impropriety, to treat all parties to the case fairly, and to maximize the value of the estate." *In re Adelphia Communications Corp.*, 336 B.R. 610, 669-70 (Bankr. S.D.N.Y. 2006).

The Trustee alleges Bhansali breached his duty of loyalty to the Debtors in numerous ways both before and after their bankruptcy filings. For example, he alleges Bhansali orchestrated numerous Actual Fraudulent Transfers, both as part of the day-to-day operation of the Funnel Scheme and also to permanently shield assets from creditors as part of the Exit Scheme, during the eight years preceding the Debtors' bankruptcy filing. (FAC ¶¶ 175, 206.) He further alleges that, after the Debtors' bankruptcy filing (when Bhansali unquestionably owed fiduciary duties to the Debtors' estates), Bhansali failed to call due the $11.2 million loan balance owed by NMI to

Jaffe and have NMI repay Jaffe using the more than $40 million in inventory NMI held as of the Petition Date. (*Id.* ¶ 161.) The Trustee alleges Bhansali instead caused NMI and FDII (against which the Debtors had substantial avoidance claims) to ship substantially all of their inventory to Modi-Controlled Entities overseas. (*Id.*) The Trustee further alleges that "although these shipments were disguised as sales, the parties never intended for the overseas entities to pay for the goods." (*Id.*) These allegations plausibly describe Bhansali's divided loyalties and bad faith.

Still, Bhansali argues the Amended Complaint fails to state a claim for breach of duty of loyalty because "Bhansali did not engage in any self-dealing or personally benefit from the alleged wrongdoing[.]" (MTD at 15-16.) But neither Delaware nor New York law requires self-dealing to establish a breach of the duty of loyalty. *See Stone*, 911 A.2d at 370; *Birnbaum v. Birnbaum*, 541 N.Y.S.2d 746, 748 (1989). Moreover, as discussed above, the Amended Complaint alleges that millions of dollars flowed from Nirav Modi, Purvi Mehta, and various Modi-Controlled Entities to Bhansali personally, to companies owned by his wife, and to his family's trust (FAC ¶¶ 30, 133-41).

Bhansali claims the Trustee's allegation concerning payments from DRUS to Bhansali's family trust are "not substantiated by any evidence" because the trust's bank statement shows no such transfers. (MTD at 16.) At most, Bhansali raises a factual dispute that is not susceptible to resolution on a motion to dismiss. The Amended Complaint makes clear that this allegation is based on the auto-saved version of a spreadsheet recovered from Mr. Bhansali's computer, which identifies an INR 32.83 crore "withdrawal" to "MR Family Trust" in fiscal year 2011-2012. (FAC ¶ 68(iv).) Given this document, the bank statement does not disprove the Trustee's allegation—the trust could easily have other bank accounts or the funds could have been transferred to a third party for the benefit of the M.R. Trust or Bhansali family. In sum, the Amended Complaint alleges sufficient facts to support the Trustee's breach of duty of loyalty claim.

### C.    The Amended Complaint Properly Alleges Bhansali Breached His Duty of Care.

The Amended Complaint properly alleges Bhansali breached his duty of care. "The fiduciary duty of care requires that directors of a Delaware corporation use that amount of care which ordinarily careful and prudent men would use in similar circumstances, and consider all material information reasonably available in making business decisions." *In re Trinsum Group, Inc.*, 466 B.R. 596, 606 (Bankr. S.D.N.Y. 2012) (internal quotations omitted). Breaches of the duty of care are actionable where the defendant's conduct constitutes "reckless indifference to or a deliberate disregard of stockholders" or "actions which are without the bounds of reason." *Id.*

Trustee alleges that Bhansali breached his duty of care by, among other things, (i) permitting Modi to usurp Bhansali's responsibilities (FAC ¶¶ 61-66, 206); (ii) causing the Debtors to participate in the fraudulent schemes (*id.* ¶¶ 68, 129–41, 206); (iii) depleting the Debtors' assets through Actual Fraudulent Transfers (*id.* ¶¶ 175, 206); (iv) looting recipients of Actual Fraudulent Transfers to the detriment of the Debtors' estates (*id.* ¶¶ 177-87, 206); and (v) causing the Debtors to expend corporate assets for the personal benefit of Modi and his family (*id.* ¶¶ 103–28, 206).

Bhansali makes four arguments. *First*, Bhansali argues that he did not allow Modi to usurp management because "[i]nsofar as Bhansali's duty was to the owner of [the] Debtors . . . it is inconceivable how his allowing the Debtors' ultimate owner . . . to exert control and decision-making authority over [the] Debtors' operations was with reckless indifference or without the bounds of reason."  (MTD at 17.)  This is a variation on Bhansali's argument that he did not owe a duty of care to the Debtors but instead to Modi, the Debtors' owner. But, as set forth above, due to both the Debtors' insolvency and the existence of a minority shareholder, Bhansali—the sole director and CEO of each Debtor and their respective controlling shareholders FGI and Synergies—owed fiduciary duties to the Debtors, not Modi.

20

*Second*, Bhansali argues that the Amended Complaint does not "specifically tie any act by Bhansali" to the alleged fraud. (MTD at 17.) Specifically, he argues that "[t]here are no allegations that Bhansali had any discretionary control or authority or took part in the decision to engage in the alleged fraud on any bank." (*Id.*) But the Amended Complaint alleges, among other things, that "Bhansali coordinated and directed fraudulent transactions among the U.S. Entities, Shadow Entities, and other Modi-Controlled Entities involving hundreds of millions of dollars in funds and diamonds." (FAC ¶ 63.) And while Bhansali argues "[t]he allegations do not even assert that any of the alleged transactions involving Bhansali perpetuated the alleged Bank Fraud" (MTD at 18), the Amended Complaint expressly alleges that Bhansali oversaw fraudulent transactions that "were integral to the Bank Fraud." (FAC ¶ 63.) Again, the Trustee's allegations sufficiently demonstrate Bhansali's knowledge of and participation in the fraudulent schemes.

*Third*, Bhansali calls the Actual Fraudulent Transfers nothing more than "everyday business transactions" (MTD at 18.) This is another factual dispute not appropriate for resolution on a motion to dismiss. Even so, the Trustee alleges numerous facts showing that each Actual Fraudulent Transaction was made with actual intent to hinder, delay, or defraud the Debtors' existing or future creditors. (*See, e.g.*, FAC ¶ 174.) Moreover, the Amended Complaint contains numerous others allegations describing how the fraudulent transactions differed from those with legitimate vendors. (*See, e.g., id.* ¶¶ 84-91 (describing separate accounting and inventory management practices used for Shadow Entity transactions)).

Moreover, with respect to the alleged looting of the U.S. Affiliates, Bhansali accuses the Trustee of "improperly (but no doubt deliberately) conflat[ing] the acts or omissions of non-debtor entities with that of the Debtors" and argues "[t]he alleged transfer of monies between the Debtors' debtors and non-debtor entities overseas cannot be a basis for a claim that Bhansali breached his fiduciary duty to the Debtors." *Id.* Bhansali is wrong. Since Bhansali remained the

sole director of each of the Debtors and U.S. Affiliates for several weeks after the Debtors'

bankruptcy filing (and continued to exercise control over the U.S. Affiliates' assets even after his

formal resignation from the U.S. Affiliates), he could have used NMI and FDII's assets to satisfy

the Debtors' claims against them. Instead, he and his co-conspirators shipped the U.S. Affiliates'

assets overseas to shield them from recovery by the Debtors and other creditors. Bhansali also

claims "the Amended Complaint itself alleges that the monies received by the Debtors as a result

of these 'Actual Fraudulent Transfers' were 'linked to or supporting the Bank Fraud' [and thus]

were never properly assets of the Debtors. (MTD at 18.) But the Actual Fraudulent Transfers, as

defined, encompass only transfers "of property of the Debtors[.]" (*See* FAC ¶ 173.)

    *Fourth*, Bhansali claims the breach of duty of care claim fails because Bhansali does not

owe a duty to the Trustee. But, as a matter of hornbook law, "the trustee stands in the shoes of

the bankrupt corporation and has standing to bring any suit that the bankrupt corporation could

have instituted had it not petitioned for bankruptcy." *Shearson Lehman Hutton, Inc. v. Wagoner*,

944 F.2d 114, 118 (2d Cir.1991) (citations omitted). Bhansali's contention that the Trustee cannot

bring a claim for breach of fiduciary duty belonging to the debtors contradicts this fundamental

bankruptcy precept.

**V.      The Amended Complaint States a Valid Claim for Corporate Waste.**

    The Amended Complaint states a valid claim for corporate waste. "[T]he essence of waste

is the diversion of corporate assets for improper or unnecessary purposes." *Patrick v. Allen*, 355 F.

Supp. 2d 704, 714 (S.D.N.Y. 2005). "To survive a motion to dismiss on a corporate waste claim,

Delaware law requires 'pleading of facts that show that the economics of the transaction were so

flawed that no disinterested person of right mind and ordinary business judgment could think

the transaction beneficial to the corporation.'" *In re W.J. Bradley Mortgage Capital, LLC*, 598 B.R.

150, 175 (Bankr. D. Del. 2019). Similarly, "[u]nder New York law, corporate waste occurs when

assets are used in a manner so far opposed to the true interests of the corporation so at to lead to the clear inference that no one thus acting could have been influenced by any honest desire to secure such interests." *U.S. Small Business Admin. v. Feinsod*, 347 F.Supp.3d 147, 160 (E.D.N.Y. 2018). A plaintiff states a claim for waste when he can show that the use of corporate property is inconsistent with the corporate purpose. *Patrick*, 355 F. Supp. 2d at 715.

The Trustee alleges Bhansali committed corporate waste by (i) "directing the Debtors and their officers to use corporate assets to acquire properties for the personal benefit of Modi and his family or by facilitating or permitting such use[;]" and (ii) "engag[ing] in transactions with Shadow Entities and other Modi-Controlled Entities that served no legitimate corporate or economic purpose." (FAC ¶ 255.)

Bhansali attacks the Trustee's corporate waste claim by discrediting arguments the Trustee has not made,[7] yet he fails to address the allegations concerning Actual Fraudulent Transfers to Shadow Entities and other Modi-Controlled Entities at all. (MTD at 23-26.) Indeed, the Actual Fraudulent Transfers constituted transfers of the Debtors' assets outside of the ordinary course of their businesses— frequently to Shadow Entities and other Modi-Controlled Entities Bhansali knew to be fictitious—for inadequate or even no consideration while the Debtors were insolvent. (*See, e.g.*, FAC ¶ 174.) Based on these allegations, "no disinterested person of right mind and ordinary business judgment could think [the Actual Fraudulent Transfers] beneficial to the [Debtors]." *See W.J. Bradley*, 598 B.R. at 175. The Trustee's allegations are thus sufficient to state a claim for corporate waste.

---

[7] For example, the Trustee's corporate waste claim is not based on the Ithaca Trust's purchase of the Ritz Carlton Apartment, nor the assignment of Nirav Modi's loan to Synergies to Purvi Mehta. (*See* MTD at 22-23, 25-26.)

VI.    **The Amended Complaint States Valid And Timely RICO Claims.**

A.    *The Alleged Injuries Are Sufficiently Direct and Proximate.*

Bhansali argues the Trustee lacks standing to bring the RICO claims asserted in the Amended Complaint on the grounds that "the purported scheme took a circuitous route to harm the Debtors" and that the alleged harm "is derivative, and entirely contingent upon the harm to non-party PNB." (MTD at 31.) Not true.[8] The Amended Complaint alleges Bhansali and his co-conspirators' RICO violations injured the Debtors in two principal ways, neither of which is derivative or contingent upon harm to PNB or any other third party.

*First*, Bhansali's RICO violations depleted the Debtors' tangible assets through innumerable Actual Fraudulent Transfers of cash and inventory both before and after exposure of the Bank Scheme. (*See, e.g.*, FAC ¶¶ 81-82, 173-76.) Then, in the weeks leading up to and following the filing of these Chapter 11 Cases, Bhansali and his co-conspirators cemented this injury in furtherance of the Exit Scheme by: (a) diverting substantially all of the U.S. Affiliates' assets to Modi-Controlled Entities overseas, including assets received from the Debtors through Actual Fraudulent Transfers (FAC ¶¶ 177-87); (b) submitting false statements under penalty of perjury in these Chapter 11 Cases so as to preserve control of the Debtors and buy additional time for assets to be diverted overseas (*id.* ¶¶ 152-60); (c) concealing estate assets, including the $11,216,467 loan receivable owed by NMI to Jaffe (*id.* ¶¶ 159-61); and (d) actively endeavoring to frustrate investigation of the fraudulent schemes through destruction of evidence and witness tampering (*id.* ¶¶ 146-51).

---

[8] While Bhansali frames this as a standing issue, the Second Circuit recently explained that "[a]lthough the causation requirement has sometimes been described as necessary to support 'statutory standing,' we think it is better understood as an element essential to the viability of a plaintiff's claim." *D'Addario v. D'Addario*, 901 F.3d 80, 96 n.8 (2d Cir. 2018).

*Second*, Bhansali's RICO violations caused the Debtors to spend millions of dollars in professional expenses related to the Trustee's and Examiner's investigation of information Bhansali lied about, concealed, failed to disclose, and/or actively endeavored to conceal, destroy, or otherwise render unavailable for use in connection with these chapter 11 cases. (*Id.* ¶ 303.) For the reasons set forth below, both of these injuries constitute a direct and proximate injury to the Debtors sufficient to support the Trustee's RICO claims.

   i.      *The Debtors were Injured by the Depletion of Their Tangible Assets and the Impairment of Their Claims Against U.S. Affiliates.*

In evaluating RICO claims based on looting or fraudulent transfers, courts uniformly attribute the direct injury to the entity whose assets were transferred, and characterize the harm to creditors and other indirect stakeholders as merely derivative of that injury. *See, e.g., D'Addario v. D'Addario*, 901 F.3d 80, 96-97 (2d Cir. 2018) (finding injury suffered by beneficiary of looted probate estate unripe); *Manson v. Stacescu*, 11 F.3d 1127, 1130-31 (2d Cir. 1993) ("The alleged looting of the Company only harmed the [creditor plaintiffs] indirectly."); *Wooten v. Loshbough*, 951 F.2d 768, 771 (7th Cir. 1991) ("The first level of injury is to the corporation, and the creditor only suffers because he has a claim against it."); *accord Bivens Gardens Office Bldg., Inc. v. Barnett Banks of Florida, Inc.*, 140 F.3d 898, 908 (11th Cir. 1998); *Whalen v. Carter*, 954 F.2d 1087, 1092-93 (5th Cir. 1992); *St. Paul Fire and Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 702 (2d Cir. 1989); *Jackson Nat. Life. Ins. Co. v. Litigator*, 949 F.Supp. 200, 205 (S.D.N.Y. 1996); *In re Ahead by a Length, Inc.*, 100 B.R. 157, 172-73 (Bankr. S.D.N.Y. 1989); *Dana Molded Products, Inc. v. Brodner*, 58 B.R. 576, 580-81 (N.D. Ill. 1986); *Zimmerman v. Duggan*, 86 B.R. 47, 50 (E.D. Pa. 1988).

As each Actual Fraudulent Transfer depleted the Debtors' property (*see, e.g.,* FAC ¶ 173(i)), they directly injured the Debtors and only indirectly harmed PNB and other creditors. *See Manson*, 11 F.3d at 1130-31. Moreover, the loss of the Debtors' interest in such property was

"reasonably foreseeable or anticipated as a natural consequence" of the Actual Fraudulent

Transfers. *See GICC Capital Corp. v. Technology Finance Group, Inc.*, 30 F.3d 289, 293 (2d Cir. 1994).

The Debtors' injury from the Actual Fraudulent Transfers is thus sufficiently direct and proximate

to support the Trustee's RICO claims.[9]

So too is the harm the looting of the U.S. Affiliates inflicted upon the Debtors.

Notwithstanding the well-settled principle recognized in *Manson* that the looted entity suffers the

initial injury, courts have occasionally found injuries sustained by creditors of the looted entity

sufficiently direct and proximate to support a RICO claim despite the identical harm sustained

by the looted entity. *See, e.g., GICC Capital Corp. v. Technology Finance Group, Inc.*, 30 F.3d 289, 293

(2d Cir. 1994); *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1101 (2d Cir. 1988); *Related Companies,*

*L.P. v. Ruthling*, 2017 WL 6507759, at *16 (S.D.N.Y. 2017). The circumstances under which it is

appropriate to apply *GICC* rather than *Manson* have been explained as follows:

> In *GICC*, the primary injured party was TFG, the debtor of the plaintiff, but there
> was no realistic possibility that TFG would bring suit "for the law's vindication."
> As the Court of Appeals noted, "TFG released the defendant from all claims that
> TFG might have had against the defendant. TFG's officers and directors resigned.
> TFG thus was cast adrift without recourse against" the defendant, its subsidiaries,
> or controlling persons. *GICC* thus represents the anomalous case where the
> primary injured party lacks the ability to sue. Suit by the derivatively injured party
> may be the only means to an equitable resolution in such a case; significantly, there
> exists no risk of double recovery.

*Jackson National Life Insurance Company v. Litigator*, 949 F.Supp. 200, 205 (S.D.N.Y. 1996) (internal

quotations, citations, and alterations omitted); *accord Ruthling*, 2017 WL 6507759 at *16 (quoting

---

[9] While PNB and other victims of the fraudulent schemes might be able to bring their own RICO claims
against Bhansali on the basis of the Actual Fraudulent Transfers or his other rampant misconduct, *see e.g.,
Bankers Trust Co.*, 859 F.2d at 1102, that in no way undermines the validity of the Trustee's RICO claim.
Moreover, it is not clear PNB could assert any RICO claim because its sole direct injury—its disbursement
of fraudulent loans—occurred overseas, and RICO requires a domestic injury. *See Bascuñán v. Elsaca*, 927
F.3d 806, 819 (2d Cir. 2017) ("We ultimately conclude that an injury to tangible property is generally a
domestic injury only if the property was physically located in the United States, and that a defendant's use
of the U.S. financial system to conceal or effectuate his tort does not, on its own, turn an otherwise foreign
injury into a domestic one.").

*Jackson* in stating, "Though *GICC Capital* is an 'anomalous case where the primary injured party lacks the ability to sue,' . . . this is also such a case.")).

Such circumstances exist here. Much like the looted companies in *GICC* and *Ruthling*, the U.S. Affiliates remained subject to Modi's and his co-conspirators' control after being looted and have never brought claims against Bhansali, Modi, or any of their other insiders for the harm the insiders inflicted on them. As the U.S. Affiliates cannot be expected to assert claims against Bhansali, "there is no risk of duplicative recovery," and permitting the Trustee to bring RICO claims premised on the looting of the U.S. Affiliates is "the only means to an equitable resolution." *Ruthling*, 2017 WL 6507759 at 16; *Jackson*, 949 F. Supp. at 205. In addition, by causing assets to be moved overseas and actively working to frustrate the Examiner's and Trustee's investigations, the insiders, including Bhansali, sabotaged the Trustee's ability to recover the looted assets through avoidance or comparable remedies. *See, e.g., Scholastic Decisions, Inc. v. DiDomenico*, 995 F.2d 1158, 1165 (2d Cir. 1993) ("As *Bankers Trust* recognized, a debt is 'lost' and thereby becomes a basis for RICO trebling only if the debt (1) cannot be collected (2) 'by reason of' a RICO violation.").

    ii.  *The Debtors were Injured by the Unnecessary Payment of Professional Fees.*

It is well-settled that payment of professional fees can constitute a valid RICO injury so long as they are a direct and proximate result of the defendant's RICO violation. *See D'Addario*, 901 F.3d at 96-97; *Bankers Trust Co.*, 859 F.2d at 1106; *287 Franklin Ave. v. Meisels*, 2015 WL 5457959, at *9 (E.D.N.Y. July 20, 2015); *First Capital Asset Management Inc. v. Brickellbush, Inc.*, 218 F.Supp.2d 369, 383 (S.D.N.Y. 2002). The Amended Complaint alleges that Bhansali's acts of obstruction of justice (including perjury, witness tampering, and destruction of evidence) and bankruptcy fraud (including perjury, concealment of assets, and withholding recorded information) caused the Debtors to pay substantial professional fees in connection with the Trustee's and Examiner's

investigation of information Bhansali lied about, concealed, destroyed, or otherwise actively endeavored to render unavailable for use in these proceedings.

But for Bhansali's violations of federal law, not only would the specific information and documents Bhansali buried have been much more readily available, a trustee would have been appointed immediately, which would have obviated the need for a separate examiner, and thus, the need to pay for two sets of professionals to conduct two separate investigations. As these professional expenses were "reasonably foreseeable or anticipated as a natural consequence" of Bhansali's obstruction of justice and bankruptcy fraud, their payment by the Debtors constitutes a sufficiently direct and proximate injury for the purposes of RICO. *See GICC Capital Corp. v. Technology Finance Group, Inc.*, 30 F.3d 289, 293 (2d Cir. 1994).

### B.    The Trustee's RICO Claims Are Not Time Barred.

Next, Bhansali argues that the Trustee's RICO claims are time barred because "the Debtors . . . necessarily discovered or should have discovered the alleged RICO injury no later than early 2011 when the purported scheme was implemented." (MTD at 31.) However, as discussed above, two of the principal injuries alleged by the Trustee—the impairment of claims against the U.S. Affiliates and the payment of otherwise unnecessary professional fees—resulted from acts taken within the months leading up to and following the Debtors' bankruptcy filing in February 2018. As the Trustee filed this case in March 2019, his RICO claims arising from those injuries are timely under RICO's four-year statute of limitations.

Moreover, the Trustee's RICO claims arising from all earlier misconduct and injuries, including the depletion of the Debtors' assets through Actual Fraudulent Transfers, remain timely by operation of the adverse domination tolling doctrine. "Under the doctrine of adverse domination, the statute of limitations is tolled for as long as a corporate plaintiff is controlled by the alleged wrongdoers." *In re Adelphia Communications Corp.*, 365 B.R. 24, 58-59 (Bankr. S.D.N.Y.

2007); *accord Armstrong v. McAlpin*, 699 F.2d 79, 87 (2d Cir. 1983); *Moviecolor Limited v. Eastman Kodak Co.*, 288 F.2d 80, 88 (2d Cir. 1961); *Barnet v. Drawbridge Special Opportunities Fund LP*, 2014 WL 3493320, at \*13-14 (S.D.N.Y. Sept. 5, 2014); *In re Everfresh Beverages, Inc.*, 238 B.R. 558, 577 (Bankr. S.D.N.Y. 1999); *Meridien Int'l Bank Ltd. v. Gov't of the Republic of Liberia*, 23 F. Supp. 2d 439, 447-48 (S.D.N.Y. 1998); *Rosner v. Peregrine Finance Ltd.*, 1998 WL 249197, at \*8 (S.D.N.Y. May 18, 1998); *In re Ahead by a Length, Inc.*, 100 B.R. 157, 163 (Bankr. S.D.N.Y. 1989).

The Amended Complaint alleges Bhansali's domination and control over the Debtors in great detail. (*See, e.g.,* FAC ¶¶ 61-66.) On the basis of these allegations, the statute of limitations was tolled until Bhansali relinquished control over the Debtors in May 2018. *See, e.g., Adelphia*, 365 B.R. at 58-59. Since all of the misconduct and injuries alleged in the Amended Complaint occurred while Bhansali and his co-Defendants controlled the Debtors, even injuries sustained in 2010 and 2011 remain actionable. Moreover, Bhansali again ignores section 108(a) of the Bankruptcy Code, by operation of which the Trustee has until February 28, 2020 to bring RICO claims that accrued since February 26, 2014 (i.e. four years prior to the petition date). *See* 11 U.S.C. § 108(a).

Finally, even to the extent any of the Trustee's allegations pre-date the applicable limitations period, such allegations remain relevant to show the Defendants' knowledge, intent, and pattern of racketeering activity. *See, e.g., U.S. Textiles, Inc. v. Anheuser-Busch Companies, Inc.*, 1988 WL 31479, at \*2 (N.D. Ill. 1988) ("The acts occurring outside the limitations period still can be used to show fraud and a pattern of racketeering, but plaintiff can only recover for injuries caused by overt or wrongful acts committed within the limitations period and injury suffered within the limitations period.").

### C.    The Amended Complaint Properly Pleads Each Predicate Act.

#### i.    The Amended Complaint Properly Pleads Mail and Wire Fraud.

The Amended Complaint properly pleads mail and wire fraud. "Because the mail and wire fraud statutes use the same relevant language, [courts] analyze them the same way." *U.S. v. Binday*, 804 F.3d 558, 569 (2d Cir. 2015). "The essential elements of both offenses are (1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme." *Id.* (internal quotations omitted). Though not defined by the statutes, a "scheme to defraud" has been described as "a plan to deprive a person of something of value by trick, deceit, chicane or overreaching . . . and is characterized by a departure from community standards of fair play and candid dealings." *U.S. v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000) (internal quotations and citations omitted). "[I]t is not necessary for the defendant to participate personally in the wire transmission [or mailing], as long as it is reasonably foreseeable that the [alleged wire or mailing] would occur in the execution of the scheme." *U.S. v. Bahel*, 662 F.3d 610, 641-42 (2d Cir. 2011) (quoting *Schumuck v. United States*, 489 U.S. 705, 710-11 (1989)).

The Trustee properly alleges these elements. Again, the Amended Complaint extensively describes the mechanics of the fraudulent schemes, the role played by Bhansali in such schemes, the ways in which wires and mailings were used in furtherance of such schemes generally, and dozens of specific examples of such wires and mailings. These allegations are sufficient to establish claims for mail and wire fraud.

None of Bhansali's arguments otherwise have merit. First, he argues that, to adequately plead mail or wire fraud, the Trustee is required to allege specific instances of misrepresentation of material facts by each defendant and explain when and where the statements were made, who made them, and why they were false or misleading. (MTD at 33.) But it is well-settled that such specificity is only required where the plaintiff alleges the wires or mailings themselves contained

false or misleading information; by contrast, where facially innocent mails or wires were simply

used in furtherance of a master plan to defraud, "a detailed description of the underlying scheme

and the connection therewith of the mail and/or wire communications is sufficient to satisfy Rule

9(b)." *Jerome M. Sobel & Co. v. Fleck*, 2003 WL 22839799, at *5-6 (S.D.N.Y. Dec. 1, 2003) (quoting *In

re Sumitomo Copper Litig.*, 995 F.Supp. 451, 456 (S.D.N.Y. 1998)); *accord Williams v. Affinion Group,

LLC*, 889 F.3d 116, 125 (2d Cir. 2018); *Mohr-Lecara v. Oxford Health Ins., Inc.*, 2019 WL 1409479, at

*10 (S.D.N.Y. March 28, 2019); *Stein v. New York Stair Cushion Co., Inc.*, 2006 WL 319300, at *5

(E.D.N.Y. 2006); *In re Gas Reclamation, Inc. Securities Litig.*, 659 F.Supp. 493, 513 (S.D.N.Y. 1987).

If anything, the Amended Complaint alleges more detail than necessary; for example, in

*Ahead by a Length*, the court emphasized:

> It is not necessary that the trustee plead detailed evidentiary matter. Where, as
> here, it is alleged that the transactions involved cover a long period of time,
> pleading on information and belief without specifics as to each and every
> transaction is often permissible. Since the trustee, a stranger to the fraudulent
> scheme, has specified so many of the transactions in detail, the [a]mended
> [c]omplaint is certainly adequate."

100 B.R. at 168; *accord Stratton Oakmont*, 234 B.R. at 316-17 ("While it is true that some allegations

are more detailed than others, the Trustee is permitted to plead in such a fashion given his second-

hand knowledge of facts which are predominantly if not exclusively in the control of [the

defendants]."). So too here.

Next, Bhansali argues the Amended Complaint "fails to allege with any specificity that

Bhansali had the requisite intent to defraud the Debtors." (MTD at 34.) Yet, "[w]hen the necessary

result of the actor's scheme is to injure others, fraudulent intent may be inferred from the scheme

itself." *U.S. v. D'Amato*, 39 F.3d 1249, 1257 (2d Cir. 1994). As the use of wires and mailings in

connection with the schemes to deplete the Debtors' assets through Actual Fraudulent Transfers

and to loot the U.S. Affiliates necessarily involved injuring the Debtors, Bhansali's intent to injure

the Debtors can be inferred from the facts alleged. *See id.* Moreover, "while the actual fraud alleged must be stated with particularity[,] the requisite intent of the alleged perpetrator need not be alleged with great specificity." *Wight v. BankAmerica Corp.*, 219 F.3d 79, 91 (2d Cir. 2000) (internal quotations and alterations omitted); *accord Mohr-Lecara*, 2019 WL 1409479 at 10. ("A civil RICO defendant's *mens rea* need not be alleged with great specificity.").

Bhansali also calls it "telling" that of the "ninety examples of purported mails and wires . . . only twelve of them even reference Bhansali and, of those that do, the majority of the twelve communications are merely ones which were forwarded to or copied Bhansali." (MTD at 34.) But, as noted above, the Trustee is not required to prove Bhansali personally participated in or even knew about any specific wire or mailing; he need only show Bhansali participated in a scheme to defraud in furtherance of which the use of wires or mailings was foreseeable. *See Bahel*, 662 F.3d at 641-42; *accord Stein*, 2006 WL 319300 at *6. Moreover, in *Bankers Trust*, the Second Circuit rejected an identical argument "that the complaint does not sufficiently allege [the defendant's] participation in the . . . acts of the other defendants," holding:

> At this early stage and in the absence of any meaningful discovery, [the plaintiff] has been unable to ascertain fully the extent of the [defendant's] participation in and knowledge of the bribery and . . . frauds. Nevertheless, more than enough has been pled to raise an inference of [the defendant's] knowledge and participation.

*Bankers Tr. Co. v. Rhoades*, 859 F.2d 1096, 1107 (2d Cir. 1988). So too here.

Bhansali also argues that none of alleged emails referencing Bhansali from after March 2016 (which is when Bhansali argues the statute of limitations ran) "shows any act or omission by Bhansali that may indicate an intent to defraud the Debtors or establish any connection with the Bank Fraud." (MTD at 34.) But the law is clear that "even 'innocent' mailings or wire transfers may constitute predicate acts so long as they are part of the execution of the scheme." *Adelphia*,

2007 WL 2403553 at *13; *accord U.S. v. Reifler*, 446 F.3d 65, 96 (2d Cir. 2006); *Fleck*, 2003 WL 22839799 at *5; *Stein*, 2006 WL 319300 at *5.[10]

> ii.    *The Amended Complaint Properly Pleads Violations of the National Stolen Property Act.*

The Amended Complaint properly pleads violations of the National Stolen Property Act, 18 U.S.C. § 2314 ("**NSPA**"). A claim under the NSPA, requires: "first, that the defendant have transported 'goods, wares, [or] merchandise' in interstate or foreign commerce; second, that those goods have a value of '$5,000 or more'; and, third, that the defendant 'kno[w] the same to have been stolen, converted or taken by fraud.'" *Dowling v. United States*, 473 U.S. 207, 214 (1985) (quoting 18 U.S.C. § 2314); *accord United States v. Agrawal*, 726 F.3d 235, 251 (2d Cir. 2013).

Attacking the Trustee's allegations concerning Bhansali's knowledge of the fraudulent nature of the Actual Fraudulent Transfers, Bhansali accuses the Trustee of making "self-serving revisions" to his original complaint "with a few strokes of the keyboard, in a conclusory manner, [to allege] Bhansali has the requisite knowledge [without any] additional factual allegations to support this claim." (MTD at 36 n.14.) While Bhansali correctly notes that the Amended Complaint now alleges the Defendants' knowledge conjunctively, rather than disjunctively, he ignores the extensive new factual allegations justifying that revision. Indeed, for the reasons discussed above, the Trustee's allegations concerning Bhansali's knowledge of the fraudulent nature of the Actual Fraudulent Transfers are not mere conclusions, but instead solid factual

---

[10] Bhansali also recycles his argument that PNB was the intended victim of the acts underlying the Trustee's allegations of wire fraud and mail fraud. (MTD at 35.) That is not the case for all of the reasons discussed in response to Bhansali's causation argument. He further argues, in a one-sentence footnote, that the Trustee failed to sufficiently allege Bhansali's participation in the alleged RICO enterprise. But the Amended Complaint characterizes each Debtor itself as a RICO enterprise (along with several alternative association-in-fact theories) (FAC ¶¶ 238-41), and extensively alleges Bhansali's participation in and management and control over the affairs of the Debtors.

allegations that satisfy Rule 9(b) and for which all reasonable inferences must be drawn in the

Trustee's favor.

> ### iii.    The Amended Complaint Properly Pleads Money Laundering.

The Amended Complaint properly pleads money laundering under 18 U.S.C. §§ 1956 and

1957. A claim under section 1956 requires that "(1) the individual conducted a financial

transaction in interstate commerce, (2) with knowledge that the property involved in the

transaction represented some form of unlawful activity, (3) with the transaction in fact involving

the proceeds of specified unlawful activity, (4) with the purpose, in whole or in part, of concealing

or disguising the nature, the location, the source, the ownership or the control of the illegally

acquired proceeds." *Republic of Colombia v. Diageo N. Am. Inc.*, 531 F. Supp. 2d 365, 438 (E.D.N.Y.

2007); *accord United States v. Maher*, 108 F.3d 1513, 1527-28 (2d Cir. 1997). Section 1957 requires

that the defendant "(1) knowingly engaged or attempted to engage in a monetary transaction

involving criminally derived property, (2) with such property being valued at more than $10,000,

and (3) with such money actually being derived from specified unlawful activity." *Republic of

Colombia*, 531 F. Supp. 2d at 438-39.

The Trustee alleges that Bhansali knew the property involved in each Subsequent Transfer

represented the proceeds of unlawful activity (e.g., the mail and wire fraud committed in

connection with each applicable Actual Fraudulent Transfer). (FAC ¶¶ 173-76, 272.) Bhansali

claims this is not enough, arguing that Amended Complaint fails to allege Bhansali knew about

the fraud, knew that the property "represented 'some form of specific unlawful conduct,'" or had

the requisite intent to conceal the origin of the funds. (MTD at 36-37.) However, the allegations

supporting Bhansali's participation and involvement in the fraudulent schemes, as chronicled at

length above, are sufficient to establish Bhansali's knowledge that the Subsequent Transfers

represented the proceeds of some form of unlawful activity and that Bhansali intended to conceal their origin.

### iv.     The Amended Complaint Properly Pleads Obstruction of Justice.

The Amended Complaint properly pleads obstruction of justice. 18 U.S.C. § 1503(a) criminalizes, among other things, "corruptly . . . endeavor[ing] to influence, obstruct, or impede" (1) any officer in or of any court of the United States in the discharge of his duty; or (2) the due administration of justice. *See* 18 U.S.C. § 1503(a). A bankruptcy trustee constitutes an officer of the court for the purposes of section 1503(a), s*ee U.S. v. Crisp*, 306 F.3d 71, 82 (2d Cir. 2002), and so too should a bankruptcy examiner. *See* 11 U.S.C. § 1104(c) (providing for court-appointed examiners in cases involving, *inter alia*, fraud or misconduct).  To establish a violation of section 1503(a), the plaintiff must establish that:

(1)  there is a pending judicial or grand jury proceeding constituting the administration of justice;

(2)  the defendant knew or had notice of the proceeding; and

(3)  the defendant acted with the wrongful intent or improper purpose to influence the judicial or grand jury proceeding, whether or not the defendant is successful in doing so.

*U.S. v. Sampson*, 898 F.3d 287, 299 (2d Cir. 2018). A plaintiff can prove the requisite intent by showing that the defendant's conduct "had the natural and probable effect of interfering with a judicial or grand jury proceeding." *Id.*

Separately, section 1512(b) criminalizes "knowingly us[ing] intimidation, threaten[ing], or corruptly persuad[ing] another person, or attempting to do so, or engaging win misleading conduct toward another person, with intent to" among other things:

(1)  influence, delay, or prevent the testimony of any person in an official proceeding; or

(2)  cause or induce any person to (among other things):

35

(a) withhold testimony, or withhold a record, document, or other object
from an official proceeding; or

(b) alter, destroy, mutilate, or conceal an object with intent to impair the
object's integrity or availability for use in an official proceeding.

*See* 18 U.S.C. § 1512(b).

Section 1512(c) criminalizes "corruptly altering, destroying, mutilating, or concealing a record, document, or other object, or attempting to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or (2) otherwise obstructing, influencing, or impeding any official proceeding, or attempting to do so." 18 U.S.C. § 1512(c).

In the context of section 1512, the term "official proceeding" includes any proceeding before a bankruptcy judge. *See* 18 U.S.C. § 1515(a)(1). The official proceeding "need not be pending or about to be instituted at the time of the offense[,]" but must be "reasonably foreseeable to the defendant." *See U.S. v. Pugh*, 937 F.3d 108, 120 (2d Cir. 2019); 18 U.S.C. § 1512(f)(1). While the plaintiff must show a "nexus" between the defendant's conduct and the pending or foreseeable official proceeding, such nexus "does not depend on the defendant's knowledge" but instead whether the defendant's acts have "a relationship in time, causation, or logic with the judicial proceedings." *Id.* "In other words, the endeavor must have the natural and probable effect of interfering with the due administration of justice." *Id.* Finally, section 1512 applies to conduct that occurs outside of the United States and also criminalizes conspiring to commit any offense under section 1512. *See* 18 U.S.C. §§ 1512(j)-(k).

The Amended Complaint properly pleads violations of these provisions. It alleges that Bhansali—or others with whom Bhansali conspired (including, but not limited to, Nirav Modi and Nehal Modi): (a) intimidated and coerced directors and employees of Shadow Entities not to cooperate with investigative authorities, including by confiscating their passports (FAC ¶ 151(ii), (vi)); (b) destroyed cell phones of Shadow Entity directors (*id.* at ¶ 151(iii)); (c) bribed a Shadow

36

Entity director to give false testimony (*id.* ¶ 151(v)); (d) directed Shadow Entity personnel to sign false affidavits (*id.* ¶ 151(vii)); (e) made false and misleading statements under penalty of perjury in the Debtors' bankruptcy cases (*id.* ¶¶ 152-61); (f) concealed assets in the Debtors' bankruptcy cases, including the $11.2 million loan owed by NMI to Jaffe (*id.*); (g) researched and implemented means of permanently deleting or encrypting electronic data (*id.* ¶¶ 142-49, 279); and (h) lied to the Examiner (*id.* ¶¶ 168-70).

Substantially all of the alleged misconduct occurred either after the Debtors' bankruptcy filing or just before. Bhansali and his co-conspirators were therefore aware of or at least could have foreseen these Chapter 11 Cases at the time they engaged in the conduct alleged. *See Pugh*, 937 F.3d at 120. Moreover, the natural and foreseeable consequence of the alleged misconduct was to impede and obstruct the administration of the Debtors' bankruptcy proceedings and the Trustee and Examiner's discharge of their duties. *See U.S. v. Sampson*, 898 F.3d at 299. Thus, the Trustee properly pleaded obstruction of justice.

Bhansali's arguments here are unavailing. First, he claims the Amended Complaint "is devoid of any allegations to support the notion that Bhansali's actions were not the result of a mistake." (MTD at 37.) Given the extensive details regarding Bhansali's prominent role in orchestrating the fraudulent schemes, the Trustee plausibly alleges that Bhansali's disavowal of the Debtor's involvement in such schemes under penalty of perjury was not accidental. Nor is it clear how Bhansali could have mistakenly committed or conspired to commit the myriad other acts alleged by the Trustee.

Next, Bhansali challenges the continuity of the Trustee's obstruction of justice allegations, which he incorrectly claims "occurred well after the alleged racketeering activity had ended[.]" (MTD at 38.) But, as discussed above, the Exit Scheme, in connection with which Bhansali and his co-conspirators diverted assets of the Debtors and U.S. Affiliates to overseas Modi-Controlled

Entities after the Bank Scheme's exposure, was still very much in operation during the first half of 2018 when the alleged obstruction of justice occurred. (*See* FAC ¶¶ 173-187.) Indeed, approximately $45 million in NMI and FDII inventory remained in the custody of Malca Amit in New York until September 2018, when it was released to the U.S. Affiliates' director, Rochelle Miller, and subsequently shipped to overseas Modi-Controlled Entities. (*Id.* at ¶¶ 178-85.)

This case is therefore distinguishable from the cases cited by Bhansali. In *World Wrestling Entertainment, Inc. v. Jakks Pacific, Inc.*, 530 F.Supp.2d 486 (S.D.N.Y. 2007), "[t]he alleged coverup . . . d[id] not qualify because it post-date[d]—*by a couple of years*—the underlying and completed bribery scheme." *Id.* at 512 (emphasis added). Even so, *World Wrestling* recognized that obstruction of justice can serve as a predicate act where it "furthers the main criminal objectives" of a conspiracy by "lengthening its life" – "such as when conspirators in a kidnaping conspiracy hide while waiting for the delivery of ransom." *Id.* Just as hiding lengthens the life of a kidnaping conspiracy, the alleged obstruction of justice here allowed additional time for the looting of the U.S. Affiliates to occur. *See id.*

The other case Bhansali cites, *Ray Larsen Associates, Inc. v. Nikko America, Inc.*, 1996 WL 442799 (S.D.N.Y. 1996), is equally distinguishable. In *Ray Larsen*, the plaintiff alleged a mail and wire fraud scheme spanning October 1987 to March 1989 in its original complaint. *Id.* at 7. In a 1994 amended complaint, the plaintiff alleged acts of obstruction of justice during the pendency of the lawsuit. *Id.* at n.8. The court declined to consider these allegations because the alleged racketeering activity otherwise ceased in 1989. *Id.* In this case, by contrast, Bhansali's acts of

obstruction of justice were directly linked, both temporally and logically, to the other alleged racketeering activities.[11] Bhansali's obstruction of justice arguments thus fail.[12]

> v.    *The Amended Complaint Properly Pleads Bankruptcy Fraud.*

The Amended Complaint properly pleads bankruptcy fraud. 18 U.S.C. § 152 criminalizes, among other things, knowingly and fraudulently (1) concealing any property belonging to the estate of a debtor; (2) making a false oath or account in or in relation to a bankruptcy case; and (3) making a false declaration, certificate, verification, or statement under penalty of perjury in or in relation to a bankruptcy case. *See* 18 U.S.C. § 152.

The Trustee satisfied these elements by: (1) alleging Bhansali knowingly and fraudulently declared under penalty of perjury that certain Shadow Entities listed in the Debtors' lists of largest creditors were not insiders of the Debtors and that the Debtors had no involvement in the alleged wrongful misconduct; and (2) alleging Bhansali and Gandhi knowingly and fraudulently concealed property belonging to the Debtors' estates, including the $11.2 million loan owed by NMI to Jaffe. Rather than address the substance of section 152, Bhansali incorporates his obstruction of justice arguments by reference, which he claims apply equally to the Trustee's bankruptcy fraud allegations. Those arguments are equally inapposite here for all of the reasons discussed above.

---

[11] Moreover, the plaintiff in *Ray Larsen* relied on the obstruction of justice allegations because its other allegations were insufficient to establish close-ended continuity (which requires long-term criminal conduct). *Id.* at 7. That is not an issue here where the alleged racketeering activity dates back to at least 2010 (and the Exit Scheme to at least 2012).

[12] Bhansali also challenges the causation between the alleged obstruction of justice and the injuries alleged by the Trustee. This argument fails for the reasons discussed above.

D.      *The Amended Complaint Properly Pleads RICO Conspiracy.*

The Amended Complaint properly pleads RICO conspiracy. To establish a violation of 18 U.S.C. § 1962(d), the plaintiff need only "prove the existence of an *agreement* to violate RICO's substantive provisions." *U.S. v. Appins*, 637 F.3d 59, 75 (2d Cir. 2011) (emphasis in original). For an agreement to exist, the defendant need only know of the general contours of the conspiracy and agree to its general criminal objective. *Id.* (citing *U.S. v. Zichettello*, 208 F.3d 72, 100 (2d Cir. 2000)). The defendant need not commit any predicate acts so long as they adopt the goal of furthering or facilitating the criminal endeavor. *Id.* A defendant may agree to join a RICO conspiracy without knowing the identities of all of the other conspirators and without full knowledge of all of the details of the conspiracy. *Id.*

The Trustee alleges Bhansali knowingly and willfully agreed with Modi, Gandhi, and others to violate section 1962(c). (*See* FAC ¶ 308.) Bhansali argues the Trustee's RICO conspiracy claim must be dismissed because the Trustee has not adequately pleaded a substantive RICO violation. Since, for all of the reasons discussed above, the Trustee has in fact properly pleaded a violation of section 1962(c), Bhansali's conspiracy argument fails as well.

## CONCLUSION

For reasons set forth in this Opposition, the Trustee respectfully requests the Court deny Defendant Mihir Bhansali's Motion to Dismiss in its entirety.

Dated: December 13, 2019
        New York, New York

Respectfully submitted,

**JENNER & BLOCK LLP**

By: /s/ Vincent E. Lazar
Vincent E. Lazar
Angela M. Allen (admitted *pro hac vice*)
William A. Williams (*pro hac vice* pending)
353 North Clark Street
Chicago, Illinois 60654
(312) 222-9350
vlazar@jenner.com
aallen@jenner.com

Carl N. Wedoff
919 Third Avenue
New York, New York 10022
(212) 891-1600
cwedoff@jenner.com

*Counsel for the Chapter 11 Trustee*