**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| FIRESTAR DIAMOND, INC., *et al.* | No. 18-10509 (SHL) |
| Debtors. | (Jointly Administered) |
| RICHARD LEVIN, Chapter 11 Trustee of FIRESTAR DIAMOND, INC., FANTASY, INC., and OLD AJ, INC. f/k/a A. JAFFE, INC., | Adv. Proc. No. 19-1102 (SHL) |
| Plaintiff, | |
| v. | |
| NIRAV DEEPAK MODI, MIHIR BHANSALI, and AJAY GANDHI, | |
| Defendants. | |

**TRUSTEE'S OPPOSITION TO DEFENDANT NIRAV DEEPAK**
**MODI'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................**Error! Bookmark not defined.**

PRELIMINARY STATEMENT .............................................................................. 1

SUMMARY OF ALLEGATIONS ........................................................................... 2

I.      The Bank Scheme. ................................................................................ 2

II.     The Funnel Scheme. ............................................................................. 4

III.    The Exit Scheme. .................................................................................. 5

APPLICABLE STANDARDS ................................................................................. 8

I.      Rule 12(b)(6) Standard ......................................................................... 8

II.     Rule 9(b) Standard. .............................................................................. 8

ARGUMENT .......................................................................................................... 9

I.      The Trustee Has Standing to Bring the State Law Claims. ................... 9

II.     The Amended Complaint States a Valid Claim for Breach of Fiduciary Duty and
        Corporate Waste ................................................................................. 12

        A.      Based On The Allegations Of The Amended Complaint, Modi Owed
                Fiduciary Duties of Loyalty and Care ......................................... 12

        B.      The Amended Complaint Properly Alleges Modi is Liable for Breach of
                Fiduciary Duty and Corporate Waste. ......................................... 14

III.    The Amended Complaint States Valid Claims for Aiding and Abetting Breach of
        Fiduciary Duty. .................................................................................. 17

IV.     The State Law Claims Are Not Time Barred ........................................ 19

V.      The Amended Complaint States Valid And Timely RICO Claims ....................................... 20

        A.      The Alleged Injuries Are Sufficiently Direct and Proximate. ................. 20

                i.      Modi's Causation Argument Directly Contradicts Supreme Court
                        Precedent ........................................................................ 21

                ii.     The Debtors' Injuries Flowed Directly From Modi's Misconduct. ............ 22

                iii.    Modi's Causation Argument Misapplies Other Important RICO
                        Principles ........................................................................ 26

i

B.    The Trustee's RICO Claims Are Not Barred by the In Pari Delicto
       Doctrine ........................................................................................................ 28

C.    The Trustee's RICO Allegations  Satisfy the Requirements of Rule 9(b). .............. 29

D.    The Amended Complaint Properly Pleads Each Predicate Act. ............................ 31

       i.     The Amended Complaint Properly Pleads Mail and Wire Fraud. ............ 31

       ii.    The Amended Complaint Properly Pleads Violations of the NSPA. ........ 33

       iii.   The Amended Complaint Properly Pleads Money Laundering. ............... 34

       iv.    The Amended Complaint Properly Pleads Obstruction of Justice. ........... 35

E.    The Amended Complaint Properly Pleads RICO Conspiracy. .............................. 38

F.    The Trustee's RICO Claims Are Not Time Barred. ................................................. 39

CONCLUSION ....................................................................................................................... 40

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

CASES

*287 Franklin Ave. v. Meisels*,
  2015 WL 5457959 (E.D.N.Y. July 20, 2015) .................................................................. 26

*4 K&D Corp. v. Concierge Auctions, LLC*,
  2 F.Supp.3d 525, 543 (S.D.N.Y. 2014) ........................................................................ 27

*Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*,
  930 A.2d 92 (Del. 2007)............................................................................................... 14

*American Tissue, Inc. v. Donaldson, Lufkin & Jenrette Secs. Corp.*,
  351 F. Supp. 2d 79 (S.D.N.Y. 2004) ............................................................................ 11

*Anhui Green Lighting Co., Ltd. v. Green Logic LED Electrical Supply, Inc.*,
  2019 WL 6498094 (S.D.N.Y. Dec. 3, 2019) .................................................................. 8

*Anza v. Ideal Steel Supply Corp.*,
  547 U.S. 451 (2006) ...................................................................................................... 21

*Armstrong v. McAlpin*,
  699 F.2d 79 (2d Cir. 1983)........................................................................................... 40

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ........................................................................................................ 8

*Baisch v. Gallina*,
  346 F.3d 366 (2d Cir. 2003).......................................................................................... 22

*Banco de Desarrollo Agropecuario, S.A. v. Gibbs*,
  709 F.Supp. 1302 (S.D.N.Y. 1989)......................................................................... 19, 20

*Bankers Trust Co. v. Rhoades*,
  859 F.2d 1096 (2d Cir. 1988)............................................................................. 24, 26, 33

*Barnet v. Drawbridge Special Opportunities Fund LP*,
  2014 WL 3493320 (S.D.N.Y. Sept. 5, 2014) ................................................................ 40

*Bascuñán v. Elsaca*,
  927 F.3d 806 (2d Cir. 2017)......................................................................................... 28

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ........................................................................................................ 8

*Berk v. Tradewell, Inc.,*
    2003 WL 21664679 (S.D.N.Y. July 16, 2003) ................................................................. 30

*Bivens Gardens Office Bldg., Inc. v. Barnett Banks of Florida, Inc.,*
    140 F.3d 898 (11th Cir. 1998) ................................................................................ 24

*City of New York v. Smokes-Spirits.com, Inc.,*
    541 F.3d 425 (2d Cir. 2008) ............................................................................. 21, 22

*Commercial Cleaning Services, L.L.C. v. Colin Service Systems, Inc.,*
    271 F.3d 374 (2d Cir. 2001) .................................................................................. 27

*D'Addario v. D'Addario,*
    901 F.3d 80 (2d Cir. 2018) ....................................................................... 20, 23, 26

*Dowling v. United States,*
    473 U.S. 207 (1985) ............................................................................................ 34

*FDIC v. Pellatreau & Pellatreau,*
    965 F.Supp. 381 (E.D.N.Y. 1997) ..................................................................... 19, 20

*Financial Guar. Ins. Co. v. Putnam Advisory Co., LLC,*
    783 F.3d 395 (2d Cir. 2015) .................................................................................... 8

*First Capital Asset Management Inc. v. Brickellbush, Inc.,*
    218 F.Supp.2d 369 (S.D.N.Y. 2002) ..................................................................... 26

*GICC Capital Corp. v. Technology Finance Group, Inc.,*
    30 F.3d 289 (2d Cir. 1994) .............................................................................. 24, 26

*Hemi Group, LLC v. City of New York,*
    559 U.S. 1 (2010) ........................................................................... 20, 21, 22, 28

*Hirsch v. Arthur Anderson & Co.,*
    72 F.3d 1085 (2d Cir. 1995) .................................................................................. 11

*Holmes v. Secs. Inv'r Prot. Corp.,*
    503 U.S. 258 (1992) ............................................................................................ 20

*In re Adelphia Commc'ns Corp.,*
    365 B.R. 24 (Bankr. S.D.N.Y. 2007) ..................................................................... 40

*In re Ahead by a Length, Inc.,*
    100 B.R. 157 (Bankr. S.D.N.Y. 1989) .......................................................... 24, 31, 40

*In re Am. Express Co. S'Holder Litig.,*
    39 F.3d 395 (2d Cir. 1994) .................................................................................. 22

*In re Autobacs Strauss, Inc.,*
    473 B.R. 525 (Bankr. D. Del. 2012) ............................................................. 13

*In re Bennett Funding Group, Inc.,*
    367 B.R. 269 (Bankr. N.D.N.Y. 2007) ......................................................... 30

*In re BH S&B Holdings LLC,*
    420 B.R. 112 (Bankr. S.D.N.Y. 2009) ........................................................... 13

*In re CBI Holding Co., Inc.,*
    529 F.3d 432 (2d Cir. 2008) .......................................................................... 11

*In re Colonial Ltd. Pshp. Litig.,*
    78 B.R. 40 (D. Conn. 1994) ........................................................................... 12

*In re Everfresh Beverages, Inc.,*
    238 B.R. 558 (Bankr. S.D.N.Y. 1999) ........................................................... 40

*In re Food Mgmt. Grp., LLC,*
    380 B.R. 677 (Bankr. S.D.N.Y. 2008) ........................................................... 28

*In re Magnesium Corp. of Am.,*
    399 B.R. 722 (Bankr. S.D.N.Y. 2009) ........................................................... 13

*In re Maxus Energy Corp.,*
    571 B.R. 650 (Bankr. D. Del. 2017) ......................................................... 13, 14

*In re MF Global Holdings Ltd.,*
    507 B.R. 808 (S.D.N.Y. 2014) ....................................................................... 14

*In re Optimal U.S. Litig.,*
    813 F. Supp. 2d 383 (S.D.N.Y. 2011) ........................................................... 29

*In re PHS Group, Inc.,*
    581 B.R. 16 (E.D.N.Y. 2018) .................................................................... 11, 29

*In re Scott Acquisition Corp.,*
    344 B.R. 283 (Bankr. D. Del. 2006) .............................................................. 12

*In re Sharp Int'l Corp.,*
    403 F.3d 43 (2d Cir. 2005) ............................................................................ 17

*In re Teleglobe Commc'ns Corp.,*
    493 F.3d 345 (3d Cir. 2007) ..................................................................... 13, 14

*In re Tribune Co. Fraudulent Conveyance Litig.,*
    2019 WL 294807 (S.D.N.Y. Jan. 23, 2019) ................................................... 15

*In re Trinsum Group, Inc.,*
    466 B.R. 596 (Bankr. S.D.N.Y. 2012) .......................................................................... 15

*In re Tronox Inc.,*
    450 B.R. 432 (Bankr. S.D.N.Y. 2011) .......................................................................... 13

*In re Tronox Inc.,*
    503 B.R. 239 (S.D.N.Y. 2013) ...................................................................................... 13

*In re TS Employment, Inc.,*
    603 B.R. 700 (Bankr. S.D.N.Y. 2019) .......................................................................... 29

*In re W.J. Bradley Mortgage Capital, LLC,*
    598 B.R. 150 (Bankr. D. Del. 2019) ....................................................................... 16, 17

*In re Welspun Litig.,*
    2019 WL 2174089 (S.D.N.Y. May 20, 2019) ................................................................. 9

*ITT, An International Investment Trust v. Cornfeld,*
    619 F.2d 909 (2d Cir. 1980) ......................................................................................... 19

*Jackson Nat. Life. Ins. Co. v. Litigator,*
    949 F.Supp. 200 (S.D.N.Y. 1996) ........................................................................... 24, 25

*Jerome M. Sobel & Co. v. Fleck,*
    2003 WL 22839799 (S.D.N.Y. Dec. 1, 2003) ........................................................ 32, 33

*John Swann Holdings Corp. v. Simmons,*
    62 F.Supp.3d 304, 310 (S.D.N.Y. 2014) ...................................................................... 15

*Kaufman v. Cohen,*
    760 N.Y.S.2d 157 (App. Div. 2003) .............................................................................. 17

*Limas LS PLC v. PHL Variable Insurance Co.,*
    2013 WL 12286066 (D. Conn. Dec. 17, 2013) ...................................................... 30, 31

*M & T Bank Corp. v. Gemstone CDO VII, Ltd.,*
    881 N.Y.S.2d 364 (Sup. Ct. 2009) ............................................................................... 18

*Malpiede v. Townson,*
    780 A.2d 1075 (Del. 2001) .......................................................................................... 18

*Manson v. Stacescu,*
    11 F.3d 1127 (2d Cir. 1993) .................................................................................... 23, 24

*McHale v. CitiBank, N.A. (In re 1031 Tax Group, LLC),*
    420 B.R. 178 (Bankr. S.D.N.Y. 2009) ..................................................................... 10, 11

*Meridien Int'l Bank Ltd. v. Gov't of the Republic of Liberia,*
   23 F. Supp. 2d 439 (S.D.N.Y. 1998) ............................................................. 40

*Michelson v. Penney,*
   135 F.2d 409 (2d Cir. 1943) ........................................................................ 19

*Mohr-Lecara v. Oxford Health Ins., Inc.,*
   2019 WL 1409479 (S.D.N.Y. March 28, 2019) ......................................... 32, 34

*Moviecolor Limited v. Eastman Kodak Co.,*
   288 F.2d 80 (2d Cir. 1961) .......................................................................... 40

*O'Neill v. Warburg, Pincus & Co.,*
   833 N.Y.S.2d 461 (N.Y. App. Div. 2007) .................................................. 13

*Patrick v. Allen,*
   355 F. Supp. 2d 704 (S.D.N.Y. 2005) ................................................... 15, 16

*Pereira v. EisnerAmper LLP (In re Waterford Wedgwood USA, Inc.),*
   529 B.R. 599 (Bankr. S.D.N.Y. 2015) ....................................................... 12

*Picard v. JPMorgan Chase Co.,*
   460 B.R. 84 (S.D.N.Y. 2011) ....................................................................... 11

*RBC Capital Markets, LLC v. Jervis,*
   129 A.3d 816 (Del. 2015) ............................................................................ 17

*Related Companies, L.P. v. Ruthling,*
   2017 WL 6507759 (S.D.N.Y. 2017) ......................................................... 24, 25

*Republic of Colombia v. Diageo N. Am. Inc.,*
   531 F. Supp. 2d 365 (E.D.N.Y. 2007) ....................................................... 35

*Roselink Investors, L.L.C. v. Shenkman,*
   386 F.Supp.2d 209 (S.D.N.Y. 2004) .......................................................... 13

*Rosner v. Peregrine Finance Ltd.,*
   1998 WL 249197 (S.D.N.Y. May 18, 1998) .............................................. 40

*Rothstein v. UBS AG,*
   708 F.3d 82 (2d Cir. 2013)............................................................................ 8

*Scholastic Decisions, Inc. v. DiDomenico,*
   995 F.2d 1158 (2d Cir. 1993) ..................................................................... 25

*Schroeder v. Pinterest Inc.,*
   17 N.Y.S.3d 678 (App. Div. 2015) ............................................................ 18

*Securities Investor Protection Corp. v. Stratton Oakmont, Inc.,*
    234 B.R. 293 (Bankr. S.D.N.Y. 1999) ................................................................. 8, 31

*St. Paul Fire and Marine Ins. Co. v. PepsiCo, Inc.,*
    884 F.2d 688 (2d Cir. 1989) ............................................................................... 10, 24

*Sullivan v. Kodsi,*
    373 F.Supp.2d 302 (S.D.N.Y. 2005) ........................................................................ 30

*Sunrise Indus. Joint Venture v. Ditric Optics, Inc.,*
    873 F.Supp. 765 (E.D.N.Y. 1995) ........................................................................... 30

*Teras Int'l Corp. v. Gimbel,*
    2014 WL 7177972 (S.D.N.Y. Dec. 17, 2014) ...................................................... 13, 14

*Terminate Control Corp. v. Horowitz,*
    28 F.3d 1335 (2d Cir. 1994) .................................................................................. 27

*Town of Kearny v. Hudson Meadows Urban Renewal Corp.,*
    829 F.2d 1263 (3d Cir. 1987) ................................................................................ 27

*Tymoshenko v. Firtash,*
    57 F. Supp. 3d 311, 322 (S.D.N.Y. 2014) .............................................................. 33

*U.S. Small Bus. Admin. v. Feinsod,*
    347 F.Supp.3d 147, 161 (E.D.N.Y. 2018) ........................................................... 13, 16

*U.S. v. Appins,*
    637 F.3d 59 (2d Cir. 2011) .................................................................................... 39

*U.S. v. Autuori,*
    212 F.3d 105 (2d Cir. 2000) .................................................................................. 32

*U.S. v. Bahel,*
    662 F.3d 610 (2d Cir. 2011) .................................................................................. 32

*U.S. v. Binday,*
    804 F.3d 558 (2d Cir. 2015) .................................................................................. 31

*U.S. v. Crisp,*
    306 F.3d 71 (2d Cir. 2002) .................................................................................... 36

*U.S. v. D'Amato,*
    39 F.3d 1249 (2d Cir. 1994) .................................................................................. 33

*U.S. v. Pugh,*
    937 F.3d 108 (2d Cir. 2019), *amended and superseded on other grounds,* 2019 WL
    6708812 (2d Cir. Dec. 10, 2019) ...................................................................... 37, 38

*U.S. v. Sampson*,
    898 F.3d 287 (2d Cir. 2018) ................................................................. 36, 38

*United States v. Agrawal*,
    726 F.3d 235 (2d Cir. 2013) ......................................................................... 34

*United States v. Maher*,
    108 F.3d 1513 (2d Cir. 1997) ....................................................................... 35

*Wechsler v. Bowman*,
    285 N.Y. 284 (1941) .................................................................................... 17

*Weinstein Enterprises, Inc. v. Orloff*,
    870 A.2d 499 (Del. 2005) ....................................................................... 13, 14

*Whalen v. Carter*,
    954 F.2d 1087 (5th Cir. 1992) ...................................................................... 24

*Wight v. BankAmerica Corp.*,
    219 F.3d 79 (2d Cir. 2000) ........................................................................... 33

*Williams v. Affinion Group, LLC*,
    889 F.3d 116 (2d Cir. 2018) ......................................................................... 32

*Wooten v. Loshbough*,
    951 F.2d 768 (7th Cir. 1991) ........................................................................ 23

**STATUTES**

11 U.S.C. § 101 ............................................................................................. 29

11 U.S.C. § 108 ....................................................................................... 20, 40

11 U.S.C. § 1104 ........................................................................................... 36

18 U.S.C. § 1503 ........................................................................................... 36

18 U.S.C. § 1512 ................................................................................. 36, 37, 38

18 U.S.C. § 1515 ........................................................................................... 37

18 U.S.C. § 1956 ........................................................................................... 34

18 U.S.C. § 1957 ........................................................................................... 34

18 U.S.C. § 1962 ........................................................................................... 39

18 U.S.C. § 2314 ........................................................................................... 34

## OTHER AUTHORITIES

Fed. R. Civ. P. 9.......................................................................................................................................passim

Fed. R. Civ. P. 12........................................................................................................................................ 8

Plaintiff Richard Levin, not individually but solely as chapter 11 trustee ("**Trustee**" or "**Plaintiff**") for Debtors Firestar Diamond, Inc., Fantasy, Inc., and Old AJ, Inc. f/k/a A. Jaffe, Inc. (collectively, the "**Debtors**"),[1] in opposition to Defendant Nirav Deepak Modi's motion to dismiss (the "**Motion**" or "**MTD**") the Trustee's First Amended Complaint (the "**Amended Complaint**" or "**FAC**"), respectfully states as follows:

## PRELIMINARY STATEMENT

Nirav Modi was the principal architect, kingpin, and beneficiary of a multi-billion-dollar criminal enterprise whose misdeeds spanned four continents over nearly a decade. The Indian Debt Tribunal found as much when it awarded PNB and a consortium of other banks enormous judgments against him. To escape further liability, Modi urges this Court to view all of his transgressions as a single scheme against PNB so that no other party has standing to sue him. But the Trustee's claims are not based on injuries to PNB. Rather, the Trustee alleges Modi's misconduct directly and proximately injured the Debtors by (i) fraudulently depleting their assets, (ii) frustrating their claims against third parties, and (iii) forcing them to pay for two duplicative investigations into his misconduct. Under settled U.S. Supreme Court and Second Circuit precedent, these injuries support actionable claims against Modi.

Moreover, while Modi argues that the Trustee's claims are time barred, a significant portion of the alleged misconduct (and thus alleged injuries) occurred just before and after the Debtors' bankruptcy filings in February 2018 and are not time barred even under Modi's theories. The 2018 allegations alone are sufficient to support the Trustee's claims. Still, even the Trustee's

---

[1] Unless otherwise defined, all capitalized terms shall have the meaning ascribed to them in the Amended Complaint. Additionally, with respect to allegations made on information and belief in the Amended Complaint, the Trustee will treat such allegations as true for the purposes of this Opposition. However, nothing in this Opposition should be construed as negating or limiting such qualifications in the Amended Complaint.

allegations of earlier misconduct remain actionable by operation of equitable tolling principles under both state and federal law, which tolled the limitations periods until Modi and his co-conspirators relinquished control of the Debtors in May 2018.

Most of Modi's remaining arguments challenge the sufficiency of the Trustee's substantive allegations. But Modi repeatedly ignores both the applicable legal requirements and the extensive allegations against him in the Amended Complaint. Taking the Amended Complaint's allegations as true and construed in the light most favorable to the Trustee, the Trustee has sufficiently alleged plausible claims against Modi for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, corporate waste, and civil RICO. As such, the Motion should be denied.

SUMMARY OF ALLEGATIONS

While the Amended Complaint, for the sake of simplicity and to avoid unnecessary characterization, used the term "Bank Fraud" as shorthand for the myriad allegations of fraud throughout the Amended Complaint, those allegations are more accurately conceptualized as comprising three distinct, but related fraudulent schemes—each of which Modi orchestrated, directed, and facilitated for his own benefit and to the detriment of the Debtors and many others.

**I.    The Bank Scheme.**

The first scheme (the "**Bank Scheme**") involved fraudulently inducing PNB and other banks to extend credit based on circular import and export transactions between LOU Entities and Shadow Entities. (*See generally* FAC ¶¶ 23-41.) Precious gems, metals, and jewelry were transferred in a "loop" between LOU Entities and Shadow Entities as part of the Bank Scheme to fraudulently inflate the LOU Entities' import volume and increase their LOU funding. (*Id.* ¶ 35.) The Bank Scheme began in approximately early 2011 when Modi and his co-conspirators

2

fraudulently solicited issuance of the first bank loan (*id.* ¶ 23) and stopped in late January 2018 when the Bank Scheme was exposed (*id.* ¶ 42).

The Trustee plausibly alleges that Modi engineered, oversaw, and controlled the Bank Scheme, as demonstrated by the following allegations, among others:

- The Indian Debt Tribunal found that Nirav Modi and his family members "are the masterminds behind the perpetration of" a "systematic fraud" involving "dummy companies . . . set up in Hong Kong and Dubai . . . act[ing] as nodes for circular transactions to layer and launder money generated by . . . fraudulent LOUs." (*Id.* ¶ 51.)

- Modi orchestrated and directed a scheme to obtain loans, credits, or other funds under false pretenses and without collateral from numerous banks, including PNB. (*Id.* ¶ 23.)

- Modi and others at his direction worked with certain PNB employees, including Gokulnath Shetty, who authorized the issuance of the LOUs without securing collateral and without properly recording the LOUs in PNB's records. (*Id.* ¶ 41.)

- Modi conspired to artificially inflate the import volume of the LOU entities with sham transactions so as to obtain more LOU funding. (*Id.* ¶ 27.)

- Modi utilized a web of Shadow Entities to engage in fraudulent and fictitious import transactions. (*Id.* ¶ 29.)

- Nirav Modi coordinated and directed the operations of the Shadow Entities and LOU Entities to further the fraudulent schemes (*Id.* ¶ 67.)

- Modi's longtime business partner Hemant Bhatt sent Modi his resignation from the LOU Entities and various other Modi-Controlled Entities on the day PNB refused to issue a new LOU (*Id.* ¶¶ 43-44.)

- On August 14, 2009, Modi directed Gandhi to make payments totaling $2,293,326 to Brilliant and Diagem. On June 16, 2010, Modi instructed Gandhi, "Unique has wired $250,000 today to Synergies. Please wire to the account Mehul bhai wants." (*Id.* ¶ 82(i).)[2]

- On August 26, 2010, Nirav Modi emailed Ajay Gandhi to ask, "What will be the week-by-week payment plan for September to India?" On August

---

[2] The Trustee includes these email chains between Modi and Gandhi in connection with the Bank Scheme, rather than the Funnel Scheme, because they occurred while the Debtors were still engaged in import/export transactions with LOU Entities directly underlying fraudulent LOUs (which stopped around 2013). (*See* FAC ¶¶ 34, 56.)

27, 2010, Gandhi replied, attaching two spreadsheets containing two possible scenarios, and noting "to cover August borrowing base – I have asked India to remit $1 m for one day & I will remit back on September 1. Substantial amount of inventory was shipped to India & HK hence inventory & AR became ineligible." (*Id.* ¶ 82(ii).)

- On October 21, 2010, Modi and Gandhi communicated by email about the shipment of a diamond to a Shadow Entity. Modi stated, "Send the 70 ct vivid yellow to Firestone Dubai @51,500 and not Firestone HK." Gandhi responded, "Firestone, Dubai confirmed (Not Unique)[,]" to which Modi clarified, "Sorry Unique[,]" in reference to the Shadow Entity. Gandhi responded with "Glad I asked!!!" (*Id.* ¶ 82(iii).).

## II.   The Funnel Scheme.

The second scheme (the "**Funnel Scheme**") involved fraudulent transactions disguised as sales, loans, and equity investments among Shadow Entities and Firestar Entities (including the Debtors) designed to funnel cash and inventory into and out of the "loop" comprising the Bank Scheme. (*See id.* ¶¶ 56-60.) Whereas the Bank Scheme was based on circular transactions between LOU Entities and Shadow Entities, the Funnel Scheme was based on circular transactions among Shadow Entities and Firestar Entities. The Funnel Scheme principally spanned from roughly 2013, when the Shadow Entities became the LOU Entities' exclusive trading partners (*id.* ¶¶ 34, 56), to late January 2018, when the Bank Scheme was exposed (*id.* ¶ 42).

In addition to the allegations referenced in connection with the Bank Scheme, the Trustee plausibly alleges Modi engineered, oversaw, and controlled the Funnel Scheme, as further demonstrated by the following allegations, among others:

- The Indian Debt Tribunal found that "the fraud has been perpetrated by Nirav Modi in collusion, connivance and with the aid and assistance of the group companies i.e. Firestar International Limited and Firestar Diamond International Pvt. Ltd. along with their affiliates, subsidiaries, Nirav Family Trust, Nirav Modi Family Trust, directors and key managerial personnel." (*Id.* ¶ 51.)

- Modi, Bhansali, Gandhi, and other co-conspirators funneled millions of dollars in funds and diamonds through the Debtors and their offices in

circular transactions with Shadow Entities and other Modi-Controlled
Entities. (*Id.* ¶ 53.)

- On July 23, 2012, Ajay Gandhi sent a message to Nirav Modi through
  Panemail, which is a web-based email service that automatically deletes
  messages, "Niravbhai, please see attached payment plan in 5 parts to clean-
  up AR and AP of [FDII] for HK, Dubai, Belgium and NY. Funds should
  come from respective companies. 1. $452k. 2. $1.129m. 3. $1.5m. 4. $828k.
  5. $1.05m. If implemented, the attached AR and AP of $4.3 million can be
  cleaned up. Please let me know if you have different thought." On August
  3, 2012, Gandhi forwarded the email to Hemant Bhatt, copying Bhansali,
  and stated, "I will call you Monday to discuss. We need to move funds in
  Firestar Diamond International, Inc. per attached. NM/MB is fine so long
  as money flows from SDC/Tristar and Diamlink to any of HK or Dubai
  entities." (*Id.* ¶ 81(ii).)

- On February 6, 2013, Ajay Gandhi emailed Nirav Modi, copying Mihir
  Bhansali, "Niravbhai, After keeping $3 million buffer, I can pay $1 million
  to India in February 2013. Please let me know if I should ask Manish/Amit
  for listing to pay." Modi replied, "Yes pls." One day earlier, Gandhi
  emailed Manish Bosamiya, Miten Pandya, and Amit Magia, "We can pay
  $1.0 million to India in the month of February 2013. Please email me a list
  to pay." (*Id.* ¶ 81(xi).)

- Modi's personal assistant instructed Gandhi to communicate regarding
  Shadow Entities only on Gmail or Panemail rather than on the Firestar
  Entities' regular email system. (*Id.* ¶ 143.)

- Modi consulted with Ajay Gandhi throughout the Relevant Period about
  Gandhi's ability to wire funds from the U.S. Entities to India-based Modi-
  Controlled Entities. (*Id.* ¶ 83.)

- Modi coordinated with Gandhi and Bhansali on how to respond to auditor
  inquiries into Shadow Entities and related transactions. (*Id.* ¶ 102.)

## III.   The Exit Scheme.

The third scheme (the "**Exit Scheme**") constituted the conspirators' exit strategy and

involved efforts to permanently shield ill-gotten assets from their victims, including the Debtors.

The Exit Scheme included: (a) the systematic looting of the Debtors', U.S. Affiliates', and other

Firstar Entities' assets in the months leading up to and following exposure of the Bank Scheme

(*id.* at ¶¶ 173-87); (b) bribery, witness tampering, destruction of evidence, and bankruptcy fraud

designed to buy additional time for such looting (*id.* ¶¶ 142-72); and (c) the broader diversion of cash, real estate, and other assets for the benefit of Modi and his family (*id.* ¶¶ 103-40). Implementation of the Exit Scheme began as early as April 2012 when Modi gifted to his sister Purvi Mehta a $14,575,000 loan receivable owed to him by Synergies to Purvi Mehta (which Synergies paid in full to Mehta in July 2017 (*id.* ¶¶ 124-25)) and continued through at least September 2018 when over $45 million of NMI inventory was taken from Malca Amit and shipped to overseas Modi-Controlled Entities (*id.* ¶ 185).

In addition to the allegations referenced in connection with the Bank Scheme and Funnel Scheme, the Trustee plausibly alleges that Modi engineered, oversaw, and controlled the Exit Scheme, as further demonstrated by the following allegations, among others:

- The Indian Debt Tribunal found that Nirav Modi "moved the US Court for insolvency to avoid the liability" and that "Nirav Modi and his accompli[c]es have taken prompt steps before the US Court to avoid the seiz[ure] and attachment of the properties purchased and acquired by Nirav Modi from the proceeds of the fraudulent debt." (*Id.* ¶ 51(vi).)

- Modi maintained communications with Mihir Bhansali after the Debtors filed for bankruptcy and discussed the Debtors' sale and bankruptcy process with Bhansali. (*Id.* ¶¶ 164-67.)

- On April 5, 2018, Angelina Ypma, the global president of the Nirav Modi brand and a director of FIL, emailed Ajay Gandhi, copying Mihir Bhansali, "**Nirav has instructed me to work with you to move all of NM US inventory (HJ and core back to HK ASAP**.) HK will pay Malca in advance to move the jewels." (*Id.* ¶ 179 (emphasis added).)

- On May 4, 2018, Ypma emailed Gandhi, copying Bhansali, "I shall be coming to NY from Monday 7 till Thursday 10 May to review the NM inventory. **Nirav told me** that I can work with [FDI employee Shanna Singh] to count the inventory . . ." (*Id.* ¶ 182.)

- In February or March 2018, after exposure of the Bank Scheme:

  o Nirav Modi intimidated, coerced, and threatened to kill or falsely implicate Shadow Entity directors if they cooperated with investigative authorities. (*Id.* ¶ 151(ii).)

6

- o Nehal Modi, acting at the direction of or in coordination with Nirav Modi, destroyed cell phones of Shadow Entity directors. (*Id.* ¶ 151(iii).)

- o Nehal Modi, acting at the direction of or in coordination with Nirav Modi, removed 150 boxes of pearls from one of the Hong-Kong based Modi-Controlled Entities. (*Id.* ¶ 151(iv).)

- o Nehal Modi, acting at the direction of or in coordination with Nirav Modi, bribed a Shadow Entity director to give false testimony to judicial authorities (*Id.* ¶ 151(v).)

- o Nirav Modi coerced Shadow Entity personnel to hide in Cairo, Egypt and, once there, confiscated their passports, and required them to sign an affidavit stating the Shadow Entities were in no way related to Nirav Modi. (*Id.* ¶ 151(vi)-(vii).)

- In 2011, Modi "loaned" $14,575,000 to Synergies, which Synergies used to pay off purported loans to FIPL (which Modi also owned). In 2012, Modi gifted his interest in the "loan" to Purvi Mehta. In 2017, Synergies used a $20 million "capital infusion" from FHL to fully repay Mehta. (*Id.* ¶ 125.)

- In fiscal year 2012, DRUS transferred approximately $76 million to Nirav Modi's family trust. (*Id.* ¶ 68(iv).)

- In March 2017, Gandhi emailed Modi that HSBC requested more information on the ownership structure of CPRE "going up thru the ladder to FILP, India[,]" including the "Source of Wealth" of "Purvi Modi[.]" Gandhi relayed that he "avoided giving these [sic] information and told them that we may do restructuring of Central Park and may change ownership etc." but that the "only way, we can avoid is only if we pay-off the $ 3 m mortgage in next few months." Modi responded, "There will be a change in ownership in May end so better to explain that." (*Id.* ¶ 117.)

- In 2017, Nirav Modi funneled $23 million through Purvi Mehta and the Ithaca Trust to purchase the Ritz Carlton Apartment, which was used solely for Modi and his family. In total, Nirav Modi and his wife transferred over $31.5 million to Mehta in September 2017. (*Id.* ¶¶ 107-111.)

- On December 4, 2017, by email, Modi told Gandhi to pay off the HSBC mortgage in full. On December 5, 2017, FDI paid off the approximately $3 million balance on the Essex House Apartment mortgage, using funds from Jaffe and Fantasy as well as from its own account and from a Firestar HSBC line of credit. (*Id.* ¶¶ 118.)

- On December 29, 2017, Modi caused FGI to sell CPRE (which held the Essex House) to the Ithaca Trust, which an accountant explained to Modi was the best way to "fast track" the transaction. (*Id.* ¶¶ 119-20.)

7

## APPLICABLE STANDARDS

### I.      Rule 12(b)(6) Standard.

The Court must deny a motion to dismiss where the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* For a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), the Court must similarly "accept[] all allegations in the complaint as true, and draw[] all reasonable inferences in plaintiffs' favor." *Rothstein v. UBS AG*, 708 F.3d 82, 90 (2d Cir. 2013). "Detailed factual allegations" are not required, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555), and factual disputes are not resolved on a motion to dismiss. *Financial Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 405 (2d Cir. 2015).

### II.     Rule 9(b) Standard.

Rule 9(b) requires plaintiffs averring fraud to "state with particularity the circumstances constituting fraud[.]" Fed. R. Civ. P. 9(b). "Although Rule 9(b) contains a heightened particularity standard, it also relaxes the standard for pleading fraudulent intent: 'Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.'" *Anhui Green Lighting Co., Ltd. v. Green Logic LED Electrical Supply, Inc.*, 2019 WL 6498094, at *4 (S.D.N.Y. Dec. 3, 2019). A complaint alleges facts sufficient to give rise to a strong inference of fraudulent intent by either (a) alleging facts showing that the defendant had both motive and opportunity to commit fraud, or (b) alleging facts which constitute strong circumstantial evidence of conscious misbehavior or recklessness. *Securities Investor Protection Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293, 310 (Bankr. S.D.N.Y. 1999) (citing *Acito v. IMCERA Grp, Inc.*, 47 F.3d 47, 52 (2d Cir. 1995)).

Rule 9(b) "does not require factual pleadings that demonstrate the <u>probability</u> of wrongdoing . . . . At the pleading stage, the alleged fraud need only be <u>plausible</u> based on the complaint, it need not be more likely than other possibilities." *In re Welspun Litig.*, 2019 WL 2174089, at *15 (S.D.N.Y. May 20, 2019) (citing *Lorely Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 170 (2d Cir. 2015)) (emphasis in original).

## ARGUMENT

## I.      The Trustee Has Standing to Bring the State Law Claims.

The Trustee has standing to bring each of the state law claims asserted in the Amended Complaint. Modi argues that the Amended Complaint does not allege a particularized injury to the Debtors sufficient to create standing, and instead alleges injuries "particularized as to PNB, which is exclusively entitled to pursue related claims." (MTD at 11 (internal quotation marks omitted).) But that is not what the Trustee alleges.

The Trustee narrowly tailored his Amended Complaint to only assert claims premised on injuries sustained by the Debtors. For example, the Trustee alleges that Modi's breaches of his fiduciary duties injured the Debtors by:

- depleting the Debtors' assets through numerous Actual Fraudulent Transfers;

- impairing the Trustee's ability to recover on account of claims against the U.S. Affiliates and others;

- causing the Debtors' estates to incur substantial administrative expenses related to the investigation of information Modi conspired with Bhansali and Gandhi not to disclose and to actively conceal, destroy, or otherwise render unavailable for use in connection with these chapter 11 cases; and

- increasing creditors' claims against the estate and causing the collapse and resulting loss of value of the Debtors and their businesses.

(FAC ¶ 207.)[3] Each of the first three injuries constitutes a direct and particularized injury to the Debtors themselves, not to PNB or any other creditor. Indeed, the Actual Fraudulent Transfers and payment of unnecessary administrative expenses depleted the Debtors' assets, not those of PNB or any other specific creditor. Similarly, Modi's looting of the U.S. Affiliates in the months before and after the Petition Date, destroyed the value of the Debtors' claims against the U.S. Affiliates (*i.e.* the $11,216,467 and $2,329,930 loan receivables held by Jaffe and FDI, respectively, against NMI, as well as millions of dollars in actual fraudulent transfer claims against NMI and FDII), none of which belonged to PNB or any other specific creditor. Only the fourth injury is in any way derivative of injuries sustained by creditors. But, even then, no one creditor could assert a claim for the "collapse and resulting loss of value of the Debtors' businesses" caused by the increase in creditor claims at large. *See St. Paul Fire and Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 701 (2d Cir. 1989 ("If a claim is a general one, with no particularized injury arising from it, and if that claim could be brought by any creditor of the debtor, the trustee is the proper person to assert the claim[.]")).

The cases cited by Modi do not undermine the Trustee's standing; just the opposite, several of them confirm it. For example, in *McHale v. CitiBank, N.A. (In re 1031 Tax Group, LLC)*, 420 B.R. 178 (Bankr. S.D.N.Y. 2009), the debtors' director allegedly misappropriated <u>customer</u> property held by the debtors in a custodial capacity. The court held the trustee lacked standing to recover damages for injuries sustained by the customers whose property was misappropriated. But here, as discussed above, the depleted assets belonged to the Debtors, not PNB or any other creditor, so only the Debtors suffered direct injury from their depletion. Indeed, Judge Glenn

---

[3] Similarly, the Trustee alleges that Modi's corporate waste injured the debtors "by losing the millions of dollars expended for the personal benefit of Modi and his family, and in transactions with Shadow Entities that served no legitimate or corporate purpose." (FAC ¶ 222.) For standing purposes, this is analogous to the fraudulent depletion of assets alleged in the breach of fiduciary duty count.

recognized this distinction in *1031 Tax Group* in holding that, "[d]espite the [t]rustee's lack of constitutional standing for injuries particular to exchange participants of the 1031 [d]ebtors, the [t]rustee has Article III standing for damages suffered **by the [d]ebtors** as a result of Citibank's alleged aiding and abetting of Okun's breach of fiduciary duty." 420 B.R. at 195-96 (emphasis added); *accord American Tissue, Inc. v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 351 F. Supp. 2d 79, 90 (S.D.N.Y. 2004).

*Picard v. JPMorgan Chase Co.*, 460 B.R. 84 (S.D.N.Y. 2011), also involved misappropriation of <u>customer</u> property and is therefore distinguishable on the same grounds. Moreover, the *Picard* trustee went so far as to include injuries sustained by customers and other creditors in his damages calculation and sought to recover on their behalf.[4] Here, nothing in the Amended Complaint seeks to recover anything on PNB's or any other creditor's behalf. Similarly, in *Hirsch v. Arthur Anderson & Co.*, 72 F.3d 1085 (2d Cir. 1995), the trustee sought to recover from the debtors' accountants and law firms for injuries caused by the distribution of misleading private placement memoranda to investors. *Id.* at 1094. The court held that the "claims predicated upon the distribution of misleading PPMs to investors . . . are the property of those investors, and may be asserted only by them[.]" *Id.* Here, none of the injuries alleged by the Trustee are analogous to the distribution of misleading PPMs in *Hirsch*.[5]

---

[4] Specifically, the *Picard* trustee alleged, "As a result of the Defendants aiding and abetting this breach of fiduciary duty, **customers, creditors, and/or [the debtor]** lost billions of dollars. At a minimum, the Defendant's actions resulted in a loss of approximately $19 billion." (Case No. 11-cv-00913, at Dkt. 50, ¶ 535 (emphasis added)); *see also* 460 B.R. at 96 ("The [t]rustee admits that he pursues these claims to recover the net equity of some of the claimants against the BLMIS estate.").)

[5] *Hirsch* also involved professional malpractice claims, which the court held were barred by the *Wagoner* rule. But, similar to the *in pari delicto* doctrine discussed below, the *Wagoner* rule is inapplicable here because Modi is an insider of the Debtors. *See, e.g., In re PHS Group, Inc.*, 581 B.R. 16, 30 (E.D.N.Y. 2018) (collecting cases for the proposition that "[t]he *Wagoner* doctrine . . . does not apply to claims against insiders."). For this reason, *In re CBI Holding Co., Inc.*, 529 F.3d 432 (2d Cir. 2008), which analyzed the applicability of exceptions to the *Wagoner* rule, is similarly inapposite.

Modi also cites another opinion issued in the same lawsuit as *Hirsch*, *In re Colonial Ltd. Pshp. Litig.*, 78 B.R. 40 (D. Conn. 1994), for the proposition that "'[i]f the facts of the complaint suggest that the claims actually belong to the creditors, a blanket allegation of damages to the debtors will not confer standing on the trustee.'" (MTD at 11 (quoting 78 B.R. at 43).) This citation is unavailing for the same reason as *Hirsch*.

Modi also cites *Pereira v. EisnerAmper LLP (In re Waterford Wedgwood USA, Inc.)*, 529 B.R. 599 (Bankr. S.D.N.Y. 2015). But, whereas the alleged injury in *Pereira* involved mandatory employer contributions owed by the debtor going unpaid, none of the injuries alleged by the Trustee involve the Debtors' failure to honor any obligation. Nor did the Debtors benefit in any way from the fraudulent and needless depletion of their assets and other injuries alleged by the Trustee. *Pereira* is therefore inapposite.

In sum, since the Trustee "is not seeking recovery on behalf of an individual or even a class of creditors" but instead "seeks recovery for the bankrupt corporation itself[,]" Modi's "argument that the Trustee lacks standing [should be] rejected." *See In re Scott Acquisition Corp.*, 344 B.R. 283, 291 (Bankr. D. Del. 2006).

## II.    The Amended Complaint States a Valid Claim for Breach of Fiduciary Duty and Corporate Waste.

### A.    *Based On The Allegations Of The Amended Complaint, Modi Owed Fiduciary Duties of Loyalty and Care.*

Modi argues he did not owe the Debtors any fiduciary duties on the grounds that he was not a director or officer of the Debtors or a "*de facto* director, officer, or person in control of the Debtors" and that the Trustee failed to "allege facts that show [Modi's] actual control of the corporation with respect to the challenged transactions." (MTD at 15.) But the Trustee does not need to show actual control. Modi's status as the Debtors' ultimate controlling shareholder, as

well as the Debtors' insolvency and partial ownership by Samuel Sandberg, are each sufficient to impose fiduciary duties on Modi.

"In the context of imposing fiduciary responsibilities, it is well established . . . that control exists when a stockholder owns, directly or indirectly, more than half of a corporation's voting power." *Weinstein Enterprises, Inc. v. Orloff*, 870 A.2d 499, 507 (Del. 2005); *accord In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 386 (3d Cir. 2007) ("BCE, as the ultimate owner of more than half . . . of the Debtors' voting power, owed them the duties of care and loyalty."). Only where the defendant is a minority shareholder is the plaintiff required to prove the defendant's "*actual exercise* of control over the corporation's conduct[.]" *Weinstein*, 870 A.2d at 507.

Moreover, "[w]here there are shareholders in addition to the parent company, both the directors of the subsidiary and the parent company, as controlling shareholder, have a duty to consider the interests of the minority shareholders." *Roselink Investors, L.L.C. v. Shenkman*, 386 F.Supp.2d 209, 218 n.3 (S.D.N.Y. 2004); *accord In re Tronox Inc.*, 503 B.R. 239, 325 (S.D.N.Y. 2013); *In re BH S&B Holdings LLC*, 420 B.R. 112, 144 (Bankr. S.D.N.Y. 2009); *O'Neill v. Warburg, Pincus & Co.*, 833 N.Y.S.2d 461, 462 (N.Y. App. Div. 2007) (applying New York law).

And even when there are no minority shareholders, ultimate shareholders owe fiduciary duties to creditors when the company is insolvent. *Teleglobe*, 493 F.3d at 386; *In re Tronox Inc.*, 450 B.R. 432, 439 (Bankr. S.D.N.Y. 2011); *Teras Int'l Corp. v. Gimbel*, 2014 WL 7177972, at *11 (S.D.N.Y. Dec. 17, 2014) (applying New York law). So too do directors of the parent of an insolvent subsidiary. *In re Maxus Energy Corp.*, 571 B.R. 650, 659 (Bankr. D. Del. 2017); *In re Autobacs Strauss, Inc.*, 473 B.R. 525, 560 (Bankr. D. Del. 2012). And a claim for breach of that duty belongs to the insolvent subsidiary, not its creditors. *U.S. Small Bus. Admin. v. Feinsod*, 347 F.Supp.3d 147, 161 (E.D.N.Y. 2018); *Teras*, 2014 WL 7177972 at *12; *In re Magnesium Corp. of Am.*, 399 B.R. 722, 773-74

(Bankr. S.D.N.Y. 2009); *Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 103 (Del. 2007).

The Trustee alleges Modi owns approximately 94.88% of, and is a director of, FIL, which in turn indirectly owns 95% of each Debtor. (*See* FAC ¶¶ 7, 9-10, 14, 16, 18.) He further alleges that Samuel Sandberg owns the remaining approximately 5% of FDI and Jaffe (FAC ¶¶ 9-10), and that the Debtors were insolvent at the time of each Actual Fraudulent Transfer (*id.* ¶ 174(v)), which occurred as early as August 2011 (*see id.* ¶ 55(i)). Consequently, due to both the Debtors' insolvency and the existence of a minority shareholder, Modi, as the ultimate controlling shareholder of each Debtor and as the director of their parent FIL, owed fiduciary duties to and enforceable by the Debtors. *See Weinstein*, 870 A.2d at 507; *Teleglobe*, 493 F.3d at 386; *Maxus Energy*, 571 B.R. at 659; *Teras*, 2014 WL 7177972 at *11-12.

      **B.**      **The Amended Complaint Properly Alleges Modi is Liable for Breach of Fiduciary Duty and Corporate Waste.**

Modi only challenges the Trustee's breach of fiduciary duty and corporate waste claims to the extent they are based on the formation of the Ithaca Trust, the purchase of the Ritz Carlton Apartment, or the purchase of the Essex House (MTD at 17-18).[6] While the Trustee included those allegations as examples of how Modi tried to shield his ill-gotten wealth as part of the Exit Scheme, his breach of fiduciary duty and corporate waste claims are based on separate allegations—namely, the Actual Fraudulent Transfers, looting of the U.S. Affiliates, and obstruction of the Debtors' bankruptcy proceedings—which Modi ignores.

"The duty of loyalty requires [a fiduciary] to (1) avoid fiduciary conflicts of interest and (2) act in good faith for the corporation's best interest." *In re MF Global Holdings Ltd.*, 507 B.R. 808,

---

[6]As Modi discusses the substance of the Trustee's breach of fiduciary duty and corporate waste claims together (MTD at 17-18), so too will the Trustee.

811 (S.D.N.Y. 2014) (citing *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362 (Del. 2006));

*accord In re Tribune Co. Fraudulent Conveyance Litig.*, 2019 WL 294807, at *11 (S.D.N.Y. Jan. 23, 2019).

"A failure to act in good faith may be demonstrated 'where the fiduciary intentionally acts
with a purpose other than that of advancing the best interests of the corporation, where the
fiduciary acts with the intent to violate applicable positive law, or where the fiduciary
intentionally fails to act in the face of a known duty to act." *John Swann Holdings Corp. v. Simmons*,
62 F.Supp.3d 304, 310 (S.D.N.Y. 2014) (quoting *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27,
67 (Del. 2006)). "Most basically, the duty of loyalty proscribes a fiduciary from any means of
misappropriation of assets entrusted to his management and supervision." *Id.* (citing *U.S.W., Inc.
v. Time Warner, Inc.*, 1996 WL 307445, at *21 (Del. Ch. June 6, 1996)). "Other instances of . . .
disloyalty include but are certainly not limited to the motives of entrenchment, fraud upon the
corporation or the board, abdication of . . . duty, or the sale of one's vote." *Id.* (citing *Cede & Co. v.
Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993)).

"[T]he fiduciary duty of care requires that directors of a Delaware corporation use that
amount of care which ordinarily careful and prudent men would use in similar circumstances,
and consider all material information reasonably available in making business decisions." *In re
Trinsum Group, Inc.*, 466 B.R. 596, 606 (Bankr. S.D.N.Y. 2012) (internal quotations omitted).
Breaches of the duty of care are actionable where the defendant's conduct constitutes "reckless
indifference to or a deliberate disregard of stockholders" or "actions which are without the
bounds of reason." *Id.*

"[T]he essence of waste is the diversion of corporate assets for improper or unnecessary
purposes." *Patrick v. Allen*, 355 F. Supp. 2d 704, 714 (S.D.N.Y. 2005). "To survive a motion to
dismiss on a corporate waste claim, Delaware law requires 'pleading of facts that show that the
economics of the transaction were so flawed that no disinterested person of right mind and

ordinary business judgment could think the transaction beneficial to the corporation.'" *In re W.J. Bradley Mortgage Capital, LLC*, 598 B.R. 150, 175 (Bankr. D. Del. 2019). Similarly, "[u]nder New York law, corporate waste occurs when assets are used in a manner so far opposed to the true interests of the corporation so at to lead to the clear inference that no one thus acting could have been influenced by any honest desire to secure such interests." *U.S. Small Business Admin. v. Feinsod*, 347 F.Supp.3d 147, 160 (E.D.N.Y. 2018). A plaintiff states a claim for waste when he can show that the use of corporate property is inconsistent with the corporate purpose. *Patrick*, 355 F. Supp. 2d at 715.

The Trustee alleges Modi breached his fiduciary duties and committed corporate waste in numerous ways both before and after their bankruptcy filings. For example, he alleges Modi:

(a) caused the Debtors' to engage in numerous Actual Fraudulent Transfers of their assets to other companies owned and/or controlled by Nirav Modi (FAC ¶¶ 81-82, 173-176, 202);

(b) diverted substantially all of NMI and FDII's assets to overseas entities owned and/or controlled by Modi rather than using such assets repay NMI and FDII's substantial debts to the Debtors (*id.* ¶¶ 177-87, 202) (as plausibly shown by, *inter alia*, Angelina Ypma's statement to Gandhi and Bhansali that "***Nirav has instructed me*** to work with you to move all of NM US inventory . . . back to H[ong ]K[ong] ASAP." (*id.* ¶¶ 179-82 (emphasis added)));

(c) conspired with Bhansali and Gandhi to fraudulently obstruct the proper administration of the Debtors' bankruptcy proceedings by, *inter alia,* lying about the Debtors' involvement in the fraudulent schemes and their familiarity with the Shadow Entities and concealing Jaffe's $11.2 loan to NMI and prepetition transfers of millions of dollars of the Debtors' assets to Shadow Entities. (*id.* ¶¶ 287-88) (as plausibly shown by, *inter alia*, Modi's post-petition discussions with Bhansali about the Debtors' bankruptcy proceedings and sale efforts (*id.* ¶¶ 164-67) and Modi's covert use of Gandhi's personal email account in February 2018 (*id.* ¶ 144));

(d) promised to repay the LOU Entities' debts to PNB by selling assets of Firestar Entities (i.e. including the Debtors and U.S. Affiliates) (*id.* ¶¶ 47-48); and

16

(e) threatened, coerced, and bribed Shadow Entity personnel not to cooperate
with investigative authorities (or conspired to do so) (*id.* ¶ 151).

These allegations plausibly describe Modi's divided loyalties, bad faith, and reckless disregard for the interests of the Debtors, and thus, support a valid claim for breach of fiduciary duty against Modi. Moreover, the Actual Fraudulent Transfers constituted transfers of the Debtors' assets outside of the ordinary course of their businesses—frequently to Shadow Entities and other entities Modi created, owned, and/or controlled and knew to be fictitious—for inadequate or even no consideration while the Debtors were insolvent. (*See, e.g.,* FAC ¶ 174.) Based on these allegations, "no disinterested person of right mind and ordinary business judgment could think [the Actual Fraudulent Transfers] beneficial to the [Debtors]." *See W.J. Bradley,* 598 B.R. at 175. The Trustee's allegations thus properly state a claim for corporate waste.

## III.   The Amended Complaint States Valid Claims for Aiding and Abetting Breach of Fiduciary Duty.

The Trustee also states a valid claim for aiding and abetting breach of fiduciary duty. Under Delaware law, the elements of aiding and abetting breaches of fiduciary duty are: "(i) the existence of a fiduciary relationship, (ii) a breach of the fiduciary's duty, (iii) knowing participation in that breach by the defendants, and (iv) damages proximately caused by the breach." *RBC Capital Markets, LLC v. Jervis,* 129 A.3d 816, 861 (Del. 2015). New York has substantially similar requirements. *Kaufman v. Cohen,* 760 N.Y.S.2d 157 (App. Div. 2003) ("[a] claim for aiding and abetting a breach of fiduciary duty requires: (1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly induced or participated in the breach, and (3) that plaintiff suffered damage as a result of the breach."); *accord In re Sharp Int'l Corp.,* 403 F.3d 43, 49–50 (2d Cir. 2005); *see also Wechsler v. Bowman,* 285 N.Y. 284, 291 (1941).

To establish scienter, the plaintiff must demonstrate that the aider and abettor had "actual or constructive knowledge that their conduct was legally improper." *Jervis,* 129 A.3d at 862;

*Malpiede v. Townson*, 780 A.2d 1075, 1097 (Del. 2001). "A defendant knowingly participates in the breach of fiduciary duty when he or she provides 'substantial assistance' to the fiduciary, which occurs 'when a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur.'" *Schroeder v. Pinterest Inc.*, 17 N.Y.S.3d 678, 689 (App. Div. 2015); *accord M & T Bank Corp. v. Gemstone CDO VII, Ltd.*, 881 N.Y.S.2d 364 (Sup. Ct. 2009).

For all of the reasons set forth in the Trustee's oppositions to Bhansali's and Gandhi's motions to dismiss (Adv. Dkt. 48, 49), the Trustee properly alleges Bhansali and Gandhi breached their fiduciary duties to the Debtors (FAC ¶¶ 206, 210), and that their breaches harmed the Debtors (*id.* ¶¶ 207, 211). The Trustee also alleges Modi's knowing participation and substantial assistance in Bhansali and Gandhi's breaches based on, *inter alia*, his allegations that Modi:

(a) directed Bhansali and Gandhi to effectuate Actual Fraudulent Transfers of the Debtors' assets to Shadow Entities and other Modi-Controlled Entities throughout the Relevant Period (or otherwise oversaw and discussed such transfers with Bhansali and Gandhi);

(b) discussed the Debtors' bankruptcy proceedings and sale efforts with Bhansali after Modi absconded;

(c) sent Angelina Ypma to assist Bhansali and Gandhi in diverting U.S. Affiliates' assets to overseas Modi-Controlled Entities after Modi absconded; and

(d) threatened, coerced, and bribed Shadow Entity personnel not to cooperate with investigative authorities (or conspired with Nehal Modi to do so).

Modi does not address the substance of the Trustee's aiding and abetting claim, nor that of the Trustee's underlying claims against Bhansali and Gandhi.[7] Instead, he argues that they are time-barred. (*See* MTD at 12-14). For the reasons discussed below, however, that is not true.

---

[7] In a footnote to his conclusion, Modi "joins his co-defendants in their motions to dismiss" and "asserts [their arguments] as if set forth" in his motion. (MTD at 36.) But, as the Trustee explained in response to Bhansali's and Gandhi's motions to dismiss (*see* Adv. Dkt. 48, 49), none of their arguments have merit. Moreover, Modi's blanket incorporation of Bhansali's and Gandhi's arguments is surprising given that many of their arguments emphasize and rely on Modi's domination and control over the Debtors.

IV.     **The State Law Claims Are Not Time Barred.**

Modi argues the Trustee's common law claims are time barred because "[a]ll of the common law claims against Modi are based, at least in part, on stale conduct." (MTD at 12.) This argument fails for multiple reasons. First, again, a substantial portion of the acts underlying the Trustee's common law claims occurred just before or after the Debtors' bankruptcy filing in February 2018. Thus, even applying the March 27, 2016 cutoff date advanced by Modi (which, as discussed below, is incorrect even without tolling), the Trustee's common law claims are timely.

Even so, the Trustee's claims premised on earlier conduct remain actionable as well. Indeed, "[w]here an action is brought by a trustee or liquidator on behalf of a corporation that has been looted by persons who completely dominated and controlled it, the statute of limitations is tolled as against the control persons until the appointment of the independent trustee or liquidator." *Banco de Desarrollo Agropecuario, S.A. v. Gibbs*, 709 F.Supp. 1302, 1310 (S.D.N.Y. 1989) (citing *Armstrong v. McAlpin*, 699 F.2d 79, 87 (2d Cir. 1983)); *ITT, An International Investment Trust v. Cornfeld*, 619 F.2d 909, 929-30 (2d Cir. 1980); *Michelson v. Penney*, 135 F.2d 409, 415-16 (2d Cir. 1943)); *see also FDIC v. Pellatreau & Pellatreau*, 965 F.Supp. 381, 388 (E.D.N.Y. 1997).

The Amended Complaint alleges Modi's and his co-Defendants' domination and control over the Debtors in great detail. (*See, e.g.*, FAC ¶¶ 18, 61-91, 188-94.) As such, the statutes of limitations for the Trustee's common law claims against Modi and his co-defendants were tolled until the Trustee's appointment in June 2018. Since the original complaint was filed in March 2019, less than a year later, the Trustee's claims are not time barred under either the three-year limitations period for breach of fiduciary or the six-year limitations period for corporate waste.

Moreover, even if the statutes of limitations were not tolled under nonbankruptcy principles, Modi's calculation of March 27, 2016 as the cut-off date would still be incorrect. Modi ignores section 108(a) of the Bankruptcy Code, which allows the Trustee an additional two years

19

to bring any claim that was timely as of the petition date. *See* 11 U.S.C. § 108(a). Thus, the Trustee

has until February 26, 2020 to bring any claim that accrued since February 26, 2015 (if the

limitations period is three years) or February 26, 2012 (if the limitations period is six years).

In any event, "[w]hile a statute of limitations defense may be raised in a motion to

dismiss[,] such a motion should not be granted unless it appears to beyond doubt that the plaintiff

can prove no set of facts in support of his claim which would entitle him to relief." *Banco de*

*Desarrollo Agropecuario, S.A. v. Gibbs*, 709 F.Supp. 1302, 1309-10 (S.D.N.Y. 1989) (citing *Ortiz v.*

*Cornetta*, 867 F.2d 146 (2d Cir. 1989)) (internal quotations omitted). If the plaintiff alleges facts

sufficient to trigger tolling of the limitations period, for example, dismissal is not appropriate.

*See, e.g. FDIC v. Pellatreau & Pellatreau*, 965 F.Supp. 381, 388-89 (E.D.N.Y. 1997) ("[Given] the

possibility that certain tolling doctrines may be applicable, the Court declines at this time to

dismiss the FDIC's causes of action relating to ventures entered prior to August, 1986.").

## V.     The Amended Complaint States Valid And Timely RICO Claims.

### A.     *The Alleged Injuries Are Sufficiently Direct and Proximate.*

Modi argues the Trustee lacks standing to bring the RICO claims asserted in the Amended

Complaint on the grounds that "the only direct 'victim' of the alleged pattern of racketeering

activity was PNB." (MTD at 22.)[8] He then invokes the Supreme Court's holdings in *Hemi Group,*

*LLC v. City of New York*, 559 U.S. 1 (2010), *Holmes v. Secs. Inv'r Prot. Corp.*, 503 U.S. 258 (1992), and

*Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006), which he claims bar the Trustee's RICO claims.

But Modi's arguments directly contradict *Hemi*, misconstrue the injuries alleged by the Trustee,

and misapply other important principles under RICO.

---

[8] While Modi frames this as a standing issue, the Second Circuit recently explained that "[a]lthough the
causation requirement has sometimes been described as necessary to support 'statutory standing,' we
think it is better understood as an element essential to the viability of a plaintiff's claim." *D'Addario v. D'Addario*,
901 F.3d 80, 96 n.8 (2d Cir. 2018).

i.      **Modi's Causation Argument Directly Contradicts Supreme Court Precedent.**

Modi's causation argument directly contradicts *Hemi*, in which the Supreme Court made clear that, in evaluating RICO causation, "the focus is on the directness of the relationship between the conduct and the harm." 559 U.S. at 12. Modi urges the Court to focus instead on whether Modi's misconduct was aimed at the Debtors or PNB. But that is exactly what the Supreme Court reversed the Second Circuit for doing in *Hemi*. *Id.* at 13.

Indeed, in *Hemi*, New York City brought RICO claims against a New Mexico-based online cigarette vendor, alleging that the defendant committed mail and wire fraud in connection with its failure to comply with its obligation as an out-of-state seller to submit customer information to New York <u>state</u> taxing authorities, which then resulted in the state authorities not passing such information to the <u>city</u> authorities, which then prevented the city from collecting tax revenues from the defendant's New York customers. *Id.* at 9. The defendant argued that the city's alleged injury—a loss of tax revenue—was contingent upon the fraud directed at the state, and derivative of injuries to the state, and therefore too attenuated to satisfy RICO's causation requirements. *Id.*

In the opinion *Hemi* reversed, the Second Circuit disagreed. *City of New York v. Smokes-Spirits.com, Inc.*, 541 F.3d 425, 442 (2d Cir. 2008). First, the Second Circuit distinguished *Holmes* on the grounds that, unlike the customers' injury in *Holmes*, the city's alleged injury was not derivative because, "though the City and State are injured by the same activity, the City's injury does not depend on the State being injured." *Id.* at 443. The Second Circuit then reasoned, on the basis of earlier Second Circuit precedent focusing on whether the plaintiff was an "intended" or "foreseeable" target of the racketeering activity:[9]

---

[9] The notion that a RICO injury must have been the "preconceived purpose" or "specifically intended consequence" stemmed from *In re Am. Express Co. S'Holder Litig.*, 39 F.3d 395, 399 (2d Cir. 1994). But the Second Circuit later explained that "in *American Express*, we were simply quoting these phrases from the plaintiffs' briefs . . . we did not [hold] that RICO plaintiffs were required to demonstrate that the injury was

> [I]t is clear that the City is alleged to be the target of the scheme because a large part of, if not the driving force behind, defendants' business plans was to sell cigarettes in such a way as to allow consumers to evade New York City's taxes . . . The fact that the State may also have been targeted by defendants' schemes does not change the result. "No precedent suggests that a racketeering enterprise may have only one 'target,' or that only a primary target has standing"; indeed, "there is a broad class of plaintiffs under RICO." *See Baisch*, 346 F.3d at 375 (2d Cir. 2003).

*Id.* The Supreme Court rejected this reasoning. It instead emphasized that the proper inquiry is not whether the plaintiff was an "intended" or "foreseeable" target (let alone the primary target), but simply whether there is "some direct relation between the injury asserted and the conduct alleged." 559 U.S. at 8, 12 (internal quotations omitted). Having clarified the proper inquiry, the Supreme Court rebuffed the city's attempts to broadly characterize the violation as "not merely Hemi's failure to file Jenkins Act information with the State, but as a more general 'systematic scheme to defraud the City of tax revenue.'" *Id.* at 13. It stressed that "the City cannot escape the proximate cause requirement merely by alleging that the fraudulent scheme embraced all those indirectly harmed by the alleged conduct. Otherwise, our RICO proximate cause precedent would become a mere pleading rule." *Id.*

*Hemi* therefore requires this Court to ignore Modi's broad characterization of the alleged schemes and consider only whether the specific injuries alleged have "some direct relation" to the specific conduct alleged—regardless of who such conduct was intended to target.

### ii.    The Debtors' Injuries Flowed Directly From Modi's Misconduct.

Consistent with *Hemi*, the Amended Complaint alleges that many of the specific acts comprising Modi's RICO violations injured the Debtors in two principal ways, neither of which is derivative or contingent upon harm to PNB or any other third party.

---

the 'preconceived purpose.' *American Express* held that an injury must be the foreseeable result—not necessarily the intended result—of the racketeering enterprise." *Baisch v. Gallina*, 346 F.3d 366, 375 n.1 (2d Cir. 2003).

*First*, Modi's RICO violations depleted the Debtors' tangible assets through innumerable Actual Fraudulent Transfers of cash and inventory both before and after exposure of the Bank Scheme. (*See, e.g.*, FAC ¶¶ 81-82, 173-76.) Then, in the weeks leading up to and following the filing of these Chapter 11 Cases, Modi and his co-conspirators cemented this injury in furtherance of the Exit Scheme by: (a) orchestrating additional Actual Fraudulent Transfers of the Debtors' assets to overseas Modi-Controlled Entities to shield such assets from creditors (*id.* ¶ 176); (b) diverting substantially all of the U.S. Affiliates' assets to Modi-Controlled Entities overseas, including assets the U.S. Affiliates received from the Debtors through Actual Fraudulent Transfers (*id.* ¶¶ 177-87); and (c) actively endeavoring to frustrate investigation of the fraudulent schemes through destruction of evidence and witness tampering (*id.* ¶¶ 146-51).

The depletion of the Debtors' assets and the destruction of their claims against U.S. Affiliates are sufficiently direct and proximate injuries. Indeed, in evaluating RICO claims based on looting or fraudulent transfers, courts uniformly attribute the direct injury to the entity whose assets were transferred and characterize the harm to creditors and other indirect stakeholders as merely derivative of that injury. *See, e.g., D'Addario v. D'Addario*, 901 F.3d 80, 96-97 (2d Cir. 2018) (finding injury suffered by beneficiary of looted probate estate unripe); *Manson v. Stacescu*, 11 F.3d 1127, 1130-31 (2d Cir. 1993) ("The alleged looting of the Company only harmed the [creditor plaintiffs] indirectly."); *Wooten v. Loshbough*, 951 F.2d 768, 771 (7th Cir. 1991) ("The first level of injury is to the corporation, and the creditor only suffers because he has a claim against it."); *accord Bivens Gardens Office Bldg., Inc. v. Barnett Banks of Florida, Inc.*, 140 F.3d 898, 908 (11th Cir. 1998); *Whalen v. Carter*, 954 F.2d 1087, 1092-93 (5th Cir. 1992); *St. Paul Fire and Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 702 (2d Cir. 1989); *Jackson Nat. Life. Ins. Co. v. Litigator*, 949 F.Supp. 200, 205 (S.D.N.Y. 1996); *In re Ahead by a Length, Inc.*, 100 B.R. 157, 172-73 (Bankr. S.D.N.Y. 1989).

23

As each Actual Fraudulent Transfer depleted the Debtors' property (*see, e.g.,* FAC ¶ 173(i)), each directly injured the Debtors and only indirectly harmed PNB and other creditors. *See Manson*, 11 F.3d at 1130-31. Moreover, even under the Second Circuit's pre-*Hemi* case law, the loss of the Debtors' interest in such property was "reasonably foreseeable or anticipated as a natural consequence" of the Actual Fraudulent Transfers. *See GICC Capital Corp. v. Technology Finance Group, Inc.*, 30 F.3d 289, 293 (2d Cir. 1994). The Debtors' injury from the Actual Fraudulent Transfers is thus sufficiently direct and proximate to support the Trustee's RICO claims.

So too is the Debtors' injury from the looting of the U.S. Affiliates. Notwithstanding the well-settled principle recognized in *Manson* that the looted entity suffers the initial injury, courts have occasionally found injuries sustained by creditors of the looted entity sufficiently direct and proximate to support a RICO claim despite the identical harm sustained by the looted entity. *See, e.g., GICC Capital Corp. v. Technology Finance Group, Inc.*, 30 F.3d 289, 293 (2d Cir. 1994); *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1101 (2d Cir. 1988); *Related Companies, L.P. v. Ruthling*, 2017 WL 6507759, at *16 (S.D.N.Y. 2017). The circumstances under which courts apply *GICC* rather than *Manson* have been explained as follows:

> In *GICC*, the primary injured party was TFG, the debtor of the plaintiff, but there was no realistic possibility that TFG would bring suit "for the law's vindication." As the Court of Appeals noted, "TFG released the defendant from all claims that TFG might have had against the defendant. TFG's officers and directors resigned. TFG thus was cast adrift without recourse against" the defendant, its subsidiaries, or controlling persons. *GICC* thus represents the anomalous case where the primary injured party lacks the ability to sue. Suit by the derivatively injured party may be the only means to an equitable resolution in such a case; significantly, there exists no risk of double recovery.

*Jackson National Life Insurance Company v. Litigator*, 949 F.Supp. 200, 205 (S.D.N.Y. 1996) (internal quotations, citations, and alterations omitted); *accord Ruthling*, 2017 WL 6507759 at *16 (quoting *Jackson* in stating, "Though *GICC Capital* is an 'anomalous case where the primary injured party lacks the ability to sue,' . . . this is also such a case.")).

Such circumstances exist here. Much like the looted companies in *GICC* and *Ruthling*, the U.S. Affiliates remained subject to Modi's and his co-conspirators' control after being looted and have never brought claims against Modi, Bhansali, Gandhi, or any of their other insiders for the harm the insiders inflicted on them. As the U.S. Affiliates cannot be expected to assert claims against Modi, "there is no risk of duplicative recovery," and permitting the Trustee to bring RICO claims premised on the looting of the U.S. Affiliates is "the only means to an equitable resolution." *Ruthling*, 2017 WL 6507759 at 16; *Jackson*, 949 F. Supp. At 205. In addition, by causing assets to be moved overseas and actively working to frustrate the Examiner's and Trustee's investigations, the insiders, including Modi, sabotaged the Trustee's ability to recover the looted assets through avoidance or comparable remedies. *See, e.g., Scholastic Decisions, Inc. v. DiDomenico*, 995 F.2d 1158, 1165 (2d Cir. 1993) ("As *Bankers Trust* recognized, a debt is 'lost' and thereby becomes a basis for RICO trebling only if the debt (1) cannot be collected (2) 'by reason of' a RICO violation.").

*Second*, Modi's RICO violations caused the Debtors to spend millions of dollars in professional fees related to the Trustee's and Examiner's investigation of information Bhansali and Gandhi (in collusion with Modi) lied about, concealed, failed to disclose, or actively endeavored to conceal, destroy, or otherwise render unavailable for use in connection with these chapter 11 cases. (*Id.* ¶ 303.) For the reasons set forth below, both of these injuries constitute a direct and proximate injury to the Debtors sufficient to support the Trustee's RICO claims.

The Debtors' unnecessary payment of professional fees also constitutes a sufficiently direct and proximate injury. Payment of professional fees can constitute a valid RICO injury as long as they are a direct and proximate result of the defendant's RICO violation. *See D'Addario v. D'Addario*, 901 F.3d 80, 96-97 (2d Cir. 2018); *Bankers Trust Co.*, 859 F.2d at 1106; *287 Franklin Ave. v. Meisels*, 2015 WL 5457959, at *9 (E.D.N.Y. July 20, 2015); *First Capital Asset Management Inc. v. Brickellbush, Inc.*, 218 F.Supp.2d 369, 383 (S.D.N.Y. 2002). The Amended Complaint alleges that

Modi's acts of obstruction of justice (including conspiracy with Bhansali, Gandhi, and Nehal Modi to commit perjury, witness tampering, and destruction of evidence) caused the Debtors to pay substantial professional fees in connection with the Trustee's and Examiner's investigation of information Bhansali lied about, concealed, destroyed, or otherwise actively endeavored to render unavailable for use in these proceedings. (FAC ¶ 289.)

But for Modi's violations of federal law, not only would the specific information and documents Modi and his co-conspirators buried have been much more readily available, a trustee would have been appointed immediately, which would have obviated the need for a separate examiner, and thus, the need to pay for two sets of professionals to conduct two separate investigations. Moreover, even applying the pre-*Hemi* standard, as these professional fees were "reasonably foreseeable or anticipated as a natural consequence" of Modi's obstruction of justice, their payment constitutes a sufficiently direct and proximate injury for the purposes of RICO. *See GICC Capital Corp. v. Technology Finance Group, Inc.*, 30 F.3d 289, 293 (2d Cir. 1994).

### iii.    Modi's Causation Argument Misapplies Other Important RICO Principles.

Modi's causation argument also misapplies other important RICO principles. For example, he argues that the "only direct 'victim' *of the alleged pattern of racketeering activity* was PNB." (MTD at 22 (emphasis added).) But his focus on identifying a victim of the <u>entire</u> alleged pattern (as opposed to specific acts comprising the pattern) is misguided. "[S]o long as a plaintiff has adequately pleaded a 'pattern of racketeering activity,' for the purposes of damages, the plaintiff need only allege that it has suffered an injury from at least one or more of the predicate acts comprising the RICO violation." *4 K&D Corp. v. Concierge Auctions, LLC*, 2 F.Supp.3d 525, 543 (S.D.N.Y. 2014); *accord Terminate Control Corp. v. Horowitz*, 28 F.3d 1335, 1347 (2d Cir. 1994); *Town*

of *Kearny v. Hudson Meadows Urban Renewal Corp.*, 829 F.2d 1263, 1268 (3d Cir. 1987).[10] As

discussed above, Modi's misconduct directly injured the Debtors separately from any injuries

sustained by PNB. Moreover, even as to acts that also directly injured PNB, the law is clear that

"[i]f a defendant's illegal acts caused direct injury to more than one category of plaintiffs, the

defendant may well be obligated to compensate different plaintiffs for different injuries."

*Commercial Cleaning Services, L.L.C. v. Colin Service Systems, Inc.*, 271 F.3d 374, 383-84 (2d Cir. 2001).

Modi next argues that the alleged injuries to the Debtors "flowed only indirectly, at best,

from the alleged scheme to defraud PNB." (MTD at 22.) Again, that is not true. For example, the

Trustee alleges the Actual Fraudulent Transfers comprising the Funnel Scheme supplied the

Shadow Entities with funds and inventory, which the Shadow Entities then used to engage in

bogus transactions with the LOU Entities, which Modi and his co-conspirators then used to solicit

LOUs from PNB, which finally caused PNB to disburse LOU proceeds. The injury alleged by the

Trustee—the depletion of the Debtors assets—flows directly from the first step in the chain (*i.e.*

the fraudulent transfers). By contrast, the injury to PNB (*i.e.* its disbursement of LOU proceeds)

is several steps removed from the fraudulent transfer. As such, adopting Modi's reasoning would

require the Court to do just what *Hemi* prohibits: "extend RICO liability to situations where the

defendant's fraud on the third party ([the Debtors]) . . . made it easier for a *fourth* party ([the LOU

Entities]) to cause harm to the [would-be] plaintiff ([PNB])." *See Hemi*, 559 U.S. at 11 (emphasis in

original). Moreover, with respect to the looting of the Debtors' and U.S. Affiliates' assets as part

---

[10] This principle similarly negates Modi's point that "the FAC is almost entirely dedicated to describing the alleged scheme against PNB" with only a "handful of paragraphs at the end" alleging the "Debtors' asset depletion and bankruptcy-related injuries[.]" (MTD at 23.) Indeed, that was precisely the point: to establish a pattern of racketeering by describing Modi's and his co-conspirators' eight-year-long fraudulent schemes and then explain how certain of their predicate acts directly injured the Debtors.

of the Exit Scheme after the Bank Scheme's exposure, any injury sustained by PNB must be derivative, since PNB did not disburse any additional LOU funds after that date.

Finally, Modi argues that PNB is better situated to bring the Trustee's RICO claims. But PNB cannot bring the RICO claims asserted by the Trustee because, as discussed above, such claims are based on direct injuries to the Debtors, not PNB. While it is true that PNB sustained its own direct injury from Modi's and his co-conspirators' act of fraudulently soliciting LOUs from PNB, the Trustee's RICO claims are not based on that conduct (other than to the extent it reinforces the Defendants' pattern of racketeering activity), nor on that injury. Even then, it is not clear PNB could assert any RICO claim because its sole direct injury—its disbursement of fraudulent loans—occurred overseas, and RICO requires a domestic injury. *See Bascuñán v. Elsaca*, 927 F.3d 806, 819 (2d Cir. 2017) ("We ultimately conclude that an injury to tangible property is generally a domestic injury only if the property was physically located in the United States, and that a defendant's use of the U.S. financial system to conceal or effectuate his tort does not, on its own, turn an otherwise foreign injury into a domestic one.").

## B.   *The Trustee's RICO Claims Are Not Barred by the In Pari Delicto Doctrine.*

Modi next claims the doctrine of *in pari delicto* bars the Trustee's RICO claims because "the Debtors were critically involved in and instrumentalities of the alleged PNB Scheme." (MTD at 26.) But, since Modi is the Debtors' ultimate controlling shareholder, he cannot assert an *in pari delicto* defense. "*In pari delicto* is a state law equitable defense analogous to unclean hands 'rooted in the common-law notion that a plaintiff's recovery may be barred by his own wrongful conduct.'" *In re Food Mgmt. Grp., LLC*, 380 B.R. 677, 693 (Bankr. S.D.N.Y. 2008) (quoting *Pinter v. Dahl*, 486 U.S. 622, 632 (1988)). However, *in pari delicto* does not protect "insiders in the sense that they either are on the board or in management, or in some other way control the corporation." *In re Optimal U.S. Litig.*, 813 F. Supp. 2d 383, 400 (S.D.N.Y. 2011) (internal quotation marks omitted).

Thus, a trustee, standing in the shoes of a debtor, is permitted to assert claims against the corporate debtor's insiders when there is an alleged injury to the debtor. *In re PHS Grp. Inc.*, 581 B.R. 16, 31 (Bankr. E.D.N.Y. 2018).

Courts may determine "insider" status under a statutory definition. For example, under section 101(31) of the Bankruptcy Code, "insider" includes a "director of the debtor; officer of the debtor; [and] person in control of the debtor." 11 U.S.C. § 101(31). Individuals within this definition are "statutory insiders." *In re PHS Grp. Inc.*, 581 B.R. 16, 31 (Bankr. E.D.N.Y. 2018). To determine non-statutory insider status, courts also consider: (1) the close relationship between the debtor and the third party; (2) the degree of the individual's involvement in the debtor's affairs; (3) whether the defendant had opportunities to self-deal; and (4) whether the defendant holds or held a controlling interest in the debtor corporation. *In re TS Employment, Inc.*, 603 B.R. 700, 708 (Bankr. S.D.N.Y. 2019) (collecting cases).

The Trustee alleges Modi dominated and controlled the debtors (*see, e.g.*, FAC ¶¶ 18, 61-91, 188-94) sufficient to show he was "person in the control" of the Debtors under the statutory insider definition. *See PHS Group,* 581 B.R. at 31. These allegations also support each of the non-statutory factors: Modi (i) had a "close relationship" with the Debtors; (ii) had a substantial "degree of . . . involvement" with the Debtors ; (iii) had the ability to self-deal; and (iv) held a controlling interest in the Debtors. *See TS Employment*, 603 B.R. at 708. As such, the *in pari delicto* defense is unavailable to Modi.

### C.   *The Trustee's RICO Allegations Satisfy the Requirements of Rule 9(b).*

Modi argues the Trustee's wire fraud, mail fraud, money laundering, and National Stolen Property Act allegations must satisfy the heightened pleading requirements of Rule 9(b). To the extent Rule 9(b) applies, the Trustee's allegations satisfy its requirements. "Where facts are peculiarly within the opposing party's knowledge, as might be the case where private, financial

29

transfers are involved, a complaint may base allegations on information and belief, provided that it 'adduce specific facts supporting a strong inference of fraud[.]'" *Sullivan v. Kodsi*, 373 F.Supp.2d 302, 306 (S.D.N.Y. 2005) (quoting *Wexner v. First Manhattan Co.*, 209 F.2d 169, 172 (2d Cir. 1990)); *accord Berk v. Tradewell, Inc.*, 2003 WL 21664679, at *13 (S.D.N.Y. July 16, 2003)).

Indeed "[g]reater liberality in the pleading of fraud is particularly appropriate in bankruptcy cases because it is often the trustee, a third party to the fraudulent transaction, that must plead the fraud on secondhand knowledge for the benefit of the estate and all of its creditors." *In re Bennett Funding Group, Inc.*, 367 B.R. 269, 297 (Bankr. N.D.N.Y. 2007) (quoting *Securities Investor Protection Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293, 310 (Bankr. S.D.N.Y. 1999) (alterations and quotations marks omitted). This is particularly true "when the trustee's lack of personal knowledge is compounded with complicated issues and transactions which extend over lengthy periods of time." *Id.* In that circumstance, "the trustee's handicap increases, and courts, therefore, should afford him or her even greater latitude." *Id.* Moreover, "Rule 9(b) is applied more leniently to complaints against corporate insiders." *Berk*, 2003 WL 2003 WL 21664679 at *13 (citing *Allen v. New World Coffee, Inc.*, 2001 WL 293683, at *4 (S.D.N.Y. March 27, 2001)); *accord Limas LS PLC v. PHL Variable Insurance Co.*, 2013 WL 12286066, at *5 (D. Conn. Dec. 17, 2013); *Sunrise Indus. Joint Venture v. Ditric Optics, Inc.*, 873 F.Supp. 765, 772 (E.D.N.Y. 1995).

Under these standards, the Trustee's allegations are sufficient. His allegations of wire fraud, mail fraud, money laundering, and violations of the National Stolen Property Act each relate to Actual Fraudulent Transfers of the Debtors' assets and Subsequent Transfers by the U.S. Affiliates of assets they received from the Debtors through Actual Fraudulent Transfers. The Trustee alleges dozens of specific examples of such transfers (including the parties, dates, amounts, method of transfer, and related communications) (FAC ¶¶ 81-82, 175-177), alleges facts showing the fraudulent nature of such transfers (*id.* 39-41; ¶ 174), explains the role of such

transfers in the broader fraudulent schemes orchestrated by Modi (*id.* ¶¶ 39-41; 54-59; 177-187),

and alleges Modi's personal involvement in many of the transfers (*id.* ¶¶ 81(ii), 81(xi), 82(i), 82(ii),

82(iii), 83, 164, 179-183). If anything, the Amended Complaint alleges more detail than necessary;

for example, in *Ahead by a Length*, the court emphasized:

> It is not necessary that the trustee plead detailed evidentiary matter. Where, as
> here, it is alleged that the transactions involved cover a long period of time,
> pleading on information and belief without specifics as to each and every
> transaction is often permissible. Since the trustee, a stranger to the fraudulent
> scheme, has specified so many of the transactions in detail, the [a]mended
> [c]omplaint is certainly adequate."

100 B.R. at 168; *accord Stratton Oakmont*, 234 B.R. at 316-17 ("While it is true that some allegations

are more detailed than others, the Trustee is permitted to plead in such a fashion given his second-

hand knowledge of facts which are predominantly if not exclusively in the control of [the

defendants]."). So too here.

### D.     *The Amended Complaint Properly Pleads Each Predicate Act.*

### i.     **The Amended Complaint Properly Pleads Mail and Wire Fraud.**

The Amended Complaint properly pleads mail and wire fraud. "Because the mail and

wire fraud statutes use the same relevant language, [courts] analyze them the same way." *U.S. v.*

*Binday*, 804 F.3d 558, 569 (2d Cir. 2015). "The essential elements of both offenses are (1) a scheme

to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to

further the scheme." *Id.* (internal quotations omitted). Though not defined by the statutes, a

"scheme to defraud" has been described as "a plan to deprive a person of something of value by

trick, deceit, chicane or overreaching . . . and is characterized by a departure from community

standards of fair play and candid dealings." *U.S. v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000)

(internal quotations and citations omitted). "[I]t is not necessary for the defendant to participate

personally in the wire transmission [or mailing], as long as it is reasonably foreseeable that the

[alleged wire or mailing] would occur in the execution of the scheme." *U.S. v. Bahel*, 662 F.3d 610, 641-42 (2d Cir. 2011) (quoting *Schumuck v. United States*, 489 U.S. 705, 710-11 (1989)).

The Trustee properly alleges these elements. The Amended Complaint extensively describes the mechanics of the fraudulent schemes Modi designed and oversaw (FAC ¶¶ 23-41, 53-60, 103-41, 171-197), the general ways in which wires and mailings were used in furtherance of those schemes (*id.* ¶¶ 39-41; 54-59; 177-187), and numerous specific examples of such wires and mailings (*id.* ¶¶ 81-82, 175-177). These allegations properly state claims for mail and wire fraud.

Modi challenges the mail and wire fraud allegations on two grounds. Both lack merit. First, he argues that "only two" of the specific communications "involve Modi and neither sets forth any statements that the Trustee alleges were false or misleading." (MTD at 30.) This argument misstates the necessary showing. Where facially innocent mails or wires are used in furtherance of a larger plan to defraud, "a detailed description of the underlying scheme and the connection therewith of the mail and/or wire communications is sufficient to satisfy Rule 9(b)." *Jerome M. Sobel & Co. v. Fleck*, 2003 WL 22839799, at *5-6 (S.D.N.Y. Dec. 1, 2003) (quoting *In re Sumitomo Copper Litig.*, 995 F.Supp. 451, 456 (S.D.N.Y. 1998); *accord Williams v. Affinion Group, LLC*, 889 F.3d 116, 125 (2d Cir. 2018); *Mohr-Lecara v. Oxford Health Ins., Inc.*, 2019 WL 1409479, at *10 (S.D.N.Y. March 28, 2019).

Modi argues that "beyond general statements regarding Modi's alleged control of the Debtors, the Trustee does not make any other specific allegations as to the what, why, when, and how of Modi's alleged participation in any alleged fraudulent scheme." (MTD at 30.) As discussed above, however, the Amended Complaint describes Modi's participation in the fraudulent scheme in great detail. Moreover, in *Bankers Trust*, the Second Circuit rejected an identical argument "that the complaint does not sufficiently allege [the defendant's] participation in the . . . acts of the other defendants," holding:

32

> At this early stage and in the absence of any meaningful discovery, [the plaintiff]
> has been unable to ascertain fully the extent of the [defendant's] participation in
> and knowledge of the bribery and . . . frauds. Nevertheless, more than enough has
> been pled to raise an inference of [the defendant's] knowledge and participation.

*Bankers Tr. Co. v. Rhoades*, 859 F.2d 1096, 1107 (2d Cir. 1988). So too here.[11]

Next, Modi argues "the Trustee does not even begin to explain how the cited communications establish Modi having the requisite intent to defraud." (MTD at 31.) But, again, the wires and mailings themselves do not need to demonstrate an intent to defraud on their face. *See Jerome M. Sobel & Co.*, at *5-6. Rather, "[w]hen the necessary result of the actor's scheme is to injure others, fraudulent intent may be inferred from the scheme itself." *U.S. v. D'Amato*, 39 F.3d 1249, 1257 (2d Cir. 1994). As the use of wires and mailings in connection with the schemes to deplete the Debtors' assets through Actual Fraudulent Transfers and to loot the U.S. Affiliates necessarily involved injuring the Debtors, Modi's intent to injure the Debtors can be inferred from the facts alleged. *See id.* Moreover, "while the actual fraud alleged must be stated with particularity[,] the requisite intent of the alleged perpetrator need not be alleged with great specificity." *Wight v. BankAmerica Corp.*, 219 F.3d 79, 91 (2d Cir. 2000) (internal quotations and alterations omitted); *accord Mohr-Lecara*, 2019 WL 1409479 at 10. ("A civil RICO defendant's *mens rea* need not be alleged with great specificity.").

### ii.    The Amended Complaint Properly Pleads Violations of the NSPA.

The Amended Complaint properly pleads violations of the National Stolen Property Act, 18 U.S.C. § 2314 ("**NSPA**"). A claim under the NSPA, requires: "first, that the defendant have

---

[11] Modi relies on *Tymoshenko v. Firtash* to support his contention that the Trustee failed to allege how the subject statements were fraudulent. 2015 WL 5505841, at *5 (S.D.N.Y. Sept. 18, 2015). In that case, the court referred to its earlier decision dismissing a RICO claim with a mail and wire fraud predicate act because the plaintiff failed to allege (i) defendants used interstate wires or mail in connection with their fraudulent conduct, (ii) defendants targeted a third party's money or property, or (iii) proximate causation for their injuries. *Tymoshenko v. Firtash*, 57 F. Supp. 3d 311, 322 (S.D.N.Y. 2014). The Amended Complaint shares none of these deficiencies.

transported 'goods, wares, [or] merchandise' in interstate or foreign commerce; second, that those goods have a value of '$5,000 or more'; and, third, that the defendant 'kno[w] the same to have been stolen, converted or taken by fraud.'" *Dowling v. United States*, 473 U.S. 207, 214 (1985) (quoting 18 U.S.C. § 2314); *accord United States v. Agrawal*, 726 F.3d 235, 251 (2d Cir. 2013).

Modi attacks the Trustee's allegations concerning Modi's knowledge of the fraudulent nature of the Actual Fraudulent Transfers, claiming the Trustee relies on the "conclusory allegation" that Modi knew "that the funds involved had been fraudulently transferred from the applicable Debtor to the applicable U.S. Affiliate or had otherwise been stolen converted, or taken by fraud." (MTD at 32 (quoting FAC ¶ 255).) The Trustee's allegations concerning Modi's knowledge of the fraudulent nature of the Actual Fraudulent Transfers are not mere conclusions, but instead solid factual allegations that satisfy Rule 9(b) and for which all reasonable inferences must be drawn in the Trustee's favor. (*See, e.g.*, FAC ¶¶ 81, 82, 179, 182.)

### iii.   The Amended Complaint Properly Pleads Money Laundering.

The Amended Complaint properly pleads money laundering under 18 U.S.C. §§ 1956 and 1957. A claim under section 1956 requires that "(1) the individual conducted a financial transaction in interstate commerce, (2) with knowledge that the property involved in the transaction represented some form of unlawful activity, (3) with the transaction in fact involving the proceeds of specified unlawful activity, (4) with the purpose, in whole or in part, of concealing or disguising the nature, the location, the source, the ownership or the control of the illegally acquired proceeds." *Republic of Colombia v. Diageo N. Am. Inc.*, 531 F. Supp. 2d 365, 438 (E.D.N.Y. 2007); *accord United States v. Maher*, 108 F.3d 1513, 1527-28 (2d Cir. 1997). Section 1957 requires that the defendant "(1) knowingly engaged or attempted to engage in a monetary transaction involving criminally derived property, (2) with such property being valued at more than $10,000,

and (3) with such money actually being derived from specified unlawful activity." *Republic of Colombia*, 531 F. Supp. 2d at 438-39.

The Trustee alleges that Modi knew the property involved in each Subsequent Transfer represented the proceeds of unlawful activity (*e.g.*, the mail and wire fraud committed in connection with each applicable Actual Fraudulent Transfer). (FAC ¶¶ 173-76, 272.) Modi claims this is not enough, arguing that the Amended Complaint fails to allege Modi's participation in "specific transfers" or knew that the transfers "represented some form of unlawful activity" or was "criminally derived." (MTD at 32-33.) The extensive allegations supporting Modi's participation and involvement in the fraudulent schemes identified above, including but not limited to the Subsequent Transfers itemized in paragraph 175 of the Amended Complaint, are sufficient to establish Modi's knowledge that the Subsequent Transfers represented the proceeds of some form of unlawful activity and that Modi intended to conceal their origin. The Trustee properly alleges money laundering.[12]

### iv.    The Amended Complaint Properly Pleads Obstruction of Justice.

The Amended Complaint properly pleads obstruction of justice. 18 U.S.C. § 1503(a) criminalizes, among other things, "corruptly . . . endeavor[ing] to influence, obstruct, or impede" (1) any officer in or of any court of the United States in the discharge of his duty; or (2) the due administration of justice. *See* 18 U.S.C. § 1503(a). A bankruptcy trustee constitutes an officer of the court for the purposes of section 1503(a), s*ee U.S. v. Crisp*, 306 F.3d 71, 82 (2d Cir. 2002), and so too

---

[12] The case law Modi cites does not disturb this conclusion. (MTD at 32-33.) In *Jus Punjabi, LLC v. Get Punjabi, Inc.*, the plaintiff failed to identify which defendants were involved in the subject acts or why those actions were fraudulent. 2015 U.S. Dist. LEXIS 66006, at *15 (S.D.N.Y. May 20, 2015). In *Bernstein v. Misk*, the allegations were limited to the conclusion that defendants "laundered funds for the enterprise." 948 F. Supp. 228, 236 (E.D.N.Y. 1997). And in *Casio Computer Co. v. Sayo*, "there were no . . . allegations or factual support to indicate that defendants knowingly conducted any financial transaction involving the proceeds of unlawful activity." 1999 U.S. Dist. LEXIS 14675, at *55 (S.D.N.Y. Sep. 20, 1999).

35

should a bankruptcy examiner. *See* 11 U.S.C. § 1104(c) (providing for court-appointed examiners in cases involving, *inter alia*, fraud or misconduct). To establish a violation of section 1503(a), the plaintiff must establish that:

(1) there is a pending judicial or grand jury proceeding constituting the administration of justice;

(2) the defendant knew or had notice of the proceeding; and

(3) the defendant acted with the wrongful intent or improper purpose to influence the judicial or grand jury proceeding, whether or not the defendant is successful in doing so.

*U.S. v. Sampson*, 898 F.3d 287, 299 (2d Cir. 2018). A plaintiff can prove the requisite intent by showing that the defendant's conduct "had the natural and probable effect of interfering with a judicial or grand jury proceeding." *Id.*

Separately, section 1512(b) criminalizes "knowingly us[ing] intimidation, threaten[ing], or corruptly persuad[ing] another person, or attempting to do so, or engaging win misleading conduct toward another person, with intent to" among other things:

(1) influence, delay, or prevent the testimony of any person in an official proceeding; or

(2) cause or induce any person to (among other things):

    (a) withhold testimony, or withhold a record, document, or other object from an official proceeding; or

    (b) alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding.

*See* 18 U.S.C. § 1512(b).

Finally, section 1512(c) criminalizes "corruptly altering, destroying, mutilating, or concealing a record, document, or other object, or attempting to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or (2) otherwise obstructing, influencing, or impeding any official proceeding, or attempting to do so." 18 U.S.C. § 1512(c).

36

In the context of section 1512, the term "official proceeding" includes any proceeding before a bankruptcy judge. *See* 18 U.S.C. § 1515(a)(1). The official proceeding "need not be pending or about to be instituted at the time of the offense[,]" but must be "reasonably foreseeable to the defendant." *See U.S. v. Pugh*, 937 F.3d 108, 120 (2d Cir. 2019), *amended and superseded on other grounds*, 2019 WL 6708812 (2d Cir. Dec. 10, 2019); 18 U.S.C. § 1512(f)(1). While the plaintiff must show a "nexus" between the defendant's conduct and the pending or foreseeable official proceeding, such nexus "does not depend on the defendant's knowledge" but instead whether the defendant's acts have "a relationship in time, causation, or logic with the judicial proceedings." *Id.* "In other words, the endeavor must have the natural and probable effect of interfering with the due administration of justice." *Id.* Section 1512 applies to conduct that occurs outside of the United States and also criminalizes conspiring to commit any offense under section 1512. *See* 18 U.S.C. §§ 1512(j)-(k).

The Amended Complaint plausibly alleges Modi committed and conspired to commit violations of these provisions. Modi argues that "all" of the Trustee's allegations "concern conduct before the initiation of these bankruptcy proceedings" and therefore do not "relate to a U.S. federal proceeding." (MTD at 34 (quoting *Bologna v. Allstate Insurance Co.*, 138 F. Supp. 2d 310, 321 (E.D.N.Y. 2001)).) But substantially all of the alleged misconduct occurred either after the Debtors' bankruptcy filing or just before. Indeed, the Trustee alleges that in February and March 2018 alone, Modi and others with whom Modi conspired (including but not limited to Mihir Bhansali and Nehal Modi): (a) intimidated and coerced directors and employees of Shadow Entities not to cooperate with investigative authorities, including by confiscating their passports (FAC ¶ 151(ii), (vi)); (b) destroyed cell phones of Shadow Entity Directors (*id.* ¶ 151(iii)); (c) bribed a Shadow Entity director to give false testimony (*id.* ¶ 151(v)); and (d) directed Shadow Entity personnel to sign false affidavits (*id.* ¶ 151(vii)).

37

Additionally, the Trustee alleges that Modi conspired with Bhansali and Gandhi (*id.* ¶ 288) with respect to their acts of (a) making false and misleading statements under penalty of perjury in the Debtors' bankruptcy cases (*id.* ¶¶ 152-61); (b) concealing assets in the Debtors' bankruptcy cases, including the $11.2 million loan owed by NMI to Jaffe (*id.*); (c) lying to the Examiner (*id.* ¶¶ 168-70); and (d) researching and implementing means of permanently deleting or encrypting electronic data (*id.* ¶¶ 142-49, 279). Modi's agreement with Bhansali and Gandhi can be plausibly inferred from the Trustee's allegations that Modi: (a) communicated with Bhansali about the Debtors' bankruptcy proceedings (FAC ¶¶ 164-67); (b) directed Angelina Ypma to work with Bhansali and Gandhi to divert assets to Hong Kong in the weeks after the Debtors' bankruptcy filing (*id.* ¶¶ 179, 182); and (c) covertly used Gandhi's personal email account in February 2018 (*id.* ¶ 144).

Modi and his co-conspirators were therefore aware of or at least could have foreseen these Chapter 11 Cases at the time they engaged in the conduct alleged. *See Pugh*, 937 F.3d at 120. Moreover, the natural and foreseeable consequence of the alleged misconduct was to impede and obstruct the administration of the Debtors' bankruptcy proceedings and the Trustee's and Examiner's discharge of their duties. *See U.S. v. Sampson*, 898 F.3d at 299. Thus, the Trustee properly pleaded obstruction of justice.

## E.    *The Amended Complaint Properly Pleads RICO Conspiracy.*

Modi argues "[b]ecause the Trustee fails to plead a substantive RICO violation by Modi, its conspiracy claim must fail as well." (MTD at 28 n.3.) But for all of the reasons discussed above, the Trustee has properly pleaded a substantive RICO violation by Modi. Even so, to establish a violation of 18 U.S.C. § 1962(d), the plaintiff need only "prove the existence of an *agreement* to violate RICO's substantive provisions." *U.S. v. Appins*, 637 F.3d 59, 75 (2d Cir. 2011) (emphasis in original). For an agreement to exist, the defendant need only know of the general contours of the

conspiracy and agree to its general criminal objective. *Id.* (citing *U.S. v. Zichettello*, 208 F.3d 72, 100 (2d Cir. 2000)). The defendant need not commit any predicate acts so long as they adopt the goal of furthering or facilitating the criminal endeavor. *Id.* A defendant may agree to join a RICO conspiracy without knowing the identities of all of the other conspirators and without full knowledge of all of the details of the conspiracy. *Id.*

The Trustee alleges Modi knowingly and willfully agreed with Bhansali, Gandhi, and others to violate section 1962(c). (*See* FAC ¶ 308.) Modi does not argue otherwise, nor does he challenge the Trustee's substantive RICO claims against Bhansali, and Gandhi. As such, his RICO conspiracy argument fails.

> ### F.    *The Trustee's RICO Claims Are Not Time Barred.*

Finally, Modi argues that the Trustee's RICO claims "should be partially dismissed as time-barred." (MTD at 34.) However, as discussed above, two of the principal injuries alleged by the Trustee—the impairment of claims against the U.S. Affiliates and the payment of otherwise unnecessary professional fees—resulted from acts taken within the months leading up to and following the Debtors' bankruptcy filing in February 2018. As the Trustee filed this case in March 2019, his RICO claims arising from those injuries are timely under RICO's four-year statute of limitations.

Moreover, the Trustee's RICO claims arising from all earlier misconduct and injuries, including the depletion of the Debtors' assets through Actual Fraudulent Transfers, remain timely by operation of the adverse domination tolling doctrine. "Under the doctrine of adverse domination, the statute of limitations is tolled for as long as a corporate plaintiff is controlled by the alleged wrongdoers." *In re Adelphia Commc'ns Corp.*, 365 B.R. 24, 58-59 (Bankr. S.D.N.Y. 2007); *accord Armstrong v. McAlpin*, 699 F.2d 79, 87 (2d Cir. 1983); *Moviecolor Limited v. Eastman Kodak Co.*, 288 F.2d 80, 88 (2d Cir. 1961); *Barnet v. Drawbridge Special Opportunities Fund LP*, 2014 WL 3493320,

at *13-14 (S.D.N.Y. Sept. 5, 2014); *In re Everfresh Beverages, Inc.*, 238 B.R. 558, 577 (Bankr. S.D.N.Y. 1999); *Meridien Int'l Bank Ltd. v. Gov't of the Republic of Liberia*, 23 F. Supp. 2d 439, 447-48 (S.D.N.Y. 1998); *Rosner v. Peregrine Finance Ltd.*, 1998 WL 249197, at *8 (S.D.N.Y. May 18, 1998); *In re Ahead by a Length, Inc.*, 100 B.R. 157, 163 (Bankr. S.D.N.Y. 1989).

The Amended Complaint alleges Modi's and his co-Defendants' domination and control over the Debtors in great detail. (*See, e.g.*, FAC ¶¶ 18, 61-91, 188-94.) On the basis of these allegations, the statute of limitations was tolled until Modi and his co-Defendants relinquished control over the Debtors in 2018. *See, e.g., Adelphia*, 365 B.R. at 58-59. Since all of the misconduct and injuries alleged in the Amended Complaint occurred while Modi and his co-Defendants controlled the Debtors, even injuries sustained in 2010 and 2011 remain actionable. Moreover, Modi again ignores section 108(a) of the Bankruptcy Code, by operation of which the Trustee has until February 28, 2020 to bring RICO claims that accrued since February 26, 2014 (i.e. four years prior to the petition date). *See* 11 U.S.C. § 108(a).

Finally, even to the extent any of the Trustee's allegations pre-date the applicable limitations period, such allegations remain relevant to show the Defendants' knowledge, intent, and pattern of racketeering activity. *See, e.g., U.S. Textiles, Inc. v. Anheuser-Busch Companies, Inc.*, 1988 WL 31479, at *2 (N.D. Ill. 1988) ("The acts occurring outside the limitations period still can be used to show fraud and a pattern of racketeering, but plaintiff can only recover for injuries caused by overt or wrongful acts committed within the limitations period and injury suffered within the limitations period.").

## CONCLUSION

For reasons set forth in this Opposition, the Trustee respectfully requests the Court deny Defendant Nirav Deepak Modi's Motion to Dismiss in its entirety.

Dated: December 18, 2019
      New York, New York

Respectfully submitted,

**JENNER & BLOCK LLP**

By:  /s/ Vincent E. Lazar
Vincent E. Lazar
Angela M. Allen (admitted *pro hac vice*)
William A. Williams (admitted *pro hac vice*)
353 North Clark Street
Chicago, Illinois 60654
(312) 222-9350
vlazar@jenner.com
aallen@jenner.com

Carl N. Wedoff
919 Third Avenue
New York, New York 10022
(212) 891-1600
cwedoff@jenner.com

*Counsel for the Chapter 11 Trustee*

41