JENNER & BLOCK LLP
Vincent E. Lazar
Angela M. Allen (admitted *pro hac vice*)
William A. Williams (admitted *pro hac vice*)
353 North Clark Street
Chicago, Illinois 60654
(312) 222-9350

Carl N. Wedoff
919 Third Avenue
New York, New York 10022
(212) 891-1600

*Counsel for the Chapter 11 Trustee*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>FIRESTAR DIAMOND, INC., *et al.*<br><br>        Debtors. | Chapter 11<br><br>No. 18-10509 (SHL)<br><br>(Jointly Administered) |
| RICHARD LEVIN, Chapter 11 Trustee of FIRESTAR DIAMOND, INC., FANTASY, INC., and OLD AJ, INC. f/k/a A. JAFFE, INC.,<br><br>        Plaintiff,<br><br>    v.<br><br>NIRAV DEEPAK MODI, MIHIR BHANSALI, and AJAY GANDHI,<br><br>        Defendants. | Adv. Proc. No. 19-1102 (SHL) |

**TRUSTEE'S OPPOSITION TO DEFENDANT MIHIR BHANSALI'S**
**MOTION FOR RULE 11 SANCTIONS OR TO STRIKE CERTAIN PLEADINGS**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES……………………………………………………………………………ii

PRELIMINARY STATEMENT ............................................................................................ 1

BACKGROUND .................................................................................................................... 1

APPLICABLE STANDARDS................................................................................................ 4

I.      Rule 11(b) Standard. ............................................................................................... 4

II.     Rule 12(f) Standard. ............................................................................................... 5

ARGUMENT.......................................................................................................................... 5

I.      The Challenged Allegations Are Well-Supported and Directly Relevant and
        Easily Satisfy Rule 11............................................................................................. 5

        A.      The Trustee's Allegations Concerning the Source of Funds for Bhansali's
                Apartment Purchase Are Objectively Reasonable and Not Frivolous. .................... 6

        B.      The Trustee's Allegations Concerning the M.R. Family Trust Are
                Objectively Reasonable and Not Frivolous. ............................................... 10

        C.      The Trustee's Allegations Concerning Mr. Bhansali's Conduct Following
                Exposure of the Bank Fraud Are Objectively Reasonable and Not
                Frivolous......................................................................................................... 12

II.     None of the Trustee's Allegations Should Be Stricken. ........................................ 17

CONCLUSION ..................................................................................................................... 18

i

<u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*AJ Energy LLC v. Woori Bank*,
2019 WL 4688629 (S.D.N.Y. Sept. 26, 2019) ....................................................................... 4

*Billhofer v. Flamel Technologies, S.A.*,
2012 WL 3079186 (S.D.N.Y. July 30, 2012) ...................................................................... 10

*Blank v. Tripoint Global Equities, LLC*,
338 F.Supp.3d 194 (S.D.N.Y. 2018) ................................................................................. 10

*Elfoulki v. Brannons Sandwich Shop, LLC*,
2016 WL 3542458 (S.D.N.Y. June 22, 2016) ..................................................................... 4

*G-I Holdings, Inc. v. Baron & Budd*,
2002 WL 1934004 (S.D.N.Y. Aug. 21, 2002) ................................................................... 14

*Galin v. Hamada*,
283 F.Supp.3d 189 (S.D.N.Y. 2017) ................................................................................. 5

*In re Reilly*,
244 B.R. 46 (Bankr. D. Conn. 2000) ................................................................................. 6

*Khodeir v. Sayyed*,
2016 WL 5817003 (S.D.N.Y. Sept. 28, 2016) .............................................................. 5, 17

*Kiobel v. Millson*,
592 F.3d 78 (2d Cir. 2010) ............................................................................................. 6, 17

*Lan v. Time Warner, Inc.*,
2016 WL 6778180 (S.D.N.Y. Oct. 18, 2016) ............................................................... 6, 10

*Lipsky v. Commonwealth United Corp.*,
551 F.2d 887 (2d Cir. 1976) ............................................................................................. 5

*Lucas v. Duncan*,
574 F.3d 772 (D.C. Cir. 2009) ..................................................................................... 10, 16

*Navarro-Ayala v. Hernandez-Colon*,
3 F.3d 464 (1st Cir. 1993) ............................................................................................... 10

*Norris v. Coca-Cola Co.*,
1986 WL 10723 (S.D.N.Y. Sept. 22, 1986) ..................................................................... 14

*Oliveri v. Thompson,*
   803 F.2d 1265 (2d Cir. 1986) ........................................................................ 5

*Rosenshein v. Kushner,*
   2016 WL 4508756 (S.D.N.Y. Aug. 26, 2016) ............................................. 5

*Schoolcraft v. City of New York,*
   299 F.R.D. 65 (S.D.N.Y. 2014) .................................................................. 5

*Sussman v. Bank of Israel,*
   56 F.3d 450 (2d Cir. 1995) ................................................................... 4, 17

*Wermann v. Excel Dentistry, P.C.,*
   2014 WL 846723 (S.D.N.Y. Feb. 25, 2014) ............................................. 18

### OTHER AUTHORITIES

Federal Rule of Civil Procedure 11 ........................................................... passim

Federal Rule of Civil Procedure 12 ................................................................. 5

Federal Rules of Civil Procedure, Rules and Commentary, Rule 11 (Feb. 2019
   Update) ....................................................................................................... 6

Plaintiff Richard Levin, not individually but solely as chapter 11 trustee ("**Trustee**" or

"**Plaintiff**") for Debtors Firestar Diamond, Inc., Fantasy, Inc., and Old AJ, Inc. f/k/a A. Jaffe, Inc.

(collectively, the "**Debtors**"),[1] in opposition to Defendant Mihir Bhansali's *Motion for Rule 11*

*Sanctions or to Strike Certain Pleadings* (Adv. Dkt. 59) (the "**Motion**"), respectfully states as follows:

### PRELIMINARY STATEMENT

Bhansali asks the Court to sanction the Trustee for declining to withdraw certain

allegations the Trustee made on information and belief in his Amended Complaint illustrating

how Bhansali personally benefitted from and attempted to cover up the massive fraud scheme he

and his co-Defendants orchestrated. The Motion is unfounded. Most of Bhansali's arguments

stem from selective omissions or misreadings of the Amended Complaint and the India

Enforcement Directorate pleadings which support it.  Bhansali's other arguments improperly ask

the Court to conclude the  Trustee violated Rule 11 by refusing to accept Bhansali's

unsubstantiated, self-serving assurances that certain allegations are false, notwithstanding the

direct and circumstantial evidence supporting the Trustee's allegations. For all of the reasons

discussed below, the Motion should be denied in its entirety.

### BACKGROUND

On September 20, 2019, the Trustee filed the Amended Complaint, which asserts claims

for breach of fiduciary duty, corporate waste, and violations of the Racketeering Influenced

Corrupt Organizations Act ("**RICO**") against the Debtors' controlling shareholder Nirav Modi,

chief executive officer and sole director Mihir Bhansali, and chief financial officer Ajay Gandhi.

---

[1] Unless otherwise defined, all capitalized terms shall have the meaning ascribed to them in the Trustee's
first amended complaint (Adv. Dkt. 28 (the "**Amended Complaint**" or "**FAC**")). Additionally, with respect
to allegations made on information and belief in the Amended Complaint, the Trustee will treat such
allegations as true for the purposes of this Opposition. However, nothing in this Opposition should be
construed as negating or limiting such qualifications in the Amended Complaint.

As alleged in the Amended Complaint, from approximately 2011 to January 2018, Modi, Bhansali, and their co-conspirators fraudulently solicited and obtained billions of dollars in bank financing based on bogus cross-border diamond and jewelry transactions with Shadow Entities, the purportedly independent Dubai- and Hong Kong-based suppliers and customers they secretly controlled (defined in the Amended Complaint as the "**Bank Fraud**"). (FAC at ¶¶ 23-41.) Bhansali managed the day-to-day operations of both the legitimate and the fraudulent aspects of Modi's businesses as Modi's second-in-command throughout the relevant period. (*See id.* at ¶¶ 61-102.)

In January 2018, the fraud was exposed when Modi's co-conspirators attempted to refinance fraudulent loans issued by a since-retired Punjab National Bank ("**PNB**") employee. (*Id.* at ¶ 42.) In the weeks that followed, Modi, Bhansali, and their co-conspirators shifted their focus to thwarting investigation of the fraud and protecting assets from seizure by creditors and government authorities. (*Id.* at ¶¶142-187.) For example, in February 2018, Bhansali and Nirav Modi's brother Nehal Modi traveled together to Dubai where they looted the Dubai-based Shadow Entities, coerced the directors of the Dubai-based Shadow Entities to relocate to Cairo, Egypt, and threatened them not to cooperate with investigative authorities. (*Id.* at ¶ 151.) Around this same time, Nehal Modi also bribed a Shadow Entity director to testify falsely, destroyed cell phones, and removed additional assets from the Hong Kong offices; and Nirav Modi threatened to kill or falsely implicate one of the Shadow Entity directors if he cooperated in the investigation. (*Id.*) On the basis of the direct and circumstantial evidence discussed below, the Trustee alleged on information and belief that Bhansali was complicit in the acts of Nirav and Nehal Modi in early 2018. (*Id.*)

The Amended Complaint also alleges several examples of ways in which Bhansali personally benefitted from the fraud. Of relevance here, the Trustee alleged that Bhansali's family

2

trust received approximately $4.57 million in fiscal year 2011-2012 from Diamonds R' Us ("**DRUS**"), one of the three Indian partnerships through which Modi and Bhansali obtained fraudulent loans (defined in the Amended Complaint as the "**LOU Entities**") (*id.* at ¶ 130); and that Bhansali used proceeds of the fraud laundered through Nirav Modi's sister Purvi Mehta to purchase a new Manhattan apartment in March 2017 (*id.* at ¶¶ 137-140).

On November 13, 2019, shortly after moving to dismiss the Amended Complaint, Bhansali's counsel sent the Trustee's counsel a letter claiming that certain of the Trustee's allegations had been discredited in the Indian proceedings or were otherwise unsupported and "demand[ing] that the Amended Complaint be immediately withdrawn or appropriately corrected." (*See* Mot. at Ex. F at 1.) On December 2, 2019, the Trustee's counsel responded with a high-level overview of the Trustee's investigation and supporting evidence and explaining why, even after reviewing the materials attached to Bhansali's letter, the Trustee continued to believe his allegations were appropriate. (*See* Mot. at Ex. E (the "**Responsive Letter**").)

On February 25, 2020, the Trustee filed a separate adversary complaint against Purvi Mehta, Nehal Modi, certain other members of the Modi family, and certain entities they owned and controlled seeking damages for their participation in the RICO conspiracy (*See* Adv. No. 20-01054, Dkt. 1 (the "**Modi Family Complaint**").) The Modi Family Complaint describes in greater detail how Bhansali was involved in the fraud scheme (*id.* at ¶¶ 68, 75-79, 106-124, 264-265), how Bhansali worked with Nehal Modi following its exposure to divert assets to Hong Kong (*id.* at ¶¶ 195-242), and how fraud proceeds were laundered through Purvi Mehta, particularly throughout 2017 in the months leading up to the Bank Fraud's exposure (*id.* at ¶¶ 276-370).

On March 5, 2020, notwithstanding the explanations in the Trustee's Responsive Letter and without otherwise responding to that letter, Bhansali served the Motion, and filed it with the Court after the safe harbor provision expired, on March 31, 2020.

## APPLICABLE STANDARDS

### I.    Rule 11(b) Standard.

Rule 11(b) provides that, "[b]y presenting to the court a pleading, written motion, or other paper . . . an attorney . . . certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances" the pleading "is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation," Fed. R. Civ. P. 11(b)(1), and "the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery," Fed. R. Civ. P. 11(b)(3).

To satisfy the requirements of Rule 11(b)(3), "[t]he inquiry need not be infallible but it must be objectively reasonable under the circumstances." *Elfoulki v. Brannons Sandwich Shop, LLC*, 2016 WL 3542458, at *2 (S.D.N.Y. June 22, 2016). As for the "improper purpose" prohibition under Rule 11(b)(1), the Second Circuit has endorsed the view that "'complaints are not filed for an improper purpose if they are non-frivolous.'" *Sussman v. Bank of Israel*, 56 F.3d 450, 458-59 (2d Cir. 1995) (quoting *Townsend v. Holman Consulting Corp.*, 929 F.2d 1358, 1362 (9th Cir. 1990)).

If a court determines Rule 11(b) has been violated, it may, but is not required to, impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation. Fed. R. Civ. P. 11(c). "The standard for imposing Rule 11 sanctions . . . is purposefully high, so as not to stifle legal creativity and zealous advocacy." *AJ Energy LLC v. Woori Bank*, 2019 WL 4688629, at *10 (S.D.N.Y. Sept. 26, 2019). Courts must "resolve all doubts in favor of the signer of the pleading . . . and may impose sanctions only where an attorney's conduct was objectively unreasonable." *Galin v. Hamada*, 283 F.Supp.3d 189, 201 (S.D.N.Y. 2017) (citing *Rodick v. City of Schenectady*, 1 F.3d 1341, 1350 (2d Cir. 1993); *Storey v. Cello Holdings, L.L.C.*, 347 F.3d 370, 387 (2d Cir. 2003)) (internal quotations omitted); *accord Oliveri v. Thompson*, 803 F.2d

4

1265, 1275 (2d Cir. 1986) ("[R]ule 11 is violated only when it is patently clear that a claim has absolutely no chance of success." (internal quotations omitted)).

## II.     Rule 12(f) Standard.

Rule 12(f) authorizes courts to strike "any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "To prevail on a motion to strike, the defendant must show that: (1) no evidence in support of the allegations would be admissible; (2) the allegations have no bearing on the relevant issues; and (3) permitting the allegations to stand would result in prejudice to the movant." *Khodeir v. Sayyed*, 2016 WL 5817003, at *3 (S.D.N.Y. Sept. 28, 2016) (citing *Hargett v. Metro. Trans. Auth.*, 552 F. Supp. 2d 393, 404 (S.D.N.Y. 2008)).

"Motions to strike are not favorably viewed," *Schoolcraft v. City of New York*, 299 F.R.D. 65, 67 (S.D.N.Y. 2014), and "courts should not tamper with the pleadings unless there is a strong reason for doing so." *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976). "There has arisen a general rule that motions to strike under Rule 12(f) should be denied unless the challenged allegations have no possible relation or logical connection to the subject matter of the controversy and may cause some form of significant prejudice to one or more of the parties to the action." *Rosenshein v. Kushner*, 2016 WL 4508756, at *7 (S.D.N.Y. Aug. 26, 2016) (internal quotations omitted).

## ARGUMENT

## I.     The Challenged Allegations Are Well-Supported and Directly Relevant and Easily Satisfy Rule 11.

As detailed below, the disputed allegations are supported by robust direct and circumstantial evidence and directly relate to the Trustee's claims against Bhansali. As such, they easily satisfy the low bar imposed by Rule 11. *See* 1 Federal Rules of Civil Procedure, Rules and Commentary, Rule 11 (Feb. 2019 Update) ("A fact assertion does not violate Rule 11(b)(3) if there

was at least some support for it at the time the assertion was made, even if the support was weak

or inferential. . . . In general, an assertion of fact is supported if there is some proof—direct or

indirect—that can be marshaled in support of it."); *accord Kiobel v. Millson*, 592 F.3d 78, 81 (2d Cir.

2010) ("A statement of fact can give rise to the imposition of sanctions only when the 'particular

allegation is utterly lacking in support.'").

This is especially true given that each of the disputed allegations were made on

information and belief, which "are generally not sanctionable unless it was objectively

unreasonable to believe that they were 'likely to have evidentiary support after a reasonable

opportunity for further investigation or discovery[.]'" *Lan v. Time Warner, Inc.*, 2016 WL 6778180,

at *8 (S.D.N.Y. Oct. 18, 2016).[2] As each of the Trustee's allegations are objectively reasonable,

Bhansali's request for sanctions is unfounded.

### A.    The Trustee's Allegations Concerning the Source of Funds for Bhansali's Apartment Purchase Are Objectively Reasonable and Not Frivolous.

To show one of the ways Bhansali personally benefitted from the Bank Fraud, which is

relevant to proving Bhansali breached his duty of loyalty and acted with fraudulent intent, the

Trustee alleged on information and belief that Bhansali used fraud proceeds to purchase a new

Manhattan residence at 50 Riverside Boulevard (the "**Apartment**") in March 2017. (FAC at ¶¶

138-40.) The Trustee based this allegation on the fact that, less than two weeks before the sale

closed, Bhansali received $1.5 million from Nirav Modi's sister Purvi Mehta (*id.* at ¶ 137), through

whom substantial proceeds of the Bank Fraud were laundered (*see id.* at ¶¶ 123-128; *see also* Modi

Family Compl. at ¶¶ 276-370).

---

[2] Even if further investigation yields no additional support for these allegations, Rule 11(b) "does not require a formal amendment to pleadings for which evidentiary support is not obtained, but rather calls upon a litigant not thereafter to advocate such claims or defenses." *In re Reilly*, 244 B.R. 46, 50 (Bankr. D. Conn. 2000) (quoting advisory committee notes to Rule 11).

Bhansali argues this allegation violates Rule 11 because, according to Bhansali, the India Enforcement Directorate "effectively abandoned" an "identical allegation" and "altered their theory of the case" after Mihir Bhansali's wife, Rakhi Bhansali, "submitted incontrovertible proof" that the purchase funds came from Ms. Bhansali's family and had no relation to the Bank Fraud. (Mot. at 6-7.) Bhansali is wrong.

First, the Enforcement Directorate never attempted to trace the funds used to purchase the Apartment to the Bank Fraud—nor did they need to. (*See* Resp. Letter at 3-4.) Under the relevant Indian statute, the government can attach <u>any</u> of Bhansali's property—even if the attached property is not itself linked to the fraud. The Enforcement Directorate made clear in its attachment complaint (including by underlining the relevant portion of the statute), attached as Exhibit G to Bhansali's Motion, that it was pursuing the Apartment under the "or the value of" prong of the statute:

> "Proceeds of crime means any property derived or obtained, directly or indirectly, by any person as a result of criminal activity relating to a scheduled offence <u>or the value of any such property or where such property is taken or held outside the country then the property equivalent in value held within the country or abroad.</u>" [quoting Section 2(1)(U) of the Prevention of Money Laundering Act, 2002]
> . . .
>
> [The Apartment] is beneficially owned by Mihir Bhansali and represents **the value of** Proceeds of Crime as substantial amount of POC has been diverted to Mihir Bhansali and to entities controlled by him mainly from Ms. Fine Classic FZE.

(Mot. at Ex. G at 17, 19 (underlined emphasis in original; bolded emphasis added).)

When Rakhi Bhansali attempted to argue that the Apartment was not paid for using the specific proceeds of the Bank Fraud, the Enforcement Directorate described her arguments on this point as "completely misplaced and incorrect" and explained that "the [Apartment] was attached under 'value thereof' route, and therefore, there was no need to show that [proceeds of crime] ha[ve] been utilized in [the] purchase of said property." (*See* Motion at Exhibit H (the "**ED**

7

Reply"), p. 11.) In other words, the Enforcement Directorate did not "abandon" or "alter" any

argument.

Second, the evidence continues to plausibly support the allegation that the Apartment

was purchased using proceeds of the Bank Fraud. The Bhansalis' HSBC bank statements, excerpts

of which are attached hereto as **<u>Exhibit A</u>**,[3] reflect the following transactions:

- On February 24, 2017, Nirav Modi's sister Purvi Mehta transferred $1,500,000 from her Bank of Singapore account to the Bhansalis' jointly-owned HSBC checking account ending 9743 ("**HSBC Checking 9743**"). (Ex. A at HBUS0190098.) That same day, the Bhansalis transferred $1,050,000 from HSBC Checking 9743 to their HSBC savings account ending 6374 ("**HSBC Savings 6374**"). (*Id.*) As shown by the internal HSBC email correspondence attached hereto as **<u>Exhibit B</u>**, the purpose of HSBC Savings 6374 was to hold $50,000 in "side collateral" securing the Bhansali's $1,830,000 loan from HSBC in connection with their purchase of the Apartment.

- On March 3, 2017, the Bhansalis transferred $1,001,104.11 from HSBC Savings 6374 to their HSBC savings account ending 3618 ("**HSBC Savings 3618**"). (Ex. A at HBUS0190103.)

- On March 8, 2017, the Bhansalis transferred $650,000 from HSBC Savings 3618 back to HSBC Checking 9743. (*Id.*)

- On March 9, 2017, the Bhansalis paid $4,631,018.33 from HSBC Checking 9743 in connection with closing their purchase of the Apartment. (*Id.* at HBUS0190102.)

Thus, the evidence shows that the $1,500,000 wired from Purvi Mehta to Mihir Bhansali on

February 24, 2017 funded at least $50,000 of "side collateral" for the Bhansalis' $1,830,000 loan

from HSBC and at least a portion of the $4,631,018.33 paid by the Bhansalis at closing to purchase

the Apartment. As alleged in paragraphs 123 through 128 of the Amended Complaint, and as

further detailed in the Modi Family Complaint, Purvi Mehta acted as a key conduit for laundering

---

[3] As Exhibit A contains material designated as Highly Confidential under the *Protective Order Governing Trustee Discovery* (Bankr. Dkt. 529) (the "**Protective Order**"), the Trustee is filing Exhibit A under seal as authorized by paragraph 18 of the Protective Order.

proceeds of the Bank Fraud, including in connection with Nirav Modi's own purchase of a new Manhattan residence in 2017. (*See* Modi Family Compl. at ¶¶ 276-370.)

Additionally, the Trustee has alleged in extensive detail the manner in which Bhansali, Modi's chief lieutenant, directed and participated in the fraud scheme. (*See, e.g., id.* at ¶¶ 68, 75-79, 106-124, 264-265.) Given Mihir Bhansali's prominent role in the fraud, as well as the fact that Nirav Modi funneled additional fraud proceeds through Purvi Mehta around the same time to purchase his own apartment (*see* Modi Family Compl. at ¶¶ 312-340), it is entirely reasonable to allege on information and belief that the balance of the apartment purchase price was derived from the fraud scheme as well. Notably, Bhansali has not provided the Trustee or the Court with the "incontrovertible proof" he claims his wife Rakhi provided the Indian authorities (Mot. at 6), even after the Trustee emphasized as much in his Responsive Letter (Resp. Letter at 3).

Bhansali calls the Amended Complaint "deliberately misleading" for "neglecting to mention" that the $1,500,000 Purvi Mehta wired to Bhansali on February 24, 2017 purportedly was a loan, which Bhansali "repaid" on October 2, 2017. (Mot. at 8-9.) But how Bhansali characterizes the transfer and whether Bhansali later "repaid" Purvi Mehta has nothing to do with whether the funds wired to Bhansali in February 2017 constituted proceeds of fraud, or whether those funds were used to purchase the Apartment. Moreover, Bhansali's $1,518,350 "repayment" to Purvi Mehta was sourced from $2,132,902.56 in suspicious "deposits" and "special next day credits" Bhansali received only a few days earlier, which in light of the other allegations plausibly represented fraudulent proceeds themselves. (*See* Ex. A at HBUS0190128.) And, in any event, "Rule 11 normally does not require one party to uncover and to set forth the facts that support the other side's position." *Navarro-Ayala v. Hernandez-Colon*, 3 F.3d 464, 467 (1st Cir. 1993); *accord Lucas v. Duncan*, 574 F.3d 772, 780 (D.C. Cir. 2009).

For all of these reasons, the Trustee reasonably believes his allegations concerning the source of the funds used to purchase the Apartment are "'likely to have evidentiary support after a reasonable opportunity for further investigation or discovery[.]'" *Lan v. Time Warner, Inc.*, 2016 WL 6778180, at *8 (S.D.N.Y. Oct. 18, 2016). The Trustee therefore did not violate Rule 11 by making or by declining to withdraw this allegation.

**B.     The Trustee's Allegations Concerning the M.R. Family Trust Are Objectively Reasonable and Not Frivolous.**

Next, to provide another example of how Bhansali personally benefitted from the Bank Fraud, the Trustee alleged on information and belief that the M.R. Family Trust, which was created by and for the benefit of Bhansali's family members, received approximately $4.57 million from Diamonds 'R' US in fiscal year 2011-2012. (FAC at ¶ 130.) Bhansali argues the Trustee violated Rule 11 in making this allegation because, Bhansali claims, (i) the Amended Complaint "fails to provide any substantiation" for this allegation; and (ii) bank statements for what Bhansali characterizes as the sole "relevant account" (which Bhansali sent the Trustee <u>after</u> the complaint was filed) reflect only *de minimis* transfers, and thus constitute "conclusive evidence" of the allegation's falsity. (Mot. at 7-8.) Neither argument has merit.

First, setting aside that the Trustee is not required to provide detailed evidentiary substantiation in the complaint, *see, e.g., Blank v. Tripoint Global Equities, LLC*, 338 F.Supp.3d 194, 209 (S.D.N.Y. 2018); *Billhofer v. Flamel Technologies, S.A.*, 2012 WL 3079186, at *5 (S.D.N.Y. July 30, 2012), the Amended Complaint in fact includes substantiation for that allegation. Paragraph 68(iv) of the Amended Complaint alleges that an auto-saved spreadsheet recovered from Mihir Bhansali's computer reflected "cash flows" from Diamonds 'R' US to the M.R. Family Trust in the amount of 32.83 crore INR (~$4.5 million) in fiscal year 2011-2012. The following excerpt from the

spreadsheet, a complete copy of which is attached as **Exhibit C** hereto, reflects some of the specific information upon which the Trustee relied in making this allegation:

| DIAMONDS 'R' Us. | | | | |
|---|---|---|---|---|
| | FY-2008-09 | FY-2009-10 | FY-2010-11 | FY-2011-12 |
| **Cash flow** | | | | |
| Withdrawals (over 1 cr.), and who | - | - | - | - |
| NDM Family Trust | - | 127.45 | - | - |
| Tushar Agarwal | - | 4.85 | - | - |
| Withdrawals (over 1 cr.), and who | - | - | - | - |
| MR Family Trust | - | - | - | 32.83 |
| NDM Family Trust | - | - | - | 548.44 |
| MAT paid | 3.25 | 3.93 | - | - |

Bhansali argues the Trustee "has improperly assumed that monies DRUS allocated were actually paid to Mr. Bhansali" and that "[w]hile DRUS records indicate that this amount had been so allocated, as a result of the DRUS bankruptcy proceedings, the $4,570,000 reflected as 'owed' to Mr. Bhansali was never paid to Mr. Bhansali or his family." (Mot. at 8.) Yet the spreadsheet's references to "cash flow" and "withdrawals" more plausibly denote actual transfers than allocation of debt. The Trustee therefore had an objectively reasonable basis for making this allegation.

Nor do the HDFC bank statements attached as Exhibit J to the Motion support a violation of Rule 11. At best, the statements only establish that DRUS did not transfer cash to this account. It does not prove that the M.R. Family Trust does not have other bank accounts; that funds (or other assets) were not transferred to other entities owned by or related to the M.R. Family Trust; or that funds or other assets were not transferred to some other third party for the benefit of the M.R. Family Trust or Bhansali family. Indeed, the fact that purportedly only "approximately $2,107" was deposited into this account actually bolsters this theory, as people do not normally set up trusts or bank accounts to hold such a small amount.

Rather than seriously address the plausible theories posited by the Trustee—for example, by producing DRUS' bank statements and other transfer records—Bhansali accuses the Trustee of "rank speculation" and rhetorically asks "why, had there been an actual transfer, these funds would not have been transferred to the *relevant account*." (Mot. at 8.) In other words, Bhansali is asking the Court to sanction the Trustee for declining—in the face of evidence of transfers that Bhansali apparently tried to delete from his computer (*see* Modi Family Compl. at ¶ 106)—to blindly accept the self-serving assurances of an alleged fraudster that this is the only "relevant account" into which a transfer from DRUS could have been made. That is not a violation of Rule 11.

### C.    The Trustee's Allegations Concerning Mr. Bhansali's Conduct Following Exposure of the Bank Fraud Are Objectively Reasonable and Not Frivolous.

Finally, to show that Bhansali's and his co-conspirators' pattern of racketeering activity continued even after the Bank Fraud was exposed in January 2018 (and to show their status as co-conspirators more generally), the Trustee alleged that Bhansali, Nirav Modi, and Nehal Modi worked together in February and March 2018 to thwart the investigation of the fraud and to remove assets from the reach of creditors and government authorities. (FAC at ¶¶ 142-72.) To that end, the Trustee alleged in paragraph 151 of the Amended Complaint:

151.  Upon information and belief, based on statements made by various Firestar Entity and Shadow Entity directors and employees to Indian authorities, around February or March 2018:

(i)   Mihir Bhansali removed approximately 50 kilograms of gold and 2.5 Lac Dirhams (worth approximately $68,000) from a Dubai-based Firestar Entity;

(ii)  Mihir Bhansali and Nirav Modi intimidated and coerced directors and employees of Shadow Entities not to cooperate with investigative authorities. For example, upon information and belief, one of the directors of Unique told the ED that, "When the case registered against Nirav Modi, all of us (directors/owners) wanted to return to India as soon as possible and wanted to cooperate with the agencies to prove

our innocence. In March [2018], Mihir Bhansali (close aide of Nirav Modi) told us not to panic and said he is on the job and everything will be under control in a matter of days. . . . he kept us under constant fear that our return to India could result in arrest by the agencies." Similarly, upon information and belief, Nirav Modi, or others operating at Modi and Bhansali's direction, threatened to kill or falsely implicate Ashish Lad, a director of Unity, if he revealed anything to the investigative authorities.

(iii)    Nirav Modi's brother, Nehal Modi, upon information and belief acting at the direction of or in coordination with Nirav Modi and Mihir Bhansali, destroyed cell phones of Shadow Entity directors. Upon information and belief, Nehal Modi told the directors that their "mobile phones are easy to track and they are evidence."

(iv)    Nehal Modi, upon information and belief acting at the direction of or in coordination with Nirav Modi and Mihir Bhansali, removed 150 boxes of pearls from one of the Hong Kong-based Modi-Controlled Entities. In the "to do" list spreadsheet recovered from Mihir Bhansali's computer, the tasks listed under "MB" included "Pearls – where to keep the inventory?" and "Pearls – original purchase entries."

(v)    Nehal Modi, upon information and belief acting at the direction of or in coordination with Nirav Modi and Bhansali, bribed Anish Lad INR 2,000,000 (approximately $28,000) to give false testimony to judicial authorities in Europe.

(vi)    Nirav Modi told the Shadow Entity personnel that "it was not safe for [them] in Dubai and [they] must shift to Cairo[, Egypt.]" Once in Cairo, Modi, or others operating at his behest, confiscated the Shadow Entity personnel's passports "on the pretext of some residency permission."

(vii)    Nirav Modi, or others operating at his behest, instructed the Shadow Entity personnel to sign an affidavit stating that the Shadow Entities belong to the directors and were in no way related to Nirav Modi before they left Cairo.

(FAC ¶ 151.) Bhansali argues that Paragraph 151 violates Rule 11 to the extent it alleges that Bhansali was involved in efforts to threaten witnesses, induce false testimony, destroy evidence, and remove assets. Here too, his argument fails.

First, as indicated in paragraph 151, the Trustee made these allegations on information and belief based on *inter alia* "statements made by various Firestar Entity and Shadow Entity

directors and employees to Indian authorities." (*Id.*) The Trustee is entitled to rely on the Enforcement Directorate's investigative findings. Indeed, "parties and their attorneys are entitled to base their complaints on statements of witnesses, reports of their investigators and hearsay reports and statements of others until such time, if ever, as they are satisfied that the statements and other evidence are not competent or are otherwise untrustworthy." *G-I Holdings, Inc. v. Baron & Budd*, 2002 WL 1934004, at *13 (S.D.N.Y. Aug. 21, 2002) (quoting *In re Air Disaster at Lockerbie, Scotland*, 144 F.R.D. 613, 617 (E.D.N.Y. 1992)) (alterations omitted); *accord Norris v. Coca-Cola Co.*, 1986 WL 10723, at *2 (S.D.N.Y. Sept. 22, 1986) ("Plaintiff was entitled to rely on the facts stated in the official report of the accident compiled by Jamaican authorities in bringing this action . . .").

Bhansali claims that "none of the witness statements that were provided to authorities in India . . . suggest that Mr. Bhansali participated directly or indirectly in any of this conduct." (Mot. at 9). Not true. The Enforcement Directorate's complaint, a copy of which is attached as Exhibit K to Bhansali's motion (the "**ED Complaint**"), repeatedly implicates Bhansali in efforts to threaten witnesses, induce false testimony, and remove assets. According to the ED Complaint, Shadow Entity directors Jinesh Shah, Netaji Mohite, Shridhar Mayekar, Subey George, Vipin Sanith, Sonu Mehta, and Rushabh Jethwa <u>each</u> testified that Bhansali threatened them. (ED Compl. at pp. 59 (Jinesh Shah); 63 (Netaji Mohite); 64 (Shridhar Mayekar); 65 (Subey George); 66 (Vipin Sanith); 72 (Sonu Mehta); and 77 (Rushabh Jethwa).) Similarly, Pradeep Mhatre, the FIPL employee Bhansali directed to set up the secret servers used by the conspirators, told the Enforcement Directorate:

> In Feb[ruary] 2018, after the case was public, Mihir Bhansali called him and asked a favour – He said that a company is not a human being and it cannot stand in court. So on behalf of the company . . . he (Pradeep Mhatre) has to sign certain documents. ***On instructions of Mihir Bhansali***, he went to Delhi on 24 Feb[ruary] 2018 and met one advocate Mudi Jain. He had prepared a bunch of approx[imately] 100-150 pages and instructed him to sign; that he signed on all the papers as instructed and also 10-12 pages in High Court and also gave his

14

[identification] card and signed in some register in front of some court official. He further added that he did [not] know anything about the papers or its materials/contents of the papers and *he signed the papers only on the instructions of Mihir Bhansali*. In a similar way, he was instructed by Mihir Bhansali to sign the documents in Mumbai Court.

(*Id.* at 68.)

The ED Complaint and related witness statements also implicate Mihir Bhansali in efforts to remove assets from the overseas entities. For example, the Enforcement Directorate alleged that "Mihir Bhansali also directly took 50KG Gold having value around USD 2.2 Million and cash to the tune of 2,50,000 dirham from Dubai based companies of Nirav Modi." (*Id.* at 89.) Thus, notwithstanding Bhansali's assertions otherwise, there is direct evidence supporting the allegations of paragraph 151.

Second, additional circumstantial evidence supports these allegations, all of which occurred during the period from February to May 2018. In early February, after the fraud was exposed, Bhansali traveled with Nehal Modi to Dubai, which the Trustee independently confirmed from another auto-saved spreadsheet recovered from Bhansali's computer, a copy of which is attached as **Exhibit D** hereto, summarizing Bhansali's international travel history, including the following flights:

| |
|---|
| 23-Feb-18 Flight (Dubai to New York- (John F. Kennedy) FLEX) |
| 11-Feb-18 Flight (Mumbai to Dubai FLEXPLUS) |
| 9-Feb-18 Flight (Dubai to Mumbai FLEX) |
| 7-Feb-18 Flight (New York- (John F. Kennedy) to Dubai FLEX) |

During this trip, Bhansali created (and later deleted) a "to do" list for himself and his co-conspirators including: "send all non-Firestar comp[uter]s to HK," "Forensic accounts for [Shadow Entities] Pacific, Fine Classic, Unique," and "Pearls – where to keep the inventory?" (Modi Family Compl. at ¶¶ 106(iii), 275(iii)); threatened and induced false testimony from Shadow Entity directors (ED Compl. at pp. 59, 63-66, 68, 72, 77); removed over $2 million in gold

and petty cash from the Dubai offices (*Id.* at p. 89); and used virtual private network software to conceal his internet usage (Modi Family Compl. at ¶ 272).

During the period from late February to May 2018, while the Shadow Entity directors continued to be held in Cairo against their will, Bhansali remained in contact with Nirav Modi while in hiding (*id.* at ¶¶ 254, 256-57); perjured himself by submitting a sworn declaration to this Court assuring that the Debtors were not involved in the fraud and listing numerous Shadow Entities as "non-affiliated" creditors (*id.* at ¶¶ 243-46); appointed Nehal Modi's friend Anthony Allicock as sole director of Firestar Holdings Ltd., the Hong Kong-based parent of the Debtors and their non-debtor U.S. affiliates, and directed Allicock to divert over $40 million of the U.S. affiliates' inventory to Hong Kong (*id.* at ¶¶ 195-242); and researched methods for sending and erasing encrypted communications, permanently deleting internet browsing history, and hacking wireless networks (*id.* at ¶¶ 270-71). Thus, based upon the facts already known or alleged or known, it is entirely reasonable and plausible to allege Bhansali's involvement on the basis of circumstantial evidence.

"There is nothing . . . in Rule 11 that require[s] [a plaintiff's] pleadings to distinguish between direct and circumstantial evidence," *Lucas*, 574 F.3d at 778. "If an attorney has evidence that a man 'walked into a room with a wet umbrella' at a certain time, the attorney does have 'evidentiary support' for the 'factual contention' that 'it was raining' at that time. He may not have proof by a preponderance, but he certainly has support. Accordingly, a lawyer does not violate Rule 11 by saying so." *Id.* at 778-79.

The same logic applies here. Just as a wet umbrella is enough to allege rain, the foregoing circumstantial evidence (including travel records) as well as the information from the ED Complaint support the Trustee's allegations that Bhansali was complicit in the acts of Nirav and Nehal Modi from February to May 2018.  In particular, the facts that Bhansali allegedly threatened

Shadow Entity directors, made them sign false affidavits, and removed gold and cash while Bhansali and Nehal Modi traveled together to Dubai in February 2018 support the Trustee's allegations. Thus, none of the allegations in paragraph 151 of the Amended Complaint are "utterly lacking in support" or otherwise objectively unreasonable based on the direct and circumstantial evidence. *See Kiobel v. Millson*, 592 F.3d 78, 81 (2d Cir. 2010).

Nor were these allegations made for an improper purpose. Bhansali accuses the Trustee of including these allegations "to cajole or extort him into an unjust settlement . . . rather than to further the legal claims alleged." This accusation is baseless. The allegations in paragraph 151 are directly relevant to the Trustee's RICO claims because they are acts of obstruction of justice bolstering the pattern of racketeering activity alleged. The Trustee included these allegations to support his RICO claims, not for any improper purpose. *See Sussman v. Bank of Israel*, 56 F.3d 450, 458-59 (2d Cir. 1995) ("Complaints are not filed for an improper purpose if they are non-frivolous.").

## II.   None of the Trustee's Allegations Should Be Stricken.

Finally, none of the Trustee's allegations should be stricken. Again, "[t]o prevail on a motion to strike, the defendant must show that: (1) no evidence in support of the allegations would be admissible; (2) the allegations have no bearing on the relevant issues; and (3) permitting the allegations to stand would result in prejudice to the movant." *Khodeir v. Sayyed*, 2016 WL 5817003, at *3.

Each of the allegations at issue directly relates to the Trustee's claims for relief. For example, the allegations concerning the Apartment, the wires from Purvi Mehta, and the M.R. Family Trust are relevant as evidence that Bhansali personally benefitted from the fraudulent scheme alleged, which is in turn relevant to whether Bhansali breached of his duty of loyalty and to whether he acted with fraudulent intent. Similarly, as discussed above, the allegations

concerning Bhansali's involvement in cover-up efforts following exposure of the fraud are directly relevant to the Trustee's RICO claims.

Similarly, none of the Trustee's allegations unduly prejudice Bhansali. "A scandalous allegation is one that reflects <u>unnecessarily</u> on the defendants' moral character, or uses repulsive language that detracts from the dignity of the court." *Wermann v. Excel Dentistry, P.C.*, 2014 WL 846723, at *5 (S.D.N.Y. Feb. 25, 2014) (internal quotations omitted) (emphasis added). Thus, "on a motion to strike . . . 'it is not enough that the matter offends the sensibilities of the objecting party if the challenged allegations describe acts or events that are relevant to the action.'" *Id.* (quoting *Lynch v. Southhampton Animal Shelter Found. Inc.*, 278 F.R.D. 55, 64-65 (E.D.N.Y. 2011)).

As all of the Trustee's allegations are relevant, and none of them unnecessarily prejudice Bhansali, Bhansali's request to strike should therefore be denied.

## CONCLUSION

For reasons set forth in this Opposition, the Trustee respectfully requests the Court deny Defendant Mihir Bhansali's Motion in its entirety.

Dated: April 16, 2020
      New York, New York

Respectfully submitted,

**JENNER & BLOCK LLP**

By: */s/ Vincent E. Lazar*
Vincent E. Lazar
Angela M. Allen (admitted *pro hac vice*)
William A. Williams (admitted *pro hac vice*)
353 North Clark Street
Chicago, Illinois 60654
(312) 222-9350
vlazar@jenner.com
aallen@jenner.com
wwilliams@jenner.com

Carl N. Wedoff
919 Third Avenue
New York, New York 10022
(212) 891-1600
cwedoff@jenner.com

*Counsel for the Chapter 11 Trustee*

**Exhibit A**

**(Filed Under Seal)**

**Exhibit B**

**Exhibit C**

**<u>Exhibit D</u>**