**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

FOR PUBLICATION

--------------------------------------------------------------x

In re:                                                                      Chapter 11

Firestar Diamond, Inc., *et al.*,                                           Case No. 18-10509 (SHL)

                                        Debtors.                            (Jointly Administered)

--------------------------------------------------------------x

Richard Levin,
Chapter 11 Trustee of Firestar Diamond, Inc., *et al.*,

                                        Plaintiff,

                        v.                                                  Adv. No. 19-01102 (SHL)

Nirav Deepak Modi, Mihir Bhansali, and
Ajay Gandhi,

                                        Defendants.

--------------------------------------------------------------x

## MEMORANDUM OF DECISION

**A P P E A R A N C E S :**

**JENNER & BLOCK LLP**
*Attorneys for the Chapter 11 Trustee, Richard Levin, Esq.*
919 Third Avenue
New York, New York 10022
By:     Carl N. Wedoff, Esq.

353 North Clark Street
Chicago, Illinois 60654
By:     Vincent E. Lazar, Esq.
        Angela M. Allen, Esq.
        William A. Williams, Esq.

**PATTERSON BELKNAP WEBB & TYLER LLP**
*Attorneys for Nirav Deepak Modi*
1133 Avenue of the Americas, Suite 2005
New York, New York 10036
By:     Alejandro H. Cruz, Esq.
        Daniel A. Lowenthal, Esq.
        Daniel Ruzumna, Esq.

**WHITE & WILLIAMS LLP**
*Attorneys for Mihir Bhansali*
7 Times Square, Suite 2900
New York, NY 10036
By:     Thomas Butler, Esq.
          Nicole A. Sullivan, Esq.

**SERPE RYAN LLP**
*Attorneys for Ajay Gandhi*
1115 Broadway, 12th Fl.
New York, NY 10010
By:     Silvia L. Serpe, Esq.

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court are Nirav Deepak Modi's, Mihir Bhansali's, and Ajay Gandhi's

(collectively, the "Defendants") motions to dismiss the First Amended Complaint of Richard

Levin, Esq., the Chapter 11 Trustee appointed in the above-captioned bankruptcy cases (the

"Trustee").  *See* Motion to Dismiss First Amended Adversary Complaint (the "Gandhi Motion")

[ECF No. 36]; Motion to Dismiss Adversary Proceeding (the "Bhansali Motion") [ECF No. 38];

Motion to Dismiss Adversary Proceeding (the "Modi Motion") [ECF No. 42].  In their motions,

Defendants seek, among other things, the dismissal of various claims under the Racketeer

Influenced and Corrupt Organizations Act ("RICO").  *See* Memorandum of Law of Defendant

Ajay Gandhi at 15 [ECF No. 36] (the "Gandhi Memorandum"); Memorandum of Law of

Defendant Mihir Bhansali at 28 [ECF No. 39] (the "Bhansali Memorandum"); Memorandum of

Law of Defendant Nirav Deepak Modi at 18 [ECF No. 43] (the "Modi Memorandum").

Defendants present a variety of theories, including standing, failure to allege fraud with

particularity, failure to adequately plead predicate acts under RICO, and statute of limitations.

Defendants also seek dismissal of the Trustee's state law claims.[1]  Also before the Court is Defendant Mihir Bhansali's related Motion for Rule 11 Sanctions or to Strike Certain Pleadings (the "Sanctions Motion") [ECF No. 59].  For the reasons that follow, the Court denies the motions.

## BACKGROUND

In late January 2018, Punjab National Bank ("PNB") filed a complaint against Nirav Modi and several associated entities in India, alleging "the largest bank fraud in Indian history" against PNB and other banks.  *See In re Firestar Diamond, Inc.*, 615 B.R. 161, 162–64 (Bankr. S.D.N.Y. 2020); Report of John J. Carney, Examiner at 4 [ECF No. 394, Case No. 18-10509]. Approximately one month later, three U.S. corporations indirectly owned by Nirav Modi filed for Chapter 11 protection in the Southern District of New York: Firestar Diamond, Inc. ("FDI"), Fantasy, Inc. ("FI") and A. Jaffe, Inc. ("A. Jaffe," and together with FDI and FI, the "Debtors").  *See* ECF No. 1 [Case No. 18-10509].  Amidst a tumultuous, failed sale process of the Debtors' assets and the resignation of the Debtors' Chief Executive Officer ("CEO") Mihir Bhansali, the Court ordered the appointment of the Trustee in mid-June 2018.  *See* ECF No. 227 [Case No. 18-10509].  The Trustee has administered the Debtors' estates since June 2018.

In March 2019, the Trustee filed a complaint against the Defendants, *see* ECF No. 1, and an amended complaint some six months later, *see* Amended Complaint against Mihir Bhansali, Ajay Gandhi, Nirav Deepak Modi (the "First Amended Compl.") [ECF No. 28].  As is the case in a motion to dismiss, the facts of the complaint are taken as true.  *See BG Litig. Recovery I, LLC v. Barrick Gold Corp.*, 180 F. Supp. 3d 316, 320 (S.D.N.Y. 2016).

---

[1]    *See* Gandhi Memorandum at 6; Bhansali Memorandum at 9; Modi Memorandum at 9.

While in business, the Debtors operated as wholesale diamond and bridal jewelry businesses.  *See* First Amended Compl. ¶¶ 6–8.  Defendant Nirav Deepak Modi ("Modi") is the former indirect controlling majority shareholder and/or de facto director, officer, or controlling person of the Debtors; Mihir Bhansali ("Bhansali") served as the sole director and CEO of each Debtor; and Ajay Gandhi ("Gandhi") served as the Chief Financial Officer ("CFO") of each Debtor.  *Id.* ¶ 1.

Generally, the Trustee's action seeks to recover damages from harm inflicted by the Defendants on the Debtors and their estates as a result of

> the Defendants' six-year, extensive international fraud, money laundering, and embezzlement scheme that resulted in accrual of claims against the Debtors of over $1 billion in favor of Punjab National Bank, the diversion of millions of dollars of the Debtors' assets for the benefit of the family of Nirav Modi and Mihir Bhansali, and the collapse of the Debtors and the resulting loss of value of their businesses.

*Id.* ¶ 1.

From approximately early 2011 to early 2018 (the "Relevant Period"), the Defendants orchestrated and carried out a scheme to "obtain loans, credits, or other funds under false pretenses and without collateral" from numerous banks (the "Bank Fraud"), including PNB, which is majority owned by the Indian government.  *Id.* ¶ 23.  The Bank Fraud involved the use of letters of undertaking ("LOUs"),[2] a financial instrument unique to India designed to facilitate efficient import transactions.  *Id.* ¶ 24.  Modi and the co-conspirators sought to artificially inflate the import volumes of Modi's India-based companies with sham transactions so as to obtain more and more LOU funding in order to obtain even more LOU bank financing.[3]  *Id.* ¶¶ 26–27.

---

[2]        See *In re Firestar Diamond, Inc.*, 615 B.R. 161, 163 n.2 (Bankr. S.D.N.Y. 2020) for an explanation on the mechanics of LOUs.

[3]        These India-based companies are: (1) Diamonds 'R' Us ("DRUS"); (2) Solar Export ("Solar"); and (3) Stellar Diamond ("Stellar") (collectively, the "LOU Entities").  First Amended Compl. ¶ 27.

To carry out this scheme, Modi and his co-conspirators used a web of shell companies known as the "Shadow Entities" based in Hong Kong and Dubai that posed as legitimate businesses to create fake import transactions and launder the proceeds.[4]  *See id.* ¶¶ 29–32.  As the Amended Complaint explains:

> Transactions involving the Shadow Entities either purported to transfer goods that did not exist, were never transferred, were transferred at prices having nothing to do with market value but instead based on whatever amounts were necessary to reconcile the Shadow Entities' and Firestar Entities'[5] books and records so as to conceal other transfers made for illegitimate purposes, or were transferred in "circular transactions," in which the same goods were exported from and re-imported among Modi-Controlled Entities multiple times at varying and often inflated prices to give the appearance of multiple distinct transactions for the sole purpose of artificially increasing the entities' import volume.

*Id.* ¶ 35.  PNB and the other defrauded banks are reported to have lost in excess of $1 billion as a result of the Bank Fraud.  *Id.* ¶ 52.

The Defendants and their co-conspirators allegedly funneled millions of dollars in funds and diamonds through the Debtors in furtherance of the Bank Fraud, "both in circular transactions with Shadow Entities and other Modi-Controlled Entities to propagate the Bank Fraud and in noncircular transactions designed to launder the proceeds of the Bank Fraud" for Modi's and Bhansali's personal benefit.  *Id.* ¶ 53.  The Trustee lists examples of how the Debtors directly benefited from fraudulently issued LOUs and were involved in circular transactions until

---

[4]      The Shadow Entities include: Auragem Company Ltd. ("Auragem"), Brilliant Diamonds Ltd. ("Brilliant"), Eternal Diamonds Corporation Ltd. ("Eternal"), Fancy Creations Company Ltd. ("Fancy Creations"), Sino Traders 7 Ltd. ("Sino"), Sunshine Gems Ltd. ("Sunshine"), Unique Diamond and Jewellery FZC ("Unique"), World Diamond Distribution FZE ("World Diamond"), Vista Jewelry FZE ("Vista"), Empire Gems FZE ("Empire"), Universal Fine Jewelry FZE ("Universal"), Diagems FZC ("Diagems"), Tri Color Gems FZE ("Tri Color"), Pacific Diamonds FZE ("Pacific"), Himalayan Traders FZE ("Himalayan"), and Unity Trading, FZE ("Unity") (collectively, the "Shadow Entities," together with the Firestar Entities, LOU Entities, and all other entities controlled by Nirav Modi and his family members, the "Modi-Controlled Entities").  First Amended Compl. ¶ 29.  The Hong Kong-based Shadow Entities included Auragem, Brilliant, Eternal, Fancy Creations, Sino, and Sunshine.  The Dubai-based Shadow Entities included Unique, World Diamond, Vista, Empire, Universal, Diagems, Tri Color, Pacific, Himalayan, and Unity.  *Id.* ¶ 31.

[5]      For the definition of "Firestar Entities," *see infra* note 6.

5

early 2013, when the Debtors no longer directly participated in import and export transactions underlying LOU issuances and instead received LOU proceeds indirectly through Shadow Entities. *See id.* ¶¶ 54–55, 57. At that point, the Shadow Entities themselves acted as intermediaries between the Firestar Entities and the LOU Entities. *Id.* ¶ 56. The Debtors would also make payments directly to Shadow Entities, ostensibly for the repayment of outstanding LOUs. *Id.* ¶ 58. The Debtors' records reflect cash transfers to and from the Debtors and the Shadow Entities totaling approximately $227 million during the Relevant Period. *Id.* ¶ 60.

Bhansali and Gandhi acted in concert with Modi with respect to the Debtors' participation in the Bank Fraud. *Id.* ¶ 61. In addition to his role as CEO of the Debtors, Bhansali served as CEO or director while Gandhi served as CFO for each entity in a group known as the "U.S. Affiliates."[6] *Id.* ¶¶ 63–64. With Modi's oversight, Bhansali and Gandhi together were able to coordinate and direct fraudulent transfers "among the U.S. Entities, Shadow Entities, and other Modi-Controlled Entities involving hundreds of millions of dollars in funds and diamonds." *Id.* ¶ 63, 64. Bhansali and Gandhi each had authority to approve loose diamond transactions among the U.S. Entities and the Shadow Entities and were also signatories on each

---

[6]     The U.S. Affiliates are comprised of: (1) Firestar Group, Inc. ("FGI"), a Delaware corporation and a holding company that owns approximately 95% of the equity interests in FDI; Synergies Corporation ("Synergies"), a Delaware corporation and a holding company that owns approximately 95% of the equity interests in Jaffe and 100% of the equity interests in FGI; (3) Firestar Diamond International, Inc. ("FDII"), a Delaware corporation; and (4) Nirav Modi, Inc., a Delaware corporation. The U.S. Affiliates, together with the Debtors, are the "U.S. Entities." First Amended Compl. ¶¶ 9–12.

In addition, the Debtors have foreign affiliates: (1) Nirav Modi Ltd. ("NML"), a Hong Kong company that owns 100% of the equity interests in NMI and is the principal holding company for subsidiaries operating Nirav Modi-branded boutiques around the globe; (2) Firestar Holdings Ltd. ("FHL"), a Hong Kong company that owns 100% of the equity interests in Synergies, FDII, and NML; (3) Firestar Diamond International Private Limited ("FDIPL"), an India company that operated jewelry factories in India; (4) Firestar International Limited ("FIL"), an India company that holds 100% of the equity interests in FHL and FDIPL and is the ultimate holding company of numerous other Firestar entities (collectively, including the Debtors, U.S. Affiliates, FHL, NML, FDIPL, and FIL, the "Firestar Entities"). *Id.* ¶¶ 13–16.

of the U.S. Entities' bank accounts.[7]  *Id.* ¶ 65.  While the examples listed are too numerous to discuss in detail here, the Trustee generally alleges that Defendants exercised oversight and control of the Shadow Entities and LOU Entities, exercised oversight and control over transactions between the Debtors and Shadow Entities, engaged in suspicious accounting, finance, and inventory practices, engaged in efforts to deceive or manipulate auditors and lenders, orchestrated transactions to divert assets from the Bank Fraud and the Debtors for the benefit of Modi's and Bhansali's families, and attempted to stonewall and disrupt investigations of the Bank Fraud before and after the Debtors' bankruptcy filing.  *See id.* ¶¶ 68–80, 81–83, 84–91, 92–102, 103–41, 142–172.

It is the Trustee's contention that each "Actual Fraudulent Transaction"[8] gives rise to the right to avoid and recover the value of such transactions and that each Actual Fraudulent Transaction was made with actual intent to hinder, delay, or defraud the Debtors' existing or future creditors.  *Id.* ¶¶ 173–74.  Moreover, the Trustee alleges that

- each Actual Fraudulent Transaction was made to or for the benefit of an insider of the Debtors;

- the Defendants and their co-conspirators went to great lengths to conceal the existence and nature of the Actual Fraudulent Transactions (pre- and post-filing);

- the Defendants and their co-conspirators retained control over the proceeds of each Actual Fraudulent Transfer;

- the Debtors were insolvent at the time of each Actual Fraudulent Transaction;

---

[7]     According to the Trustee, Bhansali and Gandhi "were the only persons authorized to effectuate transfers from their accounts, along with Joshua Weinman with respect to FDII and Sumay Bhansali with respect to [A.] Jaffe."  First Amended Compl. ¶ 65.

[8]     The Trustee defines "Actual Fraudulent Transaction" as a combination of "Actual Fraudulent Transfer" (defined as a "transfer of property of the Debtors derived from or subsequently transferred to a Shadow Entity or LOU Entity, directly or indirectly, or otherwise linked to or supporting the Bank Fraud, during the six-year period prior to the Petition Date") and "Actual Fraudulent Obligation" (defined as an "obligation incurred by the Debtors to a Shadow Entity or LOU Entity, or otherwise linked to or supporting the Bank Fraud, during the six-year period prior to the Petition Date").  First Amended Compl. ¶ 173(i)–(ii).

- the Debtors often did not receive reasonably equivalent value (or any consideration at all) in exchange for Actual Fraudulent Transactions;

- the Actual Fraudulent Transactions were not made in the ordinary course of the Debtors' businesses and served no legitimate corporate or economic purpose;

- many of the Actual Fraudulent Transactions involved transfers to and from the Shadow Entities; and

- Modi absconded after exposure of the Bank Fraud.

*Id.* ¶ 174; *see also id.* ¶ 176 (listing examples of how the Defendants continued to orchestrate Actual Fraudulent Transfers to Modi-Controlled Entities up to the filing date of the main bankruptcy cases); *id.* ¶¶ 177–87 (listing examples of how the Defendants caused NMI and FDII to move cash and inventory overseas out of the reach of their creditors and the Debtors). The Trustee also alleges that Defendants caused the U.S. Affiliates, upon receiving Actual Fraudulent Transfers, to subsequently transfer the proceeds of such Actual Fraudulent Transfers to Shadow Entities or other Modi-Controlled Entities (the "Subsequent Transfers"). *See id.* ¶ 175(i)–(xv). To carry out these schemes, the Trustee alleges that Modi exercised "total ultimate control" over the Debtors and directed Bhansali's and Modi's actions, from carrying out the Bank Fraud to responding to queries from auditors. *See id.* ¶¶ 188–97.

In the Amended Complaint, the Trustee brings the following counts against the Defendants: (1) Counts One, Two, and Three allege a breach of fiduciary duty against each defendant, *see id.* ¶¶ 198–211, and Count Four alleges that Modi aided and abetted Bhansali's and Gandhi's breach of fiduciary duty as an alternative to Count One, *see id.* ¶¶ 212–17; (2) Counts Five, Six, and Seven allege that each defendant committed waste of the Debtors' assets, *see id.* ¶¶ 218–32; and (3) Count Eight alleges each defendant violated RICO, *see id.* ¶¶ 233–313. The Trustee alleges the Defendants engaged in a RICO enterprise, *see id.* ¶¶ 238–46, and committed the following predicate acts contributing to the RICO enterprise:

8

     (i)     Mail and Wire Fraud, violations of 18 U.S.C. § 1341, 1343, *see id.* ¶¶ 248–253;

     (ii)     National Stolen Property Act, violations of 18 U.S.C. §§ 2314, 2315, *see id.* ¶¶ 254–259;

     (iii)     Money Laundering, violations of 18 U.S.C. §§ 1956, 1957, *see id.* ¶¶ 260–276;

     (iv)     Obstruction of Justice, violations of 18 U.S.C. §§ 1503, 1512, *see id.* ¶¶ 277–289; and

     (v)     Bankruptcy Fraud, violations of 18 U.S.C. § 152, *see id.* ¶¶ 290–296.

The Trustee contends that the racketeering conduct continued throughout the Relevant Period, that the RICO pattern and predicate acts caused injury to the Debtors, and that the Debtors are entitled to recover treble damages, *see id.* ¶¶ 297–306. Count Nine alleges that each defendant engaged in a RICO conspiracy in violation of 18 U.S.C. § 1962(d). *See id.* ¶¶ 307–13.

For each of the three groups of counts, the Trustee requests that the Court hold the Defendants jointly and severally liable for no less than $15,000,000 for injuries suffered by the Debtors pursuant to the Defendants' acts. *See id.* at Wherefore Cl. (a)–(c).

## <u>DISCUSSION</u>

### I. Legal Standards

#### 1. Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 US 662, 678 (2009). A claim has facial plausibility when the court may reasonably infer that the defendant is liable for the misconduct alleged. *See Iqbal*, 556 US at 678; *see also Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 556 (2007). A pleading offering only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," however, "will not do." *Twombly,* 550 U.S. at 555; *see Rothstein v. UBS AG,* 708 F.3d 82, 94 (2d Cir. 2013) (discrediting "legal

conclusions couched as factual allegations"). In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the court must accept as true all factual allegations in the complaint, drawing all reasonable inferences in favor of the plaintiff. *See BG Litig. Recovery I, LLC v. Barrick Gold Corp.*, 180 F. Supp. 3d 316, 320 (S.D.N.Y. 2016). In sum, the court must determine whether the "well-pleaded factual allegations," assumed to be true, "plausibly give rise to an entitlement to relief." *Iqbal,* 556 U.S. at 679.

A Rule 12(b)(6) motion is addressed to the face of the pleading. *Goldman v. Belden,* 754 F.2d 1059, 1065–66 (2d Cir. 1985). Pursuant to Federal Rule of Civil Procedure 10(c), the pleading is deemed to include any document attached to it as an exhibit or any document incorporated in it by reference. *Id.*; *see also Cortec Indus., Inc. v. Sum Holding, L.P.,* 949 F.2d 42, 47 (2d Cir. 1991).

### 2. RICO and Rule 9(b)

To adequately allege a civil cause of action under RICO, a plaintiff must allege that "a person engaged in '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 120 (2d Cir. 2013) (quoting *DeFalco v. Bernas*, 244 F.3d 286, 306 (2d Cir. 2001)).

Rule 9(b) of the Federal Rules of Civil Procedure requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Rule 9(b) "seeks to provide a defendant with sufficient and fair notice of the plaintiff's claim in order to enable that defendant to defend him or herself, protect a defendant's reputation from the harm that can flow from unfounded accusations of fraud, and reduce the number of strike suits." *Securities Inv'r Protec. Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293, 309 (Bankr. S.D.N.Y. 1999) (citing *Campaniello Imports, Ltd. v. Saporiti Italia,* 117

F.3d 655, 663 (2d Cir. 1997); *O'Brien v. National Property Analysts Partners,* 936 F.2d 674, 676

(2d Cir. 1991)). Thus, "the complaint must: (1) specify the statements that the plaintiff contends

were fraudulent, (2) identify the speaker, (3) state where and when the statements were made,

and (4) explain why the statements were fraudulent." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273,

290 (2d Cir. 2006). That said, the rule "does not require factual pleadings that demonstrate the

probability of wrongdoing." *Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Securities,*

*LLC*, 797 F.3d 160, 174 (2d Cir. 2015) (alteration omitted) (quoting *Iqbal*, 556 U.S. at 678). "At

the pleadings stage, the alleged fraud need only be plausible based on the complaint; it need not

be more likely than other possibilities." *Id.* (citing *Twombly*, 550 U.S. at 556 ("[A] well-pleaded

complaint may proceed even if it strikes a savvy judge that actual proof of those facts is

improbable, and that a recovery is very remote and unlikely.") (citation and internal quotation

marks omitted)); *cf. Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 360 (2d Cir. 2013) ("*Iqbal* . . .

requires assertions of facts supporting a *plausible* inference of fraud—not of facts which can

have no conceivable other explanation.").

Although "mental states may be pleaded generally, [a plaintiff] must nonetheless allege

facts that give rise to a strong inference of fraudulent intent." *Loreley Financing*, 797 F.3d at

171 (internal quotation marks omitted); *see* Fed. R. Civ. P. 9(b); Fed. R. Bankr. P. 7009

("[M]alice, intent, knowledge, and other conditions of a person's mind may be alleged

generally."). "An inference is strong if it is cogent and at least as compelling as any opposing

inference one could draw from the facts alleged." *Loreley Financing*, 797 F.3d at 176–77

(internal quotation marks omitted). Such an inference "may be established either (a) by alleging

facts to show that defendants had both motive and opportunity to commit fraud, or (b) by

alleging facts that constitute strong circumstantial evidence of conscious misbehavior or

recklessness." *Lerner*, 459 F.3d at 290–91 (internal quotation marks omitted).

## II.   The Trustee's Claims Under RICO

Defendants move to dismiss Count 8 and Count 9 of the First Amended Complaint, in

which the Trustee alleges that Defendants participated in a RICO enterprise, engaged in a pattern

of racketeering activity, committed the requisite number of predicate acts, and participated in a

conspiracy to commit RICO violations, all of which caused injury to the Debtors.  *See* First

Amended Compl. ¶¶ 233–313.  Defendants raise a number of distinct arguments as to these

RICO counts.[9]

### 1.   Standing

First, Defendants argue that the Trustee lacks standing under RICO because the Debtors'

alleged injuries were indirectly caused by Defendants' alleged RICO violations and derivative to

the direct harm suffered by non-debtor PNB.[10]

RICO provides a private cause of action for "[a]ny person injured in his business or

property by reason of a violation of Section 1962 of this chapter."  18 U.S.C. § 1964(c).  To have

standing under Section 1964(c), a civil RICO plaintiff must show: (1) that his alleged harm

qualifies as an injury to his business or property; and (2) that the harm was "by reason of" the

RICO violation, which requires the plaintiff to establish proximate causation.  *Holmes v. Sec.

Investor Prot. Corp.,* 503 U.S. 258, 268 (1992); *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479,

496 (1985).  The Supreme Court in *Holmes* gave three reasons for the importance of the

directness between the RICO predicate act and the harm.  "First, the less direct an injury is, the

---

[9]     *See* Gandhi Memorandum at 15; Bhansali Memorandum at 28; Modi Memorandum at 18.

[10]    *See* Gandhi Memorandum at 17; Bhansali Memorandum at 30; Modi Memorandum at 22.

more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors;" "[s]econd, quite apart from problems of proving factual causation, recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries;" and "finally, the need to grapple with these problems is simply unjustified by the general interest in deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely." *Holmes*, 503 U.S. at 269–70 (internal citations omitted).

Since *Holmes*, the Supreme Court has offered additional guidance about RICO standing. To start, a RICO plaintiff must show the defendants' alleged RICO violations bear a direct connection to the plaintiff's asserted harms. *See Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006) ("When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries."). But a "showing that the defendant violated [Section] 1962, the plaintiff was injured, and the defendant's violation was a 'but for' cause of plaintiff's injury" is insufficient by itself to show that the plaintiff's injury was "by reason of" the RICO violation. *Holmes*, 503 U.S. at 265–66. Rather, a plaintiff must show that a predicate offense "not only was a 'but for' cause of his injury, but was the proximate cause as well." *Id.* at 268, 271, 274 (a link between injury and conduct that is "too remote," "purely contingent," or "indirec[t]" is insufficient).

In *Anza,* the Supreme Court made clear that RICO's proximate cause requirement bars suits by derivative victims and those whose injuries are "purely contingent on the harm suffered by" direct victims. *Anza*, 547 U.S. at 457 (quoting *Holmes*, 503 U.S. at 271) (internal quotation

marks omitted).  Moreover, "the compensable injury flowing from a violation of [Section 1962(c)] 'necessarily is the harm caused by predicate acts sufficiently related to constitute a pattern, for the essence of the violation is the commission of those acts in connection with the conduct of an enterprise.'"  *Id.* (quoting *Sedima,* 473 U.S. at 497).  Under *Anza,* therefore, courts must scrutinize the causal link between the predicate act and the injury, identifying with precision both the nature of the violation and the cause of the injury to the plaintiff.  *See id.* at 456–61.  Where the predicate act is not itself the immediate cause of the plaintiff's injury, proximate cause may be lacking.  *Holmes*, 503 U.S. at 269 ("[T]he less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors.").  In assessing the RICO "direct relationship" requirement, the Court in *Anza* also looked to whether a better situated plaintiff would have an incentive to sue.  *See Anza*, 547 U.S. at 460 (citing *Holmes*, 503 U.S. at 269–270).

Some six years after *Anza*, the Supreme Court used the same principles to deny RICO standing to the City of New York's lawsuit against a New Mexico business that sold cigarettes online to New York City residents and failed to submit customer information to the State of New York as required by Federal law.  *See Hemi Group, LLC v. City of New York, N.Y.*, 559 U.S. 1, 11–12 (2010).  The Court in *Hemi* found the State of New York was "better situated" than the City to seek recovery, as the State had an incentive to sue because it also charged its own tax on cigarettes at nearly double the City's rate.  *Id.* (declining to extend the causal chain where the defendant's obligation was to file the customer information with the State, not the City, and where the City's harm was directly caused by the customers not paying the City's sales tax, not by the defendant).

Relying on *Holmes*, *Anza*, and *Hemi*, Defendants contend that the Trustee here lacks standing. They assert that the only party directly harmed by the alleged RICO violations was PNB and, thus, any harm to the Debtors was contingent on the harm to PNB.[11]  For example, Modi asserts that the Trustee "attempts to contrive a direct injury to the Debtors . . . by alleging that each 'operated as a legitimate business built on fruitful relationships with reputable customers' before the racketeering activity began" and were subsequently injured by the depletion of the Debtors' assets due to fraudulent transfers, administrative expenses incurred during the bankruptcy proceedings, and the impairment of their ability to sell assets. Modi Memorandum at 22. Modi further contends that "these 'injuries' flowed only indirectly, at best, from the alleged scheme to defraud PNB," and were "purely contingent on the harm suffered by PNB." *Id.* at 22–23 (internal quotations omitted). In other words, Modi argues that the depletion of assets injury, if taken as true, essentially served to support, further, and cover up the Bank Fraud, while the administrative expenses and impairment of the Debtors' ability to sell assets injuries were not caused by the predicate acts but rather by PNB's attempts to recover its losses from the Bank Fraud. *See id.* at 23–24. Additionally, Modi argues that PNB is the better situated party with an incentive to sue because (1) "[d]etermining how much of the Debtors' assets, if any, were 'depleted' as a result of the alleged RICO violations would require extensive forensic and expert analysis and resolution of factual disputes . . . to ensure the Debtors would not recover a windfall;" (2) "apportioning injury between PNB and the Debtors would require precisely the sort of 'complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts;'" and (3) "the alleged direct victim of the fraud is not only positioned to vindicate its claim, it already has appeared in New York (in this very

---

[11]        *See* Gandhi Memorandum at 17; Bhansali Memorandum at 30; Modi Memorandum at 22.

proceeding) to assert RICO violations against the Debtors," which Defendants claim mirror the allegations in the Amended Complaint here. *Id.* at 25–26 (citing *Holmes*, 503 U.S. at 269–70).

Bhansali and Gandhi also cite *BCCI Holdings (Luxembourg), Societe Anonyme v. Pharaon*, 43 F. Supp. 2d 359 (S.D.N.Y. 1999) for the proposition that "courts have repeatedly refused to find standing under RICO where the harm caused to the plaintiff is the result of the exposure of the alleged racketeering activity, rather than from the predicate acts underlying the scheme itself." *Id.* at 365.

But Defendants' standing arguments ignore the full extent of the Trustee's allegations. While the Amended Complaint describes the Bank Fraud against PNB, it also alleges a direct fraud against the Debtors by the Defendants.  Importantly, although the Bank Fraud is laid out in the Amended Complaint as a backdrop to understanding the specific predicate acts set forth in the Amended Complaint, the predicate acts alleged all resulted in direct injuries to the Debtors.[12] Specifically, the Trustee contends that Defendants' RICO predicate acts directly (1) depleted the Debtors' tangible assets through fraudulent transfers to overseas entities, (2) caused the Debtors to expend millions of dollars in professional fees related to the Trustee's and Examiner's investigations in the bankruptcy proceedings, and (3) impaired the Debtors' ability to sell its assets. *See* Trustee's Opposition to Defendant Ajay Gandhi's Motion to Dismiss the First Amended Complaint at 21 ("Trustee's Opposition to Gandhi") [ECF No. 48]; Trustee's Opposition to Defendant Mihir Bhansali's Motion to Dismiss the First Amended Complaint at 24–25 ("Trustee's Opposition to Bhansali") [ECF No. 49]; Trustee's Opposition to Defendant

---

[12]    Moreover, the facts of *BCCI* are distinguishable from the facts in the instant case.  In *BCCI*, the plaintiff had previously pled guilty to the very RICO violations they were alleging against the defendant, a major shareholder in the plaintiff.  *BCCI*, 43 F. Supp. 2d at 360.  Here, the Trustee alleges that Defendants had complete control over the Debtors, and the Debtors have not pled guilty to, or been held liable for, the RICO violations alleged against Defendants.

Nirav Deepak Modi's Motion to Dismiss the First Amended Complaint at 22–26 ("Trustee's

Opposition to Modi") [ECF No. 51].  Additionally, the Trustee alleges that each Actual

Fraudulent Transaction was made "with actual intent to hinder, delay, or defraud the Debtors'

existing or future creditors."  First Amended Compl. ¶ 174.[13]  As the Debtor has been directly

injured, it is hard to imagine another party in a better position to sue on behalf of the Debtor than

the Trustee.  *Hemi Group*, 559 U.S. at 11–12 (holding in the RICO context that the focus is on

the directness of the relationship between the conduct and the harm).[14]

This direct harm caused by the Actual Fraudulent Transactions extends to the Subsequent

Transfers—transfers first made to the U.S. Affiliates and then subsequently transferred to

overseas entities, namely Shadow Entities.  *See* First Amended Compl.  ¶ 175(i)–(xv).

Defendants contend that these Subsequent Transfers are part of the Bank Fraud against PNB and

did not injure the Debtors because the transactions depleted value from the U.S. Affiliates, not

the Debtors, and are the "definition of indirect."  *See* Hr. Tr. 15:18–16:5; 17:18–24, Apr. 30,

2020 [ECF No. 66].  However, "[w]hen a corporation fraudulently is caused to issue debt and

stripped of its assets in a manner that obviously will leave the creditors unpaid, those creditors

---

[13]     The Trustee specifically alleges the following: (i) each Actual Fraudulent Transaction was made to or for the benefit of an insider of the Debtors; (ii) the Defendants and their co-conspirators actively endeavored to conceal the existence and nature of the Actual Fraudulent Transactions, both before and after the filing of these Chapter 11 cases; (iii) the Defendants and their co-conspirators retained control over the proceeds of each Actual Fraudulent Transfer; (iv) the Debtors, in many cases, did not receive reasonably equivalent value in exchange for Actual Fraudulent Transactions or any consideration at all; (v) the Debtors were insolvent at the time each Actual Fraudulent Transaction occurred based on both the figures reflected on their balance sheet and the substantial contingent liability they incurred in the course of their involvement in the Bank Fraud; (vi) the Actual Fraudulent Transactions were not made in the ordinary course of the Debtors' businesses and served no legitimate corporate or economic purpose; (vii) many of the Actual Fraudulent Transactions involved Shadow Entities, which constitute dummies or fictitious parties; and (viii) Nirav Modi absconded after exposure of the Bank Fraud.  *See* First Amended Compl. ¶¶ 174(i)–(viii).

[14]     In their replies, Bhansali and Gandhi argue that the Trustee has "*conceded* that 'PNB and other victims of the fraudulent schemes might be able to bring their own RICO claims against Bhansali [and/or Gandhi] on the basis of the Actual Fraudulent Transfers or his other misconduct.'" Bhansali Reply at 14 (citing Trustee Opposition to Bhansali at 23 n.7); Gandhi Reply at 15 (citing Trustee Opposition to Gandhi at 23 n.7).  But PNB was not the party most directly injured by the Actual Fraudulent Transactions alleged in the Amended Complaint, and it is not clear that PNB would have standing were such a lawsuit brought.

have standing." *GICC Capital Corp. v. Tech. Fin. Group, Inc.*, 30 F.3d 289, 293 (2d Cir. 1994).

Here, the Trustee alleges that the U.S. Affiliates were looted as a result of the RICO violations.

*See* Trustee Opposition to Modi at 24.   Accepting this allegation as true, the Debtors, as

creditors of the U.S. Affiliates, suffered injuries that were "sufficiently direct and proximate to

support a RICO claim despite the identical harm sustained by [the U.S. Affiliates]." *GICC*, 30

F.3d at 293.

    At oral argument, Defendants argued that the circular transactions described in the

amended complaint—the "actual fraudulent transfers . . . derived from or subsequently

transferred to a shadow entity or otherwise linked to the bank fraud"—did not "actually deplet[e]

actual value" from the Debtors.  Hr. Tr. 15:10–22, Apr. 30, 2020.  Defendants referenced the two

sets of books that the Trustee alleges were used by Defendants and contended that the one "fake

set of books" shows only fictitious circular transactions that do not actually deplete value from

the Debtors.  *Id.* at 15:23–16:3.  As the Court noted at the hearing, however, this argument

assumes that the Debtors had no legitimate economic business.  *Id.* at 16:8–25.[15]  That premise is

squarely at odds with the allegations in the Amended Complaint and the bankruptcy itself.  *See,*

*e.g.*, First Amended Compl. ¶¶ 85–91, 298–303; Case No. 18-10509, ECF Nos. 389, 617, 645,

647.  Indeed, the Trustee has made clear that it seeks only to recover for the harm exerted

directly upon the Debtors via the Actual Fraudulent Transactions and Subsequent Transfers, not

the harm caused by the LOU Entities in extracting fraudulent LOUs from PNB.  *See* Trustee

Opposition to Modi at 1, 9–11, 22–27; Trustee Opposition to Gandhi at 20–24; Trustee

Opposition to Bhansali at 24–28; Hr. Tr. 57:18–24, April 30, 2020.  Accordingly, the Court finds

---

[15]    To the extent that it is ever necessary to parse which commingled funds are proceeds of the Bank Fraud and
which are the profits of the Debtors' legitimate business transactions, *see* Hr. Tr. at 20:15–21; 21:7–22, Apr. 30,
2020, this would be a question for the factfinder at trial or at the summary judgment stage.

that the Trustee has standing to seek recovery for injuries resulting directly from both the Actual

Fraudulent Transactions and the Subsequent Transfers.

Bhansali and Gandhi also argue that only the initial "intended target" of the RICO

enterprise has standing to sue.[16]  Modi similarly insists that it is appropriate for the Court to

focus on whether the Bank Fraud was "aimed" at the Debtors or PNB.[17]  Bhansali and Gandhi

both expressly contend that PNB was the "intended target" of the initial fraud, and the Court's

inquiry must end there.[18]  In support of this argument, they both rely on *BCCI*, 43 F. Supp. 2d at

365 (stating that plaintiffs must be the "intended targets" of RICO violations and the alleged

injury must have been the 'preconceived purpose' of the RICO activities) and *In re Am. Express

Co. Shareholder Litig.*, 39 F.3d 395, 400 (2d Cir. 1994) (dismissing RICO claims by

shareholders who were not the intended targets of the RICO violations)).

But the Second Circuit decision in *American Express*, upon which *BCCI* relies, does not

establish "intended target" as the bright line rule that Gandhi and Bhansali suggest.  In that case,

shareholders of American Express attempted to recover from former directors, officers, and

employees of the company for alleged RICO violations that harmed the company by hurting its

reputation.  *American Express*, 39 F.3d at 396–98.  While the RICO defendants attempted to

harm a competitor and benefit American Express, the Second Circuit found that the appellants'

cause of action—reputational and eventual financial harm to American Express—were ancillary

effects of the RICO violations and not proximate enough to establish a valid RICO claim.  *Id.* at

---

[16]    *See, e.g.*, Bhansali Memorandum at 2 ("It is black letter law that a plaintiff must allege that plaintiff itself
was the intended target of the alleged pattern of racketeering activity[.]"); Gandhi Memorandum at 17 (stating that
"the Trustee lacks standing" for the same reason); Hr. Tr. 44:14–15, Apr. 30, 2020 ("The caselaw requires Your
Honor to ask, who was the intended target of the alleged RICO violation?").

[17]    Modi Memorandum at 23; Defendant Nirav Modi's Reply Memorandum of Law in Further Support of his
Motion to Dismiss the First Amended Complaint (the "Modi Reply") at 6 n.5 [ECF No. 56].

[18]    *See* Bhansali Memorandum at 30; Gandhi Memorandum at 17.

400.   The fact that American Express was not the "intended target" was essentially a description

of the facts; it did not establish an independent hurdle for standing as Defendants suggest. *See*

*id.* ("[T]he shareholders of American Express were not the intended targets of the RICO

violations . . . the commission of the RICO violations was not what injured American Express.

Rather, it was the exposure of those acts that caused the appellants' harm.").  Indeed, the Second

Circuit later clarified that "in *American Express* we were simply quoting these phrases

["preconceived purpose" and "specifically intended consequence"] from the plaintiffs' brief,

which argued that the defendants had specifically intended the injuries.  We rejected those claims

on their own terms, but we did not generalize from the plaintiffs [sic] argument that RICO

plaintiffs were required to demonstrate that the injury was the 'preconceived purpose.'"  *Baisch*

*v. Gallina*, 346 F.3d 366, 375 n.1 (2d Cir. 2003).[19]

Defendants also attempt to move the starting line of the RICO proximate cause analysis

from the alleged predicate acts to events preceding the predicate acts, namely the Bank Fraud.

For example, Modi argues that the analysis should center on whether the harm was directly

caused by "the asserted racketeering activity" as opposed to "any predicate act."  Modi Reply at

12 n.7.  In support of this proposition, Modi cites to the Second Circuit's decision in *Empire*

*Merchants, LLC v. Reliable Churchill LLLP*, 902 F.3d 132, 142 (2d Cir. 2018).   But this case

does not support Modi's position.  In *Empire Merchants*, the Second Circuit discussed the

proximate cause standard set forth in *Holmes*, *Anza*, and *Hemi*, and stated at the outset that "a

plaintiff suing under RICO must establish that the RICO offense [i.e., the predicate act] was the

---

[19]      In any event, the Supreme Court's more recent decision in *Anza*—discussed above—provides the
controlling standard for RICO causation.  *See Hemi*, 559 U.S. at 12 ("[N]o one has asked us to revisit *Anza*.").
Moreover, the Supreme Court's most recent decision on RICO standing in *Hemi* explicitly criticized the dissent's
view that courts should look to whether "the harm is foreseeable; it is a consequence that [the defendant] *intended,
indeed desired*; and it falls well within the set of risks that Congress sought to prevent."  *Hemi*, 559 U.S. at 12
(emphasis added).

"proximate cause" of the plaintiff's injuries.  *Id.* at 141 (citing *Holmes*, 503 U.S. at 268).  Indeed,

as in *Anza*, the Court again clarified that the predicate act must *necessarily* be the proximate

cause of the defendant's injury.  *Id.* at 143; *Anza*, 547 U.S. at 457 (internal quotation marks

omitted) ("the compensable injury flowing from a violation of [Section 1962(c)] necessarily is

the harm caused by predicate acts"); *see also 4 K & D Corp. v. Concierge Auctions, LLC*, 2 F.

Supp. 3d 525, 543 (S.D.N.Y. 2014) ("So long as a plaintiff has adequately pleaded a 'pattern of

racketeering activity,' for purposes of damages, the plaintiff need only allege that it has suffered

an injury from at least one or more of the predicate acts comprising the RICO violation.").[20]

Taking the alleged predicate acts as the starting point of the analysis, causation here is

relatively straightforward.  As discussed above, the Trustee alleges that Defendants committed

various predicate acts, all causing injury to the Debtors by depleting their assets through Actual

Fraudulent Transfers and diverting the Debtors' assets to the Shadow Entities overseas; diverting

the U.S. Affiliates' assets—including assets received from the Debtors through the Actual

Fraudulent Transactions—to Shadow Entities, thereby impairing the Debtor's claims against the

U.S. Affiliates; and causing the Debtors to spend millions of dollars in professional expenses

related to the Bankruptcy proceedings.  *See* Trustee's Opposition to Modi at 22–26; Trustee's

Opposition to Gandhi at 20–25; Trustee's Opposition to Bhansali at 24–28.  The Debtors were

the party most immediately harmed by these predicate acts.  Notably, at least to the extent that

these predicate acts occurred after the Bank Fraud had been uncovered, PNB was not directly

injured by these alleged RICO violations.  *See* First Amended Compl. ¶ 176 (listing examples of

---

[20]     Both Gandhi and Bhansali similarly characterize the chain of causation between "the purported scheme" and the harm to the Debtors as a "circuitous route" beginning with Defendants fraudulently obtaining LOUs from PNB and PNB advancing money to Modi-controlled entities (the purported scheme as described by Gandhi and Bhansali), which led to investigations, criminal enforcement, the Debtors' bankruptcy proceedings, and, finally, to PNB's asserted claims against the Debtors in the bankruptcy proceeding (the injury as described by Gandhi and Bhansali).  Bhansali Memorandum at 30; Gandhi Memorandum at 17.

how the Defendants continued to orchestrate Actual Fraudulent Transfers to Modi-Controlled

Entities after exposure of the bank fraud and up to the filing date of the main bankruptcy cases);

*id.* ¶¶ 177–87 (listing examples of how, leading up to and following the filing of the bankruptcy

case, the Defendants caused NMI and FDII to move cash and inventory overseas out of the reach

of their creditors and the Debtors); *see also Hemi*, 559 U.S. at 14–15 (discussing its holding in

*Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008), in which it concluded that the

plaintiff's theory of causation was "straightforward" and noted that the plaintiff was also the only

party injured by the alleged predicate act).  As the Court need not progress beyond the first step

in the chain of causation, the Trustee has sufficiently alleged that the predicate acts proximately

caused the Debtors' injuries.  *See Hemi*, 559 U.S. at 9 (citing *Holmes*, 503 U.S. at 271–272;

*Bridge*, 553 U.S. at 657–659; and *Anza*, 547 U.S. at 460–461).

## 2.   Civil RICO Predicate Acts and Rule 9(b)

Defendants argue that the Trustee has failed to meet the heightened standards of Rule

9(b) of the Federal Rules of Civil Procedure for the predicate acts of racketeering grounded in

fraud and has failed to adequately plead all elements of the remaining predicate acts in

compliance with Rule 8 of the Federal Rules of Civil Procedure.[21]

To establish a pattern of racketeering, a plaintiff "must allege that each defendant

committed at least two predicate acts of racketeering activity."  *Jerome M. Sobel & Co. v. Fleck*,

2003 WL 22839799, at *6 (S.D.N.Y. Dec. 1, 2003), *report and recommendation adopted*, 2004

WL 48877 (S.D.N.Y. Jan. 8, 2004); *see also De Falco v. Bernas*, 244 F.3d 286, 306 (2d Cir.

2001); 18 U.S.C. § 1961(5); 18 U.S.C. § 1961(1) (listing the predicate acts of racketeering).

This requirement is consistent with Rule 9(b)'s particularity requirement where multiple

---

[21]     *See* Gandhi Memorandum at 19; Bhansali Memorandum at 32; Modi Memorandum at 29, 32.

defendants are charged with fraud, as is the case here.  *See DiVittorio v. Equidyne Extractive Indus., Inc.,* 822 F.2d 1242, 1247 (2d Cir. 1987) ("Where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud." (internal citation omitted)).

In the context of a civil RICO claim, "all allegations of fraudulent predicate acts[ ] are subject to the heightened pleading requirement of [Rule 9(b)]."  *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 178 (2d Cir. 2004).  This includes allegations of predicate acts of mail, wire, and bankruptcy fraud, and conduct under the National Stolen Property Act.  *See Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 185 (2d Cir. 2008); *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 178 (2d Cir. 2004).

The Trustee here pleads that all Defendants engaged in at least two predicate acts based on fraud—more specifically, mail and wire fraud and violations of the National Stolen Property Act—and predicate acts of money laundering and obstruction of justice.  *See* First Amended Compl. ¶¶ 248–53, 254–59, 260–76; 277–89.  The Trustee also alleges that Bhansali and Gandhi committed bankruptcy fraud.  *See id.* ¶¶ 290–96.  The Court will analyze each of these acts under the Rule 9(b) or Rule 8 standards, as appropriate.

### (i)  Mail and Wire Fraud

"A complaint alleging mail and wire fraud must show (1) the existence of a scheme to defraud, (2) defendant's knowing and intentional participation in the scheme, and (3) the use of interstate mails or transmission facilities in furtherance of the scheme."  *S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp.,* 84 F.3d 629, 633 (2d Cir. 1996) (citation omitted); *see also* 18 U.S.C. §§ 1341, 1343.

Defendants argue that the Amended Complaint fails to establish that Defendants engaged in mail or wire fraud because it fails to identify a false or fraudulent statement and fails to allege with specificity that the Defendants had the requisite intent to defraud Debtors.[22]  But the Court disagrees.  In cases where, as here, the plaintiff alleges that the mails or wires were used in furtherance of the fraudulent scheme, *see* First Amended Compl. ¶¶ 248–53—as opposed to claiming that the communication itself contained false or misleading information—"a detailed description of the underlying scheme and the connection therewith of the mail and/or wire communications, is sufficient to satisfy Rule 9(b)."  *Fleck*, 2003 WL 22839799, at *5–6 (quoting *In re Sumitomo Copper Litig.*, 995 F. Supp. 451, 456 (S.D.N.Y. 1998)) (emphasis omitted).  As discussed above, the Amended Complaint sets forth in great detail the specifics of the alleged underlying scheme and each Defendant's involvement in the scheme.[23]  Additionally, for each of the years during the Relevant Period, the Trustee describes dozens of specific examples of the use of mail and wire communications in furtherance of Actual Fraudulent Transfers and Subsequent Transfers.  *See* First Amended Compl. ¶¶ 39–41, 54–60, 81–83, 174–87.  For example, the Trustee alleges specific instances of the circular exporting and importing of the same diamonds by the Debtors in 2011 and via Shadow Entities from 2013 to 2016, as well as numerous cash transfers between the Debtors and the Shadow Entities during this time period. *Id.* ¶¶ 54–60.  Additionally, the Trustee lists various email exchanges to and from Defendants allegedly coordinating the Actual Fraudulent Transactions, *see id.* ¶¶ 81–83, and the Subsequent Transfers, *id.* ¶¶ 175–76, between 2010 and 2018.  Moreover, the Trustee describes the shipping and wiring of inventory and cash overseas in the time leading up to the bankruptcy so that they

---

[22]    *See* Gandhi Memorandum at 21; Bhansali Memorandum at 33; Modi Memorandum at 30–31.

[23]    *See generally* discussion *supra* under "Background."

would be out of reach of creditors, including the Debtors.  *Id.* ¶¶ 177–86.  Thus, given the

numerous detailed examples and a plausible explanation of the scheme as a whole, the First

Amended Complaint satisfies the requirements of Rule 9(b).

Defendants' second Rule 9(b) argument—that the Trustee failed to allege that Defendants

had the requisite intent to defraud—similarly lacks merit.[24]  In this context, it is not necessary for

a plaintiff to plead a defendant's mental state with particularity.  *See, e.g.*, Fed. R. Civ. P. 9(b)

("[T]he circumstances constituting fraud . . . shall be stated with particularity.  Malice, intent,

knowledge, and other condition of mind of a person may be averred generally."); *Chill v. Gen.*

*Elec. Co.,* 101 F.3d 263, 267 (2d Cir. 1996) ("[T]he fraud alleged must be stated with

particularity . . . the requisite intent of the alleged [perpetrator] of the fraud need not be alleged

with great specificity.") (internal citations omitted).  While a plaintiff must "allege facts that give

rise to a strong inference of fraudulent intent," *San Leandro Emergency Med. Group Profit*

*Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801, 812 (2d Cir. 1996) (internal citations omitted),

that standard is easily met here given the massive and detailed fraudulent scheme set forth in the

Amended Complaint.

### (ii)  National Stolen Property Act

The National Stolen Property Act ("NSPA") provides criminal penalties for any person

who "transports in interstate or foreign commerce any goods, wares, merchandise, securities or

money, of the value of $5,000 or more, knowing the same to have been stolen, converted or

taken by fraud."  18 U.S.C. § 2314.  Violations of the NSPA are subject to Rule 9(b).  *See Spool*,

520 F.3d at 185.  Once again, Defendants argue that the Trustee has failed to plead this predicate

---

[24]    *See* Gandhi Memorandum at 21–22; Bhansali Memorandum at 34–35; Modi Memorandum at 30–31.

act with particularity as required by Rule 9(b), specifically challenging the sufficiency of

allegations about Defendants' knowledge.[25]

But the Defendants' arguments again are without merit.  The Trustee has adequately pled

the Defendants' oversight and control of the Shadow Entities, *see* First Amended Compl. ¶ 81,

their communications to advance the Bank Fraud, *see id.* ¶ 82, and their involvement in the

Actual Fraudulent Transactions and Subsequent Transfers, *see id.* ¶¶ 174–77.  All these

allegations detail the Defendants' knowledge that the property being transferred had "been

stolen, converted or taken by fraud" under the NSPA.[26]  Thus, the Trustee has satisfied its

burden under Rule 9(b) as to these predicate acts.

### (iii) Money Laundering

In alleging predicate acts of money laundering, the Trustee cites to Sections 1656 and

1957 of Title 18.  Section 1956 requires that:

> (1) the individual conducted a financial transaction in interstate commerce, (2)
> with knowledge that the property involved in the transaction represented some
> form of unlawful activity, (3) with the transaction in fact involving the proceeds
> of specified unlawful activity, (4) with the purpose, in whole or in part, of
> concealing or disguising the nature, the location, the source, the ownership or the
> control of the illegally acquired proceeds.

*Bernstein v. Misk,* 948 F. Supp. 228, 236 n.2 (E.D.N.Y.1997) (internal quotation marks omitted):

*see also United States v. Maher,* 108 F.3d 1513, 1527–28 (2d Cir. 1997); 18 U.S.C. § 1956.

Section 1957 requires that the defendant "(1) knowingly engaged or attempted to engage in a

---

[25]     *See* Gandhi Memorandum at 22; Bhansali Memorandum at 35; Modi Memorandum at 31.

[26]     *See also* discussion *supra* Part II(2)(i).  For example, the Trustee outlines many emails between Defendants and other alleged co-conspirators arranging wire transfers between various Firestar Entities, including Shadow Entities, ranging between hundreds of thousands and millions of dollars.  First Amended Compl. ¶¶ 81–82.  Moreover, the Trustee specifically alleges that "[e]ach Actual Fraudulent Transaction was made with the actual intent to hinder, delay, or defraud the Debtor's existing or future creditors," and that Defendants caused the transfers and the Subsequent Transfers to Shadow Entities from 2012 to the weeks leading up to and following the initiation of the bankruptcy.  *Id.* ¶¶ 174–77.

monetary transaction involving criminally derived property, (2) with such property being valued at more than $10,000, and (3) with such money actually being derived from specific criminal activity." *Bernstein,* 948 F. Supp. at 236 n.2; 18 U.S.C. § 1957. "Money laundering claims are not subject to the heightened pleading standard of Rule 9(b), but plaintiffs must still adequately plead all elements of the offense in compliance with Rule 8." *Jus Punjabi, LLC v. Get Punjabi, Inc.*, 2015 U.S. Dist. LEXIS 66006, at *18 (S.D.N.Y. May 20, 2015).

Defendants argue that the Trustee has inadequately pled money laundering by failing to allege that Modi participated in any specific fraudulent transfers or that any of the Defendants knew that the property involved in the transfers was in some way related to unlawful activity.[27] Once again, the Court disagrees. The Trustee details how each alleged Actual Fraudulent Transfer and Subsequent Transfer injured the Debtors or the Debtors' claims against the U.S. Affiliates or transferred property of the Debtor away while the Debtor was insolvent for little to no consideration. *See* First Amended Compl. ¶¶ 173–76, 272. Additionally, the Trustee's extensive allegations of the Defendants' involvement in the Actual Fraudulent Transfers and the Subsequent Transfers plausibly demonstrate that the Defendants knew that the property involved in the Subsequent Transfers was the product of unlawful activity—such as the mail and wire fraud discussed above. *See id.* Moreover, the Subsequent Transfers away from the U.S. Affiliates to Shadow Entities plausibly establish that Defendants intended to conceal its nature or source. *See id.* ¶¶ 265–76. Since the count of money laundering is not subject to the heightened pleading standards of Rule 9(b) and the Trustee need not plead it with particularity, the Trustee has adequately pled money laundering under Rule 8.

---

[27]    *See* Gandhi Memorandum at 23–24; Bhansali Memorandum at 36; Modi Memorandum at 32–33.

### (iv) Obstruction of Justice

In alleging predicate acts of obstruction of justice, the Trustee cites to 18 U.S.C. §§ 1503(a) and 1512.  Section 1503(a) prohibits, among other things, endeavoring to intimidate, threaten, or injure court officers, commissioners, and jurors.  It also contains a residual or "omnibus" clause.  *See, e.g.*, *United States v. Aguilar*, 515 U.S. 593, 598 (1995) (describing Section 1503(a)'s structure).  This "omnibus" clause broadly prohibits, *inter alia*, "corruptly . . . endeavor[ing] to influence, obstruct, or impede, the due administration of justice."  18 U.S.C. § 1503(a); *see also United States v. Kumar*, 617 F.3d 612, 620 (2d Cir. 2010) ("[T]he omnibus clause embraces the widest variety of conduct that impedes the judicial process[.]") (internal quotation marks and citation omitted).  The *mens rea* is acting "corruptly," meaning with "a specific intent to obstruct a federal judicial or grand jury proceeding."  *United States v. Schwarz*, 283 F.3d 76, 109 (2d Cir. 2002).

Section 1512 broadly criminalizes "knowingly us[ing] intimidation, threaten[ing], or corruptly persuad[ing]" a witness with intent to delay or prevent the witness's testimony, or "attempt[ing] to do so."  18 U.S.C. § 1512(b).  The statute also criminalizes "corruptly . . . obstruct[ing], influenc[ing], or imped[ing] any official proceeding, or attempt[ing] to do so."  *Id* § 1512(c)(2).  "In order to prove obstruction of justice in violation of [S]ection[s] 1512(c)(2) [or (b)(2)], 'the government must show that there was a "nexus" between the defendant's conduct and the pending, or foreseeable, official proceeding.'"  *United States v. Pugh*, 945 F.3d 9, 21 & n.4 (2d Cir. 2019) (quoting *United States v. Martinez*, 862 F.3d 223, 237 (2d Cir. 2017)).  "[T]he existence of a nexus between [a defendant's] action and the proceeding does not depend on the defendant's knowledge . . . .  Rather, the existence of a nexus, for obstruction-of-justice purposes,

is determined by whether the defendant's acts have a relationship in time, causation, or logic with the judicial proceedings." *Id.* at 21–22.

Defendants argue that the Trustee has failed to adequately plead obstruction of justice because there is no proximate link between the alleged obstruction and harm to the Debtors, there is a lack of continuity between the alleged obstruction and the other alleged predicate acts, and the obstruction was not perpetrated with the required "corrupt" intent.[28]  But once again, the Defendants' arguments lack merit.  The Trustee has adequately pled that Bhansali and Gandhi made false and misleading statements under penalty of perjury in the Debtors' bankruptcy cases, *see* First Amended Compl. ¶¶ 152, 156–61, all Defendants conspired to conceal assets in the Debtors' bankruptcy cases, including the $11.2 million loan owed by NMI to Jaffe, *see id.* ¶¶ 152, 156–61, 287–88, all Defendants researched and implemented means of permanently deleting or encrypting electronic data, *id.* ¶¶ 142–45, 279, and Gandhi lied to the Examiner appointed by this Court during a deposition, while Bhansali invoked his Fifth Amendment right against self-incrimination to every question asked, *id.* ¶¶ 168–70, 172, 283.[29]  The Trustee also alleges that all Defendants sought to cover up the Bank Fraud, Actual Fraudulent Transfers, and Subsequent Transfers in the shadow of these bankruptcy cases.  *See id.* ¶¶ 173–87.  Additionally, the Trustee alleges that the Defendants engaged in witness intimidation, coercion, passport confiscation, evidence destruction, and bribery, which all run afoul of Section 1512.  *See id.* ¶ 151.  Moreover, many of the alleged acts of obstruction occurred when it was foreseeable that the Debtors would file for bankruptcy; such a bankruptcy would inevitably involve an investigation of the Debtors' finances, including the various transactions that were part of the

---

[28]    *See* Gandhi Memorandum at 24; Bhansali Memorandum at 37; Modi Memorandum at 33.

[29]    The Trustee further alleges that Modi conspired with Bhansali and Gandhi with respect to all of the acts of obstruction alleged here.  *Id.* ¶ 288.

scheme. *See Pugh*, 945 F.3d at 21–22 & n.4; 18 U.S.C. § 1512(c)(2); *see also* 18 U.S.C. § 1515(a)(1)(A) (defining a proceeding before a U.S. bankruptcy judge as an "official proceeding"). Finally, as alleged by the Trustee, Defendants' acts of obstruction were clearly in furtherance of a then-ongoing fraudulent scheme and not merely a cover-up of a previously completed scheme, thus satisfying the continuity requirement for establishing a pattern of racketeering activity within meaning of RICO. *See World Wrestling Entm't, Inc. v. Jakks Pac., Inc.*, 530 F. Supp. 2d 486, 512 (S.D.N.Y. 2007), *aff'd*, 328 F. App'x 695 (2d Cir. 2009).

The Defendants' acts, as alleged, "ha[d] the natural and probable effect of interfering with a judicial or grand jury proceeding." *United States v. Quattrone*, 441 F.3d 153, 171 (2d Cir. 2006) (quoting *United States v. Wood*, 6 F.3d 692, 695 (10th Cir. 1993)) (internal quotation marks omitted). Therefore, the Trustee has properly pled obstruction of justice as a predicate act for civil RICO.

### (v) Bankruptcy Fraud

Lastly, Gandhi and Bhansali argue that the Trustee failed to sufficiently plead bankruptcy fraud under 18 U.S.C. § 152, incorporating by reference their arguments for obstruction of justice discussed above.[30] Section 152 of Title 18 prohibits, *inter alia*, knowingly and fraudulently concealing property belonging to the estate of a debtor from debtors and making a false declaration, certificate, verification, or statement under penalty of perjury. *See* 18 U.S.C. § 152. The Amended Complaint details how Gandhi and Bhansali allegedly signed bankruptcy declarations, statements of financial affairs, and schedules containing false information, and concealed property of the estate. *See* First Amended Compl. ¶¶ 156–61, 283. Therefore, the Trustee has adequately pled bankruptcy fraud.

---

[30]    *See* Gandhi Memorandum at 26; Bhansali Memorandum at 38.

### 3.   RICO Statute of Limitations

Defendants next argue that the Trustee's RICO claims are partially time barred because the applicable four-year statute of limitations started running when the Debtors should have discovered the alleged wrongdoing by Defendants, i.e., in early 2011—the latest point at which the RICO conspiracy was allegedly consummated.[31]  In other words, Defendants assert that the Trustee is unable to bring a claim for actions that occurred prior to March 2015, which is four years before the Trustee brought this suit.[32]  *See Agency Holding Corp. v. Malley-Duff & Associates, Inc.,* 483 U.S. 143, 156 (1987) (establishing a four-year limitations period for civil RICO claims).

For the alleged misconduct that occurred prior to March 2015, the Trustee relies on an equitable tolling principle called the adverse domination doctrine.  "Under the doctrine of adverse domination, the statute of limitations is tolled for as long as a corporate plaintiff is controlled by the alleged wrongdoers."  *In re Adelphia Commc'ns Corp.*, 365 B.R. 24, 58 (Bankr. S.D.N.Y. 2007), *aff'd in part sub nom.*, *Adelphia Recovery Tr. v. Bank of Am., N.A.*, 390 B.R. 64 (S.D.N.Y. 2008), *adhered to on reconsideration*, 2008 WL 1959542 (S.D.N.Y. May 5, 2008) (quoting *RTC v. Farmer*, 865 F. Supp. 1143, 1151 (E.D. Pa. 1994)).  "[T]he doctrine is based on the theory that the corporation which can only act through the controlling wrongdoers cannot reasonably be expected to pursue a claim which it has against them until they are no longer in control."  *Id.* at 58–59 (quoting *RTC*, 865 F. Supp. at 1151).  Relying on this doctrine, the Trustee here alleges that Defendants remained in control of the Debtors until Bhansali and Gandhi resigned from their positions in May 2018, thus tolling the statute of limitations until that

---

[31]     *See* First Amended Compl. ¶ 297.

[32]     *See* Gandhi Memorandum at 19; Bhansali Memorandum at 31; Modi Memorandum at 34.

time.[33]  Defendants Gandhi and Bhansali contend that the Amended Complaint actually only alleges that Modi had complete domination and control of the Debtors, and that both Gandhi and Bhansali allowed Modi to usurp their management functions.[34]  But the Trustee rightly argues that the adverse domination doctrine covers instances where, as here, a non-control party working in concert with the control party would not bring an action that exposes their own wrongdoing.  *See* Hr. Tr. 67:10–68:6, Apr. 30, 2020 (citing *In re Adelphia*, 365 B.R. at 59 (observing that "a corporation likewise cannot reasonably be expected to pursue a claim against those who *aided and abetted* the controlling wrongdoers, or acted in concert with them, until the controlling wrongdoers are no longer in control"); and *ADR Tr. Corp. v. Fleischer*, 826 F. Supp. 1273, 1278–79 (D. Kan. 1993) (holding that the adverse domination doctrine logically applies to certain "noncontrol" persons because if "these persons assisted or jointly participated with the controlling directors in committing wrongful acts, the same self[-]interest reasons that would prevent a director from suing another director would prevent him or her from bringing an action against the noncontrol person")).  Accordingly, the four-year Civil RICO statute of limitations does not curtail the Amended Complaint at the pleading stage.

### 4.  In Pari Delicto

Lastly, Modi invokes the doctrine of *in pari delicto* in asserting that the Trustee's RICO claims are barred due to the Debtors' involvement in the alleged Bank Fraud scheme.[35]  "*In pari delicto* is a state law equitable defense analogous to unclean hands 'rooted in the common-law notion that a plaintiff's recovery may be barred by his own wrongful conduct.'"  *In re Food*

---

[33]    *See* Trustee Opposition to Gandhi at 25; Trustee Opposition to Modi at 39; Trustee Opposition to Bhansali at 28; *see also* First Amended Compl. ¶¶ 61–91 (alleging the Defendants' "domination and control" over the Debtors in the Amended Complaint with particularity); Hr. Tr. 66:3–67:6, Apr. 30, 2020.

[34]    *See* Bhansali Reply at 5–6; Gandhi Reply at 8–9.

[35]    *See* Modi Memorandum at 26.

*Mgmt. Grp., LLC*, 380 B.R. 677, 693 (Bankr. S.D.N.Y. 2008) (quoting *Pinter v. Dahl,* 486 U.S.

622, 632 (1988)).[36]   The doctrine serves the dual purposes of preventing courts from settling

disputes between wrongdoers and deterring illegality through said abstention.  *See Bateman*

*Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 306 (1985).  In bankruptcy proceedings, a

trustee "stands in the shoes" of the debtor corporation; it can only bring actions that could have

been brought by the debtor prior to the bankruptcy proceeding*.  See In re MF Global Holdings*

*Ltd. Inv. Litig.,* 998 F. Supp. 2d 157, 189 (S.D.N.Y. 2014), *aff'd sub nom. In re MF Glob.*

*Holdings Ltd. Inv. Litig. (DeAngelis v. Corzine)*, 611 Fed. Appx. 34 (2d Cir. 2015) ("Because a

trustee stands in the shoes of a bankrupt corporation, *in pari delicto* prevents the trustee from

recovering in tort if the corporation, acting through authorized employees in their official

capacities, participated in the tort.") (internal citations omitted); *see also Picard v. JP Morgan*

*Chase & Co. (In re Bernard L. Madoff Inv. Sec. LLC.),* 721 F.3d 54, 58–59, 64 n.13 (2d Cir.

2013), *cert. denied,* 573 U.S. 945 (2014) (for purposes of *in pari delicto,* the trustee stood in the

shoes of the debtor, Bernard L. Madoff Investment Securities LLC, a brokerage firm used by

Madoff as a vast Ponzi scheme, and could not assert claims against the defendants for

participating in the scheme that the debtor orchestrated).

There are some circumstances, however, in which it would be inappropriate to impute the

conduct of a defendant on the debtor corporation for the purposes of *in pari delicto*.  *Flaxer v.*

*Gifford (In re Lehr Constr. Corp.)*, 528 B.R. 598 (Bankr. S.D.N.Y. 2015), *aff'd*, 551 B.R. 732

(S.D.N.Y. 2016), *aff'd*, 666 Fed. Appx. 66 (2d Cir. 2016).  The Trustee here has invoked one

such circumstance: the "insider exception," which provides that the bad acts of corporate

---

[36]      The doctrine's full name is *in pari delicto potior est conditio defendentis*, meaning "[i]n a case of equal or
mutual fault, the position of the [defending party] is the better one."  *Baena v. KPMG LLP*, 453 F.3d 1, 6 (1st Cir.
2006) (internal quotation marks omitted).

"insiders" are not imputed on a corporation and the *in pari delicto* defense does not apply.

*Feltman v. Kossoff & Kossoff LLP (In re TS Empl., Inc.)*, 603 B.R. 700, 703 (Bankr. S.D.N.Y

2019) ("*[I]n pari delicto* does not apply to the actions of fiduciaries who are insiders in the sense

that they are on the board or in management, or in some other way control the corporation.")

(internal citations omitted).  Courts can deem actors as *per se* insiders under the statutory

definition, *see* 11 U.S.C. § 101(31)(B); however, this non-exhaustive list does not preclude

courts from finding actors to be "non-statutory insiders" by considering factors to determine that

they were the "person in the control" of the corporation.  *Pergament v. Amton Inc. (In re PHS

Grp. Inc.)*, 581 B.R. 16, 31 (Bankr. E.D.N.Y 2018).  Accordingly, a potential insider's status

should be determined "based on the totality of the circumstances, including the degree of an

individual's involvement in a debtor's affairs."  *In re Borders Group, Inc.*, 453 B.R. 459, 469

(Bankr. S.D.N.Y. 2011).  The relevant case law for a "totality of the circumstances" analysis can

be distilled into a non-exclusive list of four factors for the courts to consider: (1) the close

relationship between the debtor and the defendant; (2) the degree of the defendant's involvement

in the debtor's affairs; (3) whether the defendant had opportunities to self-deal; and (4) whether

the defendant holds or held a controlling interest in the debtor corporation.  *In re TS*, 603 B.R. at

708.[37]

---

[37]     Modi argues that the "insider exception" should not apply in the context of RICO.  Modi Reply at 10–11
(citing *Republic of Iraq v. ABB AG*, 768 F.3d 145, (2d Cir. 2014)).  However, *Republic of Iraq* is inapposite here.  In
*Republic of Iraq*, the Second Circuit held that the *in pari delicto* doctrine was applicable in the context of that case
brought pursuant to RICO, *id.* at 167–68; however, it did not hold that it applies without exception.  The relevant
question that the Second Circuit ultimately answered in the affirmative was whether "the actions of the Hussein
Regime, while it acted as the government of Iraq, [were] to be attributed to The Republic of Iraq."  *Id.* at 164–65.
The Court reasoned that although the Republic of Iraq contended that the Hussein Regime was "[il]legitimate," that
argument was irrelevant as "foreign government's actions are attributed to the state regardless of whether they are
'legal under the municipal law of the foreign state,'" and discussed the long held legal position that a foreign state
survives changes in its government.  *Id.* at 164.  The court noted, however, that "not every action that happens to be
taken by officials of a foreign state is properly attributable to that state."  *Id.* at 165.  In any event, the Court did not
address whether corporate insiders can rely on the *in pari delicto* defense in the RICO context, nor did it address
whether the "insider exception" is applicable.

In order to survive a motion to dismiss, a plaintiff must allege more than mere conclusory statements relating to the defendant's relationship with the debtor corporation. *Id.* at 710–11. Here, the Trustee easily clears that bar. The Trustee alleges that Modi was the "person in the control" of the Debtors under the statutory insider definition, see *PHS Group*, 581 B.R. at 31, as evidenced by Modi's controlling interest in the Debtors, "close relationship" with the Debtors, substantial "degree of . . . involvement" with the Debtors, and his ability to self-deal. *See In re TS Employment, Inc.*, 603 B.R. 700, 708 (Bankr. S.D.N.Y. 2019); First Amended Compl. ¶¶ 18, 61–91, 188–94. Therefore, the Trustee has pled sufficient facts to render the *in pari delicto* defense unavailable to Modi at this pleading stage.

## III. State Law Claims

Defendants also move to dismiss Counts One, Two, and Three (Breach of Fiduciary Duty); Count Four (Aiding and Abetting Breach of Fiduciary Duty (Modi)); and Counts Five, Six, and Seven (Corporate Waste) (collectively, the "State Law Claims").

### 1. Standing

As a preliminary matter, all Defendants argue that the Trustee does not have standing to bring the State Law Claims against them because the Trustee is pursuing these claims on behalf of a particular creditor, PNB, that suffered injury in the alleged Bank Fraud scheme.[38]

It is well established that a bankruptcy trustee "is empowered to pursue only those claims that properly belonged to the debtor before it entered bankruptcy." *See Picard v. JPMorgan Chase & Co.*, 460 B.R. 84, 91 (S.D.N.Y. 2011), *aff'd sub nom.*, *In re Bernard L. Madoff Inv. Securities LLC.*, 721 F.3d 54 (2d Cir. 2013). "It is well settled that a bankruptcy trustee has no standing generally to sue third parties on behalf of the estate's creditors, but may only assert

---

[38]    *See* Gandhi Memorandum at 6; Bhansali Memorandum at 9; Modi Memorandum at 9.

claims held by the bankrupt corporation itself." *Shearson Lehman Hutton, Inc. v. Wagoner*, 944

F.2d 114, 118 (2d Cir.1991) (citing *Caplin v. Marine Midland Grace Trust Co. of N.Y.,* 406 U.S.

416 (1972)); *see also Wornick v. Gaffney,* 544 F.3d 486, 490 (2d Cir. 2008); *Wight v.*

*BankAmerica Corp.,* 219 F.3d 79, 86 (2d Cir. 2000); *In re Mediators, Inc.,*105 F.3d 822 (2d Cir.

1997); *Hirsch v. Arthur Andersen & Co.,* 72 F.3d 1085, 1093 (2d Cir. 1995). This is because the

Trustee steps into the shoes of the debtor for the purpose of bringing property into the

bankruptcy estate and, as such, possesses only the rights of the debtor. *See Picard*, 460 B.R. at

91; 11 U.S.C. § 541(a)(1).

For reasons discussed above, the Court concludes that the Trustee has successfully pled

injuries incurred by the Debtors—not PNB—and such claims "properly belonged to the debtor

before it entered bankruptcy." *Picard*, 460 B.R. at 91. The Trustee sets forth numerous

allegations in the Amended Complaint that the Debtors were injured by Defendants' breaches of

fiduciary duty and commissions of corporate waste. These include, *inter alia*, depleting the

Debtors' assets through the Actual Fraudulent Transfers; impairing the Debtors' claims against

the U.S. Affiliates; increasing creditors' claims against the estate, causing the collapse and loss

of business of the Debtors and their companies; causing the estate to incur significant

administrative expenses from two separate examinations conducted by the Examiner and

Trustee; and expending the Debtors' assets in transactions with the Shadow Entities and for the

personal benefit of Modi and his family. *See* First Amended Compl. ¶¶ 198–232. Therefore, the

Trustee has standing to plead the State Law Claims against the Defendants. *See In re 1031 Tax*

*Group, LLC*, 420 B.R. 178, 195–96 (Bankr. S.D.N.Y. 2009) (distinguishing between injuries

sustained by customers from damages suffered by the debtors).

###### 2.   Statute of Limitations

Defendants next argue that the State Law Claims are time barred because most of the conduct complained of occurred outside of the applicable statute of limitations.[39]

But again as discussed above, the Trustee has alleged facts in connection with its RICO claim to assert equitable tolling, i.e., the adverse domination doctrine, through the Defendants' "domination and control" over the Debtors.  *See* First Amended Compl. ¶¶ 18, 61–91, 188–94; *Farmer*, 865 F. Supp. at 1151; *Banco De Desarrollo Agropecuario, S.A. v. Gibbs*, 709 F. Supp. 1302, 1310 (S.D.N.Y. 1989) (The "statute of limitations is tolled as against the control persons until the appointment of the independent trustee or liquidator.") (citing *Armstrong v. McAlpin,* 699 F.2d 79, 87 (2d Cir. 1983); *IIT, An International Investment Trust v. Cornfeld,* 619 F.2d 909, 929–30 (2d Cir. 1980); *Michelsen v. Penney,* 135 F.2d 409, 415–16 (2d Cir. 1943)).

The Trustee has alleged Defendants' "domination and control" over the Debtors through numerous examples.  *See, e.g.*, First Amended Compl. ¶¶ 61–91 (alleging the Defendants exercised oversight and control of the Shadow Entities and LOU Entities, exercised oversight and control over transactions between the Debtors and Shadow Entities, engaged in suspicious accounting, finance, and inventory practices).  The parties do not appear to dispute that a six-year statute of limitations applies to the Trustee's corporate waste claims.  *See* Modi Memorandum at 14; *Golden P. Bancorp v. F.D.I.C.*, 273 F.3d 509, 518 (2d Cir. 2001) (the statute of limitations in New York for corporate waste is six years) (citing *Blake v. Blake*, 638 N.Y.S.2d 632 (App. Div. 1st Dept. 1996)); N.Y. C.P.L.R. § 213(7) (McKinney) ("The following actions must be commenced within six years: an action by or on behalf of a corporation against a present or former director, officer or stockholder . . . to recover damages for waste . . . .").  But they do

---

[39]   *See* Gandhi Memorandum at 8; Bhansali Memorandum at 12, 26–27; Modi Memorandum at 12.

dispute whether a three- or six-year statute of limitations applies to the breach of fiduciary duty

claims.[40]  However, because the Trustee was not appointed until June 2018 and the original

complaint was filed in March 2019, the Trustee's State Law Claims are not time barred under

either the three-year or six-year limitations periods given these allegations of adverse

domination.  *See FDIC v. Pellatreau & Pellatreau*, 965 F. Supp. 381, 388–89 (E.D.N.Y. 1997)

(finding dismissal of the FDIC's causes of action is inappropriate where the allegations are

sufficient to allege adverse domination as a basis for equitable tolling); *Gibbs*, 709 F. Supp. at

1309–10 ("While a statute of limitations defense may be raised in a motion to dismiss[,] such a

motion should not be granted unless it appears to beyond doubt that the plaintiff can prove no set

of facts in support of his claim which would entitle him to relief.") (citing *Ortiz v. Cornetta*, 867

F.2d 146 (2d Cir. 1989)) (internal quotation marks omitted).  Therefore, the Trustee's State Law

Claims are not time barred.[41]

### 3.  Applicability of Rule 9(b)

Defendants Gandhi and Bhansali next argue that the State Law Claims should be

dismissed because the Trustee has failed to meet the heightened pleading requirements of Rule

---

[40]     *See* Gandhi Memorandum at 7; Bhansali Memorandum at 12; Modi Memorandum at 12.  Under New York
law, the applicable limitations period for breach of fiduciary depends on the substantive remedy that the plaintiff
seeks.  *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132, 139 (2009) (citing *Loengard v. Santa Fe
Indus.*, 70 N.Y.2d 262, 266 (1987)); *see, e.g., Yatter v. Morris Agency,* 682 N.Y.S.2d 198, 199 (App. Div. 1st Dept.
1998) (finding where the remedy sought is purely monetary in nature, courts construe the suit as alleging "injury to
property" within the meaning of N.Y. C.P.L.R. § 214(4), which has a three-year limitations period); *cf. Loengard,*
70 N.Y.2d at 266–267 (finding where the relief sought is equitable in nature, the six-year limitations period of N.Y.
C.P.L.R. § 213(1) applies).

[41]     Even if there were no allegations of adverse domination here, much of the conduct here is clearly timely
under either a three- or six-year statute of limitations.  The Trustee alleges many examples of conduct that occurred
just prior to the Debtors' bankruptcy filings in 2018.  *See, e.g.*, First Amended Compl. ¶ 176 (orchestrating Actual
Fraudulent Transfers of the Debtors' assets to Modi-Controlled Entities in the weeks leading up to the Debtors'
bankruptcy filing; *id.* ¶¶ 161, 177–87 (causing NMI and FDII to shop substantially all of their more than $40 million
in inventory to Modi-Controlled Entities overseas rather than using that inventory to repay the Debtors); *id.* ¶¶ 159–
60 (failing to disclose an $11.2 million loan owed by NMI to A. Jaffe).  The Court further notes that under Section
108 of the Bankruptcy Code, the Trustee is afforded an extra two years to commence actions that would have been
timely as of the bankruptcy petition date.  *See* 11 U.S.C. § 108(a).

9(b) of the Federal Rules of Civil Procedure.[42]  Specifically, they argue that the Trustee has

failed to allege that either defendant had the requisite knowledge of the fraudulent nature of the

acts and circumstances surrounding the different stages of the Bank Fraud scheme.[43]

The Court disagrees.  While "Rule 9(b) pleadings [generally] cannot be based upon

information and belief," *DiVittorio v. Equidyne Extractive Industries, Inc.*, 822 F.2d 1242, 1247

(2d Cir. 1987) (citing *Segal v. Gordon,* 467 F.2d 602, 608 (2d Cir. 1972)), the Second Circuit has

recognized an exception to this rule for defendants—like those here—who are insiders or have

control over the release of the necessary information, *see id.*; *Wexner v. First Manhattan Co.,*

902 F.2d 169, 172 (2d Cir. 1990) ("Where pleading is permitted on information and belief, a

complaint must adduce specific facts supporting a strong inference of fraud or it will not satisfy

even a relaxed pleading standard."); *Sunrise Industrial Joint Venture v. Ditric Optics, Inc.,* 873

F. Supp. 765, 772 (E.D.N.Y. 1995) ("Indeed, the particularity requirement of Rule 9(b) is

appropriately relaxed where the individual defendant is a corporate insider.").  Moreover, courts

have allowed bankruptcy trustees, as an outsider third-party, wider latitude when pleading fraud

in circumstances where the defendants are insiders or have control of the facts required by the

trustee.  *See White Metal Rolling and Stamping Corp. v. Drew Indus., Inc. (In re White Metal*

*Rolling and Stamping Corp.),* 222 B.R. 417, 428 (Bankr. S.D.N.Y. 1998) ("Since a bankruptcy

trustee rarely has personal knowledge of the events preceding his appointment, he can plead

fraud based upon information and belief provided he pleads the basis of his belief."); *see also*

*Atlanta Shipping Corp., Inc. v. Chemical Bank,* 631 F. Supp. 335, 348 (S.D.N.Y.1986), *aff'd* 818

F.2d 240 (2d Cir. 1987); *Hassett v. Zimmerman (In re O.P.M. Leasing Services, Inc.),* 32 B.R.

---

[42]     *See* Gandhi Memorandum at 11; Bhansali Memorandum at 19.

[43]     *See* Gandhi Memorandum at 12; Bhansali Memorandum at 20.

199, 203 (Bankr. S.D.N.Y. 1983) (*citing Schlick v. Penn-Dixie Cement Corp.,* 507 F.2d 374. 379

(2d Cir. 1974)); *Eisenberg v. Feiner (In re Ahead By A Length, Inc.),* 100 B.R. 157, 166 (Bankr.

S.D.N.Y. 1989).

The Trustee has alleged sufficient facts to justify the application of these relaxed pleading

rules here.  More specifically, the Trustee has alleged numerous examples demonstrating the

Defendants' knowledge of the fraudulent nature of the circular transactions.  *See, e.g.*, First

Amended Compl. ¶¶ 68–69 (Bhansali oversaw the creation and staffing of the Shadow Entities

and LOU Entities to perpetrate the fraud schemes and tracked the transactions on spreadsheets);

*id.* ¶ 81(ii) (Gandhi designed numerous circular transactions with Shadow Entities); *id.* ¶ 85

(Gandhi maintained two sets of books and records for A. Jaffe, one that included Shadow Entity

transactions and one that did not); *id.* ¶¶ 92–102 (Defendants repeatedly deceived auditors

inquiring about Shadow Entity transactions); *id.* ¶¶ 168–70 (Defendants made demonstrably

false statements to the Examiner).  Therefore, the Court holds that the Trustee has satisfied the

applicable pleading requirements of Rule 9(b) as to the Defendants for the fraud alleged here.[44]

### 4.    Fiduciary Duty Claims

### (i)    Whether a Duty is Owed to the Debtors

Two of the Defendants, Bhansali and Modi, challenge the Trustee's assertions that they

owed any fiduciary duties to the Debtors.[45]

---

[44]    In addition, there is authority for a lesser standard of pleading where—as here—there is a long history for the alleged fraudulent transactions.  *See A.I.A. Holdings, S.A. v. Lehman Brothers, Inc.,* 1998 WL 159059, *6 (S.D.N.Y. April 1, 1998) ("When the issues are complicated or the transactions cover a long period of time, courts tend to require less of the pleader.") (citing *In re Olympia Brewing Co. Secs. Litig.,* 674 F. Supp. 597, 620 (D. Ill. 1987)); *cf., Securities Inv'r Protec. Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293, 310–11 (Bankr. S.D.N.Y. 1999) (noting that a trustee is usually pleading fraud on secondhand knowledge for the benefit of the estate and its creditors).

[45]    *See* Bhansali Memorandum at 13–14; Modi Memorandum at 15.

Bhansali asserts that he owed a fiduciary duty to the parent corporation, Firestar

International Ltd. ("FIL"), but not to the Debtors as subsidiaries of the parent.  *See* Bhansali

Memorandum at 13–14.  It is true that, under New York and Delaware law,[46] "when one

company wholly owns another, the directors of the parent and the subsidiary are obligated to

manage the affairs of the subsidiary in the best interests only of the parent and its shareholders."

*Roselink Inv'rs, L.L.C. v. Shenkman*, 386 F. Supp. 2d 209, 215 (S.D.N.Y. 2004) (citing *Anadarko*

*Petroleum Corp. v. Panhandle Eastern Corp.,* 545 A.2d 1171, 1174 (Del. 1988)); *see also*

*Deangelis v. Corzine (In re MF Global Holdings Ltd. Investment Litig.)*, 998 F. Supp. 2d 157,

180 n.15 (S.D.N.Y. 2014) ("[T]he general rule is that directors and officers of a wholly owned

subsidiary . . . owe fiduciary duties only to the parent corporation, not to the subsidiary.") (citing

*Aviall, Inc. v. Ryder Sys., Inc.,* 913 F. Supp. 826, 832 (S.D.N.Y. 1996), *aff'd,* 110 F.3d 892 (2d

Cir. 1997)); *United States Small Bus. Admin. v. Feinsod*, 347 F. Supp. 3d 147, 160 (E.D.N.Y.

2018) (Under New York law, "[w]here . . . a corporation is a wholly-owned subsidiary, its

directors and officers owe their fiduciary duties to the parent corporation.").  But Bhansali's

argument fails because even the "directors of a wholly-owned subsidiary, who otherwise would

owe fiduciary duties only to the parent corporation, also owe fiduciary duties to creditors of the

subsidiary when the subsidiary enters 'the zone of insolvency.'"  *Shenkman*, 386 F. Supp. 2d at

215 (citing *Geyer v. Ingersoll Publications Co.,* 621 A.2d 784, 791 (Del. Ch. 1992); *In re Tronox*

*Inc.*, 450 B.R. 432, 438–39 (Bankr. S.D.N.Y. 2011) (citing *North Am. Catholic Educ.*

---

[46]    "Under New York law, the law of the state of incorporation governs an allegation of breach of fiduciary owed to a corporation [and an allegation of corporate waste]."  *Tese-Milner v. TPAC, LLC* (*In re Ticketplanet.com*), 313 B.R. 46, 62 (Bankr. S.D.N.Y. 2004) (citing *Diamond v. Oreamuno,* 24 N.Y.2d 494, 503–04 (1969)); *see also In re BP p.l.c. Derivative Litig.*, 507 F. Supp. 2d 302, 310 (S.D.N.Y. 2007) (citing *Hausman v. Buckley*, 299 F.2d 696, 698 (2d Cir. 1962) for the application of New York choice of law rules in the context of a corporate waste claim). Therefore, Delaware law governs the Trustee's claims for breach of fiduciary duty and corporate waste relating to debtors FDI and FI, and New York law governs these claims relating to debtor A. Jaffe.  *See* First Amended Compl. ¶ 608.

*Programming Found., Inc. v. Gheewalla,* 930 A.2d 92, 101–02) (Del. Sup. Ct. 2007). In short,

insolvent corporations can sue their officers and directors for breach of fiduciary duty. *See*

*Pereira v. Farace,* 413 F.3d 330, 342 (2d Cir. 2005) ("[B]reach of fiduciary duty claims belong

to the corporation [as opposed to the creditors].")); *In re Mediators,* 105 F.3d at 826–27;

*Magnesium Corp. of Am. v. Renco Grp., Inc. (In re Magnesium Corp. of Am.),* 399 B.R. 722, 760

(S.D.N.Y. 2009) ("'Put simply, when a director of an insolvent corporation, through a breach of

fiduciary duty, injures the firm itself, the claim against the director is still one belonging to the

corporation.'") (quoting *Prod. Res. Grp. L.L.C. v. NCT Grp., Inc.* 863 A.2d 772, 792 (Del. Ch.

2004)). As discussed above, the Trustee here has alleged that the Debtors have been insolvent

since August 2011, when the Actual Fraudulent Transactions commenced. *See* First Amended

Compl. ¶¶ 174(v), 55(i). More specifically, the Trustee alleges that "[t]he Debtors were

insolvent at the time each Actual Fraudulent Transaction occurred based on both the figures

reflected on their balance sheet and the substantial contingent liability they incurred in the course

of their involvement in the Bank Fraud," which dates back to August 2011. First Amended

Compl. ¶ 174(v); *see id.* ¶ 55(i).[47]

Moreover, Bhansali's argument fails for another reason. Directors' fiduciary duties are

limited to the parent only in the context of a parent and wholly owned subsidiary. *See Roselink*,

386 F. Supp. 2d at 219 n.3 (citing *Sinclair Oil Corp. v. Levien,* 280 A.2d 717, 720 (Del.1971)

("Where there are shareholders in addition to the parent company, both the directors of the

---

[47]     Bhansali further argues that, as to Debtor A. Jaffe, the Trustee failed to allege any damages flowing from
Bhansali's alleged breach. Bhansali Memorandum at 14. Specifically, Bhansali contends that the Trustee is
"stretch[ing] the damages" to include those arising from Bhansali's invoking his Fifth Amendment rights in his
deposition with the Examiner in the bankruptcy proceeding. *Id.* But as noted in Bhansali's own pleadings, the
Trustee has alleged a number of specific injuries after the bankruptcy was filed, including depleting the Debtors'
assets through Actual Fraudulent Transfers, delaying the Trustee's appointment and impairment of his ability to
recover, incurring administrative expenses due Bhansali's refusal to cooperate, and increasing creditors' claims
against the estate thereby causing the loss of value in the Debtors and their businesses. *Id.* at 14 n.4 (citing First
Amended Compl. ¶ 207); *see* Trustee Opposition to Bhansali at 17 n.6.

subsidiary and the parent company, as controlling shareholder, have a duty to consider the

interests of the minority shareholders."). Thus, to the extent that the Debtors are not all wholly

owned subsidiaries, Bhansali's argument fails.[48]

For his part, Modi argues that he owes no fiduciary duties as he is not a director, officer,

or person in control of the Debtors.[49] But "in the context of imposing fiduciary responsibilities,

it is well established in the corporate jurisprudence of Delaware that control exists when a

stockholder owns, directly or indirectly, more than half of a corporation's voting power."

*Weinstein Enters., Inc. v. Orloff*, 870 A.2d 499, 507 (Del. 2005) (citing *Paramount*

*Communications, Inc. v. QVC Network, Inc.,* 637 A.2d 34 (Del. 1994); *Citron v. Fairchild*

*Camera & Instrument Corp.,* 569 A.2d 53, 70 (Del. 1989); *Gilbert v. El Paso Co.,* 490 A.2d

1050, 1055 (Del. Ch. 1984)); *see also In re LMI Legacy Holdings, Inc.*, 2017 WL 1508606, at *7

(Bankr. D. Del. Apr. 27, 2017) ("Where New York law is not as robust as Delaware law

regarding matters of fiduciary duties, New York courts have looked to Delaware law for

guidance. The Delaware Court of Chancery has been notably direct in stating that '[a]

stockholder is controlling, and owes fiduciary duties to the other stockholders, if it owns a

majority interest in or *exercises control* over the business affairs of the corporation.'") (internal

citation and quotation marks omitted). The Trustee here has alleged that Modi is the controlling

shareholder of the Debtors through a web of corporations: Modi owns 94.88 percent of the shares

of FIL, which owns 100 percent of the shares of Firestar Holdings Ltd. ("FHL") and Firestar

Diamond International Private Ltd. ("FDIPL"). FHL owns 100 percent of the equity interests of

Synergies Corp. ("Synergies"), which owns 100 percent of Firestar Group, Inc. ("FGI"), which

---

[48]     The Trustee has alleged that an individual, Samuel Sandberg, owns five-percent stakes in debtors FDI and
A. Jaffe, while FDI owns 100-percent of debtor FI. *See* First Amended Compl. ¶¶ 6–10.

[49]     *See* Modi Memorandum at 15.

owns 95 percent of the equity interest in Debtor FDI.  Synergies owns 95 percent of the equity

interest in Debtor A. Jaffe.  *See* First Amended Compl. ¶¶ 6–16, 18.  While Modi also asserts

that the Trustee must show that he exercised "actual control" over the Debtors,[50] the Court

disagrees.  Such a requirement exists only where a stockholder owns less than a majority of a

corporation's voting shares.  *See Weinstein Enters.*, 870 A.2d at 507 (citing *Fairchild Camera &*

*Instrument Corp.,* 569 A.2d at 70; *Gilbert,* 490 A.2d at 1055; *Kahn v. Lynch Communication*

*Sys., Inc.,* 638 A.2d 1110, 1113–14 (Del.1994) (considering control of board as evidence of

control of business affairs); *Ivanhoe Partners v. Newmont Mining Corp.*, 535 A.2d 1334, 1344

(Del. 1987) ("Under Delaware law a shareholder owes a fiduciary duty only if it owns a majority

interest in or exercises control over the business affairs of the corporation.")).  But that is not the

situation here.

### (ii)  Other Arguments about Breach of Fiduciary Duty Claims

The Defendants argue that the Trustee fails to state a claim for breach of fiduciary duty,

specifically the duties of care and loyalty, owed to the Debtors.[51]

Under both New York and Delaware law,[52] directors owe fiduciary duties of care and

loyalty to shareholders and the entity itself; absent specific allegations that the directors breached

such duties, the business judgment rule of each state's law prevents a court from second guessing

such directors' business decisions.  *See Hughes v. BCI Int'l Holdings, Inc.,* 452 F. Supp. 2d 290,

308 (S.D.N.Y. 2006); *Gheewalla,* 930 A.2d at 101.

---

[50]     *See* Modi Memorandum at 15.

[51]     *See* Gandhi Memorandum at 10; Bhansali Memorandum at 14; Modi Memorandum at 17.

[52]     As noted *supra* note 39, New York or Delaware law applies here given that Debtors Firestar Diamond, Inc.
and Fantasy, Inc. are both Delaware corporations, while Debtor A. Jaffe is a New York corporation.  *See* First
Amended Compl. ¶¶ 6–8; Bhansali Memorandum at 8; Modi Memorandum at 1; Gandhi Memorandum at 10 n.6.

The duty of care generally "requires a director to perform his duties as a director in good faith and with that degree of care which an ordinarily prudent person in a like position would use under similar circumstances." *In re Sabine Oil & Gas Corp.*, 547 B.R. 503, 556 (Bankr. S.D.N.Y. 2016), *aff'd*, 562 B.R. 211 (S.D.N.Y. 2016) (citing *Gheewalla* 930 A.2d 92, 101; *Hughes,* 452 F.Supp.2d at 308); *see also In re Walt Disney Co. Deriv. Litig.,* 907 A.2d 693, 749 (Del. Ch. 2005) ("The fiduciary duty of due care requires that directors of a Delaware corporation use that amount of care which ordinarily careful and prudent men would use in similar circumstances, and consider all material information reasonably available in making business decisions, and that deficiencies in the directors' process are actionable only if the directors' actions are grossly negligent.") (internal quotation marks omitted).

The duty of loyalty "requires a director to subordinate his own personal interests to the interests of the corporation." *In re Sabine*, 547 B.R. at 556 (citing *Gheewalla,* 930 A.2d at 101; *Hughes,* 452 F.Supp.2d at 308); *see also Stone ex rel. AmSouth Bancorporation v. Ritter,* 911 A.2d 362, 370 (Del. 2006) (finding under Delaware law, the duty of loyalty requires an officer or director to (1) avoid fiduciary conflicts of interest and (2) act in good faith for the corporation's best interest); *CVC Claims Litig. LLC. v. Citicorp Venture Capital Ltd.,* 2007 WL 2915181, at *3 (S.D.N.Y. Oct. 3, 2007) ("A breach of loyalty claim requires some form of self-dealing or misuse of corporate office for personal gain."); *Joseph v. Frank (In re Troll Commc'ns),* 385 B.R. 110, 118 (Bankr. D. Del. 2008) (same).  To allege a breach of the duty of loyalty, the Trustee must "plead facts demonstrating that a majority of a board that approved the transaction in dispute was interested and/or lacked independence." *Continuing Creditors' Comm. Of Star*

*Telecomm. Inc. v. Edgecomb,* 385 F.Supp.2d 449, 460 (D. Del. 2004) (citing *Orman v. Cullman,*

794 A.2d 5, 23 (Del. Ch. 2002)).[53]

Gandhi asserts that he can be liable for a breach of fiduciary duty only where he had

"'discretionary authority in the relevant functional area and the ability to cause or prevent the

complained-of action.'"  Gandhi Memorandum at 12 (quoting *Pereira v. Cogan*, 294 B.R. 449,

522 (S.D.N.Y. 2003); *see also Gold v. Sloan,* 486 F.2d 340, 351 (4th Cir. 1973) (officers who

lack "the slightest connection" with events in question or ability to meaningfully participate

should not be considered officers for liability purposes); *Colby v. Klune,*178 F.2d 872, 873 (2d

Cir. 1949) ("It is immaterial how [an officer's] functions are labeled or how defined in the by-

laws or that he does or does not act under the supervision of some other corporate

representative."); *Schimmel v. Goldman,* 57 F.R.D. 481, 485–86 (S.D.N.Y. 1973)

(acknowledging that defendant might argue that "although given the title of an officer, he did not

perform the policy making functions or have access to inside information which characterize an

'officer'").  As it was Modi who had "omnipresent oversight and control" over the Debtors,

Gandhi argues that he should not be held liable for acting at the direction of his boss.[54]

But Gandhi conveniently ignores the full scope of the allegations in the Amended

Complaint.  The Trustee has alleged that Gandhi, as Chief Financial Officer of the Debtors,

carried the responsibility and authority consistent with his title.  More specifically, the Trustee

has alleged that Gandhi controlled the finances of the Debtors, had authority to approve

transactions between entities in the Firestar network, was a signatory of each of the U.S. Entities'

---

[53]      To assert a breach of fiduciary duty, "New York law [also] requires damages directly caused by the defendant's misconduct."  *Picard v. Madoff (In re Bernard L. Madoff Inv. Sec. LLC),* 458 B.R. 87, 127 (Bankr. S.D.N.Y. 2011); *see also In re Perry H. Koplik & Sons, Inc.,* 499 B.R. 276, 289 (S.D.N.Y. 2013) (quoting *Rut v. Young Adult Inst., Inc.,* 901 N.Y.S.2d 715, 717 (App. Div. 2d Dept. 2010) (internal citation omitted)), *aff'd,* 567 F. App'x 43 (2d Cir. 2014).

[54]      Gandhi Memorandum at 12–13 (quoting First Amended Compl. ¶ 189).

bank accounts, was authorized to effectuate transfers from these accounts, maintained the

Debtors' books and records, and managed external audits of the Debtors. *See* First Amended

Compl. ¶¶ 65, 85, 92–102, 195–96. That the Trustee alleges that Modi exercised control of the

Debtors "does not mean that other individuals or entities did not also control key aspects of the

business." *In re TS Employment, Inc.*, 603 B.R. at 711 (citing *In re Bernard L. Madoff*, 458 B.R.

at 124 (concluding that the complaint adequately alleged defendants in senior management

positions were insiders for imputation purposes, notwithstanding defendants' contentions that

Bernard Madoff controlled all aspects of the fraud)); *see also In re Felt Mfg. Co., Inc.*, 371 B.R.

589, 612 (Bankr. D.N.H. 2007) (finding allegations that individual was Chapter 11 debtor's CFO,

coupled with allegations regarding debtor's financial reporting problems or errors, alleged illegal

dividends, and CFO's admissions to other directors stated a plausible claim for breach of

fiduciary duty under New Hampshire law). Here, "although [Modi] may have been in total

control of [the Debtors], [Gandhi] still could have exercised control over the financial reporting

systems and accounting decisions, and acted with complete autonomy." *In re TS Employment,

Inc.*, 603 B.R. at 711. Therefore, the Trustee has adequately alleged that Gandhi had the

requisite authority to be held liable as an officer of the Debtors for breach of fiduciary duty.

Bhansali challenges the Trustee's breach of fiduciary duty claim on several other

grounds. First, Bhansali states that the Trustee has not shown that he engaged in self-dealing or

misuse of corporate office in alleging a breach of duty of loyalty.[55] *See CVC Claims Litig. LLC.,*

2007 WL 2915181, at *3 ("A breach of loyalty claim requires some form of self-dealing or

misuse of corporate office for personal gain."); *see also In re Troll Commc'ns,* 385 B.R. at 118

(same); *In re IT Group Inc.*, 02-10118, 2005 WL 3050611, at *8 n.10 (D. Del. Nov. 15, 2005)

---

[55]      *See* Bhansali Memorandum at 15–16.

("[I]n the absence of facts showing self-dealing or improper motive, a corporate officer or director is not legally responsible to the corporation for losses that may be suffered as a result of a decision that an officer made or that directors authorized in good faith.") (quoting *Gagliardi v. TriFoods Int'l, Inc.,* 683 A.2d 1049, 1051 (Del. Ch. 1996)).   As a threshold matter, Bhansali's argument fails because the Trustee actually has alleged such self-dealing here: the Trustee contends that Bhansali, his wife's companies, and family trust received "millions" of dollars from Nirav Modi, Purvi Mehta, and various Modi-Controlled Entities.  *See* First Amended Compl. ¶¶ 30, 133–41.   Moreover, Bhansali interprets the duty of loyalty too narrowly. Although self-dealing is a classic example of a breach of duty of loyalty, the absence of self-dealing does not mandate dismissal because a duty of loyalty claim encompasses other "situations in which a fiduciary's personal interest possibly conflicts with the interest of those owed a fiduciary duty."  *Birnbaum v. Birnbaum*, 73 N.Y.2d 461, 466 (1989) (citing *In re Ryan's Will*, 291 N.Y. 376, 407 (1943)).   In fact, the Trustee has set forth numerous allegations that Bhansali breached his duty of loyalty owed to the Debtors.   These allegations include Bhansali orchestrating Actual Fraudulent Transactions, his failure to call due an $11.2 million loan balance owed by NMI to A. Jaffe, his actions to cause NMI and FDII to ship their inventory to Modi-Controlled Entities overseas out of the reach of Debtors' avoidance actions, and—last but not least—his personally profiting from the proceeds of the Bank Fraud.  *See* First Amended Compl. ¶¶ 161, 175, 206.

Second, Bhansali asserts that the Trustee's allegations that Bhansali allowed Modi to usurp his management responsibilities, that Bhansali caused the Debtors to participate in the Bank Fraud, that he depleted the Debtors' assets, and that he impaired the Trustee's ability to investigate and recover assets all fail.  *See* Bhansali Memorandum at 16–19.  Bhansali argues

that these allegations fail because he acted at the direction of Modi, he does not owe a duty to the

Trustee, the allegations fail to link Bhansali to the Bank Fraud, or the allegations fall short of the

pleading standard.  *See* Bhansali Memorandum at 16–19.  But as discussed above, the allegations

against Modi do not necessarily absolve Bhansali for purposes of a motion to dismiss.  So while

the Trustee can and has sued Modi, "[u]nder the Bankruptcy Code the trustee stands in the shoes

of the bankrupt corporation and has standing to bring any suit that the bankrupt corporation

could have instituted had it not petitioned for bankruptcy."  *Wagoner*, 944 F.2d at 118 (citing

*Caplin v. Marine Midland Grace Trust Co.,* 406 U.S. 416, 429 (1972); *see also* 11 U.S.C. §§

541, 542.  As explained above, the Trustee here has plausibly alleged numerous examples of how

Bhansali coordinated and participated in the numerous Actual Fraudulent Transactions in

contravention to his fiduciary duties to the Debtors.  *See* First Amended Compl. ¶¶ 63, 67–102

(alleging how Bhansali used his position as director of each of the U.S. Entities and CEO of the

Debtors, Synergies, FGI, and NMI to coordinate and direct fraudulent transactions among the

U.S. Entities, Shadow Entities, and other Modi-Controlled Entities involving hundreds of

millions of dollars in funds and diamonds).[56]

---

[56]      Bhansali also raises various factual disputes that are not ripe at the pleading stage.  For example, the
Amended Complaint alleges that "[u]pon information and belief, the M.R. Family Trust received INR [Indian
Rupees] 32.83 crore [crore translates to 10 million in English] (approximately $4.57 million) from DRUS
[Diamonds 'R' Us] in fiscal year 2011-2012" for the benefit of Mr. Bhansali and his family.  First Amended Compl.
¶ 130.  Bhansali disputes this allegation, stating that bank statements for the M.R. Family Trust from the period of
May 31, 2007 through March 31, 2018 "conclusively establishes that there was no such transfer of $4.57 million to
the M.R. Family Trust account at any time."  Bhansali Memorandum at 16; Sullivan Decl. ¶ 4, Ex. C [ECF No. 40].
But as the Trustee points out, this merely raises a factual dispute as to the duty of loyalty claim that is not ripe at this
stage of the proceedings.  Similarly, Bhansali's argument that the Actual Fraudulent Transfers are nothing more than
"everyday business transactions" and, thus, that the Trustee fails to allege any wrongdoing associated with its duty
of care claim, Bhansali Memorandum at 18, also raises a factual dispute.  Additionally, Bhansali asserts that the
Actual Fraudulent Transfers were "linked to or supporting the Bank Fraud," and, thus, "were never properly assets
of the Debtors."  *Id.* at 19.  Besides being a factual dispute not ripe at this stage, this argument also mischaracterizes
the Trustee's allegation that these were transfers "of property of the Debtors derived from or subsequently
transferred to a Shadow Entity or LOU Entity."  First Amended Compl. ¶ 173.

Accordingly, the Trustee has adequately pled that the Defendants breached their fiduciary duties to the Debtors.[57]

### 5.   Corporate Waste

Lastly, Defendants argue that the Trustee fails to state a claim for corporate waste, focusing largely on the creation of the Ithaca Trust and the transactions surrounding the purchase of the Essex House and Ritz Carlton apartments.[58]

"[T]he essence of waste is the diversion of corporate assets for improper or unnecessary purposes."  *Geltzer v. Bedke (In re Mundo Latino Mkt.)*, 590 B.R. 610, 619 (Bankr. S.D.N.Y. 2018) (internal citations omitted); *see also Aronoff v. Albanese*, 446 N.Y.S.2d 368, 370 (N.Y. App. Div. 2d Dept. 1982).  Notably, the standards for stating a claim of waste under New York and Delaware law are substantially the same.[59]  *See United States SBA v. Feinsod*, 347 F. Supp.

---

[57]      Modi's arguments as to fiduciary duties actually relate more to the Trustee's corporate waste allegations. For example, his arguments focus on the formation of the Ithaca Trust and the purchase of the Essex House and Ritz Carlton apartments.  *See* Modi Memorandum at 17–18; *Hanson Tr. PLC v. ML SCM Acq., Inc.*, 781 F.2d 264, 279 n.9 (2d Cir. 1986) ("[A] prima facie showing of lack of due care is distinct from a prima facie showing of corporate waste, which may constitute a cause of action against directors separate and distinct from breach of the duty of loyalty or due care.").  As Modi does not challenge the substance of the fiduciary duty allegations, the Court addresses Modi's arguments on these issues in the discussion of corporate waste below.

Modi similarly does not challenge the substance of Count Four in the Amended Complaint for aiding and abetting Bhansali's and Gandhi's breach of fiduciary duty, except to the extent that the claims are time-barred, lack a proper factual basis, and are derivative of Bhansali's and Gandhi's breach of fiduciary duty.  *See* Modi Memorandum at 11.  Because the Court has determined that Bhansali and Gandhi owed fiduciary duties to the Debtors and the breach of fiduciary claims are not time-barred, the Trustee states a valid claim for aiding and abetting breach of fiduciary duty.

[58]      *See* Gandhi Memorandum at 13; Bhansali Memorandum at 20; Modi Memorandum at 17.

[59]      Unlike New York, there is authority that a claim for waste under Delaware law "will not lie against an officer as only directors may be liable for waste under Delaware law."  *Sama v. Mullaney (In re Wonderwork, Inc.)*, 611 B.R. 169, 208 (Bankr. S.D.N.Y. 2020) (citing *Giuliano v. Schnabel (In re DSI Renal Holdings, LLC)*, 574 B.R. 446, 476 (Bankr. D. Del. 2017)).  *DSI Renal Holdings*, in turn, cites the Supreme Court of Delaware's opinion in *Walt Disney Co. Derivative Litig.*, which provides that a claim of waste will arise only in the rare, "unconscionable case where *directors* irrationally squander or give away corporate assets."  *In re Walt Disney Co. Derivative Litig.*, 906 A.2d at 74 (emphasis added) (citing *Brehm v. Eisner*, 746 A.2d 244, 263 (Del. 2000)).  "The *Walt Disney* case does not discuss whether corporate waste claims may be brought against officers or controlling shareholders because the plaintiff in *Walt Disney* only asserted claims against directors who served at the time of the events in question."  *DSI Renal Holdings*, 574 B.R. at 476.  To date, no Delaware court has determined whether officers or controlling shareholders could be liable for corporate waste.  *See id.* at 476 n.92.  In the First Amended Complaint, the Trustee

3d 147, 166 n.18 (E.D.N.Y. 2018).  Under New York law, waste occurs when "assets are used in

a manner 'so far opposed to the true interests [of the corporation so] as to lead to the clear

inference that no one thus acting could have been influenced by any honest desire to secure such

interests.'"  *Patrick v. Allen*, 355 F. Supp. 2d 704, 715 (S.D.N.Y. 2005) (quoting *Meredith v.

Camp Hill Estates, Inc.*, 430 N.Y.S.2d 383, 386 (App. Div. 2d Dept. 1980)).  In other words,

New York's business judgment rule dictates that a court defers to the decisions of a corporation's

directors unless fraud, self-dealing, or bad faith is alleged.  *See Stern v. Gen. Elec. Co.*, 924 F.2d

472, 476 (2d Cir. 1991).  Under Delaware law, a Plaintiff must show that the challenged

transaction was "so one sided that no business person of ordinary, sound judgment could

conclude that the corporation has received adequate consideration."  *In re Walt Disney Co.

Derivative Litig.*, 906 A.2d at 74 (quoting *Brehm*, 746 A.2d at 263).

   The Trustee alleges that Defendants committed corporate waste by both "directing the

Debtors and their officers to use corporate assets to acquire properties for the personal benefit of

Modi and his family or by facilitating or permitting such use" and "engag[ing] in transactions

with Shadow Entities and other Modi-Controlled Entities that served no legitimate corporate or

economic purpose" while the Debtors were insolvent.  First Amended Compl. ¶¶ 220, 225, 230;

*see also id.* ¶¶ 81–82, 173–176.  As noted, Defendants focus the majority of their arguments on

the Trustee's allegations concerning the Ithaca Trust, Essex House apartment, and Ritz Carlton

apartment; they assert that the Amended Complaint fails to allege that these transactions did not

serve a business purpose, that the corporation did not receive adequate consideration, or that the

---

alleges only that Gandhi was an officer of the Debtors.  *See* First Amended Compl. ¶¶ 228–32.  But Gandhi has not
raised this issue as a basis for dismissal of this Count.

Debtors or their assets were even involved in the transactions.[60]  The Trustee responds that the

corporate waste claim "is not based on the Ithaca Trust's purchase of the Ritz Carlton Apartment,

nor the assignment of Nirav Modi's loan to Synergies to Purvi Mehta," nor is it based on the

transactions concerning the Essex House Apartment, but instead is based on the Actual

Fraudulent Transfers to Shadow Entities or other Modi-Controlled Entities for inadequate or no

consideration while the Debtors were insolvent.  Trustee's Opposition to Bhansali at 23, n.7;

Trustee's Opposition to Modi at 14.  Indeed, the Amended Complaint does not list these specific

properties, but rather alleges that in addition to the Actual Fraudulent Transactions and

Subsequent Transfers discussed above, the Defendants directed the acquisition of properties

using corporate assets for the personal benefit of Modi and his family.  First Amended Compl. ¶¶

220, 225, 230.  The allegations as to the Actual Fraudulent Transfers alone are a sufficient basis

for a claim for corporate waste because they involve a diversion of assets from the Debtors to

U.S. affiliates, Shadow Entities, and other Modi-Controlled Entities.  Such transactions could be

reasonably characterized under the standards of Delaware and New York law as so one-sided as

to defeat the business judgment rule or as sufficiently opposed to the corporation's true interests.

*See Camp Hill Estates*, 430 N.Y.S.2d at 386; *Eisner*, 746 A.2d at 263.  Accordingly, the

Trustee's claims survive the Defendants' motions to dismiss.  The Court has considered the

parties' other arguments not specifically addressed in this Decision and concludes that they

either are mooted by the other holdings in the Decision or lack merit.

---

[60]     *See* Gandhi Memorandum at 14–15 & n.9; Bhansali Memorandum at 22–26; Modi Memorandum at 17–18.
Bhansali further contends that the Trustee failed to allege that Bhansali had any knowledge of, responsibility for, or
benefited personally from, the fraudulent transfers, Bhansali Memorandum at 22–26; however, as discussed *supra*,
the Trustee adequately alleged that Defendants exercised direct oversight and control over each Actual Fraudulent
Transaction and that Defendants possessed the requisite knowledge that the fraudulent transfers represented the
proceeds of specified unlawful activity.  *See* First Amended Compl. ¶¶ 81, 173–76, 272.

## IV. Sanctions Motion

In addition to seeking dismissal, Defendant Bhansali filed the Sanctions Motion against the Trustee seeking sanctions under Rule 11 of the Federal Rules of Civil Procedure, or, in the alternative, an order striking certain allegations in the Amended Complaint.  *See* Memorandum of Law in Support of Defendant Mihir Bhansali's Motion for Rule 11 Sanctions or to Strike Certain Pleadings at 1 (the "Sanctions Memorandum") [ECF No. 59].[61]  Bhansali argues that the Trustee should be subject to Rule 11 sanctions for making three allegations that are purportedly false, unfounded, or intentionally misleading: (1) that the purchase of Bhansali's New York apartment was funded by proceeds from the Bank Fraud wired by Purvi Mehta; (2) that a trust set up to benefit the Bhansali family received funds from an entity involved in the Bank Fraud, and (3) that Bhansali was involved in extortion, bribery, threats to kill, and destruction of evidence.  *See* Sanctions Memorandum at 6–11.

### 1.  Rule 11

The purpose of Rule 11(b) is to ensure that a written motion presented to the court is formed after an "inquiry reasonable under the circumstances."  Fed. R. Civ. P. 11(b).  Further, the rule seeks to ensure that representations to the court are not made for an "improper purpose," *see* Fed. R. Civ. P. 11(b)(1), that the claims and contentions are warranted by existing law and constitute a nonfrivolous argument, *see* Fed. R. Civ. P. 11(b)(2), and that they have or will have (after further inquiry) evidentiary support, *see* Fed. R. Civ. P. 11(b)(3).

Rule 11 provides examples of improper purposes, stating that complaints are filed improperly if they "harass, cause unnecessary delay, or needlessly increase the cost of litigation."

---

[61]    At the hearing on the Sanction Motion, the Court gave its preliminary thoughts that the Sanctions Motion was not well founded and unquestionably premature, but did not formally rule on the motion.  *See* Hr. Tr. 107:24–109:17, Apr. 30, 2020.

Fed. R. Civ. P. 11(b)(1).  Practically, complaints are only improper if they "utterly lack support." *In re September 11th Liab. Ins. Coverage Cases*, 243 F.R.D. 114, 124 (S.D.N.Y. 2007).  While the "improper purpose" and "frivolousness" inquiries are separate and distinct, they often overlap, and courts have found that a complaint is not filed for an improper purpose if it is nonfrivolous.  *Sussman v. Bank of Israel*, 56 F.3d 450, 458–59 (2d Cir. 1995) (quoting *Townsend v. Holman Consulting Corp.*, 929 F.2d 1358, 1362 (9th Cir. 1990)).

If a court determines that Rule 11(b) was violated, it may impose sanctions under Rule 11(c).  *See* Fed. R. Civ. P. 11(c).  Sanctions are not warranted for a nonfrivolous complaint even if one of the purposes for filing it may be considered improper: "A party should not be penalized for or deterred from seeking and obtaining warranted judicial relief merely because one of his multiple purposes in seeking that relief may have been improper."  *Id* at 459.  Indeed, sanctions are appropriate only where "it should have been patently obvious to any attorney who had familiarized himself [or herself] with the law" that the action was frivolous.  *Four Keys Leasing & Maint. Corp. v. Simithis*, 849 F.2d 770, 773 (2d Cir. 1988); *see also Healey v. Chelsea Res., Ltd.*, 947 F.2d 611, 626 (2d Cir. 1991) (noting it must be "patently clear that a claim ha[d] absolutely no chance of success"); *Galin v. Hamada*, 283 F. Supp. 3d 189, 201 (S.D.N.Y. 2017) (a court should only impose sanctions under Rule 11(c) for a violation of Rule 11(b) "where an attorney's conduct was objectively unreasonable.") (citing *Storey v. Cello Holdings, L.L.C.*, 347 F.3d 370, 387 (2d Cir. 2003)).[62]

---

[62]    Moreover, Rule 11 contains a "safe harbor" provision which is not at issue here.  "When Rule 11 sanctions are initiated by the motion of a party, it gives the subject the opportunity to withdraw the potentially offending statements before the sanctions motion is officially filed."  *See Storey v. Cello Holdings, L.L.C.*, 347 F.3d 370, 389 (2d Cir. 2003) (citing Fed. R. Civ. P. 11(c)(1)(A) (providing a "safe harbor" by requiring the motion for sanctions to be served twenty-one days before it can be filed with the court).

In considering a Rule 11 motion, the Court is mindful that allegations made upon information and belief when the defendant has near exclusive control over the evidence do not need to be plead specifically, even with allegations relating to fraud. *See IUE AFL-CIO Pension Fund v. Herrman*, 9 F.3d 1049, 1057 (2d Cir. 1993) ("[A]llegations may be based on information and belief when facts are peculiarly within the opposing party's knowledge.") (internal quotation marks omitted) (quoting *Wexner,* 902 F.2d at 172).

The Court examines each of Bhansali's three arguments under these standards.

### (i)    The Apartment Purchase and Purvi Mehta Wire

Bhansali argues that the Trustee's allegations surrounding the source of funding for Bhansali's apartment, located at 50 Riverside Blvd., New York, NY (the "Apartment"), are without basis, asserting that there is "incontrovertible" proof that the apartment purchase was "not in any way connected to [the Bank Fraud]." Hr. Tr. 97:8–9, Apr. 30, 2020; *see* Sanctions Memorandum at 6; First Amended Compl. ¶¶ 138–40. Furthermore, even if there was a basis at the outset for these allegations based on similar claims by the Indian government in a separate proceeding, Bhansali argues that the Trustee's continued pursuit of these claims is sanctionable now that the Indian government has "abandoned" such allegations in its investigation. Hr. Tr. 97:1–2, Apr. 30, 2020; Sanctions Memorandum at 7–8.

In response, the Trustee asserts that the allegations about the source of funds to purchase the Apartment are based on evidence of the following chain of events: (1) less than two weeks before the sale close, Purvi Mehta transferred $1.5 million to the Bhansalis' jointly owned checking account, (2) the Bhansalis then made subsequent transfers between two of their savings accounts; (3) the Bhansalis held $50,000 of "side collateral" from these funds to secure a loan from HSBC; (4) the Bhansalis then transferred $650,000 back to their checking account; and (5)

the Bhansalis, funded in part by these funds, used money from the same checking account to purchase the Apartment.  *See* Trustee's Opposition to Defendant Mihir Bhansali's Motion for Rule 11 Sanctions or to Strike Certain Pleadings at 8 (the "Sanctions Opposition") [ECF No. 60]; *id.* at Ex. A (the Bhansalis' HSBC bank statements); Hr. Tr. 102:23–103:5, Apr. 30, 2020.  In further support of its position, the Trustee notes that Purvi Mehta's role in laundering activities is set forth in the Amended Complaint and allegations in a separate adversary proceeding commenced against members of the Modi family and certain entities they owned or controlled. Sanctions Opposition at 8–9; First Amended Compl. ¶¶ 123–28; Hr. Tr. 104:3–11, Apr. 30, 2020.  Moreover, the Trustee details Bhansali's participation in the fraud scheme throughout the Amended Complaint, which further supports its allegations—made on information and belief— that fraud proceeds were used to purchase the Apartment.  Sanctions Opposition at 9; *see* First Amended Compl. at ¶¶ 68, 75–79, 106–24, 264–65.  The Trustee also disputes the suggestion that the Indian Enforcement Directorate "abandoned" this claim.  Sanctions Opposition at 7–8. The Trustee notes that the Indian authorities are not required to trace the source of the funds for the Apartment purchase in order to attach the funds under Indian law, thus making this allegation unnecessary.  *Id.*

The Court agrees that the detailed allegations surrounding Purvi Mehta's role in laundering the proceeds of the Bank Fraud, the allegations set forth in the complaint concerning Bhansali's participation in the fraud scheme, and the involvement of both these individuals in the specific bank transfers outlined here, provide sufficient support for the allegations to overcome a sanctions motion under Rule 11.  Moreover, the Trustee's allegations are made upon information and belief and do not need to be plead specifically.  *See Herrman*, 9 F.3d at 1057.  Accordingly, the Court concludes that these allegations do not "utterly lack support" and are not sanctionable.

*See In re September 11th Liab.*, 243 F.R.D at 124.  Given the information presented by the

Trustee, it is objectively reasonable to believe that the Trustee is "'likely to have evidentiary

support after a reasonable opportunity for further investigation or discovery[.]'" *Lan v. Time

Warner, Inc.*, 2016 WL 6778180 at *8 (S.D.N.Y. Oct. 18, 2016).

### (ii)  The M.R. Family Trust

Bhansali complains that the Trustee's allegations about transfers of money to the M.R.

Family Trust, a trust set up for the benefit of Bhansali and his family, are unfounded, *see* First

Amended Compl. ¶ 130, arguing that the trust never received a transfer of $4.7 million from

Diamonds 'R' Us, an LOU Entity allegedly involved in the Bank Fraud.  *See* Hr. Tr. 97:21–98:1,

Apr. 30, 2020; Sanctions Memorandum at 8; First Amended Compl. ¶¶ 129–30.  Bhansali asserts

that the M.R. Family Trust's bank statements establish that this money was never received, and

that the Trustee is inappropriately relying on a different ledger for proof of this transfer in the

face of the clear contrary evidence of the trust's bank statements.  *See* Hr. Tr. 98:1–11, Apr. 30,

2020; Sanctions Memorandum at 8–9.

But the Trustee correctly argues that he is not required to provide detailed evidentiary

substantiation in the complaint.  *See* Hr. Tr. 101:5–9, Apr. 30, 2020.  Despite this, it nonetheless

points to an auto-saved spreadsheet recovered from Bhansali's computer.  *Id.* at 104:22.  The

Trustee contends that the presence of terms in the spreadsheet such as "cashflow" and

"withdrawals" suggest a physical transfer of money and has reproduced a copy of the

transactions in its opposition.  *See id.* at 104:23–105:17; Sanctions Opposition at 11.

Like the allegations regarding the Apartment purchase, the allegations relating to the

M.R. Family Trust are not sanctionable. The Trustee has provided a sufficient basis for its

allegations, namely the auto-saved spreadsheet.  Combined with the circumstantial allegations

based upon information and belief, this is sufficient at this stage of the proceeding for those

allegations. *See Herrman*, 9 F.3d at 1057.

### (iii) Conduct Following the Discovery of Fraud

Lastly, Bhansali challenges some of the allegations made in paragraph 151 of the

Amended Complaint, specifically claiming that the Trustee wrongfully relies on witness

statements from the Indian proceedings in making allegations that Bhansali threatened to commit

murder, committed bribery and extortion, and destroyed evidence.[63]  *See* Hr. Tr. 99:4–9, Apr. 30,

2020; First Amended Compl. ¶ 151.  Bhansali argues that these allegations would be highly

prejudicial if the matter were to proceed to trial.  Hr. Tr. 100:5–7, Apr. 30, 2020.

The Court acknowledges the seriousness of these allegations and recognizes that they

may reflect poorly on Bhansali.  But they are not "utterly baseless" for Rule 11 purposes at this

stage of the proceedings.  The Trustee relies on the Indian Enforcement Directorate's

investigative findings "implicat[ing] Bhansali in efforts to threaten witnesses, induce false

testimony, and remove assets."  *See* Sanctions Opposition at 14–15.  The Trustee is entitled to

base the Amended Complaint on "statements of witnesses, reports of their investigators and

hearsay reports and statements of others until such time, if ever, as they are satisfied that the

statements and other evidence are not competent or are otherwise untrustworthy."  *In re Air*

*Disaster at Lockerbie, Scotland, On Dec. 21, 1988*, 144 F.R.D. 613, 617 (E.D.N.Y. 1992) (citing

*Oliveri v. Thompson*, 803 F.2d 1265, 1279 (2d Cir. 1986) ("A plaintiff does not have to be

prepared to meet a summary judgment motion as soon as the complaint is filed."); *Samuels v.*

---

[63]     At oral argument, the Trustee clarified that these allegations relate to conduct after the fraud was discovered and are again based upon information and belief that Mr. Bhansali may have directed or coordinated with other actors, namely Modi and Nehal Modi.  *See* Hr. Tr. 106:7–23, Apr. 30, 2020.

*Wilder,* 906 F.2d 272, 274 (7th Cir. 1990) ("Counsel must investigate, but need not have in hand

before filing enough proof to establish the case.")).[64]

### 2.   Rule 12(f)

In the alternative, Bhansali moves to strike these same allegations under Rule 12(f) of the

Federal Rules of Civil Procedure, invoking the Court's discretion to strike certain "scandalous"

pleadings.  Sanctions Memorandum at 11–12.

Under Rule 12, a court may strike from a pleading any "redundant, immaterial,

impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  "A scandalous allegation is one that

reflects unnecessarily on the defendant's moral character, or uses repulsive language that detracts

from the dignity of the court."  *Cabbie v. Rollieson*, 2006 WL 464078, at *11 (S.D.N.Y. Feb. 27,

2006).  The decision to strike allegations is well within the discretion of the trial court.

*Hollander v. American Cyanamid Co.*, 172 F.3d 192, 198 (2d Cir. 1999).  "[M]otions to strike

are viewed with disfavor and infrequently granted."  *In re Merrill Lynch & Co., Research*

*Reports Sec. Litig.*, 218 F.R.D. 76, 78 (S.D.N.Y. 2003).  In general, "the courts should not

tamper with the pleadings unless there is a strong reason for doing so."  *RSM Prod. Corp. v.*

*Fridman*, 643 F. Supp. 2d 382, 394 (S.D.N.Y. 2009) (internal citations omitted), *aff'd*, 387 F.

App'x 72 (2d Cir. 2010).

"On a motion to strike, however, '[i]t is not enough that the matter offends the

sensibilities of the objecting party if the challenged allegations describe acts or events that are

---

[64]    In reaching its conclusions, the Court takes note that Bhansali invoked his Fifth Amendment right when
questioned about his communications with Modi during the sale process of the Debtors' assets in this bankruptcy
case, one of the central facts that led to the appointment of a Chapter 11 Trustee.  *See* Order Directing the
Appointment of a Chapter 11 Trustee [ECF No. 227, Case No. 18-10509]; *cf. MacKay v. Drug Enf't Admin.*, 664
F.3d 808, 820 (10th Cir. 2011) (citing *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) ("[T]he Fifth Amendment
does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative
evidence offered against them. . . .")).  The Court reserves decision on the issue of whether these allegations are
unduly prejudicial for trial until an appropriate date in the future.

relevant to the action.'" *Lynch v. Southhampton Animal Shelter Found. Inc.,* 278 F.R.D. 55, 64–65 (E.D.N.Y.2011) (quoting 5C Fed. Prac. & Proc. Civ. § 1382 (3d ed. 2011)).  Thus, to prevail on a motion to strike, the movant must show "(1) no evidence in support of the allegations would be admissible; (2) the allegations have no bearing on the relevant issues; and (3) permitting the allegations to stand would result in prejudice to the movant." *Roe v. City of New York*, 151 F. Supp. 2d 495, 510 (S.D.N.Y. 2001).  As noted at the hearing on this motion, the allegations contained in the Amended Complaint are "very serious" and are the subject of much disagreement between the parties.  *See* Hr. Tr. 109:11–12, Apr. 30, 2020.  But that is to be expected in a complaint alleging such a massive fraud.  Given the Court's rulings above regarding relief based on Rule 11 and the stringent standard for motions to strike, the Court declines to strike these allegations.

## CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss are denied and Bhansali's Sanctions Motion is denied.  The Trustee is directed to settle an order on five days' notice and contact the Court to schedule a pre-trial conference within 30 days of this Decision.  The proposed order must be submitted by filing a notice of the proposed order on the Case Management/Electronic Case Filing docket, with a copy of the proposed order attached as an exhibit to the notice.  A copy of the notice and proposed order shall also be served upon counsel to all of the Defendants.

Dated: October 15, 2021
      New York, New York

                              */s/ Sean H. Lane*
                              UNITED STATES BANKRUPTCY JUDGE