**<u>Exhibit B</u>**

Selected Docket Entries
(Complaint, Summons, Response Deadline Order, Amended Complaint, MTD Decision,
MTD Order, Certificates of Service)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| FIRESTAR DIAMOND, INC., *et al.* | No. 18-10509 (SHL) |
| Debtors. | (Jointly Administered) |
| RICHARD LEVIN, Chapter 11 Trustee of FIRESTAR DIAMOND, INC., FANTASY, INC., and OLD AJ, INC. f/k/a A. JAFFE, INC., | Adv. Proc. No. 19-_____ (SHL) |
| Plaintiff, | |
| v. | |
| NIRAV DEEPAK MODI, MIHIR BHANSALI, and AJAY GANDHI, | |
| Defendants. | |

**COMPLAINT AGAINST INSIDERS FOR BREACH OF FIDUCIARY DUTY, AIDING AND ABETTING BREACH OF FIDUCIARY DUTY, CORPORATE WASTE, AND VIOLATIONS OF THE RACKETEERING INFLUENCED CORRUPT ORGANIZATIONS ACT**

Plaintiff Richard Levin, not individually but solely as chapter 11 trustee ("**Trustee**" or "**Plaintiff**") for Debtors Firestar Diamond, Inc., Fantasy, Inc., and Old AJ, Inc. f/k/a A. Jaffe, Inc. (collectively, the "**Debtors**"), for his Complaint alleges as follows:

**NATURE OF THE ACTION**

1.     This is an action against Defendant Nirav Deepak Modi ("**Modi**"), the former indirect controlling majority shareholder and *de facto* director, officer, or controlling person of the Debtors; Mihir Bhansali ("**Bhansali**"), who served as the Debtors' sole director and as the Chief Executive Officer ("**CEO**") of each Debtor; and Ajay Gandhi ("**Gandhi**"), who served as the Chief Financial Officer ("**CFO**") of each Debtor. This action seeks to recover from the Defendants the damages the Debtors and their estates suffered as a result of their six-year, extensive international

1

fraud, money laundering, and embezzlement scheme, that resulted in accrual of claims against the Debtors of over $1 billion in favor of Punjab National Bank, the diversion of millions of dollars of the Debtors' assets for Modi's personal benefit, and the collapse of the Debtors and the resulting loss of value of their businesses.

## JURISDICTION AND VENUE

2. This Court has jurisdiction over the subject matter of this adversary proceeding under 28 U.S.C. § 1334(b) because this adversary proceeding arises under Title 11 and arises in and is related to the chapter 11 cases *In re Firestar Diamond, Inc., et al*, Case No. 18-10509 (SHL), which are pending in this Court.

3. This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2).

4. The Trustee consents to entry of final order or judgment by this Court.

5. Venue of this adversary proceeding is proper in this district under 28 U.S.C. § 1409.

## THE PARTIES

6. Plaintiff Richard Levin is the chapter 11 trustee for the Debtors, duly appointed under section 1104(a) of the Bankruptcy Code by the United States Trustee for Region 2 on June 14, 2018, whose appointment was approved by this Court by order entered the same day.

7. The Trustee brings this action, not individually, but solely in his capacity as Trustee.

8. Debtor Firestar Diamond, Inc. (f/k/a Firestone, Inc.) ("**Firestar**") is a privately-held Delaware corporation, with its principal place of business in New York. While in operation, Firestar principally operated a wholesale diamond business. Firestar Group, Inc., a Delaware corporation ("**Group**"), owns 100% of the equity interests in Firestar.

9.     Debtor Fantasy, Inc. ("**Fantasy**") is a privately-held Delaware corporation, with its principal place of business in New York. While in operation, Fantasy was principally a wholesale diamond business. Firestar owns 100% of the equity interests in Fantasy.

10.     Debtor Old AJ, Inc. (f/k/a A. Jaffe, Inc., f/k/a Sandberg & Sikorski Corp.) ("**Jaffe**") is a privately-held New York corporation, with its principal place of business in New York. While in operation, Jaffe was principally a bridal jewelry business.

11.     Synergies Corporation is a Delaware corporation that owns 95% of the equity interests in Jaffe and 100% of the equity interests in Group. Firestar Holdings Ltd., a Hong Kong company ("**Firestar Hong Kong**"), owns 100% of the equity interests in Synergies Corporation.

12.     Firestar International Limited (f/k/a Firestar International Private Limited, f/k/a Firestone International Private Limited, f/k/a Diamond 'R' Us) ("**FIL**") holds 100% of the equity interest in Firestar Hong Kong and is the ultimate holding company of numerous other Firestar entities (collectively, including the Debtors, Group, Synergies Corporation, Firestar Hong Kong, and FIL, the "**Firestar Entities**").

13.     At all relevant times, Modi owned or controlled approximately 94.88% of the equity interests in FIL and was a director of FIL. Upon information and belief, Modi is a citizen of India and traveled frequently to the United States, including the New York, to conduct business in New York through the Debtors and through other Firestar Entities.

14.     At all relevant times, Bhansali served as the sole director and CEO of each Debtor in New York and resided and continues to reside in New York.

15.     At all relevant times, Gandhi served as the Chief Financial Officer CFO of each Debtor in New York and resided and continues to reside in New York.

## FACTS

**Modi's Diamond Businesses**

16.     Modi entered the diamond business around 2000 through FIL, then known as Diamonds 'R' Us, which operated as a diamond trading company in India specializing in loose diamonds and gems for use in retailers' assembled products. In or about 2010, Modi entered the luxury retail business through one or more of the Firestar Entities and began to sell high-end finished jewelry he designed. Over time, Modi expanded his diamond and jewelry business, with retail, wholesale, and manufacturing locations in Antwerp, Armenia, Beijing, Belgium, Dubai, Hong Kong, India, Johannesburg, London, Macau, Moscow, Paris, and the United States.

17.     Modi, acting through the FIL, acquired Firestar (then known as Firestone, Inc.) in 2005, acquired a 95% interest in Jaffe (then known as Sandberg & Sikorski Corp.) in 2007, and incorporated Fantasy in 2012.

**The Punjab National Bank Fraud**

18.     From approximately early 2011 to early 2018 (the "**Relevant Period**"), Modi orchestrated and directed a scheme to obtain loans, credits, or other funds under false pretenses and without collateral from Punjab National Bank ("**PNB**"), a publicly-owned Indian bank majority owned by the central government of India, as described below (the "**PNB Fraud**").

19.     Modi and others he directed, acting through at least three entities under Modi's control—Diamonds 'R' Us, Solar Exports, and Stellar Diamonds—obtained from PNB Letters of Undertaking ("**LOUs**"), which are guarantees under which PNB allows its customers to obtain short-term credit from other Indian banks' foreign branches to engage in foreign import transactions into India without providing ordinarily-required collateral. Typically, upon presentation of an LOU, the foreign branch pays the exporter and seeks reimbursement from the LOU issuer, in this case PNB, who then charges its customer. However, in this case, the entities

4

under Modi's control who obtained the LOUs did not provide any collateral, and PNB failed to properly record the LOUs in its core banking system.

20.     PNB advanced amounts equal to over US$1 billion under LOUs for the benefit of entities under Modi's control against imports to India without the ordinarily-required collateral and, in some cases, generated by circular trading (also known as "round tripping"), a fraudulent practice whereby the same diamonds are exported from and re-imported back into India multiple times at varying and often inflated prices, in transactions involving various Firestar Entities and more than twenty foreign shell companies secretly controlled by Modi (the "**Shadow Entities**") to give the appearance of multiple distinct transactions.

21.     Modi and others at his direction used the Shadow Entities to create the appearance that independent entities were engaging in transactions with the Firestar Entities.

22.     The Debtors' records reflect sales by the Debtors to Shadow Entities totaling approximately $214 million during the Relevant Period and cash transfers to and from the Debtors and the Shadow Entities totaling approximately $227 million during the seven-year period from 2011 and 2018.

23.     When a diamond was imported or re-imported into India through a circular trading transaction among the Firestar Entities or the Shadow Entities, was often connected to a Firestar Entity drawing funds from a foreign bank under a PNB-issued LOU.

24.     To facilitate the issuing of the LOUs and to prevent detection, Modi and others at his direction worked with two PNB employees, including Gokulnath Shetty, who authorized the issuance of the LOUs without securing collateral and without properly recording the LOUs in PNB's records.

25.     The PNB Fraud orchestrated by Modi has resulted in several investigations and criminal enforcement actions against Modi, Bhansali, and others by Indian governmental

authorities, including the Central Bureau of Investigation; the Directorate of Enforcement; the Income Tax Department; and the Serious Fraud Investigation Office. On or about March 12, 2019, the Indian government issued an extradition request to the government of the United Kingdom on the basis of an arrest warrant issued against Nirav Modi by an Indian Court. In response to that request, Modi was arrested in London on or about March 20, 2019 and is currently incarcerated in London.

26.     In his Declaration filed with this Court on February 28, 2018, referencing the revelation of the PNB Fraud in India, Bhansali stated under penalty of perjury:

> 40. The supply chain disruption and negative publicity have dramatically impaired the Debtors' business operations in the short term and have created a great deal of uncertainty and confusion in the market about the Debtors' ability to continue to operate their business as a going concern.

> 41. Without greater certainty and assurances, certain vendors have expressed a reluctance to continue doing business with the Debtors and certain customers have begun to explore moving certain of the Debtors' programs to other suppliers.

> 42. As such, the Debtors filed these Chapter 11 cases in an effort to preserve the going concern value of their businesses and effectuate a sale or other transaction that will provide the resources necessary to allow the Debtors' successful brands to continue to thrive.

27.     The PNB Fraud coordinated and overseen by Modi and others at his direction resulted in a total loss to PNB of exceeding US$1 billion. As a result of the PNB Fraud, PNB has asserted significant claims against the Debtors on the grounds that a substantial portion of the proceeds of the PNB Fraud were transferred to the Debtors.

**Debtors' Involvement in the PNB Fraud**

28.     At Modi's direction, the Debtors were involved in the PNB Fraud and were exporters and direct beneficiaries of at least six LOUs totaling $10,192,303. The Debtors also engaged in circular trading that facilitated the issuance and presentation of additional LOUs and the resulting payments to the Shadow Entities and to Firestar Entities.

29.     As one example, the Debtors exported the same 3.27 carat Fancy Vivid Yellow Orange Cushion Cut SI1 diamond three times and imported it once between August 8 and September 13, 2011, a period of five weeks. On August 8, 2011, Firestar (then Firestone, Inc.) sold the diamond to Fancy Creations Company, Ltd., a Shadow Entity for $1,098,802. Approximately three weeks later, Solar Exports, a Modi-controlled entity, exported the diamond to Firestar for $183,087—approximately $900,000 less, although much closer to its actual value. Six days later, Firestar exported the diamond back to Fancy Creations Company, Ltd. for $1,156,043, now in excess of the original inflated price. Finally, two weeks later, Jaffe sold the diamond to World Diamond for $1,218,991, a Shadow Entity whose operations were managed by an employee of the Firestar Entities in India, Sandeep Mistry.

30.     As another example, later in 2011, the Debtors engaged in the circular trading of a diamond that was recorded as a 1.04 carat Fancy Intense Pink Emerald Cut SI2 diamond. The diamond appeared in the Debtors' records in three transactions within six weeks of each other and was valued at a different price each time, averaging $644,453 over the three purported transactions, well above the 2011 market value for such a diamond of $300,000 per carat. On information and belief, there was at most only one such diamond. The Debtors' records reflect a shipment of a diamond of this description on August 19, 2011, with an Indian Firestar Entity sending it to Firestar for $608,400. As with the 3.27 carat Fancy Vivid Yellow Orange Cushion Cut SI1, Sandeep Mistry sent shipping instructions and a spreadsheet accompanied by invoices created in India. Consistent with Mistry's instructions, Firestar sold it to SDC Designs LLC (on information and belief, a New York company with connections to Modi) for $642,200. Jaffe shipped a diamond with the same description one month later to Diamonds 'R' Us in India for $682,760.

31.     One of the purported transactions that is recorded as involving this 1.04 carat Fancy Intense Pink Emerald Cut SI2 diamond occurred in October 2011. On October 4, 2011, the diamond was among a package of twenty-six fancy-colored loose diamonds shipped from Jaffe to Diamonds 'R' Us in India. Diamonds 'R' Us sought an LOU from PNB for $1,921,079 to purchase the diamonds from Jaffe. Gokulnath Shetty, a PNB employee working with Modi, authorized the issuance of this LOU at the PNB Brady House branch. Shetty did not properly record the LOU in PNB's records, and Diamonds 'R' Us did not provide the ordinarily-required collateral to PNB for the LOU. PNB coordinated with its Hong Kong branch, which deposited money into PNB's Deutsche Bank nostro account in New York, New York. PNB paid Jaffe for the diamonds from the nostro account on October 13, 2011. On the same day, after receiving the $1,921,079 from the bank, Jaffe transferred $1,832,700 to Firestar Entities in India.

32.     At least six PNB LOUs were issued where a Debtor was the exporting entity and direct beneficiary of the LOU funds. The funds drawn under each of these LOUs were received by the Debtors and in each case were either returned to a Firestar Entity in India or used by the Debtors or Shadow Entities.

33.     Additionally, funds generated by many of the fraudulent LOUs went through the Debtors, which received the funds from one or more of the Shadow Entities.

**Involvement of Debtors' Directors and Officers in the PNB Fraud**

34.     At the direction of Modi, certain of Debtors' directors and officers participated in and advanced the PNB Fraud, including Bhansali and Gandhi.

**Mihir Bhansali**

35.     As director of the Debtors and the Debtors' CEO, and in coordination with or at the direction of Modi, Bhansali coordinated and directed fraudulent transactions among the

8

Debtors and Shadow Entities involving hundreds of millions of dollars. These transactions were integral to the PNB Fraud.

36.     Bhansali managed the Debtors' "house accounts," the accounts in which proceeds of loose diamond sales were segregated from regular sales accounts for purposes of computing commissions. The Debtors engaged in loose diamond sales primarily with Shadow Entities. The Debtors received approximately $155 million in cash transfers from Shadow Entities during the Relevant Period and paid approximately $72 million out to Shadow Entities. The vast majority of these transactions involved the purchase and sale of tens of millions of dollars-worth of loose diamonds per year, which is not consistent with Debtors' stated business purpose.

37.     At least in 2012, Jaffe maintained two sets of books and records: "core" financials, which did not include loose diamond transactions, and "regular" financials, which did, which reflected transactions executed to further the PNB fraud, and which existed to hide those transactions.

38.     Bhansali coordinated and directed a number of the circular transactions involving the Debtors. For example, in a 2012 email, Kurian Matthews, a Firestar Entity employee in Dubai, relayed a conversation he had with Bhansali in which they set up a circular transaction starting at Fantasy, going through Radashir Jewelry Co. Pvt. Ltd. (on information and belief, a Shadow Entity), FIL, and Firestar and ending back at Fantasy. The purpose was to "clear the old invoices of Radashir on FDC" because a bank was inquiring about the old invoices.

39.     Similarly, in December 2012, Bhansali and Kurian Mathews discussed wiring money to Radashir and back to the Debtors against Radashir's accounts payables to "use [the money] for NM [Modi]."

40.     In March 2016, Evelyn Kosiec, the Jaffe operations manager, asked Bhansali where to re-export loose diamonds, and an hour later she emailed Gandhi, "Mihir informed to ship this

to Eternal diamonds [a Shadow Entity] in Hong Kong, the same price, rounded to the nearest 5 120 day terms."

41.     Bhansali oversaw and directed the use of different sales and inventory practices for Debtors' transactions with Shadow Entities as compared to those used with retailer customers. For instance, each diamond or gem received by the Debtors for use in an ordinary retail transaction was unpacked, compared to its packing slip, scanned for quality control, and logged as "ready to ship." Goods received from Firestar Entities or Shadow Entities as part of the loose diamond transactions often were re-shipped within several days, often to the country from which they originated. Consistent with instructions from Firestar Global Entities, these goods were either re-shipped without being opened or, if they were opened, they were inventoried in bulk, not individually.

42.     Bhansali was intimately involved in and managed the transactions between the Debtors and the Shadow Entities. He had a copy on his office computer of a spreadsheet entitled "AR-AP (Jan'18)" with a document date in early February 2018. The spreadsheet identified payables and receivables as between each of the Modi-controlled entities and the Firestar Entities on the one hand, which were listed on the horizontal axis, and the Shadow Entities on the other hand, which were listed on the vertical axis. The spreadsheet tracks millions of dollars in accounts receivable and accounts payable balances between the Shadow Entities and Firestar Entities but did not list any customers known to be legitimate, foreign of otherwise.

43.     Many of the Shadow Entities directors were current or former employees of Firestar Entities. In addition, many Shadow Entity employees were current or former employees of Firestar Entities, which was reflected on the "AR-AP (Jan'18)" spreadsheet Bhansali had on his computer.

10

44.     Bhansali coordinated and directed the operations of various Shadow Entities. In fact, Bhansali, along with Modi, directed the establishment and controlled some of the Shadow Entities that engaged in the circular trading, including Empire Gems, Unique Diamond and Jewelry, Pacific Diamonds, Universal Fine Jewelry, Vista Jewelry, and Tri Color Gems.

45.     On September 7, 2011, Firestar Dubai employee Kurian Mathews forwarded an email to Bhansali containing fee quotes from accountants for proposed audits of two Hong Kong Shadow Entities, Auragems Company Ltd. and Fancy Creations Company Ltd. Mathews stated the fees may have been higher than Firestar Diamond in Hong Kong "due to the complexity of the transactions in these entities." Mathews then sought Bhansali's instruction as to "how to proceed further on this[.]"

46.     On February 4, 2013, Sridhar Krishnan, the manager of SDC Designs, LLC wrote to Bhansali and Modi partner Hemant Bhatt using personal email addresses. Krishman told Bhatt and Bhansali, "you should expect 1.4 million in Universal fze today. Please wire the same to A Jaffe." Two days later, Bhatt confirmed that Universal Fine Jewelry FZE had received the funds and that "Empire paid US $1,391,570 to A Jaffe value 05 Feb 13."

47.     On August 19, 2017, a manager of Universal Fine Jewelry FZE emailed Bhansali enclosing a profile of three Shadow Entities — Universal Fine Jewelry FZE, Empire Gems FZE, and Diagems Inc. — and asking Bhansali to "review and advice [sic]." The manager's email signature stated he was also the General Manager of Firestar Diamond in Dubai.

48.     Bhansali also oversaw and directed the operations of other Firestar Entities, often including minute details involving day-to-day operations. For example, on April 26, 2011, an employee of a Firestar Entity sought Bhansali's permission to make wire transfers from a Firestar Entity in Hong Kong to Firestar and Brilliant Diamonds. On September 14, 2017, a former Firestar employee asked for Bhansali's approval before changing the authorized signatory for Firestar

Hong Kong. On December 14, 2017, a request from a Dubai employee for a tablet computer was directed to Bhansali.

## Ajay Gandhi

49.     As CFO of the Debtors, Gandhi coordinated and directed transactions among the Debtors and Shadow Entities totaling hundreds of millions of dollars. These transactions were integral to the PNB Fraud.

50.     During the Relevant Period, Gandhi controlled the finances of the Debtors. He had authority to approve loose diamond transactions among the Debtors and the Shadow Entities totaling hundreds of millions of dollars.

51.     Gandhi did not distinguish the relationship of the Shadow Entities to the Firestar Entities from the relationship of the Debtors to the Firestar Entities and directed the use of the Debtors' funds for payment of expenses of the Shadow Entities. For example, on March 18, 2014, Ajay Gandhi directed $150,000 to be wired from Firestar's account to Unique Diamond & Jewelry, a purportedly-independent entity that was in fact a Shadow Entity, for the payment of Unique's back office expenses for the period of October 2013 to March 2014. Similarly, on February 15, 2015, Gandhi emailed two Firestar India back office employees and instructed them to pay "$300,000 from Firestar Diamond, Inc to Eternal Diamond. (Back office Expense)" for this Shadow Entity.

52.     Additionally, on January 19, 2010, Gandhi stated in his request for an aging report from the Firestar Entities' back office in India, "You can exclude affiliates such as FIPL [FIL], FS, FC, JS, Sandberg, Unique[,]" thereby referring to Unique Diamond & Jewelry as an affiliate of the Debtors.

53.     On May 5, 2017, Gandhi sent a list of Shadow Entities to Altamash Ansari, a back office employee in India, and stated "Use names from attached for Eternal, Pacific & Tri Color. (Do not share this pdf with anyone.)."

12

54.     Gandhi had access to the books of various Shadow Entities. On August 6, 2013, Gandhi sent an email to Bhavesh Patel, a Firestar back-office employee in India, attaching a spreadsheet titled "FS-Inc from Kurian June 2013." The spreadsheet contained purchase and sales ledgers of four Shadow Entities—Fancy Creations Company Limited, Brilliant Diamonds Limited, Eternal Diamond Limited and Unique Diamond & Jewelry—showing these entities' accounting for transactions with Firestar. There appears to be no legitimate reason why Gandhi would be in possession of the internal books and records of multiple Shadow Entities, absent having control or orchestration of their records.

55.     On June 10, 2013, to hide their involvement in the PNB Fraud, Modi's personal assistant instructed Gandhi to communicate with her regarding Shadow Entities only on Gmail or Panemail, a program that automatically deletes messages, rather than on the Debtors' regular email system.

56.     The PNB Fraud coordinated and directed by Modi, Bhansali, and Gandhi has resulted in substantial creditor claims against the Debtors, including a substantial claim by PNB, and caused the collapse and resulting loss of value of the Debtors' and their businesses.

**Modi, Bhansali and Gandhi Coordinated their Actions**

57.     Modi coordinated and directed the execution of the PNB Fraud with senior officers and directors of the Debtors, including Bhansali and Gandhi.

58.     Throughout the Relevant Period, Modi sent hundreds of emails to Bhansali and Gandhi, had numerous telephone conversations with them, and met with them at the Debtors' premises and elsewhere. Through many of these emails, telephone conferences, and visits, Modi directed Bhansali and Gandhi and exerted total ultimate control over Debtors' affairs, including in regard to day-to-day details. One means of Modi's omnipresent oversight and control over the

13

Debtors consisted of the dozens of flash reports regarding the Debtors' financials that he received throughout the Relevant Period.

59.     Examples from a short period in 2009 illustrate Modi's total ultimate control over the Debtors. On February 22, 2009, Modi conveyed his preferences to Bhansali regarding which of the Debtors should contribute to a charity dinner. On June 10, 2009, Modi wrote to Gandhi, "Please confirm that shipments made after bankruptcy to Robbins and Western Stone are not in Tab 3 [of the spreadsheet.]" On March 17, 2009, Modi instructed Bhansali and Gandhi, "Pls don't pay further draws/reimbursement to A.Jaffe [sic] salespeople unless I approve. Pls confirm[.]" And on March 20, 2009, Modi requested additional information from Gandhi regarding the Jaffe medical plan and the legality of implementing a method to decrease the medical costs. On June 8, 2009, upon reviewing Jaffe's accounts receivable, Modi instructed Gandhi, "If [the customers] always have been late, we should analyze their business prospects on a going forward basis." On June 17, 2009, Modi weighed in on an "Inventory Reduction Plan" for Jaffe, and on July 9, 2009, Bhansali wrote to Modi, "This was the summary of our plan for Jaffe, that Sam, you and I finalized with Ajay the Friday evening in your house." On July 15, 2009, Modi reviewed a Jaffe budget and commented, "I have deleted some line items[,]" and instructed Gandhi, "When planning, pls review moving to a 4 day week for Jaffe and /or salary cuts . . . for remaining people." On August 14, 2009, Modi instructed Gandhi to respond to an auditor's question with "4.2 million" as the inventory number for Jaffe.

60.     Examples from a short period in 2015 show Modi's total ultimate control over the Debtors persisted throughout the Relevant Period. On January 5, 2015, Gandhi wrote to Modi, "Based on my cash flow, I can pay $ 3 million in India in January 2015. Please let me know if I can ask for a list from Manish to pay India[,]" to which Modi responded, "Yes[.]" Similarly, on February 9, 2015, Gandhi told Modi, "February cash flow has improved in the last week. I have

14

$ 2.0 m of Borrowing Cushion. Please let me know if I should pay India - $ 1.5 m this month after keeping $ 500k as cushion[,]" to which Modi responded, "Pls pay $2 m; don't keep cushion." Then, on February 19, 2015, Gandhi told Modi, "Received funds from HK. Now I can pay additional $ 1.5 m this month [to India] this month. Can I ask Manish for a list to pay?" to which Modi responded, "Yes[.]" And on March 2, 2015, Gandhi relayed to Modi that, "Based on my cash flow, I can pay $ 3 m to India in March 2015. Should I ask Manish for a list?" to which Modi responded, "Yes[.]"

61.     Furthermore, Modi treated Gandhi in some respects as a personal accountant. For instance, on February 28, 2017, Modi directed Gandhi to prepare "all financial related parts" of Modi's personal application to live in the River House in New York City, a process which included gathering information concerning Modi's wife, Ami Modi.

62.     Modi, Bhansali, and Gandhi communicated frequently concerning the PNB Fraud and to advance the PNB Fraud. For instance, on August 14, 2009, Modi directed Gandhi to make payments totaling $2,293,326 to Shadow Entities Brilliant Diamonds Ltd. and Diagem Inc. On June 16, 2010, Modi instructed Gandhi, "Unique [a Shadow Entity] has wired $250,000 today to Synergies. Please wire to the account Mehul bhai wants."

63.     On October 21, 2010, in furtherance of a circular trade, Modi and Gandhi communicated by email about the shipment of a diamond to a Shadow Entity. Modi stated, "send the 70 ct vivid yellow to Firestone Dubai @51,500 and not Firestone HK." Gandhi responded, "Firestone, Dubai confirmed (Not Unique)[,]" to which Modi clarified, "Sorry Unique[,]" in reference to the Shadow Entity. Gandhi responded with "Glad I asked!!!"

64.     Modi, Bhansali, and Gandhi coordinated their communications to prevent detection of the PNB Fraud. For instance, on September 7, 2011, in addressing an inquiry from Standard Chartered Bank regarding transactions with certain Shadow Entities, which the bank

15

believed were independent customers, Gandhi represented that these entities were not in fact customers but that Firestar would buy large diamonds from them as vendors. Gandhi explained, "sometimes these goods need to be returned but due to the terms of the original sale, the vendors instruct us to ship these goods to another companies, that they select who are not located in India. We record these transfers as a reduction to purchases and an increase to accounts receivable at the original purchase cost of the diamonds/ jewelry." Bhansali, who was included on the email from Gandhi, forwarded this response to Modi. Modi then responded, noting "As SC is a common bank in India, Antwerp and NY. It might be a good idea that Ajay and you discuss all responses [sic]."

**Modi Used the Debtors' Funds to Purchase Personal Assets**

65.     Just as he orchestrated the circular trades at the heart of the PNB Fraud, Modi also orchestrated transactions to divert assets from the PNB Fraud and the Debtors for the benefit of himself and his family.

**The Ithaca Trust**

66.     On August 23, 2017, Modi's sister Purvi Mehta ("**Mehta**") established the Ithaca Trust, an irrevocable trust for the benefit of Modi's wife, Ami Modi, and their three children. The Ithaca Trust's investment advisor was Abhay Dinesh Javeri, Ami Modi's brother. The trustee was Commonwealth Trust Corporation ("**Commonwealth**"). Attorneys from the law firm of Day Pitney LLP ("**Pitney**") were the principal drafters of the Ithaca Trust agreement and served as advisors for the creation of the trust.

67.     Ostensibly, the Ithaca Trust was funded with $23 million in cash from Mehta, but Commonwealth's records show that Modi was behind the initial funding. In an August 24, 2017 email regarding the Ithaca Trust's formation, Modi informed Pitney attorneys that "[t]he funds are in place with Purvi [Mehta]. Please let me know account details to wire the money . . . ."

16

68.     Commonwealth's records also show that those funds Modi placed with Mehta to establish the Ithaca Trust were funneled to Mehta from the PNB Fraud. Mehta revealed in disclosure forms to Commonwealth that she funded the Ithaca Trust using "dividends" she received from Fine Classic FZE, a Shadow Entity of which Mehta was the 100% owner. Like the other Shadow Entities, Fine Classic FZE operated as part of the PNB Fraud.

69.     Further, throughout 2017, tens of millions of dollars passed between Ami Modi's HSBC account and Mehta's Bank of Singapore account. A bank statement for Ami Modi for September 2017 shows $31,506,701 disbursed, almost all of which went to Mehta.

**The Ritz Carlton Apartment**

70.     The purpose of the Ithaca Trust was to hold Manhattan real estate for Modi and his family. The initial $23 million in trust funding was used to purchase an apartment at the Ritz Carlton residences, 50 Central Park South, Unit 33, New York, New York (the "**Ritz Carlton Apartment**") for the sole use of Modi and his family.

71.     On August 30, 2017, Modi emailed Pitney attorneys and other professionals informing them that $23 million had been wired from Mehta to Commonwealth and directing Commonwealth to further wire the funds to attorneys at Katz Matz to execute the purchase of the Ritz Carlton Apartment. Mehta was not on the email thread.

72.     That same day, Katz Matz attorney Steven Matz emailed Modi and others with instructions for the September 7, 2017 closing of the Ithaca Trust's purchase of the Ritz Carlton Apartment. Once again, Mehta was not on the email thread.

73.     On September 7, 2017, the Ithaca Trust closed on the purchase of the Ritz Carlton Apartment. The Ithaca Trust paid $25 million to the seller through Central Park South 50 Properties LLC ("**CPS50**"), an entity the Ithaca Trust owns. Mehta signed the contract of sale. Of the purchase price, $2.5 million was wired from an Ami Modi HSBC account into an escrow

account at the Katz Matz law firm, which handled the sale. The remaining $23 million was paid with funds that Modi had funneled to Mehta from the PNB Fraud.

### The Essex House Apartment

74. Modi also used the Ithaca Trust to obtain real estate that previously had been owned indirectly by Firestar.

75. On February 15, 2007, Central Park Real Estate LLC ("**CPRE**") was formed under Delaware law. CPRE was owned by Firestar until approximately the end of 2009, when it was transferred to Group.

76. On March 26, 2007, CPRE purchased an apartment at the Essex House, 160 Central Park South (the "**Essex House Apartment**"); Bhansali signed the deed on behalf of CPRE. The Essex House Apartment was also used by Modi and as a personal residence.

77. Based on direction from Modi and Gandhi, Firestar funded $2 million of the approximately $5 million purchase price of the Essex House Apartment. The balance was financed by an approximately $3 million mortgage from HSBC. Firestar also made at least $856,335 of the monthly payments on the mortgage between 2011 and 2018 and paid JW Marriott Essex House NY $15,828.35 in January 2018, after CPRE had been transferred from Group to the Ithaca Trust.

78. On December 5, 2008, Modi emailed Bhansali and Gandhi that, "*I bought Essex House at $4,995,000 and took a loan of $3 million*" (emphasis added). Modi and Gandhi then discussed by email, with Bhansali copied, the fact that Firestar had funded part of the Essex House purchase.

79. In March 2017, Gandhi emailed Modi that HSBC requested more information on the ownership structure of CPRE "going up thru the ladder to FILP, India[,]" including the "Source of Wealth" of "Purvi Modi[.]" Gandhi relayed that he "avoided giving these [sic]

information and told them that we may do restructuring of Central Park and may change ownership etc." but that the "only way, we can avoid is only if we pay-off the $ 3 m mortgage in next few months." Modi responded, "There will be a change in ownership in May end so better to explain that."

80.      On December 4, 2017, by email, Modi told Gandhi to pay off the HSBC mortgage in full. On December 5, 2017, Firestar paid off the approximately $3 million balance on the Essex House Apartment mortgage, using funds from Jaffe and Fantasy as well as from its own account and from a Firestar HSBC line of credit.

81.      On December 15, 2017, one of Modi's accountants emailed Modi with three potential options for minimizing transfer taxes on "the movement of CPRE." The first option was having Modi purchase CPRE directly from Group, the second was having Ami Modi purchase CPRE directly, and the third was using the Ithaca Trust to make the purchase by having Mehta contribute more cash to the trust. The accountant explained that, "since [Modi] prefer[red] to fast track the transaction," the existing trust could be used and then the trustee could "move the LLC to another trust in due time."

82.      Modi chose the third option. On December 29, 2017, the Ithaca Trust purchased CPRE from Group for $6 million. On January 2, 2018, Mehta transferred $6 million to the Commonwealth Trust Company, as trustee of the Ithaca Trust. The Ithaca Trust then wired $6 million to Group's HSBC account for the purchase of CPRE.

83.      By this time, Commonwealth had flagged the Ithaca Trust as a "high risk trust" and internally expressed concern about serving as trustee. On March 13, 2018, Commonwealth emailed Pitney attorneys to inform them that its trust committee had decided that Commonwealth should resign as trustee of the Ithaca Trust.

84. On May 25, 2018, Nehal Deepak Modi, the protector of the Ithaca Trust and Modi's brother, appointed Trident Trust Company (South Dakota) Inc., as successor trustee of the Ithaca Trust.

**Events After the Petition Date**

85. On February 28, 2018, while still serving as the Debtors' CEO, Bhansali submitted to this Court a declaration under penalty of perjury that contained material falsehoods, including that the Shadow Entities were unaffiliated unsecured creditors of the Debtors. In addition, during the early weeks of the chapter 11 cases, Bhansali, as the Debtors' CEO, made other representations formally and informally, explicitly and implicitly, to this Court, to the United States Trustee, and to creditors, regarding the Debtors' involvement in the PNB Fraud. Bhansali led the bankruptcy court and other parties to believe that the Debtors were not involved in the PNB Fraud and that they were innocently caught up in an overseas matter. For example, at the outset of the cases Bhansali declared under penalty of perjury: "The Debtors and their dedicated employees have worked tirelessly over the past week or so to … reassure their vendors and customers that they had no involvement in the alleged wrongful conduct."

86. Modi was involved in the Debtors' bankruptcy filings. Bhansali and the Debtors' counsel had a conversation with Modi on February 24, 2018, two days pre-petition, concerning the decision to file the chapter 11 cases. In addition, Modi had at least one conversation with Bhansali between the Petition Date and March 15, 2018. The revelation of this conversation ultimately derailed the going-concern sale process of all or part of the Debtors' businesses. The postponement of the sale process resulted in a decrease in value from the original sales price of Jaffe's assets to the ultimate sales price for those assets approximately two months later.

# CLAIMS FOR RELIEF

## COUNT 1

### Breach of Fiduciary Duty
### (Nirav Modi)

87.     Plaintiff restates and re-alleges paragraphs 1 through 86 of this Complaint as though fully set forth herein.

88.     Through numerous emails, telephone conversations with Bhansali and Gandhi, among others, and visits to the Debtors' offices, Modi directed the Debtors to participate in the PNB Fraud, including by making payments to the Shadow Entities and other Firestar Entities, exercised dominion and ultimate total control over the Debtors and their directors and officers, and was the ultimate authority for the Debtors.

89.     As a result of Modi's dominion and total control over the Debtors and as the ultimate authority for the Debtors, Modi was a *de facto* director, officer, or person in control of the Debtors.

90.     As a *de facto* director, officer, or person in control of the Debtors, Modi owed fiduciary duties of due care and loyalty to the Debtors and was required to discharge his duties in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner he reasonably believed to be in the best interests of the Debtors.

91.     Modi breached his fiduciary duties as a *de facto* director, officer, or person in control of the Debtors by, among other things, (a) directing the Debtors and their *de jure* directors and officers to engage in the PNB Fraud, including by entering into circular trading transactions with Shadow Entities and Firestar entities, in violation of his duties of due care, loyalty, and good faith and (b) directing the Debtors and their officers to use corporate assets to acquire properties

21

for the personal benefit of Modi and his family, also in violation of his duties of due care, loyalty, and good faith.

92.     Modi's breaches of fiduciary duty, including his breaches of the duties of due care, loyalty, and good faith, proximately caused the Debtors to suffer injury by, among other things, increasing the creditor claims against the estate and causing the collapse and resulting loss of value of the Debtors' and their businesses.

## COUNT 2

### Breach of Fiduciary Duty
### (Mihir Bhansali and Ajay Gandhi)

93.     Plaintiff restates and re-alleges paragraphs 1 through 92 of this Complaint as though fully set forth herein.

94.     As a director and officer of the Debtors, Bhansali owed fiduciary duties of due care and loyalty to those entities and was required to discharge his duties in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner he reasonably believed to be in the best interests of the Debtors.

95.     Bhansali breached his fiduciary duties by, among other things, (a) allowing Modi to usurp Bhansali's management responsibilities and decision-making authority, in violation of his duty of care, (b) causing the Debtors to engage in the PNB Fraud, including by entering into circular trading transactions with Shadow Entities and Firestar entities, in violation of his duties of due care and loyalty, and (c) causing the Debtors to expend corporate assets to acquire properties for the personal benefit of Modi and his family, in violation of his duties of due care and loyalty.

96.     As an officer of the Debtors, Gandhi owed fiduciary duties to those entities and was required to discharge his duties in good faith, with the care an ordinarily prudent person in

a like position would exercise under similar circumstances, and in a manner he reasonably believed to be in the best interests of the Debtors.

97.     Gandhi breached his fiduciary duties by, among other things, (a) allowing Modi to usurp Bhansali's management responsibilities and decision-making authority, in violation of his duty of care, (b) causing the Debtors to engage in the PNB Fraud, including by entering into circular trading transactions with Shadow Entities and Firestar entities, in violation of his duties of due care and loyalty, and (c) causing the Debtors to expend corporate assets to acquire properties for the personal benefit of Modi and his family, in violation of his duties of due care and loyalty.

98.     The breaches of fiduciary duty by Bhansali and Gandhi proximately caused the Debtors to suffer injury by, among other things, increasing the creditor claims against the estate and causing the collapse and resulting loss of value of the Debtors' and their businesses.

## COUNT 3

### Aiding and Abetting Breach of Fiduciary Duty
### (Nirav Modi)

99.     Plaintiff restates and re-alleges paragraphs 1 through 98 of this Complaint as though fully set forth herein.

100.     In the alternative to Count 1 above, assuming (but not admitting) that Modi did not owe a fiduciary duty to the Debtors, Modi aided and abetted breaches of fiduciary duties by the *de jure* directors and officers of the Debtors, including Bhansali and Gandhi.

101.     As alleged in Count 2 above, Bhansali—as director and officer of the Debtors—and Gandhi—as officer of the Debtors—owed fiduciary duties to the Debtors and breached those fiduciary duties.

102.     Modi knew that that Bhansali and Gandhi had fiduciary duties as directors and officers of the Debtors and knew they were breaching their fiduciary duties because, among other things, (a) Modi communicated with them about transactions between the Debtors and Shadow Entities, and (b) Modi communicated with them about expending corporate funds on personal assets for Modi and his family.

103.     Modi induced, participated, and assisted the breaches of fiduciary duties by Bhansali and Gandhi by, among other things, (a) directing Bhansali and Gandhi to engage in the PNB fraud, including by entering into circular trading transactions with Shadow Entities and Firestar entities, and (b) directing Bhansali and Gandhi to expend corporate assets to acquire properties for the personal benefit of Modi and his family.

104.     The breaches of fiduciary duty by Bhansali and Gandhi, aided and abetted by Modi, proximately caused the Debtors to suffer injury by, among other things, increasing the creditor claims against the estate and causing the collapse and resulting loss of value of the Debtors' and their businesses.

### COUNT 4

### Corporate Waste
### (Nirav Modi)

105.     Plaintiff restates and re-alleges paragraphs 1 through 104 of this Complaint as though fully set forth herein.

106.     As a *de facto* director, officer, or person in control of the Debtors, Modi had the duty to the Debtors to preserve and protect their assets from undue waste or loss.

107.     Modi committed waste of the Debtors' assets by directing the Debtors and their officers to use corporate assets to acquire properties for the personal benefit of Modi and his family.

24

108.    The corporate waste committed by Modi proximately caused the Debtors to suffer injury by losing the millions of dollars spent for the personal benefit of Modi and his family.

## COUNT 5

### Corporate Waste
### (Mihir Bhansali and Ajay Gandhi)

109.    Plaintiff restates and re-alleges paragraphs 1 through 108 of this Complaint as though fully set forth herein.

110.    As a director and officer of the Debtors, Bhansali had the duty to the Debtors to preserve and protect their assets from undue waste or loss.

111.    Bhansali committed waste of the Debtors' assets by directing the Debtors and their officers to use corporate assets to acquire properties for the personal benefit of Modi and his family or by facilitating or permitting such use.

112.    As an officer of the Debtors, Gandhi had the duty to the Debtors to preserve and protect their assets from undue waste or loss.

113.    Gandhi committed waste of the Debtors' assets by directing the Debtors and their officers to use corporate assets to acquire properties for the personal benefit of Modi and his family or by facilitating or permitting such use.

114.    The corporate waste committed, facilitated, or permitted by Bhansali and Gandhi proximately caused the Debtors to suffer injury by losing the millions of dollars expended for the personal benefit of Modi and his family.

## COUNT 6

### Racketeering Influenced Corrupt Organizations Act ("RICO")
### 18 U.S.C. § 1962(c)
### (Nirav Modi, Mihir Bhansali, Ajay Gandhi)

115.     Plaintiff restates and re-alleges paragraphs 1 through 114 of this Complaint as though fully set forth herein.

116.     Defendants Modi, Bhansali, and Gandhi are each a "person" capable of holding legal or beneficial interest in property within the meaning of 18 U.S.C. § 1962(c) and 18 U.S.C. § 1961(3).

117.     Defendants Modi, Bhansali, and Gandhi each violated 18 U.S.C. § 1962(c) by their respective acts, described in the prior paragraphs and as further described below.

118.     Defendants Modi, Bhansali, and Gandhi each had the specific intent to violate 18 U.S.C. § 1962(c) and to commit each underlying predicate act alleged below.

119.     Defendants Modi, Bhansali, and Gandhi each committed at least two predicate acts of racketeering, as more specifically alleged below. The acts of racketeering were not isolated; rather, they were related in that they had the same or similar purpose and result, participants, victims, or method of commission. Further, the acts of racketeering have been continuous, spanning the period from at least early 2011 to early 2018.

### The RICO Enterprise

120.     Defendants Modi, Bhansali, and Gandhi, together with all Modi owned or controlled entities, form an association-in-fact engaged in and affecting interstate and foreign commerce for a common and continuing purpose of formulating and implementing a common scheme to defraud PNB for the Defendants' personal enrichment through a pattern of fraud, lies, deceit, and corruption (hereinafter the "**RICO Enterprise**").

121.     At all relevant times, Defendants Modi, Bhansali and Gandhi each were employed by or associated with the RICO Enterprise, and each conducted or participated, directly or indirectly, in the conduct of the RICO Enterprise's affairs through a pattern of racketeering activity.

122.     The Rico Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which the Defendants engage.

123.     The RICO Enterprise, as an association-in-fact, constitutes an "enterprise" within the meaning of 18 U.S.C. § 1961(4), and it was or is engaged in, and its activities affected, interstate and foreign commerce.

124.     The RICO Enterprise's repeated, continuous, and flagrant violations of federal criminal law constitute a "pattern of racketeering activity" in violation of RICO, 18 U.S.C. § 1961, *et seq.*

125.     The RICO Enterprise's common purpose came into existence no later than early 2011, when Defendants Modi, Bhansali, Gandhi implemented a scheme to defraud PNB by fraudulently obtaining LOUs by exploiting the web of Shadow Entities and other Modi owned or controlled entities.

126.     Defendants Modi, Bhansali, and Gandhi are central and controlling figures in the RICO Enterprise, have been responsible for oversight of the scheme to defraud PNB, and have directed other conspirators to take actions necessary to accomplish the overall aims of the RICO Enterprise.

### The Pattern of Racketeering Activity

127.     The RICO Enterprise, as conducted and controlled by Defendants Modi, Bhansali, and Gandhi, engaged in a pattern of racketeering activity, as defined by 18 U.S.C. § 1961(1) and

(5), consisting of multiple acts of racketeering by members of the enterprise that are interrelated, not isolated, and perpetrated for the same or similar purposes by the same persons.

**Predicate Acts: Mail and Wire Fraud, Violations of 18 U.S.C. § 1341, 1343**

128.    The RICO Enterprise's pattern of racketeering included mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343.

129.    The RICO Enterprise, as conducted and controlled by Defendants Modi, Bhansali, and Gandhi, engaged in a criminal scheme to defraud PNB, launder the fraudulently procured funds, and enrich the Defendants.

130.    In furtherance of their scheme, the RICO Enterprise, as conducted and controlled by Defendants Modi, Bhansali, and Gandhi, willfully and knowingly transmitted, or caused to be transmitted, by means of (1) causing matters and things to be placed in any post office or authorized depository, or deposited or caused to be deposited matters or things to be sent or delivered by a private or commercial interstate carrier or (2) by means of wire communications in interstate or foreign commerce, writings, signs, signals, pictures, and sounds, including without limitation the following:

a.    The shipping in August and September of 2011 of a purported 3.27 carat Fancy Vivid Yellow Orange Cushion Cut SI1 diamond;

b.    The shipping in October 2011 of a purported 1.04 carat Fancy Intense Pink Emerald Cut SI2 diamond;

c.    An August 14, 2009, email communication from Modi to Ghandi in which Modi directed Gandhi to make payments totaling $2,293,326 to Shadow Entities Brilliant Diamonds Ltd. and Diagem Inc.;

d.    A June 16, 2010, email communication in which Modi instructed Gandhi, "Unique [a Shadow Entity] has wired $250,000 today to Synergies. Please wire to the account Mehul bhai wants[;]"

e.    An October 21, 2010, email communication in which Modi and Gandhi discussed the shipment of a diamond to a Shadow Entity;

28

f.     A September 7, 2011, email communication in which Modi, Bhansali, and Gandhi coordinated their communications to prevent detection of the PNB Fraud;

g.     A November 20, 2012, email communication between Bhansali, Gandhi, and Kurian Matthews in which Bhansali instructed Gandhi to cycle approximately $750,000 from Fantasy through FIL and Firestar and back to Fanstasy to clear old invoices drawing unwanted attention from bankers;

h.     A March 18, 2014, email communication in which Gandhi directed $150,000 be transferred from Firestar to Unique Diamond & Jewelry;

i.     A February 15, 2015, email communication in which Gandhi directed $300,000 be transferred from Firestar to Eternal Diamond;

j.     All wire transfers involving funds obtained as a result of the PNB Fraud, including, but not limited to: the wire transfer of $23 million from Mehta's bank account for the creation of the Ithaca Trust; the wire transfer on or about September 7, 2017, of $25 million from CPS50 to purchase the Ritz Carlton Apartment; the wire transfers of $2.5 million from Ami Modi's HSBC account and of $23 million from Mehta's bank account to fund CPS50; the wire transfer on January 2, 2018, of $6 million from Mehta's bank account to Commonwealth Trust Company for the purchase of CPRE.

131.    The use of interstate and international mail and wires to connect this international racketeering conspiracy was foreseeable.

132.    Accordingly, the RICO Enterprise, as conducted and controlled by Defendants Modi, Bhansali, and Gandhi, committed numerous violations of mail and/or wire fraud in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1343.

133.    By enabling, facilitating, and promoting the PNB Fraud, the RICO Enterprise's violations of 18 U.S.C. §§ 1341 and 1343 directly and proximately caused injury to each Debtor's business and property by destroying each Debtor's going-concern value and rendering each Debtor insolvent.

**Predicate Acts: National Stolen Property Act, Violations of 18 U.S.C. §§ 2314, 2315**

134.    The RICO Enterprise's pattern of racketeering included numerous violations of the National Stolen Property Act, 18 U.S.C. §§ 2314, 2315.

135.    On numerous occasions during the Relevant Period, the RICO Enterprise, as conducted and controlled by Defendants Modi, Bhansali, and Gandhi, willfully and knowingly transported, transmitted, or transferred in interstate or foreign commerce—or received, possessed, concealed, stored, bartered, sold, disposed of, or pledged as security for a loan—goods, wares, merchandise, securities, or money that crossed an interstate or international boundary after being stolen, converted, or taken by fraud (the "**Stolen Property Transfers**"), including without limitation:

a.    On March 8, 2011, Firestar received $1,863,220.65 in fraudulently procured LOU funds from PNB's "nostro" account at the New York branch of Deutsche Bank Trust Co. Americas (the "**PNB Nostro Account**"). The applicable LOU was fraudulently obtained by FIL.

b.    On May 6, 2011, Firestar received $1,858,183.50 in fraudulently procured LOU funds from the PNB Nostro Account. The applicable LOU was fraudulently obtained by Solar Exports.

c.    On August 22, 2011, Firestar received $1,499,700.75 in fraudulently procured funds from the PNB Nostro Account. The applicable LOU was fraudulently obtained by FIL.

d.    On October 4, 2011, Firestar received $1,803,213.75 in fraudulently procured LOU funds from the PNB Nostro Account. The applicable LOU was fraudulently obtained by FIL.

e.    Also on October 4, 2011, Firestar separately received $1,246,730.60 in fraudulently procured funds from the PNB Nostro Account. The applicable LOU was fraudulently obtained by FIL.

f.    On October 13, 2011, Jaffe received $1,921,043.65 in fraudulently procured LOU funds from the PNB Nostro Account. The applicable LOU was fraudulently obtained by Diamonds 'R' Us.

g.    On February 7, 2013, Firestar received $931,965 in fraudulently procured LOU funds from Pacific Diamonds FZE, a Shadow Entity located in the United Arab Emirates. These funds were derived

        from an LOU that was fraudulently obtained by Diamonds 'R' Us in which Pacific Diamonds FZE was the exporter.

h.      On February 11, 2013, Firestar received $980,805 in fraudulently procured LOU funds from Pacific Diamonds FZE. These funds were derived from the same LOU fraudulently obtained by Diamonds "R" Us in which Pacific Diamonds FZE was the exporter.

i.       On March 19, 2013, Firestar received $191,501.35 in fraudulently procured LOU funds from Auregem Company Ltd., a Shadow Entity located in Hong Kong. These funds were derived from an LOU that was fraudulently obtained by Diamonds 'R' Us in which Auragem Company Ltd. was the exporter.

j.      On March 19, 2013, Firestar received $236,078.45 in fraudulently procured LOU funds from Fancy Creations Company Ltd., a Shadow Entity located in Hong Kong. These funds were derived from the same LOU referenced in subparagraph (i) above

k.      On May 6, 2013, Firestar received $21,393.98 in fraudulently procured LOU funds from Fancy Creations Company Ltd. These funds were derived from an LOU that was fraudulently obtained by Stellar Diamonds.

l.       On March 27, 2015, Fantasy received $1,522,451 in fraudulently procured LOU funds from Pacific Diamonds FZE. That same day, Fantasy transferred these funds to Firestar.

m.    On May 3, 2016, Firestar received $399,962 in fraudulently procured LOU funds from Tri Color Gems FZE, a Shadow Entity located in the United Arab Emirates. These funds were derived from an LOU that that was fraudulently obtained by Solar Exports in which Tri Color Gems FZE was the exporter.

n.      On December 19, 2016, Firestar received $599,972 in fraudulently procured LOU funds from Pacific Diamonds FZE. These funds were derived from an LOU that was fraudulently obtained by Stellar Diamonds in which Tri Color Gems was the exporter.

o.      On December 6, 2012, Fantasy executed a security agreement in favor of HSBC Bank USA pledging substantially all of its assets— at least some of which were traceable to the fraudulently procured LOU funds—as collateral for a line of credit issued by HSBC Bank USA. Gandhi executed the security agreement in his capacity as chief financial officer of Fantasy. Bhansali signed as a witness to the security agreement in his capacity as president of Fantasy.

p.   On December 12, 2012, Firestar and Fantasy each executed a security agreement in favor of Israel Discount Bank of New York pledging substantially all of their respective assets—at least some of which were traceable to the fraudulently procured LOU funds—as collateral for a line of credit issued by Israel Discount Bank of New York. Gandhi executed each security agreement in his capacity as chief financial officer for Firestar and Fantasy, respectively.

136.   For each Stolen Property Transfer, the RICO Enterprise, through Defendants Modi, Bhansali, or Gandhi, knew that the money or property transferred, received, or disposed of had been stolen, converted, or taken by fraud.

137.   Each Stolen Property Transfer involved money or property having a value of $5,000 or more.

138.   Accordingly, the RICO Enterprise, as conducted and controlled by Defendants Modi, Bhansali, and Gandhi, committed numerous violations of the National Stolen Property Act, 18 U.S.C. §§ 2314, 2315.

139.   By enabling, facilitating, and promoting the PNB Fraud, the RICO Enterprise's violations of 18 U.S.C. §§ 2314 and 2315 directly and proximately caused injury to each Debtor's business and property by destroying each Debtor's going-concern value and rendering each Debtor insolvent.

**Predicate Acts: Money Laundering, Violations of 18 U.S.C. §§ 1956, 1957.**

140.   The RICO Enterprise's pattern of racketeering included numerous acts of money laundering in violation of 18 U.S.C. §§ 1956, 1957.

141.   The PNB Fraud constitutes an offense against India, a foreign nation, involving fraud, or a scheme or attempt to defraud, against PNB, a foreign bank.

142.   Certain of the financial transactions underlying or comprising the PNB Fraud occurred, in whole or in part, in the United States in that certain of the LOU transactions

underlying or comprising the PNB Fraud involved the movement of funds by wire or other means from the PNB Nostro Account at the New York branch of Deutsche Bank Trust Company Americas to the Debtors' bank accounts at the New York branches of HSBC Bank USA and Israel Discount Bank of New York. Additionally, the RICO Enterprise's circular trading of the same diamonds and other goods among Modi owned or controlled entities — including the Debtors and their U.S. affiliates — for the purpose of artificially inflating the volume of imports to secure additional LOUs and obtaining liquidity to repay other LOUs occurred, in part, within the United States.

143.    The money, diamonds, and other goods and property derived from or obtained or retained, directly or indirectly, through the PNB Fraud constitute the proceeds of an "unlawful specified activity" within the meaning of 18 U.S.C. § 1956(c)(7)(B)(iii).

144.    On numerous occasions during the Relevant Period, the RICO Enterprise, as conducted and controlled by Defendants Modi, Bhansali, and Gandhi, willfully and knowingly conducted financial transactions involving the proceeds of the PNB Fraud (the "**Money Laundering Transactions**"), including without limitation:

  a.  Each of the transactions identified in paragraphs 135(a)-(p) above.

  b.  Each sham transaction whereby the Debtors exported diamonds and other goods to Shadow Entities or other Modi-owned entities in exchange for funds transferred by wire or other means for the purpose of artificially inflating the volume of exports to secure additional LOUs, thereby promoting or carrying on the PNB Fraud.

  c.  Each sham transaction whereby the Debtors transferred funds by wire or other means in exchange for imported diamonds and other goods from Shadow Entities or other Modi-owned entities for the purpose of providing those entities' with liquidity to repay the LOU obligations, thereby promoting or carrying on the PNB Fraud.

  d.  All other transfers, by wire or other means, of funds obtained as a result of the PNB Fraud, including, but not limited to: the wire transfer of $23 million from Mehta's bank account for the creation of the Ithaca

33

Trust; the wire transfer on or about September 7, 2017, of $25 million from CPS50 to purchase the Ritz Carlton Apartment; the wire transfers of $2.5 million from Ami Modi's HSBC account and of $23 million from Mehta's bank account to fund CPS50; the wire transfer on January 2, 2018, of $6 million from Mehta's bank account to Commonwealth Trust Company for the purchase of CPRE.

145.    The RICO Enterprise, as conducted and controlled by Defendants Modi, Bhansali, and Gandhi, knew that the property involved in each Money Laundering Transaction represented the proceeds of the PNB Fraud.

146.    Each Money Laundering Transaction involved a monetary transaction in criminally derived property of a value of greater than $10,000 and derived from specified unlawful activity.

147.    Many of the Money Laundering Transactions involved the transfer of funds from a place outside of the United States to a place within the United States, or vice versa, including without limitation the transfers described in paragraph 144(b)-(c) above.

148.    The RICO Enterprise, as conducted and controlled by Defendants Modi, Bhansali, and Gandhi, conducted each Money Laundering Transaction with the intent to promote the carrying on of the PNB Fraud.

149.    The RICO Enterprise, as conducted and controlled by Defendants Modi, Bhansali, and Gandhi, conducted each Money Laundering Transaction with the knowledge that such Money Laundering Transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the PNB Fraud.

150.    Accordingly, the RICO Enterprise, as conducted and controlled by Defendants Modi, Bhansali, and Gandhi, committed numerous acts of money laundering in violation of 18 U.S.C. §§ 1956 and 1957.

151.    By enabling, facilitating, and promoting the PNB Fraud, the RICO Enterprise's violations of 18 U.S.C. §§ 1956 and 1957 directly and proximately caused injury to each Debtor's business and property by destroying each Debtor's going-concern value and rendering each Debtor insolvent.

## Continuity of Conduct

152.    Defendants' violations of law as set forth herein, each of which directly and proximately injured the Debtors, constituted a continuous course of conduct in the United States beginning in no later than early 2011 and continuing at least through the date of the filing of the chapter 11 petitions commencing these cases, which was intended to obtain economic gain through false representations, fraud, deceit, and other improper and unlawful means. Therefore, the violations were a part of pattern of racketeering activity under 18 U.S.C. §§ 1961(1) and (5).

## The RICO Enterprise Caused Injury to Debtors

153.    Each Debtor has been injured in its business or property as a direct result and proximate result of the Rico Enterprise's violations, described above, of 18 U.S.C. § 1962(c), including any injury by reason of the predicate acts constituting the pattern of racketeering activity.

154.    Before Defendants hatched their scheme to defraud PNB, each of the Debtors operated as a legitimate business built on fruitful relationships with reputable customers.

155.    Firestar was incorporated in 2004 for the purposes of acquiring Frederick Goldman, Inc., which was one of FIL's U.S. customers. Firestar historically operated as a distributor and wholesaler of finished gold and diamond jewelry. Its customer base consisted of legitimate jewelry retailers such as Zales, JCPenney, and Macy's.

156.    Fantasy was incorporated in 2012 for the purpose of holding the exclusive license from Chicago-based Fantasy Diamond Corp. to supply the Endless Diamond Brand to U.S.

retailers. Fantasy was created primarily to conduct business with Costco Wholesale Corporation based on sales attributable to the Endless Diamond Brand. Fantasy's other customers include Zales, Sam's Club, and Walmart. Fantasy sold finished jewelry, generally at a higher price point than Firestar.

157.     Jaffe is the successor to New York-based Sandberg & Sikorksi Corporation, whose predecessors date back to 1892. Sandberg & Sikorski historically consisted of two divisions, one that sold to major U.S. retailers and A. Jaffe, a luxury bridal line that supplied assembled pieces of jewelry to high-end independent jewelry retailers. In 2007, FIL purchased a 95% stake in Sandberg & Sikorski. Sandberg & Sikorski was renamed A. Jaffe, Inc. in 2011. It did not become fully integrated within the Firestar group of entities until 2016.

158.     As a result of Defendants' exploitation of the Debtors as part of their scheme to defraud PNB, each Debtor's customer and supplier relationships, industry reputation, and ultimately value as a going concern were destroyed. Defendants' misconduct destroyed each Debtor's financial standing by burdening them with enormous liability to PNB, crippling their ability to operate as legitimate businesses, and forcing them to expend resources on an expensive chapter 11 liquidation.

### Plaintiff's Entitlement to Treble Damages

159.     As a result of the violations of 18 U.S.C. § 1962(c) by the RICO Enterprise, each Debtor has suffered substantial damages in an amount to be proven at trial.

160.     Under 11 U.S.C. §§ 323, 541(a)(1) and 1106(a), Plaintiff has standing to bring all claims alleged in this Complaint on behalf of each of the Debtors' chapter 11 estates.

161.     Under 18 U.S.C. § 1964(c), Plaintiff is entitled to recover treble the Debtors' general and special compensatory damages, plus interest, costs, and attorneys' fees caused by reason of Defendants' violations of 18 U.S.C. § 1962(c).

# COUNT 7

## Racketeering Influenced Corrupt Organizations Act
## 18 U.S.C. § 1962(d)
## (Nirav Modi, Mihir Bhansali, Ajay Gandhi)

162. Plaintiff restates and re-alleges paragraphs 1 through 161 of this Complaint as though fully set forth herein.

163. Since at least early 2011, the Defendants together with others known and unknown, being persons employed by and associated with the RICO Enterprise, have unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with others to violate 18 U.S.C. § 1962(c), as described above, in violation of 18 U.S.C. § 1962(d).

164. The Defendants knew that they were engaged in a conspiracy to commit the predicate acts and knew that the predicate acts were part of such racketeering activity, and the participation and agreement of each of them was necessary to allow the commission of this pattern of racketeering activity. This conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

165. The Defendants agreed to conduct or participate in, directly or indirectly, the conduct, management, or operation of the RICO Enterprise's affairs through a pattern of racketeering activity, including but not limited to the acts of racketeering set forth above in Count 6 of this Complaint.

166. As part of the conspiracy, each Defendant, at times acting through certain of its officers, agents, and representatives or co-conspirators, committed at least two predicate acts of racketeering in the conduct of the RICO Enterprise's affairs.

167. As a direct and proximate result of the Defendants' conspiracy, the racketeering activity of the RICO Enterprise, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), each of the Debtors has been injured in its business and property.

37

168.    Under 18 U.S.C. § 1964(c), Plaintiff is entitled to recover treble its general and special compensatory damages, plus interest, costs, and attorneys' fees incurred by reason of Defendants' violations of 18 U.S.C. § 1962(d).

WHEREFORE, Plaintiff, as chapter 11 trustee of the Debtors, respectfully requests that the Court enter judgment:

    a.   On Counts 1, 2, and 3, in favor of Plaintiff and against Defendants Modi, Bhansali, and Gandhi, jointly and severally, in the amount of damages to be proven at trial that were suffered by the Debtors and their estates as a result of the Defendants' breaches of fiduciary duty and aiding and abetting breaches of fiduciary duty, plus interest, costs and attorneys' fees, and such other equitable relief as may be just and proper.

    b.   On Counts 4 and 5, in favor of Plaintiff and against Defendants Modi, Bhansali, and Gandhi, jointly and severally, in the amount of damages to be proven at trial that were suffered by the Debtors and their estates as a result of the corporate waste committed, permitted, or suffered by Defendants, plus interest, costs and attorneys' fees, and such other equitable relief as may be just and proper.

    c.   On Counts 6 and 7, in favor of Plaintiff and against Defendants Modi, Bhansali, and Gandhi, jointly and severally, in treble the amount of damages to be proven at trial that were suffered by the Debtors and their estates as a result of the Defendants' violation of the Racketeering Influenced Corrupt Organizations Act,

plus interest, costs and attorneys' fees, and such other equitable relief as may be

just and proper.

Dated: March 27, 2019,
      New York, New York

Respectfully submitted,

**JENNER & BLOCK LLP**

By: /s/ Vincent E. Lazar
Vincent E. Lazar
Angela M. Allen (*pro hac vice* pending)
353 North Clark Street
Chicago, Illinois 60654
(312) 222-9350
vlazar@jenner.com
caallen@jenner.com

Carl N. Wedoff
Nicolas G. Keller
919 Third Avenue
New York, New York 10022
(212) 891-1600
cwedoff@jenner.com
nkeller@jenner.com

*Counsel for the Chapter 11 Trustee*

# UNITED STATES BANKRUPTCY COURT
## Southern District of New York

In re: Firestar Diamond, Inc. and Fantasy, Inc.

Bankruptcy Case No.:
18−10509−shl

Richard Levin Chapter 11 Trustee of Firestar Diamond, Inc., Fantasy, Inc., and Old AJ, Inc. f/k/a A. Jaffe, Inc.

Plaintiff(s),

Adversary Proceeding No.
19−01102−shl

−against−

Nirav Deepak Modi
Mihir Bhansali
Ajay Gandhi

Defendant(s)

## SUMMONS AND NOTICE OF PRETRIAL CONFERENCE IN AN ADVERSARY PROCEEDING

YOU ARE SUMMONED and required to submit a motion or answer to the complaint which is attached to this summons to the clerk of the bankruptcy court within 30 days after the date of issuance of this summons, except that the United States and its offices and agencies shall submit a motion or answer to the complaint within 35 days, to:

| **Address of Clerk:** |
|---|
| **Clerk of the Court** <br> **United States Bankruptcy Court** <br> **Southern District of New York** <br> **One Bowling Green** <br> **New York, NY 10004−1408** |

At the same time, you must also serve a copy of the motion or answer upon the plaintiff's attorney.

| **Name and Address of Plaintiff's Attorney:** |
|---|
| **Carl N Wedoff** <br> **Jenner & Block LLP** <br> **919 Third Avenue** <br> **New York, NY 10022** |

If you make a motion, your time to answer is governed by Fed. R. Bankr. P. 7012.

YOU ARE NOTIFIED that a pretrial conference of the proceeding commenced by the filing of the complaint will be held at the following time and place:

| United States Bankruptcy Court <br> Southern District of New York <br> One Bowling Green <br> New York, NY 10004−1408 | Room: Courtroom 701, One Bowling Green, New York, NY 10004−1408 |
|---|---|
| | Date and Time: 5/16/19 at 10:00 AM |

IF YOU FAIL TO RESPOND TO THIS SUMMONS, YOUR FAILURE WILL BE DEEMED TO BE YOUR CONSENT TO ENTRY OF A JUDGMENT BY THE BANKRUPTCY COURT AND JUDGMENT BY DEFAULT MAY BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT.

Dated: 3/28/19

Vito Genna
_____
*Clerk of the Court*

By: /s/ Carmen Ortiz
_____
*Deputy Clerk*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| FIRESTAR DIAMOND, INC., *et al.* | No. 18-10509 (SHL) |
| Debtors. | (Jointly Administered) |
| RICHARD LEVIN, Chapter 11 Trustee of FIRESTAR DIAMOND, INC., FANTASY, INC., and OLD AJ, INC. f/k/a A. JAFFE, INC., | Adv. Proc. No. 19-1102 (SHL) |
| Plaintiff, | |
| v. | |
| NIRAV DEEPAK MODI, MIHIR BHANSALI, and AJAY GANDHI, | |
| Defendants. | |

### ORDER SETTING FOREIGN DEFENDANT
### NIRAV DEEPAK MODI'S TIME TO RESPOND TO THE COMPLAINT

Upon the motion (the "**Motion**")[1] of Richard Levin, not individually but solely in his capacity as chapter 11 trustee (the "**Trustee**") for Firestar Diamond, Inc. ("**Firestar**") for an order setting the Defendants' time to respond to Complaint under Bankruptcy Rule 7012(a) to thirty days after service of the Complaint and Summons; and the Court having conducted a hearing on the Motion on April 15, 2019 (the "**Hearing**"); and the Court having considered the Motion, all responses filed thereto, if any, as well as any evidence presented at the hearing; and the Court having jurisdiction to consider and determine the Motion in accordance with 28 U.S.C. §§ 157 and 1334; and appropriate notice under the circumstances of the Motion having been provided, and

---

[1] Capitalized terms not defined herein shall have the meaning ascribed to them in the Motion.

it appearing that no other or further notice need be provided; and after due deliberation and sufficient cause appearing therefor,

IT IS ORDERED:

1.      Defendant Nirav Deepak Modi is required to submit a motion or answer to the Complaint to the clerk of the bankruptcy court within 30 days after service of the Complaint and Summons.

2.      ***This Order shall be served on Defendant Nirav Deepak Modi when he is served with the complaint in this adversary proceeding.***

Dated: April 18, 2019                                    */s/ Sean H. Lane*
                                                        The Honorable Sean H. Lane
                                                        United States Bankruptcy Judge



**HM Courts & Tribunals Service**

ROYAL COURTS OF JUSTICE GROUP
**Queen's Bench Division**
Foreign Process Section
Room E16
Royal Courts of Justice
Strand, London
WC2A 2LL

**DX** 44450 Strand

**T** 020 7947 7772
**F** 0870 324 0025
**E** ForeignProcess.RCJ@justice.gov.uk

**Text Phone** 18001 020 7947 7772
(Helpline for the deaf and hard of
hearing)

**www.justice.gov.uk**

**Kelly Hagedorn**
**Jenner & Block LLP**
**25 Old Broad Street**
**London EC2N 1HQ**

Our ref:   QF-2019-002119
Your ref:

Date: 17-09-2019

Dear Ms Hagedorn

### RE: USA v Modi

Please find enclosed the Return documents and Certificate of Service in relation to service of
documents on Mr Modi at HMP Wandsworth.

Yours faithfully,

Jennifer Foley
**Foreign Process Section**

**From:** Adele, Ikechi [HMPS] [mailto:Ikechi.Adele@justice.gov.uk]
**Sent:** 12 September 2019 14:08
**To:** Harbert, Elaine <Elaine.Harbert1@Justice.gov.uk>; Shoulder, David
<David.Shoulder@justice.gov.uk>
**Cc:** Madsen, Maria <Maria.Madsen@justice.gov.uk>
**Subject:** Serving of papers; Mr Modi

Dear Senior Master Fontaine

I will like to confirm that the papers from Wandsworth County Court were served, by myself, on Mr
Nirav Deepak Modi yesterday 11/09/2019 at 14:46hrs.

Please do not hesitate to contact me if you have any further queries.

Kind regards

Ikechi

**Ikechi Adele | Head of Offender Management Unit**
HMP Wandsworth | Heathfield Road | London SW18 3HS
02085883966 | ikechi.adele@justice.gov.uk

Official/Official-Sensitive/Secret

---

This e-mail and any attachments is intended only for the attention of the addressee(s). Its unauthorised use, disclosure, storage or copying is not permitted. If you are not the intended recipient, please destroy all copies and inform the sender by return e-mail. Internet e-mail is not a secure medium. Any reply to this message could be intercepted and read by someone else. Please bear that in mind when deciding whether to send material in response to this message by e-mail. This e-mail (whether you are the sender or the recipient) may be monitored, recorded and retained by the Ministry of Justice. Monitoring / blocking software may be used, and e-mail content may be read at any time. You have a responsibility to ensure laws are not broken when composing or forwarding e-mails and their contents.

F.P ref: **QF-2019-002119**
T.A Ref: Kelly

Hagedorn **«Reference»**

### CERTIFICATE - ATTESTATION

The undersigned authority has the honour to certify, in conformity with article 6 of the Convention
L'autorite soussignee a l'honneur d'attester conformenent a l'article 6 de ladite Convention.

1) that the document has been served the (date) **11-09-2019**
que le demande a ete executee        le (date)

  -at (place, street, number)    **Nirav Deepak Modi, HMP Wandsworth, Heathfield Rd,**
  -a (localite, rue, numero)     **London, SW18 3HU**

- in one of the following methods authorised by article 5:
-dans une des formes suivantes prevues a l'article 5:
a) in accordance with the provisions of sub-paragraph (a) of the first paragraph of article 5 of the convention
selon les formes legales (article 5, alinea premier, lettre a)

  b) in accordance with the following particular method    **On Mr Ikechi Adele an Administrative**
selon la forme particuliere suivante    **Officer who served Mr Nirav Deepak Modi 11th September 2019**

c) by delivery to the addressee, who accepted it voluntarily
par remise simple
The documents referred to in the request have been delivered to:

Les documents mentionnes dans la demande ont ete remis a:
- (identity and description of person)
- (identite et qualite de la personne)

  - relationship to the addressee (family, business or other)
  - liens de parente de subordination ou autres avec le desinataire de l'acts

2) that the document has not been served, by reason of the following facts:
que la demande n'a pas ete executee, en raison des faits suivants:

in conformity with the second paragraph of article 12 of the Convention, the applicant is requested to pay the expenses details in the attached statement.
Conformement a l'article 12, alinea 2 de ladite Convention, le requerant est prie de payer ou de rembourser les frais dont le detail figure au memoire ci-joint

Annexes
Documents returned
Pieces renvoyees

in appropriate cases, documents establishing the service:
le cas echeant, les documents justicatifs de l'execution:



Done at London
fait a

the **17-09-2019**

Signature and/or stamp:
Signature et/ou cachet:

2019 - 2119

ZURÜCKSENDEN - TO RETURN
à retourner-de restituire

## SUMMARY OF THE DOCUMENT TO BE SERVED
### ÉLÉMENTS ESSENTIELS DE L'ACTE

**Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, signed at The Hague, the 15th of November 1965 (Article 5, fourth paragraph).**

Convention relative à la signification et à la notification à l'étranger des actes judiciaires ou extrajudiciaires en matière civile ou commerciale, signée à La Haye le 15 novembre 1965 (article 5, alinéa 4).

| | |
|---|---|
| **Name and address of the requesting authority:** <br> Nom et adresse de l'autorité requérante : | Honorable Sean H. Lane <br> United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York, 10004-1408, United States of America |

<table>
<tr>
<td><b>Particulars of the parties*:</b><br>Identité des parties* :</td>
<td>

Firestar Diamond, Inc. f/k/a Firestone, Inc. (Debtor)<br>
c/o Richard Levin, Chapter 11 Trustee<br>
Jenner & Block LLP<br>
919 Third Avenue, New York NY 10022, USA<br>
+1 (612) 891-1601<br><br>

Fantasy, Inc. (Debtor)<br>
c/o Richard Levin, Chapter 11 Trustee<br>
Jenner & Block LLP<br>
919 Third Avenue, New York NY 10022, USA<br>
+1 (612) 891-1601<br><br>

Old AJ, Inc. f/k/a A. Jaffe, Inc. f/k/a Sandberg & Sikorski Corp. (Debtor)<br>
c/o Richard Levin, Chapter 11 Trustee<br>
Jenner & Block LLP<br>
919 Third Avenue, New York NY 10022, USA<br>
+1 (612) 891-1601<br><br>

Richard Levin (Plaintiff) represented by Jenner & Block LLP, 919 Third Avenue, New York, New York 10022, USA; contactable through his attorneys: Angela Allen, aallen@jenner.com +1 (312) 222-9350, and Carl Wedoff, cwedoff@jenner.com, +1 (202) 891-1600<br><br>

Nirav Deepak Modi (Defendant)<br>
HMP Wandsworth<br>
Heathfield Road, London, SW18 3HU<br>
United Kindgom<br><br>

Mihir Bhansali (Defendant)<br>
c/o White & Williams LLP<br>
attn: Thomas E. Butler, Esq.<br>
7 Times Square Ste. 2900<br>
New York NY 10036, USA<br><br>

Ajay Gandhi (Defendant)<br>
c/o Serpe Ryan LLP<br>
attn: Silvia L. Serpe<br>
16 Madison Square West<br>
New York, New York 10010, USA

</td>
</tr>
</table>



\* If appropriate, identity and address of the person interested in the transmission of the document
S'il y a lieu, identité et adresse de la personne intéressée à la transmission de l'acte

☒ **JUDICIAL DOCUMENT**\*\*
ACTE JUDICIAIRE\*\*

| | |
|---|---|
| **Nature and purpose of the document:**<br>Nature et objet de l'acte : | The Order attached as Exhibit 3 requires Nirav Deepak Modi, as a Defendant in the proceedings, to respond to the Complaint within 30 days after service of the Complaint [Exhibit 1] and Summons [Exhibit 2]. |
| **Nature and purpose of the proceedings and, when appropriate, the amount in dispute:**<br>Nature et objet de l'instance, le cas échéant, le montant du litige : | This is an action against the Defendant Nirav Deepak Modi, the former indirect controlling majority shareholder and de facto director, officer or controlling person of the Debtors; Mihir Bhansali, who served as the Debtors' sole director and as the Chief Executive Officer of each Debtor; and Ajay Gandhi, who sreved as the Chief Financial Officer of each Debtor. This action seeks to recover from the Defendants the damages the Debtors and their estates suffered as a result of their six year, extensive international fraud, money-laundering, and embezzlement scheme, that resulted in the accrual of claims against the Debtors of over $1 billion in favour of Punjab National Bank, the diversion of millions of dollars of the Debtor's assets for Mr. Modi's personal benefit, and the collapse of the Debtors and the resulting loss of value of their business. |
| **Date and Place for entering appearance**:**<br>Date et lieu de la comparution** : | |
| **Court which has given judgment**:**<br>Juridiction qui a rendu la décision** : | United States Bankruptcy Court<br>Southern District of New York<br>One Bowling Green<br>New York, NY 10004-1408 |
| **Date of judgment**:**<br>Date de la décision** : | 18 April 2019 |
| **Time limits stated in the document**:**<br>Indication des délais figurant dans l'acte** : | Under the Order attached as Exhibit 3, Nirav Deepak Modi is required to submit a motion or answer to the Complaint to the clerk of the bankruptcy court within 30 days after Service of the Complaint and Summons. |

** if appropriate / s'il y a lieu

☐ **EXTRAJUDICIAL DOCUMENT****
ACTE EXTRAJUDICIAIRE**

| | |
|---|---|
| **Nature and purpose of the document:**<br>Nature et objet de l'acte : | 11. Describe the nature and purpose of the document |
| **Time-limits stated in the document**:**<br>Indication des délais figurant dans l'acte** : | 12. Specify limits |

** if appropriate / s'il y a lieu

Permanent Bureau July 2017

## Exhibit 1

Complaint

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>FIRESTAR DIAMOND, INC., *et al.*<br><br>Debtors. | Chapter 11<br><br>No. 18-10509 (SHL)<br><br>(Jointly Administered) |
| RICHARD LEVIN, Chapter 11 Trustee of<br>FIRESTAR DIAMOND, INC., FANTASY, INC.,<br>and OLD AJ, INC. f/k/a A. JAFFE, INC.,<br><br>Plaintiff,<br><br>v.<br><br>NIRAV DEEPAK MODI, MIHIR BHANSALI,<br>and AJAY GANDHI,<br><br>Defendants. | Adv. Proc. No. 19-_____ (SHL) |

**COMPLAINT AGAINST INSIDERS FOR BREACH OF FIDUCIARY DUTY, AIDING AND ABETTING BREACH OF FIDUCIARY DUTY, CORPORATE WASTE, AND VIOLATIONS OF THE RACKETEERING INFLUENCED CORRUPT ORGANIZATIONS ACT**

Plaintiff Richard Levin, not individually but solely as chapter 11 trustee ("**Trustee**" or "**Plaintiff**") for Debtors Firestar Diamond, Inc., Fantasy, Inc., and Old AJ, Inc. f/k/a A. Jaffe, Inc. (collectively, the "**Debtors**"), for his Complaint alleges as follows:

## NATURE OF THE ACTION

1.      This is an action against Defendant Nirav Deepak Modi ("**Modi**"), the former indirect controlling majority shareholder and *de facto* director, officer, or controlling person of the Debtors; Mihir Bhansali ("**Bhansali**"), who served as the Debtors' sole director and as the Chief Executive Officer ("**CEO**") of each Debtor; and Ajay Gandhi ("**Gandhi**"), who served as the Chief Financial Officer ("**CFO**") of each Debtor. This action seeks to recover from the Defendants the damages the Debtors and their estates suffered as a result of their six-year, extensive international

1

fraud, money laundering, and embezzlement scheme, that resulted in accrual of claims against the Debtors of over $1 billion in favor of Punjab National Bank, the diversion of millions of dollars of the Debtors' assets for Modi's personal benefit, and the collapse of the Debtors and the resulting loss of value of their businesses.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over the subject matter of this adversary proceeding under 28 U.S.C. § 1334(b) because this adversary proceeding arises under Title 11 and arises in and is related to the chapter 11 cases *In re Firestar Diamond, Inc., et al*, Case No. 18-10509 (SHL), which are pending in this Court.

3.      This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2).

4.      The Trustee consents to entry of final order or judgment by this Court.

5.      Venue of this adversary proceeding is proper in this district under 28 U.S.C. § 1409.

## THE PARTIES

6.      Plaintiff Richard Levin is the chapter 11 trustee for the Debtors, duly appointed under section 1104(a) of the Bankruptcy Code by the United States Trustee for Region 2 on June 14, 2018, whose appointment was approved by this Court by order entered the same day.

7.      The Trustee brings this action, not individually, but solely in his capacity as Trustee.

8.      Debtor Firestar Diamond, Inc. (f/k/a Firestone, Inc.) ("**Firestar**") is a privately-held Delaware corporation, with its principal place of business in New York. While in operation, Firestar principally operated a wholesale diamond business. Firestar Group, Inc., a Delaware corporation ("**Group**"), owns 100% of the equity interests in Firestar.

2

9.    Debtor Fantasy, Inc. ("**Fantasy**") is a privately-held Delaware corporation, with its principal place of business in New York. While in operation, Fantasy was principally a wholesale diamond business. Firestar owns 100% of the equity interests in Fantasy.

10.    Debtor Old AJ, Inc. (f/k/a A. Jaffe, Inc., f/k/a Sandberg & Sikorski Corp.) ("**Jaffe**") is a privately-held New York corporation, with its principal place of business in New York. While in operation, Jaffe was principally a bridal jewelry business.

11.    Synergies Corporation is a Delaware corporation that owns 95% of the equity interests in Jaffe and 100% of the equity interests in Group. Firestar Holdings Ltd., a Hong Kong company ("**Firestar Hong Kong**"), owns 100% of the equity interests in Synergies Corporation.

12.    Firestar International Limited (f/k/a Firestar International Private Limited, f/k/a Firestone International Private Limited, f/k/a Diamond 'R' Us) ("**FIL**") holds 100% of the equity interest in Firestar Hong Kong and is the ultimate holding company of numerous other Firestar entities (collectively, including the Debtors, Group, Synergies Corporation, Firestar Hong Kong, and FIL, the "**Firestar Entities**").

13.    At all relevant times, Modi owned or controlled approximately 94.88% of the equity interests in FIL and was a director of FIL. Upon information and belief, Modi is a citizen of India and traveled frequently to the United States, including the New York, to conduct business in New York through the Debtors and through other Firestar Entities.

14.    At all relevant times, Bhansali served as the sole director and CEO of each Debtor in New York and resided and continues to reside in New York.

15.    At all relevant times, Gandhi served as the Chief Financial Officer CFO of each Debtor in New York and resided and continues to reside in New York.

3

## FACTS

**Modi's Diamond Businesses**

16.     Modi entered the diamond business around 2000 through FIL, then known as Diamonds 'R' Us, which operated as a diamond trading company in India specializing in loose diamonds and gems for use in retailers' assembled products. In or about 2010, Modi entered the luxury retail business through one or more of the Firestar Entities and began to sell high-end finished jewelry he designed. Over time, Modi expanded his diamond and jewelry business, with retail, wholesale, and manufacturing locations in Antwerp, Armenia, Beijing, Belgium, Dubai, Hong Kong, India, Johannesburg, London, Macau, Moscow, Paris, and the United States.

17.     Modi, acting through the FIL, acquired Firestar (then known as Firestone, Inc.) in 2005, acquired a 95% interest in Jaffe (then known as Sandberg & Sikorski Corp.) in 2007, and incorporated Fantasy in 2012.

**The Punjab National Bank Fraud**

18.     From approximately early 2011 to early 2018 (the "**Relevant Period**"), Modi orchestrated and directed a scheme to obtain loans, credits, or other funds under false pretenses and without collateral from Punjab National Bank ("**PNB**"), a publicly-owned Indian bank majority owned by the central government of India, as described below (the "**PNB Fraud**").

19.     Modi and others he directed, acting through at least three entities under Modi's control—Diamonds 'R' Us, Solar Exports, and Stellar Diamonds—obtained from PNB Letters of Undertaking ("**LOUs**"), which are guarantees under which PNB allows its customers to obtain short-term credit from other Indian banks' foreign branches to engage in foreign import transactions into India without providing ordinarily-required collateral. Typically, upon presentation of an LOU, the foreign branch pays the exporter and seeks reimbursement from the LOU issuer, in this case PNB, who then charges its customer. However, in this case, the entities

4

under Modi's control who obtained the LOUs did not provide any collateral, and PNB failed to properly record the LOUs in its core banking system.

20. PNB advanced amounts equal to over US$1 billion under LOUs for the benefit of entities under Modi's control against imports to India without the ordinarily-required collateral and, in some cases, generated by circular trading (also known as "round tripping"), a fraudulent practice whereby the same diamonds are exported from and re-imported back into India multiple times at varying and often inflated prices, in transactions involving various Firestar Entities and more than twenty foreign shell companies secretly controlled by Modi (the "**Shadow Entities**") to give the appearance of multiple distinct transactions.

21. Modi and others at his direction used the Shadow Entities to create the appearance that independent entities were engaging in transactions with the Firestar Entities.

22. The Debtors' records reflect sales by the Debtors to Shadow Entities totaling approximately $214 million during the Relevant Period and cash transfers to and from the Debtors and the Shadow Entities totaling approximately $227 million during the seven-year period from 2011 and 2018.

23. When a diamond was imported or re-imported into India through a circular trading transaction among the Firestar Entities or the Shadow Entities, was often connected to a Firestar Entity drawing funds from a foreign bank under a PNB-issued LOU.

24. To facilitate the issuing of the LOUs and to prevent detection, Modi and others at his direction worked with two PNB employees, including Gokulnath Shetty, who authorized the issuance of the LOUs without securing collateral and without properly recording the LOUs in PNB's records.

25. The PNB Fraud orchestrated by Modi has resulted in several investigations and criminal enforcement actions against Modi, Bhansali, and others by Indian governmental

authorities, including the Central Bureau of Investigation; the Directorate of Enforcement; the Income Tax Department; and the Serious Fraud Investigation Office. On or about March 12, 2019, the Indian government issued an extradition request to the government of the United Kingdom on the basis of an arrest warrant issued against Nirav Modi by an Indian Court. In response to that request, Modi was arrested in London on or about March 20, 2019 and is currently incarcerated in London.

26.     In his Declaration filed with this Court on February 28, 2018, referencing the revelation of the PNB Fraud in India, Bhansali stated under penalty of perjury:

> 40. The supply chain disruption and negative publicity have dramatically impaired the Debtors' business operations in the short term and have created a great deal of uncertainty and confusion in the market about the Debtors' ability to continue to operate their business as a going concern.

> 41. Without greater certainty and assurances, certain vendors have expressed a reluctance to continue doing business with the Debtors and certain customers have begun to explore moving certain of the Debtors' programs to other suppliers.

> 42. As such, the Debtors filed these Chapter 11 cases in an effort to preserve the going concern value of their businesses and effectuate a sale or other transaction that will provide the resources necessary to allow the Debtors' successful brands to continue to thrive.

27.     The PNB Fraud coordinated and overseen by Modi and others at his direction resulted in a total loss to PNB of exceeding US$1 billion. As a result of the PNB Fraud, PNB has asserted significant claims against the Debtors on the grounds that a substantial portion of the proceeds of the PNB Fraud were transferred to the Debtors.

**Debtors' Involvement in the PNB Fraud**

28.     At Modi's direction, the Debtors were involved in the PNB Fraud and were exporters and direct beneficiaries of at least six LOUs totaling $10,192,303. The Debtors also engaged in circular trading that facilitated the issuance and presentation of additional LOUs and the resulting payments to the Shadow Entities and to Firestar Entities.

29.     As one example, the Debtors exported the same 3.27 carat Fancy Vivid Yellow Orange Cushion Cut SI1 diamond three times and imported it once between August 8 and September 13, 2011, a period of five weeks. On August 8, 2011, Firestar (then Firestone, Inc.) sold the diamond to Fancy Creations Company, Ltd., a Shadow Entity for $1,098,802. Approximately three weeks later, Solar Exports, a Modi-controlled entity, exported the diamond to Firestar for $183,087—approximately $900,000 less, although much closer to its actual value. Six days later, Firestar exported the diamond back to Fancy Creations Company, Ltd. for $1,156,043, now in excess of the original inflated price. Finally, two weeks later, Jaffe sold the diamond to World Diamond for $1,218,991, a Shadow Entity whose operations were managed by an employee of the Firestar Entities in India, Sandeep Mistry.

30.     As another example, later in 2011, the Debtors engaged in the circular trading of a diamond that was recorded as a 1.04 carat Fancy Intense Pink Emerald Cut SI2 diamond. The diamond appeared in the Debtors' records in three transactions within six weeks of each other and was valued at a different price each time, averaging $644,453 over the three purported transactions, well above the 2011 market value for such a diamond of $300,000 per carat. On information and belief, there was at most only one such diamond. The Debtors' records reflect a shipment of a diamond of this description on August 19, 2011, with an Indian Firestar Entity sending it to Firestar for $608,400. As with the 3.27 carat Fancy Vivid Yellow Orange Cushion Cut SI1, Sandeep Mistry sent shipping instructions and a spreadsheet accompanied by invoices created in India. Consistent with Mistry's instructions, Firestar sold it to SDC Designs LLC (on information and belief, a New York company with connections to Modi) for $642,200. Jaffe shipped a diamond with the same description one month later to Diamonds 'R' Us in India for $682,760.

7

31.     One of the purported transactions that is recorded as involving this 1.04 carat Fancy Intense Pink Emerald Cut SI2 diamond occurred in October 2011. On October 4, 2011, the diamond was among a package of twenty-six fancy-colored loose diamonds shipped from Jaffe to Diamonds 'R' Us in India. Diamonds 'R' Us sought an LOU from PNB for $1,921,079 to purchase the diamonds from Jaffe. Gokulnath Shetty, a PNB employee working with Modi, authorized the issuance of this LOU at the PNB Brady House branch. Shetty did not properly record the LOU in PNB's records, and Diamonds 'R' Us did not provide the ordinarily-required collateral to PNB for the LOU. PNB coordinated with its Hong Kong branch, which deposited money into PNB's Deutsche Bank nostro account in New York, New York. PNB paid Jaffe for the diamonds from the nostro account on October 13, 2011. On the same day, after receiving the $1,921,079 from the bank, Jaffe transferred $1,832,700 to Firestar Entities in India.

32.     At least six PNB LOUs were issued where a Debtor was the exporting entity and direct beneficiary of the LOU funds. The funds drawn under each of these LOUs were received by the Debtors and in each case were either returned to a Firestar Entity in India or used by the Debtors or Shadow Entities.

33.     Additionally, funds generated by many of the fraudulent LOUs went through the Debtors, which received the funds from one or more of the Shadow Entities.

**Involvement of Debtors' Directors and Officers in the PNB Fraud**

34.     At the direction of Modi, certain of Debtors' directors and officers participated in and advanced the PNB Fraud, including Bhansali and Gandhi.

### Mihir Bhansali

35.     As director of the Debtors and the Debtors' CEO, and in coordination with or at the direction of Modi, Bhansali coordinated and directed fraudulent transactions among the

8

Debtors and Shadow Entities involving hundreds of millions of dollars. These transactions were integral to the PNB Fraud.

36.     Bhansali managed the Debtors' "house accounts," the accounts in which proceeds of loose diamond sales were segregated from regular sales accounts for purposes of computing commissions. The Debtors engaged in loose diamond sales primarily with Shadow Entities. The Debtors received approximately $155 million in cash transfers from Shadow Entities during the Relevant Period and paid approximately $72 million out to Shadow Entities. The vast majority of these transactions involved the purchase and sale of tens of millions of dollars-worth of loose diamonds per year, which is not consistent with Debtors' stated business purpose.

37.     At least in 2012, Jaffe maintained two sets of books and records: "core" financials, which did not include loose diamond transactions, and "regular" financials, which did, which reflected transactions executed to further the PNB fraud, and which existed to hide those transactions.

38.     Bhansali coordinated and directed a number of the circular transactions involving the Debtors. For example, in a 2012 email, Kurian Matthews, a Firestar Entity employee in Dubai, relayed a conversation he had with Bhansali in which they set up a circular transaction starting at Fantasy, going through Radashir Jewelry Co. Pvt. Ltd. (on information and belief, a Shadow Entity), FIL, and Firestar and ending back at Fantasy. The purpose was to "clear the old invoices of Radashir on FDC" because a bank was inquiring about the old invoices.

39.     Similarly, in December 2012, Bhansali and Kurian Mathews discussed wiring money to Radashir and back to the Debtors against Radashir's accounts payables to "use [the money] for NM [Modi]."

40.     In March 2016, Evelyn Kosiec, the Jaffe operations manager, asked Bhansali where to re-export loose diamonds, and an hour later she emailed Gandhi, "Mihir informed to ship this

9

to Eternal diamonds [a Shadow Entity] in Hong Kong, the same price, rounded to the nearest 5 120 day terms."

41.     Bhansali oversaw and directed the use of different sales and inventory practices for Debtors' transactions with Shadow Entities as compared to those used with retailer customers. For instance, each diamond or gem received by the Debtors for use in an ordinary retail transaction was unpacked, compared to its packing slip, scanned for quality control, and logged as "ready to ship." Goods received from Firestar Entities or Shadow Entities as part of the loose diamond transactions often were re-shipped within several days, often to the country from which they originated. Consistent with instructions from Firestar Global Entities, these goods were either re-shipped without being opened or, if they were opened, they were inventoried in bulk, not individually.

42.     Bhansali was intimately involved in and managed the transactions between the Debtors and the Shadow Entities. He had a copy on his office computer of a spreadsheet entitled "AR-AP (Jan'18)" with a document date in early February 2018. The spreadsheet identified payables and receivables as between each of the Modi-controlled entities and the Firestar Entities on the one hand, which were listed on the horizontal axis, and the Shadow Entities on the other hand, which were listed on the vertical axis. The spreadsheet tracks millions of dollars in accounts receivable and accounts payable balances between the Shadow Entities and Firestar Entities but did not list any customers known to be legitimate, foreign of otherwise.

43.     Many of the Shadow Entities directors were current or former employees of Firestar Entities. In addition, many Shadow Entity employees were current or former employees of Firestar Entities, which was reflected on the "AR-AP (Jan'18)" spreadsheet Bhansali had on his computer.

44. Bhansali coordinated and directed the operations of various Shadow Entities. In fact, Bhansali, along with Modi, directed the establishment and controlled some of the Shadow Entities that engaged in the circular trading, including Empire Gems, Unique Diamond and Jewelry, Pacific Diamonds, Universal Fine Jewelry, Vista Jewelry, and Tri Color Gems.

45. On September 7, 2011, Firestar Dubai employee Kurian Mathews forwarded an email to Bhansali containing fee quotes from accountants for proposed audits of two Hong Kong Shadow Entities, Auragems Company Ltd. and Fancy Creations Company Ltd. Mathews stated the fees may have been higher than Firestar Diamond in Hong Kong "due to the complexity of the transactions in these entities." Mathews then sought Bhansali's instruction as to "how to proceed further on this[.]"

46. On February 4, 2013, Sridhar Krishnan, the manager of SDC Designs, LLC wrote to Bhansali and Modi partner Hemant Bhatt using personal email addresses. Krishman told Bhatt and Bhansali, "you should expect 1.4 million in Universal fze today. Please wire the same to A Jaffe." Two days later, Bhatt confirmed that Universal Fine Jewelry FZE had received the funds and that "Empire paid US $1,391,570 to A Jaffe value 05 Feb 13."

47. On August 19, 2017, a manager of Universal Fine Jewelry FZE emailed Bhansali enclosing a profile of three Shadow Entities — Universal Fine Jewelry FZE, Empire Gems FZE, and Diagems Inc. — and asking Bhansali to "review and advice [sic]." The manager's email signature stated he was also the General Manager of Firestar Diamond in Dubai.

48. Bhansali also oversaw and directed the operations of other Firestar Entities, often including minute details involving day-to-day operations. For example, on April 26, 2011, an employee of a Firestar Entity sought Bhansali's permission to make wire transfers from a Firestar Entity in Hong Kong to Firestar and Brilliant Diamonds. On September 14, 2017, a former Firestar employee asked for Bhansali's approval before changing the authorized signatory for Firestar

11

Hong Kong. On December 14, 2017, a request from a Dubai employee for a tablet computer was directed to Bhansali.

### Ajay Gandhi

49.     As CFO of the Debtors, Gandhi coordinated and directed transactions among the Debtors and Shadow Entities totaling hundreds of millions of dollars. These transactions were integral to the PNB Fraud.

50.     During the Relevant Period, Gandhi controlled the finances of the Debtors. He had authority to approve loose diamond transactions among the Debtors and the Shadow Entities totaling hundreds of millions of dollars.

51.     Gandhi did not distinguish the relationship of the Shadow Entities to the Firestar Entities from the relationship of the Debtors to the Firestar Entities and directed the use of the Debtors' funds for payment of expenses of the Shadow Entities. For example, on March 18, 2014, Ajay Gandhi directed $150,000 to be wired from Firestar's account to Unique Diamond & Jewelry, a purportedly-independent entity that was in fact a Shadow Entity, for the payment of Unique's back office expenses for the period of October 2013 to March 2014. Similarly, on February 15, 2015, Gandhi emailed two Firestar India back office employees and instructed them to pay "$300,000 from Firestar Diamond, Inc to Eternal Diamond. (Back office Expense)" for this Shadow Entity.

52.     Additionally, on January 19, 2010, Gandhi stated in his request for an aging report from the Firestar Entities' back office in India, "You can exclude affiliates such as FIPL [FIL], FS, FC, JS, Sandberg, Unique[,]" thereby referring to Unique Diamond & Jewelry as an affiliate of the Debtors.

53.     On May 5, 2017, Gandhi sent a list of Shadow Entities to Altamash Ansari, a back office employee in India, and stated "Use names from attached for Eternal, Pacific & Tri Color. (Do not share this pdf with anyone.)."

12

54. Gandhi had access to the books of various Shadow Entities. On August 6, 2013, Gandhi sent an email to Bhavesh Patel, a Firestar back-office employee in India, attaching a spreadsheet titled "FS-Inc from Kurian June 2013." The spreadsheet contained purchase and sales ledgers of four Shadow Entities—Fancy Creations Company Limited, Brilliant Diamonds Limited, Eternal Diamond Limited and Unique Diamond & Jewelry—showing these entities' accounting for transactions with Firestar. There appears to be no legitimate reason why Gandhi would be in possession of the internal books and records of multiple Shadow Entities, absent having control or orchestration of their records.

55. On June 10, 2013, to hide their involvement in the PNB Fraud, Modi's personal assistant instructed Gandhi to communicate with her regarding Shadow Entities only on Gmail or Panemail, a program that automatically deletes messages, rather than on the Debtors' regular email system.

56. The PNB Fraud coordinated and directed by Modi, Bhansali, and Gandhi has resulted in substantial creditor claims against the Debtors, including a substantial claim by PNB, and caused the collapse and resulting loss of value of the Debtors' and their businesses.

**Modi, Bhansali and Gandhi Coordinated their Actions**

57. Modi coordinated and directed the execution of the PNB Fraud with senior officers and directors of the Debtors, including Bhansali and Gandhi.

58. Throughout the Relevant Period, Modi sent hundreds of emails to Bhansali and Gandhi, had numerous telephone conversations with them, and met with them at the Debtors' premises and elsewhere. Through many of these emails, telephone conferences, and visits, Modi directed Bhansali and Gandhi and exerted total ultimate control over Debtors' affairs, including in regard to day-to-day details. One means of Modi's omnipresent oversight and control over the

13

Debtors consisted of the dozens of flash reports regarding the Debtors' financials that he received throughout the Relevant Period.

59.    Examples from a short period in 2009 illustrate Modi's total ultimate control over the Debtors. On February 22, 2009, Modi conveyed his preferences to Bhansali regarding which of the Debtors should contribute to a charity dinner. On June 10, 2009, Modi wrote to Gandhi, "Please confirm that shipments made after bankruptcy to Robbins and Western Stone are not in Tab 3 [of the spreadsheet.]" On March 17, 2009, Modi instructed Bhansali and Gandhi, "Pls don't pay further draws/reimbursement to A.Jaffe [sic] salespeople unless I approve. Pls confirm[.]" And on March 20, 2009, Modi requested additional information from Gandhi regarding the Jaffe medical plan and the legality of implementing a method to decrease the medical costs. On June 8, 2009, upon reviewing Jaffe's accounts receivable, Modi instructed Gandhi, "If [the customers] always have been late, we should analyze their business prospects on a going forward basis." On June 17, 2009, Modi weighed in on an "Inventory Reduction Plan" for Jaffe, and on July 9, 2009, Bhansali wrote to Modi, "This was the summary of our plan for Jaffe, that Sam, you and I finalized with Ajay the Friday evening in your house." On July 15, 2009, Modi reviewed a Jaffe budget and commented, "I have deleted some line items[,]" and instructed Gandhi, "When planning, pls review moving to a 4 day week for Jaffe and /or salary cuts . . . for remaining people." On August 14, 2009, Modi instructed Gandhi to respond to an auditor's question with "4.2 million" as the inventory number for Jaffe.

60.    Examples from a short period in 2015 show Modi's total ultimate control over the Debtors persisted throughout the Relevant Period. On January 5, 2015, Gandhi wrote to Modi, "Based on my cash flow, I can pay $3 million in India in January 2015. Please let me know if I can ask for a list from Manish to pay India[,]" to which Modi responded, "Yes[.]" Similarly, on February 9, 2015, Gandhi told Modi, "February cash flow has improved in the last week. I have

$ 2.0 m of Borrowing Cushion. Please let me know if I should pay India - $ 1.5 m this month after keeping $ 500k as cushion[,]" to which Modi responded, "Pls pay $2 m; don't keep cushion." Then, on February 19, 2015, Gandhi told Modi, "Received funds from HK. Now I can pay additional $ 1.5 m this month [to India] this month. Can I ask Manish for a list to pay?" to which Modi responded, "Yes[.]" And on March 2, 2015, Gandhi relayed to Modi that, "Based on my cash flow, I can pay $ 3 m to India in March 2015. Should I ask Manish for a list?" to which Modi responded, "Yes[.]"

61.     Furthermore, Modi treated Gandhi in some respects as a personal accountant. For instance, on February 28, 2017, Modi directed Gandhi to prepare "all financial related parts" of Modi's personal application to live in the River House in New York City, a process which included gathering information concerning Modi's wife, Ami Modi.

62.     Modi, Bhansali, and Gandhi communicated frequently concerning the PNB Fraud and to advance the PNB Fraud. For instance, on August 14, 2009, Modi directed Gandhi to make payments totaling $2,293,326 to Shadow Entities Brilliant Diamonds Ltd. and Diagem Inc. On June 16, 2010, Modi instructed Gandhi, "Unique [a Shadow Entity] has wired $250,000 today to Synergies. Please wire to the account Mehul bhai wants."

63.     On October 21, 2010, in furtherance of a circular trade, Modi and Gandhi communicated by email about the shipment of a diamond to a Shadow Entity. Modi stated, "send the 70 ct vivid yellow to Firestone Dubai @51,500 and not Firestone HK." Gandhi responded, "Firestone, Dubai confirmed (Not Unique)[,]" to which Modi clarified, "Sorry Unique[,]" in reference to the Shadow Entity. Gandhi responded with "Glad I asked!!!"

64.     Modi, Bhansali, and Gandhi coordinated their communications to prevent detection of the PNB Fraud. For instance, on September 7, 2011, in addressing an inquiry from Standard Chartered Bank regarding transactions with certain Shadow Entities, which the bank

15

believed were independent customers, Gandhi represented that these entities were not in fact customers but that Firestar would buy large diamonds from them as vendors. Gandhi explained, "sometimes these goods need to be returned but due to the terms of the original sale, the vendors instruct us to ship these goods to another companies, that they select who are not located in India. We record these transfers as a reduction to purchases and an increase to accounts receivable at the original purchase cost of the diamonds/ jewelry." Bhansali, who was included on the email from Gandhi, forwarded this response to Modi. Modi then responded, noting "As SC is a common bank in India, Antwerp and NY. It might be a good idea that Ajay and you discuss all responses [sic]."

**Modi Used the Debtors' Funds to Purchase Personal Assets**

65.     Just as he orchestrated the circular trades at the heart of the PNB Fraud, Modi also orchestrated transactions to divert assets from the PNB Fraud and the Debtors for the benefit of himself and his family.

### The Ithaca Trust

66.     On August 23, 2017, Modi's sister Purvi Mehta ("**Mehta**") established the Ithaca Trust, an irrevocable trust for the benefit of Modi's wife, Ami Modi, and their three children. The Ithaca Trust's investment advisor was Abhay Dinesh Javeri, Ami Modi's brother. The trustee was Commonwealth Trust Corporation ("**Commonwealth**"). Attorneys from the law firm of Day Pitney LLP ("**Pitney**") were the principal drafters of the Ithaca Trust agreement and served as advisors for the creation of the trust.

67.     Ostensibly, the Ithaca Trust was funded with $23 million in cash from Mehta, but Commonwealth's records show that Modi was behind the initial funding. In an August 24, 2017 email regarding the Ithaca Trust's formation, Modi informed Pitney attorneys that "[t]he funds are in place with Purvi [Mehta]. Please let me know account details to wire the money . . . ."

16

68.     Commonwealth's records also show that those funds Modi placed with Mehta to establish the Ithaca Trust were funneled to Mehta from the PNB Fraud. Mehta revealed in disclosure forms to Commonwealth that she funded the Ithaca Trust using "dividends" she received from Fine Classic FZE, a Shadow Entity of which Mehta was the 100% owner. Like the other Shadow Entities, Fine Classic FZE operated as part of the PNB Fraud.

69.     Further, throughout 2017, tens of millions of dollars passed between Ami Modi's HSBC account and Mehta's Bank of Singapore account. A bank statement for Ami Modi for September 2017 shows $31,506,701 disbursed, almost all of which went to Mehta.

### The Ritz Carlton Apartment

70.     The purpose of the Ithaca Trust was to hold Manhattan real estate for Modi and his family. The initial $23 million in trust funding was used to purchase an apartment at the Ritz Carlton residences, 50 Central Park South, Unit 33, New York, New York (the "**Ritz Carlton Apartment**") for the sole use of Modi and his family.

71.     On August 30, 2017, Modi emailed Pitney attorneys and other professionals informing them that $23 million had been wired from Mehta to Commonwealth and directing Commonwealth to further wire the funds to attorneys at Katz Matz to execute the purchase of the Ritz Carlton Apartment. Mehta was not on the email thread.

72.     That same day, Katz Matz attorney Steven Matz emailed Modi and others with instructions for the September 7, 2017 closing of the Ithaca Trust's purchase of the Ritz Carlton Apartment. Once again, Mehta was not on the email thread.

73.     On September 7, 2017, the Ithaca Trust closed on the purchase of the Ritz Carlton Apartment. The Ithaca Trust paid $25 million to the seller through Central Park South 50 Properties LLC ("**CPS50**"), an entity the Ithaca Trust owns. Mehta signed the contract of sale. Of the purchase price, $2.5 million was wired from an Ami Modi HSBC account into an escrow

account at the Katz Matz law firm, which handled the sale. The remaining $23 million was paid with funds that Modi had funneled to Mehta from the PNB Fraud.

### The Essex House Apartment

74.    Modi also used the Ithaca Trust to obtain real estate that previously had been owned indirectly by Firestar.

75.    On February 15, 2007, Central Park Real Estate LLC ("**CPRE**") was formed under Delaware law. CPRE was owned by Firestar until approximately the end of 2009, when it was transferred to Group.

76.    On March 26, 2007, CPRE purchased an apartment at the Essex House, 160 Central Park South (the "**Essex House Apartment**"); Bhansali signed the deed on behalf of CPRE. The Essex House Apartment was also used by Modi and as a personal residence.

77.    Based on direction from Modi and Gandhi, Firestar funded $2 million of the approximately $5 million purchase price of the Essex House Apartment. The balance was financed by an approximately $3 million mortgage from HSBC. Firestar also made at least $856,335 of the monthly payments on the mortgage between 2011 and 2018 and paid JW Marriott Essex House NY $15,828.35 in January 2018, after CPRE had been transferred from Group to the Ithaca Trust.

78.    On December 5, 2008, Modi emailed Bhansali and Gandhi that, "*I bought Essex House at $4,995,000 and took a loan of $3 million*" (emphasis added). Modi and Gandhi then discussed by email, with Bhansali copied, the fact that Firestar had funded part of the Essex House purchase.

79.    In March 2017, Gandhi emailed Modi that HSBC requested more information on the ownership structure of CPRE "going up thru the ladder to FILP, India[,]" including the "Source of Wealth" of "Purvi Modi[.]" Gandhi relayed that he "avoided giving these [sic]

18

information and told them that we may do restructuring of Central Park and may change ownership etc." but that the "only way, we can avoid is only if we pay-off the $ 3 m mortgage in next few months." Modi responded, "There will be a change in ownership in May end so better to explain that."

80. On December 4, 2017, by email, Modi told Gandhi to pay off the HSBC mortgage in full. On December 5, 2017, Firestar paid off the approximately $3 million balance on the Essex House Apartment mortgage, using funds from Jaffe and Fantasy as well as from its own account and from a Firestar HSBC line of credit.

81. On December 15, 2017, one of Modi's accountants emailed Modi with three potential options for minimizing transfer taxes on "the movement of CPRE." The first option was having Modi purchase CPRE directly from Group, the second was having Ami Modi purchase CPRE directly, and the third was using the Ithaca Trust to make the purchase by having Mehta contribute more cash to the trust. The accountant explained that, "since [Modi] prefer[red] to fast track the transaction," the existing trust could be used and then the trustee could "move the LLC to another trust in due time."

82. Modi chose the third option. On December 29, 2017, the Ithaca Trust purchased CPRE from Group for $6 million. On January 2, 2018, Mehta transferred $6 million to the Commonwealth Trust Company, as trustee of the Ithaca Trust. The Ithaca Trust then wired $6 million to Group's HSBC account for the purchase of CPRE.

83. By this time, Commonwealth had flagged the Ithaca Trust as a "high risk trust" and internally expressed concern about serving as trustee. On March 13, 2018, Commonwealth emailed Pitney attorneys to inform them that its trust committee had decided that Commonwealth should resign as trustee of the Ithaca Trust.

19

84.     On May 25, 2018, Nehal Deepak Modi, the protector of the Ithaca Trust and Modi's brother, appointed Trident Trust Company (South Dakota) Inc., as successor trustee of the Ithaca Trust.

**Events After the Petition Date**

85.     On February 28, 2018, while still serving as the Debtors' CEO, Bhansali submitted to this Court a declaration under penalty of perjury that contained material falsehoods, including that the Shadow Entities were unaffiliated unsecured creditors of the Debtors. In addition, during the early weeks of the chapter 11 cases, Bhansali, as the Debtors' CEO, made other representations formally and informally, explicitly and implicitly, to this Court, to the United States Trustee, and to creditors, regarding the Debtors' involvement in the PNB Fraud. Bhansali led the bankruptcy court and other parties to believe that the Debtors were not involved in the PNB Fraud and that they were innocently caught up in an overseas matter. For example, at the outset of the cases Bhansali declared under penalty of perjury: "The Debtors and their dedicated employees have worked tirelessly over the past week or so to … reassure their vendors and customers that they had no involvement in the alleged wrongful conduct."

86.     Modi was involved in the Debtors' bankruptcy filings. Bhansali and the Debtors' counsel had a conversation with Modi on February 24, 2018, two days pre-petition, concerning the decision to file the chapter 11 cases. In addition, Modi had at least one conversation with Bhansali between the Petition Date and March 15, 2018. The revelation of this conversation ultimately derailed the going-concern sale process of all or part of the Debtors' businesses. The postponement of the sale process resulted in a decrease in value from the original sales price of Jaffe's assets to the ultimate sales price for those assets approximately two months later.

## CLAIMS FOR RELIEF

### COUNT 1

#### Breach of Fiduciary Duty
#### (Nirav Modi)

87.     Plaintiff restates and re-alleges paragraphs 1 through 86 of this Complaint as though fully set forth herein.

88.     Through numerous emails, telephone conversations with Bhansali and Gandhi, among others, and visits to the Debtors' offices, Modi directed the Debtors to participate in the PNB Fraud, including by making payments to the Shadow Entities and other Firestar Entities, exercised dominion and ultimate total control over the Debtors and their directors and officers, and was the ultimate authority for the Debtors.

89.     As a result of Modi's dominion and total control over the Debtors and as the ultimate authority for the Debtors, Modi was a *de facto* director, officer, or person in control of the Debtors.

90.     As a *de facto* director, officer, or person in control of the Debtors, Modi owed fiduciary duties of due care and loyalty to the Debtors and was required to discharge his duties in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner he reasonably believed to be in the best interests of the Debtors.

91.     Modi breached his fiduciary duties as a *de facto* director, officer, or person in control of the Debtors by, among other things, (a) directing the Debtors and their *de jure* directors and officers to engage in the PNB Fraud, including by entering into circular trading transactions with Shadow Entities and Firestar entities, in violation of his duties of due care, loyalty, and good faith and (b) directing the Debtors and their officers to use corporate assets to acquire properties

21

for the personal benefit of Modi and his family, also in violation of his duties of due care, loyalty, and good faith.

92. Modi's breaches of fiduciary duty, including his breaches of the duties of due care, loyalty, and good faith, proximately caused the Debtors to suffer injury by, among other things, increasing the creditor claims against the estate and causing the collapse and resulting loss of value of the Debtors' and their businesses.

## COUNT 2

### Breach of Fiduciary Duty
### (Mihir Bhansali and Ajay Gandhi)

93. Plaintiff restates and re-alleges paragraphs 1 through 92 of this Complaint as though fully set forth herein.

94. As a director and officer of the Debtors, Bhansali owed fiduciary duties of due care and loyalty to those entities and was required to discharge his duties in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner he reasonably believed to be in the best interests of the Debtors.

95. Bhansali breached his fiduciary duties by, among other things, (a) allowing Modi to usurp Bhansali's management responsibilities and decision-making authority, in violation of his duty of care, (b) causing the Debtors to engage in the PNB Fraud, including by entering into circular trading transactions with Shadow Entities and Firestar entities, in violation of his duties of due care and loyalty, and (c) causing the Debtors to expend corporate assets to acquire properties for the personal benefit of Modi and his family, in violation of his duties of due care and loyalty.

96. As an officer of the Debtors, Gandhi owed fiduciary duties to those entities and was required to discharge his duties in good faith, with the care an ordinarily prudent person in

22

a like position would exercise under similar circumstances, and in a manner he reasonably believed to be in the best interests of the Debtors.

97.     Gandhi breached his fiduciary duties by, among other things, (a) allowing Modi to usurp Bhansali's management responsibilities and decision-making authority, in violation of his duty of care, (b) causing the Debtors to engage in the PNB Fraud, including by entering into circular trading transactions with Shadow Entities and Firestar entities, in violation of his duties of due care and loyalty, and (c) causing the Debtors to expend corporate assets to acquire properties for the personal benefit of Modi and his family, in violation of his duties of due care and loyalty.

98.     The breaches of fiduciary duty by Bhansali and Gandhi proximately caused the Debtors to suffer injury by, among other things, increasing the creditor claims against the estate and causing the collapse and resulting loss of value of the Debtors' and their businesses.

### COUNT 3

**Aiding and Abetting Breach of Fiduciary Duty**
**(Nirav Modi)**

99.     Plaintiff restates and re-alleges paragraphs 1 through 98 of this Complaint as though fully set forth herein.

100.     In the alternative to Count 1 above, assuming (but not admitting) that Modi did not owe a fiduciary duty to the Debtors, Modi aided and abetted breaches of fiduciary duties by the *de jure* directors and officers of the Debtors, including Bhansali and Gandhi.

101.     As alleged in Count 2 above, Bhansali—as director and officer of the Debtors— and Gandhi—as officer of the Debtors—owed fiduciary duties to the Debtors and breached those fiduciary duties.

23

102.     Modi knew that that Bhansali and Gandhi had fiduciary duties as directors and officers of the Debtors and knew they were breaching their fiduciary duties because, among other things, (a) Modi communicated with them about transactions between the Debtors and Shadow Entities, and (b) Modi communicated with them about expending corporate funds on personal assets for Modi and his family.

103.     Modi induced, participated, and assisted the breaches of fiduciary duties by Bhansali and Gandhi by, among other things, (a) directing Bhansali and Gandhi to engage in the PNB fraud, including by entering into circular trading transactions with Shadow Entities and Firestar entities, and (b) directing Bhansali and Gandhi to expend corporate assets to acquire properties for the personal benefit of Modi and his family.

104.     The breaches of fiduciary duty by Bhansali and Gandhi, aided and abetted by Modi, proximately caused the Debtors to suffer injury by, among other things, increasing the creditor claims against the estate and causing the collapse and resulting loss of value of the Debtors' and their businesses.

## COUNT 4

### Corporate Waste
### (Nirav Modi)

105.     Plaintiff restates and re-alleges paragraphs 1 through 104 of this Complaint as though fully set forth herein.

106.     As a *de facto* director, officer, or person in control of the Debtors, Modi had the duty to the Debtors to preserve and protect their assets from undue waste or loss.

107.     Modi committed waste of the Debtors' assets by directing the Debtors and their officers to use corporate assets to acquire properties for the personal benefit of Modi and his family.

24

108.    The corporate waste committed by Modi proximately caused the Debtors to suffer injury by losing the millions of dollars spent for the personal benefit of Modi and his family.

## COUNT 5

### Corporate Waste
### (Mihir Bhansali and Ajay Gandhi)

109.    Plaintiff restates and re-alleges paragraphs 1 through 108 of this Complaint as though fully set forth herein.

110.    As a director and officer of the Debtors, Bhansali had the duty to the Debtors to preserve and protect their assets from undue waste or loss.

111.    Bhansali committed waste of the Debtors' assets by directing the Debtors and their officers to use corporate assets to acquire properties for the personal benefit of Modi and his family or by facilitating or permitting such use.

112.    As an officer of the Debtors, Gandhi had the duty to the Debtors to preserve and protect their assets from undue waste or loss.

113.    Gandhi committed waste of the Debtors' assets by directing the Debtors and their officers to use corporate assets to acquire properties for the personal benefit of Modi and his family or by facilitating or permitting such use.

114.    The corporate waste committed, facilitated, or permitted by Bhansali and Gandhi proximately caused the Debtors to suffer injury by losing the millions of dollars expended for the personal benefit of Modi and his family.

25

## COUNT 6

### Racketeering Influenced Corrupt Organizations Act ("RICO")
### 18 U.S.C. § 1962(c)
### (Nirav Modi, Mihir Bhansali, Ajay Gandhi)

115.    Plaintiff restates and re-alleges paragraphs 1 through 114 of this Complaint as though fully set forth herein.

116.    Defendants Modi, Bhansali, and Gandhi are each a "person" capable of holding legal or beneficial interest in property within the meaning of 18 U.S.C. § 1962(c) and 18 U.S.C. § 1961(3).

117.    Defendants Modi, Bhansali, and Gandhi each violated 18 U.S.C. § 1962(c) by their respective acts, described in the prior paragraphs and as further described below.

118.    Defendants Modi, Bhansali, and Gandhi each had the specific intent to violate 18 U.S.C. § 1962(c) and to commit each underlying predicate act alleged below.

119.    Defendants Modi, Bhansali, and Gandhi each committed at least two predicate acts of racketeering, as more specifically alleged below. The acts of racketeering were not isolated; rather, they were related in that they had the same or similar purpose and result, participants, victims, or method of commission. Further, the acts of racketeering have been continuous, spanning the period from at least early 2011 to early 2018.

### The RICO Enterprise

120.    Defendants Modi, Bhansali, and Gandhi, together with all Modi owned or controlled entities, form an association-in-fact engaged in and affecting interstate and foreign commerce for a common and continuing purpose of formulating and implementing a common scheme to defraud PNB for the Defendants' personal enrichment through a pattern of fraud, lies, deceit, and corruption (hereinafter the "**RICO Enterprise**").

26

121.    At all relevant times, Defendants Modi, Bhansali and Gandhi each were employed by or associated with the RICO Enterprise, and each conducted or participated, directly or indirectly, in the conduct of the RICO Enterprise's affairs through a pattern of racketeering activity.

122.    The Rico Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which the Defendants engage.

123.    The RICO Enterprise, as an association-in-fact, constitutes an "enterprise" within the meaning of 18 U.S.C. § 1961(4), and it was or is engaged in, and its activities affected, interstate and foreign commerce.

124.    The RICO Enterprise's repeated, continuous, and flagrant violations of federal criminal law constitute a "pattern of racketeering activity" in violation of RICO, 18 U.S.C. § 1961, *et seq.*

125.    The RICO Enterprise's common purpose came into existence no later than early 2011, when Defendants Modi, Bhansali, Gandhi implemented a scheme to defraud PNB by fraudulently obtaining LOUs by exploiting the web of Shadow Entities and other Modi owned or controlled entities.

126.    Defendants Modi, Bhansali, and Gandhi are central and controlling figures in the RICO Enterprise, have been responsible for oversight of the scheme to defraud PNB, and have directed other conspirators to take actions necessary to accomplish the overall aims of the RICO Enterprise.

### The Pattern of Racketeering Activity

127.    The RICO Enterprise, as conducted and controlled by Defendants Modi, Bhansali, and Gandhi, engaged in a pattern of racketeering activity, as defined by 18 U.S.C. § 1961(1) and

(5), consisting of multiple acts of racketeering by members of the enterprise that are interrelated, not isolated, and perpetrated for the same or similar purposes by the same persons.

**Predicate Acts: Mail and Wire Fraud, Violations of 18 U.S.C. § 1341, 1343**

128.    The RICO Enterprise's pattern of racketeering included mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343.

129.    The RICO Enterprise, as conducted and controlled by Defendants Modi, Bhansali, and Gandhi, engaged in a criminal scheme to defraud PNB, launder the fraudulently procured funds, and enrich the Defendants.

130.    In furtherance of their scheme, the RICO Enterprise, as conducted and controlled by Defendants Modi, Bhansali, and Gandhi, willfully and knowingly transmitted, or caused to be transmitted, by means of (1) causing matters and things to be placed in any post office or authorized depository, or deposited or caused to be deposited matters or things to be sent or delivered by a private or commercial interstate carrier or (2) by means of wire communications in interstate or foreign commerce, writings, signs, signals, pictures, and sounds, including without limitation the following:

a.    The shipping in August and September of 2011 of a purported 3.27 carat Fancy Vivid Yellow Orange Cushion Cut SI1 diamond;

b.    The shipping in October 2011 of a purported 1.04 carat Fancy Intense Pink Emerald Cut SI2 diamond;

c.    An August 14, 2009, email communication from Modi to Ghandi in which Modi directed Gandhi to make payments totaling $2,293,326 to Shadow Entities Brilliant Diamonds Ltd. and Diagem Inc.;

d.    A June 16, 2010, email communication in which Modi instructed Gandhi, "Unique [a Shadow Entity] has wired $250,000 today to Synergies. Please wire to the account Mehul bhai wants[;]"

e.    An October 21, 2010, email communication in which Modi and Gandhi discussed the shipment of a diamond to a Shadow Entity;

28

f.   A September 7, 2011, email communication in which Modi, Bhansali, and Gandhi coordinated their communications to prevent detection of the PNB Fraud;

g.   A November 20, 2012, email communication between Bhansali, Gandhi, and Kurian Matthews in which Bhansali instructed Gandhi to cycle approximately $750,000 from Fantasy through FIL and Firestar and back to Fanstasy to clear old invoices drawing unwanted attention from bankers;

h.   A March 18, 2014, email communication in which Gandhi directed $150,000 be transferred from Firestar to Unique Diamond & Jewelry;

i.   A February 15, 2015, email communication in which Gandhi directed $300,000 be transferred from Firestar to Eternal Diamond;

j.   All wire transfers involving funds obtained as a result of the PNB Fraud, including, but not limited to:  the wire transfer of $23 million from Mehta's bank account for the creation of the Ithaca Trust; the wire transfer on or about September 7, 2017, of $25 million from CPS50 to purchase the Ritz Carlton Apartment; the wire transfers of $2.5 million from Ami Modi's HSBC account and of $23 million from Mehta's bank account to fund CPS50; the wire transfer on January 2, 2018, of $6 million from Mehta's bank account to Commonwealth Trust Company for the purchase of CPRE.

131.   The use of interstate and international mail and wires to connect this international racketeering conspiracy was foreseeable.

132.   Accordingly, the RICO Enterprise, as conducted and controlled by Defendants Modi, Bhansali, and Gandhi, committed numerous violations of mail and/or wire fraud in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1343.

133.   By enabling, facilitating, and promoting the PNB Fraud, the RICO Enterprise's violations of 18 U.S.C. §§ 1341 and 1343 directly and proximately caused injury to each Debtor's business and property by destroying each Debtor's going-concern value and rendering each Debtor insolvent.

29

**Predicate Acts: National Stolen Property Act, Violations of 18 U.S.C. §§ 2314, 2315**

134.    The RICO Enterprise's pattern of racketeering included numerous violations of the National Stolen Property Act, 18 U.S.C. §§ 2314, 2315.

135.    On numerous occasions during the Relevant Period, the RICO Enterprise, as conducted and controlled by Defendants Modi, Bhansali, and Gandhi, willfully and knowingly transported, transmitted, or transferred in interstate or foreign commerce—or received, possessed, concealed, stored, bartered, sold, disposed of, or pledged as security for a loan— goods, wares, merchandise, securities, or money that crossed an interstate or international boundary after being stolen, converted, or taken by fraud (the "**Stolen Property Transfers**"), including without limitation:

a.     On March 8, 2011, Firestar received $1,863,220.65 in fraudulently procured LOU funds from PNB's "nostro" account at the New York branch of Deutsche Bank Trust Co. Americas (the "**PNB Nostro Account**"). The applicable LOU was fraudulently obtained by FIL.

b.     On May 6, 2011, Firestar received $1,858,183.50 in fraudulently procured LOU funds from the PNB Nostro Account. The applicable LOU was fraudulently obtained by Solar Exports.

c.     On August 22, 2011, Firestar received $1,499,700.75 in fraudulently procured funds from the PNB Nostro Account. The applicable LOU was fraudulently obtained by FIL.

d.     On October 4, 2011, Firestar received $1,803,213.75 in fraudulently procured LOU funds from the PNB Nostro Account. The applicable LOU was fraudulently obtained by FIL.

e.     Also on October 4, 2011, Firestar separately received $1,246,730.60 in fraudulently procured funds from the PNB Nostro Account. The applicable LOU was fraudulently obtained by FIL.

f.     On October 13, 2011, Jaffe received $1,921,043.65 in fraudulently procured LOU funds from the PNB Nostro Account. The applicable LOU was fraudulently obtained by Diamonds 'R' Us.

g.     On February 7, 2013, Firestar received $931,965 in fraudulently procured LOU funds from Pacific Diamonds FZE, a Shadow Entity located in the United Arab Emirates. These funds were derived

from an LOU that was fraudulently obtained by Diamonds 'R' Us in which Pacific Diamonds FZE was the exporter.

h.   On February 11, 2013, Firestar received $980,805 in fraudulently procured LOU funds from Pacific Diamonds FZE. These funds were derived from the same LOU fraudulently obtained by Diamonds "R" Us in which Pacific Diamonds FZE was the exporter.

i.   On March 19, 2013, Firestar received $191,501.35 in fraudulently procured LOU funds from Auregem Company Ltd., a Shadow Entity located in Hong Kong. These funds were derived from an LOU that was fraudulently obtained by Diamonds 'R' Us in which Auragem Company Ltd. was the exporter.

j.   On March 19, 2013, Firestar received $236,078.45 in fraudulently procured LOU funds from Fancy Creations Company Ltd., a Shadow Entity located in Hong Kong. These funds were derived from the same LOU referenced in subparagraph (i) above

k.   On May 6, 2013, Firestar received $21,393.98 in fraudulently procured LOU funds from Fancy Creations Company Ltd. These funds were derived from an LOU that was fraudulently obtained by Stellar Diamonds.

l.   On March 27, 2015, Fantasy received $1,522,451 in fraudulently procured LOU funds from Pacific Diamonds FZE. That same day, Fantasy transferred these funds to Firestar.

m.   On May 3, 2016, Firestar received $399,962 in fraudulently procured LOU funds from Tri Color Gems FZE, a Shadow Entity located in the United Arab Emirates. These funds were derived from an LOU that was fraudulently obtained by Solar Exports in which Tri Color Gems FZE was the exporter.

n.   On December 19, 2016, Firestar received $599,972 in fraudulently procured LOU funds from Pacific Diamonds FZE. These funds were derived from an LOU that was fraudulently obtained by Stellar Diamonds in which Tri Color Gems was the exporter.

o.   On December 6, 2012, Fantasy executed a security agreement in favor of HSBC Bank USA pledging substantially all of its assets — at least some of which were traceable to the fraudulently procured LOU funds — as collateral for a line of credit issued by HSBC Bank USA. Gandhi executed the security agreement in his capacity as chief financial officer of Fantasy. Bhansali signed as a witness to the security agreement in his capacity as president of Fantasy.

31

p.    On December 12, 2012, Firestar and Fantasy each executed a security agreement in favor of Israel Discount Bank of New York pledging substantially all of their respective assets—at least some of which were traceable to the fraudulently procured LOU funds—as collateral for a line of credit issued by Israel Discount Bank of New York. Gandhi executed each security agreement in his capacity as chief financial officer for Firestar and Fantasy, respectively.

136.    For each Stolen Property Transfer, the RICO Enterprise, through Defendants Modi, Bhansali, or Gandhi, knew that the money or property transferred, received, or disposed of had been stolen, converted, or taken by fraud.

137.    Each Stolen Property Transfer involved money or property having a value of $5,000 or more.

138.    Accordingly, the RICO Enterprise, as conducted and controlled by Defendants Modi, Bhansali, and Gandhi, committed numerous violations of the National Stolen Property Act, 18 U.S.C. §§ 2314, 2315.

139.    By enabling, facilitating, and promoting the PNB Fraud, the RICO Enterprise's violations of 18 U.S.C. §§ 2314 and 2315 directly and proximately caused injury to each Debtor's business and property by destroying each Debtor's going-concern value and rendering each Debtor insolvent.

**Predicate Acts: Money Laundering, Violations of 18 U.S.C. §§ 1956, 1957.**

140.    The RICO Enterprise's pattern of racketeering included numerous acts of money laundering in violation of 18 U.S.C. §§ 1956, 1957.

141.    The PNB Fraud constitutes an offense against India, a foreign nation, involving fraud, or a scheme or attempt to defraud, against PNB, a foreign bank.

142.    Certain of the financial transactions underlying or comprising the PNB Fraud occurred, in whole or in part, in the United States in that certain of the LOU transactions

32

underlying or comprising the PNB Fraud involved the movement of funds by wire or other means from the PNB Nostro Account at the New York branch of Deutsche Bank Trust Company Americas to the Debtors' bank accounts at the New York branches of HSBC Bank USA and Israel Discount Bank of New York. Additionally, the RICO Enterprise's circular trading of the same diamonds and other goods among Modi owned or controlled entities — including the Debtors and their U.S. affiliates — for the purpose of artificially inflating the volume of imports  to secure additional LOUs and obtaining liquidity to repay other LOUs occurred, in part, within the United States.

143.     The money, diamonds, and other goods and property derived from or obtained or retained, directly or indirectly, through the PNB Fraud constitute the proceeds of an "unlawful specified activity" within the meaning of 18 U.S.C. § 1956(c)(7)(B)(iii).

144.     On numerous occasions during the Relevant Period, the RICO Enterprise, as conducted and controlled by Defendants Modi, Bhansali, and Gandhi, willfully and knowingly conducted financial transactions involving the proceeds of the PNB Fraud (the "**Money Laundering Transactions**"), including without limitation:

a.   Each of the transactions identified in paragraphs 135(a)-(p) above.

b.   Each sham transaction whereby the Debtors exported diamonds and other goods to Shadow Entities or other Modi-owned entities in exchange for funds transferred by wire or other means for the purpose of artificially inflating the volume of exports to secure additional LOUs, thereby promoting or carrying on the PNB Fraud.

c.   Each sham transaction whereby the Debtors transferred funds by wire or other means in exchange for imported diamonds and other goods from Shadow Entities or other Modi-owned entities for the purpose of providing those entities' with liquidity to repay the LOU obligations, thereby promoting or carrying on the PNB Fraud.

d.   All other transfers, by wire or other means, of funds obtained as a result of the PNB Fraud, including, but not limited to: the wire transfer of $23 million from Mehta's bank account for the creation of the Ithaca

33

Trust; the wire transfer on or about September 7, 2017, of $25 million from CPS50 to purchase the Ritz Carlton Apartment; the wire transfers of $2.5 million from Ami Modi's HSBC account and of $23 million from Mehta's bank account to fund CPS50; the wire transfer on January 2, 2018, of $6 million from Mehta's bank account to Commonwealth Trust Company for the purchase of CPRE.

145.     The RICO Enterprise, as conducted and controlled by Defendants Modi, Bhansali, and Gandhi, knew that the property involved in each Money Laundering Transaction represented the proceeds of the PNB Fraud.

146.     Each Money Laundering Transaction involved a monetary transaction in criminally derived property of a value of greater than $10,000 and derived from specified unlawful activity.

147.     Many of the Money Laundering Transactions involved the transfer of funds from a place outside of the United States to a place within the United States, or vice versa, including without limitation the transfers described in paragraph 144(b)-(c) above.

148.     The RICO Enterprise, as conducted and controlled by Defendants Modi, Bhansali, and Gandhi, conducted each Money Laundering Transaction with the intent to promote the carrying on of the PNB Fraud.

149.     The RICO Enterprise, as conducted and controlled by Defendants Modi, Bhansali, and Gandhi, conducted each Money Laundering Transaction with the knowledge that such Money Laundering Transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the PNB Fraud.

150.     Accordingly, the RICO Enterprise, as conducted and controlled by Defendants Modi, Bhansali, and Gandhi, committed numerous acts of money laundering in violation of 18 U.S.C. §§ 1956 and 1957.

151.    By enabling, facilitating, and promoting the PNB Fraud, the RICO Enterprise's violations of 18 U.S.C. §§ 1956 and 1957 directly and proximately caused injury to each Debtor's business and property by destroying each Debtor's going-concern value and rendering each Debtor insolvent.

### Continuity of Conduct

152.    Defendants' violations of law as set forth herein, each of which directly and proximately injured the Debtors, constituted a continuous course of conduct in the United States beginning in no later than early 2011 and continuing at least through the date of the filing of the chapter 11 petitions commencing these cases, which was intended to obtain economic gain through false representations, fraud, deceit, and other improper and unlawful means. Therefore, the violations were a part of pattern of racketeering activity under 18 U.S.C. §§ 1961(1) and (5).

### The RICO Enterprise Caused Injury to Debtors

153.    Each Debtor has been injured in its business or property as a direct result and proximate result of the Rico Enterprise's violations, described above, of 18 U.S.C. § 1962(c), including any injury by reason of the predicate acts constituting the pattern of racketeering activity.

154.    Before Defendants hatched their scheme to defraud PNB, each of the Debtors operated as a legitimate business built on fruitful relationships with reputable customers.

155.    Firestar was incorporated in 2004 for the purposes of acquiring Frederick Goldman, Inc., which was one of FIL's U.S. customers. Firestar historically operated as a distributor and wholesaler of finished gold and diamond jewelry. Its customer base consisted of legitimate jewelry retailers such as Zales, JCPenney, and Macy's.

156.    Fantasy was incorporated in 2012 for the purpose of holding the exclusive license from Chicago-based Fantasy Diamond Corp. to supply the Endless Diamond Brand to U.S.

retailers. Fantasy was created primarily to conduct business with Costco Wholesale Corporation based on sales attributable to the Endless Diamond Brand. Fantasy's other customers include Zales, Sam's Club, and Walmart. Fantasy sold finished jewelry, generally at a higher price point than Firestar.

157.    Jaffe is the successor to New York-based Sandberg & Sikorksi Corporation, whose predecessors date back to 1892. Sandberg & Sikorski historically consisted of two divisions, one that sold to major U.S. retailers and A. Jaffe, a luxury bridal line that supplied assembled pieces of jewelry to high-end independent jewelry retailers. In 2007, FIL purchased a 95% stake in Sandberg & Sikorski. Sandberg & Sikorski was renamed A. Jaffe, Inc. in 2011. It did not become fully integrated within the Firestar group of entities until 2016.

158.    As a result of Defendants' exploitation of the Debtors as part of their scheme to defraud PNB, each Debtor's customer and supplier relationships, industry reputation, and ultimately value as a going concern were destroyed. Defendants' misconduct destroyed each Debtor's financial standing by burdening them with enormous liability to PNB, crippling their ability to operate as legitimate businesses, and forcing them to expend resources on an expensive chapter 11 liquidation.

### Plaintiff's Entitlement to Treble Damages

159.    As a result of the violations of 18 U.S.C. § 1962(c) by the RICO Enterprise, each Debtor has suffered substantial damages in an amount to be proven at trial.

160.    Under 11 U.S.C. §§ 323, 541(a)(1) and 1106(a), Plaintiff has standing to bring all claims alleged in this Complaint on behalf of each of the Debtors' chapter 11 estates.

161.    Under 18 U.S.C. § 1964(c), Plaintiff is entitled to recover treble the Debtors' general and special compensatory damages, plus interest, costs, and attorneys' fees caused by reason of Defendants' violations of 18 U.S.C. § 1962(c).

36

## COUNT 7

**Racketeering Influenced Corrupt Organizations Act**
**18 U.S.C. § 1962(d)**
**(Nirav Modi, Mihir Bhansali, Ajay Gandhi)**

162.     Plaintiff restates and re-alleges paragraphs 1 through 161 of this Complaint as though fully set forth herein.

163.     Since at least early 2011, the Defendants together with others known and unknown, being persons employed by and associated with the RICO Enterprise, have unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with others to violate 18 U.S.C. § 1962(c), as described above, in violation of 18 U.S.C. § 1962(d).

164.     The Defendants knew that they were engaged in a conspiracy to commit the predicate acts and knew that the predicate acts were part of such racketeering activity, and the participation and agreement of each of them was necessary to allow the commission of this pattern of racketeering activity. This conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

165.     The Defendants agreed to conduct or participate in, directly or indirectly, the conduct, management, or operation of the RICO Enterprise's affairs through a pattern of racketeering activity, including but not limited to the acts of racketeering set forth above in Count 6 of this Complaint.

166.     As part of the conspiracy, each Defendant, at times acting through certain of its officers, agents, and representatives or co-conspirators, committed at least two predicate acts of racketeering in the conduct of the RICO Enterprise's affairs.

167.     As a direct and proximate result of the Defendants' conspiracy, the racketeering activity of the RICO Enterprise, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), each of the Debtors has been injured in its business and property.

37

168.    Under 18 U.S.C. § 1964(c), Plaintiff is entitled to recover treble its general and special compensatory damages, plus interest, costs, and attorneys' fees incurred by reason of Defendants' violations of 18 U.S.C. § 1962(d).

WHEREFORE, Plaintiff, as chapter 11 trustee of the Debtors, respectfully requests that the Court enter judgment:

a.    On Counts 1, 2, and 3, in favor of Plaintiff and against Defendants Modi, Bhansali, and Gandhi, jointly and severally, in the amount of damages to be proven at trial that were suffered by the Debtors and their estates as a result of the Defendants' breaches of fiduciary duty and aiding and abetting breaches of fiduciary duty, plus interest, costs and attorneys' fees, and such other equitable relief as may be just and proper.

b.    On Counts 4 and 5, in favor of Plaintiff and against Defendants Modi, Bhansali, and Gandhi, jointly and severally, in the amount of damages to be proven at trial that were suffered by the Debtors and their estates as a result of the corporate waste committed, permitted, or suffered by Defendants, plus interest, costs and attorneys' fees, and such other equitable relief as may be just and proper.

c.    On Counts 6 and 7, in favor of Plaintiff and against Defendants Modi, Bhansali, and Gandhi, jointly and severally, in treble the amount of damages to be proven at trial that were suffered by the Debtors and their estates as a result of the Defendants' violation of the Racketeering Influenced Corrupt Organizations Act,

38

plus interest, costs and attorneys' fees, and such other equitable relief as may be

just and proper.

Dated: March 27, 2019,
      New York, New York

Respectfully submitted,

**JENNER & BLOCK LLP**

By: /s/ Vincent E. Lazar
Vincent E. Lazar
Angela M. Allen (*pro hac vice* pending)
353 North Clark Street
Chicago, Illinois 60654
(312) 222-9350
vlazar@jenner.com
caallen@jenner.com

Carl N. Wedoff
Nicolas G. Keller
919 Third Avenue
New York, New York 10022
(212) 891-1600
cwedoff@jenner.com
nkeller@jenner.com

*Counsel for the Chapter 11 Trustee*

## **Exhibit 2**

Summons

## UNITED STATES BANKRUPTCY COURT
### Southern District of New York

In re: Firestar Diamond, Inc. and Fantasy, Inc.

Bankruptcy Case No.:
18−10509−shl

Richard Levin Chapter 11 Trustee of Firestar Diamond, Inc., Fantasy, Inc., and
Old AJ, Inc. f/k/a A. Jaffe, Inc.

Plaintiff(s),

−against−

Adversary Proceeding No.
19−01102−shl

Nirav Deepak Modi
Mihir Bhansali
Ajay Gandhi

Defendant(s)

## SUMMONS AND NOTICE OF PRETRIAL CONFERENCE
## IN AN ADVERSARY PROCEEDING

YOU ARE SUMMONED and required to submit a motion or answer to the complaint which is attached to this summons to the clerk of the bankruptcy court within 30 days after the date of issuance of this summons, except that the United States and its offices and agencies shall submit a motion or answer to the complaint within 35 days, to:

| Address of Clerk: |
| --- |
| **Clerk of the Court**<br>**United States Bankruptcy Court**<br>**Southern District of New York**<br>**One Bowling Green**<br>**New York, NY 10004−1408** |

At the same time, you must also serve a copy of the motion or answer upon the plaintiff's attorney.

| Name and Address of Plaintiff's Attorney: |
| --- |
| **Carl N Wedoff**<br>**Jenner & Block LLP**<br>**919 Third Avenue**<br>**New York, NY 10022** |

If you make a motion, your time to answer is governed by Fed. R. Bankr. P. 7012.

YOU ARE NOTIFIED that a pretrial conference of the proceeding commenced by the filing of the complaint will be held at the following time and place:

| United States Bankruptcy Court<br>Southern District of New York<br>One Bowling Green<br>New York, NY 10004−1408 | Room: Courtroom 701, One Bowling Green, New York, NY 10004−1408<br><br>Date and Time: 5/16/19 at 10:00 AM |
| --- | --- |

IF YOU FAIL TO RESPOND TO THIS SUMMONS, YOUR FAILURE WILL BE DEEMED TO BE YOUR CONSENT TO ENTRY OF A JUDGMENT BY THE BANKRUPTCY COURT AND JUDGMENT BY DEFAULT MAY BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT.

Dated: 3/28/19

Vito Genna

*Clerk of the Court*

By: /s/ Carmen Ortiz

*Deputy Clerk*

## **Exhibit 3**

Rule 7012(a) Order

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>FIRESTAR DIAMOND, INC., *et al.*<br><br>    Debtors. | Chapter 11<br><br>No. 18-10509 (SHL)<br><br>(Jointly Administered) |
| RICHARD LEVIN, Chapter 11 Trustee of<br>FIRESTAR DIAMOND, INC., FANTASY, INC.,<br>and OLD AJ, INC. f/k/a A. JAFFE, INC.,<br><br>    Plaintiff,<br><br>  v.<br><br>NIRAV DEEPAK MODI, MIHIR BHANSALI,<br>and AJAY GANDHI,<br><br>    Defendants. | Adv. Proc. No. 19-1102 (SHL) |

**ORDER SETTING FOREIGN DEFENDANT**
**NIRAV DEEPAK MODI'S TIME TO RESPOND TO THE COMPLAINT**

Upon the motion (the "**Motion**")[1] of Richard Levin, not individually but solely in his

capacity as chapter 11 trustee (the "**Trustee**") for Firestar Diamond, Inc. ("**Firestar**") for an order

setting the Defendants' time to respond to Complaint under Bankruptcy Rule 7012(a) to thirty

days after service of the Complaint and Summons; and the Court having conducted a hearing on

the Motion on April 15, 2019 (the "**Hearing**"); and the Court having considered the Motion,

all responses filed thereto, if any, as well as any evidence presented at the hearing; and the Court

having jurisdiction to consider and determine the Motion in accordance with 28 U.S.C. §§ 157 and

1334; and appropriate notice under the circumstances of the Motion having been provided, and

---

[1] Capitalized terms not defined herein shall have the meaning ascribed to them in the Motion.

it appearing that no other or further notice need be provided; and after due deliberation and sufficient cause appearing therefor,

IT IS ORDERED:

1.     Defendant Nirav Deepak Modi is required to submit a motion or answer to the Complaint to the clerk of the bankruptcy court within 30 days after service of the Complaint and Summons.

2.     *This Order shall be served on Defendant Nirav Deepak Modi when he is served with the complaint in this adversary proceeding.*

Dated: April 18, 2019

/s/ *Sean H. Lane*
The Honorable Sean H. Lane
United States Bankruptcy Judge

2

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Chapter 11 |
| FIRESTAR DIAMOND, INC., *et al.* | No. 18-10509 (SHL) |
| Debtors. | (Jointly Administered) |
| RICHARD LEVIN, Chapter 11 Trustee of FIRESTAR DIAMOND, INC., FANTASY, INC., and OLD AJ, INC. f/k/a A. JAFFE, INC., | Adv. Proc. No. 19-1102 (SHL) |
| Plaintiff, | |
| v. | |
| NIRAV DEEPAK MODI, MIHIR BHANSALI, and AJAY GANDHI, | |
| Defendants. | |

**FIRST AMENDED COMPLAINT AGAINST INSIDERS FOR BREACH OF FIDUCIARY DUTY, AIDING AND ABETTING BREACH OF FIDUCIARY DUTY, CORPORATE WASTE, AND VIOLATIONS OF THE RACKETEERING INFLUENCED CORRUPT ORGANIZATIONS ACT**

Plaintiff Richard Levin, not individually but solely as chapter 11 trustee ("**Trustee**" or "**Plaintiff**") for Debtors Firestar Diamond, Inc., Fantasy, Inc., and Old AJ, Inc. f/k/a A. Jaffe, Inc. (collectively, the "**Debtors**"), for his First Amended Complaint alleges as follows:

**NATURE OF THE ACTION**

1. This is an action against Defendant Nirav Deepak Modi ("**Modi**"), the former indirect controlling majority shareholder and/or *de facto* director, officer, or controlling person of the Debtors; Mihir Bhansali ("**Bhansali**"), who served as the sole director and Chief Executive Officer ("**CEO**") of each Debtor; and Ajay Gandhi ("**Gandhi**"), who served as the Chief Financial Officer ("**CFO**") of each Debtor. This action seeks to recover from the Defendants the damages

the Debtors and their estates suffered as a result of the Defendants' six-year, extensive international fraud, money laundering, and embezzlement scheme that resulted in accrual of claims against the Debtors of over $1 billion in favor of Punjab National Bank, the diversion of millions of dollars of the Debtors' assets for the benefit of the family of Nirav Modi and Mihir Bhansali, and the collapse of the Debtors and the resulting loss of value of their businesses.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over the subject matter of this adversary proceeding under 28 U.S.C. § 1334(b) because this adversary proceeding arises under Title 11 and arises in and is related to the above-captioned chapter 11 cases, which are pending in this Court.

3.      This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2).

4.      The Trustee consents to entry of final order or judgment by this Court.

5.      Venue of this adversary proceeding is proper in this district under 28 U.S.C. § 1409.

## THE PARTIES & OTHER RELEVANT ENTITIES

*A.      The Debtors*

6.      Debtor Firestar Diamond, Inc. (f/k/a Firestone, Inc.) ("**FDI**") is a privately-held Delaware corporation, with its principal place of business in New York. While in operation, FDI principally operated a wholesale diamond business.

7.      Debtor Fantasy, Inc. ("**Fantasy**") is a privately-held Delaware corporation, with its principal place of business in New York. While in operation, Fantasy was principally a wholesale diamond business. FDI owns 100% of the equity interests in Fantasy.

8.      Debtor Old AJ, Inc. (f/k/a A. Jaffe, Inc., f/k/a Sandberg & Sikorski Corp.) ("**Jaffe**") is a privately-held New York corporation, with its principal place of business in New York. While in operation, Jaffe was principally a bridal jewelry business.

### B. The Debtors' U.S. Affiliates

9. Firestar Group, Inc. ("**FGI**"), a Delaware corporation, is a holding company that owns approximately 95% of the equity interests in FDI. Samuel Sandberg owns the remaining approximately 5% of FDI.

10. Synergies Corporation ("**Synergies**"), a Delaware corporation, is a holding company that owns approximately 95% of the equity interests in Jaffe and 100% of the equity interests in FGI. Samuel Sandberg owns the remaining approximately 5% of Jaffe.

11. Firestar Diamond International, Inc. ("**FDII**"), a Delaware corporation, operated primarily as a loose diamond trading business.

12. Nirav Modi, Inc. (f/k/a Firestar Jewelry, Inc.) ("**NMI**," together with FGI, Synergies, and FDII, the "**U.S. Affiliates**;" the U.S. Affiliates, together with the Debtors, the "**U.S. Entities**"), a Delaware corporation, operated *Nirav Modi*-branded retail boutiques in New York, Los Angeles, Las Vegas, and Honolulu.

### C. The Debtors' Foreign Affiliates

13. Nirav Modi Ltd. ("**NML**"), a Hong Kong company, owns 100% of the equity interests in NMI. Upon information and belief, NML is the principal holding company for subsidiaries operating *Nirav Modi*-branded boutiques around the globe.

14. Firestar Holdings Ltd. ("**FHL**"), a Hong Kong company, owns 100% of the equity interests in Synergies, FDII, and NML.

15. Firestar Diamond International Private Limited ("**FDIPL**"), an India company, operated factories in India. Upon information and belief, FDIPL manufactured a significant percentage of the jewelry marketed and sold by the Debtors and other Modi-Controlled Entities (as defined below).

16.     Firestar International Limited (f/k/a Firestar International Private Limited) ("**FIL**" or "**FIPL**"), and India company, holds 100% of the equity interests in FHL and FDIPL and is the ultimate holding company of numerous other Firestar entities (collectively, including the Debtors, U.S. Affiliates, FHL, NML, FDIPL, and FIL, the "**Firestar Entities**").

## D.     The Parties

17.     Plaintiff Richard Levin is the chapter 11 trustee for the Debtors, duly appointed under section 1104(a) of the Bankruptcy Code by the United States Trustee for Region 2 on June 14, 2018, whose appointment was approved by this Court by order entered that same day. The Trustee brings this action, not individually, but solely in his capacity as Trustee.

18.     Defendant Nirav Modi, at all relevant times, owned or controlled approximately 94.88% of the equity interests in FIL and was a director of FIL. Upon information and belief, Modi is a citizen of India and traveled frequently to the United States, including to New York, to conduct business in New York through the Debtors and the U.S. Affiliates.

19.     Defendant Mihir Bhansali, at all relevant times, served as the sole director and CEO of each Debtor in New York and resided and continues to reside in New York. Bhansali also served as the sole director of each U.S. Affiliate, as well as the Chief Executive Officer of Synergies, FGI, and NMI. Upon information and belief, Bhansali is Nirav Modi's cousin. For example, in a guest list recovered from Nirav Modi's computer for the wedding of Nirav Modi's brother, Neeshal Modi, Mihir Bhansali is described as a "Maternal Cousin." In the context of the Bank Fraud described below, Bhansali served as Nirav Modi's right-hand man and de facto second-in-command.

20.     Defendant Ajay Gandhi, at all relevant times, served as the Chief Financial Officer of each of the Debtors and U.S. Affiliates and resided and continues to reside in New York.

4

## BACKGROUND

### A. Modi's Diamond Businesses

21.     Modi entered the diamond business around 2000 under the name Diamonds 'R'
Us, an India partnership formed by Modi, Modi's uncle Mehul Choksi, and Modi's business
partner Hemant Bhatt. Diamonds 'R' Us operated as a diamond trading company in India
specializing in loose diamonds and gems for use in retailers' assembled products. In or about
2010, Modi entered the luxury retail business through one or more of the Firestar Entities and
began to sell high-end finished jewelry he designed under the *Nirav Modi* brand. Over time, Modi
expanded his diamond and jewelry business, with retail, wholesale, and manufacturing
operations in Armenia, Beijing, Belgium, Dubai, Hong Kong, India, Johannesburg, London,
Macau, Moscow, Paris, and the United States.

22.     Modi, acting through FIL and its subsidiaries, acquired FDI (then known as
Firestone, Inc.) in 2005, acquired a 95% interest in Jaffe (then known as Sandberg & Sikorski Corp.)
from Samuel Sandberg in 2007, and incorporated Fantasy in 2012. In connection with Modi's
indirect acquisition of Jaffe, Samuel Sandberg received an equity interest in FDI.

### B. Mechanics of the Bank Fraud

23.     From approximately early 2011 to early 2018 (the "**Relevant Period**"), Modi
orchestrated and directed a scheme to obtain loans, credits, or other funds under false pretenses
and without collateral from numerous banks, including Punjab National Bank ("**PNB**"), a
publicly-owned Indian bank majority owned by the central government of India (as set forth in
more detail below, the "**Bank Fraud**").

24.     The Bank Fraud involved the fraudulent procurement of buyer's credit issued
under letters of undertaking ("**LOU**s"), a financial instrument unique to India designed to
facilitate efficient import transactions.

5

25.     When used legitimately, LOUs allow an importer to forego the expense an importer would otherwise incur by borrowing Indian currency and then converting it to a foreign currency to pay foreign suppliers. Instead, the importer obtains short-term credit from its bank in India, secured by invoices for the to-be imported goods. The issuing bank, in turn, enters into the foreign currency transaction: it requests a foreign branch of another Indian bank to transmit funds into the issuing bank's own account (referred to as its nostro — "our" — account) at the foreign branch of a third bank to pay the exporter in its local currency. The issuing bank then repays the intermediary bank and recoups the loan from the importer (or the imported goods serving as its collateral).

26.     Since each LOU requires an import transaction, an importer's LOU borrowing capacity is tied directly to its import volume — the more imports, the more LOU funding available.

27.     Modi and his co-conspirators conspired to take advantage of this feature by artificially inflating the import volume of Modi's India-based companies — most notably Diamonds 'R' Us ("**DRUS**"), Solar Export ("**Solar**"), and Stellar Diamond ("**Stellar**") (collectively, the "**LOU Entities**") — with sham transactions so as to obtain more and more LOU funding. Upon information and belief, DRUS is separate from the similarly named partnership discussed above, which, upon information and belief, ultimately became FIPL.

28.     PNB and other banks advanced amounts equal to over $1 billion under LOUs for the benefit of entities under Modi's control in connection with imports to India without the ordinarily-required collateral.

29.     To carry out this scheme, Modi and his co-conspirators utilized a web of shadow entities to engage in fraudulent and fictitious import transactions, including *inter alia*: Auragem Company Ltd. ("**Auragem**"), Brilliant Diamonds Ltd. ("**Brilliant**"), Eternal Diamonds Corporation Ltd. ("**Eternal**"), Fancy Creations Company Ltd. ("**Fancy Creations**"), Sino Traders

6

Ltd. ("**Sino**"), Sunshine Gems Ltd. ("**Sunshine**"), Unique Diamond and Jewellery FZC ("**Unique**"), World Diamond Distribution FZE ("**World Diamond**"), Vista Jewelry FZE ("**Vista**"), Empire Gems FZE ("**Empire**"), Universal Fine Jewelry FZE ("**Universal**"), Diagems FZC ("**Diagems**"), Tri Color Gems FZE ("**Tri Color**"), Pacific Diamonds FZE ("**Pacific**"), Himalayan Traders FZE ("**Himalayan**"), and Unity Trading, FZE ("**Unity**") (collectively, the "**Shadow Entities**," together with the Firestar Entities, LOU Entities, and all other entities controlled by Nirav Modi and his family members, the "**Modi-Controlled Entities**").

30. Though designed to look like legitimate independent businesses, the Shadow Entities were no more than shell companies controlled by Modi and his co-conspirators. They conducted virtually no legitimate business, but instead existed only to further the Bank Fraud by conducting bogus transactions with the LOU Entities, Firestar Entities, and other Modi-Controlled Entities and laundering the ill-gotten proceeds.

31. The two primary clusters of Shadow Entities operated from Hong Kong and Dubai. The Hong Kong-based Shadow Entities included Auragem, Brilliant, Eternal, Fancy Creations, Sino, and Sunshine. The Dubai-based Shadow Entities included Unique, World Diamond, Vista, Empire, Universal, Diagems, Tri Color, Pacific, Himalayan, and Unity.

32. The Shadow Entities are mostly registered at either small, unoccupied offices or at single, leased desks within shared offices. They have almost identical websites with similar backgrounds, fonts, contact pages, and language. They are located in Special Economic Zones ("**SEZ**") and Free Trade Zones ("**FTZ**"), which are areas within a country that enjoy trade incentives, such as reductions in trade controls and enforcement, and whose reduced oversight makes them havens for fraudulent schemes and money launderers.

33. Upon information and belief, the LOU Entities and Shadow Entities traded exclusively or nearly exclusively with other Modi-Controlled Entities. For example, as alleged

below, Mihir Bhansali's laptop computer contained a spreadsheet listing, among other things, each LOU Entity's sales, costs of goods sold, top customers, and top vendors for fiscal years 2009 to 2017. The top customer and top vendor lists contained only Shadow Entities and Firestar Entities. The following table, which is based on figures in that spreadsheet, reflects the extent to which the LOU Entities traded exclusively with Shadow Entities and Firestar Entities:

| LOU Entity | Fiscal Year 2012 - 2017 | | | | | |
| | Sales to Listed Modi-Controlled Entities as % of Gross Sales | | | Purchases from Listed Modi-Controlled Entities as % of Total Costs of Goods Sold | | |
| | Shadow Entities | Firestar Entities | Total | Shadow Entities | Firestar Entities | Total |
|---|---|---|---|---|---|---|
| DRUS | 88.4% | 7.5% | 95.9% | 99.7% | 0.4% | 100.1% |
| Stellar | 98.7% | 0.5% | 99.2% | 100.1% | 0.3% | 100.3% |
| Solar | 98.9% | 0.7% | 99.6% | 99.9% | 0.1% | 100.0% |

34.     Upon information and belief, from around 2013 onward, Nirav Modi and his co-conspirators used the Shadow Entities as an intermediary between the LOU Entities and Firestar Entities. PNB and other banks were aware of Nirav Modi's affiliation with the LOU Entities and the Firestar Entities, but not his affiliation with the Shadow Entities.

35.     The Shadow Entity import and export transactions purported to involve arm's-length sales of highly valuable loose diamonds, pearls, gold, silver, and other jewelry. In truth, these transactions had no legitimate economic purpose and routinely involved goods that (i) did not exist, (ii) were never transferred, (iii) were transferred at prices having nothing to do with market value, but instead based on whatever amounts were necessary to reconcile the Shadow Entities' and Firestar Entities' books and records so as to conceal other transfers made for illegitimate purposes, or (iv) were transferred in "circular transactions," in which the same goods were exported from and re-imported among Modi-Controlled Entities multiple times at varying and often inflated prices to give the appearance of multiple distinct transactions for the sole purpose of artificially increasing the entities' import volume.

8

36.     Upon information and belief, based on statements made by various Firestar Entity and Shadow Entity employees to Indian authorities:

    (i)     FIL, FDIPL, and other India-based Firestar Entities would export jewelry to Shadow Entities in Dubai and Hong Kong, where, at least in some instances, the diamonds would be removed and the precious metals melted and then subsequently re-exported.

    (ii)    The jewelry exported from India to the Shadow Entities was never returned as defective or substandard, as would be expected in the course of an arm's length vendor-customer relationship.

    (iii)   Orders placed by Shadow Entities frequently lacked the formality, exactness, and diligence that ordinarily would be expected of transactions with a bona fide third party. For example, V. Suresh Ramnath Naidu, a director of Diagems, told Indian authorities that he used to sign blank invoices, but that he never actually saw any of the diamonds or jewelry.

37.     Moreover, when acting as vendors, Modi-Controlled Entities obtained additional funding through packing credit loans, which are short-term working capital loans obtained by vendors to fulfill upcoming orders of goods. In the context of the Bank Fraud, the India-based Modi-Controlled Entities would obtain packing credit loans on the basis of purported orders from other Modi-Controlled Entities overseas. However, packing credit loan proceeds were frequently diverted for other purposes, including the repayment of outstanding LOUs.

38.     Many of the Shadow Entities' directors were current or former employees of Firestar Entities. In addition, many Shadow Entity employees were current or former employees of Firestar Entities.

39.     In the context of the Bank Fraud, transactions between and among Firestar Entities, LOU Entities, and Shadow Entities furthered the Bank Fraud by: (1) inflating the Indian entities' LOU borrowing capacity by artificially inflating their import volumes for LOUs and export volume for packing credit loans; (2) facilitating the repayment of some but not all outstanding LOUs and packing credit loans; (3) laundering the fraudulent proceeds by making them difficult

to trace and siphoning them to Modi and his co-conspirators; and (4) making it difficult for auditors, lenders, and regulatory bodies to detect the Bank Fraud.

40.    Transfers for these purposes were concealed in various ways, including: (a) round trip transactions of gems, jewelry, or funds in which Modi-Controlled Entities transferred assets amongst themselves without any legitimate economic purpose; (b) buying and selling gems at inflated or deflated prices (or sending paperwork without sending the gems at all); (c) characterizing transfers as loans or loan repayments or advances against future purchases or returns of such advances; and (d) in some instances, fraudulently doctoring books and records outright.

41.    To facilitate the issuing of the LOUs and to prevent detection, Modi and others at his direction, including upon information and belief Manish Bosamiya, Subhash Parab, and Miten Pandya, worked with certain PNB employees, including Gokulnath Shetty, who authorized the issuance of the LOUs without securing collateral and without properly recording the LOUs in PNB's records.

## C.  Detection and Exposure of the Bank Fraud

42.    On or around January 20, 2018, a representative of one of the Modi-Controlled Entities solicited issuance of a new LOU from PNB. Unbeknownst to Nirav Modi and his co-conspirators, Gokulnath Shetty had retired. On January 22, 2018, PNB refused to issue the LOU without a 100% cash margin deposit, among other requirements. The Modi representative refused to furnish any margin on the grounds that PNB had never before required a margin to issue an LOU. Alarmed by this revelation, PNB immediately began investigating the borrowing practices of the Modi-Controlled Entities.

43.    Also on January 22, 2018, the same day PNB refused to issue the LOU, Nirav Modi's longtime business partner Hemant Bhatt resigned as an authorized signatory for the three

LOU Entities and as director/designated partner of the following entities, each of which, upon information and belief, is a Modi-Controlled Entity:

| Modi-Controlled Entity | Hemant Bhatt's Role |
|---|---|
| NDM Enterprises Pvt Limited | Director |
| Neeshal Trading Pvt Limited | Director |
| Neeshal Marketing Pvt Limited | Director |
| Neeshal Merchandising Pvt Limited | Director |
| Dream Trading Pvt Limited | Director |
| Ami Merchandising Pvt Limited | Director |
| Firestone Trading Pvt Limited | Director |
| Firestar Diamond Pvt Limited | Director |
| Radashir Jewelry Company Pvt Limited | Director |
| Camelot Enterprises Pvt Limited | Director |
| Camelot Trading Pvt Limited | Director |
| Devdatta Enterprises Pvt Limited | Director |
| Neeshal Enterprises LLP | Designated Partner |
| Paragon Jewellery LLP | Designated Partner |
| Paragon Merchandising LLP | Designated Partner |
| Panchjanya Diamonds LLP | Designated Partner |

44.     In his resignation email to Nirav Modi and Mihir Bhansali, Bhatt stated, "In view of age, health and personal commitments, I am unable to devote my time and attention to the affairs of the following Companies/firms in my non-executive directorship capacity and/or any other matter. I therefore request you to accept my resignation with effect from today." Upon information and belief, Bhatt's resignation was directly related to PNB's refusal to issue the LOU.

45.     The Bank Fraud orchestrated by Modi has resulted in several investigations and criminal enforcement actions against Modi, Bhansali, and others by Indian governmental authorities, including the Central Bureau of Investigation ("**CBI**"); the Directorate of Enforcement ("**ED**"); the Income Tax Department; and the Serious Fraud Investigation Office.

46.     On January 29, 2018, PNB lodged a criminal complaint against Nirav Modi with India's CBI. On February 13, 2018, PNB lodged a complaint against Nirav Modi with India's ED,

which subsequently attached various movable and immovable properties belonging to Nirav Modi and various Modi-Controlled Entities.

47.     On information and belief, on February 13, 2018, Nirav Modi sent an email assuring PNB that amounts owed by the LOU Entities would be repaid and further stating "I must add that my intent is to honour all the obligations on my part, Firestar's part and whatever the firms are liable to pay."

48.     On information and belief, on February 17, 2018, Nirav Modi sent an email to PNB suggesting that the sale of assets of, *inter alia*, FIL and FDIPL will be sufficient to settle the amounts owed to PNB.

49.     On July 3, 2018, PNB filed Application No. 119/2018 in the Debts Recovery Tribunal No. I at Mumbai (the "**Indian Debt Tribunal**") against, *inter alia*, Nirav Modi and certain of his family members, each LOU Entity, FIL, and FDIPL.

50.     On or about March 12, 2019, the Indian government issued an extradition request to the government of the United Kingdom on the basis of an arrest warrant issued against Nirav Modi by an Indian court. In response to that request, Modi was arrested in London on or about March 20, 2019 and is currently incarcerated in London.

51.     On July 6, 2019, the presiding officer of the Indian Debt Tribunal issued a judgment against, *inter alia*, Nirav Modi, the LOU Entities, and FIL, based on the admissions of liability and assurances of repayment Nirav Modi made to PNB in communications such as those described above. The judgment was also based on, *inter alia*, the following factual findings (capitalized terms in original):

   (i)   Nirav Modi has floated Overseas Companies in Hong Kong and U.A.E. which are dummy/shell Companies. The Directors and share-holders of these Companies are either ex-employees or employees acting under instructions of Nirav Modi.

 (ii)  The Overseas Companies and Hong Kong and Dubai deals with the Firestar Group directly or indirectly owned by Nirav Modi who as full control over these Companies through the dummy Directors. The Enforcement Directorate in its Complaint has recorded that the list of top 8 borrowers and top 8 suppliers are none else but the ex-employees of Firestar Group and acting and implementing the instructions given by Nirav Modi and Mihir Bhansali.

 (iii)  The fraud has been perpetrated by Nirav Modi in collusion, connivance and with the aid and assistance of the group companies i.e. Firestar International Limited and Firestar Diamond International Pvt. Ltd. along with their affiliates, subsidiaries, Nirav Family Trust, Nirav Modi Family Trust, directors and key managerial personnel.

 (iv)  The investigation conducted by the Enforcement Directorate further reveals that the dummy Companies were set up in Hong Kong and Dubai along with the regular Firestar Group Companies [and] acted as nodes for circular transactions to layer and launder money generated by the fraudulent LOUs.

 (v)  [Nirav Modi and his family members] are the mastermind[s] behind the perpetration of the fraud. Defendants have laid a complex structure or façade involving several layers of partnership Firms, companies and trusts for the purposes of perpetrating fraud and to isolate themselves from the liability that has arisen from unauthorized LOUs.

 (vi)  All of the aforesaid dates and events reveal the systematic fraud was perpetrated by Nirav Modi and moving the US Court for insolvency to avoid the liability. Nirav Modi and his accomplishes [sic] have taken prompt steps before the US Court to avoid the seizer [sic] and attachment of the properties purchased and acquired by Nirav Modi from the proceeds of the fraudulent debt.

 52.  The Bank Fraud resulted in a total loss to PNB and other banks in excess of $1 billion. As a result of the Bank Fraud, PNB has asserted claims against each of the Debtors in excess of $1 billion on the grounds, among others, that a substantial portion of the proceeds of the Bank Fraud were transferred to the Debtors.

**D. The Debtors' Role in the Bank Fraud**

 53.  Modi, Bhansali, Gandhi, and other co-conspirators funneled millions of dollars in funds and diamonds through the Debtors and their offices in furtherance of the Bank Fraud, both

13

in circular transactions with Shadow Entities and other Modi-Controlled Entities to propagate the Bank Fraud and in noncircular transactions designed to launder the proceeds of the Bank Fraud for the benefit of the family of Nirav Modi and Mihir Bhansali, and other co-conspirators.

54.   In the early stages of the Bank Fraud scheme, from around 2010 to 2012 when the LOU Entities were still trading directly with Firestar Entities, the Debtors were directly involved in import and export transactions underlying fraudulently procured LOUs. For example, in 2011, FDI and Jaffe were the exporters and direct beneficiaries of five LOUs and one LOU, respectively, totaling $10,192,303. The details of the Jaffe LOU transaction are as follows:

(i)   On October 4, 2011, Jaffe shipped a package of twenty-six fancy-colored loose diamonds to DRUS. DRUS sought an LOU from PNB for $1,921,079 to purchase the diamonds from Jaffe. PNB coordinated with its Hong Kong branch, which deposited money into PNB's Deutsche Bank nostro account in New York. PNB paid Jaffe for the diamonds from the nostro account on October 13, 2011. On the same day, after receiving the $1,921,079 from the bank, Jaffe transferred $1,832,700 in payments listed as "L/C Collections," which, upon information and belief, represents payments to Firestar Entities in India through Indian banks.

55.   Other examples of the Debtors' involvement in circular transactions from around this time include:

(i)   From August 8, 2011 to September 13, 2011, a period of five weeks, the Debtors exported the same 3.27 carat Fancy Vivid Yellow Orange Cushion Cut SI1 diamond three times and imported it once. On August 8, 2011, FDI sold the diamond to Fancy Creations for $1,098,802. Approximately three weeks later, Solar exported the diamond to FDI for $183,087— approximately $900,000 less, although much closer to its actual value. Six days later, FDI exported the diamond back to Fancy Creations for $1,156,043, now in excess of the original inflated price. Finally, two weeks later, Jaffe sold the diamond for $1,218,991 to World Diamond, a Shadow Entity whose operations were managed by Sandeep Mistry.

(ii)   Later in 2011, the Debtors engaged in the circular trading of a diamond that was recorded as a 1.04 carat Fancy Intense Pink Emerald Cut SI2 diamond. On information and belief, there was at most only one such diamond. The diamond appeared in the Debtors' records in three transactions within six weeks of each other and was valued at a different price each time, well above the 2011 market value for such a diamond at a maximum value of

14

$300,000 per carat. The Debtors' records reflect a shipment of a diamond of this description on August 19, 2011, with an Indian Firestar Entity sending it to FDI for $608,400. As with the 3.27 carat Fancy Vivid Yellow Orange Cushion Cut SI1, Sandeep Mistry sent shipping instructions and a spreadsheet accompanied by invoices created in India. Consistent with Mistry's instructions, Firestar sold it to SDC Designs LLC (on information and belief, a New York company with connections to Modi) for $642,200. Jaffe shipped a diamond with the same description one month later to DRUS in India for $682,760.

56.     From around 2013 onward, upon information and belief, the Shadow Entities were used as an intermediary between the Firestar Entities and LOU Entities. PNB and other banks were aware of Nirav Modi's affiliation with the Firestar Entities and LOU Entities, but not his affiliation with the Shadow Entities. Applying for financing in connection with transactions among firms known to be controlled by Nirav Modi was therefore more likely to raise suspicion.

57.     Consistent with this shift in roles, from around 2013 onwards, upon information and belief, the Debtors no longer directly participated in import and export transactions underlying LOU issuances. Instead, during this period, the Debtors received LOU proceeds indirectly through Shadow Entities. For example:

(i)     On February 7, 2013, Pacific transferred $931,965 to FDI. Upon information and belief, this transfer was linked to a fraudulent LOU that DRUS obtained from PNB in the amount of $3,097,000 in which Pacific was the exporter. That same day, FDI transferred a total of $710,465 in payments listed as "L/C Collections," which upon information and belief represents payments to India-based Firestar Entities through Indian banks. Also on February 7, 2013, FDI received $643,356.89 from FDII and transferred $643,356.89 to Belgium-based Firestar Diamond BVBA. FDII's bank statements reflect that FDII had received $643,356.89 from Firestar Diamond BVBA on February 6, 2013. Also on February 7, 2013, Eternal transferred $1,321,880 to Stellar and World Diamond transferred $1,191,942.65 to Firestar Diamond FZE.

(ii)    On March 19, 2013, FDI received $191,501.35 from Auragem and $236,078.45 from Fancy Creations. Upon information and belief, these transfers were linked to fraudulent LOUs. DRUS obtained an LOU in the amount of $3,949,000 in which Auragem was the exporter dated March 19, 2013, and DRUS obtained another LOU in the amount of $4,398,000 in

which Fancy Creations was the exporter dated March 18, 2013. That same day, FDI transferred $315,000 to FDII, $200,025 to Tri Color.

(iii)    On May 6, 2013, FDI received $21,393.98 from Fancy Creations. Upon information and belief, this transfer was linked to a fraudulent LOU that Stellar obtained from PNB for which Fancy Creations was the exporter. That same day, FDI transferred $1.6 million to Tri Color.

(iv)    On March 27, 2015, Fantasy received $1,522,451 from Pacific, which, upon information and belief, constituted the proceeds of a fraudulent LOU from PNB for which Pacific was the exporter. That same day, Fantasy received $1,001,993 from Empire and Fantasy transferred $2,550,000 to FDI. That same day, FDI transferred $3,010,000 from its HSBC account to its Israel Discount Bank of New York ("**IDB**") account from which, that same day, FDI transferred a total of $3,013,033 in payments listed as "Trade Services." Upon information and belief, the "Trade Services" notation is analogous to the "L/C Collections" notation used by HSBC and indicates transfers to India-based Firestar Entities through Indian banks.

(v)    On May 3, 2016, FDI received $399,962 from Tri Color. Upon information and belief, this transfer was linked to a fraudulent LOU that Solar obtained from PNB for which Tri Color was the exporter.

(vi)    On December 19, 2016, FDI received $599,972 from Pacific. Upon information and belief, this transfer was linked to a fraudulent LOU dated December 8, 2016 that Stellar obtained from PNB in the amount of $2,707,000 for which Tri Color was an exporter. On December 9, 2016, Tri Color received $1,384,000 in LOU proceeds. That same day, Auragem transferred $1,459,000 to Stellar. On December 13, 2016, Tri Color transferred $1,119,000 to Stellar. On December 15, 2016, Stellar transferred $1,420,000 to Pacific. On December 19, 2016, Pacific transferred the $599,972 to FDI referenced above. That same day, FDI also received $1,593,391.12 from World Diamond and $330,998.54 from Unique. That same day, FDI also transferred $997,514.96 to Firestar Diamond BVBA and $1,889,810 to FDIPL.

58.    Similarly, during this period, the Debtors made numerous transfers to Shadow Entities linked to the repayment of outstanding LOUs. For example:

(i)    On September 24, 2015, FDI borrowed $1,500,000 from HSBC. That same day, FDI received $1,414,865.28 from FDIPL. That same day, FDI transferred $1,840,969 to Auragem, $1,400,000 to Fancy Creations, and $210,128.11 to FIPL. Upon information and belief, on September 28, 2015, Auragem transferred INR 2.88 Cr (worth approximately $473,000) to DRUS. Upon information and belief, on September 29, 2015, DRUS transferred $1,505,000 to Hong Kong-based UCO Bank. Upon information

and belief, UCO Bank served as the correspondent bank in connection with a fraudulent LOU dated October 9, 2014 that DRUS obtained from PNB in the amount of $1,479,000 for which Auragem was an exporter. Upon information and belief, the maturity date of this LOU was September 30, 2015.

(ii) On February 26, 2016, FDI transferred $1,192,106 to Tri Color. Upon information and belief, on March 9, 2016, Tri Color transferred $1,647,000 to Solar. That same day, Solar transferred $2,087,000 to Hong Kong-based Axis Bank. Upon information and belief, Axis Bank served as the correspondent bank in connection with a fraudulent LOU dated March 20, 2015 that Solar obtained from PNB in the amount of $1,758,000 for which Auragem and Sunshine were the exporters. Upon information and belief, the maturity date of this LOU was March 11, 2016. Also on March 9, 2016, upon information and belief, Solar transferred $2,083,000 to DRUS. Upon information and belief, on March 10, 2016, DRUS transferred $2,340,000 to UCO as repayment of another fraudulent LOU.

(iii) On March 3, 2016, FDI transferred $873,997 to Pacific. On March 9, 2016, Pacific transferred $64,000 to Solar. Upon information and belief, Solar used these funds to make the $2,087,000 transfer to Axis Bank and/or the $2,083,000 transfer to DRUS referenced above on March 9, 2016.

59. Consistent with these examples and others alleged below, upon information and belief, the Debtors' Shadow Entity-linked transactions from 2013 onwards were effectuated for secondary purposes related the Bank Fraud including to: (a) facilitate repayment of LOUs and packing credit loans; (b) provide Shadow Entities with the goods and funds the Shadow Entities needed to sell and purchase goods to and from the LOU Entities; (c) clear the Shadow Entities', Firestar Entities', and LOU Entities' accounts receivable and accounts payable so as to avert suspicion from auditors, lenders, and other third parties; and (d) divert the proceeds of the Bank Fraud for the benefit of the family of Nirav Modi and Mihir Bhansali, and other co-conspirators.

60. The Debtors' records reflect cash transfers to and from the Debtors and the Shadow Entities totaling approximately $227 million during the Relevant Period.

### E. Involvement of Debtors' Directors and Officers in the Bank Fraud

61.     Certain of Debtors' directors and officers, including Bhansali and Gandhi, participated in and advanced the Bank Fraud. As described below, Bhansali and Gandhi, at the direction of and in coordination with Nirav Modi, controlled all aspects of the Debtors' internal and external operations and affairs at all relevant times.

62.     As the ultimate controlling shareholder of all of the Firestar Entities, including the Debtors and U.S. Affiliates, Nirav Modi, in coordination with Bhansali and Gandhi, orchestrated or oversaw fraudulent transactions among the U.S. Entities, Shadow Entities, and other Modi-Controlled Entities involving hundreds of millions of dollars in funds and diamonds. These transactions were integral to the Bank Fraud.

63.     As director of each of the U.S. Entities, and as CEO of FDI, Fantasy, Synergies, FGI, and NMI, and in coordination with or at the direction of Modi, Bhansali coordinated and directed fraudulent transactions among the U.S. Entities, Shadow Entities, and other Modi-Controlled Entities involving hundreds of millions of dollars in funds and diamonds. These transactions were integral to the Bank Fraud.

64.     As CFO of each of the U.S. Entities, and in coordination with or at the direction of Modi and Bhansali, Gandhi coordinated and directed fraudulent transactions among the U.S. Entities, Shadow Entities, and other Modi-Controlled Entities involving hundreds of millions of dollars in funds and diamonds. These transactions were integral to the Bank Fraud.

65.     At all relevant times, subject to Nirav Modi's broad oversight, Gandhi and Bhansali controlled the finances of the Debtors. Each had authority to approve loose diamond transactions among the U.S. Entities and the Shadow Entities totaling hundreds of millions of dollars. Gandhi and Bhansali were also each a signatory on each of the U.S. Entities' bank accounts and, upon information and belief, were the only persons authorized to effectuate

transfers from their accounts, along with Joshua Weinman with respect to FDII and Sumay Bhansali with respect to Jaffe.

66.     In addition to the specific examples listed below, Bhansali, Gandhi, and Modi directly participated in, oversaw, or were otherwise responsible for all conduct attributed to the Debtors and other U.S. Entities in this Amended Complaint.

       *i.*      *Oversight and Control of Shadow Entities and LOU Entities*

67.     Nirav Modi and Mihir Bhansali, with the assistance of other co-conspirators such as Ajay Gandhi, Hemant Bhatt, Sandeep Mistry, Shyam Wadhwa, Kurian Mathews, Saju Paulose Parokaran, and Satyendra Shukla, among others, coordinated and directed the operations of the Shadow Entities and LOU Entities to further the Bank Fraud.

68.     Mihir Bhansali's prominent role in orchestrating the Bank Fraud is illustrated by several spreadsheets recovered from Bhansali's work computer. Each of these spreadsheets was saved in January or February 2018 as a .XAR file in the "AppData\Roaming" subfolder of Mihir Bhansali's computer, which is the format and location Microsoft Excel uses to save documents under its "AutoRecover" feature. Bhansali's computer did not contain any versions of these spreadsheets outside of the AppData\Roaming subfolder, suggesting that he did not intend for them to be saved or that he deleted them at some point. These spreadsheets are summarized as follows:

    (i)    The spreadsheet saved as ~ar20DE.xar, last modified on February 16, 2018, identified under the heading "AR-AP (Jan'18)" payables and receivables as between each of the LOU Entities and the Firestar Entities, on the one hand, which were listed on the horizontal axis, and the Hong Kong and Dubai-based Shadow Entities, on the other hand, which were listed on the vertical axis. The spreadsheet tracks millions of dollars in accounts receivable and accounts payable balances between the Shadow Entities and LOU Entities/Firestar Entities but did not list any customers known to be legitimate, foreign of otherwise. The far right column listed the names of individuals who, upon information and belief, were the primary contact for each of the Shadow Entities.

(ii)   The spreadsheet saved as ~ar666B.xar, last modified on February 18, 2018 at 7:20 a.m., appears to be a step-by-step guide to the mechanics and economics of the circular transactions. The spreadsheet lists as "Step 1", "Firestar India buys from HK Supplier[.]" It lists as "Step 2", "Firestar sells to Dubai customer[.]" It lists as "Step 3", "DXB customer sells to HK supplier." Below these steps, the spreadsheet provides a hypothetical example of a circular transaction in which the Firestar Entity purchases an item for "98" (no currency specified) from Vista and sells it to World Diamond for "100"; World Diamond then sells the item to Vista for "102". The spreadsheet then lists the net profit/loss for each of the three entities with respect to this transaction (i.e. a profit of "2" for World Diamond and the Firestar Entity and a loss of "-4" for Vista. On the right-hand side of the spreadsheet, there is another set of steps and the beginning of another debit/credit ledger which, upon information belief, describes another type of transaction designed to further the Bank Fraud. It lists as "Step 1", "Party A sells to SSD[.] It lists as "Step 2", "SSD manufactures and ships back to Party A[.]" Upon information and belief, "Party A" is intended to refer to a Shadow Entity. Upon information and belief, "SSD" refers to the LOU Entities (i.e. **S**olar, **S**tellar, and **D**RUS).  It appears that the auto-save occurred prior to Bhansali completing the debit/credit ledger for the right-hand sequence. Another auto-saved version of this spreadsheet, saved eleven minutes prior at 7:09 a.m., does not contain the right-hand sequence; this demonstrates that Bhansali created the spreadsheet himself.

(iii)  The spreadsheet saved as ~ar6E8E.xar, created on February 12, 2018 and last modified on February 13, 2018, appears to be a "to do" list for various co-conspirators after the exposure of the Bank Fraud. The tasks included:

(a)   For "SM": "List of external vendors – customer clean up[.]"

(b)   For "KM": "How to knock off MM loan and others?"; "FC – AR of 130, AP of 220. How to make AP of 90, none open payables should be in current SSD companies[.]"; "Reduce AR/AP globally[.]"

(c)   For "MB": "Criminal investigation in India – what can happen?"; "Unique to sell to FC[.] FC to sell to current creditors[.] FC to sell Novella shares to Unique[.]"; "SSD debtors to sell goods to Unique and other companies that are not paying Firestar – late orders [.]"; "Forensic accounts for Pacific, Fine Classic, Unique[.]"

(d)   For "SP": "Send all non-Firestar Dubai comps to HK[.]"; "For the past 8 years, all import-export docs, bank statements of SSD (focus on last 1 year), BC application[.]"

Upon information and belief, in the context of this document, "SM" refers to Sandeep Mistry, "KM" refers to Kurian Mathews, "MB" refers to Mihir Bhansali, "SP" refers to Subhash Parab, "FC" refers to Fine Classic or Fancy Creations, "BC application" refers to buyer's credit application, and "SSD" refers to the LOU Entities (i.e. **S**olar, **S**tellar, and **D**RUS). There were several auto-saved iterations of this spreadsheet on Bhansali's laptop, some containing slight changes saved only minutes apart, which suggests that Bhansali authored the list himself.

(iv)    The spreadsheet saved as ~ar6f5.xar, last modified on January 8, 2018, contains three tabs (one for each of the LOU Entities) showing, for the fiscal years 2012 through 2017, each LOU Entity's (a) profits & losses, (b) "BC open" (which, upon information and belief, refers to "buyer's credit" and indicates the amount of outstanding bank loans), (c) cash flow to trusts benefitting Nirav Modi's family, and (d) volume of transactions with various Shadow Entities and Firestar Entities. As alleged above, this spreadsheet demonstrates that transactions with Shadow Entities accounted for the overwhelming majority of the LOU Entities' transactions from 2011 through 2017. The spreadsheet also shows that the LOU Entities were transacting at tiny gross margins — frequently less than 1%. After expenses, the LOU Entities were barely breaking even and, in many years, were operating at a loss. Still, the spreadsheet indicates that they transferred massive amounts of money to trusts benefitting the family of Nirav Modi and Mihir Bhansali. For example, the spreadsheet indicates that in fiscal year 2012, DRUS had gross sales of INR 933.11 crore (~$128 million) and a net loss after taxes of INR -22.85 crore (~-$3.1 million), yet it transferred INR 548.44 crore (~$76 million) to the "NDM Family Trust" and INR 32.83 crore (~$4.5 million) to the "MR Family Trust." As alleged below, upon information and belief, the M.R. Family Trust was established by or for the benefit of Mihir R. Bhansali and his family.

69.    Upon information and belief, based on statements made by various Firestar Entity employees to Indian authorities, Mihir Bhansali personally oversaw the creation of the Shadow Entities and LOU Entities and the selection of their principals, directors, officers, and employees.

70.    Bhansali also personally completed performance appraisals for at least some of the individuals involved in the operations of Shadow Entities and LOU Entities. For example, on March 1, 2016, Bhansali emailed Anup Panchal, the chief operations officer of FIL, a list of goals for the 2017 fiscal year, including "People goals – EXIM team, IT head, SSD, Dubai sales, Neeshal's team, Saju's team (all accounts to be in Surat vs. Bombay), Jaipur and Noida factories[.]" On

21

November 4, 2017, Panchal emailed Bhansali his performance review materials. With respect to the goals set by Bhansali, Panchal noted "SSD: separated people, product machinery and made individual functional[.]" Upon information and belief, Panchal was reporting upon his achievements with respect to the operations of the LOU Entities.

71.     Mihir Bhansali's electronic calendar contained several entries, which, upon information and belief, refer to discussions Bhansali had in the course of managing the LOU Entities' operations, including: (a) a meeting scheduled for April 4, 2016 with the subject "SSD conversation;" and (b) a meeting scheduled for April 6, 2016 with the subject "SSD infrastructure," with an invite to Saju Paulose.

72.     On January 19, 2010, Gandhi emailed Bhavesh Patel, copying Shyam Wadhwa, a request for an aging report for accounts receivables owed to FDI. In the email, Gandhi stated, "You can exclude affiliates such as FIPL, FS, FC, JS, Sandberg, Unique[.]"

73.     On September 7, 2011, Kurian Mathews forwarded an email to Bhansali containing fee quotes from accountants for proposed audits of Auragem and Fancy Creations. Mathews stated, "It seems to be on the higher side when compared with FDL HK, they may be [sic] quoted higher due to the complexity of the transactions in these entities. Audit fees of FDL HK for the year 2010-2011 was HKD 22,000. Audit fees of Brilliant & Eternal for the year 2009-2010 was HKD 27,000 each." Mathews then sought Bhansali's instruction as to "how to proceed further on this."

74.     On March 31, 2013, Bhavesh Patel emailed Mihir Bhansali accounts payable and accounts receivable ledgers of Eternal, Unique, and Brilliant.

75.     On August 6, 2013, Gandhi sent an email to Bhavesh Patel, attaching a spreadsheet titled "FS-Inc from Kurian June 2013." The spreadsheet contained purchase and sales ledgers of four Shadow Entities—Fancy Creations, Brilliant, Eternal, and Unique—showing these entities' accounting for transactions with FDI.

76.     On April 3, 2017, an India-based consultant emailed Mihir Bhansali a spreadsheet summarizing sales from various foreign Firestar Entities, including FIPL and FDIPL, to Dubai-based Shadow Entities, including World Diamond, Universal, Empire, Vista, Unique, and Diagems. The spreadsheet reflected a total of $770,730,000 in sales of rough stones, polished stones, and jewelry by various foreign Firestar Entities to these six Shadow Entities during fiscal year 2015 to 2016, and a total of $454,910,000 in such sales from April 2016 to February 2017.

77.     On May 5, 2017, Gandhi sent a list of Shadow Entities, and contact information for each, to Altamash Ansari, a back office employee in India, and stated "Use names from attached for Eternal, Pacific & Tri Color. (Do not share this pdf with anyone.)."

78.     On August 19, 2017, a manager of Universal emailed Bhansali enclosing a profile of three Shadow Entities—Universal, Empire, and Diagems—and asking Bhansali to "review and advice [sic]." The manager's email signature stated he was also the General Manager of a Firestar Entity in Dubai.

79.     On April 23, 2018, Ajay Gandhi emailed the personal email address of Altamash Ansari, a back office employee of FIPL in India, "Please email what is open AR & AP of non-affiliated AR & AP and their ledger since 2011?" Ansari replied, "I have attached herewith AR-AP of Overseas Non-Affiliates along with Ledger from start (separate tabs for specific parties)." The attachment to the email was an Excel spreadsheet entitled "Overseas Non-Affiliate AR-AP as of 04.22.2018." It contained tabs summarizing the open accounts receivable and accounts payable between Jaffe and Empire, Vista, Eternal, Tri Color, and Universal as of April 22, 2018. It also contained separate tabs reflecting ledgers of purchase and sale transactions between Jaffe and Empire, Vista, Eternal, and Tri Color, respectively.

80.     Bhansali also oversaw and directed the operations of other Modi-Controlled Entities, often including minute details involving day-to-day operations. For example, on April

26, 2011, an employee of a Firestar Entity sought Bhansali's permission to make wire transfers

from a Firestar Entity in Hong Kong to FDI and Brilliant Diamonds. On September 14, 2017, a

former Firestar employee asked for Bhansali's approval before changing the authorized signatory

for FHL. On December 14, 2017, a request from a Dubai employee for a tablet computer was

directed to Bhansali.

ii. *Oversight and Control of Transactions with Shadow Entities*

81.     During the Relevant Period, Modi, Bhansali, and Gandhi exercised direct

oversight and control over transactions between the Debtors and Shadow Entities. For example:

(i)     On June 8, 2012, Gandhi emailed Bhavesh Patel and Shyam Wadhwa, "Please email payables to HK and Dubai – all the companies. Firestar, Firestar Diamond Int'l and Jaffe. Need to pay $1m to HK or Dubai hence need name and amounts only." Bhavesh replied, "There is nothing open in Dubai however HK open payables attached herewith for your review." Gandhi replied, "It could be Pacific, World Diamond, etc too." That same day, FDI transferred $1,000,000 to Fancy Creations. This transaction is described as an "advance" in FDI's bank statement.

(ii)    On July 23, 2012, Ajay Gandhi sent a message to Nirav Modi through Panemail, which is a web-based email service that automatically deletes messages, "Niravbhai, please see attached payment plan in 5 parts to clean-up AR and AP of [FDII] for HK, Dubai, Belgium and NY. Funds should come from respective companies. 1. $452k. 2. $1.129m. 3. $1.5m. 4. $828k. 5. $1.05m. If implemented, the attached AR and AP of $4.3 million can be cleaned up. Please let me know if you have different thought." On August 3, 2012, Gandhi forwarded the email to Hemant Bhatt, copying Bhansali, and stated, "I will call you Monday to discuss. We need to move funds in Firestar Diamond International, Inc. per attached. NM/MB is fine so long as money flows from SDC/Tristar and Diamlink to any of HK or Dubai entities." On August 14, 2012, Gandhi followed up, "Hemant, When can I expect payments for the below cycle that we spoke about?" On August 27, 2012, Bhatt replied to Gandhi, copying Bhansali, "Pacific and Unique paid as above. Please pay accordingly." The message contained a list reflecting that Pacific and Unique owed FDII $779,579 and $418,498, respectively, in accounts receivable, and that FDII owed Fancy Creations, FDL, and Diagems $1,063,369, $121,129, and $14,033, respectively, in accounts payable. On August 28, 2012, Hemant Bhatt messaged Ajay Gandhi on Panemail, "Auragem paid $200,000.00 and Brilliant paid $231,175.03. Pleeasse [sic] confirm receipt and pay to Fancy." FDII's bank statements reflect: (a) incoming wires of $779,544.11 and $418,463.00 on August 27,

2012 from Pacific and Unique, respectively; (b) incoming wires of $231,150.03 from Brilliant and $199,975.00 from Auragem on August 28, 2012; and (c) outgoing wires of $1,063,369, $121,129.21, and $14,032.80 on August 28, 2012 to Fancy Creations, FDL, and Diagems, respectively.

(iii)    On August 28, 2012, Gandhi emailed Bhavesh Patel, "Tomorrow, please wire $431,175 to Fancy Creations from [FDII's] Capital Old Account." FDII's bank statement reflects an outgoing wire in the amount of $431,175 to Fancy Creations on August 29, 2012.

(iv)    On September 12, 2012, Gandhi emailed Bhavesh Patel, copying Hemant Bhatt, "Please wire $150,000 to Unique Diamond for back office expenses from January 2012 thru June 2012 – invoice #'s UD-FI-004 & UD-FI-001." That same day, Patel emailed Gandhi and Bhatt, "Please find attached wire from FSI to Unique as per new bank details for $150k." Gandhi replied solely to Patel, "Spoke to HB for return of funds?" Patel replied, "I called him today morning. He confirmed and told that, he will require invoice details if any / from which location amount will remit etc[.] so that he will arrange as per your requirement in NY." Gandhi replied, "Ask him from where he can remit and give him details. It could be in FS or Intl."

(v)    On December 4, 2012, Sridhar Krishnan of SDC Designs emailed Gandhi, "You shall receive payment of $1,737,155 . . . from Empire Gems FZE in Firestar Diamond International, part payment against your invoice # 73112 dt 7/31/12[.] Please make payment to SDC Designs LLC against their invoice # 629966 dt 7/30/12." Gandhi replied, "When?" Krishnan replied, "I am wiring today to Universal FZE, so I guess you would get it from Empire gems tomorrow." Gandhi then forwarded the email chain to Mihir Bhansali and asked, "Ok to proceed per below once funds are received?" That same day, Gandhi separately forwarded Krishnan's email to Hemant Bhatt and asked, "Is this OK once funds are received?" Gandhi followed up with Bhatt several hours later, "Do not send email. Please call me to confirm in the morning."

(vi)    On December 10, 2012, Gandhi emailed Bhavesh Patel, "Pay $1m against above invoice to Empire Gems tomorrow from HSBC per attached wire instruction. Also let HB know that $733k is already paid against this invoice. Upon information and belief, "HB" refers to Hemant Bhatt. On December 11, 2012, FDI wired $1,185,025.05 to Empire.

(vii)    On December 13, 2012, Gandhi instructed Bhavesh Patel to "prepare the following wires today: 1. Pay $231,000 to Unique for Back Office expenses from Firestar Diamond Inc. 2. Pay $391,611 to Synergies Corp from Firestar Diamond, Inc. for Interest. 3. Pay $300,000 to Unique from Synergies Corp. for Loan Repayment. 4. Pay $91,000 to Brilliant from Synergies Corp for Loan Repayment. 5. Balance amount tomorrow to Diagem once funds are here in Firestar Diamond, Inc." Later that day, Gandhi followed up,

"Money is coming any minute hence wire $552,133.10 to Diagem from Firestar Diamond, Inc. (against open invoice) . . ." The next day, Patel replied, "Based o[n] HB's details, please find wire from FSI to Diagems for $552,133.10. Gandhi replied, "Please tell HB about wires from yesterday and ask if he receives it. Upon information and belief, "HB" refers to Hemant Bhatt.

(viii)  On December 20, 2012, Bhavesh Patel emailed Ajay Gandhi, "Please find attached wire [from FDI] to Diagems ($119k) and Pacific ($652k) as per instructions." Gandhi replied, "Change Empire amount as discussed."

(ix)  In a 2012 email, Kurian Matthews relayed a conversation he had with Bhansali in which they set up a circular transaction starting at Fantasy, going through Radashir Jewelry Co. Pvt. Ltd. (a Modi-Controlled Entity that has been implicated in the Bank Fraud), FIL, and Firestar and ending back at Fantasy. The purpose was to "clear the old invoices of Radashir on FDC" because a bank was inquiring about the old invoices. Similarly, in December 2012, Bhansali and Kurian Mathews discussed wiring money to Radashir and back to the Debtors against Radashir's accounts payables to "use [the money] for NM [Modi]."

(x)  On February 4, 2013, Sridhar Krishnan, the manager of SDC Designs, LLC wrote to Bhansali and Modi partner Hemant Bhatt using personal email addresses. Krishman told Bhatt and Bhansali, "You should expect 1.4 million in Universal fze today. Please wire the same to A Jaffe." Two days later, Bhatt confirmed that Universal Fine Jewelry FZE had received the funds and that "Empire paid US $1,391,570 to A Jaffe value 05 Feb 13."

(xi)  On February 6, 2013, Ajay Gandhi emailed Nirav Modi, copying Mihir Bhansali, "Niravbhai, After keeping $3 million buffer, I can pay $1 million to India in February 2013. Please let me know if I should ask Manish/Amit for listing to pay." Modi replied, "Yes pls." One day earlier, Gandhi emailed Manish Bosamiya, Miten Pandya, and Amit Magia, "We can pay $1.0 million to India in the month of February 2013. Please email me a list to pay." As alleged above, Manish Bosamiya and Miten Pandya were among the individuals directly involved in obtaining LOU funding from PNB. Thus, upon information and belief, the purpose of Gandhi's emails was to inform Modi, Bosamiya, and Pandya the amount Gandhi would be able to send to facilitate repayment of LOUs.

(xii)  On February 19, 2013, Shyam Wadhwa emailed Ajay Gandhi, "Kindly clarify details of open vendor bills against which inward wire receipt of $2[,]006,987.25 on 29th May '12 has been applied. Gandhi replied, "$2m was received & wired back to FIPL and Radashir." His email included a table reflecting that, on May 19, 2012, $2,006,949.25 received from Pacific was sent to FIPL ($1,953,990) and Radashir ($126,010).

26

(xiii)   On February 22, 2013, Bhavesh Patel emailed Ajay Gandhi a wire confirmation reflecting a $503,501.41 transfer from FDI to Pacific.

(xiv)   On October 23, 2013, Ajay Gandhi emailed Bhavesh Patel, "Pay $150,000 to Pacific Diamonds per the attached from Firestar Diamond, Inc. – HSBC." Patel replied with the wire confirmation and stated, "Please find attached wire from FSI to Pacific as Professional Fees."

(xv)   On October 30, 2013, Bhavesh Patel emailed Ajay Gandhi, copying Altamash Ansari and Shyam Wadhwa, "Please find attached internal transfer as well as wire document for your reference. 1. FSI to Jaffe, Amount $1,768,385.00 (Internal) 2. Jaffe to Pacific, Amount $2,455,036.00 (Abu Dhabi Bank). A few hours later, Patel followed up to ask Gandhi to "please approve attached wires as discussed."

(xvi)   On December 31, 2013, Mihir Bhansali emailed Ajay Gandhi, "As discussed, FSI will pay to Sangam Diamonds Corp. on behalf of Fancy Creation Company Limited (HK) (Invoice # 100773 Dt. 19.12.2013). Attached are Invoice of Sangam Diamonds Corp Sale to Fancy and Sangam's bank info. Please make wire today." Gandhi replied, copying Bhavesh Patel, "Bhavesh, please set-up wire from Firestar to Sangam Diamond – NY." Patel then replied with the wire confirmation reflecting a $1,247,746 payment to Sangam Diamonds Corp. On January 8, 2014, Gandhi forwarded Bhansali's December 31, 2013 email to Hemant Bhatt, stating "I paid $1.24m on 12/31/13 to Fancy per attached. This funds never came back hence I will pay $575k today. Please call me if needed."

(xvii)   On February 5, 2014, Altamash Ansari emailed Ajay Gandhi, with a copy to Shyam Wadhwa and Bhavesh Patel, a table of "Receipts & Payments for the month in which [Jaffe] received money from Pacific." The table listed amounts Jaffe received from and paid to Pacific, Empire, Twin Fields, and various Firestar Entities. Replying solely to Shyam Wadhwa, Gandhi stated, "Pacific got paid more than they send funds !!!!!" Wadhwa replied, "Please ignore below email. To answer your question, A. Jaffe had received Funds through Pacific which were lying as ADVANCE in books. Post shipment of diamonds, advance has got adjusted." On February 12, 2014, Gandhi replied, "Anything I need to do?" Wadhwa replied, "Manish Bosamiya would be requiring $ 4M funds against India billing on A. Jaffe." As noted above, upon information and belief, Manish Bosamiya was one of the individuals directly involved in obtaining LOU funding from PNB, which suggests that the $4 million Wadhwa requested from Jaffe was directly related to repaying an LOU. Gandhi replied, "Spoke to MB [upon information and belief, Mihir Bhansali]. Let's talk tomorrow or Friday. He prefers outgoing shipment from Jaffe to Firestar BVBA as oppose to anywhere."

27

(xviii) On March 18, 2014, Ajay Gandhi emailed Bhavesh Patel, copying Hemant Bhatt, instructions to wire $150,000 from FDI to Unique for "back office expenses," $123, 097 from FDI to Synergies for "Interest," and $123,000 from Synergies to Brilliant for "Loan repayment." Patel replied with the wire confirmations.

(xix) On March 25, 2014, Shyam Wadhwa emailed Ajay Gandhi, copying Bhavesh Patel, "FHL has remitted sub-debt funds [of] USD [$]4,058,500 to Firestar Diamond Inc and USD [$]1,800,000 to Firestar Group Inc. Please remit funds to Brilliant from both companies and confirm." Patel then sent Gandhi wire confirmations reflecting a transfer of $4,058,500 from FDI to Brilliant and a transfer of $1,800,000 from FGI to Brilliant.

(xx) On August 4, 2014, Sridhar Krishnan of SDC Designs emailed Ajay Gandhi, "Did you wire to Empire. Please advise." Gandhi replied, "I need to pay overseas. I have asked for a listing to pay. I will let you know once it is wired." Krishnan replied, "I need the funds by tomorrow. Please expedite."

(xxi) On September 18, 2014, Manish Bosamiya emailed Ajay Gandhi, copying Bhavesh Patel, "Firestar Diamond Intl Inc will receive US $550,000.00 from Firestar Diamond Ltd (HK) in Capital One Bank." Patel then emailed Gandhi, "Please approve below wire from Capital Old [one of FDII's Capital One bank accounts] to Pacific for $550,000.00 as POA."

(xxii) On December 16, 2014, Gandhi emailed Avinash Oza and Altamash Ansari, "Please pay $1,240,273.54 to Auragem, HK tomorrow for their invoice #2580001314 from Firestar Diamond, Inc. (Part payment)." Oza replied with the wire confirmation. Gandhi replied, "Bank information confirmed with Sandeep?" Upon information and belief, Gandhi was referring to Sandeep Mistry, one of the key co-conspirators in the Bank Fraud.

(xxiii) On February 19, 2015, Ajay Gandhi emailed Hemant Bhatt, "I would like to pay $300k for back-office expenses. Pay to Unique? Please email me wire information. Also, I would like to pay $180k from Synergies to Brilliant. Please email me wire confirmation." On February 20, 2015, Ajay Gandhi emailed Arpan Doshi and Avinash Oza instructions to wire $186,871 from FDI to Synergies as "Interest", $300,000 from FDI to Eternal as "Back Office Expense," and $180,000 from Synergies to Brilliant as "Loan Repayment." Doshi replied with the wire confirmations.

(xxiv) On March 2, 2015, Gandhi emailed Avinash Oza and Arpan Doshi instructions to wire $300,000 from FDI to Unique and $180,000 from Synergies to Brilliant. Doshi replied with the wire confirmations.

(xxv)      On June 26, 2015 Ajay Gandhi emailed Arpan Doshi and Avinash Oza instructions to wire $300,000 from FDI to Pacific. FDI's bank statement reflects a transfer from FDI to Pacific of $1,438,270.60 on that day.

(xxvi)      On September 28, 2015, Ajay Gandhi emailed Avinash Oza, "Please wire $1,017,000 from Firestar Diamond, Inc to Pacific Diamond – on account." Oza replied with the wire confirmation. Gandhi replied, please wire $54,000 to Pacific D from Firestar Diamond, Inc." Gandhi then emailed Operation 1, in reply to an email earlier that day in which Operation 1 sent Gandhi Pacific's bank details, "$1.017m wired. I thought it was $1.017m but I received $1.071m. Will wire balance tomorrow - $54k." FDI's bank statements reflect these transfers.

(xxvii)      On February 26, 2016, Ajay Gandhi emailed Avinash Oza and Arpan Doshi instructions to wire $1,192,105.55 from FDI to Tri Color. Doshi replied with the wire confirmation.

(xxviii)      In March 2016, Evelyn Kosiec, the Jaffe operations manager, asked Bhansali where to re-export loose diamonds, and an hour later she emailed Gandhi, "Mihir informed to ship this to Eternal diamonds in Hong Kong, the same price, rounded to the nearest 5 120 day terms."

(xxix)      On March 4, 2016, Gandhi emailed Avinash Oza and Arpan Doshi instructions to wire $300,000 from FDI to Unique. Oza replied with the wire confirmation.

(xxx)      On March 9, 2016, Ajay Gandhi emailed Avinash Oza and Arpan Doshi instructions to wire $247,551 from FDI to Synergies and $250,000 from Synergies to Brilliant. Doshi replied with the wire confirmations.

(xxxi)      On March 15, 2016, Ajay Gandhi emailed Avinash Oza and Arpan Doshi instructions to wire $700,000 from Jaffe to Pacific. Oza replied with the wire confirmation.

(xxxii)      On March 21, 2016, Ajay Gandhi emailed Avinash Oza and Arpan Doshi instructions to wire $1 million from Jaffe to Pacific. Doshi replied with the wire confirmation.

(xxxiii)      On March 24, 2016, Ajay Gandhi emailed Avinash Oza and Arpan Doshi instructions to wire $1 million from Jaffe to Pacific. Oza replied with the wire confirmation.

(xxxiv)      On March 25, 2016, Ajay Gandhi emailed Avinash Oza and Arpan Doshi instructions to wire $1.4 million from Jaffe to NMI, and then $613,069 from NMI to Auragem and $787,000 from NMI to Nirav Modi Ltd. Doshi replied with the wire confirmations.

(xxxv)    On March 31, 2016, Ajay Gandhi emailed Avinash Oza and Arpan Doshi instructions to wire $301,540 from Fantasy to Tri Color Gems. Oza replied with the wire confirmation.

(xxxvi)    On April 5, 2016, Gandhi emailed Avinash Oza and Arpan Doshi instructions to wire $500,000 from Jaffe to Pacific. Doshi replied with the wire confirmation.

(xxxvii)    On May 6, 2016, Gandhi emailed Avinash Oza, Arpan Doshi, and Altamash Ansari instructions to wire $2 million from Jaffe to Pacific. Oza replied with the wire confirmation.

(xxxviii)    On June 1, 2016, Gandhi emailed Avinash Oza and Arpan Doshi instructions to wire $815,000 from Jaffe to Pacific. Doshi replied with the wire confirmation. Jaffe's bank statements reflect this wire transfer.

(xxxix)    On June 29, 2016, Ajay Gandhi emailed Altamash Ansari and Vishal Popat a bank statement reflecting a $599,972 wire transfer from Pacific to Jaffe on June 29, 2016. Gandhi instructed them to "show as advance if no open AR from Pacific."

(xl)    On July 18, 2016, Ajay Gandhi emailed Avinash Oza instructions to wire $200,000 from FDI to Jaffe, $200,000 from Jaffe to Fancy Creations, $150,000 from FDI to FDII, and $150,000 from FDII to Fancy Creations. Oza replied with the wire confirmations.

(xli)    On July 19, 2016, Ajay Gandhi Emailed Avinash Oza instructions to wire $1,809,528 from FDI to Fancy Creations. Oza replied with the wire confirmation.

(xlii)    On July 22, 2016, Gandhi emailed Avinash Oza and Arpan Doshi instructions to wire "$715k from Firestar to Fancy – Purchases[;] $200k from Firestar to Jaffe[;] $200k from Jaffe to Fancy – Purchases[.]" Oza replied with the wire confirmations.

(xliii)    On March 22, 2017, Ajay Gandhi emailed Avinash Oza and Kunal Patel instructions to wire $300,000 from FDI to Unique for "Back-Office expenses" and $240,000 from Synergies to Brilliant for "Repayment of Loan." Oza replied with the wire confirmations.

(xliv)    On January 3, 2018, Gandhi emailed Avinash Oza instructions to wire $483,620.05 from FDI to Pacific, $2,188,769.43 from FDII to Pacific, and $530,000 from Jaffe to Pacific. Oza replied with the wire confirmations. Gandhi then forwarded this email to Subhash Parab and Shyam Wadhwa stating, with respect to the $2,188,769.43 transfer to Pacific, "We have wired these funds from FSI but please apply this amount to FSII (Pacific) due to bank error in Capital One." Consistent with Gandhi's email, FDI's bank

statements confirm that FDI wired both $483,620.05 and $2,188,769.43 to Pacific on January 3, 2018.

(xlv)    On January 31, 2018, Avinash Oza emailed Ajay Gandhi wire confirmations reflecting transfers of $2,466,015 and $525,000 from FDII to Fancy Creations. Gandhi forwarded the wire confirmations to Shyam Wadhwa and stated, "Please let your vendor know of this payment and clear any AR from HK."

82.    Modi, Bhansali, and Gandhi communicated frequently with each other and various other co-conspirators concerning the Bank Fraud and to advance the Bank Fraud. For example:

(i)    On August 14, 2009, Modi directed Gandhi to make payments totaling $2,293,326 to Brilliant and Diagem. On June 16, 2010, Modi instructed Gandhi, "Unique has wired $250,000 today to Synergies. Please wire to the account Mehul bhai wants."

(ii)    On August 26, 2010, Nirav Modi emailed Ajay Gandhi to ask, "What will be the week-by-week payment plan for September to India?" On August 27, 2010, Gandhi replied, attaching two spreadsheets containing two possible scenarios, and noting "to cover August borrowing base – I have asked India to remit $1 m for one day & I will remit back on September 1. Substantial amount of inventory was shipped to India & HK hence inventory & AR became ineligible." On August 29, 2010, Gandhi forwarded this email chain to Mihir Bhansali.

(iii)    On October 21, 2010, in furtherance of a circular trade, Modi and Gandhi communicated by email about the shipment of a diamond to a Shadow Entity. Modi stated, "Send the 70 ct vivid yellow to Firestone Dubai @51,500 and not Firestone HK." Gandhi responded, "Firestone, Dubai confirmed (Not Unique)[,]" to which Modi clarified, "Sorry Unique[,]" in reference to the Shadow Entity. Gandhi responded with "Glad I asked!!!"

(iv)    On December 20, 2013, Ajay Gandhi emailed Manish Bosamiya, Miten Pandya, and Amit Magia, "I can pay $600k from Capital One – Diamond Division or A. Jaffe – HSBC." On December 23, 2013, Bosamiya replied, "Please find attached open invoice of $602,761.39 from FSI." Patel replied to Gandhi, "They don't have anything most recent open from Jaffe or diamond division so they gave listing from FSI for $603k. Please let me know if we can pay from FSI so that I will prepare wires as per that." Gandhi replied, "Transfer to H[s]bc but do not pay from this list but pay other list [o]f Manish around $1.8m."

(v) On January 9, 2014, Ajay Gandhi emailed Miten Pandya, Manish Bosamiya, and Amit Magia, "I can pay $5 million in January 2014 to India. Please email me a listing of invoices so that I can wire funds on a weekly basis or so." Bosamiya replied with the allocation of the $5 million among various Firestar Entities. On January 13, 2014, Gandhi replied, "$5m wired per below. Please acknowledge receipt of these wires." On January 21, 2014, Bosamiya replied, copying Bhavesh Patel, "Boi – London [upon information and belief, "Boi" refers to "Bank of India] informed yesterday that they have not received $2,157,359.90 as the concern [sic] person was on leave last week and they have only received the message that funds are coming but Nostro is not credited. Please provide the swift message." Later that day, Patel replied to Gandhi, "Manishbhai called me and they received fund." Gandhi then replied to Bosamiya, "Bhavesh emailed me that funds were received. Please let me know otherwise."

(vi) On April 1, 2014, Gandhi emailed Manish Bosamiya, "I can pay $4 million in April 2014 to India. Please email me a listing of invoices so that I can wire funds on a weekly basis or so." Bosamiya replied with instructions to wire $1,763,644.60 from FDI to FIL and $2,250,858.36 from FDI to FDIPL. On April 2, 2014, Gandhi replied, "1.76m wired today." On April 14, 2014, Gandhi followed up, "$240k and $341k wired today."

(vii) On April 6, 2016, Shyam Wadhwa emailed Ajay Gandhi and Mihir Bhansali asking them to send $2.7 million from Jaffe to FIL to clear outstanding accounts receivable and stating "our fund position is tight in India, else would have wired funds to you against our payables of about USD 1M from FDIPL for clearing AR/AP between India and NY." Gandhi replied, copying Bhansali, "We have Overseas AR of around $8.5m in Firestar Diamond, Inc. – If I get funds in FD, Inc then we can wire funds to India this month." The next day, Gandhi followed up, "I can wire $1m this month from Jaffe thru FS. Can it come back to FS?"

83. Ajay Gandhi sent numerous substantially similar emails to Nirav Modi, Miten Pandya, Manish Bosamiya, Amit Magia, Shyam Wadhwa, and others advising them of his ability to wire funds from the U.S. Entities to India throughout the Relevant Period.

iii. *Suspicious Accounting, Finance, and Inventory Management Practices*

84. During the Relevant Period, Gandhi and Bhansali engaged in and oversaw suspicious accounting, corporate finance, and inventory management practices which, upon information and belief, were for the purpose of furthering and concealing the Bank Fraud.

32

85.     For example, Gandhi and Bhansali maintained two sets of books and records for Jaffe: "core" financials, which did not include loose diamond transactions outside the normal course of Jaffe's business, and "regular" financials, which did reflect transactions with Shadow Entities and other Firestar Entities to further the Bank Fraud.

86.     For example, Jaffe's federal tax return for the fiscal year ending March 31, 2012 listed sales of only $9,090,661. However, Jaffe's sales journal, as well as the Jaffe financial statements originally provided by Gandhi to the Examiner, indicates that, during that same time period, Jaffe's sales totaled $49,628,873.

87.     Once Gandhi was questioned by the Examiner about the significant difference between the tax return sales of around $9 million and the "original" financial statements and sales journal which both reflected $49 million of sales, Gandhi produced a second set of financial statements, which he called the "core" set. This "core" set reflected sales at $10 million. Gandhi did not provide any real explanation as to why he maintained two sets of financial statements. The difference between these financials was primarily loose diamond sales between Jaffe and various Shadow Entities.

88.     Bhansali managed the Debtors' "house accounts," the accounts in which proceeds of loose diamond sales were segregated from regular sales accounts for purposes of computing commissions. Upon information and belief, the difference between the amounts reported in the Jaffe's tax returns versus the amounts reflected in its sales journals primarily relates to such transactions.

89.     Upon information and belief, Bhansali and Gandhi also oversaw and directed the use of different sales and inventory practices for Debtors' transactions with Shadow Entities as compared to those used with retailer customers.

90. For example, each diamond or gem received by the Debtors for use in an ordinary retail transaction would be unpacked, compared to its packing slip, scanned for quality control, and logged as "ready to ship."

91. These practices were not employed with respect to Shadow Entity-related transactions. For those transactions, a Shadow Entity or foreign Firestar Entity would often send bulk shipments of loose diamonds accompanied by email instructions to export them immediately upon receipt to either another Firestar Entity or a Shadow Entity at specified prices and quantities. Packing slips and invoices for the subsequent exports often accompanied these email instructions. Consistent with instructions from overseas Modi-Controlled Entities, these goods were either re-shipped without being opened or, if they were opened, they were inventoried in bulk, not individually.

     *iv.     Efforts to Manipulate or Deceive Auditors and Lenders*

92. On numerous occasions, Bhansali and Gandhi sidestepped auditors' inquiries concerning the U.S. Entities' dealings with Shadow Entities by offering a farfetched explanation, feigning ignorance, or, in some cases, ignoring the question altogether.

93. For example, on November 10, 2016, Trupti Naag, a senior analyst at accountancy Manish Modi & Associates, emailed Gandhi requesting additional information regarding entries on a spreadsheet summarizing "AR / AP of Various Foreign Companies as of October 31, 2016."

94. The spreadsheet purported to show accounts receivable and accounts payable balances between Firestar, FDII, NMI, Jaffe, and Synergies (on the horizontal axis) and Shadow Entities Pacific, Unique, World Diamond, Auragem, Empire, Fancy Creations, Sino Traders, Eternal, Universal, Vista, Tri Color, and Brilliant (on the vertical axis).

95. The spreadsheet, Naag's inquiries, and Gandhi's responses demonstrate the extent to which the supposed pretexts for the movement of funds among the various Firestar Entities

and Shadow Entities—frequently accounted for as loans, sales, and advances against future sales—lacked legitimate business sense. For example:

(i) The spreadsheet listed Pacific as owing FDII $244,548 in accounts receivable. With respect to this entry, Naag asked, "As per the sale register up to Sep 2016, there has been no transaction with Pacific diamonds, is this receivable against sale or advance given for purchase?" Gandhi responded "AR for Sale in March 2016."

(ii) The spreadsheet listed FDII as owing a total of $13,484,957 in accounts payable to Pacific, Auragem, Empire, Fancy, and Sino Traders. With respect to these entries, Naag asked, "There were no purchase transactions with these parties up to Sep 2016, what is the nature of these payables?" Gandhi responded "There is a purchase of $1.3m in August 2015." He had no explanation for the remaining more than $12.2 million in purported accounts payable from FDII to Shadow Entities.

(iii) The spreadsheet listed Jaffe as being owed a total of $839,278 in accounts receivable from Pacific, Empire, Eternal, and Vista. With respect to these entries, Naag asked, "There are no sale transactions to Pacific, Eternal, and Vista. Are these advances given for purchases?" Gandhi responded, "Yes[.]"

(iv) The spreadsheet listed Jaffe as owing a total of $6,998,488 in accounts payable to Pacific, Eternal, Universal, and Tri Color. With respect to these entries, Naag asked, "There have been no purchases from these parties up to Sep 2016. Have purchases been made in Oct?" Gandhi responded, "For Future[.]"

(v) The spreadsheet listed Synergies as owing Brilliant $1,287,000 in accounts payable. With respect to this entry, Naag asked, "Is this advance received against sale or borrowings?" Gandhi responded, "Borrowing[.]" Upon information and belief, this entry related to the same purported $1,287,000 "loan" from Brilliant to Synergies alleged below, for which a term sheet was not executed until July 2017 when the issue was "holding up" Synergies' audit.

96. As another example, on April 22, 2017, Rutvi Mehta of Sampat & Mehta emailed Kunal Patel, copying Ajay Gandhi: "This invoice of Fancy Creation is in the name of Firestar Diamond, Inc. and purchased i.e. the 1st three products are booked in the books of Firestar Jewellery INC. Why invoice is booked in Firestar Jewellery Inc.?" Trushit Shah, also of Sampat & Mehta, followed up: "Ajaybhai, We were under the impression that splitting of invoice between

US entities is done only in case of Group companies transaction. However, in this case splitting

is done with outsider as well." Gandhi replied, "Vendor error." A few minutes later, apparently

deciding that excuse was not sufficient, he equivocated, "Also to save freight, they ship together

as one invoice. Difficult to fight with them."

97.     As another example, in a June 16, 2011 email, John Regan at HSBC Bank asked

Ajay Gandhi why Synergies would be wiring funds to Unique. Gandhi replied: "Unique loaned

to Synergies Corp. Synergies Corp loaned to Twin Fields. Twin Fields paid back loan after 3 days

to Synergies Corp. Synergies Corp paid back funds to Unique." Regan replied, "Unique is

affiliated correct? Does Nirav own it? Is this why there are loans back and forth?" Gandhi replied,

"Unique is not an affiliated company but Nirav has a very good relationship with them." Regan

then asked, "Why is each company lending to the other?" Gandhi replied, "I am sure there were

business reasons. What is the concern for the bank?"

98.     As another example, on March 31, 2010, Oakley Champine, a Vice President of

Antwerp Diamond Bank, asked Ajay Gandhi several questions relating to transactions among

Firestar Entities and Shadow Entities. She asked, "[w]hat is the reason for the large negative

accounts payable balances between Firestone and affiliated companies (Firestone Group India,

S&S)?" Gandhi replied, "Mostly advance given against purchases."

99.     In some instances, Gandhi sought Bhansali's advice on how to respond to auditor

inquires. For example, on April 26, 2017, Ajay Gandhi forwarded an auditor's inquiries into the

U.S. Entities' A/R and A/P balances with Shadow Entities to Mihir Bhansali. Gandhi stated:

"Point 2 [regarding the Shadow Entities] - lets discuss." Bhansali replied: "Pls speak to Shyam

[Wadhwa] on this, thank you. Let me know when we can clear at least the $4m." (FDII's A/P

included $4,702,350 owed to Auragem and $4,147,816 owed to Fancy Creations).

36

100.    As another example, on September 7, 2011, a banker at Standard Chartered Bank emailed Ajay Gandhi, "We understand that Firestar in NY sales [sic] mostly to big retailers in the US but the recent A/R outstanding shows more concentration on companies such as Unique Diamond, Empire Gem and SDC Designs. Can we get YTD sales data of 2010 and 2011 of the top 10 accounts for each year on year comparison?" She further stated, "Also, in the AR ageing it shows Firstar has given Steller [sic] diamonds and Unique diamonds $11m limits each—and Brilliant, Fancy creations $2m each. We understand that these foreign bills we are not discounting them, but we'd like to get more background info on these accounts given the size of exposures."

101.    On September 12, 2011, Gandhi replied, "Various overseas companies that you have mentioned are not our customers. We buy unique large diamonds/jewelry pieces from various vendors in India and sometimes these goods need to be returned, but due to the terms of the original sale, the vendors instruct us to ship these goods to another companies [sic], that they select, who are not located in India. We record these transfers as a reduction to purchases and an increase to accounts receivable at the original purchase cost of the diamonds/ jewelry." Gandhi further stated, "Such activities are gradually transferred to a new corporation we have established recently." Upon information and belief, FDII, which was incorporated in May 2011, was the "new corporation" Gandhi was referring to. Gandhi also provided mailing addresses for Vista and Empire.

102.    Bhansali, who was included on the email from Gandhi, forwarded this response to Modi, stating "Nirav, Please read this email below from SCB last week, and Ajay's reply. Just an FYI." Modi then forwarded the email to V Srinivasan, who upon information and belief is the former deputy managing director of Axis Bank's corporate banking division, and stated, "As SC is a common bank in India, Antwerp and NY. It might be a good idea that Ajay and you discuss

all responses [sic]." Upon information and belief, Axis Bank frequently served as an intermediary bank in connection with LOU transactions underlying the Bank Fraud.

> v.    *Use of Debtors' Funds and Proceeds of the Bank Fraud to Purchase Personal Assets*

103.    Just as he orchestrated the circular trades at the heart of the Bank Fraud, Modi also orchestrated transactions to divert assets from the Bank Fraud and the Debtors for the benefit of himself and his and Bhansali's family.

<u>The Ithaca Trust</u>

104.    On August 23, 2017, Modi's sister Purvi Mehta ("**Mehta**") established the Ithaca Trust, an irrevocable trust for the benefit of Modi's wife, Ami Modi, and their three children. The Ithaca Trust's investment advisor was Abhay Dinesh Javeri, Ami Modi's brother. The trustee was Commonwealth Trust Corporation ("**Commonwealth**"). Attorneys from the law firm of Day Pitney LLP ("**Pitney**") were the principal drafters of the Ithaca Trust agreement and served as advisors for the creation of the trust.

105.    Ostensibly, the Ithaca Trust was funded with $23 million in cash from Mehta, but Commonwealth's records show that Modi was behind the initial funding. In an August 24, 2017 email regarding the Ithaca Trust's formation, Modi informed Pitney attorneys that "[t]he funds are in place with Purvi [Mehta]. Please let me know account details to wire the money . . . ."

106.    Commonwealth's records also show that those funds Modi placed with Mehta to establish the Ithaca Trust were funneled to Mehta from the Bank Fraud. Mehta revealed in disclosure forms to Commonwealth that she funded the Ithaca Trust using "dividends" she received from Fine Classic FZE ("**Fine Classic**"), a Shadow Entity of which Mehta was the 100% owner. Like the other Shadow Entities, Fine Classic operated as part of the Bank Fraud, and was a recipient of large amounts of fraudulently obtained funds.

107.    Further, throughout 2017, tens of millions of dollars passed between the HSBC bank account of Nirav Modi's wife, Ami Modi, and Mehta's Bank of Singapore account. A bank statement for Ami Modi for September 2017 shows $31,506,701 disbursed, almost all of which went to Mehta.

The Ritz Carlton Apartment

108.    The purpose of the Ithaca Trust was to hold Manhattan real estate for Modi and his family. The initial $23 million in trust funding was used to purchase an apartment at the Ritz Carlton residences, 50 Central Park South, Unit 33, New York, New York (the "**Ritz Carlton Apartment**") for the sole use of Modi and his family.

109.    On August 30, 2017, Modi emailed Pitney attorneys and other professionals informing them that $23 million had been wired from Mehta to Commonwealth and directing Commonwealth to further wire the funds to attorneys at Katz Matz to execute the purchase of the Ritz Carlton Apartment. Mehta was not on the email thread.

110.    That same day, Katz Matz attorney Steven Matz emailed Modi and others with instructions for the September 7, 2017 closing of the Ithaca Trust's purchase of the Ritz Carlton Apartment. Once again, Mehta was not on the email thread.

111.    On September 7, 2017, the Ithaca Trust closed on the purchase of the Ritz Carlton Apartment. The Ithaca Trust paid $25 million to the seller through Central Park South 50 Properties LLC ("**CPS50**"), an entity the Ithaca Trust owns. Mehta signed the contract of sale. Of the purchase price, $2.5 million was wired from an Ami Modi HSBC account into an escrow account at the Katz Matz law firm, which handled the sale. The remaining $23 million came from funds that Modi had funneled to Mehta from the Bank Fraud.

### The Essex House Apartment

112.    Modi also used the Ithaca Trust to obtain real estate that previously had been owned indirectly by FDI.

113.    On February 15, 2007, Central Park Real Estate LLC ("**CPRE**") was formed under Delaware law. CPRE was owned by FDI until approximately the end of 2009, when it was transferred to FGI.

114.    On March 26, 2007, CPRE purchased an apartment at the Essex House, 160 Central Park South (the "**Essex House Apartment**"); Bhansali signed the deed on behalf of CPRE. The Essex House Apartment was used by Modi and as a personal residence.

115.    Based on direction from Modi and Gandhi, FDI funded $2 million of the approximately $5 million purchase price of the Essex House Apartment. The balance was financed by an approximately $3 million mortgage from HSBC. FDI also made at least $856,335 of the monthly payments on the mortgage between 2011 and 2018 and paid JW Marriott Essex House NY $15,828.35 in January 2018, after CPRE had been transferred from FGI to the Ithaca Trust.

116.    On December 5, 2008, Modi emailed Bhansali and Gandhi that, "*I bought Essex House at $4,995,000 and took a loan of $3 million*" (emphasis added). Modi and Gandhi then discussed by email, with Bhansali copied, the fact that FDI had funded part of the Essex House purchase.

117.    In March 2017, Gandhi emailed Modi that HSBC requested more information on the ownership structure of CPRE "going up thru the ladder to FILP, India[,]" including the "Source of Wealth" of "Purvi Modi[.]" Gandhi relayed that he "avoided giving these [sic] information and told them that we may do restructuring of Central Park and may change ownership etc." but that the "only way, we can avoid is only if we pay-off the $ 3 m mortgage in

40

next few months." Modi responded, "There will be a change in ownership in May end so better to explain that."

118.    On December 4, 2017, by email, Modi told Gandhi to pay off the HSBC mortgage in full. On December 5, 2017, FDI paid off the approximately $3 million balance on the Essex House Apartment mortgage, using funds from Jaffe and Fantasy as well as from its own account and from a Firestar HSBC line of credit.

119.    On December 15, 2017, one of Modi's accountants emailed Modi with three potential options for minimizing transfer taxes on "the movement of CPRE." The first option was having Modi purchase CPRE directly from Group, the second was having Ami Modi purchase CPRE directly, and the third was using the Ithaca Trust to make the purchase by having Mehta contribute more cash to the trust. The accountant explained that, "since [Modi] prefer[red] to fast track the transaction," the existing trust could be used and then the trustee could "move the LLC to another trust in due time."

120.    Modi chose the third option. On December 29, 2017, the Ithaca Trust purchased CPRE from FGI for $6 million. On January 2, 2018, Mehta transferred $6 million to the Commonwealth Trust Company, as trustee of the Ithaca Trust. The Ithaca Trust then wired $6 million to FGI's HSBC account for the purchase of CPRE.

121.    By this time, Commonwealth had flagged the Ithaca Trust as a "high risk trust" and internally expressed concern about serving as trustee. On March 13, 2018, Commonwealth emailed Pitney attorneys to inform them that its trust committee had decided that Commonwealth should resign as trustee of the Ithaca Trust.

122.    On May 25, 2018, Nehal Deepak Modi, the protector of the Ithaca Trust and Modi's brother, appointed Trident Trust Company (South Dakota) Inc., as successor trustee of the Ithaca Trust.

41

### Diversion of Funds to Purvi Mehta

123.    Throughout the Relevant Period, millions of dollars in proceeds of the Bank Fraud were funneled to Nirav Modi's sister, Purvi Mehta in various ways.

124.    For example, between October 20, 2011 and March 11, 2011, Nirav Modi personally transferred a total of $14,575,000 to Synergies, which Synergies used to pay off purported loans to FIPL. On April 1, 2012, Nirav Modi assigned his interest in the loan to Purvi Mehta. This assignment was described as a gift in numerous emails. For example, on December 22, 2016, Shyam Wadhwa emailed Purvi Mehta's husband, Manish Modi, "Manish – Awaiting Completed gift deed documents from your end for both Synergy loan gift to Purvi and FHL Loan gift to Purvi. Please mail me scanned copy followed by original."

125.    On July 13, 2017, in connection with FHL's acquisition of Synergies as part of a broader restructuring of the Firestar Entities, FHL transferred $20 million to Synergies as a purported capital infusion. That same day, Synergies transferred $650,000 to Jaffe, $1,047,000 to Brilliant (as repayment of the loan alleged above), $3,694,000 to FDIPL (as the purchase price for FGI, which Synergies acquired as part of the 2017 restructuring), and $14,575,000 to Purvi Mehta. The $14,575,000 to Purvi Mehta was transferred under the pretext of paying off the loan Modi had assigned to Mehta.

126.    Additionally, at all relevant times, Purvi Mehta and her and Nirav Modi's father, Deepak Modi, indirectly owned 100% of the equity in Twin Fields Investments Ltd. ("**Twin Fields**"), which in turn owned 100% of the equity in BBB Group, Inc ("**BBB Group**").

127.    Ajay Gandhi, on behalf of Synergies, successfully bid on the intellectual property rights of Bailey Banks & Biddle at a bankruptcy auction in 2009. BBB Group was incorporated in 2010 to operate *Bailey Banks & Biddle*-branded retail stores. Upon information and belief, Nirav

Modi's brother, Nehal Modi, was the *de jure* or *de facto* director of BBB Group and Mihir Bhansali was the *de jure* or *de facto* director of Twin Fields.

128.     Twin Fields' bank statements reflect a total of approximately $21.3 million in cash inflows from Jaffe and approximately $26.9 million in cash inflows from Fine Classic and a total of approximately $42.8 million in cash outflows to BBB Group.

<u>Diversion of Funds for the Benefit of Mihir Bhansali and His Family</u>

129.     Mihir Bhansali and his family also personally benefitted from the Bank Fraud and from Bhansali's breaches of his fiduciary duties.

130.     For example, upon information and belief, the M.R. Family Trust received INR 32.83 crore (approximately $4.57 million) from DRUS in fiscal year 2011-2012. Upon information and belief, the M.R. Family Trust was created by and for the benefit of members of Mihir Bhansali's family. For example, upon information and belief, Mihir Bhansali's father, Rashmikant K. Bhansali, is or was the trustee of the M.R. Family Trust. Upon information and belief, Rashmikant K. Bhansali, in his capacity as trustee of the M.R. Family Trust, served as a partner of DRUS from 2007 to 2011.

131.     Upon information and belief, Mihir Bhansali holds or formerly held equity interests in various Modi-Controlled Entities, including without limitation, FDIPL and Jewelry Solutions International Private Limited (which is the name under which FDI was incorporated). As alleged in this Complaint, millions of dollars flowed through FDIPL and FDI during the Relevant Period.

132.     Upon information and belief, Mihir Bhansali's wife, Rakhi Bhansali, holds or formerly held, 99.9% of the equity interests in Neeshal Marketing Private Limited ("**Neeshal Marketing**") and Neeshal Merchandising Private Limited ("**Neeshal Merchandising**").

133.    During the Relevant Period, upon information and belief, millions of dollars in proceeds of the Bank Fraud flowed through Neeshal Merchandising. For example, upon information and belief, Neeshal Merchandising was the direct recipient of at least $11,475,127.67 in LOU funds sourced from PNB during the Relevant Period.

134.    Additionally, Neeshal Merchandising received funds from Shadow Entities on numerous occasions. For example:

(i)    On October 14, 2010, Fancy Creations transferred $841,944.64 to Neeshal Merchandising.

(ii)    On December 10, 2010, Fancy Creations transferred $1,408,947.34 to Neeshal Merchandising.

(iii)    On March 14, 2011, Fancy Creations transferred $1,132,309.59 to Neeshal Merchandising.

(iv)    On October 18, 2011, Brilliant transferred $661,080.98 to Neeshal Merchandising.

(v)    On April 25, 2012, Fancy Creations transferred $605,608.59 to Neeshal Merchandising.

135.    Additionally, Neeshal Merchandising received funds directly from the Debtors on at least one occasion. For example, on July 28, 2011, FDI transferred $420,478.58 to Neeshal Merchandising.

136.    Nirav Modi's personal financial statements reflect "advances" to Mihir Bhansali of $195,020 in 2016, $629,184 in 2012, and $776,574 in 2011.

137.    On February 24, 2017, Purvi Mehta wired $1,500,000 to Mihir Bhansali's personal checking account at HSBC.

138.    On March 22, 2017, Bhansali and his wife purchased apartment 24A at 50 Riverside Boulevard in New York City for approximately $7.1 million, of which approximately $5.3 million was paid in cash. Bhansali's annual salary from the Debtors was approximately $185,000.

44

139. Only two days after the Debtors filed for bankruptcy, Bhansali transferred his interests in the apartment to his wife, Rakhi Bhansali for nominal consideration.

140. Upon information and belief, this apartment was purchased using proceeds of the Bank Fraud.

141. On June 29, 2017, Purvi Mehta wired $750,000 to Mihir Bhansali's personal checking account at HSBC.

vi.    *Efforts to Cover Up and Frustrate Investigation of the Bank Fraud Before and After the Debtors' Bankruptcy Filing*

142. Modi, Bhansali, and Gandhi researched and implemented various tactics to conceal and destroy evidence of their involvement in the Bank Fraud both prior to and after the Bank Fraud's exposure.

143. On June 10, 2013, to hide their involvement in the Bank Fraud, Modi's personal assistant instructed Gandhi, from her personal email address to Gandhi's personal email address, to communicate with her regarding Shadow Entities only on Gmail or Panemail, a program that automatically deletes messages, rather than on the Firestar Entities' regular email system.

144. On February 13, 2018, an attorney at Day Pitney LLP emailed Ajay Gandhi to suggest that bank statements for CPS 50 Properties LLC, which was owned by the Ithaca Trust and which held the 50 Central Park South property, be sent directly to Abhay Javeri as manager of CPS Properties LLC. Gandhi forwarded the email to "ajaycpa@yahoo.com", which upon information and belief is Gandhi's personal email address, and stated, "Niravbhai, OK to have CPS 50 Properties LLC bank statement from Citibank sent to Abhay Javeri to his email address or Abby's mailing address?" The fact that Gandhi addressed this email to "Niravbhai" suggests that Nirav Modi was using Ajay Gandhi's personal email account to communicate in the weeks following the exposure of the Bank Fraud.

145.     On March 11, 2018, Ajay Gandhi ran internet searches on the Adelphia Communications fraud case and related bankruptcy. These searches included: "how did adelphia get caught"; "how rigas family were caught in the fraud of adelphia"; and "how adelphia fraud was discovered?"

146.     On March 9, 2018, Bhansali visited an internet article entitled "14 Signal App Tips for Secure Chats," which described tips for sending and erasing secure communications through Signal, an end-to-end encryption application.

147.     On March 12, 2018, Mihir Bhansali visited an internet article entitled "How to Clear Your Cache on Any Browser." The article described methods of deleting internet browsing history on various web browsers. That same day, Bhansali visited an internet article entitled "How to Hack Wi-Fi Passwords." This article described methods of obtaining access to wireless networks without the required password.

148.     Mihir Bhansali's laptop contained a software program called "Hide My Ass! Pro VPN." Upon information and belief, the purpose of this program is to facilitate anonymous internet usage through virtual private network technology. The software's logs indicate that the program was used as recently as February 11, 2018.

149.     Bhansali's laptop also contained a program called SecurStar DriveCrypt. Upon information and belief, the purpose of this program is to encrypt data on computers.

150.     As alleged above, Bhansali created what appears to be a "to-do" list for various co-conspirators following exposure of the Bank Fraud. The list included instructions to "Send all non-Firestar Dubai comps to HK." Upon information and belief, "comps" refers to "computers."

151.     Upon information and belief, based on statements made by various Firestar Entity and Shadow Entity directors and employees to Indian authorities, around February or March 2018:

46

(i)    Mihir Bhansali removed approximately 50 kilograms of gold and 2.5 Lac Dirhams (worth approximately $68,000) from a Dubai-based Firestar Entity;

(ii)    Mihir Bhansali and Nirav Modi intimidated and coerced directors and employees of Shadow Entities not to cooperate with investigative authorities. For example, upon information and belief, one of the directors of Unique told the ED that, "When the case registered against Nirav Modi, all of us (directors/owners) wanted to return to India as soon as possible and wanted to cooperate with the agencies to prove our innocence. In March [2018], Mihir Bhansali (close aide of Nirav Modi) told us not to panic and said he is on the job and everything will be under control in a matter of days. . . . he kept us under constant fear that our return to India could result in arrest by the agencies." Similarly, upon information and belief, Nirav Modi, or others operating at Modi and Bhansali's direction, threatened to kill or falsely implicate Ashish Lad, a director of Unity, if he revealed anything to the investigative authorities.

(iii)    Nirav Modi's brother, Nehal Modi, upon information and belief acting at the direction of or in coordination with Nirav Modi and Mihir Bhansali, destroyed cell phones of Shadow Entity directors. Upon information and belief, Nehal Modi told the directors that their "mobile phones are easy to track and they are evidence."

(iv)    Nehal Modi, upon information and belief acting at the direction of or in coordination with Nirav Modi and Mihir Bhansali, removed 150 boxes of pearls from one of the Hong Kong-based Modi-Controlled Entities. In the "to do" list spreadsheet recovered from Mihir Bhansali's computer, the tasks listed under "MB" included "Pearls – where to keep the inventory?" and "Pearls – original purchase entries."

(v)    Nehal Modi, upon information and belief acting at the direction of or in coordination with Nirav Modi and Bhansali, bribed Anish Lad INR 2,000,000 (approximately $28,000) to give false testimony to judicial authorities in Europe.

(vi)    Nirav Modi told the Shadow Entity personnel that "it was not safe for [them] in Dubai and [they] must shift to Cairo[, Egypt.]" Once in Cairo, Modi, or others operating at his behest, confiscated the Shadow Entity personnel's passports "on the pretext of some residency permission."

(vii)    Nirav Modi, or others operating at his behest, instructed the Shadow Entity personnel to sign an affidavit stating that the Shadow Entities belong to the directors and were in no way related to Nirav Modi before they left Cairo.

ix.     *Fraudulent Omissions, Misstatements, and Misrepresentations Made in Connection*
        *With The Debtors' Chapter 11 Cases*

152.    On February 26, 2018, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. During the early weeks of the chapter 11 cases, Bhansali and Gandhi, as the Debtors' CEO and CFO, respectively, made fraudulent omissions, misstatements, and misrepresentations, formally and informally, explicitly and implicitly, to this Court, to the United States Trustee, and to creditors, regarding the Debtors' involvement in the Bank Fraud and their relationship to various Shadow Entities.

153.    For example, in his Declaration filed with this Court on February 28, 2018, Bhansali stated under penalty of perjury, "A list setting forth the twenty (20) largest unsecured creditors, of each of FDI, [Fantasy] and [Jaffe], excluding those persons who constitute 'insiders' under Bankruptcy Code section 101(31), is attached hereto as Exhibit B."

154.    Exhibit B to Bhansali's declaration, which purported to list the top 20 unsecured non-affiliated creditors of each Debtor, included: World Diamond as a creditor of FDI in the amount of $79,918.70; Fancy Creations as a creditor of FDI in the amount of $19,617.50; Tri Color as a creditor of Jaffe in the amount of $3,356,165.99; Pacific as a creditor of Jaffe in the amount of $2,922,239.31; Universal as a creditor of Jaffe in the amount of $42,905.00; and Eternal as a creditor of Jaffe in the amount of $31,645.39.

155.    Moreover, Bhansali led the bankruptcy court and other parties to believe that the Debtors were not involved in the Bank Fraud and that they were innocently caught up in an overseas matter. For example, in a declaration filed shortly after the petition date, Bhansali declared under penalty of perjury: "The Debtors and their dedicated employees have worked tirelessly over the past week or so to … reassure their vendors and customers that they had no involvement in the alleged wrongful conduct."

156.     On March 27, 2018, the Debtors filed their bankruptcy schedules and statements of financial affairs ("**SOFA**"), all of which Ajay Gandhi signed under penalty of perjury. The Debtors' statements of financial affairs contained numerous misstatements, misrepresentations, and omissions.

157.     For example, FDI's SOFA did not list any transfers to Shadow Entities in response to Question No. 3, which asks for payments made to creditors within 90 days prior to the petition date, Question No. 4, which asks for transfers of property to insiders of the debtor within 1 year prior to the petition date, or Question No. 13, which asks for any other transfers made outside the ordinary course of business within 2 years prior to the petition date.

158.     In fact, there were substantial transfers by FDI to Shadow Entities that Gandhi personally directed or otherwise participated in during the relevant periods. For example, Gandhi did not disclose FDI's transfers of $483,620.05 and $2,188,769.43 to Pacific on January 3, 2018—only a few weeks prior to the Petition Date. Nor did Gandhi disclose FDI's payment of $300,000 to Unique on March 22, 2017, less than a year prior to the Petition Date.

159.     Additionally, neither Jaffe's bankruptcy schedules nor SOFA disclosed any amounts owed by NMI to Jaffe.

160.     However, Jaffe's and NMI's books and records each reflect significant loan balances owed by NMI to Jaffe as of the Petition Date that have never been repaid. Jaffe's general ledger account #120250, entitled "Loan Receivable - Firestar Jewelry, Inc.", reflected a loan balance owed by NMI of $11,216,467 as of the Petition Date. Similarly, NMI's balance sheet as of March 31, 2018 reflected an $11,216,467 loan payable to Jaffe.

161.     Rather than call the loan due and have NMI repay Jaffe using the more than $40 million in inventory NMI held as of the Petition Date, Modi, Bhansali, and Gandhi, as alleged below, caused NMI and FDII to ship substantially all of their inventory to Modi-Controlled

49

Entities overseas. Although these shipments were disguised as sales, the parties never intended for the overseas entities to pay for the goods. For example, NMI's books and records reflect aged accounts receivable owed by Nirav Modi Limited to NMI of $23,767,423.39 as of May 15, 2018, of which $16,264,838 was less than 60 days old—well in excess of the $10 million credit limit for Nirav Modi Limited reflected in the report.

162.    On March 23, 2018, the Debtors moved for approval of bidding and sale procedures for the sale of substantially all of their assets under section 363 of the Bankruptcy Code. On March 29, 2018, the Court approved the Debtors' bidding and sale procedures.

163.    On April 20, 2018, the Court appointed John J. Carney as examiner (the "**Examiner**") to investigate the nature and extent of the Debtors' involvement in the Bank Fraud.

164.    Shortly after the Examiner's appointment, the Examiner attempted to interview Bhansali. Bhansali flatly refused to cooperate. When pressed by the Examiner's counsel, Bhansali's counsel acknowledged that Bhansali was in communication with Modi as late as March 15, 2018, and that he and Modi discussed the Debtors' sale and bankruptcy process.

165.    On May 1, 2018, the Debtors adjourned the auction for FDI and Fantasy's assets indefinitely. On May 3, 2018, Parag Diamonds, Inc. was the successful bidder for Jaffe's assets.

166.    On May 15, 2018, at a hearing concerning the approval of the Jaffe sale, the Debtors' chief restructuring officer Mark Samson testified that Mihir Bhansali had been in communication with Nirav Modi between the commencement of the Debtors' chapter 11 cases and March 15, 2018, and that Bhansali continued to be involved "on a daily basis" as "a key employee" in the sale process after that date.

167.    Following this revelation, the Court asked for the record to be supplemented with additional detail concerning the nature and extent of Bhansali's post-petition communications with Modi and adjourned the hearing to May 23, 2018. On May 19, 2018, the Debtors withdrew

the sale motion without prejudice. (Dkt. 177.) At a hastily-arranged Chambers conference on May 18, 2018, Bhansali's counsel advised the Court that Bhansali resigned as director and officer of the Debtors that same day and that Bhansali refused to submit a declaration and appear for cross-examination concerning his post-petition communications with Modi.

168.     On May 17, 2018, Ajay Gandhi sat for an interview with the Examiner's team. In that interview, Gandhi stated that the only thing he knew about the Shadow Entities was that they were Bhansali's customers. In subsequent interviews, Gandhi continued to insist he was not aware that any Shadow Entity was owned or controlled by Modi. When confronted by the Examiner's team with emails indicating that Gandhi was aware that numerous Shadow Entities were related parties, Gandhi repeatedly maintained he did not remember these emails, nor that the Shadow Entities were in any way controlled by Modi.

169.     Additionally, in response to the Examiner's questions regarding Gandhi's involvement in hundreds of millions of dollars in loose diamond transactions, Gandhi told the Examiner that he merely signed packing slips with no verification of the contents of the shipment, its valuation, the profitability, or propriety of such transaction.

170.     Additionally, when the Examiner asked Gandhi whether he ever used his personal email address for Firestar business, Gandhi stated that he did not. In fact, during the Relevant Period, Gandhi sent numerous emails pertaining to the Debtors and other Modi-Controlled Entities to and from his myriad personal email addresses.

171.     On June 14, 2018, the Court approved the Trustee's appointment, at which time the Trustee assumed control of the Debtors' estates and operations.

172.     On August 7, 2018, the Examiner conducted a deposition of Mihir Bhansali, at which Bhansali invoked his Fifth Amendment right against self-incrimination in response to every question except his name.

### Involvement in Actual Fraudulent Transactions

173. Based on, among other things, the facts and circumstances set forth in this

Complaint,

    (i)    each transfer of property of the Debtors derived from or subsequently transferred to a Shadow Entity or LOU Entity, directly or indirectly, or otherwise linked to or supporting the Bank Fraud, during the six-year period prior to the Petition Date (each an "**Actual Fraudulent Transfer**"); and

    (ii)    each obligation incurred by the Debtors to a Shadow Entity or LOU Entity, or otherwise linked to or supporting the Bank Fraud, during the six-year period prior to the Petition Date (each an "**Actual Fraudulent Obligation**", together with each Actual Fraudulent Transfer, the "**Actual Fraudulent Transactions**")

gave rise to a right to avoid such Actual Fraudulent Transactions and to recover the value of such

Actual Fraudulent Transfers under applicable bankruptcy and nonbankruptcy law.

174. Each Actual Fraudulent Transaction was made with actual intent to hinder, delay,

or defraud the Debtors' existing or future creditors. For example:

    (i)    Each Actual Fraudulent Transaction was made to or for the benefit of an insider of the Debtors.

    (ii)    Modi, Bhansali, Gandhi, and their co-conspirators actively endeavored to conceal the existence and nature of the Actual Fraudulent Transactions, both before and after the filing of these chapter 11 cases.

    (iii)    Modi, Bhansali, Gandhi, and their co-conspirators retained control over the proceeds of each Actual Fraudulent Transfer.

    (iv)    In many cases, the Debtors did not receive reasonably equivalent value in exchange for Actual Fraudulent Transactions, and in some instances, did not receive any consideration at all.

    (v)    The Debtors were insolvent at the time each Actual Fraudulent Transaction occurred based on both the figures reflected on their balance sheet and the substantial contingent liability they incurred in the course of their involvement in the Bank Fraud.

(vi)     The Actual Fraudulent Transactions were not made in the ordinary course of the Debtors' businesses and served no legitimate corporate or economic purpose.

(vii)    Many of the Actual Fraudulent Transactions involved Shadow Entities, which constitute dummies or fictitious parties.

(viii)   Nirav Modi absconded after exposure of the Bank Fraud.

175.     In many cases, Modi, Gandhi, and Bhansali caused the U.S. Affiliates, upon receiving Actual Fraudulent Transfers, to subsequently transfer the proceeds of such Actual Fraudulent Transfers to Shadow Entities or other Modi-Controlled Entities. For example:

(i)      On August 30, 2012, FDI wired $1,501,000 to FDII. That same day, Gandhi emailed Bhavesh Patel, "Transfer $1,501,000 from [FDI to FDII]. Pay $21,774 from [FDII] to Fancy Creation." That same day, Gandhi emailed Sridhar Krishnan of SDC Designs to let him know that FDII would issue a check in the amount of $1,500,395 to SDC Designs. On August 31, 2012, FDII issued a check in the amount of $1,500,395 to SDC Designs.

(ii)     On December 11, 2012, Gandhi emailed Bhavesh Patel, "Please keep wire ready for $602,862 to SDC Designs LLC from [FDII's} Capital Old account for invoice 63966." On December 12, 2012, Gandhi emailed a banker at IDB a request for a $500,000 loan, with respect to which FDI was the obligor and FDII the beneficiary. That same day, the $500,000 loan proceeds were disbursed to FDII's Capital One Bank account. That same day, FDII wired $602,862 to SDC Designs.

(iii)    On December 13, 2012, Firestar wired $391,611 to Synergies. That same day, Synergies wired $91,000 to Brilliant. On December 14, 2012, Synergies wired $300,000 to Unique. On December 13, 2012, Ajay Gandhi emailed Bhavesh Patel instructions to make these wires.

(iv)     On February 19, 2013, FDI wired $627,000 to FDII. Bhavesh Patel emailed a wire confirmation for this transfer to Ajay Gandhi. That same day, FDII wired $1,266,430 to Fancy Creations and $332,300 to Diagems. That same day, Shyam Wadhwa emailed Bhavesh Patel instructions to make these two wires and stating, "Since Ajaybhai would be traveling tonight . . . please take Ajaybhai signature on wire transfer doc and send it to Mihirbhai for his signature." That same day, Bhavesh Patel emailed Gandhi the wire documents for these transfers. Gandhi forwarded them to Bhansali, stating, "Please print, sign and scan back to me." Bhansali replied, "Done and sent."

(v)     On April 25, 2013, FDI wired $350,000 to FDII. That same day, Jaffe wired $480,000 to FDII. That same day, FDII wired $812,030 to Diagems.

(vi)    On May 6, 2013, FDI wired $652,239 to FDII. That same day, FDII wired $463,389 to Tri Color. The next day, FDII wired $280,005 to Empire.

(vii)   On June 18, 2013, FDI wired $1,525,000 to FDII. That same day, Bhavesh Patel emailed Gandhi the confirmation for this wire, stating "Please find attached wires as per instructions." That same day, FDII wired $1,615,463.93 to Fancy Creations. On June 17, 2018, Bhavesh Patel emailed Gandhi wire documents for this transfer. Gandhi forwarded them to Mihir Bhansali to sign and return.

(viii)  On July 9, 2013, FDI wired $600,000 to FDII. That same day, FDII wired $600,024 to Fancy Creations. That same day, Bhavesh Patel emailed the wire confirmation for this transfer to Gandhi.

(ix)    On October 23, 2013, Firestar transferred $123,744 to Synergies. On October 24, 2013, Synergies transferred $125,000 to Brilliant. On October 23, 2013, Gandhi emailed Bhavesh Patel instructions to make these transfers.

(x)     On March 18, 2014, Firestar transferred $123,097 to Synergies. That same day, Synergies transferred $123,000 to Brilliant. That same day, Gandhi emailed Bhavesh Patel instructions to make these wires.

(xi)    On February 20, 2015, Firestar transferred $186,871 to Synergies. That same day, Synergies transferred $180,000 to Brilliant. That same day, Gandhi emailed instructions to Arpan Doshi and Avinash Oza to make these wires.

(xii)   On September 29, 2015, Jaffe wired $950,000 to FDII. That same day, FDII wired $943,827 to SDC Designs. That same day, Gandhi emailed Avinash Oza and Arpan Doshi instructions to make these transfers.

(xiii)  On March 9, 2016, FDI transferred $247,551 to Synergies. That same day, Synergies transferred $250,000 to Brilliant. That same day, Gandhi emailed Avinash Oza and Arpan Doshi instructions to make these wires.

(xiv)   On March 25, 2016, Jaffe transferred $1,400,000 to NMI. That same day, NMI transferred $613,069 to Auragem and $787,000 to Nirav Modi Ltd. That same day, Gandhi sent an email to Avinash Oza and Arpan Doshi instructing them to make these wires.

(xv)    On March 20, 2017, Firestar transferred $246,871 to Synergies. That same day, Gandhi emailed Avinash Oza instructions to make this wire. On March 22, 2017, Synergies transferred $240,000 to Brilliant. That same day, Gandhi emailed Avinash Oza and Kunal Patel instructions to make this wire.

176.     In addition to the Actual Fraudulent Transfers that occurred prior to the exposure of the Bank Fraud, Bhansali, Gandhi, and Modi continued to orchestrate Actual Fraudulent Transfers to Modi-Controlled Entities in the weeks leading up to the Petition Date. For example:

(i)     On or around January 23, 2018, FDI shipped 2,319.64 carats of loose diamonds with a declared value of $426,320.97 through Malca Amit to Eternal in Hong Kong. Ajay Gandhi was copied on numerous emails sent by Rebecca Chow, FDI's shipping department manager, relating to this shipment. On January 23, 2018, Ajay Gandhi emailed Rebecca Chow, copying Mihir Bhansali, contact information for Ivy Lau, an employee of Eternal.

(ii)    On January 25, 2018, FDI wired $910,278.70 to Dubai-based Firestar Diamond FZE. On January 24, 2018, Subhash Parab emailed Gandhi, copying Shyam Wadhwa, "please clear USD [$]910,278.70." The next day, Gandhi forwarded the email to Avinash Oza and Kunal Patel. Oza replied with the wire confirmation.

(iii)   On February 6, 2018, FDI wired $1,002,836.77 to FIL. That same day, Jaffe wired $505,610.51 to FIL and Fantasy wired $401,471.08 to FIL. That same day, Subhash Parab emailed Ajay Gandhi, copying Shyam Wadhwa, "Please pay following bills to FIPL . . . We have some urgent re-payment from IDBI bank for that [sic] we require below bills in IDBI bank[.]" The email contained a list of amounts owed by FDI and Fantasy totaling $1,002,836.77 and $401,471.08, respectively. Gandhi replied, "I can pay $500k from Jaffe to [sic]. Please email list as needed for Jaffe." Parab replied with a list of amounts owed by Jaffe totaling $505,610.51. Gandhi replied, "Funds wired."

(iv)    On or around February 6, 2018, FDI shipped 4,474.15 carats of loose diamonds with a declared value of $789,140.42 through Malca Amit to Eternal in Hong Kong. Ajay Gandhi was copied on numerous emails relating to this shipment.

177.     Additionally, in the weeks leading up to and following the Petition Date, Modi, Bhansali, and Gandhi caused NMI and FDII to move significant amounts of cash and inventory overseas where their creditors, including the Debtors, could not reach them. For example:

(i)     On January 4, 2018, NMI shipped two packages of inventory, with declared values of $585,000 and $65,000, respectively, through Malca Amit to Nirav Modi Ltd. in India.

(ii)     On January 10, 2018, NMI shipped inventory with declared value of $108,550, through Malca Amit to Nirav Modi Ltd. in India.

(iii)    On January 11, 2018, NMI shipped inventory with declared value of $32,370, through Malca Amit to Nirav Modi Ltd. in India.

(iv)     On January 16, 2018, NMI shipped inventory with declared value of $943,800, through Malca Amit to Nirav Modi Ltd. in India.

(v)      On January 19, 2018, NMI shipped three packages of inventory, with declared values of $273,000, $409,500, and $771,680, respectively, through Malca Amit to Nirav Modi Ltd. in India.

(vi)     On January 24, 2018, NMI shipped inventory with a declared value of $1,075,200 through Malca Amit to FDIPL in India.

(vii)    On January 25, 2018, FDII shipped inventory with a declared value of $1,886,922.67 through Malca Amit to Fancy Creations in Hong Kong.

(viii)   On January 26, 2018, NMI shipped inventory with a declared value of $198,750 through Malca Amit to Nirav Modi Ltd. in Hong Kong.

(ix)     On January 29, 2018, NMI shipped inventory with a declared value of $75,050 through Malca Amit to Nirav Modi Ltd. in Hong Kong.

(x)      On January 30, 2018, FDII shipped inventory having a declared value of $570,104.37 through Malca Amit to Firestar Diamond Ltd. in Hong Kong.

(xi)     On January 31, 2018, NMI shipped inventory with a declared value of $660,500 through Malca Amit to Nirav Modi Ltd. in Hong Kong.

(xii)    On January 31, 2018, FDII wired $2,466,015 and $525,000 to Fancy Creations. That same day, Ajay Gandhi forwarded the wire confirmations to Shyam Wadhwa and stated, "Please let your vendor know of this payment and clear any AR from HK."

(xiii)   On February 2, 2018, FDII wired $400,000 to Fancy Creations. That same day, Ajay Gandhi emailed Avinash Oza and Kunal Patel, copying Shyam Wadhwa, "Please wire $400,000 to Fancy from Capital One – Advance Refund." Oza replied with the wire confirmation.

(xiv)    On February 13, 2018, NMI shipped inventory with a declared value of $154,440 through Malca Amit to Nirav Modi Ltd. in Hong Kong.

(xv)     On February 14, 2018, FDII shipped inventory with a declared value of $409,138 through Malca Amit to Firestar Diamond BVBA in Belgium.

    (xvi)      On February 16, 2018, NMI shipped inventory with a declared value of $58,825 to Nirav Modi Ltd. in Hong Kong.

    (xvii)    On March 6, 2018, FDII shipped inventory with a declared value of $4,325,472.34 through Malca Amit to Firestar Diamond Ltd. in Hong Kong.

    (xviii)   On April 6, 2018, FDII shipped inventory with a declared value of $6,804,210.49 through Malca Amit to Firestar Diamond Ltd. in Hong Kong.

    (xix)     On May 9, 2018, FDII shipped inventory with a declared value of $2,700,000 million through Malca Amit to Fancy Creations in Hong Kong.

178.    Additionally, in February and March 2018, the NMI boutiques in Las Vegas, Honolulu, Los Angeles, and New York shipped substantially all of their inventory to New York. The inventory was held in storage by Malca Amit, upon information and belief, because its value exceeded the amount of available insurance coverage on items stored in FDI's vault.

179.    On April 5, 2018, Angelina Ypma, the global president of the *Nirav Modi* brand and a director of FIL, emailed Ajay Gandhi, copying Mihir Bhansali, "Nirav has instructed me to work with you to move all of NM US inventory (HJ and core back to HK ASAP.) HK will pay Malca in advance to move the jewels." Gandhi replied by noting that he and Bhansali had resigned from NMI, but that they were "happy to assist as needed should [Ypma] hit any bottleneck."

180.    On or around May 3, 2018, FDII delivered inventory having a declared value of $3,200,000 to Malca Amit, upon information and belief, to be held in storage.

181.    Upon information and belief, Bhansali and Gandhi continued to exercise oversight and control over the NMI inventory after their formal resignation from NMI.

182.    On May 4, 2018, Ypma emailed Gandhi, copying Bhansali, "I shall be coming to NY from Monday 7 till Thursday 10 May to review the NM inventory. Nirav told me that I can work with [FDI employee Shanna Singh] to count the inventory . . . Thank you to give me the support." Gandhi reiterated that he and Bhansali had resigned from NMI and directed Ypma to work with NMI's new management "on the logistics."

183.     Upon information and belief, during Ypma's visit to New York in May 2018, Ypma met with Gandhi and Bhansali and asked them for permission to remove some of the NMI inventory from storage at Malca Amit. Upon information and belief, Gandhi gave Ypma permission to remove items up to a specified total value, which, upon information and belief, was around approximately $2 million. Upon information and belief, Ypma selected items worth well in excess of the limit Gandhi set. Upon information and belief, the items Ypma selected were subsequently shipped to Hong Kong.

184.     On June 1, 2018, Rochelle Miller was appointed as CEO and sole director of each U.S. Affiliate, including NMI and FDII. That same day, Anthony Allicock, the director of FHL, introduced Angelina Ypma to Rochelle Miller over email. On June 2, 2018, Rochelle Miller, acting in her capacity as director/CEO of NMI, contacted Malca-Amit to request shipment to Hong Kong of two lists of NMI inventory: 1) 208 pieces at a declared value of $5,063,914.01; and (2) 53 pieces at a declared value of $2,846,545.

185.     On September 5 and 7, 2018, after confirming Rochelle Miller's appointment as director and CEO of NMI and FDII, Malca Amit released nine parcels to the custody of Rochelle Miller. Eight of these parcels contained NMI inventory and had a total declared value of $41,841,419. The remaining parcel contained the FDII inventory delivered to Malca Amit on May 3, 2018 with a declared value of $3,200,000. Upon information and belief, all of this inventory was subsequently shipped overseas to Modi-Controlled Entities.

186.     The systematic diversion of the U.S. Entities' assets to overseas Modi-Controlled Entities described in the foregoing paragraphs, in combination with the fraudulent omissions and misrepresentations Gandhi and Bhansali made in the context of these chapter 11 cases, has made recovery of millions of dollars in Actual Fraudulent Transfers and loan receivables effectively impossible.

187.     Had Bhansali and Gandhi immediately disclosed the Debtors' involvement in the Bank Fraud and relationship with Shadow Entities, had they disclosed the substantial loan balance owed by NMI to Jaffe, and had they not orchestrated the depletion of the U.S. Affiliates' assets, a chapter 11 trustee would have been appointed immediately to pursue claims against the U.S. Affiliates and could have requested a freeze of the U.S. Affiliates' assets while such litigation was pending.

**F.   *Modi, Bhansali, Gandhi, and Other Conspirators Coordinated their Actions***

188.     Modi coordinated and directed the execution of the Bank Fraud with his family members and various directors, officers, and employees of Firestar Entities, Shadow Entities, and other Modi-Controlled Entities, including Bhansali and Gandhi.

189.     Throughout the Relevant Period, Modi sent hundreds of emails to Bhansali and Gandhi, had numerous telephone conversations with them, and met with them at the Debtors' premises and elsewhere. Through many of these emails, telephone conferences, and visits, Modi directed Bhansali and Gandhi and exerted total ultimate control over Debtors' affairs, including in regard to day-to-day details. One means of Modi's omnipresent oversight and control over the Debtors consisted of the dozens of flash reports regarding the Debtors' financials that he received throughout the Relevant Period.

190.     Examples from a short period in 2009 illustrate Modi's total ultimate control over the Debtors. On February 22, 2009, Modi conveyed his preferences to Bhansali regarding which of the Debtors should contribute to a charity dinner. On June 10, 2009, Modi wrote to Gandhi, "Please confirm that shipments made after bankruptcy to Robbins and Western Stone are not in Tab 3 [of the spreadsheet.]" On March 17, 2009, Modi instructed Bhansali and Gandhi, "Pls don't pay further draws/reimbursement to A.Jaffe [sic] salespeople unless I approve. Pls confirm[.]"

191.     On March 20, 2009, Modi requested additional information from Gandhi regarding the Jaffe medical plan and the legality of implementing a method to decrease the medical costs. On June 8, 2009, upon reviewing Jaffe's accounts receivable, Modi instructed Gandhi, "If [the customers] always have been late, we should analyze their business prospects on a going forward basis." On June 17, 2009, Modi weighed in on an "Inventory Reduction Plan" for Jaffe, and on July 9, 2009, Bhansali wrote to Modi, "This was the summary of our plan for Jaffe, that Sam, you and I finalized with Ajay the Friday evening in your house." On July 15, 2009, Modi reviewed a Jaffe budget and commented, "I have deleted some line items[,]" and instructed Gandhi, "When planning, pls review moving to a 4 day week for Jaffe and /or salary cuts . . . for remaining people." On August 14, 2009, Modi instructed Gandhi to respond to an auditor's question with "4.2 million" as the inventory number for Jaffe.

192.     Examples from a short period in 2015 show Modi's total ultimate control over the Debtors persisted throughout the Relevant Period. On January 5, 2015, Gandhi wrote to Modi, "Based on my cash flow, I can pay $ 3 million in India in January 2015. Please let me know if I can ask for a list from Manish to pay India[,]" to which Modi responded, "Yes[.]"

193.     Similarly, on February 9, 2015, Gandhi told Modi, "February cash flow has improved in the last week. I have $ 2.0 m of Borrowing Cushion. Please let me know if I should pay India - $ 1.5 m this month after keeping $ 500k as cushion[,]" to which Modi responded, "Pls pay $2 m; don't keep cushion." Then, on February 19, 2015, Gandhi told Modi, "Received funds from HK. Now I can pay additional $ 1.5 m this month [to India] this month. Can I ask Manish for a list to pay?" to which Modi responded, "Yes[.]" And on March 2, 2015, Gandhi relayed to Modi that, "Based on my cash flow, I can pay $ 3 m to India in March 2015. Should I ask Manish for a list?" to which Modi responded, "Yes[.]"

194.     Furthermore, Modi treated Gandhi in some respects as a personal accountant. For

instance, on February 28, 2017, Modi directed Gandhi to prepare "all financial related parts" of

Modi's personal application to live in the River House in New York City, a process which

included gathering information concerning Modi's wife, Ami Modi. Gandhi also maintained

spreadsheets tracking Modi's personal net worth from at least 2011 through 2017.

195.     At least some of the coordination of the various Shadow Entities' involvement in

manipulating audits, and the Bank Fraud more generally, was conducted through an

operation1@firestardiamond.com ("**Operation 1**") email address. Upon information and belief,

the Operation 1 account was used by Sandeep Mistry and possibly others.

196.     For example, as part of the audit process, the auditors would email parties listed

on the audited company's accounts receivable and accounts payable records to request written

confirmation of the amounts reflected in the audited company's books and records. For audits of

the U.S. entities, which upon information and belief were conducted together, Ajay Gandhi

would be copied on the auditor's emails to Shadow Entities, which Gandhi would often forward

to Operation 1 to ask that Operation 1 cause the Shadow Entity to provide confirmation the

auditors. For example:

(i)     On June 7, 2017, Ajay Gandhi forwarded to Operation 1 an auditor's
        request to Fancy Creations. Operation 1 replied, "Today or tomorrow
        customer will confirm as discussed." Gandhi replied, "There were several
        emails…" Gandhi was referencing the auditor's requests to several other
        Shadow Entities, which Gandhi had also forwarded to Operation 1.

(ii)    On July 11, 2017, Gandhi sent an email to Operation 1 asking "Can you
        please have your customer [Brilliant] sign the attached confirmation for
        Synergies Corp?"   The attachment was not the typical auditor's
        confirmation request sheet; instead, it was a term sheet for an unsecured
        loan from Brilliant to Synergies in the amount of $1,287,000. The term sheet
        indicated that the loan would be interest free, repayable on demand, dated
        as of September 30, 2016—nearly one year earlier—and was to be used "for
        the business purpose of the Company." On July 19, 2017, Gandhi sent an
        email directly to "accounts@brilliantdiamonds.hk", copying Operation 1,

stating, "Please see attached Synergies Confirmation and sign and email to me ASAP. You are holding up my audit. This is balance confirmation as of 9/30/16." Approximately an hour later, Gandhi forwarded the email to Kurian Matthews asking, "Kurian – can you please have your customer take care of it ASAP per below email?" On July 23, 2017, an employee of Brilliant replied to Gandhi's email, copying Operation 1, attaching the signed loan term sheet.

(iii)    On November 10, 2017, Gandhi forwarded to Operation 1 an auditor's request to Eternal and asked Operation 1 to "Please chase your vendor to confirmed [sic] it. Audit is on hold." That same day, Gandhi sent substantively identical emails to Operation 1 forwarding auditor requests to Fancy Creations and Sino Traders.

197.    The Operation 1 account was also used to orchestrate transfers of funds and jewels among Firestar Entities and Shadow Entities. For example:

(iv)    On March 6, 2015, Rebecca Chow emailed Sandeep Mistry, copying Samir Shah and Paresh Mehta, "Please be informed that 1.68.52cts of 1/2ct VS loose diamond that's ready to be shipped. Please provide shipping address so we can process." Later that day, Chow forwarded the email to Operation 1 and stated, "Hi Sandeep, Hope this email reach [sic] you! Please advise below and thanks."

(v)    On September 28, 2015, Ajay Gandhi sent Operation 1 remittance instructions for Jaffe's HSBC bank account ending 2460. The next day, Operation 1 replied, "Universal made payment of 1.4 m Advance Against Invoice[.]" A few hours later, Gandhi replied, "Received and wired to SDC." Jaffe's bank statements reflect that, on September 29, 2015, Jaffe received $1,399,962 from Universal Fine Jewelry FZE. That same day, Jaffe transferred $464,050 to SDC Designs LLC and $950,000 to FDII. FDII's bank statements reflect that, on September 29, 2015, FDII transferred $943,827.50 to SDC Designs LLC. Thus, consistent with the email exchange between Ajay Gandhi and Operation 1, the entire approximately $1.4 million Jaffe received from Universal was ultimately paid to SDC Designs, LLC.

(vi)    On January 29, 2016, Dhinakaran Pillai, a finance manager at Firestar International Pvt. Ltd., emailed Ajay Gandhi, "We have remitted today US $405,180.83 in FSI from FIPL invoice details as listed below . . . Once the payment as has been realized in your account, kindly remit the overdue outstanding of US $650,880.00 against our invoices, details as attached for your reference." The email referenced two invoices from FIPL to FDI dated October 22, 2015 and October 23, 2015, respectively. On February 3, 2016, Subhash Parab, who was copied on Pillai's email to Gandhi, forwarded the email to Operation 1 with the note "FYI". Operation 1 then emailed Gandhi, "Ajaybhai, India Team conformed [sic] that $650k is against his

plan $405k, so that Please send to Firestar Dubai $650k, which we yesterday talk [sic]. Regards, Sandeep[.]" Gandhi replied, copying Subhash Parab, "I will pay $425k. Please let me know where or what company."

(vii)   On February 1, 2016, Operation 1 emailed Rebecca Chow and Samir Shah, "You will be received [sic] the goods from Tricolor[.] Please coordinate with Samir Bhai in details[.]" The email included a table listing a total of 379.02 carats of mixed diamonds of varying specifications. FDI's purchase ledger reflects a February 22, 2016 purchase of 379.02 carats of loose diamonds from Tri Color Gems for a total price of $400,131.

(viii)  On February 9, 2016, Rebecca Chow emailed Operation 1, copying Ajay Gandhi, "Hi Sandeep, as per our phone conversation, please be informed that package of RE-117 & RE-119 both has [sic] been received in NY. Additionally, there is one shipment received that has no paper work at all."

(ix)    On March 3, 2016, Subhash Parab emailed Ajay Gandhi, copying Operation 1 and Shyam Wadhwa, "Dear Ajaybhai, Kindly wire USD2.00 Mio [sic] payment from A. Jaffe to FIPL as per attached listing." The attachment was a spreadsheet listing several dozen invoices issued by FIPL to Jaffe between March 20, 2015 and September 9, 2015 totaling $2,004,879.70. Gandhi replied, "Just realized cannot pay to Jaffe (Part of $3 m) unless funds are coming in from overseas."

(x)     On March 29, 2017, Operation 1 emailed Ajay Gandhi, "Ajaybhai, We sold goods to Pacific Diamond FZE, and party will wire advice $1.9m[.] Please send to them Proforma Invoice as below details . . . Regards[,] Sales". Gandhi replied with invoice no. 032017, dated March 20, 2017, reflecting a sale by Jaffe to Pacific of 1,691.25 carats of "Mix Diamonds" at a total price of $2,114,062.50. On April 3, 2017, Jaffe received a $1,499,972 transfer from Pacific with a wire reference of "ADVANCE AGAINST PROFORMA INV N032017." That same day, Jaffe transferred $1,510,267.77 to Firestar International Pvt. Ltd.

(xi)    On September 22, 2017, Gandhi sent an email to Operation 1 attaching a report reflecting accounts receivable owed by Brilliant, Unique, and World Diamond to FDI and asking Operation 1 to "Please have your customer clear these AR - $5.5m on or before September 30, 2017."

# CLAIMS FOR RELIEF

## COUNT 1

### Breach of Fiduciary Duty
### (Nirav Modi)

198.    Plaintiff restates and re-alleges paragraphs 1 through 197 of this Complaint as though fully set forth herein.

199.    Through numerous emails, telephone conversations with Bhansali and Gandhi, among others, and visits to the Debtors' offices, Modi directed the Debtors to participate in the Bank Fraud, including by making payments to the Shadow Entities and other Firestar Entities, exercised dominion and ultimate total control over the Debtors and their directors and officers, and was the ultimate authority for the Debtors.

200.    As a result of Modi's dominion and total control over the Debtors and as the ultimate authority for the Debtors, Modi was a *de facto* director, officer, or person in control of the Debtors.

201.    As a *de facto* director, officer, or person in control of the Debtors, Modi owed fiduciary duties of due care and loyalty to the Debtors and was required to discharge his duties in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner he reasonably believed to be in the best interests of the Debtors.

202.    Modi breached his fiduciary duties as a *de facto* director, officer, or person in control of the Debtors by, among other things, (a) directing the Debtors and their *de jure* directors and officers to engage in the Bank Fraud, including by entering into circular trading transactions with Shadow Entities and Firestar entities, in violation of his duties of due care, loyalty, and good faith, (b) directing the Debtors and their officers to use corporate assets to acquire properties for

the personal benefit of Modi and his family, also in violation of his duties of due care, loyalty, and good faith; and (c) orchestrating the diversion of the U.S. Entities' assets overseas after exposure of the Bank Fraud, also in violation of his duties of due care, loyalty, and good faith.

203.    Modi's breaches of fiduciary duty, including his breaches of the duties of due care, loyalty, and good faith, proximately caused the Debtors to suffer injury, in an amount to be determined at trial, by, among other things, depleting the Debtors' assets through numerous Actual Fraudulent Transactions; looting the recipients of the Actual Fraudulent Transfers so as to impair the Trustee's ability to recover from them; and increasing the creditor claims against the estate and causing the collapse and resulting loss of value of the Debtors and their businesses.

## COUNT 2

### Breach of Fiduciary Duty
### (Mihir Bhansali)

204.    Plaintiff restates and re-alleges paragraphs 1 through 203 of this Complaint as though fully set forth herein.

205.    As a director and officer of the Debtors, Mihir Bhansali owed fiduciary duties of due care and loyalty to those entities and was required to discharge his duties in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner he reasonably believed to be in the best interests of the Debtors.

206.    Bhansali breached his fiduciary duties by, among other things, (a) allowing Modi to usurp Bhansali's management responsibilities and decision-making authority, in violation of his duty of care, (b) causing the Debtors to participate in the Bank Fraud, proceeds of which were diverted to Bhansali's family trust and entities owned by Bhansali and his family members, including by entering into circular trading transactions with Shadow Entities and other Modi-Controlled Entities, in violation of his duties of due care and loyalty; (c) depleting the Debtors'

assets through numerous Actual Fraudulent Transfers; (d) looting the recipients of Actual Fraudulent Transfers so as to impair the Trustee's ability to recover from them; (e) making fraudulent misrepresentations and omissions in connection with the Debtors' chapter 11 cases; and (f) causing the Debtors to expend corporate assets to acquire properties for the personal benefit of Modi and his family, in violation of his duties of due care and loyalty.

207.     The breaches of fiduciary duty by Bhansali proximately caused the Debtors to suffer injury, in an amount to be determined at trial, by, among other things, depleting the Debtors' assets through numerous Actual Fraudulent Transfers; delaying the Trustee's appointment and impairing the Trustee's ability to recover on account of claims against their U.S. Affiliates and others; causing the Debtors' estates to incur substantial administrative expenses related to the investigation of information Bhansali failed to disclose and actively endeavored to conceal, destroy, or otherwise render unavailable for use in connection with these chapter 11 cases; and increasing the creditor claims against the estate and causing the collapse and resulting loss of value of the Debtors and their businesses.

### COUNT 3

### Breach of Fiduciary Duty
### (Ajay Gandhi)

208.     Plaintiff restates and re-alleges paragraphs 1 through 207 of this Complaint as though fully set forth herein.

209.     As an officer of the Debtors, Gandhi owed fiduciary duties of due care and loyalty to those entities and was required to discharge his duties in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner he reasonably believed to be in the best interests of the Debtors.

210.    Gandhi breached his fiduciary duties by, among other things, (a) allowing Modi to usurp Gandhi's management responsibilities and decision-making authority, in violation of his duty of care, (b) causing the Debtors to engage in the Bank Fraud, including by entering into circular trading transactions with Shadow Entities and other Modi-Controlled Entities in violation of his duties of due care and loyalty, (c) depleting the Debtors' assets through numerous Actual Fraudulent Transactions; (d) looting the recipients of Actual Fraudulent Transfers so as to impair the Trustee's ability to recover from them; (e) making fraudulent misrepresentations and omissions in the context of the Debtors' chapter 11 cases; and (f) causing the Debtors to expend corporate assets to acquire properties for the personal benefit of Modi and his family, in violation of his duties of due care and loyalty.

211.    The breaches of fiduciary duty by Gandhi proximately caused the Debtors to suffer injury, in an amount to be determined at trial, by, among other things, depleting the Debtors' assets through numerous Actual Fraudulent Transactions; delaying the Trustee's appointment and impairing the Debtors' ability to recover on account of claims against their U.S. Affiliates and others; causing the Debtors' estates to incur substantial administrative expenses related to the investigation of information Gandhi failed to disclose and, upon information and belief, actively endeavored to conceal, destroy, or otherwise render unavailable for use in connection with these chapter 11 cases; and increasing the creditor claims against the Debtors' estates and causing the collapse and resulting loss of value of the Debtors and their businesses.

## COUNT 4

### Aiding and Abetting Breach of Fiduciary Duty
### (Nirav Modi)

212.    Plaintiff restates and re-alleges paragraphs 1 through 211 of this Complaint as though fully set forth herein.

213.     In the alternative to Count 1 above, assuming (but not admitting) that Modi did not owe a fiduciary duty to the Debtors, Modi aided and abetted breaches of fiduciary duties by the *de jure* directors and officers of the Debtors, including Bhansali and Gandhi.

214.     As alleged in Count 2 and Count 3 above, Bhansali—as a director and officer of the Debtors—and Gandhi—as an officer of the Debtors—owed fiduciary duties to the Debtors and breached those fiduciary duties.

215.     Modi knew that that Bhansali and Gandhi had fiduciary duties as directors and officers of the Debtors and knew they were breaching their fiduciary duties because, among other things, (a) Modi communicated with them about transactions between the Debtors and Shadow Entities, and (b) Modi communicated with them about expending corporate funds on personal assets for Modi and his family.

216.     Modi induced, participated, and assisted the breaches of fiduciary duties by Bhansali and Gandhi by, among other things, (a) directing Bhansali and Gandhi to engage in the Bank Fraud, including by entering into circular trading transactions with Shadow Entities and Firestar entities, (b) directing Bhansali and Gandhi to deplete the Debtors' assets through numerous Actual Fraudulent Transfers; (c) directing Bhansali and Gandhi to loot the recipients of such Actual Fraudulent Transfers so as to impede the Trustee's ability to recover from them; and (d) directing Bhansali and Gandhi to expend corporate assets to acquire properties for the personal benefit of Modi and his family.

217.     The breaches of fiduciary duty by Bhansali and Gandhi, aided and abetted by Modi, proximately caused the Debtors to suffer injury, in an amount to be determined at trial, by, among other things, depleting the Debtors' assets through numerous Actual Fraudulent Transfers; delaying the Trustee's appointment and impairing the Trustee's ability to recover on account of claims against the U.S. Affiliates and others; causing the Debtors' estates to incur

substantial administrative expenses related to the investigation of information Bhansali and Gandhi failed to disclose and actively endeavored to conceal, destroy, or otherwise render unavailable for use in connection with these chapter 11 cases; and increasing the creditor claims against the estate and causing the collapse and resulting loss of value of the Debtors and their businesses.

## COUNT 5

### Corporate Waste
### (Nirav Modi)

218.     Plaintiff restates and re-alleges paragraphs 1 through 217 of this Complaint as though fully set forth herein.

219.     As a *de facto* director, officer, or person in control of the Debtors, Modi owed a duty to the Debtors to preserve and protect their assets from undue waste or loss.

220.     Modi committed waste of the Debtors' assets by directing the Debtors and their officers to use corporate assets to acquire properties for the personal benefit of Modi and his family and to engage in transactions with Shadow Entities and other Modi-Controlled Entities that served no legitimate corporate or economic purpose.

221.     The economics of these transactions were so flawed that no disinterested person of right mind and ordinary business judgment could think such transactions beneficial to the Debtors.

222.     The corporate waste committed by Modi proximately caused the Debtors to suffer injury, in an amount to be determined at trial, by losing the millions of dollars spent for the personal benefit of Modi and his family and in transactions with Shadow Entities that served no legitimate economic or corporate purpose.

## COUNT 6

### Corporate Waste
### (Mihir Bhansali)

223.      Plaintiff restates and re-alleges paragraphs 1 through 222 of this Complaint as though fully set forth herein.

224.      As a director and officer of the Debtors, Bhansali had the duty to the Debtors to preserve and protect their assets from undue waste or loss.

225.      Bhansali committed waste of the Debtors' assets by directing the Debtors and their officers to use corporate assets to acquire properties for the personal benefit of Modi and his family or by facilitating or permitting such use, and to engage in transactions with Shadow Entities and other Modi-Controlled Entities that served no legitimate corporate or economic purpose.

226.      The economics of these transactions were so flawed that no disinterested person of right mind and ordinary business judgment could think such transactions beneficial to the Debtors.

227.      The corporate waste committed, facilitated, or permitted by Bhansali proximately caused the Debtors to suffer injury, in an amount to be determined at trial, by losing the millions of dollars expended for the personal benefit of Modi and his family, and in transactions with Shadow Entities that served no legitimate economic or corporate purpose.

## COUNT 7

### Corporate Waste
### (Ajay Gandhi)

228.      Plaintiff restates and re-alleges paragraphs 1 through 227 of this Complaint as though fully set forth herein.

70

229.     As an officer of the Debtors, Gandhi had the duty to the Debtors to preserve and protect their assets from undue waste or loss.

230.     Gandhi committed waste of the Debtors' assets by directing the Debtors and their officers to use corporate assets to acquire properties for the personal benefit of Modi and his family or by facilitating or permitting such use, and to engage in transactions with Shadow Entities and other Modi-Controlled Entities that served no legitimate corporate or economic purpose.

231.     The economics of these transactions were so flawed that no disinterested person of right mind and ordinary business judgment could think such transactions beneficial to the Debtors.

232.     The corporate waste committed, facilitated, or permitted by Gandhi proximately caused the Debtors to suffer injury, in an amount to be determined at trial, by losing the millions of dollars expended for the personal benefit of Modi and his family, and in transactions with Shadow Entities that served no legitimate economic or corporate purpose.

## COUNT 8

### Racketeering Influenced Corrupt Organizations Act ("RICO")
### 18 U.S.C. § 1962(c)
### (Nirav Modi, Mihir Bhansali, Ajay Gandhi)

233.     Plaintiff restates and re-alleges paragraphs 1 through 232 of this Complaint as though fully set forth herein.

234.     Defendants Modi, Bhansali, and Gandhi are each a "person" capable of holding legal or beneficial interest in property within the meaning of 18 U.S.C. § 1962(c) and 18 U.S.C. § 1961(3).

235.     Defendants Modi, Bhansali, and Gandhi each violated 18 U.S.C. § 1962(c) by their respective acts, described in the prior paragraphs and as further described below.

236.     Defendants Modi, Bhansali, and Gandhi each had the specific intent to violate 18 U.S.C. § 1962(c) and to commit each underlying predicate act alleged below.

237.     Defendants Modi, Bhansali, and Gandhi each committed at least two predicate acts of racketeering, as more specifically alleged below. The acts of racketeering were not isolated; rather, they were related in that they had the same or similar purpose and result, participants, victims, or method of commission. Further, the acts of racketeering have been continuous, spanning the period from at least early 2011 to early 2018.

### The RICO Enterprise

238.     Each of the U.S. Entities is a corporation. Each of the U.S. Entities is therefore an "enterprise" within the meaning of 18 U.S.C. § 1961(4).

239.     Alternatively, the Firestar Entities, collectively, form an association-in-fact engaged in and affecting interstate and foreign commerce for a common and continuing purpose of designing, manufacturing, and selling diamonds and jewelry.

240.     Alternatively, Defendants Modi, Bhansali, and Gandhi, together with their known and unknown co-conspirators and all Modi-Controlled Entities, form an association-in-fact engaged in and affecting interstate and foreign commerce for a common and continuing purpose of formulating and implementing a common scheme to defraud PNB for the Defendants' personal enrichment through a pattern of fraud, lies, deceit, and corruption. Such common purpose came into existence no later than early 2011, when Defendants Modi, Bhansali, Gandhi implemented a scheme to defraud PNB by fraudulently obtaining LOUs by exploiting the web of Shadow Entities, LOU Entities, and other Modi-Controlled Entities.

241.     Whether conceptualized in the manner described in paragraph 238, paragraph 239, or paragraph 240, there existed during the Relevant Period one or more enterprises within the meaning of 18 U.S.C. § 1964(4) (the "**RICO Enterprise**").

242.    At all relevant times, Defendants Modi, Bhansali and Gandhi each were employed by or associated with the RICO Enterprise, and each conducted or participated, directly or indirectly, in the conduct of the RICO Enterprise's affairs through a pattern of racketeering activity.

243.    The RICO Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which the Defendants engage.

244.    The RICO Enterprise constitutes an "enterprise" within the meaning of 18 U.S.C. § 1961(4), and it was or is engaged in, and its activities affected, interstate and foreign commerce.

245.    The repeated, continuous, and flagrant violations of federal criminal law alleged in this Complaint constitute a "pattern of racketeering activity" in violation of RICO, 18 U.S.C. § 1961, *et seq.*

246.    Defendants Modi, Bhansali, and Gandhi are central and controlling figures in the RICO Enterprise, and have directed others to take actions necessary to accomplish the overall aims of the RICO Enterprise.

### The Pattern of Racketeering Activity

247.    Defendants Modi, Bhansali, and Gandhi conducted or participated, directly or indirectly, in the conduct of the RICO Enterprise's affairs through a pattern of racketeering activity, as defined by 18 U.S.C. § 1961(1) and (5), consisting of multiple acts of racketeering that are interrelated, not isolated, and perpetrated for the same or similar purposes by the same persons (the "**RICO Pattern**").

### Predicate Acts: Mail and Wire Fraud, Violations of 18 U.S.C. § 1341, 1343

248.    The RICO Pattern included numerous acts of mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343.

249.     Modi, Bhansali, and Gandhi voluntarily and intentionally devised and participated in one or more criminal schemes to perpetrate actual fraudulent transfers of the Debtors' and U.S. Affiliates' assets during the Relevant Period, including without limitation, the transfers described in paragraphs 81, 175, 176, and 177 of this Complaint.

250.     In furtherance of such scheme or schemes, Modi, Bhansali, and Gandhi willfully and knowingly transmitted, or caused to be transmitted, by means of (1) causing matters and things to be placed in any post office or authorized depository, or deposited or caused to be deposited matters or things to be sent or delivered by a private or commercial interstate carrier or (2) by means of wire communications in interstate or foreign commerce, writings, signs, signals, pictures, and sounds.

251.     The use of interstate and international mail and wires to perpetrate these actual fraudulent transfers and to connect this international racketeering conspiracy was foreseeable.

252.     Accordingly, Modi, Bhansali, and Gandhi committed numerous violations of mail and/or wire fraud in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1343.

253.     Modi's, Bhansali's, and Gandhi's violations of 18 U.S.C. §§ 1341 and 1343 directly and proximately caused injury to each Debtor's business and property by unjustifiably and irrevocably depleting their assets in the amount of such transfers, rendering them insolvent, and destroying their value as a going-concern.

**Predicate Acts: National Stolen Property Act, Violations of 18 U.S.C. §§ 2314, 2315**

254.     The RICO Pattern included numerous violations of the National Stolen Property Act, 18 U.S.C. §§ 2314, 2315.

255.     Based on the transfers by U.S. Affiliates of funds fraudulently received from the Debtors to foreign Modi-Controlled Entities alleged in paragraph 175 of this Complaint (the "**Subsequent Transfers**"), Modi, Bhansali, and Gandhi willfully and knowingly transported,

74

transmitted, or transferred in interstate or foreign commerce—or received, possessed, concealed, stored, bartered, sold, disposed of, or pledged as security for a loan—goods, wares, merchandise, securities, or money that crossed an interstate or international boundary after being stolen, converted, or taken by fraud.

256.    For each Subsequent Transfer, Modi, Bhansali, and Gandhi, knew that the funds involved had been fraudulently transferred from the applicable Debtor to the applicable U.S. Affiliate or had otherwise been stolen, converted, or taken by fraud.

257.    Each Subsequent Transfer involved money or property having a value of $5,000 or more.

258.    Accordingly, Modi, Bhansali, and Gandhi, committed numerous violations of the National Stolen Property Act, 18 U.S.C. §§ 2314, 2315.

259.    Modi's, Bhansali's, and Gandhi's violations of 18 U.S.C. §§ 2314 and 2315 directly and proximately caused injury to each Debtor's business and property by impairing the Debtors' ability to recover the value of the Subsequent Transfers.

**Predicate Acts: Money Laundering, Violations of 18 U.S.C. §§ 1956, 1957.**

260.    The RICO Pattern included numerous acts of money laundering in violation of 18 U.S.C. §§ 1956, 1957.

261.    Each Actual Fraudulent Transfer and each Subsequent Transfer supported and furthered the Bank Fraud by, at a minimum: (a) facilitating the reduction of outstanding payables and receivables among Modi-Controlled Entities so as to avert detection of the Bank Fraud; (b) layering the movement of funds so as to make them difficult to trace.

262.    Each Actual Fraudulent Transfer and each Subsequent Transfer occurred, in whole or in part, in the United States.

263.     Each Actual Fraudulent Transfer and each Subsequent Transfer involved or resulted from one or more acts of wire fraud.

264.     Accordingly, each Actual Fraudulent Transfer and each Subsequent Transfer constituted, involved, or resulted from an offense against India, a foreign nation, involving fraud, or a scheme or attempt to defraud, against PNB, a foreign bank.

265.     Additionally, each Actual Fraudulent Transfer was designed to deplete the applicable Debtor's assets through one or more acts of wire fraud so as to hinder, delay, or defraud such Debtor's creditors.

266.     Additionally, each Subsequent Transfer was designed to deplete the applicable U.S. Affiliate's assets through one or more acts of wire fraud so as to hinder, delay, or defraud such U.S. Affiliate's creditors, including the applicable Debtor or Debtors.

267.     Accordingly, each Actual Fraudulent Transfer and each Subsequent Transfer constituted, involved, or was the result of specified unlawful activity within the meaning of 18 U.S.C. § 1956(c)(7).

268.     Each Subsequent Transfer affected interstate or foreign commerce and involved the movement of funds by wire or other means from a place in the United States to or through a place outside of the United States.

269.     Each Subsequent Transfer involved funds that were derived from or obtained or retained, directly or indirectly, from an Actual Fraudulent Transfer and unlawful activity related to such Actual Fraudulent Transfer.

270.     Modi, Bhansali, and Gandhi conducted each Subsequent Transfer with the intent to promote the carrying on of specified unlawful activity, including in relation to: (a) fraudulently depleting the applicable Debtor's and U.S. Affiliate's assets; and (b) the Bank Fraud more generally.

271.     Modi, Bhansali, and Gandhi knew that each Subsequent Transfer was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the funds derived from the Actual Fraudulent Transfer preceding such Subsequent Transfer.

272.     Modi, Bhansali, and Gandhi, knew that the property involved in each Subsequent Transfer represented the proceeds of some form of unlawful activity.

273.     Each Subsequent Transfer involved a monetary transaction in criminally derived property of a value of greater than $10,000 and derived from specified unlawful activity.

274.     Upon information and belief, Modi, Bhansali, and Gandhi agreed, expressly or implicitly, to: (a) effectuate each Actual Fraudulent Transfer and each Subsequent Transfer; (b) fraudulently deplete the Debtors' and U.S. Affiliates' assets; and (c) perpetrate the Bank Fraud.

275.     Accordingly, Modi, Bhansali, and Gandhi, committed, and conspired to commit, numerous acts of money laundering in violation of 18 U.S.C. §§ 1956 and 1957.

276.     Modi's, Bhansali's, and Gandhi's violations of 18 U.S.C. §§ 1956 and 1957 directly and proximately caused injury to each Debtor's business and property by impairing the Debtors' ability to recover the value of the Subsequent Transfers.

**Predicate Acts: Obstruction of Justice, Violations of 18 U.S.C. §§ 1503, 1512**

277.     The RICO Pattern included numerous acts of obstruction of justice in violation of 18 U.S.C. §§ 1503 and 1512.

278.     Based on the allegations set forth in paragraph 151 of this Complaint concerning the Dubai-based Shadow Entity personnel, upon information and belief, Modi and Bhansali, or others operating at their direction, knowingly intimidated, threatened, or corruptly persuaded such Shadow Entity personnel, or engaged in misleading conduct toward such Shadow Entity personnel, with the intent to influence, delay, or prevent the testimony of such Shadow Entity

personnel in an official proceeding, including these chapter 11 cases, and to cause or induce such

Shadow Entity personnel to withhold testimony, or withhold a record, document or other object,

from an official proceeding, including these chapter 11 cases.

279.    Additionally, Bhansali corruptly altered, destroyed, mutilated, or concealed

records, documents or other objects, or attempted to do so, as demonstrated by the following

actions, alleged in more detail above, which Bhansali, or others operating at his and Modi's

direction, took in the weeks prior to and following the Petition Date:

(i)     Bhansali researched methods for deleting internet history, browsing the internet anonymously, communicating through encrypted and self-deleting messages, and encrypting computer data;

(ii)    Bhansali downloaded, installed, and, upon information and belief, used software designed for such purposes;

(iii)   Upon information and belief, Bhansali deleted or attempted to delete all copies of the spreadsheets described in paragraph 68 of this Complaint.

(iv)    Upon information and belief, Bhansali directed Subhash Parab to "send all non-Firestar comp[uter]s to HK[.]"

(v)     Upon information and belief, Nehal Modi, operating at the direction of or in coordination with Nirav Modi and Mihir Bhansali, destroyed mobile phones of various Shadow Entity personnel.

280.    Moreover, Bhansali corruptly obstructed, influenced, or impeded an official

proceeding, including the Debtors' chapter 11 cases, by, as alleged in more detail above, (a)

knowingly and intentionally making material misstatements, misrepresentations, and omissions

under penalty of perjury in connection with the Debtors' chapter 11 cases concerning the Debtors'

relationship with Shadow Entities and the Debtors' involvement in the Bank Fraud; and (b)

refusing to cooperate with the Examiner's investigation.

281.     Moreover, based on the same allegations, Bhansali corruptly endeavored to influence or impede an officer in or of this Court, including the Examiner and the Trustee, in the discharge of his duty.

282.     Moreover, based on the same allegations, Bhansali corruptly endeavored to influence, obstruct, or impede the due administration of justice.

283.     Similarly, Gandhi corruptly obstructed, influenced, or impeded an official proceeding, including the Debtors' chapter 11 cases, by, as alleged in more detail above, (a) knowingly and intentionally signing the Debtors' respective SOFAs under penalty of perjury without disclosing the Debtors' involvement in the Bank Fraud, their relationship with various Shadow Entities, and the substantial loan balances owed by NMI to Jaffe, or the significant transfers of the Debtors' assets to Shadow Entities and other Modi-Controlled Entities that were required to be disclosed in the SOFAs; and (b) feigning ignorance and outright lying to the Examiner concerning the Debtors' and his personal involvement in the transactions supporting the Bank Fraud.

284.     Moreover, based on the same allegations, Gandhi corruptly endeavored to influence or impede an officer in or of this Court, including the Examiner and the Trustee, in the discharge of his duty.

285.     Moreover, based on the same allegations, Gandhi corruptly endeavored to influence, obstruct, or impede the due administration of justice.

286.      In taking such actions, Bhansali's, and Gandhi's purpose was to impair the integrity or availability of evidence for use in an official proceeding, including these chapter 11 cases, or to otherwise obstruct, influence, or impede an official proceeding, including these chapter 11 cases.

287.     Upon information and belief, Modi, Bhansali, and Gandhi agreed, expressly or implicitly, with each other and others, including Nehal Modi, to commit each of the obstruction of justice offenses alleged in this Complaint.

288.     Accordingly, Modi, Bhansali, Gandhi, and other co-conspirators, including Nehal Modi, committed, and conspired to commit, numerous acts of obstruction of justice in violation of 18 U.S.C. §§ 1503 and 1512.

289.     Modi's, Bhansali's and Gandhi's violations of 18 U.S.C. §§ 1503 and 1512 directly and proximately caused injury to each Debtor's business and property by, among other things, impairing Jaffe's ability to sell its assets at going-concern value; delaying the Trustee's appointment and impairing his ability to recover from U.S. Affiliates; and causing the Debtors' estates to incur substantial administrative expenses related to the investigation of information Bhansali and Gandhi failed to disclose and, upon information and belief, actively endeavored to conceal, destroy, or otherwise render unavailable for use in connection with these chapter 11 cases.

### Predicate Acts: Bankruptcy Fraud, Violations of 18 U.S.C. § 152

290.     The RICO Pattern included numerous acts of bankruptcy fraud in violation of 18 U.S.C. § 152.

291.     Based on the allegations set forth in, *inter alia*, paragraphs 280 and 283 of this Complaint, Bhansali and Gandhi each knowingly and fraudulently made one or more false oaths or accounts in or relation to these chapter 11 cases.

292.     Based on those same allegations, Bhansali and Gandhi each knowingly and fraudulently made one or more false declarations, certificates, verifications, or statements under penalty of perjury in or in relation to these chapter 11 cases.

293.     Based on those same allegations, Bhansali and Gandhi, after the filing of these chapter 11 cases, knowingly and fraudulently withheld from a custodian, trustee, marshal, or other officer of this Court, including the Examiner, recorded information relating to the property or financial affairs of the Debtors.

294.     Based on those same allegations, Bhansali and Gandhi knowingly and fraudulently concealed from creditors, the United States Trustee, the Trustee, and this Court property belonging to the Debtors' estates, including the substantial loan receivable owed by NMI to Jaffe.

295.     Accordingly, Bhansali and Gandhi committed numerous acts of bankruptcy fraud in violation of 18 U.S.C. § 152.

296.     Bhansali's and Gandhi's violations of 18 U.S.C. § 152 directly and proximately caused injury to each Debtor's business and property by, among other things, impairing Jaffe's ability to sell its assets at going-concern value; delaying the Trustee's appointment and impairing his ability to recover from U.S. Affiliates; and causing the Debtors' estates to incur substantial administrative expenses related to the investigation of information Bhansali and Gandhi failed to disclose and actively endeavored to conceal, destroy, or otherwise render unavailable for use in connection with these chapter 11 cases.

### Continuity of Conduct

297.     Defendants' violations of law as set forth herein, each of which directly and proximately injured the Debtors, constituted a continuous course of conduct in the United States beginning in no later than early 2011 and continuing at least through the weeks after the filing of the chapter 11 petitions commencing these cases, which was intended to obtain economic gain through false representations, fraud, deceit, and other improper and unlawful means. Therefore, the violations were a part of pattern of racketeering activity under 18 U.S.C. §§ 1961(1) and (5).

**The RICO Pattern Caused Injury to Debtors**

298. Each Debtor has been injured in its business or property as a direct result and proximate result of Modi, Bhansali, and Gandhi's violations, described above, of 18 U.S.C. § 1962(c), including any injury by reason of the predicate acts constituting the RICO Pattern.

299. Prior to Defendants' racketeering activities, each of the Debtors operated as a legitimate business built on fruitful relationships with reputable customers.

300. Firestar was incorporated in 2004 for the purposes of acquiring Frederick Goldman, Inc., which was one of FIL's U.S. customers. Firestar historically operated as a distributor and wholesaler of finished gold and diamond jewelry. Its customer base consisted of legitimate jewelry retailers such as Zales, JCPenney, and Macy's.

301. Fantasy was incorporated in 2012 for the purpose of holding the exclusive license from Chicago-based Fantasy Diamond Corp. to supply the Endless Diamond Brand to U.S. retailers. Fantasy was created primarily to conduct business with Costco Wholesale Corporation based on sales attributable to the Endless Diamond Brand. Fantasy's other customers include Zales, Sam's Club, and Walmart. Fantasy sold finished jewelry, generally at a higher price point than Firestar.

302. Jaffe is the successor to New York-based Sandberg & Sikorksi Corporation, whose predecessors date back to 1892. Sandberg & Sikorski historically consisted of two divisions, one that sold to major U.S. retailers and A. Jaffe, a luxury bridal line that supplied assembled pieces of jewelry to high-end independent jewelry retailers. In 2007, FIL purchased a 95% stake in Sandberg & Sikorski. Sandberg & Sikorski was renamed A. Jaffe, Inc. in 2011. It did not become fully integrated within the operations of the other Firestar Entities until 2016.

303. Defendants' violations of federal law in furtherance of their scheme or schemes to loot the Debtors' assets through a series of Actual Fraudulent Transfers and to conceal the nature

of such transfers by corruptly impeding, influencing, or obstructing these chapter 11 cases resulted in: (a) each Debtor's assets being unjustifiably and irrevocably depleted in the amount of the applicable Actual Fraudulent Transfers, (b) each Debtor's chapter 11 estate incurring substantial administrative expenses stemming from Defendants' obstruction of the Examiner's and Trustee's investigations that would not otherwise have been incurred, and (c) the impairment of each Debtor's ability to sell their assets at going-concern value.

### Plaintiff's Entitlement to Treble Damages

304.     As a result of the violations of 18 U.S.C. § 1962(c) by Modi, Bhansali, and Gandhi, each Debtor has suffered substantial damages in an amount to be proven at trial.

305.     Under 11 U.S.C. §§ 323, 541(a)(1) and 1106(a), Plaintiff has standing to bring all claims alleged in this Complaint on behalf of each of the Debtors' chapter 11 estates.

306.     Under 18 U.S.C. § 1964(c), Plaintiff is entitled to recover treble the Debtors' general and special compensatory damages, plus interest, costs, and attorneys' fees caused by reason of Defendants' violations of 18 U.S.C. § 1962(c).

### COUNT 9

### Racketeering Influenced Corrupt Organizations Act
### 18 U.S.C. § 1962(d)
### (Nirav Modi, Mihir Bhansali, Ajay Gandhi)

307.     Plaintiff restates and re-alleges paragraphs 1 through 306 of this Complaint as though fully set forth herein.

308.     Since at least early 2011, the Defendants together with others known and unknown, being persons employed by and associated with the RICO Enterprise, have unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with others to violate 18 U.S.C. § 1962(c), as described above, in violation of 18 U.S.C. § 1962(d).

309.     The Defendants knew that they were engaged in a conspiracy to commit the predicate acts and knew that the predicate acts were part of such racketeering activity, and the participation and agreement of each of them was necessary to allow the commission of this pattern of racketeering activity. This conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

310.     The Defendants agreed to conduct or participate in, directly or indirectly, the conduct, management, or operation of the RICO Enterprise's affairs through a pattern of racketeering activity, including but not limited to the acts of racketeering set forth above in Count 8 of this Complaint.

311.     As part of the conspiracy, each Defendant, at times acting through certain of his agents, and representatives, or co-conspirators, committed at least two predicate acts of racketeering in the conduct of the RICO Enterprise's affairs.

312.     As a direct and proximate result of the Defendants' conspiracy, the pattern of racketeering activity through which they conducted or participated in the conduct of the affairs of the RICO Enterprise, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), each of the Debtors has been injured in its business and property.

313.     Under 18 U.S.C. § 1964(c), Plaintiff is entitled to recover treble its general and special compensatory damages, plus interest, costs, and attorneys' fees incurred by reason of Defendants' violations of 18 U.S.C. § 1962(d).

WHEREFORE, Plaintiff, as chapter 11 trustee of the Debtors, respectfully requests that the Court enter judgment:

a. On Counts 1, 2, 3, and 4, in favor of Plaintiff and against Defendants Modi, Bhansali, and Gandhi, jointly and severally, in the amount of damages to be proven at trial, but no less than $15,000,000, that were suffered by the Debtors and their estates as a result of the Defendants' breaches of fiduciary duty and aiding and abetting breaches of fiduciary duty, plus interest, costs and attorneys' fees, and such other equitable relief as may be just and proper.

b. On Counts 5, 6 and 7, in favor of Plaintiff and against Defendants Modi, Bhansali, and Gandhi, jointly and severally, in the amount of damages to be proven at trial, but no less than $15,000,000, that were suffered by the Debtors and their estates as a result of the corporate waste committed, permitted, or suffered by Defendants, plus interest, costs and attorneys' fees, and such other equitable relief as may be just and proper.

c. On Counts 8 and 9, in favor of Plaintiff and against Defendants Modi, Bhansali, and Gandhi, jointly and severally, in treble the amount of damages to be proven at trial, but no less than $15,000,000, that were suffered by the Debtors and their estates as a result of the Defendants' violation of the Racketeering Influenced Corrupt Organizations Act, plus interest, costs and attorneys' fees, and such other equitable relief as may be just and proper.

Dated: September 20, 2019,  
      New York, New York

Respectfully submitted,

**JENNER & BLOCK LLP**

By: /s/ Vincent E. Lazar  
Vincent E. Lazar  
Angela M. Allen (admitted *pro hac vice*)  
353 North Clark Street  
Chicago, Illinois 60654  
(312) 222-9350  
vlazar@jenner.com  
aallen@jenner.com

Carl N. Wedoff  
919 Third Avenue  
New York, New York 10022  
(212) 891-1600  
cwedoff@jenner.com

*Counsel for the Chapter 11 Trustee*

**UNITED STATES BANKRUPTCY COURT**　　　　　<u>FOR PUBLICATION</u>
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------x
In re:　　　　　　　　　　　　　　　　　　　Chapter 11

Firestar Diamond, Inc., *et al.*,　　　　　　　　Case No. 18-10509 (SHL)

　　　　　　　　　　　　Debtors.　　　　　(Jointly Administered)
-----------------------------------------------------------x
Richard Levin,
Chapter 11 Trustee of Firestar Diamond, Inc., *et al.*,

　　　　　　　　　　　　Plaintiff,

　　　　　v.　　　　　　　　　　　　　　　Adv. No. 19-01102 (SHL)

Nirav Deepak Modi, Mihir Bhansali, and
Ajay Gandhi,

　　　　　　　　　　　　Defendants.
-----------------------------------------------------------x


<u>**MEMORANDUM OF DECISION**</u>


**A P P E A R A N C E S :**

**JENNER & BLOCK LLP**
*Attorneys for the Chapter 11 Trustee, Richard Levin, Esq.*
919 Third Avenue
New York, New York 10022
By:　Carl N. Wedoff, Esq.

353 North Clark Street
Chicago, Illinois 60654
By:　Vincent E. Lazar, Esq.
　　　Angela M. Allen, Esq.
　　　William A. Williams, Esq.

**PATTERSON BELKNAP WEBB & TYLER LLP**
*Attorneys for Nirav Deepak Modi*
1133 Avenue of the Americas, Suite 2005
New York, New York 10036
By:　Alejandro H. Cruz, Esq.
　　　Daniel A. Lowenthal, Esq.
　　　Daniel Ruzumna, Esq.

**WHITE & WILLIAMS LLP**
*Attorneys for Mihir Bhansali*
7 Times Square, Suite 2900
New York, NY 10036
By:     Thomas Butler, Esq.
        Nicole A. Sullivan, Esq.

**SERPE RYAN LLP**
*Attorneys for Ajay Gandhi*
1115 Broadway, 12th Fl.
New York, NY 10010
By:     Silvia L. Serpe, Esq.

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court are Nirav Deepak Modi's, Mihir Bhansali's, and Ajay Gandhi's (collectively, the "Defendants") motions to dismiss the First Amended Complaint of Richard Levin, Esq., the Chapter 11 Trustee appointed in the above-captioned bankruptcy cases (the "Trustee"). *See* Motion to Dismiss First Amended Adversary Complaint (the "Gandhi Motion") [ECF No. 36]; Motion to Dismiss Adversary Proceeding (the "Bhansali Motion") [ECF No. 38]; Motion to Dismiss Adversary Proceeding (the "Modi Motion") [ECF No. 42]. In their motions, Defendants seek, among other things, the dismissal of various claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"). *See* Memorandum of Law of Defendant Ajay Gandhi at 15 [ECF No. 36] (the "Gandhi Memorandum"); Memorandum of Law of Defendant Mihir Bhansali at 28 [ECF No. 39] (the "Bhansali Memorandum"); Memorandum of Law of Defendant Nirav Deepak Modi at 18 [ECF No. 43] (the "Modi Memorandum"). Defendants present a variety of theories, including standing, failure to allege fraud with particularity, failure to adequately plead predicate acts under RICO, and statute of limitations.

2

Defendants also seek dismissal of the Trustee's state law claims.[1]  Also before the Court is

Defendant Mihir Bhansali's related Motion for Rule 11 Sanctions or to Strike Certain Pleadings

(the "Sanctions Motion") [ECF No. 59].  For the reasons that follow, the Court denies the

motions.

## BACKGROUND

In late January 2018, Punjab National Bank ("PNB") filed a complaint against Nirav

Modi and several associated entities in India, alleging "the largest bank fraud in Indian history"

against PNB and other banks.  *See In re Firestar Diamond, Inc.*, 615 B.R. 161, 162–64 (Bankr.

S.D.N.Y. 2020); Report of John J. Carney, Examiner at 4 [ECF No. 394, Case No. 18-10509].

Approximately one month later, three U.S. corporations indirectly owned by Nirav Modi filed

for Chapter 11 protection in the Southern District of New York: Firestar Diamond, Inc. ("FDI"),

Fantasy, Inc. ("FI") and A. Jaffe, Inc. ("A. Jaffe," and together with FDI and FI, the

"Debtors").  *See* ECF No. 1 [Case No. 18-10509].  Amidst a tumultuous, failed sale process of

the Debtors' assets and the resignation of the Debtors' Chief Executive Officer ("CEO") Mihir

Bhansali, the Court ordered the appointment of the Trustee in mid-June 2018.  *See* ECF No. 227

[Case No. 18-10509].  The Trustee has administered the Debtors' estates since June 2018.

In March 2019, the Trustee filed a complaint against the Defendants, *see* ECF No. 1, and

an amended complaint some six months later, *see* Amended Complaint against Mihir Bhansali,

Ajay Gandhi, Nirav Deepak Modi (the "First Amended Compl.") [ECF No. 28].  As is the case

in a motion to dismiss, the facts of the complaint are taken as true.  *See BG Litig. Recovery I,*

*LLC v. Barrick Gold Corp.*, 180 F. Supp. 3d 316, 320 (S.D.N.Y. 2016).

---

[1]      *See* Gandhi Memorandum at 6; Bhansali Memorandum at 9; Modi Memorandum at 9.

While in business, the Debtors operated as wholesale diamond and bridal jewelry businesses. *See* First Amended Compl. ¶¶ 6–8. Defendant Nirav Deepak Modi ("Modi") is the former indirect controlling majority shareholder and/or de facto director, officer, or controlling person of the Debtors; Mihir Bhansali ("Bhansali") served as the sole director and CEO of each Debtor; and Ajay Gandhi ("Gandhi") served as the Chief Financial Officer ("CFO") of each Debtor. *Id.* ¶ 1.

Generally, the Trustee's action seeks to recover damages from harm inflicted by the Defendants on the Debtors and their estates as a result of

> the Defendants' six-year, extensive international fraud, money laundering, and embezzlement scheme that resulted in accrual of claims against the Debtors of over $1 billion in favor of Punjab National Bank, the diversion of millions of dollars of the Debtors' assets for the benefit of the family of Nirav Modi and Mihir Bhansali, and the collapse of the Debtors and the resulting loss of value of their businesses.

*Id.* ¶ 1.

From approximately early 2011 to early 2018 (the "Relevant Period"), the Defendants orchestrated and carried out a scheme to "obtain loans, credits, or other funds under false pretenses and without collateral" from numerous banks (the "Bank Fraud"), including PNB, which is majority owned by the Indian government. *Id.* ¶ 23. The Bank Fraud involved the use of letters of undertaking ("LOUs"),[2] a financial instrument unique to India designed to facilitate efficient import transactions. *Id.* ¶ 24. Modi and the co-conspirators sought to artificially inflate the import volumes of Modi's India-based companies with sham transactions so as to obtain more and more LOU funding in order to obtain even more LOU bank financing.[3] *Id.* ¶¶ 26–27.

---

[2]    See *In re Firestar Diamond, Inc.*, 615 B.R. 161, 163 n.2 (Bankr. S.D.N.Y. 2020) for an explanation on the mechanics of LOUs.

[3]    These India-based companies are: (1) Diamonds 'R' Us ("DRUS"); (2) Solar Export ("Solar"); and (3) Stellar Diamond ("Stellar") (collectively, the "LOU Entities"). First Amended Compl. ¶ 27.

To carry out this scheme, Modi and his co-conspirators used a web of shell companies known as the "Shadow Entities" based in Hong Kong and Dubai that posed as legitimate businesses to create fake import transactions and launder the proceeds.[4]  *See id.* ¶¶ 29–32.  As the Amended Complaint explains:

> Transactions involving the Shadow Entities either purported to transfer goods that did not exist, were never transferred, were transferred at prices having nothing to do with market value but instead based on whatever amounts were necessary to reconcile the Shadow Entities' and Firestar Entities'[5] books and records so as to conceal other transfers made for illegitimate purposes, or were transferred in "circular transactions," in which the same goods were exported from and re-imported among Modi-Controlled Entities multiple times at varying and often inflated prices to give the appearance of multiple distinct transactions for the sole purpose of artificially increasing the entities' import volume.

*Id.* ¶ 35.  PNB and the other defrauded banks are reported to have lost in excess of $1 billion as a result of the Bank Fraud.  *Id.* ¶ 52.

The Defendants and their co-conspirators allegedly funneled millions of dollars in funds and diamonds through the Debtors in furtherance of the Bank Fraud, "both in circular transactions with Shadow Entities and other Modi-Controlled Entities to propagate the Bank Fraud and in noncircular transactions designed to launder the proceeds of the Bank Fraud" for Modi's and Bhansali's personal benefit.  *Id.* ¶ 53.  The Trustee lists examples of how the Debtors directly benefited from fraudulently issued LOUs and were involved in circular transactions until

---

[4]     The Shadow Entities include: Auragem Company Ltd. ("Auragem"), Brilliant Diamonds Ltd. ("Brilliant"), Eternal Diamonds Corporation Ltd. ("Eternal"), Fancy Creations Company Ltd. ("Fancy Creations"), Sino Traders 7 Ltd. ("Sino"), Sunshine Gems Ltd. ("Sunshine"), Unique Diamond and Jewellery FZC ("Unique"), World Diamond Distribution FZE ("World Diamond"), Vista Jewelry FZE ("Vista"), Empire Gems FZE ("Empire"), Universal Fine Jewelry FZE ("Universal"), Diagems FZC ("Diagems"), Tri Color Gems FZE ("Tri Color"), Pacific Diamonds FZE ("Pacific"), Himalayan Traders FZE ("Himalayan"), and Unity Trading, FZE ("Unity") (collectively, the "Shadow Entities," together with the Firestar Entities, LOU Entities, and all other entities controlled by Nirav Modi and his family members, the "Modi-Controlled Entities").  First Amended Compl. ¶ 29.  The Hong Kong-based Shadow Entities included Auragem, Brilliant, Eternal, Fancy Creations, Sino, and Sunshine.  The Dubai-based Shadow Entities included Unique, World Diamond, Vista, Empire, Universal, Diagems, Tri Color, Pacific, Himalayan, and Unity.  *Id.* ¶ 31.

[5]     For the definition of "Firestar Entities," *see infra* note 6.

early 2013, when the Debtors no longer directly participated in import and export transactions underlying LOU issuances and instead received LOU proceeds indirectly through Shadow Entities. *See id.* ¶¶ 54–55, 57. At that point, the Shadow Entities themselves acted as intermediaries between the Firestar Entities and the LOU Entities. *Id.* ¶ 56. The Debtors would also make payments directly to Shadow Entities, ostensibly for the repayment of outstanding LOUs. *Id.* ¶ 58. The Debtors' records reflect cash transfers to and from the Debtors and the Shadow Entities totaling approximately $227 million during the Relevant Period. *Id.* ¶ 60.

Bhansali and Gandhi acted in concert with Modi with respect to the Debtors' participation in the Bank Fraud. *Id.* ¶ 61. In addition to his role as CEO of the Debtors, Bhansali served as CEO or director while Gandhi served as CFO for each entity in a group known as the "U.S. Affiliates."[6] *Id.* ¶¶ 63–64. With Modi's oversight, Bhansali and Gandhi together were able to coordinate and direct fraudulent transfers "among the U.S. Entities, Shadow Entities, and other Modi-Controlled Entities involving hundreds of millions of dollars in funds and diamonds." *Id.* ¶ 63, 64. Bhansali and Gandhi each had authority to approve loose diamond transactions among the U.S. Entities and the Shadow Entities and were also signatories on each

---

[6]    The U.S. Affiliates are comprised of: (1) Firestar Group, Inc. ("FGI"), a Delaware corporation and a holding company that owns approximately 95% of the equity interests in FDI; Synergies Corporation ("Synergies"), a Delaware corporation and a holding company that owns approximately 95% of the equity interests in Jaffe and 100% of the equity interests in FGI; (3) Firestar Diamond International, Inc. ("FDII"), a Delaware corporation; and (4) Nirav Modi, Inc., a Delaware corporation. The U.S. Affiliates, together with the Debtors, are the "U.S. Entities." First Amended Compl. ¶¶ 9–12.

In addition, the Debtors have foreign affiliates: (1) Nirav Modi Ltd. ("NML"), a Hong Kong company that owns 100% of the equity interests in NMI and is the principal holding company for subsidiaries operating Nirav Modi-branded boutiques around the globe; (2) Firestar Holdings Ltd. ("FHL"), a Hong Kong company that owns 100% of the equity interests in Synergies, FDII, and NML; (3) Firestar Diamond International Private Limited ("FDIPL"), an India company that operated jewelry factories in India; (4) Firestar International Limited ("FIL"), an India company that holds 100% of the equity interests in FHL and FDIPL and is the ultimate holding company of numerous other Firestar entities (collectively, including the Debtors, U.S. Affiliates, FHL, NML, FDIPL, and FIL, the "Firestar Entities"). *Id.* ¶¶ 13–16.

of the U.S. Entities' bank accounts.[7]  *Id.* ¶ 65.  While the examples listed are too numerous to discuss in detail here, the Trustee generally alleges that Defendants exercised oversight and control of the Shadow Entities and LOU Entities, exercised oversight and control over transactions between the Debtors and Shadow Entities, engaged in suspicious accounting, finance, and inventory practices, engaged in efforts to deceive or manipulate auditors and lenders, orchestrated transactions to divert assets from the Bank Fraud and the Debtors for the benefit of Modi's and Bhansali's families, and attempted to stonewall and disrupt investigations of the Bank Fraud before and after the Debtors' bankruptcy filing.  *See id.* ¶¶ 68–80, 81–83, 84–91, 92–102, 103–41, 142–172.

It is the Trustee's contention that each "Actual Fraudulent Transaction"[8] gives rise to the right to avoid and recover the value of such transactions and that each Actual Fraudulent Transaction was made with actual intent to hinder, delay, or defraud the Debtors' existing or future creditors.  *Id.* ¶¶ 173–74.  Moreover, the Trustee alleges that

- each Actual Fraudulent Transaction was made to or for the benefit of an insider of the Debtors;

- the Defendants and their co-conspirators went to great lengths to conceal the existence and nature of the Actual Fraudulent Transactions (pre- and post-filing);

- the Defendants and their co-conspirators retained control over the proceeds of each Actual Fraudulent Transfer;

- the Debtors were insolvent at the time of each Actual Fraudulent Transaction;

---

[7]     According to the Trustee, Bhansali and Gandhi "were the only persons authorized to effectuate transfers from their accounts, along with Joshua Weinman with respect to FDII and Sumay Bhansali with respect to [A.] Jaffe."  First Amended Compl. ¶ 65.

[8]     The Trustee defines "Actual Fraudulent Transaction" as a combination of "Actual Fraudulent Transfer" (defined as a "transfer of property of the Debtors derived from or subsequently transferred to a Shadow Entity or LOU Entity, directly or indirectly, or otherwise linked to or supporting the Bank Fraud, during the six-year period prior to the Petition Date") and "Actual Fraudulent Obligation" (defined as an "obligation incurred by the Debtors to a Shadow Entity or LOU Entity, or otherwise linked to or supporting the Bank Fraud, during the six-year period prior to the Petition Date").  First Amended Compl. ¶ 173(i)–(ii).

- the Debtors often did not receive reasonably equivalent value (or any consideration at all) in exchange for Actual Fraudulent Transactions;

- the Actual Fraudulent Transactions were not made in the ordinary course of the Debtors' businesses and served no legitimate corporate or economic purpose;

- many of the Actual Fraudulent Transactions involved transfers to and from the Shadow Entities; and

- Modi absconded after exposure of the Bank Fraud.

*Id.* ¶ 174; *see also id.* ¶ 176 (listing examples of how the Defendants continued to orchestrate Actual Fraudulent Transfers to Modi-Controlled Entities up to the filing date of the main bankruptcy cases); *id.* ¶¶ 177–87 (listing examples of how the Defendants caused NMI and FDII to move cash and inventory overseas out of the reach of their creditors and the Debtors). The Trustee also alleges that Defendants caused the U.S. Affiliates, upon receiving Actual Fraudulent Transfers, to subsequently transfer the proceeds of such Actual Fraudulent Transfers to Shadow Entities or other Modi-Controlled Entities (the "Subsequent Transfers"). *See id.* ¶ 175(i)–(xv). To carry out these schemes, the Trustee alleges that Modi exercised "total ultimate control" over the Debtors and directed Bhansali's and Modi's actions, from carrying out the Bank Fraud to responding to queries from auditors. *See id.* ¶¶ 188–97.

In the Amended Complaint, the Trustee brings the following counts against the Defendants: (1) Counts One, Two, and Three allege a breach of fiduciary duty against each defendant, s*ee id.* ¶¶ 198–211, and Count Four alleges that Modi aided and abetted Bhansali's and Gandhi's breach of fiduciary duty as an alternative to Count One, *see id.* ¶¶ 212–17; (2) Counts Five, Six, and Seven allege that each defendant committed waste of the Debtors' assets, *see id.* ¶¶ 218–32; and (3) Count Eight alleges each defendant violated RICO, *see id.* ¶¶ 233–313. The Trustee alleges the Defendants engaged in a RICO enterprise, *see id.* ¶¶ 238–46, and committed the following predicate acts contributing to the RICO enterprise:

(i)        Mail and Wire Fraud, violations of 18 U.S.C. § 1341, 1343, *see id.* ¶¶ 248–253;

(ii)      National Stolen Property Act, violations of 18 U.S.C. §§ 2314, 2315, *see id.* ¶¶ 254–259;

(iii)     Money Laundering, violations of 18 U.S.C. §§ 1956, 1957, *see id.* ¶¶ 260–276;

(iv)     Obstruction of Justice, violations of 18 U.S.C. §§ 1503, 1512, *see id.* ¶¶ 277–289; and

(v)      Bankruptcy Fraud, violations of 18 U.S.C. § 152, *see id.* ¶¶ 290–296.

The Trustee contends that the racketeering conduct continued throughout the Relevant Period, that the RICO pattern and predicate acts caused injury to the Debtors, and that the Debtors are entitled to recover treble damages, *see id.* ¶¶ 297–306. Count Nine alleges that each defendant engaged in a RICO conspiracy in violation of 18 U.S.C. § 1962(d). *See id.* ¶¶ 307–13.

For each of the three groups of counts, the Trustee requests that the Court hold the Defendants jointly and severally liable for no less than $15,000,000 for injuries suffered by the Debtors pursuant to the Defendants' acts. *See id.* at Wherefore Cl. (a)–(c).

## DISCUSSION

### I. Legal Standards

#### 1. Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 US 662, 678 (2009). A claim has facial plausibility when the court may reasonably infer that the defendant is liable for the misconduct alleged. *See Iqbal*, 556 US at 678; *see also Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 556 (2007). A pleading offering only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," however, "will not do." *Twombly,* 550 U.S. at 555; *see Rothstein v. UBS AG,* 708 F.3d 82, 94 (2d Cir. 2013) (discrediting "legal

conclusions couched as factual allegations").  In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the court must accept as true all factual allegations in the complaint, drawing all reasonable inferences in favor of the plaintiff.  *See BG Litig. Recovery I, LLC v. Barrick Gold Corp.*, 180 F. Supp. 3d 316, 320 (S.D.N.Y. 2016).  In sum, the court must determine whether the "well-pleaded factual allegations," assumed to be true, "plausibly give rise to an entitlement to relief."  *Iqbal,* 556 U.S. at 679.

A Rule 12(b)(6) motion is addressed to the face of the pleading.  *Goldman v. Belden,* 754 F.2d 1059, 1065–66 (2d Cir. 1985).  Pursuant to Federal Rule of Civil Procedure 10(c), the pleading is deemed to include any document attached to it as an exhibit or any document incorporated in it by reference.  *Id.*; *see also Cortec Indus., Inc. v. Sum Holding, L.P.,* 949 F.2d 42, 47 (2d Cir. 1991).

### 2.   RICO and Rule 9(b)

To adequately allege a civil cause of action under RICO, a plaintiff must allege that "a person engaged in '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'"  *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 120 (2d Cir. 2013) (quoting *DeFalco v. Bernas*, 244 F.3d 286, 306 (2d Cir. 2001)).

Rule 9(b) of the Federal Rules of Civil Procedure requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).  Rule 9(b) "seeks to provide a defendant with sufficient and fair notice of the plaintiff's claim in order to enable that defendant to defend him or herself, protect a defendant's reputation from the harm that can flow from unfounded accusations of fraud, and reduce the number of strike suits."  *Securities Inv'r Protec. Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293, 309 (Bankr. S.D.N.Y. 1999) (citing *Campaniello Imports, Ltd. v. Saporiti Italia,* 117

F.3d 655, 663 (2d Cir. 1997); *O'Brien v. National Property Analysts Partners,* 936 F.2d 674, 676

(2d Cir. 1991)).  Thus, "the complaint must: (1) specify the statements that the plaintiff contends

were fraudulent, (2) identify the speaker, (3) state where and when the statements were made,

and (4) explain why the statements were fraudulent."  *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273,

290 (2d Cir. 2006).  That said, the rule "does not require factual pleadings that demonstrate the

probability of wrongdoing."  *Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Securities,*

*LLC*, 797 F.3d 160, 174 (2d Cir. 2015) (alteration omitted) (quoting *Iqbal*, 556 U.S. at 678).  "At

the pleadings stage, the alleged fraud need only be plausible based on the complaint; it need not

be more likely than other possibilities."  *Id.* (citing *Twombly*, 550 U.S. at 556 ("[A] well-pleaded

complaint may proceed even if it strikes a savvy judge that actual proof of those facts is

improbable, and that a recovery is very remote and unlikely.") (citation and internal quotation

marks omitted)); *cf. Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 360 (2d Cir. 2013) ("*Iqbal* . . .

requires assertions of facts supporting a *plausible* inference of fraud—not of facts which can

have no conceivable other explanation.").

Although "mental states may be pleaded generally, [a plaintiff] must nonetheless allege

facts that give rise to a strong inference of fraudulent intent."  *Loreley Financing*, 797 F.3d at

171 (internal quotation marks omitted); *see* Fed. R. Civ. P. 9(b); Fed. R. Bankr. P. 7009

("[M]alice, intent, knowledge, and other conditions of a person's mind may be alleged

generally.").  "An inference is strong if it is cogent and at least as compelling as any opposing

inference one could draw from the facts alleged."  *Loreley Financing*, 797 F.3d at 176–77

(internal quotation marks omitted).  Such an inference "may be established either (a) by alleging

facts to show that defendants had both motive and opportunity to commit fraud, or (b) by

11

alleging facts that constitute strong circumstantial evidence of conscious misbehavior or

recklessness." *Lerner*, 459 F.3d at 290–91 (internal quotation marks omitted).

## II. The Trustee's Claims Under RICO

Defendants move to dismiss Count 8 and Count 9 of the First Amended Complaint, in

which the Trustee alleges that Defendants participated in a RICO enterprise, engaged in a pattern

of racketeering activity, committed the requisite number of predicate acts, and participated in a

conspiracy to commit RICO violations, all of which caused injury to the Debtors. *See* First

Amended Compl. ¶¶ 233–313. Defendants raise a number of distinct arguments as to these

RICO counts.[9]

### 1. Standing

First, Defendants argue that the Trustee lacks standing under RICO because the Debtors'

alleged injuries were indirectly caused by Defendants' alleged RICO violations and derivative to

the direct harm suffered by non-debtor PNB.[10]

RICO provides a private cause of action for "[a]ny person injured in his business or

property by reason of a violation of Section 1962 of this chapter." 18 U.S.C. § 1964(c). To have

standing under Section 1964(c), a civil RICO plaintiff must show: (1) that his alleged harm

qualifies as an injury to his business or property; and (2) that the harm was "by reason of" the

RICO violation, which requires the plaintiff to establish proximate causation. *Holmes v. Sec.

Investor Prot. Corp.,* 503 U.S. 258, 268 (1992); *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479,

496 (1985). The Supreme Court in *Holmes* gave three reasons for the importance of the

directness between the RICO predicate act and the harm. "First, the less direct an injury is, the

---

[9]    *See* Gandhi Memorandum at 15; Bhansali Memorandum at 28; Modi Memorandum at 18.

[10]    *See* Gandhi Memorandum at 17; Bhansali Memorandum at 30; Modi Memorandum at 22.

more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors;" "[s]econd, quite apart from problems of proving factual causation, recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries;" and "finally, the need to grapple with these problems is simply unjustified by the general interest in deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely." *Holmes*, 503 U.S. at 269–70 (internal citations omitted).

Since *Holmes*, the Supreme Court has offered additional guidance about RICO standing. To start, a RICO plaintiff must show the defendants' alleged RICO violations bear a direct connection to the plaintiff's asserted harms. *See Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006) ("When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries."). But a "showing that the defendant violated [Section] 1962, the plaintiff was injured, and the defendant's violation was a 'but for' cause of plaintiff's injury" is insufficient by itself to show that the plaintiff's injury was "by reason of" the RICO violation. *Holmes*, 503 U.S. at 265–66. Rather, a plaintiff must show that a predicate offense "not only was a 'but for' cause of his injury, but was the proximate cause as well." *Id.* at 268, 271, 274 (a link between injury and conduct that is "too remote," "purely contingent," or "indirec[t]" is insufficient).

In *Anza,* the Supreme Court made clear that RICO's proximate cause requirement bars suits by derivative victims and those whose injuries are "purely contingent on the harm suffered by" direct victims. *Anza*, 547 U.S. at 457 (quoting *Holmes*, 503 U.S. at 271) (internal quotation

13

marks omitted).  Moreover, "the compensable injury flowing from a violation of [Section 1962(c)] 'necessarily is the harm caused by predicate acts sufficiently related to constitute a pattern, for the essence of the violation is the commission of those acts in connection with the conduct of an enterprise.'"  *Id.* (quoting *Sedima,* 473 U.S. at 497).  Under *Anza,* therefore, courts must scrutinize the causal link between the predicate act and the injury, identifying with precision both the nature of the violation and the cause of the injury to the plaintiff.  *See id.* at 456–61.  Where the predicate act is not itself the immediate cause of the plaintiff's injury, proximate cause may be lacking.  *Holmes*, 503 U.S. at 269 ("[T]he less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors.").  In assessing the RICO "direct relationship" requirement, the Court in *Anza* also looked to whether a better situated plaintiff would have an incentive to sue.  *See Anza*, 547 U.S. at 460 (citing *Holmes*, 503 U.S. at 269–270).

Some six years after *Anza*, the Supreme Court used the same principles to deny RICO standing to the City of New York's lawsuit against a New Mexico business that sold cigarettes online to New York City residents and failed to submit customer information to the State of New York as required by Federal law.  *See Hemi Group, LLC v. City of New York, N.Y.*, 559 U.S. 1, 11–12 (2010).  The Court in *Hemi* found the State of New York was "better situated" than the City to seek recovery, as the State had an incentive to sue because it also charged its own tax on cigarettes at nearly double the City's rate.  *Id.* (declining to extend the causal chain where the defendant's obligation was to file the customer information with the State, not the City, and where the City's harm was directly caused by the customers not paying the City's sales tax, not by the defendant).

Relying on *Holmes*, *Anza*, and *Hemi*, Defendants contend that the Trustee here lacks standing. They assert that the only party directly harmed by the alleged RICO violations was PNB and, thus, any harm to the Debtors was contingent on the harm to PNB.[11] For example, Modi asserts that the Trustee "attempts to contrive a direct injury to the Debtors . . . by alleging that each 'operated as a legitimate business built on fruitful relationships with reputable customers' before the racketeering activity began" and were subsequently injured by the depletion of the Debtors' assets due to fraudulent transfers, administrative expenses incurred during the bankruptcy proceedings, and the impairment of their ability to sell assets. Modi Memorandum at 22. Modi further contends that "these 'injuries' flowed only indirectly, at best, from the alleged scheme to defraud PNB," and were "purely contingent on the harm suffered by PNB." *Id.* at 22–23 (internal quotations omitted). In other words, Modi argues that the depletion of assets injury, if taken as true, essentially served to support, further, and cover up the Bank Fraud, while the administrative expenses and impairment of the Debtors' ability to sell assets injuries were not caused by the predicate acts but rather by PNB's attempts to recover its losses from the Bank Fraud. *See id.* at 23–24. Additionally, Modi argues that PNB is the better situated party with an incentive to sue because (1) "[d]etermining how much of the Debtors' assets, if any, were 'depleted' as a result of the alleged RICO violations would require extensive forensic and expert analysis and resolution of factual disputes . . . to ensure the Debtors would not recover a windfall;" (2) "apportioning injury between PNB and the Debtors would require precisely the sort of 'complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts;'" and (3) "the alleged direct victim of the fraud is not only positioned to vindicate its claim, it already has appeared in New York (in this very

---

[11]     *See* Gandhi Memorandum at 17; Bhansali Memorandum at 30; Modi Memorandum at 22.

proceeding) to assert RICO violations against the Debtors," which Defendants claim mirror the allegations in the Amended Complaint here. *Id.* at 25–26 (citing *Holmes*, 503 U.S. at 269–70).

Bhansali and Gandhi also cite *BCCI Holdings (Luxembourg), Societe Anonyme v. Pharaon*, 43 F. Supp. 2d 359 (S.D.N.Y. 1999) for the proposition that "courts have repeatedly refused to find standing under RICO where the harm caused to the plaintiff is the result of the exposure of the alleged racketeering activity, rather than from the predicate acts underlying the scheme itself." *Id.* at 365.

But Defendants' standing arguments ignore the full extent of the Trustee's allegations. While the Amended Complaint describes the Bank Fraud against PNB, it also alleges a direct fraud against the Debtors by the Defendants. Importantly, although the Bank Fraud is laid out in the Amended Complaint as a backdrop to understanding the specific predicate acts set forth in the Amended Complaint, the predicate acts alleged all resulted in direct injuries to the Debtors.[12] Specifically, the Trustee contends that Defendants' RICO predicate acts directly (1) depleted the Debtors' tangible assets through fraudulent transfers to overseas entities, (2) caused the Debtors to expend millions of dollars in professional fees related to the Trustee's and Examiner's investigations in the bankruptcy proceedings, and (3) impaired the Debtors' ability to sell its assets. *See* Trustee's Opposition to Defendant Ajay Gandhi's Motion to Dismiss the First Amended Complaint at 21 ("Trustee's Opposition to Gandhi") [ECF No. 48]; Trustee's Opposition to Defendant Mihir Bhansali's Motion to Dismiss the First Amended Complaint at 24–25 ("Trustee's Opposition to Bhansali") [ECF No. 49]; Trustee's Opposition to Defendant

---

[12]     Moreover, the facts of *BCCI* are distinguishable from the facts in the instant case. In *BCCI*, the plaintiff had previously pled guilty to the very RICO violations they were alleging against the defendant, a major shareholder in the plaintiff. *BCCI*, 43 F. Supp. 2d at 360. Here, the Trustee alleges that Defendants had complete control over the Debtors, and the Debtors have not pled guilty to, or been held liable for, the RICO violations alleged against Defendants.

Nirav Deepak Modi's Motion to Dismiss the First Amended Complaint at 22–26 ("Trustee's Opposition to Modi") [ECF No. 51]. Additionally, the Trustee alleges that each Actual Fraudulent Transaction was made "with actual intent to hinder, delay, or defraud the Debtors' existing or future creditors." First Amended Compl. ¶ 174.[13] As the Debtor has been directly injured, it is hard to imagine another party in a better position to sue on behalf of the Debtor than the Trustee. *Hemi Group*, 559 U.S. at 11–12 (holding in the RICO context that the focus is on the directness of the relationship between the conduct and the harm).[14]

This direct harm caused by the Actual Fraudulent Transactions extends to the Subsequent Transfers—transfers first made to the U.S. Affiliates and then subsequently transferred to overseas entities, namely Shadow Entities. *See* First Amended Compl. ¶ 175(i)–(xv). Defendants contend that these Subsequent Transfers are part of the Bank Fraud against PNB and did not injure the Debtors because the transactions depleted value from the U.S. Affiliates, not the Debtors, and are the "definition of indirect." *See* Hr. Tr. 15:18–16:5; 17:18–24, Apr. 30, 2020 [ECF No. 66]. However, "[w]hen a corporation fraudulently is caused to issue debt and stripped of its assets in a manner that obviously will leave the creditors unpaid, those creditors

---

[13]    The Trustee specifically alleges the following: (i) each Actual Fraudulent Transaction was made to or for the benefit of an insider of the Debtors; (ii) the Defendants and their co-conspirators actively endeavored to conceal the existence and nature of the Actual Fraudulent Transactions, both before and after the filing of these Chapter 11 cases; (iii) the Defendants and their co-conspirators retained control over the proceeds of each Actual Fraudulent Transfer; (iv) the Debtors, in many cases, did not receive reasonably equivalent value in exchange for Actual Fraudulent Transactions or any consideration at all; (v) the Debtors were insolvent at the time each Actual Fraudulent Transaction occurred based on both the figures reflected on their balance sheet and the substantial contingent liability they incurred in the course of their involvement in the Bank Fraud; (vi) the Actual Fraudulent Transactions were not made in the ordinary course of the Debtors' businesses and served no legitimate corporate or economic purpose; (vii) many of the Actual Fraudulent Transactions involved Shadow Entities, which constitute dummies or fictitious parties; and (viii) Nirav Modi absconded after exposure of the Bank Fraud. *See* First Amended Compl. ¶¶ 174(i)–(viii).

[14]    In their replies, Bhansali and Gandhi argue that the Trustee has "*conceded* that 'PNB and other victims of the fraudulent schemes might be able to bring their own RICO claims against Bhansali [and/or Gandhi] on the basis of the Actual Fraudulent Transfers or his other misconduct.'" Bhansali Reply at 14 (citing Trustee Opposition to Bhansali at 23 n.7); Gandhi Reply at 15 (citing Trustee Opposition to Gandhi at 23 n.7). But PNB was not the party most directly injured by the Actual Fraudulent Transactions alleged in the Amended Complaint, and it is not clear that PNB would have standing were such a lawsuit brought.

have standing." *GICC Capital Corp. v. Tech. Fin. Group, Inc.*, 30 F.3d 289, 293 (2d Cir. 1994). Here, the Trustee alleges that the U.S. Affiliates were looted as a result of the RICO violations. *See* Trustee Opposition to Modi at 24.   Accepting this allegation as true, the Debtors, as creditors of the U.S. Affiliates, suffered injuries that were "sufficiently direct and proximate to support a RICO claim despite the identical harm sustained by [the U.S. Affiliates]." *GICC*, 30 F.3d at 293.

At oral argument, Defendants argued that the circular transactions described in the amended complaint—the "actual fraudulent transfers . . . derived from or subsequently transferred to a shadow entity or otherwise linked to the bank fraud"—did not "actually deplet[e] actual value" from the Debtors.  Hr. Tr. 15:10–22, Apr. 30, 2020.  Defendants referenced the two sets of books that the Trustee alleges were used by Defendants and contended that the one "fake set of books" shows only fictitious circular transactions that do not actually deplete value from the Debtors. *Id.* at 15:23–16:3.  As the Court noted at the hearing, however, this argument assumes that the Debtors had no legitimate economic business. *Id.* at 16:8–25.[15]  That premise is squarely at odds with the allegations in the Amended Complaint and the bankruptcy itself. *See, e.g.*, First Amended Compl. ¶¶ 85–91, 298–303; Case No. 18-10509, ECF Nos. 389, 617, 645, 647.  Indeed, the Trustee has made clear that it seeks only to recover for the harm exerted directly upon the Debtors via the Actual Fraudulent Transactions and Subsequent Transfers, not the harm caused by the LOU Entities in extracting fraudulent LOUs from PNB. *See* Trustee Opposition to Modi at 1, 9–11, 22–27; Trustee Opposition to Gandhi at 20–24; Trustee Opposition to Bhansali at 24–28; Hr. Tr. 57:18–24, April 30, 2020.  Accordingly, the Court finds

---

[15]    To the extent that it is ever necessary to parse which commingled funds are proceeds of the Bank Fraud and which are the profits of the Debtors' legitimate business transactions, *see* Hr. Tr. at 20:15–21; 21:7–22, Apr. 30, 2020, this would be a question for the factfinder at trial or at the summary judgment stage.

that the Trustee has standing to seek recovery for injuries resulting directly from both the Actual

Fraudulent Transactions and the Subsequent Transfers.

Bhansali and Gandhi also argue that only the initial "intended target" of the RICO

enterprise has standing to sue.[16]  Modi similarly insists that it is appropriate for the Court to

focus on whether the Bank Fraud was "aimed" at the Debtors or PNB.[17]  Bhansali and Gandhi

both expressly contend that PNB was the "intended target" of the initial fraud, and the Court's

inquiry must end there.[18]  In support of this argument, they both rely on *BCCI*, 43 F. Supp. 2d at

365 (stating that plaintiffs must be the "intended targets" of RICO violations and the alleged

injury must have been the 'preconceived purpose' of the RICO activities) and *In re Am. Express

Co. Shareholder Litig.*, 39 F.3d 395, 400 (2d Cir. 1994) (dismissing RICO claims by

shareholders who were not the intended targets of the RICO violations)).

But the Second Circuit decision in *American Express*, upon which *BCCI* relies, does not

establish "intended target" as the bright line rule that Gandhi and Bhansali suggest.  In that case,

shareholders of American Express attempted to recover from former directors, officers, and

employees of the company for alleged RICO violations that harmed the company by hurting its

reputation.  *American Express*, 39 F.3d at 396–98.  While the RICO defendants attempted to

harm a competitor and benefit American Express, the Second Circuit found that the appellants'

cause of action—reputational and eventual financial harm to American Express—were ancillary

effects of the RICO violations and not proximate enough to establish a valid RICO claim.  *Id.* at

---

[16]     *See, e.g.*, Bhansali Memorandum at 2 ("It is black letter law that a plaintiff must allege that plaintiff itself was the intended target of the alleged pattern of racketeering activity[.]"); Gandhi Memorandum at 17 (stating that "the Trustee lacks standing" for the same reason); Hr. Tr. 44:14–15, Apr. 30, 2020 ("The caselaw requires Your Honor to ask, who was the intended target of the alleged RICO violation?").

[17]     Modi Memorandum at 23; Defendant Nirav Modi's Reply Memorandum of Law in Further Support of his Motion to Dismiss the First Amended Complaint (the "Modi Reply") at 6 n.5 [ECF No. 56].

[18]     *See* Bhansali Memorandum at 30; Gandhi Memorandum at 17.

400.  The fact that American Express was not the "intended target" was essentially a description

of the facts; it did not establish an independent hurdle for standing as Defendants suggest. *See*

*id.* ("[T]he shareholders of American Express were not the intended targets of the RICO

violations . . . the commission of the RICO violations was not what injured American Express.

Rather, it was the exposure of those acts that caused the appellants' harm.").  Indeed, the Second

Circuit later clarified that "in *American Express* we were simply quoting these phrases

["preconceived purpose" and "specifically intended consequence"] from the plaintiffs' brief,

which argued that the defendants had specifically intended the injuries.  We rejected those claims

on their own terms, but we did not generalize from the plaintiffs [sic] argument that RICO

plaintiffs were required to demonstrate that the injury was the 'preconceived purpose.'" *Baisch*

*v. Gallina*, 346 F.3d 366, 375 n.1 (2d Cir. 2003).[19]

Defendants also attempt to move the starting line of the RICO proximate cause analysis

from the alleged predicate acts to events preceding the predicate acts, namely the Bank Fraud.

For example, Modi argues that the analysis should center on whether the harm was directly

caused by "the asserted racketeering activity" as opposed to "any predicate act."  Modi Reply at

12 n.7.  In support of this proposition, Modi cites to the Second Circuit's decision in *Empire*

*Merchants, LLC v. Reliable Churchill LLLP*, 902 F.3d 132, 142 (2d Cir. 2018).  But this case

does not support Modi's position.  In *Empire Merchants*, the Second Circuit discussed the

proximate cause standard set forth in *Holmes*, *Anza*, and *Hemi*, and stated at the outset that "a

plaintiff suing under RICO must establish that the RICO offense [i.e., the predicate act] was the

---

[19]     In any event, the Supreme Court's more recent decision in *Anza*—discussed above—provides the
controlling standard for RICO causation.  *See Hemi*, 559 U.S. at 12 ("[N]o one has asked us to revisit *Anza*.").
Moreover, the Supreme Court's most recent decision on RICO standing in *Hemi* explicitly criticized the dissent's
view that courts should look to whether "the harm is foreseeable; it is a consequence that [the defendant] *intended,
indeed desired*; and it falls well within the set of risks that Congress sought to prevent."  *Hemi*, 559 U.S. at 12
(emphasis added).

"proximate cause" of the plaintiff's injuries. *Id.* at 141 (citing *Holmes*, 503 U.S. at 268). Indeed, as in *Anza*, the Court again clarified that the predicate act must *necessarily* be the proximate cause of the defendant's injury. *Id.* at 143; *Anza*, 547 U.S. at 457 (internal quotation marks omitted) ("the compensable injury flowing from a violation of [Section 1962(c)] necessarily is the harm caused by predicate acts"); *see also 4 K & D Corp. v. Concierge Auctions, LLC*, 2 F. Supp. 3d 525, 543 (S.D.N.Y. 2014) ("So long as a plaintiff has adequately pleaded a 'pattern of racketeering activity,' for purposes of damages, the plaintiff need only allege that it has suffered an injury from at least one or more of the predicate acts comprising the RICO violation.").[20]

Taking the alleged predicate acts as the starting point of the analysis, causation here is relatively straightforward. As discussed above, the Trustee alleges that Defendants committed various predicate acts, all causing injury to the Debtors by depleting their assets through Actual Fraudulent Transfers and diverting the Debtors' assets to the Shadow Entities overseas; diverting the U.S. Affiliates' assets—including assets received from the Debtors through the Actual Fraudulent Transactions—to Shadow Entities, thereby impairing the Debtor's claims against the U.S. Affiliates; and causing the Debtors to spend millions of dollars in professional expenses related to the Bankruptcy proceedings. *See* Trustee's Opposition to Modi at 22–26; Trustee's Opposition to Gandhi at 20–25; Trustee's Opposition to Bhansali at 24–28. The Debtors were the party most immediately harmed by these predicate acts. Notably, at least to the extent that these predicate acts occurred after the Bank Fraud had been uncovered, PNB was not directly injured by these alleged RICO violations. *See* First Amended Compl. ¶ 176 (listing examples of

---

[20]     Both Gandhi and Bhansali similarly characterize the chain of causation between "the purported scheme" and the harm to the Debtors as a "circuitous route" beginning with Defendants fraudulently obtaining LOUs from PNB and PNB advancing money to Modi-controlled entities (the purported scheme as described by Gandhi and Bhansali), which led to investigations, criminal enforcement, the Debtors' bankruptcy proceedings, and, finally, to PNB's asserted claims against the Debtors in the bankruptcy proceeding (the injury as described by Gandhi and Bhansali). Bhansali Memorandum at 30; Gandhi Memorandum at 17.

21

how the Defendants continued to orchestrate Actual Fraudulent Transfers to Modi-Controlled

Entities after exposure of the bank fraud and up to the filing date of the main bankruptcy cases);

*id.* ¶¶ 177–87 (listing examples of how, leading up to and following the filing of the bankruptcy

case, the Defendants caused NMI and FDII to move cash and inventory overseas out of the reach

of their creditors and the Debtors); *see also Hemi*, 559 U.S. at 14–15 (discussing its holding in

*Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008), in which it concluded that the

plaintiff's theory of causation was "straightforward" and noted that the plaintiff was also the only

party injured by the alleged predicate act). As the Court need not progress beyond the first step

in the chain of causation, the Trustee has sufficiently alleged that the predicate acts proximately

caused the Debtors' injuries. *See Hemi*, 559 U.S. at 9 (citing *Holmes*, 503 U.S. at 271–272;

*Bridge*, 553 U.S. at 657–659; and *Anza*, 547 U.S. at 460–461).

### 2. Civil RICO Predicate Acts and Rule 9(b)

Defendants argue that the Trustee has failed to meet the heightened standards of Rule

9(b) of the Federal Rules of Civil Procedure for the predicate acts of racketeering grounded in

fraud and has failed to adequately plead all elements of the remaining predicate acts in

compliance with Rule 8 of the Federal Rules of Civil Procedure.[21]

To establish a pattern of racketeering, a plaintiff "must allege that each defendant

committed at least two predicate acts of racketeering activity." *Jerome M. Sobel & Co. v. Fleck*,

2003 WL 22839799, at *6 (S.D.N.Y. Dec. 1, 2003), *report and recommendation adopted*, 2004

WL 48877 (S.D.N.Y. Jan. 8, 2004); *see also De Falco v. Bernas*, 244 F.3d 286, 306 (2d Cir.

2001); 18 U.S.C. § 1961(5); 18 U.S.C. § 1961(1) (listing the predicate acts of racketeering).

This requirement is consistent with Rule 9(b)'s particularity requirement where multiple

---

[21] *See* Gandhi Memorandum at 19; Bhansali Memorandum at 32; Modi Memorandum at 29, 32.

defendants are charged with fraud, as is the case here. *See DiVittorio v. Equidyne Extractive Indus., Inc.,* 822 F.2d 1242, 1247 (2d Cir. 1987) ("Where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud." (internal citation omitted)).

In the context of a civil RICO claim, "all allegations of fraudulent predicate acts[ ] are subject to the heightened pleading requirement of [Rule 9(b)]." *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 178 (2d Cir. 2004). This includes allegations of predicate acts of mail, wire, and bankruptcy fraud, and conduct under the National Stolen Property Act. *See Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 185 (2d Cir. 2008); *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 178 (2d Cir. 2004).

The Trustee here pleads that all Defendants engaged in at least two predicate acts based on fraud—more specifically, mail and wire fraud and violations of the National Stolen Property Act—and predicate acts of money laundering and obstruction of justice. *See* First Amended Compl. ¶¶ 248–53, 254–59, 260–76; 277–89. The Trustee also alleges that Bhansali and Gandhi committed bankruptcy fraud. *See id.* ¶¶ 290–96. The Court will analyze each of these acts under the Rule 9(b) or Rule 8 standards, as appropriate.

### (i)  Mail and Wire Fraud

"A complaint alleging mail and wire fraud must show (1) the existence of a scheme to defraud, (2) defendant's knowing and intentional participation in the scheme, and (3) the use of interstate mails or transmission facilities in furtherance of the scheme." *S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp.,* 84 F.3d 629, 633 (2d Cir. 1996) (citation omitted); *see also* 18 U.S.C. §§ 1341, 1343.

Defendants argue that the Amended Complaint fails to establish that Defendants engaged in mail or wire fraud because it fails to identify a false or fraudulent statement and fails to allege with specificity that the Defendants had the requisite intent to defraud Debtors.[22]  But the Court disagrees.  In cases where, as here, the plaintiff alleges that the mails or wires were used in furtherance of the fraudulent scheme, *see* First Amended Compl. ¶¶ 248–53—as opposed to claiming that the communication itself contained false or misleading information—"a detailed description of the underlying scheme and the connection therewith of the mail and/or wire communications, is sufficient to satisfy Rule 9(b)."  *Fleck*, 2003 WL 22839799, at *5–6 (quoting *In re Sumitomo Copper Litig.*, 995 F. Supp. 451, 456 (S.D.N.Y. 1998)) (emphasis omitted).  As discussed above, the Amended Complaint sets forth in great detail the specifics of the alleged underlying scheme and each Defendant's involvement in the scheme.[23]  Additionally, for each of the years during the Relevant Period, the Trustee describes dozens of specific examples of the use of mail and wire communications in furtherance of Actual Fraudulent Transfers and Subsequent Transfers.  *See* First Amended Compl. ¶¶ 39–41, 54–60, 81–83, 174–87.  For example, the Trustee alleges specific instances of the circular exporting and importing of the same diamonds by the Debtors in 2011 and via Shadow Entities from 2013 to 2016, as well as numerous cash transfers between the Debtors and the Shadow Entities during this time period. *Id.* ¶¶ 54–60.  Additionally, the Trustee lists various email exchanges to and from Defendants allegedly coordinating the Actual Fraudulent Transactions, *see id.* ¶¶ 81–83, and the Subsequent Transfers, *id.* ¶¶ 175–76, between 2010 and 2018.  Moreover, the Trustee describes the shipping and wiring of inventory and cash overseas in the time leading up to the bankruptcy so that they

---

[22]     *See* Gandhi Memorandum at 21; Bhansali Memorandum at 33; Modi Memorandum at 30–31.

[23]     *See generally* discussion *supra* under "Background."

would be out of reach of creditors, including the Debtors. *Id.* ¶¶ 177–86. Thus, given the numerous detailed examples and a plausible explanation of the scheme as a whole, the First Amended Complaint satisfies the requirements of Rule 9(b).

Defendants' second Rule 9(b) argument—that the Trustee failed to allege that Defendants had the requisite intent to defraud—similarly lacks merit.[24] In this context, it is not necessary for a plaintiff to plead a defendant's mental state with particularity. *See, e.g.*, Fed. R. Civ. P. 9(b) ("[T]he circumstances constituting fraud . . . shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally."); *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 267 (2d Cir. 1996) ("[T]he fraud alleged must be stated with particularity . . . the requisite intent of the alleged [perpetrator] of the fraud need not be alleged with great specificity.") (internal citations omitted). While a plaintiff must "allege facts that give rise to a strong inference of fraudulent intent," *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 812 (2d Cir. 1996) (internal citations omitted), that standard is easily met here given the massive and detailed fraudulent scheme set forth in the Amended Complaint.

### (ii) National Stolen Property Act

The National Stolen Property Act ("NSPA") provides criminal penalties for any person who "transports in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud." 18 U.S.C. § 2314. Violations of the NSPA are subject to Rule 9(b). *See Spool*, 520 F.3d at 185. Once again, Defendants argue that the Trustee has failed to plead this predicate

---

[24] *See* Gandhi Memorandum at 21–22; Bhansali Memorandum at 34–35; Modi Memorandum at 30–31.

act with particularity as required by Rule 9(b), specifically challenging the sufficiency of allegations about Defendants' knowledge.[25]

But the Defendants' arguments again are without merit.  The Trustee has adequately pled the Defendants' oversight and control of the Shadow Entities, *see* First Amended Compl. ¶ 81, their communications to advance the Bank Fraud, *see id.* ¶ 82, and their involvement in the Actual Fraudulent Transactions and Subsequent Transfers, *see id.* ¶¶ 174–77.  All these allegations detail the Defendants' knowledge that the property being transferred had "been stolen, converted or taken by fraud" under the NSPA.[26]  Thus, the Trustee has satisfied its burden under Rule 9(b) as to these predicate acts.

### (iii) Money Laundering

In alleging predicate acts of money laundering, the Trustee cites to Sections 1656 and 1957 of Title 18.  Section 1956 requires that:

> (1) the individual conducted a financial transaction in interstate commerce, (2) with knowledge that the property involved in the transaction represented some form of unlawful activity, (3) with the transaction in fact involving the proceeds of specified unlawful activity, (4) with the purpose, in whole or in part, of concealing or disguising the nature, the location, the source, the ownership or the control of the illegally acquired proceeds.

*Bernstein v. Misk,* 948 F. Supp. 228, 236 n.2 (E.D.N.Y.1997) (internal quotation marks omitted):

*see also United States v. Maher,* 108 F.3d 1513, 1527–28 (2d Cir. 1997); 18 U.S.C. § 1956.

Section 1957 requires that the defendant "(1) knowingly engaged or attempted to engage in a

---

[25]    *See* Gandhi Memorandum at 22; Bhansali Memorandum at 35; Modi Memorandum at 31.

[26]    *See also* discussion *supra* Part II(2)(i).  For example, the Trustee outlines many emails between Defendants and other alleged co-conspirators arranging wire transfers between various Firestar Entities, including Shadow Entities, ranging between hundreds of thousands and millions of dollars.  First Amended Compl. ¶¶ 81–82.  Moreover, the Trustee specifically alleges that "[e]ach Actual Fraudulent Transaction was made with the actual intent to hinder, delay, or defraud the Debtor's existing or future creditors," and that Defendants caused the transfers and the Subsequent Transfers to Shadow Entities from 2012 to the weeks leading up to and following the initiation of the bankruptcy.  *Id.* ¶¶ 174–77.

monetary transaction involving criminally derived property, (2) with such property being valued at more than $10,000, and (3) with such money actually being derived from specific criminal activity." *Bernstein,* 948 F. Supp. at 236 n.2; 18 U.S.C. § 1957. "Money laundering claims are not subject to the heightened pleading standard of Rule 9(b), but plaintiffs must still adequately plead all elements of the offense in compliance with Rule 8." *Jus Punjabi, LLC v. Get Punjabi, Inc.*, 2015 U.S. Dist. LEXIS 66006, at *18 (S.D.N.Y. May 20, 2015).

Defendants argue that the Trustee has inadequately pled money laundering by failing to allege that Modi participated in any specific fraudulent transfers or that any of the Defendants knew that the property involved in the transfers was in some way related to unlawful activity.[27] Once again, the Court disagrees. The Trustee details how each alleged Actual Fraudulent Transfer and Subsequent Transfer injured the Debtors or the Debtors' claims against the U.S. Affiliates or transferred property of the Debtor away while the Debtor was insolvent for little to no consideration. *See* First Amended Compl. ¶¶ 173–76, 272. Additionally, the Trustee's extensive allegations of the Defendants' involvement in the Actual Fraudulent Transfers and the Subsequent Transfers plausibly demonstrate that the Defendants knew that the property involved in the Subsequent Transfers was the product of unlawful activity—such as the mail and wire fraud discussed above. *See id.* Moreover, the Subsequent Transfers away from the U.S. Affiliates to Shadow Entities plausibly establish that Defendants intended to conceal its nature or source. *See id.* ¶¶ 265–76. Since the count of money laundering is not subject to the heightened pleading standards of Rule 9(b) and the Trustee need not plead it with particularity, the Trustee has adequately pled money laundering under Rule 8.

---

[27] *See* Gandhi Memorandum at 23–24; Bhansali Memorandum at 36; Modi Memorandum at 32–33.

### (iv) Obstruction of Justice

In alleging predicate acts of obstruction of justice, the Trustee cites to 18 U.S.C. §§ 1503(a) and 1512. Section 1503(a) prohibits, among other things, endeavoring to intimidate, threaten, or injure court officers, commissioners, and jurors. It also contains a residual or "omnibus" clause. *See, e.g.*, *United States v. Aguilar*, 515 U.S. 593, 598 (1995) (describing Section 1503(a)'s structure). This "omnibus" clause broadly prohibits, *inter alia*, "corruptly . . . endeavor[ing] to influence, obstruct, or impede, the due administration of justice." 18 U.S.C. § 1503(a); *see also United States v. Kumar*, 617 F.3d 612, 620 (2d Cir. 2010) ("[T]he omnibus clause embraces the widest variety of conduct that impedes the judicial process[.]") (internal quotation marks and citation omitted). The *mens rea* is acting "corruptly," meaning with "a specific intent to obstruct a federal judicial or grand jury proceeding." *United States v. Schwarz*, 283 F.3d 76, 109 (2d Cir. 2002).

Section 1512 broadly criminalizes "knowingly us[ing] intimidation, threaten[ing], or corruptly persuad[ing]" a witness with intent to delay or prevent the witness's testimony, or "attempt[ing] to do so." 18 U.S.C. § 1512(b). The statute also criminalizes "corruptly . . . obstruct[ing], influenc[ing], or imped[ing] any official proceeding, or attempt[ing] to do so." *Id* § 1512(c)(2). "In order to prove obstruction of justice in violation of [S]ection[s] 1512(c)(2) [or (b)(2)], 'the government must show that there was a "nexus" between the defendant's conduct and the pending, or foreseeable, official proceeding.'" *United States v. Pugh*, 945 F.3d 9, 21 & n.4 (2d Cir. 2019) (quoting *United States v. Martinez*, 862 F.3d 223, 237 (2d Cir. 2017)). "[T]he existence of a nexus between [a defendant's] action and the proceeding does not depend on the defendant's knowledge . . . . Rather, the existence of a nexus, for obstruction-of-justice purposes,

is determined by whether the defendant's acts have a relationship in time, causation, or logic with

the judicial proceedings." *Id.* at 21–22.

Defendants argue that the Trustee has failed to adequately plead obstruction of justice

because there is no proximate link between the alleged obstruction and harm to the Debtors,

there is a lack of continuity between the alleged obstruction and the other alleged predicate acts,

and the obstruction was not perpetrated with the required "corrupt" intent.[28]  But once again, the

Defendants' arguments lack merit.  The Trustee has adequately pled that Bhansali and Gandhi

made false and misleading statements under penalty of perjury in the Debtors' bankruptcy cases,

*see* First Amended Compl. ¶¶ 152, 156–61, all Defendants conspired to conceal assets in the

Debtors' bankruptcy cases, including the $11.2 million loan owed by NMI to Jaffe, *see id.* ¶¶

152, 156–61, 287–88, all Defendants researched and implemented means of permanently

deleting or encrypting electronic data, *id.* ¶¶ 142–45, 279, and Gandhi lied to the Examiner

appointed by this Court during a deposition, while Bhansali invoked his Fifth Amendment right

against self-incrimination to every question asked, *id.* ¶¶ 168–70, 172, 283.[29]  The Trustee also

alleges that all Defendants sought to cover up the Bank Fraud, Actual Fraudulent Transfers, and

Subsequent Transfers in the shadow of these bankruptcy cases.  *See id.* ¶¶ 173–87.  Additionally,

the Trustee alleges that the Defendants engaged in witness intimidation, coercion, passport

confiscation, evidence destruction, and bribery, which all run afoul of Section 1512.  *See id.* ¶

151.  Moreover, many of the alleged acts of obstruction occurred when it was foreseeable that

the Debtors would file for bankruptcy; such a bankruptcy would inevitably involve an

investigation of the Debtors' finances, including the various transactions that were part of the

---

[28]     *See* Gandhi Memorandum at 24; Bhansali Memorandum at 37; Modi Memorandum at 33.

[29]     The Trustee further alleges that Modi conspired with Bhansali and Gandhi with respect to all of the acts of obstruction alleged here.  *Id.* ¶ 288.

scheme.  *See Pugh*, 945 F.3d at 21–22 & n.4; 18 U.S.C. § 1512(c)(2); *see also* 18 U.S.C. §

1515(a)(1)(A) (defining a proceeding before a U.S. bankruptcy judge as an "official

proceeding").  Finally, as alleged by the Trustee, Defendants' acts of obstruction were clearly in

furtherance of a then-ongoing fraudulent scheme and not merely a cover-up of a previously

completed scheme, thus satisfying the continuity requirement for establishing a pattern of

racketeering activity within meaning of RICO.  *See World Wrestling Entm't, Inc. v. Jakks Pac.,

Inc.*, 530 F. Supp. 2d 486, 512 (S.D.N.Y. 2007), *aff'd*, 328 F. App'x 695 (2d Cir. 2009).

The Defendants' acts, as alleged, "ha[d] the natural and probable effect of interfering

with a judicial or grand jury proceeding."  *United States v. Quattrone*, 441 F.3d 153, 171 (2d Cir.

2006) (quoting *United States v. Wood*, 6 F.3d 692, 695 (10th Cir. 1993)) (internal quotation

marks omitted).  Therefore, the Trustee has properly pled obstruction of justice as a predicate act

for civil RICO.

### (v)  Bankruptcy Fraud

Lastly, Gandhi and Bhansali argue that the Trustee failed to sufficiently plead bankruptcy

fraud under 18 U.S.C. § 152, incorporating by reference their arguments for obstruction of

justice discussed above.[30]  Section 152 of Title 18 prohibits, *inter alia*, knowingly and

fraudulently concealing property belonging to the estate of a debtor from debtors and making a

false declaration, certificate, verification, or statement under penalty of perjury.  *See* 18 U.S.C. §

152.  The Amended Complaint details how Gandhi and Bhansali allegedly signed bankruptcy

declarations, statements of financial affairs, and schedules containing false information, and

concealed property of the estate.  *See* First Amended Compl. ¶¶ 156–61, 283.  Therefore, the

Trustee has adequately pled bankruptcy fraud.

---

[30]     *See* Gandhi Memorandum at 26; Bhansali Memorandum at 38.

### 3. RICO Statute of Limitations

Defendants next argue that the Trustee's RICO claims are partially time barred because the applicable four-year statute of limitations started running when the Debtors should have discovered the alleged wrongdoing by Defendants, i.e., in early 2011—the latest point at which the RICO conspiracy was allegedly consummated.[31]  In other words, Defendants assert that the Trustee is unable to bring a claim for actions that occurred prior to March 2015, which is four years before the Trustee brought this suit.[32]  *See Agency Holding Corp. v. Malley-Duff & Associates, Inc.,* 483 U.S. 143, 156 (1987) (establishing a four-year limitations period for civil RICO claims).

For the alleged misconduct that occurred prior to March 2015, the Trustee relies on an equitable tolling principle called the adverse domination doctrine.  "Under the doctrine of adverse domination, the statute of limitations is tolled for as long as a corporate plaintiff is controlled by the alleged wrongdoers."  *In re Adelphia Commc'ns Corp.*, 365 B.R. 24, 58 (Bankr. S.D.N.Y. 2007), *aff'd in part sub nom.*, *Adelphia Recovery Tr. v. Bank of Am., N.A.*, 390 B.R. 64 (S.D.N.Y. 2008), *adhered to on reconsideration*, 2008 WL 1959542 (S.D.N.Y. May 5, 2008) (quoting *RTC v. Farmer*, 865 F. Supp. 1143, 1151 (E.D. Pa. 1994)).  "[T]he doctrine is based on the theory that the corporation which can only act through the controlling wrongdoers cannot reasonably be expected to pursue a claim which it has against them until they are no longer in control."  *Id.* at 58–59 (quoting *RTC*, 865 F. Supp. at 1151).  Relying on this doctrine, the Trustee here alleges that Defendants remained in control of the Debtors until Bhansali and Gandhi resigned from their positions in May 2018, thus tolling the statute of limitations until that

---

[31]    *See* First Amended Compl. ¶ 297.

[32]    *See* Gandhi Memorandum at 19; Bhansali Memorandum at 31; Modi Memorandum at 34.

31

time.[33]  Defendants Gandhi and Bhansali contend that the Amended Complaint actually only alleges that Modi had complete domination and control of the Debtors, and that both Gandhi and Bhansali allowed Modi to usurp their management functions.[34]  But the Trustee rightly argues that the adverse domination doctrine covers instances where, as here, a non-control party working in concert with the control party would not bring an action that exposes their own wrongdoing.  *See* Hr. Tr. 67:10–68:6, Apr. 30, 2020 (citing *In re Adelphia*, 365 B.R. at 59 (observing that "a corporation likewise cannot reasonably be expected to pursue a claim against those who *aided and abetted* the controlling wrongdoers, or acted in concert with them, until the controlling wrongdoers are no longer in control"); and *ADR Tr. Corp. v. Fleischer*, 826 F. Supp. 1273, 1278–79 (D. Kan. 1993) (holding that the adverse domination doctrine logically applies to certain "noncontrol" persons because if "these persons assisted or jointly participated with the controlling directors in committing wrongful acts, the same self[-]interest reasons that would prevent a director from suing another director would prevent him or her from bringing an action against the noncontrol person")).  Accordingly, the four-year Civil RICO statute of limitations does not curtail the Amended Complaint at the pleading stage.

### 4. In Pari Delicto

Lastly, Modi invokes the doctrine of *in pari delicto* in asserting that the Trustee's RICO claims are barred due to the Debtors' involvement in the alleged Bank Fraud scheme.[35]  "*In pari delicto* is a state law equitable defense analogous to unclean hands 'rooted in the common-law notion that a plaintiff's recovery may be barred by his own wrongful conduct.'"  *In re Food*

---

[33]      *See* Trustee Opposition to Gandhi at 25; Trustee Opposition to Modi at 39; Trustee Opposition to Bhansali at 28; *see also* First Amended Compl. ¶¶ 61–91 (alleging the Defendants' "domination and control" over the Debtors in the Amended Complaint with particularity); Hr. Tr. 66:3–67:6, Apr. 30, 2020.

[34]      *See* Bhansali Reply at 5–6; Gandhi Reply at 8–9.

[35]      *See* Modi Memorandum at 26.

*Mgmt. Grp., LLC*, 380 B.R. 677, 693 (Bankr. S.D.N.Y. 2008) (quoting *Pinter v. Dahl,* 486 U.S. 622, 632 (1988)).[36]   The doctrine serves the dual purposes of preventing courts from settling disputes between wrongdoers and deterring illegality through said abstention.  *See Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 306 (1985).  In bankruptcy proceedings, a trustee "stands in the shoes" of the debtor corporation; it can only bring actions that could have been brought by the debtor prior to the bankruptcy proceeding.  *See In re MF Global Holdings Ltd. Inv. Litig.,* 998 F. Supp. 2d 157, 189 (S.D.N.Y. 2014), *aff'd sub nom. In re MF Glob. Holdings Ltd. Inv. Litig. (DeAngelis v. Corzine)*, 611 Fed. Appx. 34 (2d Cir. 2015) ("Because a trustee stands in the shoes of a bankrupt corporation, *in pari delicto* prevents the trustee from recovering in tort if the corporation, acting through authorized employees in their official capacities, participated in the tort.") (internal citations omitted); *see also Picard v. JP Morgan Chase & Co. (In re Bernard L. Madoff Inv. Sec. LLC.),* 721 F.3d 54, 58–59, 64 n.13 (2d Cir. 2013), *cert. denied,* 573 U.S. 945 (2014) (for purposes of *in pari delicto,* the trustee stood in the shoes of the debtor, Bernard L. Madoff Investment Securities LLC, a brokerage firm used by Madoff as a vast Ponzi scheme, and could not assert claims against the defendants for participating in the scheme that the debtor orchestrated).

There are some circumstances, however, in which it would be inappropriate to impute the conduct of a defendant on the debtor corporation for the purposes of *in pari delicto*.  *Flaxer v. Gifford (In re Lehr Constr. Corp.)*, 528 B.R. 598 (Bankr. S.D.N.Y. 2015), *aff'd*, 551 B.R. 732 (S.D.N.Y. 2016), *aff'd*, 666 Fed. Appx. 66 (2d Cir. 2016).  The Trustee here has invoked one such circumstance: the "insider exception," which provides that the bad acts of corporate

---

[36]     The doctrine's full name is *in pari delicto potior est conditio defendentis*, meaning "[i]n a case of equal or mutual fault, the position of the [defending party] is the better one."  *Baena v. KPMG LLP*, 453 F.3d 1, 6 (1st Cir. 2006) (internal quotation marks omitted).

"insiders" are not imputed on a corporation and the *in pari delicto* defense does not apply.

*Feltman v. Kossoff & Kossoff LLP (In re TS Empl., Inc.)*, 603 B.R. 700, 703 (Bankr. S.D.N.Y 2019) ("*[I]n pari delicto* does not apply to the actions of fiduciaries who are insiders in the sense that they are on the board or in management, or in some other way control the corporation.") (internal citations omitted). Courts can deem actors as *per se* insiders under the statutory definition, *see* 11 U.S.C. § 101(31)(B); however, this non-exhaustive list does not preclude courts from finding actors to be "non-statutory insiders" by considering factors to determine that they were the "person in the control" of the corporation. *Pergament v. Amton Inc. (In re PHS Grp. Inc.)*, 581 B.R. 16, 31 (Bankr. E.D.N.Y 2018). Accordingly, a potential insider's status should be determined "based on the totality of the circumstances, including the degree of an individual's involvement in a debtor's affairs." *In re Borders Group, Inc.*, 453 B.R. 459, 469 (Bankr. S.D.N.Y. 2011). The relevant case law for a "totality of the circumstances" analysis can be distilled into a non-exclusive list of four factors for the courts to consider: (1) the close relationship between the debtor and the defendant; (2) the degree of the defendant's involvement in the debtor's affairs; (3) whether the defendant had opportunities to self-deal; and (4) whether the defendant holds or held a controlling interest in the debtor corporation. *In re TS*, 603 B.R. at 708.[37]

---

[37]     Modi argues that the "insider exception" should not apply in the context of RICO. Modi Reply at 10–11 (citing *Republic of Iraq v. ABB AG*, 768 F.3d 145, (2d Cir. 2014)). However, *Republic of Iraq* is inapposite here. In *Republic of Iraq*, the Second Circuit held that the *in pari delicto* doctrine was applicable in the context of that case brought pursuant to RICO, *id.* at 167–68; however, it did not hold that it applies without exception. The relevant question that the Second Circuit ultimately answered in the affirmative was whether "the actions of the Hussein Regime, while it acted as the government of Iraq, [were] to be attributed to The Republic of Iraq." *Id.* at 164–65. The Court reasoned that although the Republic of Iraq contended that the Hussein Regime was "[il]legitimate," that argument was irrelevant as "foreign government's actions are attributed to the state regardless of whether they are 'legal under the municipal law of the foreign state,'" and discussed the long held legal position that a foreign state survives changes in its government. *Id.* at 164. The court noted, however, that "not every action that happens to be taken by officials of a foreign state is properly attributable to that state." *Id.* at 165. In any event, the Court did not address whether corporate insiders can rely on the *in pari delicto* defense in the RICO context, nor did it address whether the "insider exception" is applicable.

In order to survive a motion to dismiss, a plaintiff must allege more than mere conclusory statements relating to the defendant's relationship with the debtor corporation.  *Id.* at 710–11.  Here, the Trustee easily clears that bar.  The Trustee alleges that Modi was the "person in the control" of the Debtors under the statutory insider definition, see *PHS Group*, 581 B.R. at 31, as evidenced by Modi's controlling interest in the Debtors, "close relationship" with the Debtors, substantial "degree of . . . involvement" with the Debtors, and his ability to self-deal.  *See In re TS Employment, Inc.*, 603 B.R. 700, 708 (Bankr. S.D.N.Y. 2019); First Amended Compl. ¶¶ 18, 61–91, 188–94.  Therefore, the Trustee has pled sufficient facts to render the *in pari delicto* defense unavailable to Modi at this pleading stage.

## III. State Law Claims

Defendants also move to dismiss Counts One, Two, and Three (Breach of Fiduciary Duty); Count Four (Aiding and Abetting Breach of Fiduciary Duty (Modi)); and Counts Five, Six, and Seven (Corporate Waste) (collectively, the "State Law Claims").

### 1. Standing

As a preliminary matter, all Defendants argue that the Trustee does not have standing to bring the State Law Claims against them because the Trustee is pursuing these claims on behalf of a particular creditor, PNB, that suffered injury in the alleged Bank Fraud scheme.[38]

It is well established that a bankruptcy trustee "is empowered to pursue only those claims that properly belonged to the debtor before it entered bankruptcy."  *See Picard v. JPMorgan Chase & Co.*, 460 B.R. 84, 91 (S.D.N.Y. 2011), *aff'd sub nom.*, *In re Bernard L. Madoff Inv. Securities LLC.*, 721 F.3d 54 (2d Cir. 2013).  "It is well settled that a bankruptcy trustee has no standing generally to sue third parties on behalf of the estate's creditors, but may only assert

---

[38]     *See* Gandhi Memorandum at 6; Bhansali Memorandum at 9; Modi Memorandum at 9.

claims held by the bankrupt corporation itself." *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 118 (2d Cir.1991) (citing *Caplin v. Marine Midland Grace Trust Co. of N.Y.,* 406 U.S. 416 (1972)); *see also Wornick v. Gaffney,* 544 F.3d 486, 490 (2d Cir. 2008); *Wight v. BankAmerica Corp.,* 219 F.3d 79, 86 (2d Cir. 2000); *In re Mediators, Inc.,*105 F.3d 822 (2d Cir. 1997); *Hirsch v. Arthur Andersen & Co.,* 72 F.3d 1085, 1093 (2d Cir. 1995). This is because the Trustee steps into the shoes of the debtor for the purpose of bringing property into the bankruptcy estate and, as such, possesses only the rights of the debtor. *See Picard*, 460 B.R. at 91; 11 U.S.C. § 541(a)(1).

For reasons discussed above, the Court concludes that the Trustee has successfully pled injuries incurred by the Debtors—not PNB—and such claims "properly belonged to the debtor before it entered bankruptcy." *Picard*, 460 B.R. at 91. The Trustee sets forth numerous allegations in the Amended Complaint that the Debtors were injured by Defendants' breaches of fiduciary duty and commissions of corporate waste. These include, *inter alia*, depleting the Debtors' assets through the Actual Fraudulent Transfers; impairing the Debtors' claims against the U.S. Affiliates; increasing creditors' claims against the estate, causing the collapse and loss of business of the Debtors and their companies; causing the estate to incur significant administrative expenses from two separate examinations conducted by the Examiner and Trustee; and expending the Debtors' assets in transactions with the Shadow Entities and for the personal benefit of Modi and his family. *See* First Amended Compl. ¶¶ 198–232. Therefore, the Trustee has standing to plead the State Law Claims against the Defendants. *See In re 1031 Tax Group, LLC*, 420 B.R. 178, 195–96 (Bankr. S.D.N.Y. 2009) (distinguishing between injuries sustained by customers from damages suffered by the debtors).

### 2. Statute of Limitations

Defendants next argue that the State Law Claims are time barred because most of the conduct complained of occurred outside of the applicable statute of limitations.[39]

But again as discussed above, the Trustee has alleged facts in connection with its RICO claim to assert equitable tolling, i.e., the adverse domination doctrine, through the Defendants' "domination and control" over the Debtors. *See* First Amended Compl. ¶¶ 18, 61–91, 188–94; *Farmer*, 865 F. Supp. at 1151; *Banco De Desarrollo Agropecuario, S.A. v. Gibbs*, 709 F. Supp. 1302, 1310 (S.D.N.Y. 1989) (The "statute of limitations is tolled as against the control persons until the appointment of the independent trustee or liquidator.") (citing *Armstrong v. McAlpin,* 699 F.2d 79, 87 (2d Cir. 1983); *IIT, An International Investment Trust v. Cornfeld,* 619 F.2d 909, 929–30 (2d Cir. 1980); *Michelsen v. Penney,* 135 F.2d 409, 415–16 (2d Cir. 1943)).

The Trustee has alleged Defendants' "domination and control" over the Debtors through numerous examples. *See, e.g.*, First Amended Compl. ¶¶ 61–91 (alleging the Defendants exercised oversight and control of the Shadow Entities and LOU Entities, exercised oversight and control over transactions between the Debtors and Shadow Entities, engaged in suspicious accounting, finance, and inventory practices). The parties do not appear to dispute that a six-year statute of limitations applies to the Trustee's corporate waste claims. *See* Modi Memorandum at 14; *Golden P. Bancorp v. F.D.I.C.*, 273 F.3d 509, 518 (2d Cir. 2001) (the statute of limitations in New York for corporate waste is six years) (citing *Blake v. Blake*, 638 N.Y.S.2d 632 (App. Div. 1st Dept. 1996)); N.Y. C.P.L.R. § 213(7) (McKinney) ("The following actions must be commenced within six years: an action by or on behalf of a corporation against a present or former director, officer or stockholder . . . to recover damages for waste . . . ."). But they do

---

[39]    *See* Gandhi Memorandum at 8; Bhansali Memorandum at 12, 26–27; Modi Memorandum at 12.

dispute whether a three- or six-year statute of limitations applies to the breach of fiduciary duty

claims.[40]  However, because the Trustee was not appointed until June 2018 and the original

complaint was filed in March 2019, the Trustee's State Law Claims are not time barred under

either the three-year or six-year limitations periods given these allegations of adverse

domination.  *See FDIC v. Pellatreau & Pellatreau*, 965 F. Supp. 381, 388–89 (E.D.N.Y. 1997)

(finding dismissal of the FDIC's causes of action is inappropriate where the allegations are

sufficient to allege adverse domination as a basis for equitable tolling); *Gibbs*, 709 F. Supp. at

1309–10 ("While a statute of limitations defense may be raised in a motion to dismiss[,] such a

motion should not be granted unless it appears to beyond doubt that the plaintiff can prove no set

of facts in support of his claim which would entitle him to relief.") (citing *Ortiz v. Cornetta*, 867

F.2d 146 (2d Cir. 1989)) (internal quotation marks omitted).  Therefore, the Trustee's State Law

Claims are not time barred.[41]

### 3.  Applicability of Rule 9(b)

Defendants Gandhi and Bhansali next argue that the State Law Claims should be

dismissed because the Trustee has failed to meet the heightened pleading requirements of Rule

---

[40]     *See* Gandhi Memorandum at 7; Bhansali Memorandum at 12; Modi Memorandum at 12.  Under New York law, the applicable limitations period for breach of fiduciary depends on the substantive remedy that the plaintiff seeks.  *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132, 139 (2009) (citing *Loengard v. Santa Fe Indus.*, 70 N.Y.2d 262, 266 (1987)); *see, e.g., Yatter v. Morris Agency*, 682 N.Y.S.2d 198, 199 (App. Div. 1st Dept. 1998) (finding where the remedy sought is purely monetary in nature, courts construe the suit as alleging "injury to property" within the meaning of N.Y. C.P.L.R. § 214(4), which has a three-year limitations period); *cf. Loengard*, 70 N.Y.2d at 266–267 (finding where the relief sought is equitable in nature, the six-year limitations period of N.Y. C.P.L.R. § 213(1) applies).

[41]     Even if there were no allegations of adverse domination here, much of the conduct here is clearly timely under either a three- or six-year statute of limitations.  The Trustee alleges many examples of conduct that occurred just prior to the Debtors' bankruptcy filings in 2018.  *See, e.g.*, First Amended Compl. ¶ 176 (orchestrating Actual Fraudulent Transfers of the Debtors' assets to Modi-Controlled Entities in the weeks leading up to the Debtors' bankruptcy filing; *id.* ¶¶ 161, 177–87 (causing NMI and FDII to shop substantially all of their more than $40 million in inventory to Modi-Controlled Entities overseas rather than using that inventory to repay the Debtors); *id.* ¶¶ 159–60 (failing to disclose an $11.2 million loan owed by NMI to A. Jaffe).  The Court further notes that under Section 108 of the Bankruptcy Code, the Trustee is afforded an extra two years to commence actions that would have been timely as of the bankruptcy petition date.  *See* 11 U.S.C. § 108(a).

9(b) of the Federal Rules of Civil Procedure.[42]  Specifically, they argue that the Trustee has

failed to allege that either defendant had the requisite knowledge of the fraudulent nature of the

acts and circumstances surrounding the different stages of the Bank Fraud scheme.[43]

The Court disagrees.  While "Rule 9(b) pleadings [generally] cannot be based upon

information and belief," *DiVittorio v. Equidyne Extractive Industries, Inc.*, 822 F.2d 1242, 1247

(2d Cir. 1987) (citing *Segal v. Gordon,* 467 F.2d 602, 608 (2d Cir. 1972)), the Second Circuit has

recognized an exception to this rule for defendants—like those here—who are insiders or have

control over the release of the necessary information, *see id.*; *Wexner v. First Manhattan Co.,*

902 F.2d 169, 172 (2d Cir. 1990) ("Where pleading is permitted on information and belief, a

complaint must adduce specific facts supporting a strong inference of fraud or it will not satisfy

even a relaxed pleading standard."); *Sunrise Industrial Joint Venture v. Ditric Optics, Inc.,* 873

F. Supp. 765, 772 (E.D.N.Y. 1995) ("Indeed, the particularity requirement of Rule 9(b) is

appropriately relaxed where the individual defendant is a corporate insider.").  Moreover, courts

have allowed bankruptcy trustees, as an outsider third-party, wider latitude when pleading fraud

in circumstances where the defendants are insiders or have control of the facts required by the

trustee.  *See White Metal Rolling and Stamping Corp. v. Drew Indus., Inc. (In re White Metal*

*Rolling and Stamping Corp.),* 222 B.R. 417, 428 (Bankr. S.D.N.Y. 1998) ("Since a bankruptcy

trustee rarely has personal knowledge of the events preceding his appointment, he can plead

fraud based upon information and belief provided he pleads the basis of his belief."); *see also*

*Atlanta Shipping Corp., Inc. v. Chemical Bank,* 631 F. Supp. 335, 348 (S.D.N.Y.1986), *aff'd* 818

F.2d 240 (2d Cir. 1987); *Hassett v. Zimmerman (In re O.P.M. Leasing Services, Inc.),* 32 B.R.

---

[42]     *See* Gandhi Memorandum at 11; Bhansali Memorandum at 19.

[43]     *See* Gandhi Memorandum at 12; Bhansali Memorandum at 20.

199, 203 (Bankr. S.D.N.Y. 1983) (*citing Schlick v. Penn-Dixie Cement Corp.,* 507 F.2d 374. 379

(2d Cir. 1974)); *Eisenberg v. Feiner (In re Ahead By A Length, Inc.),* 100 B.R. 157, 166 (Bankr.

S.D.N.Y. 1989).

The Trustee has alleged sufficient facts to justify the application of these relaxed pleading

rules here.  More specifically, the Trustee has alleged numerous examples demonstrating the

Defendants' knowledge of the fraudulent nature of the circular transactions.  *See, e.g.*, First

Amended Compl. ¶¶ 68–69 (Bhansali oversaw the creation and staffing of the Shadow Entities

and LOU Entities to perpetrate the fraud schemes and tracked the transactions on spreadsheets);

*id.* ¶ 81(ii) (Gandhi designed numerous circular transactions with Shadow Entities); *id.* ¶ 85

(Gandhi maintained two sets of books and records for A. Jaffe, one that included Shadow Entity

transactions and one that did not); *id.* ¶¶ 92–102 (Defendants repeatedly deceived auditors

inquiring about Shadow Entity transactions); *id.* ¶¶ 168–70 (Defendants made demonstrably

false statements to the Examiner).  Therefore, the Court holds that the Trustee has satisfied the

applicable pleading requirements of Rule 9(b) as to the Defendants for the fraud alleged here.[44]

### 4.  Fiduciary Duty Claims

### (i)  Whether a Duty is Owed to the Debtors

Two of the Defendants, Bhansali and Modi, challenge the Trustee's assertions that they

owed any fiduciary duties to the Debtors.[45]

---

[44]     In addition, there is authority for a lesser standard of pleading where—as here—there is a long history for the alleged fraudulent transactions.  *See A.I.A. Holdings, S.A. v. Lehman Brothers, Inc.,* 1998 WL 159059, *6 (S.D.N.Y. April 1, 1998) ("When the issues are complicated or the transactions cover a long period of time, courts tend to require less of the pleader.") (citing *In re Olympia Brewing Co. Secs. Litig.,* 674 F. Supp. 597, 620 (D. Ill. 1987)); *cf., Securities Inv'r Protec. Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293, 310–11 (Bankr. S.D.N.Y. 1999) (noting that a trustee is usually pleading fraud on secondhand knowledge for the benefit of the estate and its creditors).

[45]     *See* Bhansali Memorandum at 13–14; Modi Memorandum at 15.

Bhansali asserts that he owed a fiduciary duty to the parent corporation, Firestar International Ltd. ("FIL"), but not to the Debtors as subsidiaries of the parent. *See* Bhansali Memorandum at 13–14. It is true that, under New York and Delaware law,[46] "when one company wholly owns another, the directors of the parent and the subsidiary are obligated to manage the affairs of the subsidiary in the best interests only of the parent and its shareholders." *Roselink Inv'rs, L.L.C. v. Shenkman*, 386 F. Supp. 2d 209, 215 (S.D.N.Y. 2004) (citing *Anadarko Petroleum Corp. v. Panhandle Eastern Corp.,* 545 A.2d 1171, 1174 (Del. 1988)); *see also Deangelis v. Corzine (In re MF Global Holdings Ltd. Investment Litig.)*, 998 F. Supp. 2d 157, 180 n.15 (S.D.N.Y. 2014) ("[T]he general rule is that directors and officers of a wholly owned subsidiary . . . owe fiduciary duties only to the parent corporation, not to the subsidiary.") (citing *Aviall, Inc. v. Ryder Sys., Inc.,* 913 F. Supp. 826, 832 (S.D.N.Y. 1996), *aff'd,* 110 F.3d 892 (2d Cir. 1997)); *United States Small Bus. Admin. v. Feinsod*, 347 F. Supp. 3d 147, 160 (E.D.N.Y. 2018) (Under New York law, "[w]here . . . a corporation is a wholly-owned subsidiary, its directors and officers owe their fiduciary duties to the parent corporation."). But Bhansali's argument fails because even the "directors of a wholly-owned subsidiary, who otherwise would owe fiduciary duties only to the parent corporation, also owe fiduciary duties to creditors of the subsidiary when the subsidiary enters 'the zone of insolvency.'" *Shenkman*, 386 F. Supp. 2d at 215 (citing *Geyer v. Ingersoll Publications Co.,* 621 A.2d 784, 791 (Del. Ch. 1992); *In re Tronox Inc.*, 450 B.R. 432, 438–39 (Bankr. S.D.N.Y. 2011) (citing *North Am. Catholic Educ.*

---

[46] "Under New York law, the law of the state of incorporation governs an allegation of breach of fiduciary owed to a corporation [and an allegation of corporate waste]." *Tese-Milner v. TPAC, LLC* (*In re Ticketplanet.com*), 313 B.R. 46, 62 (Bankr. S.D.N.Y. 2004) (citing *Diamond v. Oreamuno,* 24 N.Y.2d 494, 503–04 (1969)); *see also In re BP p.l.c. Derivative Litig.*, 507 F. Supp. 2d 302, 310 (S.D.N.Y. 2007) (citing *Hausman v. Buckley*, 299 F.2d 696, 698 (2d Cir. 1962) for the application of New York choice of law rules in the context of a corporate waste claim). Therefore, Delaware law governs the Trustee's claims for breach of fiduciary duty and corporate waste relating to debtors FDI and FI, and New York law governs these claims relating to debtor A. Jaffe. *See* First Amended Compl. ¶ 608.

*Programming Found., Inc. v. Gheewalla,* 930 A.2d 92, 101–02) (Del. Sup. Ct. 2007).  In short, insolvent corporations can sue their officers and directors for breach of fiduciary duty.  *See Pereira v. Farace,* 413 F.3d 330, 342 (2d Cir. 2005) ("[B]reach of fiduciary duty claims belong to the corporation [as opposed to the creditors].");  *In re Mediators,* 105 F.3d at 826–27; *Magnesium Corp. of Am. v. Renco Grp., Inc. (In re Magnesium Corp. of Am.),* 399 B.R. 722, 760 (S.D.N.Y. 2009) ("'Put simply, when a director of an insolvent corporation, through a breach of fiduciary duty, injures the firm itself, the claim against the director is still one belonging to the corporation.'") (quoting *Prod. Res. Grp. L.L.C. v. NCT Grp., Inc.* 863 A.2d 772, 792 (Del. Ch. 2004)).  As discussed above, the Trustee here has alleged that the Debtors have been insolvent since August 2011, when the Actual Fraudulent Transactions commenced.  *See* First Amended Compl. ¶¶ 174(v), 55(i).  More specifically, the Trustee alleges that "[t]he Debtors were insolvent at the time each Actual Fraudulent Transaction occurred based on both the figures reflected on their balance sheet and the substantial contingent liability they incurred in the course of their involvement in the Bank Fraud," which dates back to August 2011.  First Amended Compl. ¶ 174(v); *see id.* ¶ 55(i).[47]

Moreover, Bhansali's argument fails for another reason.  Directors' fiduciary duties are limited to the parent only in the context of a parent and wholly owned subsidiary.  *See Roselink*, 386 F. Supp. 2d at 219 n.3 (citing *Sinclair Oil Corp. v. Levien,* 280 A.2d 717, 720 (Del.1971) ("Where there are shareholders in addition to the parent company, both the directors of the

---

[47]     Bhansali further argues that, as to Debtor A. Jaffe, the Trustee failed to allege any damages flowing from Bhansali's alleged breach. Bhansali Memorandum at 14.  Specifically, Bhansali contends that the Trustee is "stretch[ing] the damages" to include those arising from Bhansali's invoking his Fifth Amendment rights in his deposition with the Examiner in the bankruptcy proceeding. *Id.*  But as noted in Bhansali's own pleadings, the Trustee has alleged a number of specific injuries after the bankruptcy was filed, including depleting the Debtors' assets through Actual Fraudulent Transfers, delaying the Trustee's appointment and impairment of his ability to recover, incurring administrative expenses due Bhansali's refusal to cooperate, and increasing creditors' claims against the estate thereby causing the loss of value in the Debtors and their businesses. *Id.* at 14 n.4 (citing First Amended Compl. ¶ 207); *see* Trustee Opposition to Bhansali at 17 n.6.

42

subsidiary and the parent company, as controlling shareholder, have a duty to consider the

interests of the minority shareholders."). Thus, to the extent that the Debtors are not all wholly

owned subsidiaries, Bhansali's argument fails.[48]

For his part, Modi argues that he owes no fiduciary duties as he is not a director, officer,

or person in control of the Debtors.[49] But "in the context of imposing fiduciary responsibilities,

it is well established in the corporate jurisprudence of Delaware that control exists when a

stockholder owns, directly or indirectly, more than half of a corporation's voting power."

*Weinstein Enters., Inc. v. Orloff*, 870 A.2d 499, 507 (Del. 2005) (citing *Paramount*

*Communications, Inc. v. QVC Network, Inc.,* 637 A.2d 34 (Del. 1994); *Citron v. Fairchild*

*Camera & Instrument Corp.,* 569 A.2d 53, 70 (Del. 1989); *Gilbert v. El Paso Co.,* 490 A.2d

1050, 1055 (Del. Ch. 1984)); *see also In re LMI Legacy Holdings, Inc.*, 2017 WL 1508606, at *7

(Bankr. D. Del. Apr. 27, 2017) ("Where New York law is not as robust as Delaware law

regarding matters of fiduciary duties, New York courts have looked to Delaware law for

guidance. The Delaware Court of Chancery has been notably direct in stating that '[a]

stockholder is controlling, and owes fiduciary duties to the other stockholders, if it owns a

majority interest in or *exercises control* over the business affairs of the corporation.'") (internal

citation and quotation marks omitted). The Trustee here has alleged that Modi is the controlling

shareholder of the Debtors through a web of corporations: Modi owns 94.88 percent of the shares

of FIL, which owns 100 percent of the shares of Firestar Holdings Ltd. ("FHL") and Firestar

Diamond International Private Ltd. ("FDIPL"). FHL owns 100 percent of the equity interests of

Synergies Corp. ("Synergies"), which owns 100 percent of Firestar Group, Inc. ("FGI"), which

---

[48]     The Trustee has alleged that an individual, Samuel Sandberg, owns five-percent stakes in debtors FDI and
A. Jaffe, while FDI owns 100-percent of debtor FI. *See* First Amended Compl. ¶¶ 6–10.

[49]     *See* Modi Memorandum at 15.

owns 95 percent of the equity interest in Debtor FDI. Synergies owns 95 percent of the equity interest in Debtor A. Jaffe. *See* First Amended Compl. ¶¶ 6–16, 18. While Modi also asserts that the Trustee must show that he exercised "actual control" over the Debtors,[50] the Court disagrees. Such a requirement exists only where a stockholder owns less than a majority of a corporation's voting shares. *See Weinstein Enters.*, 870 A.2d at 507 (citing *Fairchild Camera & Instrument Corp.,* 569 A.2d at 70; *Gilbert,* 490 A.2d at 1055; *Kahn v. Lynch Communication Sys., Inc.,* 638 A.2d 1110, 1113–14 (Del.1994) (considering control of board as evidence of control of business affairs); *Ivanhoe Partners v. Newmont Mining Corp.*, 535 A.2d 1334, 1344 (Del. 1987) ("Under Delaware law a shareholder owes a fiduciary duty only if it owns a majority interest in or exercises control over the business affairs of the corporation.")). But that is not the situation here.

### (ii)  Other Arguments about Breach of Fiduciary Duty Claims

The Defendants argue that the Trustee fails to state a claim for breach of fiduciary duty, specifically the duties of care and loyalty, owed to the Debtors.[51]

Under both New York and Delaware law,[52] directors owe fiduciary duties of care and loyalty to shareholders and the entity itself; absent specific allegations that the directors breached such duties, the business judgment rule of each state's law prevents a court from second guessing such directors' business decisions. *See Hughes v. BCI Int'l Holdings, Inc.,* 452 F. Supp. 2d 290, 308 (S.D.N.Y. 2006); *Gheewalla,* 930 A.2d at 101.

---

[50]     *See* Modi Memorandum at 15.

[51]     *See* Gandhi Memorandum at 10; Bhansali Memorandum at 14; Modi Memorandum at 17.

[52]     As noted *supra* note 39, New York or Delaware law applies here given that Debtors Firestar Diamond, Inc. and Fantasy, Inc. are both Delaware corporations, while Debtor A. Jaffe is a New York corporation. *See* First Amended Compl. ¶¶ 6–8; Bhansali Memorandum at 8; Modi Memorandum at 1; Gandhi Memorandum at 10 n.6.

The duty of care generally "requires a director to perform his duties as a director in good faith and with that degree of care which an ordinarily prudent person in a like position would use under similar circumstances." *In re Sabine Oil & Gas Corp.*, 547 B.R. 503, 556 (Bankr. S.D.N.Y. 2016), *aff'd*, 562 B.R. 211 (S.D.N.Y. 2016) (citing *Gheewalla* 930 A.2d 92, 101; *Hughes,* 452 F.Supp.2d at 308); *see also In re Walt Disney Co. Deriv. Litig.,* 907 A.2d 693, 749 (Del. Ch. 2005) ("The fiduciary duty of due care requires that directors of a Delaware corporation use that amount of care which ordinarily careful and prudent men would use in similar circumstances, and consider all material information reasonably available in making business decisions, and that deficiencies in the directors' process are actionable only if the directors' actions are grossly negligent.") (internal quotation marks omitted).

The duty of loyalty "requires a director to subordinate his own personal interests to the interests of the corporation." *In re Sabine*, 547 B.R. at 556 (citing *Gheewalla,* 930 A.2d at 101; *Hughes,* 452 F.Supp.2d at 308); *see also Stone ex rel. AmSouth Bancorporation v. Ritter,* 911 A.2d 362, 370 (Del. 2006) (finding under Delaware law, the duty of loyalty requires an officer or director to (1) avoid fiduciary conflicts of interest and (2) act in good faith for the corporation's best interest); *CVC Claims Litig. LLC. v. Citicorp Venture Capital Ltd.,* 2007 WL 2915181, at *3 (S.D.N.Y. Oct. 3, 2007) ("A breach of loyalty claim requires some form of self-dealing or misuse of corporate office for personal gain."); *Joseph v. Frank (In re Troll Commc'ns),* 385 B.R. 110, 118 (Bankr. D. Del. 2008) (same).  To allege a breach of the duty of loyalty, the Trustee must "plead facts demonstrating that a majority of a board that approved the transaction in dispute was interested and/or lacked independence." *Continuing Creditors' Comm. Of Star*

*Telecomm. Inc. v. Edgecomb,* 385 F.Supp.2d 449, 460 (D. Del. 2004) (citing *Orman v. Cullman,*

794 A.2d 5, 23 (Del. Ch. 2002)).[53]

Gandhi asserts that he can be liable for a breach of fiduciary duty only where he had

"'discretionary authority in the relevant functional area and the ability to cause or prevent the

complained-of action.'"  Gandhi Memorandum at 12 (quoting *Pereira v. Cogan*, 294 B.R. 449,

522 (S.D.N.Y. 2003); *see also Gold v. Sloan,* 486 F.2d 340, 351 (4th Cir. 1973) (officers who

lack "the slightest connection" with events in question or ability to meaningfully participate

should not be considered officers for liability purposes); *Colby v. Klune,* 178 F.2d 872, 873 (2d

Cir. 1949) ("It is immaterial how [an officer's] functions are labeled or how defined in the by-

laws or that he does or does not act under the supervision of some other corporate

representative."); *Schimmel v. Goldman,* 57 F.R.D. 481, 485–86 (S.D.N.Y. 1973)

(acknowledging that defendant might argue that "although given the title of an officer, he did not

perform the policy making functions or have access to inside information which characterize an

'officer'").  As it was Modi who had "omnipresent oversight and control" over the Debtors,

Gandhi argues that he should not be held liable for acting at the direction of his boss.[54]

But Gandhi conveniently ignores the full scope of the allegations in the Amended

Complaint.  The Trustee has alleged that Gandhi, as Chief Financial Officer of the Debtors,

carried the responsibility and authority consistent with his title.  More specifically, the Trustee

has alleged that Gandhi controlled the finances of the Debtors, had authority to approve

transactions between entities in the Firestar network, was a signatory of each of the U.S. Entities'

---

[53]    To assert a breach of fiduciary duty, "New York law [also] requires damages directly caused by the defendant's misconduct."  *Picard v. Madoff (In re Bernard L. Madoff Inv. Sec. LLC),* 458 B.R. 87, 127 (Bankr. S.D.N.Y. 2011); *see also In re Perry H. Koplik & Sons, Inc.*, 499 B.R. 276, 289 (S.D.N.Y. 2013) (quoting *Rut v. Young Adult Inst., Inc.*, 901 N.Y.S.2d 715, 717 (App. Div. 2d Dept. 2010) (internal citation omitted)), *aff'd*, 567 F. App'x 43 (2d Cir. 2014).

[54]    Gandhi Memorandum at 12–13 (quoting First Amended Compl. ¶ 189).

bank accounts, was authorized to effectuate transfers from these accounts, maintained the

Debtors' books and records, and managed external audits of the Debtors. *See* First Amended

Compl. ¶¶ 65, 85, 92–102, 195–96. That the Trustee alleges that Modi exercised control of the

Debtors "does not mean that other individuals or entities did not also control key aspects of the

business." *In re TS Employment, Inc.*, 603 B.R. at 711 (citing *In re Bernard L. Madoff*, 458 B.R.

at 124 (concluding that the complaint adequately alleged defendants in senior management

positions were insiders for imputation purposes, notwithstanding defendants' contentions that

Bernard Madoff controlled all aspects of the fraud)); *see also In re Felt Mfg. Co., Inc.*, 371 B.R.

589, 612 (Bankr. D.N.H. 2007) (finding allegations that individual was Chapter 11 debtor's CFO,

coupled with allegations regarding debtor's financial reporting problems or errors, alleged illegal

dividends, and CFO's admissions to other directors stated a plausible claim for breach of

fiduciary duty under New Hampshire law). Here, "although [Modi] may have been in total

control of [the Debtors], [Gandhi] still could have exercised control over the financial reporting

systems and accounting decisions, and acted with complete autonomy." *In re TS Employment,*

*Inc.*, 603 B.R. at 711. Therefore, the Trustee has adequately alleged that Gandhi had the

requisite authority to be held liable as an officer of the Debtors for breach of fiduciary duty.

Bhansali challenges the Trustee's breach of fiduciary duty claim on several other

grounds. First, Bhansali states that the Trustee has not shown that he engaged in self-dealing or

misuse of corporate office in alleging a breach of duty of loyalty.[55] *See CVC Claims Litig. LLC.,*

2007 WL 2915181, at *3 ("A breach of loyalty claim requires some form of self-dealing or

misuse of corporate office for personal gain."); *see also In re Troll Commc'ns,* 385 B.R. at 118

(same); *In re IT Group Inc.*, 02-10118, 2005 WL 3050611, at *8 n.10 (D. Del. Nov. 15, 2005)

---

[55]      *See* Bhansali Memorandum at 15–16.

("[I]n the absence of facts showing self-dealing or improper motive, a corporate officer or director is not legally responsible to the corporation for losses that may be suffered as a result of a decision that an officer made or that directors authorized in good faith.") (quoting *Gagliardi v. TriFoods Int'l, Inc.,* 683 A.2d 1049, 1051 (Del. Ch. 1996)). As a threshold matter, Bhansali's argument fails because the Trustee actually has alleged such self-dealing here: the Trustee contends that Bhansali, his wife's companies, and family trust received "millions" of dollars from Nirav Modi, Purvi Mehta, and various Modi-Controlled Entities. *See* First Amended Compl. ¶¶ 30, 133–41. Moreover, Bhansali interprets the duty of loyalty too narrowly. Although self-dealing is a classic example of a breach of duty of loyalty, the absence of self-dealing does not mandate dismissal because a duty of loyalty claim encompasses other "situations in which a fiduciary's personal interest possibly conflicts with the interest of those owed a fiduciary duty." *Birnbaum v. Birnbaum*, 73 N.Y.2d 461, 466 (1989) (citing *In re Ryan's Will*, 291 N.Y. 376, 407 (1943)). In fact, the Trustee has set forth numerous allegations that Bhansali breached his duty of loyalty owed to the Debtors. These allegations include Bhansali orchestrating Actual Fraudulent Transactions, his failure to call due an $11.2 million loan balance owed by NMI to A. Jaffe, his actions to cause NMI and FDII to ship their inventory to Modi-Controlled Entities overseas out of the reach of Debtors' avoidance actions, and—last but not least—his personally profiting from the proceeds of the Bank Fraud. *See* First Amended Compl. ¶¶ 161, 175, 206.

Second, Bhansali asserts that the Trustee's allegations that Bhansali allowed Modi to usurp his management responsibilities, that Bhansali caused the Debtors to participate in the Bank Fraud, that he depleted the Debtors' assets, and that he impaired the Trustee's ability to investigate and recover assets all fail. *See* Bhansali Memorandum at 16–19. Bhansali argues

that these allegations fail because he acted at the direction of Modi, he does not owe a duty to the

Trustee, the allegations fail to link Bhansali to the Bank Fraud, or the allegations fall short of the

pleading standard.  *See* Bhansali Memorandum at 16–19.  But as discussed above, the allegations

against Modi do not necessarily absolve Bhansali for purposes of a motion to dismiss.  So while

the Trustee can and has sued Modi, "[u]nder the Bankruptcy Code the trustee stands in the shoes

of the bankrupt corporation and has standing to bring any suit that the bankrupt corporation

could have instituted had it not petitioned for bankruptcy."  *Wagoner*, 944 F.2d at 118 (citing

*Caplin v. Marine Midland Grace Trust Co.,* 406 U.S. 416, 429 (1972); *see also* 11 U.S.C. §§

541, 542.  As explained above, the Trustee here has plausibly alleged numerous examples of how

Bhansali coordinated and participated in the numerous Actual Fraudulent Transactions in

contravention to his fiduciary duties to the Debtors.  *See* First Amended Compl. ¶¶ 63, 67–102

(alleging how Bhansali used his position as director of each of the U.S. Entities and CEO of the

Debtors, Synergies, FGI, and NMI to coordinate and direct fraudulent transactions among the

U.S. Entities, Shadow Entities, and other Modi-Controlled Entities involving hundreds of

millions of dollars in funds and diamonds).[56]

---

[56]     Bhansali also raises various factual disputes that are not ripe at the pleading stage.  For example, the
Amended Complaint alleges that "[u]pon information and belief, the M.R. Family Trust received INR [Indian
Rupees] 32.83 crore [crore translates to 10 million in English] (approximately $4.57 million) from DRUS
[Diamonds 'R' Us] in fiscal year 2011-2012" for the benefit of Mr. Bhansali and his family.  First Amended Compl.
¶ 130.  Bhansali disputes this allegation, stating that bank statements for the M.R. Family Trust from the period of
May 31, 2007 through March 31, 2018 "conclusively establishes that there was no such transfer of $4.57 million to
the M.R. Family Trust account at any time."  Bhansali Memorandum at 16; Sullivan Decl. ¶ 4, Ex. C [ECF No. 40].
But as the Trustee points out, this merely raises a factual dispute as to the duty of loyalty claim that is not ripe at this
stage of the proceedings.  Similarly, Bhansali's argument that the Actual Fraudulent Transfers are nothing more than
"everyday business transactions" and, thus, that the Trustee fails to allege any wrongdoing associated with its duty
of care claim, Bhansali Memorandum at 18, also raises a factual dispute.  Additionally, Bhansali asserts that the
Actual Fraudulent Transfers were "linked to or supporting the Bank Fraud," and, thus, "were never properly assets
of the Debtors."  *Id.* at 19.  Besides being a factual dispute not ripe at this stage, this argument also mischaracterizes
the Trustee's allegation that these were transfers "of property of the Debtors derived from or subsequently
transferred to a Shadow Entity or LOU Entity."  First Amended Compl. ¶ 173.

Accordingly, the Trustee has adequately pled that the Defendants breached their fiduciary duties to the Debtors.[57]

### 5. Corporate Waste

Lastly, Defendants argue that the Trustee fails to state a claim for corporate waste, focusing largely on the creation of the Ithaca Trust and the transactions surrounding the purchase of the Essex House and Ritz Carlton apartments.[58]

"[T]he essence of waste is the diversion of corporate assets for improper or unnecessary purposes." *Geltzer v. Bedke (In re Mundo Latino Mkt.)*, 590 B.R. 610, 619 (Bankr. S.D.N.Y. 2018) (internal citations omitted); *see also Aronoff v. Albanese*, 446 N.Y.S.2d 368, 370 (N.Y. App. Div. 2d Dept. 1982). Notably, the standards for stating a claim of waste under New York and Delaware law are substantially the same.[59] *See United States SBA v. Feinsod*, 347 F. Supp.

---

[57] Modi's arguments as to fiduciary duties actually relate more to the Trustee's corporate waste allegations. For example, his arguments focus on the formation of the Ithaca Trust and the purchase of the Essex House and Ritz Carlton apartments. *See* Modi Memorandum at 17–18; *Hanson Tr. PLC v. ML SCM Acq., Inc.*, 781 F.2d 264, 279 n.9 (2d Cir. 1986) ("[A] prima facie showing of lack of due care is distinct from a prima facie showing of corporate waste, which may constitute a cause of action against directors separate and distinct from breach of the duty of loyalty or due care."). As Modi does not challenge the substance of the fiduciary duty allegations, the Court addresses Modi's arguments on these issues in the discussion of corporate waste below.

Modi similarly does not challenge the substance of Count Four in the Amended Complaint for aiding and abetting Bhansali's and Gandhi's breach of fiduciary duty, except to the extent that the claims are time-barred, lack a proper factual basis, and are derivative of Bhansali's and Gandhi's breach of fiduciary duty. *See* Modi Memorandum at 11. Because the Court has determined that Bhansali and Gandhi owed fiduciary duties to the Debtors and the breach of fiduciary claims are not time-barred, the Trustee states a valid claim for aiding and abetting breach of fiduciary duty.

[58] *See* Gandhi Memorandum at 13; Bhansali Memorandum at 20; Modi Memorandum at 17.

[59] Unlike New York, there is authority that a claim for waste under Delaware law "will not lie against an officer as only directors may be liable for waste under Delaware law." *Sama v. Mullaney (In re Wonderwork, Inc.)*, 611 B.R. 169, 208 (Bankr. S.D.N.Y. 2020) (citing *Giuliano v. Schnabel (In re DSI Renal Holdings, LLC)*, 574 B.R. 446, 476 (Bankr. D. Del. 2017)). *DSI Renal Holdings*, in turn, cites the Supreme Court of Delaware's opinion in *Walt Disney Co. Derivative Litig.,* which provides that a claim of waste will arise only in the rare, "unconscionable case where *directors* irrationally squander or give away corporate assets." *In re Walt Disney Co. Derivative Litig.*, 906 A.2d at 74 (emphasis added) (citing *Brehm v. Eisner*, 746 A.2d 244, 263 (Del. 2000)). "The *Walt Disney* case does not discuss whether corporate waste claims may be brought against officers or controlling shareholders because the plaintiff in *Walt Disney* only asserted claims against directors who served at the time of the events in question." *DSI Renal Holdings*, 574 B.R. at 476. To date, no Delaware court has determined whether officers or controlling shareholders could be liable for corporate waste. *See id.* at 476 n.92. In the First Amended Complaint, the Trustee

3d 147, 166 n.18 (E.D.N.Y. 2018).  Under New York law, waste occurs when "assets are used in

a manner 'so far opposed to the true interests [of the corporation so] as to lead to the clear

inference that no one thus acting could have been influenced by any honest desire to secure such

interests.'"  *Patrick v. Allen*, 355 F. Supp. 2d 704, 715 (S.D.N.Y. 2005) (quoting *Meredith v.*

*Camp Hill Estates, Inc.*, 430 N.Y.S.2d 383, 386 (App. Div. 2d Dept. 1980)).  In other words,

New York's business judgment rule dictates that a court defers to the decisions of a corporation's

directors unless fraud, self-dealing, or bad faith is alleged.  *See Stern v. Gen. Elec. Co.*, 924 F.2d

472, 476 (2d Cir. 1991).  Under Delaware law, a Plaintiff must show that the challenged

transaction was "so one sided that no business person of ordinary, sound judgment could

conclude that the corporation has received adequate consideration."  *In re Walt Disney Co.*

*Derivative Litig.*, 906 A.2d at 74 (quoting *Brehm*, 746 A.2d at 263).

The Trustee alleges that Defendants committed corporate waste by both "directing the

Debtors and their officers to use corporate assets to acquire properties for the personal benefit of

Modi and his family or by facilitating or permitting such use" and "engag[ing] in transactions

with Shadow Entities and other Modi-Controlled Entities that served no legitimate corporate or

economic purpose" while the Debtors were insolvent.  First Amended Compl. ¶¶ 220, 225, 230;

*see also id.* ¶¶ 81–82, 173–176.  As noted, Defendants focus the majority of their arguments on

the Trustee's allegations concerning the Ithaca Trust, Essex House apartment, and Ritz Carlton

apartment; they assert that the Amended Complaint fails to allege that these transactions did not

serve a business purpose, that the corporation did not receive adequate consideration, or that the

---

alleges only that Gandhi was an officer of the Debtors.  *See* First Amended Compl. ¶¶ 228–32.  But Gandhi has not
raised this issue as a basis for dismissal of this Count.

Debtors or their assets were even involved in the transactions.[60]  The Trustee responds that the corporate waste claim "is not based on the Ithaca Trust's purchase of the Ritz Carlton Apartment, nor the assignment of Nirav Modi's loan to Synergies to Purvi Mehta," nor is it based on the transactions concerning the Essex House Apartment, but instead is based on the Actual Fraudulent Transfers to Shadow Entities or other Modi-Controlled Entities for inadequate or no consideration while the Debtors were insolvent.  Trustee's Opposition to Bhansali at 23, n.7; Trustee's Opposition to Modi at 14.  Indeed, the Amended Complaint does not list these specific properties, but rather alleges that in addition to the Actual Fraudulent Transactions and Subsequent Transfers discussed above, the Defendants directed the acquisition of properties using corporate assets for the personal benefit of Modi and his family.  First Amended Compl. ¶¶ 220, 225, 230.  The allegations as to the Actual Fraudulent Transfers alone are a sufficient basis for a claim for corporate waste because they involve a diversion of assets from the Debtors to U.S. affiliates, Shadow Entities, and other Modi-Controlled Entities.  Such transactions could be reasonably characterized under the standards of Delaware and New York law as so one-sided as to defeat the business judgment rule or as sufficiently opposed to the corporation's true interests.  *See Camp Hill Estates*, 430 N.Y.S.2d at 386; *Eisner*, 746 A.2d at 263.  Accordingly, the Trustee's claims survive the Defendants' motions to dismiss.  The Court has considered the parties' other arguments not specifically addressed in this Decision and concludes that they either are mooted by the other holdings in the Decision or lack merit.

---

[60]    *See* Gandhi Memorandum at 14–15 & n.9; Bhansali Memorandum at 22–26; Modi Memorandum at 17–18. Bhansali further contends that the Trustee failed to allege that Bhansali had any knowledge of, responsibility for, or benefited personally from, the fraudulent transfers, Bhansali Memorandum at 22–26; however, as discussed *supra*, the Trustee adequately alleged that Defendants exercised direct oversight and control over each Actual Fraudulent Transaction and that Defendants possessed the requisite knowledge that the fraudulent transfers represented the proceeds of specified unlawful activity.  *See* First Amended Compl. ¶¶ 81, 173–76, 272.

## IV. Sanctions Motion

In addition to seeking dismissal, Defendant Bhansali filed the Sanctions Motion against the Trustee seeking sanctions under Rule 11 of the Federal Rules of Civil Procedure, or, in the alternative, an order striking certain allegations in the Amended Complaint.  *See* Memorandum of Law in Support of Defendant Mihir Bhansali's Motion for Rule 11 Sanctions or to Strike Certain Pleadings at 1 (the "Sanctions Memorandum") [ECF No. 59].[61]  Bhansali argues that the Trustee should be subject to Rule 11 sanctions for making three allegations that are purportedly false, unfounded, or intentionally misleading: (1) that the purchase of Bhansali's New York apartment was funded by proceeds from the Bank Fraud wired by Purvi Mehta; (2) that a trust set up to benefit the Bhansali family received funds from an entity involved in the Bank Fraud, and (3) that Bhansali was involved in extortion, bribery, threats to kill, and destruction of evidence.  *See* Sanctions Memorandum at 6–11.

### 1.  Rule 11

The purpose of Rule 11(b) is to ensure that a written motion presented to the court is formed after an "inquiry reasonable under the circumstances."  Fed. R. Civ. P. 11(b).  Further, the rule seeks to ensure that representations to the court are not made for an "improper purpose," *see* Fed. R. Civ. P. 11(b)(1), that the claims and contentions are warranted by existing law and constitute a nonfrivolous argument, *see* Fed. R. Civ. P. 11(b)(2), and that they have or will have (after further inquiry) evidentiary support, *see* Fed. R. Civ. P. 11(b)(3).

Rule 11 provides examples of improper purposes, stating that complaints are filed improperly if they "harass, cause unnecessary delay, or needlessly increase the cost of litigation."

---

[61]    At the hearing on the Sanction Motion, the Court gave its preliminary thoughts that the Sanctions Motion was not well founded and unquestionably premature, but did not formally rule on the motion.  *See* Hr. Tr. 107:24–109:17, Apr. 30, 2020.

Fed. R. Civ. P. 11(b)(1). Practically, complaints are only improper if they "utterly lack support." *In re September 11th Liab. Ins. Coverage Cases*, 243 F.R.D. 114, 124 (S.D.N.Y. 2007). While the "improper purpose" and "frivolousness" inquiries are separate and distinct, they often overlap, and courts have found that a complaint is not filed for an improper purpose if it is nonfrivolous. *Sussman v. Bank of Israel*, 56 F.3d 450, 458–59 (2d Cir. 1995) (quoting *Townsend v. Holman Consulting Corp.*, 929 F.2d 1358, 1362 (9th Cir. 1990)).

If a court determines that Rule 11(b) was violated, it may impose sanctions under Rule 11(c). *See* Fed. R. Civ. P. 11(c). Sanctions are not warranted for a nonfrivolous complaint even if one of the purposes for filing it may be considered improper: "A party should not be penalized for or deterred from seeking and obtaining warranted judicial relief merely because one of his multiple purposes in seeking that relief may have been improper." *Id* at 459. Indeed, sanctions are appropriate only where "it should have been patently obvious to any attorney who had familiarized himself [or herself] with the law" that the action was frivolous. *Four Keys Leasing & Maint. Corp. v. Simithis*, 849 F.2d 770, 773 (2d Cir. 1988); *see also Healey v. Chelsea Res., Ltd.*, 947 F.2d 611, 626 (2d Cir. 1991) (noting it must be "patently clear that a claim ha[d] absolutely no chance of success"); *Galin v. Hamada*, 283 F. Supp. 3d 189, 201 (S.D.N.Y. 2017) (a court should only impose sanctions under Rule 11(c) for a violation of Rule 11(b) "where an attorney's conduct was objectively unreasonable.") (citing *Storey v. Cello Holdings, L.L.C.*, 347 F.3d 370, 387 (2d Cir. 2003)).[62]

---

[62] Moreover, Rule 11 contains a "safe harbor" provision which is not at issue here. "When Rule 11 sanctions are initiated by the motion of a party, it gives the subject the opportunity to withdraw the potentially offending statements before the sanctions motion is officially filed." *See Storey v. Cello Holdings, L.L.C.*, 347 F.3d 370, 389 (2d Cir. 2003) (citing Fed. R. Civ. P. 11(c)(1)(A) (providing a "safe harbor" by requiring the motion for sanctions to be served twenty-one days before it can be filed with the court).

In considering a Rule 11 motion, the Court is mindful that allegations made upon information and belief when the defendant has near exclusive control over the evidence do not need to be plead specifically, even with allegations relating to fraud. *See IUE AFL-CIO Pension Fund v. Herrman*, 9 F.3d 1049, 1057 (2d Cir. 1993) ("[A]llegations may be based on information and belief when facts are peculiarly within the opposing party's knowledge.") (internal quotation marks omitted) (quoting *Wexner,* 902 F.2d at 172).

The Court examines each of Bhansali's three arguments under these standards.

### (i)   The Apartment Purchase and Purvi Mehta Wire

Bhansali argues that the Trustee's allegations surrounding the source of funding for Bhansali's apartment, located at 50 Riverside Blvd., New York, NY (the "Apartment"), are without basis, asserting that there is "incontrovertible" proof that the apartment purchase was "not in any way connected to [the Bank Fraud]." Hr. Tr. 97:8–9, Apr. 30, 2020; *see* Sanctions Memorandum at 6; First Amended Compl. ¶¶ 138–40.  Furthermore, even if there was a basis at the outset for these allegations based on similar claims by the Indian government in a separate proceeding, Bhansali argues that the Trustee's continued pursuit of these claims is sanctionable now that the Indian government has "abandoned" such allegations in its investigation. Hr. Tr. 97:1–2, Apr. 30, 2020; Sanctions Memorandum at 7–8.

In response, the Trustee asserts that the allegations about the source of funds to purchase the Apartment are based on evidence of the following chain of events: (1) less than two weeks before the sale close, Purvi Mehta transferred $1.5 million to the Bhansalis' jointly owned checking account, (2) the Bhansalis then made subsequent transfers between two of their savings accounts; (3) the Bhansalis held $50,000 of "side collateral" from these funds to secure a loan from HSBC; (4) the Bhansalis then transferred $650,000 back to their checking account; and (5)

the Bhansalis, funded in part by these funds, used money from the same checking account to purchase the Apartment. *See* Trustee's Opposition to Defendant Mihir Bhansali's Motion for Rule 11 Sanctions or to Strike Certain Pleadings at 8 (the "Sanctions Opposition") [ECF No. 60]; *id.* at Ex. A (the Bhansalis' HSBC bank statements); Hr. Tr. 102:23–103:5, Apr. 30, 2020. In further support of its position, the Trustee notes that Purvi Mehta's role in laundering activities is set forth in the Amended Complaint and allegations in a separate adversary proceeding commenced against members of the Modi family and certain entities they owned or controlled. Sanctions Opposition at 8–9; First Amended Compl. ¶¶ 123–28; Hr. Tr. 104:3–11, Apr. 30, 2020. Moreover, the Trustee details Bhansali's participation in the fraud scheme throughout the Amended Complaint, which further supports its allegations—made on information and belief— that fraud proceeds were used to purchase the Apartment. Sanctions Opposition at 9; *see* First Amended Compl. at ¶¶ 68, 75–79, 106–24, 264–65. The Trustee also disputes the suggestion that the Indian Enforcement Directorate "abandoned" this claim. Sanctions Opposition at 7–8. The Trustee notes that the Indian authorities are not required to trace the source of the funds for the Apartment purchase in order to attach the funds under Indian law, thus making this allegation unnecessary. *Id.*

The Court agrees that the detailed allegations surrounding Purvi Mehta's role in laundering the proceeds of the Bank Fraud, the allegations set forth in the complaint concerning Bhansali's participation in the fraud scheme, and the involvement of both these individuals in the specific bank transfers outlined here, provide sufficient support for the allegations to overcome a sanctions motion under Rule 11. Moreover, the Trustee's allegations are made upon information and belief and do not need to be plead specifically. *See Herrman*, 9 F.3d at 1057. Accordingly, the Court concludes that these allegations do not "utterly lack support" and are not sanctionable.

*See In re September 11th Liab.*, 243 F.R.D at 124.  Given the information presented by the Trustee, it is objectively reasonable to believe that the Trustee is "'likely to have evidentiary support after a reasonable opportunity for further investigation or discovery[.]'"  *Lan v. Time Warner, Inc.*, 2016 WL 6778180 at *8 (S.D.N.Y. Oct. 18, 2016).

### (ii)  The M.R. Family Trust

Bhansali complains that the Trustee's allegations about transfers of money to the M.R. Family Trust, a trust set up for the benefit of Bhansali and his family, are unfounded, *see* First Amended Compl. ¶ 130, arguing that the trust never received a transfer of $4.7 million from Diamonds 'R' Us, an LOU Entity allegedly involved in the Bank Fraud.  *See* Hr. Tr. 97:21–98:1, Apr. 30, 2020; Sanctions Memorandum at 8; First Amended Compl. ¶¶ 129–30.  Bhansali asserts that the M.R. Family Trust's bank statements establish that this money was never received, and that the Trustee is inappropriately relying on a different ledger for proof of this transfer in the face of the clear contrary evidence of the trust's bank statements.  *See* Hr. Tr. 98:1–11, Apr. 30, 2020; Sanctions Memorandum at 8–9.

But the Trustee correctly argues that he is not required to provide detailed evidentiary substantiation in the complaint.  *See* Hr. Tr. 101:5–9, Apr. 30, 2020.  Despite this, it nonetheless points to an auto-saved spreadsheet recovered from Bhansali's computer.  *Id.* at 104:22.  The Trustee contends that the presence of terms in the spreadsheet such as "cashflow" and "withdrawals" suggest a physical transfer of money and has reproduced a copy of the transactions in its opposition.  *See id.* at 104:23–105:17; Sanctions Opposition at 11.

Like the allegations regarding the Apartment purchase, the allegations relating to the M.R. Family Trust are not sanctionable. The Trustee has provided a sufficient basis for its allegations, namely the auto-saved spreadsheet.  Combined with the circumstantial allegations

based upon information and belief, this is sufficient at this stage of the proceeding for those allegations.  *See Herrman*, 9 F.3d at 1057.

### (iii) Conduct Following the Discovery of Fraud

Lastly, Bhansali challenges some of the allegations made in paragraph 151 of the Amended Complaint, specifically claiming that the Trustee wrongfully relies on witness statements from the Indian proceedings in making allegations that Bhansali threatened to commit murder, committed bribery and extortion, and destroyed evidence.[63]  *See* Hr. Tr. 99:4–9, Apr. 30, 2020; First Amended Compl. ¶ 151.  Bhansali argues that these allegations would be highly prejudicial if the matter were to proceed to trial.  Hr. Tr. 100:5–7, Apr. 30, 2020.

The Court acknowledges the seriousness of these allegations and recognizes that they may reflect poorly on Bhansali.  But they are not "utterly baseless" for Rule 11 purposes at this stage of the proceedings.  The Trustee relies on the Indian Enforcement Directorate's investigative findings "implicat[ing] Bhansali in efforts to threaten witnesses, induce false testimony, and remove assets."  *See* Sanctions Opposition at 14–15.  The Trustee is entitled to base the Amended Complaint on "statements of witnesses, reports of their investigators and hearsay reports and statements of others until such time, if ever, as they are satisfied that the statements and other evidence are not competent or are otherwise untrustworthy."  *In re Air Disaster at Lockerbie, Scotland, On Dec. 21, 1988*, 144 F.R.D. 613, 617 (E.D.N.Y. 1992) (citing *Oliveri v. Thompson*, 803 F.2d 1265, 1279 (2d Cir. 1986) ("A plaintiff does not have to be prepared to meet a summary judgment motion as soon as the complaint is filed."); *Samuels v.*

---

[63]     At oral argument, the Trustee clarified that these allegations relate to conduct after the fraud was discovered and are again based upon information and belief that Mr. Bhansali may have directed or coordinated with other actors, namely Modi and Nehal Modi.  *See* Hr. Tr. 106:7–23, Apr. 30, 2020.

*Wilder,* 906 F.2d 272, 274 (7th Cir. 1990) ("Counsel must investigate, but need not have in hand

before filing enough proof to establish the case.")).[64]

### 2. Rule 12(f)

In the alternative, Bhansali moves to strike these same allegations under Rule 12(f) of the

Federal Rules of Civil Procedure, invoking the Court's discretion to strike certain "scandalous"

pleadings. Sanctions Memorandum at 11–12.

Under Rule 12, a court may strike from a pleading any "redundant, immaterial,

impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "A scandalous allegation is one that

reflects unnecessarily on the defendant's moral character, or uses repulsive language that detracts

from the dignity of the court." *Cabbie v. Rollieson,* 2006 WL 464078, at *11 (S.D.N.Y. Feb. 27,

2006). The decision to strike allegations is well within the discretion of the trial court.

*Hollander v. American Cyanamid Co.,* 172 F.3d 192, 198 (2d Cir. 1999). "[M]otions to strike

are viewed with disfavor and infrequently granted." *In re Merrill Lynch & Co., Research

Reports Sec. Litig.,* 218 F.R.D. 76, 78 (S.D.N.Y. 2003). In general, "the courts should not

tamper with the pleadings unless there is a strong reason for doing so." *RSM Prod. Corp. v.

Fridman,* 643 F. Supp. 2d 382, 394 (S.D.N.Y. 2009) (internal citations omitted), *aff'd,* 387 F.

App'x 72 (2d Cir. 2010).

"On a motion to strike, however, '[i]t is not enough that the matter offends the

sensibilities of the objecting party if the challenged allegations describe acts or events that are

---

[64] In reaching its conclusions, the Court takes note that Bhansali invoked his Fifth Amendment right when
questioned about his communications with Modi during the sale process of the Debtors' assets in this bankruptcy
case, one of the central facts that led to the appointment of a Chapter 11 Trustee. *See* Order Directing the
Appointment of a Chapter 11 Trustee [ECF No. 227, Case No. 18-10509]; *cf. MacKay v. Drug Enf't Admin.,* 664
F.3d 808, 820 (10th Cir. 2011) (citing *Baxter v. Palmigiano,* 425 U.S. 308, 318 (1976) ("[T]he Fifth Amendment
does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative
evidence offered against them. . . .")). The Court reserves decision on the issue of whether these allegations are
unduly prejudicial for trial until an appropriate date in the future.

relevant to the action.'" *Lynch v. Southhampton Animal Shelter Found. Inc.,* 278 F.R.D. 55, 64–65 (E.D.N.Y.2011) (quoting 5C Fed. Prac. & Proc. Civ. § 1382 (3d ed. 2011)).  Thus, to prevail on a motion to strike, the movant must show "(1) no evidence in support of the allegations would be admissible; (2) the allegations have no bearing on the relevant issues; and (3) permitting the allegations to stand would result in prejudice to the movant." *Roe v. City of New York*, 151 F. Supp. 2d 495, 510 (S.D.N.Y. 2001).  As noted at the hearing on this motion, the allegations contained in the Amended Complaint are "very serious" and are the subject of much disagreement between the parties.  *See* Hr. Tr. 109:11–12, Apr. 30, 2020.  But that is to be expected in a complaint alleging such a massive fraud.  Given the Court's rulings above regarding relief based on Rule 11 and the stringent standard for motions to strike, the Court declines to strike these allegations.

## CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss are denied and Bhansali's Sanctions Motion is denied.  The Trustee is directed to settle an order on five days' notice and contact the Court to schedule a pre-trial conference within 30 days of this Decision.  The proposed order must be submitted by filing a notice of the proposed order on the Case Management/Electronic Case Filing docket, with a copy of the proposed order attached as an exhibit to the notice.  A copy of the notice and proposed order shall also be served upon counsel to all of the Defendants.

Dated: October 15, 2021
     New York, New York

          */s/ Sean H. Lane*
          UNITED STATES BANKRUPTCY JUDGE

JENNER & BLOCK LLP
Vincent E. Lazar
Angela M. Allen (admitted *pro hac vice*)
William A. Williams (admitted *pro hac vice*)
353 North Clark Street
Chicago, Illinois 60654
(312) 222-9350

Carl N. Wedoff
919 Third Avenue
New York, New York 10022
(212) 891-1600

*Counsel for the Plaintiff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| FIRESTAR DIAMOND, INC., *et al.* | No. 18-10509 (SHL) |
| Debtors. | (Jointly Administered) |
| RICHARD LEVIN, Chapter 11 Trustee of FIRESTAR DIAMOND, INC., FANTASY, INC., and OLD AJ, INC. f/k/a A. JAFFE, INC., | Adv. Proc. No. 19-1102 (SHL) |
| Plaintiff, | |
| v. | |
| NIRAV DEEPAK MODI, MIHIR BHANSALI, and AJAY GANDHI, | |
| Defendants. | |

## CERTIFICATE OF SERVICE

I, Carl N. Wedoff an attorney duly admitted to practice law before this Court, hereby certify under penalty of perjury that, on October 19, 2021, I caused:

(a) the *Notice of Proposed Order* (Adv. Dkt. 70) to be served by CM/ECF and electronic mail on all counsel of record in the above-referenced adversary proceeding; and

(b) the *Notice of Proposed Order* (Adv. Dkt. 70) and *Memorandum of Decision* (Adv. Dkt. 69) to be served on Defendant Nirav Deepak Modi by overnight mail to:

Nirav Deepak Modi
HMP Wandsworth
Heathfield Road
London SW18 3HU
United Kingdom

Dated: New York, New York
October 19, 2021

JENNER & BLOCK LLP

By: /s/ *Carl N. Wedoff*
Carl N. Wedoff

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| FIRESTAR DIAMOND, INC., *et al.* | No. 18-10509 (SHL) |
| Debtors. | (Jointly Administered) |
| RICHARD LEVIN, Chapter 11 Trustee of FIRESTAR DIAMOND, INC., FANTASY, INC., and OLD AJ, INC. f/k/a A. JAFFE, INC., | Adv. Proc. No. 19-1102 (SHL) |
| Plaintiff, | |
| v. | |
| NIRAV DEEPAK MODI, MIHIR BHANSALI, and AJAY GANDHI, | |
| Defendants. | |

**ORDER DENYING (I) DEFENDANTS' MOTIONS TO DISMISS FIRST AMENDED COMPLAINT; AND (II) DEFENDANT MIHIR BHANSALI'S MOTION FOR RULE 11 SANCTIONS OR TO STRIKE CERTAIN PLEADINGS**

Before the Court are: (1) Defendant Ajay Gandhi's *Motion to Dismiss First Amended Adversary Complaint* (Adv. Dkt. 36); (2) Defendant Mihir Bhansali's *Motion to Dismiss First Amended Adversary Complaint* (Adv. Dkt. 38); (3) Defendant Nirav Deepak Modi's *Motion to Dismiss First Amended Complaint* (Adv. Dkt. 42); and (4) Defendant Mihir Bhansali's *Motion for Rule 11 Sanctions or to Strike Certain Pleadings* (Adv. Dkt. 59) (collectively, the "Motions").

The Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334. This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2). The Court has reviewed the Motions and the briefs filed in support of and in opposition to the Motions, has held a hearing on the Motions on April 30, 2020, and has determined for the reasons set forth

in the *Memorandum of Decision* issued on October 15, 2021 (Adv. Dkt. 69) that the legal and factual bases set forth in the Motions do not establish just cause for the relief requested therein.

NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

1. Each of the Motions is DENIED.

2. Defendant Nirav Deepak Modi's deadline to answer the Amended Complaint is 21 days after Plaintiff sends a copy of this Order by overnight mail to:

> Nirav Deepak Modi
> HMP Wandsworth
> Heathfield Road
> London SW18 3HU
> United Kingdom

Once service of this Order is accomplished on Nirav Deepak Modi, Plaintiff shall file proof of such service on the docket within 5 business days of service.

3. Defendant Mihir Bhansali's and Defendant Ajay Gandhi's deadline to answer the Amended Complaint is governed by the *Stipulation and Order* (Adv. Dkt. 75) entered by the Court on November 29, 2021.

4. This Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Order.

**IT IS SO ORDERED.**

Dated: New York New York
       December 3, 2021

                                 **/s/ Sean H. Lane**
                                 UNITED STATES BANKRUPTCY JUDGE

JENNER & BLOCK LLP
Vincent E. Lazar
Angela M. Allen (admitted *pro hac vice*)
William A. Williams (admitted *pro hac vice*)
353 North Clark Street
Chicago, Illinois 60654
(312) 222-9350

Carl N. Wedoff
919 Third Avenue
New York, New York 10022
(212) 891-1600

*Counsel for the Plaintiff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| FIRESTAR DIAMOND, INC., *et al.* | No. 18-10509 (SHL) |
| Debtors. | (Jointly Administered) |
| RICHARD LEVIN, Chapter 11 Trustee of FIRESTAR DIAMOND, INC., FANTASY, INC., and OLD AJ, INC. f/k/a A. JAFFE, INC., | Adv. Proc. No. 19-1102 (SHL) |
| Plaintiff, | |
| v. | |
| NIRAV DEEPAK MODI, MIHIR BHANSALI, and AJAY GANDHI, | |
| Defendants. | |

## <u>CERTIFICATE OF SERVICE</u>

I, Carl N. Wedoff an attorney duly admitted to practice law before this Court,

hereby certify under penalty of perjury that, I caused:

(a) the *Notice of Pretrial Conference* (Adv. Dkt. 72) to be served on Defendant

Nirav Deepak Modi by overnight mail on November 9, 2021 to:

> Nirav Deepak Modi
> HMP Wandsworth
> Heathfield Road
> London SW18 3HU
> United Kingdom

(b) the *Order Denying (I) Defendants' Motions to Dismiss First Amended*

*Complaint; and (II) Defendant Mihir Bhansali's Motion for Rule 11 Sanctions*

*or to Strike Certain Pleadings* (Adv. Dkt. 76) to be served on Defendant Nirav

Deepak Modi by overnight mail on December 3, 2021 to:

> Nirav Deepak Modi
> HMP Wandsworth
> Heathfield Road
> London SW18 3HU
> United Kingdom

Dated: New York, New York
    December 3, 2021                   JENNER & BLOCK LLP

                                    By:   /s/ *Carl N. Wedoff*
                                           Carl N. Wedoff