JENNER & BLOCK LLP
Vincent E. Lazar
Angela M. Allen (admitted *pro hac vice*)
William A. Williams (admitted *pro hac vice*)
353 North Clark Street
Chicago, Illinois 60654
(312) 222-9350

Carl N. Wedoff
919 Third Avenue
New York, New York 10022
(212) 891-1600

*Counsel for the Plaintiff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| FIRESTAR DIAMOND, INC., *et al.* | No. 18-10509 (SHL) |
| Debtors. | (Jointly Administered) |
| RICHARD LEVIN, trustee for the liquidating trusts of FIRESTAR DIAMOND, INC., FANTASY, INC., and OLD AJ, INC. f/k/a A. JAFFE, INC., | Adv. Proc. No. 19-1102 (SHL) |
| Plaintiff, | |
| v. | |
| NIRAV MODI, MIHIR BHANSALI, and AJAY GANDHI | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S**
**MOTION FOR AN ORDER OF ATTACHMENT AGAINST MIHIR BHANSALI**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...........................................................................................1

STATEMENT OF FACTS ...............................................................................................3

    A.    The Bank Fraud. ..................................................................................3

    B.    Bhansali's Fraudulent Transfer of His Interest in the Bhansali Residence to His Wife. ..................................................................................5

    C.    The Trustee's Claims Against Bhansali and Supporting Evidence...........................5

ARGUMENT ...............................................................................................................8

I.    THE TRUSTEE IS ENTITLED TO A PRE-JUDGMENT ORDER OF ATTACHMENT. ...............................................................................................8

    A.    The Trustee Has Stated a Cause of Action. ............................................10

    B.    The Trustee Has Shown a Probability of Success on the Merits. ...........................10

    C.    Grounds for Attachment Exist Under N.Y. C.P.L.R. § 6201....................................12

    D.    The Bhansali Residence Is Subject to Attachment As Though the Fraudulent Transfer Never Occurred. ..........................................................14

    E.    Bhansali Has Not Asserted Any Counterclaims. ......................................15

    F.    Attachment Is Necessary for the Trustee's Security. ................................16

II.    THE TRUSTEE IS ENTITLED TO DISCOVERY UNDER N.Y. C.P.L.R. § 6220................17

III.    A MINIMAL UNDERTAKING IS APPROPRIATE UNDER N.Y. C.P.L.R. § 6212(b)..........................................................................................18

CONCLUSION ...........................................................................................................19

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Amaranth Nat. Gas Commodities Litig.*,
    711 F. Supp. 2d 301 (S.D.N.Y. 2010) ................................................................. 9, 16, 17

*Bank of Leumi Tr. Co. of New York v. Istim, Inc.*,
    892 F. Supp. 478 (S.D.N.Y. 1995) ............................................................................ 10, 12

*Capital Ventures Int'l v. Republic of Arg.*,
    443 F.3d 214 (2d Cir. 2006) ................................................................................. 8, 9, 15

*In re Cassandra Grp.*,
    338 B.R. 583 (Bankr. S.D.N.Y. 2006) .................................................................... 12

*Disney Enters., Inc. v. Finanz St. Honore, B.V.*,
    2017 WL 1862211 (E.D.N.Y. May 8, 2017) ............................................................ 18

*Etalon Imob S.R.L. v. Schoenbach*,
    2012 WL 4741595 (S.D.N.Y. Oct. 3, 2012) ............................................................ 15

*Helicon Partners, LLC v. Kim's Provision Co., Inc.*,
    2013 WL 1881744 (Bankr. S.D.N.Y. May 6, 2013) ........................................... 13, 14, 15

*Heller Fin., Inc. v. Wall St. Imports, Ltd.*,
    140 Misc. 2d 205 (N.Y. Sup. Ct. 1988) .................................................................... 17

*In re Hypnotic Taxi LLC*,
    543 B.R. 365 (Bankr. E.D.N.Y. 2016) .................................................... 10, 12, 13, 14

*ITC Ent., Ltd. v. Nelson Film Partners*,
    714 F.2d 217 (2d Cir. 1983) ..................................................................................... 16

*In re Lehman Bros. Holdings Inc.*,
    469 B.R. 415 (Bankr. S.D.N.Y. 2012) ..................................................................... 12

*Mishcon de Reya New York LLP v. Grail Semiconductor, Inc.*,
    2011 WL 6957595 (S.D.N.Y. Dec. 28, 2011) ......................................................... 10

*New York Dist. Council of Carpenters Pension Fund v. KW Constr.*,
    2008 WL 2115225 (S.D.N.Y. May 16, 2008) .......................................................... 17

*OSRecovery, Inc. v. One Groupe Int'l, Inc.*,
    305 F. Supp. 2d 340 (S.D.N.Y. 2004) ..................................................................... 18

*In re Our Distribution Co., Inc.,*
    110 B.R. 658 (Bankr. S.D.N.Y. 1990) ........................................................................... 10

*Pires v. Frota Oceanica Brasileira, S.A.,*
    800 N.Y.S.2d 354 (Sup. Ct. N.Y. Co. 2005) ................................................................ 18

*In re Schick,*
    215 B.R. 13 (Bankr. S.D.N.Y. 1997) ............................................................................ 18

*Swift Spinning Mills v. B&H Apparel,*
    2003 WL 942610 (S.D.N.Y. Mar. 6, 2003) .................................................................. 17

*In re Syntax-Brillian Corp.,*
    2016 WL 1165634 (Bankr. D. Del. Feb. 8, 2016) ........................................................ 12

*Thornapple Assocs. v. Sahagen,*
    2007 WL 747861 (S.D.N.Y. Mar. 12, 2007) ................................................... 9, 10, 11, 16

*U.S. Fidelity and Guar. Co. v. J. United Electrical Contracting Corp.,*
    62 F.Supp.2d 915 (S.D.N.Y. 1999) .............................................................................. 13

## Other Authorities

Fed. R. Civ. P. 64 ................................................................................................................ 8, 14

Fed. R. Bankr. P. 7064 ............................................................................................................ 8

N.Y. C.P.L.R. § 5201 ............................................................................................................ 14

N.Y. C.P.L.R. § 6201 ................................................................................................. 2, 9, 11, 13

N.Y. C.P.L.R. § 6202 ............................................................................................................ 14

N.Y. C.P.L.R. § 6212 ................................................................................................. 8, 9, 15, 17

N.Y. C.P.L.R. § 6220 ................................................................................................... 16, 17, 18

N.Y. C.P.L.R. § 6221 ............................................................................................................ 15

N.Y. C.P.L.R. § 6223 ............................................................................................................ 15

Plaintiff Richard Levin, not individually but solely as trustee ("**Trustee**") for the liquidating trusts of debtors Firestar Diamond, Inc., Old AJ, Inc. (f/k/a A. Jaffe, Inc.), and Fantasy, Inc. (collectively, the "**Debtors**") respectfully submits this memorandum of law in support of his motion for an order of attachment against that certain parcel of real property commonly known as 50 Riverside Boulevard, Apt. 24A, New York, New York 10069 (Parcel No. 1171-2520) (the "**Bhansali Residence**") and certain related provisional relief.

## PRELIMINARY STATEMENT

The Trustee requests an order of attachment and related provisional relief to ensure the availability of assets to satisfy a judgment in the above-captioned action (the "**Adversary Case**") against Defendant Mihir Bhansali, the former chief executive officer of the Debtors and their U.S. affiliates Synergies Corporation, Firestar Group, Inc., Firestar Diamond International, Inc., Nirav Modi, Inc., and AVD Trading, Inc. (collectively, the "**U.S. Affiliates**," and, together with the Debtors, the "**U.S. Entities**"). In the Adversary Case, the Trustee alleges that Defendant Mihir Bhansali oversaw a years-long, multibillion-dollar bank fraud and related cover-up efforts. (*See generally* Ex. 1 and 2.)[1] As part of that fraud, Bhansali and his co-conspirators laundered funds and other property through the U.S. Entities, and misappropriated the U.S. Entities' assets.

On February 28, 2018, two days after the Debtors' bankruptcy filing and promptly after returning to New York after several weeks of traveling overseas to manage cover-up and looting efforts after the bank fraud was exposed, Bhansali conveyed his interest in the Bhansali Residence to his wife Rakhi Bhansali for no consideration. Bhansali and his wife purchased the Bhansali Residence in March 2017 for approximately $7.1 million using funds advanced to him by Nirav

---

[1] References to numbered exhibits are to the exhibits appended to the Declaration of Richard Levin (the "**Levin Declaration**"), submitted contemporaneously herewith.

Modi's sister (and Bhansali's cousin) Purvi Mehta, who has since admitted that she received and laundered millions of dollars in fraud proceeds.

Bhansali's actual intent to delay, hinder, or defraud creditors by re-titling the Bhansali Residence can be inferred from, *inter alia:* the suspicious timing of the transfer shortly after the bank fraud was exposed; the value of the apartment and the lack of any consideration in exchange; the interspousal nature of the transfer and the fact that Bhansali continued residing at the Bhansali Residence afterwards; the likely illicit source of the original purchase funds; the fact that Bhansali asserted his Fifth Amendment right against self-incrimination to avoid testifying or producing documents regarding these transactions; and Bhansali's leading role in the bank fraud and cover-up efforts more generally.

Under the circumstances, the Trustee is entitled to security, given the viable claims he has alleged in this action and the fact that Bhansali has already fraudulently transferred perhaps his most valuable single asset. For the reasons that follow, the Trustee satisfies the requirements for attachment under New York law, most importantly because Bhansali has "disposed of" or "secreted property" "with intent to defraud his creditors or frustrate the enforcement of a judgment that might be rendered in [the Trustee's] favor." N.Y. C.P.L.R. § 6201(3). The Trustee is also entitled to attach Bhansali's former interest in the Bhansali Residence itself (and, to the extent necessary, set aside its transfer) under N.Y. D.C.L. §§ 278 and 279, irrespective of the fact that it is now nominally held solely by his wife. Accordingly, the Trustee requests an order of attachment against the Bhansali Residence to secure the Trustee's judgment demand.

## STATEMENT OF FACTS

### A.    The Bank Fraud.

The U.S. Entities are subsidiaries of Nirav Modi's India-based flagship company Firestar International Limited (f/k/a Firestar International Private Ltd) ("**FIPL**"). (*See, e.g.,* Ex. 2 at ¶¶ 6-10; 15-19). FIPL and its subsidiaries (collectively, the "**Firestar Entities**") operated several legitimate business lines. (*Id.* ¶¶ 15-19).

Beginning around 2010, Punjab National Bank employee Gokulnath Shetty began approving import trade financing in the form of letters of undertaking ("**LOU**") to companies owned by Modi without securing collateral and without properly recording them in PNB's books and records. (*Id.* ¶¶ 20-32). By the time Shetty retired in May 2017, PNB had issued over 1,500 fraudulent LOUs, totaling approximately $3.5 billion, mostly to three India-based partnerships, Diamonds 'R' Us ("**DRUS**"), Solar Exports ("**Solar**"), and Stellar Diamond ("**Stellar**") (collectively, the "**LOU Entities**"). (*Id.* ¶¶ 33-41).

To maximize the LOU Entities' borrowing capacity, Modi, Bhansali, and their co-conspirators, set up numerous fictitious companies in Hong Kong and Dubai that were purportedly independent diamond and jewelry businesses, but were in fact secretly owned and controlled by the Modi family (the "**Shadow Entities**"). (*Id.* ¶¶ 26-32). Precious gems, metals, and jewelry were transferred in a "loop" between LOU Entities and Shadow Entities to fraudulently inflate the LOU Entities' import volume so that they could obtain more LOUs. (*Id.*).

To support this primary loop, Modi, Bhansali, and their co-conspirators moved substantial amounts of cash and inventory among Shadow Entities and Firestar Entities (including the U.S. Entities). (*Id.* ¶ 50). These transactions were to provide Shadow Entities with the goods and funds needed to transact with the LOU Entities, to divert and launder the fraudulent proceeds for the personal benefit of Modi's and Bhansali's families, and to clear the

Firestar Entities' and Shadow Entities' accounts payable and receivable to avert suspicion by auditors, lenders, and others. (*Id.*). The transactions were deliberately structured to concentrate profits in certain Shadow Entities that then diverted funds to Modi's and Bhansali's family members (especially Modi's sister and Bhansali's cousin Purvi Mehta) and out of the reach of creditors. (*Id.* ¶ 101).

During the first week of January 2018, Modi and other co-conspirators fled India before the more than $1 billion in outstanding LOUs came due at the end of the month. (*Id.* ¶ 34).  On January 29, 2018, PNB lodged a criminal complaint against Nirav Modi with India's CBI. (*Id.* ¶ 37).  On February 13, 2018, PNB lodged a complaint against Nirav Modi with India's Directorate of Enforcement. (*Id.*).

According to a summary of Mihir Bhansali's passport data recovered from Bhansali's computer, Bhansali traveled overseas to India and Dubai from February 7, 2018 until February 23, 2018. (Ex. 9). During that trip, according to statements by various Firestar Entity and Shadow Entity directors and employees to Indian authorities, Bhansali and Modi intimidated and coerced directors and employees of Shadow Entities not to cooperate with investigative authorities. (*See* Ex. 4 at 37-44).

On February 26, 2018, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.[2]

---

[2] The Trustee has further alleged, and possesses extensive evidence, that Bhansali continued managing the cover-up and looting efforts post-petition while Nirav Modi was in hiding. However, since the Trustee's claims based on Bhansali's pre-petition conduct provide a sufficient basis to satisfy the requirements for attachment, the Trustee does not believe it is necessary to substantiate his post-petition allegations against Bhansali at this time.

**B.      Bhansali's Fraudulent Transfer of His Interest in the Bhansali Residence to His Wife.**

On February 28, 2018, two days after the Petition Date, Mihir Bhansali executed a deed conveying his interest in 50 Riverside Boulevard, Unit 24A, New York, New York  in New York City (the "**Bhansali Residence**") to his wife Rakhi Bhansali for no consideration. (Ex. 13, the "**Fraudulent Deed**," and the transaction reflected therein, the "**Fraudulent Transfer**"). The Bhansalis had jointly purchased the Bhansali Residence in March 2017 for approximately $7.1 million, of which approximately $5.3 million was paid in cash. (*See* Ex. 12; Adv Dkt. 60 at Ex. A).[3] Just weeks earlier, Mihir Bhansali had received a $1.5 million wire into his personal HSBC checking account from his cousin (and Nirav Modi's sister) Purvi Mehta on February 24, 2017. (*See* Adv. Dkt. 60 at Ex. A). Notably, Purvi Mehta has admitted to acting as a primary conduit through which proceeds of the Bank Fraud were laundered. (*See* Ex. 10, Ex. 11).

On August 7, 2018, the Examiner conducted a deposition of Mihir Bhansali. (Ex. 16). Bhansali invoked Fifth Amendment right against self-incrimination when asked about the source of the funds he and his wife used to acquire the Bhansali Residence and whether he transferred his interest in the Bhansali Residence to his wife "to prevent recovery of assets" by his creditors. (*Id.* at 40:14-41:5).

**C.      The Trustee's Claims Against Bhansali and Supporting Evidence.**

On March 27, 2019, the Trustee commenced Adv. No. 19-1102 against Nirav Modi, Mihir Bhansali, and Ajay Gandhi (the former chief financial officer of the U.S. Entities), in which he asserted breach of fiduciary duty, corporate waste, and civil RICO claims against Bhansali arising

---

[3] The Trustee previously filed the bank statements reflecting these transactions under seal as Exhibit A to his opposition to Bhansali's Rule 11 motion (Adv. Dkt. 60) because they were designated as Highly Confidential under the *Protective Order Governing Trustee Discovery* (Bankr. Dkt. 529).

out of Bhansali's leading role in the Bank Fraud and related cover-up efforts following its exposure. On October 15, 2021, the Court issued an opinion denying Bhansali and his co-defendants' motions to dismiss the Trustee's amended complaint in Adv. No. 19-1102. (Dkt. 69). In that opinion, the Court held that the Trustee's Amended Complaint adequately alleged each of the causes of action asserted against Bhansali and his co-defendants. (*Id.*).

For example, Bhansali's prominent role in orchestrating the Bank Fraud is illustrated by several spreadsheets recovered from his work computer. (*See* Group Ex. 7). Each of these spreadsheets was saved by Microsoft Excel's "AutoRecover" feature. Bhansali's computer did not contain any non-"AutoRecover" versions of these spreadsheets, suggesting that he deleted them at some point. These spreadsheets are summarized as follows:

- One spreadsheet, last modified on February 16, 2018, tracked millions of dollars in payables and receivables as between each of the LOU Entities, Firestar Entities, and Shadow Entities. (Ex. 7-1)

- Another spreadsheet, last modified on February 18, 2018, appears to be a step-by-step guide to the mechanics and economics of circular transactions between Firstar Entities and Shadow Entities. (Ex. 7-2).

- Another spreadsheet created on February 12, 2018 and last modified on February 13, 2018, appears to be a "to do" list for various co-conspirators after the exposure of the Bank Fraud. The tasks included researching their potential criminal liability, "cleaning up" outstanding A/R and A/P balances among Firestar Entities and Shadow Entities and sending the Dubai-based Shadow Entities' computers to Hong Kong. (Ex. 7-3).

- Another spreadsheet, last modified on January 8, 2018, shows, for the fiscal years 2012 through 2017, each LOU Entity's (a) profits & losses, (b) outstanding bank loans, (c) cash flow to trusts benefitting Nirav Modi's family, and (d) volume of transactions with various Shadow Entities and Firestar Entities. (Ex. 7-4).

Bhansali also personally oversaw the day-to-day management and operations of the Shadow Entities, as illustrated by the following email correspondence between Bhansali, Nirav Modi, and various regional heads of the fraud scheme—including Ajay Gandhi (New York),

Kurian Matthews, Satyendra Shukla, and Saju Poulose (Dubai), and Shyam Wadhwa and Aditya

Nanivati (Hong Kong)—copies of which are attached as Group Exhibit 8 to the Levin Declaration:

- On September 7, 2011, Kurian Mathews asked for Bhansali's approval of fee quotes from accountants for proposed audits of Shadow Entities Auragem and Fancy Creations. (Ex. 8-1).

- On September 7, 2011, Ajay Gandhi responded to an inquiry from Standard Chartered Bank regarding FDI's substantial accounts receivable and accounts payable balances with various Shadow Entities by stating:

  > Various overseas companies that you have mentioned are not our customers. We buy unique large diamonds/jewelry pieces from various vendors in India and sometimes these goods need to be returned, but due to the terms of the original sale, the vendors instruct us to ship these goods to another companies [sic], that they select, who are not located in India. We record these transfers as a reduction to purchases and an increase to accounts receivable at the original purchase cost of the diamonds/ jewelry.

  (Ex. 8-2). Bhansali, who was copied on the email, forwarded Gandhi's reply to Nirav Modi and stated, "[j]ust an FYI." (*Id.*). Modi then forwarded the email to the former deputy managing director of Axis Bank's corporate banking division, and stated, "As SC is a common bank in India, Antwerp and NY. It might be a good idea that Ajay and you discuss all responses." (*Id.*).

- On July 23, 2012, Ajay Gandhi sent a message to Nirav Modi through the secret closed Panemail email server Bhansali had set up,[4] "Niravbhai, please see attached payment plan in 5 parts to cleanup AR and AP of [FDII] for HK, Dubai, Belgium and NY." (Ex. 8-3). On August 3, 2012, Gandhi forwarded the email to Nirav Modi's long-time business partner and co-conspirator Hemant Bhatt, copying Bhansali, and stated, "I will call you Monday to discuss. We need to move funds in Firestar Diamond International, Inc. per attached. NM/MB is fine so long as money flows from SDC/Tristar and Diamlink to any of HK or Dubai entities." (*Id*).

---

[4] According to the ED, Bhansali personally directed the Firestar IT manager to create the secret closed Panemail server and selected its members. (*See* Ex. 6 at 67-68). The IT manager further stated that, after India's tax authorities discovered the Panemail server in January 2017, Bhansali directed the IT manager to create a separate secret server that would not allow messages to be forwarded or downloaded. (*Id.*)

- On April 27, 2013, Kurian Mathews asked Bhansali for permission to break Bhansali's standing rule that at least two of Kurian Mathews, Satyendra Shukla, and Saju Poulose be present in Dubai at all times to monitor Shadow Entity operations, so that he could arrive in Hong Kong early to prepare for an audit of the Hong Kong-based Shadow Entities. (Ex. 8-4). Bhansali replied, "Fine. Go ahead this time." (*Id*)

- On April 26, 2017, Gandhi asked Bhansali how he should respond to an auditor's inquiries into the U.S. Entities' multi-million-dollar A/R and A/P balances with Shadow Entities Auragem and Fancy Creations. (Ex. 8-5). Bhansali directed Gandhi to discuss the issue with Shyam Wadhwa and asked when the Shadow Entity balances could be cleared. (*Id*.).

- On July 2, 2017, Bhansali and Nirav Modi directed Shyam Wadhwa, Aditya Nanivati, and Neeshal Modi to create fictitious biographical profiles for Shadow Entities in their respective regions. (Ex. 8-6).

- On October 24, 2017, Saju Poulose advised Mihir Bhansali that an independent director of FIPL had asked about the extreme variance in profit margins between the Firestar Entities' transactions with Shadow Entities as opposed to other customers. (Ex. 8-7). Bhansali instructed Poulose to warn Aditya Nanivati and Satyendra Shukla so that they could prepare an explanation. (*Id*). Nanavati then asked Bhansali, "How are we answering this? For me it is simple, some are higher volume wholesale clients and some are smaller clients/shops. Not sure if that's the right approach." (Ex. 8-8).

In addition to these materials and extensive additional direct evidence against Bhansali, the Trustee's claims are also corroborated by the investigative and judicial findings of numerous independent investigators, law enforcement agencies, and judicial tribunals around the world that have reviewed and considered the available evidence. (*See generally* Ex. 3, Ex. 4, Ex. 5, Ex. 6, Ex. 14, and Ex. 15).

## ARGUMENT

## I.    THE TRUSTEE IS ENTITLED TO A PRE-JUDGMENT ORDER OF ATTACHMENT.

Under Rule 64 of the Federal Rules of Civil Procedure, applicable here by Bankruptcy Rule 7064, "[a]ttachment is available in a federal court . . . under the circumstances and in the manner provided by the law of the state in which the district court is held." *Capital Ventures Int'l*

*v. Republic of Arg.*, 443 F.3d 214, 218–19 (2d Cir. 2006) (citations and internal quotation marks omitted); Fed. R. Civ. P. 64 ("At the commencement of and throughout an action, every remedy is available that, under the law of the state where the court is located, provides for seizing a person or property to secure satisfaction of the potential judgment."). New York law therefore governs the Trustee's request for a pre-judgment order of attachment.

New York law provides that a court may grant a pre-judgment order of attachment once the plaintiff shows that (1) "there is a cause of action," (2) "it is probable that the plaintiff will succeed on the merits," (3) "one or more grounds for attachment provided in [N.Y. C.P.L.R.] § 6201 exist," and (4) "the amount demanded from the defendant exceeds all counterclaims known to the plaintiff." N.Y. C.P.L.R. § 6212(a). There are five grounds for attachment set forth in N.Y. C.P.L.R. § 6201, including that "the defendant, with intent to defraud his creditors or frustrate the enforcement of a judgment that might be rendered in plaintiff's favor, has assigned, disposed of, encumbered or secreted property, or removed it from the state or is about to do any of these acts," N.Y. C.P.L.R. § 6201(3). Finally, the plaintiff must show a "need for the attachment," such as where necessary "to secure payment." *Capital Ventures*, 443 F.3d at 221-22. Where "a statutory ground for attachment exists and both need and likelihood of success are established, [a court's] discretion does not permit denial of the remedy for some other reason, at least absent extraordinary circumstances and perhaps even then." *Id.* at 222; *accord In re Amaranth Nat. Gas Commodities Litig.*, 711 F. Supp. 2d 301, 305-06 (S.D.N.Y. 2010).

As set forth below, the Trustee satisfies all of the requirements for a pre-judgment order of attachment against Bhansali. The Court should therefore enter an order authorizing the attachment of the Bhansali Residence to provide the Trustee security up to the amount of $15

million, which is the preliminary estimate of non-trebled damages the Trustee specified when he filed his breach of fiduciary duty and RICO claims against Bhansali.[5]

### A. The Trustee Has Stated a Cause of Action.

The first statutory requirement for attachment is that "there is a cause of action" against Bhansali. N.Y. C.P.L.R. § 6212(a). "The standard for determining whether a cause of action exists for purposes of attachment under New York law is a liberal one. Unless the plaintiff's papers clearly establish that the plaintiff must ultimately be defeated, a cause of action exists." *Thornapple Assocs. v. Sahagen,* 06-CV-6412 (JFK), 2007 WL 747861, at *3 (S.D.N.Y. Mar. 12, 2007); *accord In re Hypnotic Taxi LLC,* 543 B.R. 365 (Bankr. E.D.N.Y. 2016).

Here, the Court has already held that the Trustee has stated colorable breach of fiduciary duty, corporate waste, and RICO claims against Bhansali. (*See* Case No. 19-1102, Dkt. 69). The Trustee has therefore satisfied Section 6212(a)'s first requirement.

### B. The Trustee Has Shown a Probability of Success on the Merits.

The second statutory requirement is that it is probable the plaintiff's claims will succeed on the merits. The plaintiff need only "demonstrate that it is more likely than not that it will succeed on its claims." *Thornapple*, 2007 WL 747861, at *4; *see also In re Our Distribution Co., Inc.,* 110 B.R. 658, 664 (Bankr. S.D.N.Y. 1990) ("The court need not decide the ultimate merits of the controversy to find a likelihood of success on the merits . . . ."). In addition, "the court must give the plaintiff the benefit of all the legitimate inferences that can be drawn from the facts." *Bank of Leumi Tr. Co. of New York v. Istim, Inc.,* 892 F. Supp. 478, 482 (S.D.N.Y. 1995); *Mishcon de Reya New*

---

[5] Although the Trustee has since determined that the actual damages to the Debtor are substantially greater than $15 million, the Trustee is willing to accept an attachment of the Bhansali Residence in that amount because it likely exceeds the Bhansali Residence's value. To the extent the Trustee identifies and seeks attachment of additional assets, he reserves the right to request an increase in the attachment amount.

*York LLP v. Grail Semiconductor, Inc.*, 11-CV-04971 RJH, 2011 WL 6957595, at *4-5 (S.D.N.Y. Dec. 28, 2011).

The Trustee can readily satisfy these standards. At this point, the existence of the overarching bank fraud scheme cannot be seriously disputed. At least three separate judicial bodies around the world—including the Debts Recovery Tribunal in India, the Court of Special Judge for PMLA in India, and the Westminster Magistrates' Court in England—have independently reviewed the available evidence and concluded that the Bank Fraud likely occurred in substantially the manner alleged by the Trustee. (*See* Ex. 4, Ex. 5, Ex. 15). Nirav Modi's own sister Purvi Mehta has also admitted as much in exchange for a pardon. (*See* Ex. 10, Ex. 11).

The Trustee will also be able to prove that Bhansali knowingly managed and oversaw the fraud scheme. For example, the materials attached to the Levin Declaration demonstrate that Bhansali both managed the Shadow Entities' operations and transactions, and that he knew what they were doing was fraudulent and illegal (*see, e.g.,* Group Ex. 7, Group Ex. 8). The English court and Indian criminal court similarly concluded, respectively, that:

> "The combination of the evidence taken as a whole create an inevitable conclusion [that Nirav Modi], his brother, Mr. Shetty, Mr. Bhansali and Mr. Joshi Jie Zhang, were operating together dishonestly with other associates and banking officials to defraud PNB." (Ex. 4 at 35); and

> "Mihir Bhansali was instrumental in creating dummy companies in Dubai and appointing dummy directors and making relevant accounting procedures. He was in charge of all the dummy transactions and fund flow all over the world for Nirav Modi Group companies. He assisted in layering of proceeds of crime and [was] involved in the process of money laundering." (Ex. 15 at 6).

These conclusions are further supported by the Trustee's extensive other allegations against Bhansali in the pending adversary cases, as well as by the report of the independent Examiner, appointed by this Court, who concluded that there was "substantial evidence to support the knowledge and involvement by the Debtors and their senior officers and directors

11

[including Bhansali]… in the criminal conduct alleged by the Indian authorities," which "has been described as the largest bank fraud in Indian history." (Ex. 9, at 1).

It is therefore more likely than not that the Trustee will prevail on his claims against Bhansali. *See Thornapple*, 2007 WL 747861, at *4.

### C.    Grounds for Attachment Exist Under N.Y. C.P.L.R. § 6201.

The third statutory requirement is that one of the N.Y. C.P.L.R. § 6201 grounds exists. Of relevance here, N.Y. C.P.L.R. § 6201(3) permits an attachment if the defendant, "with intent to defraud his creditors or frustrate the enforcement of a judgment that might be rendered in plaintiff's favor, has assigned, disposed of, encumbered or secreted property, or removed it from the state or is about to do any of these acts."

When evaluating this ground, "it is not always practicable to establish by proof the existence of a fraudulent intent even when in reality it exists. Direct proof of the fact can rarely be obtained, and when it is established it must ordinarily be inferred from the circumstances." *Bank of Leumi Tr.*, 892 F. Supp. at 483 (internal alterations omitted). Courts therefore typically "look to 'badges of fraud' to establish actual intent." *Hypnotic Taxi*, 543 B.R. at 374 (citing *In re Kaiser*, 722 F.2d 1574, 1582 (2d Cir.1983)). "[S]ix telling badges of fraud are: (1) the lack or inadequacy of consideration; (2) the family, friendship, or close associate relationship between the parties; (3) the retention of possession, benefit, or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of the events and transactions under inquiry." *Id.* The "presence or absence of any single badge of fraud is not conclusive." *In re Syntax-Brillian Corp.*, No. 10-51389, 2016 WL 1165634, at *5 (Bankr. D. Del. Feb. 8, 2016). Instead, the "proper inquiry is

whether the badges of fraud are present, not whether some factors are absent." *Id.*; *accord In re Lehman Bros. Holdings Inc.*, 469 B.R. 415, 447-49 (Bankr. S.D.N.Y. 2012); *In re Cassandra Grp.*, 338 B.R. 583, 598 (Bankr. S.D.N.Y. 2006) (finding actual fraudulent transfer where only one badge of fraud was present).

Here, badges of fraud exist that indicate that Bhansali transferred his interest in the Bhansali Residence to his wife with actual intent to defraud creditors. Bhansali purchased the Bhansali Residence using funds he received from Purvi Mehta (Ex. 12; Adv. Dkt. 60 at Ex. A), who has since admitted her role as a primary conduit of the Modi family's money laundering operation (Ex. 10, Ex. 11). Then, only a few weeks after the exposure of the Bank Fraud, and only two days after the Debtors filed for bankruptcy, Bhansali transferred his interest in the Bhansali Residence to his wife for no consideration (Ex. 13), all while Bhansali and his family retained "the retention of possession, benefit or use of the property." *Hypnotic Taxi*, 543 B.R. at 374; *see also U.S. Fidelity*, 62 F.Supp.2d at 925 (drawing inference of actual fraudulent intent where the defendant transferred his interest in his residence to his wife for no consideration shortly before a debt he had guaranteed became due, and continued living there). Around that same time, Bhansali was actively managing efforts to cover up investigation of the Bank Fraud and shield assets from creditors. (*See* Ex. 4 at 38-44; Group Ex. 7;  Ex. 9). These facts, along with Bhansali's assertion of the Fifth Amendment right against self-incrimination to avoid testifying or producing documents concerning the transactions involving the Bhansali Residence (Ex. 16 at 40:14-41:5), strongly support an inference that he transferred the Bhansali Residence to his wife with actual intent to defraud creditors. The Trustee is therefore entitled to a provisional attachment under N.Y. C.P.L.R. § 6201(3).

**D.    The Bhansali Residence Is Subject to Attachment As Though the Fraudulent Transfer Never Occurred.**

Even though Rakhi Bhansali now nominally owns Mihir Bhansali's interest in the Bhansali Residence, it remains subject to attachment by the Trustee. As numerous courts have recognized, New York law permits plaintiffs to provisionally attach fraudulently transferred assets in the hands of third parties. *See, e.g., U.S. Fidelity and Guar. Co. v. J. United Electrical Contracting Corp.*, 62 F.Supp.2d 915, 925 (S.D.N.Y. 1999) ("The [plaintiffs] also seek an order of attachment against the Premises, which are now held by [the defendant's wife]. For the same reason that attachment is warranted against property directly held by [the defendant], attachment against the Premises, which were fraudulently conveyed by [the defendant] to [his wife], is also appropriate."); *accord Helicon Partners, LLC v. Kim's Provision Co., Inc.*, 2013 WL 1881744, at *7 (Bankr. S.D.N.Y. May 6, 2013) ("[I]t is well-settled under New York law dating back more than 100 years that a plaintiff may attach fraudulently transferred property."); *In re Hypnotic Taxi LLC*, 543 B.R. 365, 382-83 (Bankr. E.D.N.Y. 2016) (same).

These decisions are consistent with the applicable statutory text and legislative schemes. Under N.Y. C.P.L.R. § 6202, "any debt or property against which a money judgment may be enforced as provided in section 5201 is subject to attachment."[6] N.Y. D.C.L § 278, in turn, permits a money judgment against a fraudulent transferor to be enforced by "disregard[ing] the conveyance and attach[ing] or levy[ing] execution upon the property conveyed."[7] Construing

---

[6] N.Y. C.P.L.R. § 5201, in turn, provides in pertinent part, "A money judgment may be enforced against any property which could be assigned or transferred, whether it consists of a present or future right or interest and whether or not it is vested, unless it is except from application to the satisfaction of judgment."

[7] Although New York adopted a version of the Uniform Voidable Transactions Act effective as of April 4, 2020, the former statute governs the avoidance of Bhansali's transfer of the Bhansali Residence to his wife because that transaction occurred in 2018.

these two provisions together, because a money judgment against Bhansali is enforceable against the Bhansali Residence as though the Fraudulent Transfer never occurred, *see* N.Y. D.C.L. § 278, the Bhansali Residence can be provisionally attached to secure claims against him, *see* N.Y. C.P.L.R. § 6202.[8]

Moreover, a plaintiff seeking attachment of a fraudulently transferred asset under Federal Rule of Civil Procedure 64 and applicable New York law may do so without joining the transferee as a defendant. *See, e.g.*, *Hypnotic Taxi*, 543 B.R. at 383-84; *Helicon*, 2013 WL 1881744 at *8. Even so, in an abundance of caution, the Trustee is not seeking entry of an attachment order on an *ex parte* or expedited basis, and is serving copies of his attachment motion and supporting materials on Rakhi Bhansali by personal service. To the extent Rakhi Bhansali wishes to challenge the attachment of the Bhansali Residence, the Trustee consents to granting her leave to intervene in the Adversary Cases for the limited purpose of objecting to the Trustee's attachment motion. Alternatively, Rakhi Bhansali may move to vacate the attachment under N.Y. C.P.L.R. § 6223 or to initiate a special proceeding to determine adverse interests in the attached property under N.Y. C.P.L.R. § 6221 at any time before it is applied to satisfy a judgment. Rakhi Bhansali's due process rights with respect to the Bhansali Property are therefore adequately protected. *See, e.g.*, *Helicon*, 2013 WL 1881744 at *8.

### E.     Bhansali Has Not Asserted Any Counterclaims.

The fourth requirement of N.Y. C.P.L.R. § 6212(a) is that the amount demanded must exceed all counterclaims known to the plaintiff. *See Etalon Imob S.R.L. v. Schoenbach*, No. 12-CV-6868 BSJ, 2012 WL 4741595, at *4 (S.D.N.Y. Oct. 3, 2012) (the amount demanded exceeded any

---

[8] Moreover, N.Y. D.C.L. § 279 permits courts to, *inter alia*, "set aside [a fraudulent] conveyance" or "make any order which the circumstances of the case may require" to protect the interests of the holder of an unmatured claim against the transferor.

counterclaims where "no counterclaims have been filed against Plaintiffs as of the date of [the attachment] order"). Bhansali did not assert any counterclaims when he filed his answer in Adv. No. 19-1102 (*See* Dkt. 87), nor did he file a proof of claim in the Debtors' chapter 11 cases. Accordingly, the fourth element for a pre-judgment attachment under N.Y. C.P.L.R. § 6212(a) is met.

### F.    Attachment Is Necessary for the Trustee's Security.

In addition to the *prima facie* case for attachment under N.Y. C.P.L.R. § 6212(a), New York law provides that an order of attachment can be vacated or modified if the plaintiff fails to show "the need for continuing the levy." N.Y. C.P.L.R. § 6223. The Second Circuit has held that this provision requires a plaintiff to also show that an order of attachment "is needed to secure payment or obtain jurisdiction." *Capital Ventures*, 443 F.3d at 222 (a district court lacks discretion to deny a motion for pre-judgment attachment if the elements of Section 6212 are met and the attachment "is needed to secure payment").

Here, the order of attachment is necessary to secure payment on any potential judgment, since (1) the Bhansali Residence appears to have been Bhansali's most valuable asset; and (2) it is unknown at this time whether Bhansali owns other material assets that may be available to satisfy a judgment. Under these circumstances, Bhansali's "financial position . . . poses a significant risk that [the Trustee] will not be able to enforce a future judgment," justifying an order of attachment. *In re Amaranth Nat. Gas Commodities Litig.*, 711 F. Supp. 2d at 312 (issuing an order of attachment where the plaintiffs sought damages of $6 billion and defendant's assets were $185 million); *accord ITC Ent., Ltd. v. Nelson Film Partners*, 714 F.2d 217, 219, 220-21 (2d Cir. 1983) (remanding with instructions to enter order of attachment where defendant did not have sufficient assets in New York to satisfy a potential $2.7 million judgment against him); *Thornapple*, 2007 WL 747861, at *6

("[A] defendant's financial instability may justify a plaintiff's fear that a potential judgment will not be satisfied and thus provide a ground for an attachment.").

## II.     THE TRUSTEE IS ENTITLED TO DISCOVERY UNDER N.Y. C.P.L.R. § 6220.

Due to Bhansali's leading role in the years-long, multi-billion dollar bank fraud, which he intentionally hid and obscured from creditors, the Trustee has limited knowledge of the nature and location of Bhansali's other assets that may satisfy a judgment in this action. Therefore, the sheriff may encounter difficulty levying Bhansali's property in an amount sufficient to provide security. Accordingly, the Trustee seeks discovery pursuant to N.Y. C.P.L.R. § 6220 to aid in attachment.

N.Y. C.P.L.R. § 6220 provides that "at any time after the granting of an order of attachment and prior to final judgment in the action, upon such notice as the court may direct, the court may order disclosure by any person of information regarding any property in which the defendant has an interest, or any debts owing to the defendant." N.Y. C.P.L.R. § 6220. Under this provision, courts regularly permit discovery of defendants and relevant third parties to identify the defendants' attachable property. *See Swift Spinning Mills v. B&H Apparel,* 00-CV-652 (AKH), 2003 WL 942610, at *3-4 (S.D.N.Y. Mar. 6, 2003) (granting the plaintiff's motion "to compel discovery in aid of attachment," which included depositions of the defendants and their accountants, production of defendants' income tax returns, and access to defendant's safe deposit box); *Etalon Imob*, 2012 WL 4741595, at *5 ("So long as the order [of attachment] is outstanding and unsatisfied, a plaintiff is entitled to learn of assets [under N.Y. C.P.L.R. § 6220] to enable a sheriff to seize sufficient property to comply with the order"); *Heller Fin., Inc. v. Wall St. Imports, Ltd.*, 140 Misc. 2d 205, 206-07 (N.Y. Sup. Ct. 1988) (permitting discovery under N.Y. C.P.L.R. § 6220 against "any person," not just defendants against whom attachment is sought). As a result, in connection with granting the motion for attachment, the Court should authorize the Trustee to seek discovery

17

related to Bhansali's assets that, in addition to the Bhansali Residence, may be available to secure the Trustee's prospective judgment against Bhansali. The Trustee will seek attachment of any additional property he locates in a separate motion.

### III.    A MINIMAL UNDERTAKING IS APPROPRIATE UNDER N.Y. C.P.L.R. § 6212(b).

N.Y. C.P.L.R. § 6212(b) requires that, "[o]n a motion for an order of attachment, the plaintiff shall give an undertaking, in a total amount fixed by the court, but not less than five hundred dollars, a specified part thereof conditioned that the plaintiff shall pay to the defendant all costs and damages, including reasonable attorney's fees, which may be sustained by reason of the attachment if the defendant recovers judgment or if it is finally decided that the plaintiff was not entitled to an attachment."

Courts often order undertakings that represent a small percentage of the attachment. *See, e.g., In re Amaranth Natural Gas Commodities Lit.*, 711 F. Supp. 2d at 313 (undertaking of 0.35% ($250,000) on attachment of $72.4 million); *New York Dist. Council of Carpenters Pension Fund v. KW Constr.*, 07-CV-8008, 2008 WL 2115225, at *6 (S.D.N.Y. May 16, 2008) (undertaking of 4.5% ($50,000) on attachment of $1.1 million); *OSRecovery, Inc. v. One Groupe Int'l, Inc.*, 305 F. Supp. 2d 340, 348 (S.D.N.Y. 2004) (undertaking of 0.04% ($100,000) on attachment of $250 million); *In re Schick*, 215 B.R. 13, 18 n.7 (Bankr. S.D.N.Y. 1997) (undertaking of 0.09% ($500) on attachment of $525,000); *Disney Enters., Inc. v. Finanz St. Honore, B.V.*, 13-CV-6338 (NG) (SMG), 2017 WL 1862211, at *4 (E.D.N.Y. May 8, 2017) (undertaking of 0.5% ($3,500) on attachment of $700,000); *Pires v. Frota Oceanica Brasileira, S.A.*, 800 N.Y.S.2d 354 (table), 2005 WL 579500, at *5 (Sup. Ct. N.Y. Co. Jan. 14, 2005) (undertaking of 2.4% ($100,000) on attachment of $4.2 million).

The Trustee respectfully submits that a minimal undertaking of not more than $50,000 is appropriate here. This amount reflects approximately 0.70% of the amount to be attached. *See OSRecovery*, 305 F. Supp. 2d at 348 (approving undertaking of 0.04% ($100,000) on attachment of

$250 million). Requiring a larger undertaking will deplete limited estate assets, which is the very outcome this attachment is sought to avoid, and may impair distributions to creditors whose claims have not yet been satisfied. Conversely, the attachment and minimal undertaking will not harm the Bhansalis because they will retain beneficial use of the Bhansali Residence during the pendency of the adversary case.

## CONCLUSION

For the reasons set forth herein, the Court should (i) issue an order of attachment against the Bhansali Residence in the form attached to the Motion, (ii) permit the Trustee to give an undertaking of $50,000 for the attachment, (iii) allow discovery under N.Y. C.P.L.R. § 6220, and (iv) grant such further relief as is just.

Dated: August 31, 2022
      New York, New York       Respectfully submitted,

      **JENNER & BLOCK LLP**

      By: _/s/ Angela M. Allen_
      Vincent E. Lazar
      Angela M. Allen (admitted _pro hac vice_)
      William A. Williams (admitted _pro hac vice_)
      353 North Clark Street
      Chicago, Illinois 60654
      (312) 222-9350
      vlazar@jenner.com
      aallen@jenner.com
      wwilliams@jenner.com

      Carl N. Wedoff
      919 Third Avenue
      New York, New York 10022
      (212) 891-1600
      cwedoff@jenner.com

      _Counsel for the Trustee_