UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| FIRESTAR DIAMOND, INC., *et al.* | No. 18-10509 (SHL) |
| Debtors. | (Jointly Administered) |
| RICHARD LEVIN, Chapter 11 Trustee of FIRESTAR DIAMOND, INC., FANTASY, INC., and OLD AJ, INC. f/k/a A. JAFFE, INC., | Adv. Proc. No. |
| Plaintiff, | |
| v. | |
| MIHIR BHANSALI and AJAY GANDHI, | |
| Defendants. | |

## COMPLAINT

Plaintiff Richard Levin, not individually but solely as chapter 11 trustee ("**Trustee**" or "**Plaintiff**") for Debtors Firestar Diamond, Inc. , Fantasy, Inc., and Old AJ, Inc. f/k/a A. Jaffe, Inc. (the "**Debtors**") and as holder of a joint and several judgment against, and as assignee of all claim of non-debtor U.S. affiliate Firestar Diamond International, Inc. for his Complaint alleges as follows:

## NATURE OF THE ACTION

1.    The Trustee brings this action, comprising claims vested in the Trustee, claims belonging to the Debtors FDI and Jaffe, and claims to the Trustee by its non-debtor U.S. Affiliate FDII against Defendants Mihir Bhansali ("**Bhansali**"), who served as the sole director and Chief Executive Officer ("**CEO**") of each Debtor; and Ajay Gandhi ("**Gandhi**"), who served as the Chief Financial Officer ("**CFO**") of each Debtor. By this action, the Trustee seeks to obtain disgorgement

under the faithless servant doctrine and avoid and recover actual fraudulent transfers of compensation made by FDI and FDII to the Defendants in furtherance of Defendants' and their co-conspirators' nearly decade-long criminal conduct, which resulted in the accrual of claims against the Debtors of over $1 billion in favor of Punjab National Bank; the diversion of millions of dollars of the U.S. Entities' assets for the benefit of Defendants and co-conspirators; the collapse of the U.S. Entities; and the resulting loss of value of their businesses.

## JURISDICTION AND VENUE

2.      The United States District Court for this district (the "District Court") has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) because this adversary proceeding arises under title 11 of the United States Code and arises in and is related to these chapter 11 cases.

3.      This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(H) and (O) which this Court has authority to hear, by reason of the District Court's referral under 28 U.S.C. § 157(a) and under General Order M-431 (Amended Standing Order of Reference), and to hear and determine and enter judgment.

4.      Venue of this adversary proceeding is proper in this district under 28 U.S.C. § 1409.

5.      To the extent that this Court does not have authority to determine the claims asserted in this adversary proceeding and to enter final judgment thereon, the Trustee consents to the issuance and entry of a final judgment or order by this Court.

## THE PARTIES & OTHER RELEVANT ENTITIES

*A.      The Debtors*

6.      Debtor Firestar Diamond, Inc. (f/k/a Firestone, Inc.) ("**FDI**") is a privately-held Delaware corporation, with its principal place of business in New York. While in operation, FDI principally operated a wholesale jewelry business.

7.      Debtor Fantasy, Inc. ("**Fantasy**") is a privately-held Delaware corporation, with its principal place of business in New York. While in operation, Fantasy was principally a wholesale jewelry business. FDI owns 100% of the equity interests in Fantasy.

8.      Debtor Old AJ, Inc. (f/k/a A. Jaffe, Inc., f/k/a Sandberg & Sikorski Corp.) ("**Jaffe**") is a privately-held New York corporation, with its principal place of business in New York. While in operation, Jaffe was principally a wholesale bridal jewelry business.

**B.      The Debtors' U.S. Affiliates**

9.      The following U.S. affiliates of the Debtors have not filed for bankruptcy: Firestar Group, Inc. ("**FGI**"), Synergies Corporation ("**Synergies**"), Firestar Diamond International, Inc. ("**FDII**"), Nirav Modi, Inc. (f/k/a Firestar Jewelry, Inc.) ("**NMI**") and AVD Trading, Inc. ("**AVD**" and, together with FGI, Synergies, NMI and FDII, the "**U.S. Affiliates**;" the U.S. Affiliates, together with the Debtors, the "**U.S. Entities**").

10.     On January 15, 2020, the Trustee and the U.S. Affiliates entered into a settlement agreement under which the U.S. Affiliates assigned to the Trustee any and all claims or causes of action then-owned or subsequently acquired by the U.S. Affiliates and consented to entry of judgment jointly and severally against the U.S. Affiliates in the amount of $23,116,505.44. (*See* No. 18-10509, Dkt. 1366.) Judgment in that amount was entered on February 18, 2020. (*See* Adv. No. 20-01014, Dkt. 3.)

**C.      The Parties**

11.     Plaintiff Richard Levin is the chapter 11 trustee for the Debtors, duly appointed under section 1104(a) of the Bankruptcy Code by the United States Trustee for Region 2 on June 14, 2018, whose appointment was approved by this Court by order entered that same day. The Trustee brings this action, not individually, but solely in his capacity as Trustee.

12.     Defendant Mihir Bhansali, at all relevant times, served as the sole director and CEO of each Debtor in New York and resided and continues to reside in New York. Bhansali also served as the sole director of each U.S. Affiliate, as well as the Chief Executive Officer of Synergies, FGI, and NMI. In the context of the Bank Fraud described below, Bhansali served as Nirav Modi's right-hand man and de facto second-in-command.

13.     Defendant Ajay Gandhi, at all relevant times, served as the Chief Financial Officer of each of the Debtors and U.S. Affiliates and resided and continues to reside in New York.

14.     Non-debtor U.S. Affiliate FDII, a transferor of compensation to the Defendant Gandhi as detailed below, is a Delaware corporation and operated primarily as a loose diamond trading business.

## BACKGROUND

### A. Modi's Diamond Businesses

15.     Nirav Deepak Modi ("Modi"), the former indirect controlling majority shareholder and/or *de facto* director, officer, or controlling person of the Debtors, entered the diamond business around 2000 under the name Diamonds 'R' Us, an India partnership formed by Modi, Modi's uncle Mehul Choksi, and Modi's business partner Hemant Bhatt.

16.     In 2004, Nirav Modi founded Firestone International Private Ltd. ("**FIL**" or "**FIPL**"), later known as Firestar International Private Ltd. and now known as Firestar International Ltd., as a diamond and jewelry manufacturing and trading business in India. Nirav Modi has at all relevant times been the owner of substantially all the equity interests in FIPL.

17.     At some point in the early 2000s, Nirav Modi formed India-based Firestar Diamond International Pvt. Ltd. ("**FDIPL**") as a wholly owned subsidiary of FIPL. FDIPL operated diamond and jewelry manufacturing operations from factories in India. FDIPL manufactured a substantial portion of the inventory sold by other Firestar Entities (collectively,

4

including the Debtors, U.S. Affiliates, FDIPL, FIL, and other foreign affiliates, the "**Firestar Entities**").

18.    In or about 2010, Modi entered the luxury retail business through one or more of the Firestar Entities and began to sell high-end finished jewelry he designed under the *Nirav Modi* brand. Over time, Modi expanded his diamond and jewelry business, with retail, wholesale, and manufacturing operations in Armenia, Beijing, Belgium, Dubai, Hong Kong, India, Johannesburg, London, Macau, Moscow, Paris, and the United States.

19.    Modi, acting through FIL and its subsidiaries, acquired FDI (then known as Firestone, Inc.) in 2005, acquired a 95% interest in Jaffe (then known as Sandberg & Sikorski Corp.) from Samuel Sandberg and Stanley Sikorski in 2007, and incorporated Fantasy in 2012. In connection with Modi's indirect acquisition of Jaffe, Samuel Sandberg received an equity interest in FDI.

**B.  Mechanics of the Bank Fraud**

20.    From no later than 2010 to early 2018 (the "**Relevant Period**"), Modi orchestrated and directed a scheme to obtain loans, credits, or other funds under false pretenses and without collateral from numerous banks, including Punjab National Bank ("**PNB**"), a publicly-owned Indian bank majority owned by the central government of India (as set forth in more detail below, the "**Bank Fraud**").

21.    The Bank Fraud involved the fraudulent procurement of buyer's credit issued under letters of undertaking ("**LOU**s"), a financial instrument unique to India designed to facilitate efficient import transactions.

22.    When used legitimately, LOUs allow an importer to forego the expense an importer would otherwise incur by borrowing Indian currency and then converting it to a foreign currency to pay foreign suppliers. Instead, the importer obtains short-term credit from its bank

in India, secured by invoices for the to-be imported goods. The issuing bank, in turn, enters into the foreign currency transaction: it requests a foreign branch of another Indian bank to transmit funds into the issuing bank's own account (referred to as its nostro—"our"—account) at the foreign branch of a third bank to pay the exporter in its local currency. The issuing bank then repays the intermediary bank and recoups the loan from the importer (or the imported goods serving as its collateral).

23.     Since each LOU requires an import transaction, an importer's LOU borrowing capacity is tied directly to its import volume—the more imports, the more LOU funding available.

24.     Modi and his co-conspirators conspired to take advantage of this feature by artificially inflating the import volume of Modi's India-based companies—most notably Diamonds 'R' Us ("**DRUS**"), Solar Export ("**Solar**"), and Stellar Diamond ("**Stellar**") (collectively, the "**LOU Entities**")—with sham transactions so as to obtain more and more LOU funding.

25.     PNB and other banks advanced amounts equal to over $1 billion under LOUs for the benefit of entities under Modi's control in connection with imports to India without the ordinarily-required collateral.

26.     To carry out this scheme, Modi and his co-conspirators utilized a web of shadow entities to engage in fraudulent and fictitious import transactions, including:  Auragem Company Ltd. ("**Auragem**"), Brilliant Diamonds Ltd. ("**Brilliant**"), Eternal Diamonds Corporation Ltd. ("**Eternal**"), Fancy Creations Company Ltd. ("**Fancy Creations**"), Sino Traders Ltd. ("**Sino**"), Sunshine Gems Ltd. ("**Sunshine**"), Unique Diamond and Jewellery FZC ("**Unique**"), World Diamond Distribution FZE ("**World Diamond**"), Vista Jewelry FZE ("**Vista**"), Empire Gems FZE ("**Empire**"), Universal Fine Jewelry FZE ("**Universal**"), Diagems FZC ("**Diagems**"), Tri Color Gems FZE ("**Tri Color**"), Pacific Diamonds FZE ("**Pacific**"), Himalayan Traders FZE ("**Himalayan**"), and Unity Trading, FZE ("**Unity**") (collectively, the "**Shadow Entities**," together

6

with the Firestar Entities, LOU Entities, and all other entities controlled by Nirav Modi and his family members, the "**Modi-Controlled Entities**").

27.    Though designed to look like legitimate independent businesses, the Shadow Entities were shell companies controlled by Modi and his co-conspirators. They conducted virtually no legitimate business, but instead existed only to further the Bank Fraud by conducting bogus transactions with the Modi-Controlled Entities and laundering the ill-gotten proceeds.

28.    The LOU Entities and Shadow Entities traded exclusively or nearly exclusively with other Modi-Controlled Entities. The following table shows the extent to which the LOU Entities traded exclusively with Shadow Entities and Firestar Entities:

| LOU Entity | Fiscal Year 2012 - 2017 | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Sales to Listed Modi-Controlled Entities as % of Gross Sales | | | Purchases from Listed Modi-Controlled Entities as % of Total Costs of Goods Sold | | |
| | *Shadow Entities* | *Firestar Entities* | *Total* | *Shadow Entities* | *Firestar Entities* | *Total* |
| DRUS | 88.4% | 7.5% | 95.9% | 99.7% | 0.4% | 100.1% |
| Stellar | 98.7% | 0.5% | 99.2% | 100.1% | 0.3% | 100.3% |
| Solar | 98.9% | 0.7% | 99.6% | 99.9% | 0.1% | 100.0% |

29.    From around 2013 onward, Nirav Modi and his co-conspirators used the Shadow Entities as an intermediary between the LOU Entities and Firestar Entities. PNB and other banks were aware of Nirav Modi's affiliation with the LOU Entities and the Firestar Entities, but his affiliation with the Shadow Entities was hidden from the banks.

30.    The Shadow Entity import and export transactions purported to involve arm's-length sales of highly valuable loose diamonds, pearls, gold, silver, and other jewelry. In truth, these transactions had no legitimate economic purpose and routinely involved goods that: (i) did not exist; (ii) were never transferred; (iii) were transferred at prices having nothing to do with market value, but instead based on whatever amounts were necessary to reconcile the Shadow Entities' and Firestar Entities' books and records so as to conceal other transfers made for

7

illegitimate purposes; or (iv) were transferred in "circular transactions," in which the same goods were exported from and re-imported among Modi-Controlled Entities multiple times at varying and often inflated prices to give the appearance of multiple distinct transactions for the sole purpose of artificially increasing the entities' import volume.

31.     Transactions between and among Firestar Entities, LOU Entities, and Shadow Entities furthered the Bank Fraud by: (i) inflating the Indian entities' LOU borrowing capacity by artificially inflating their import volumes for LOUs and export volume for packing credit loans; (ii) facilitating the repayment of some but not all outstanding LOUs and packing credit loans; (iii) laundering the fraudulent proceeds by making them difficult to trace, and siphoning them to Modi and his co-conspirators; and (iv) making it difficult for auditors, lenders, and regulatory bodies to detect the Bank Fraud.

32.     Transfers for these purposes were concealed in various ways, including: (i) round trip transactions of gems, jewelry, or funds in which Modi-Controlled Entities transferred assets amongst themselves without any legitimate economic purpose; (ii) buying and selling gems at inflated or deflated prices (or sending paperwork without sending the gems at all); (iii) characterizing transfers as loans or loan repayments or advances against future purchases or returns of such advances; and (iv) in some instances, fraudulently doctoring books and records outright.

### C.  Detection and Exposure of the Bank Fraud

33.     In late May, 2017, Golkunath Shetty, the PNB employee who approved fraudulent LOUs for the benefit of Nirav Modi's companies, retired. In the months leading up to his retirement, between February and May 2017, Shetty approved nearly 150 new LOUs totaling over $1 billion to the LOU Entities. These LOUs became due on or around January 25, 2018.

34. According to Indian authorities, Nirav Modi and his brother Neeshal Modi fled India on January 1, 2018, and Ami Modi and Mehul Choksi did so on January 6, 2018 and January 4, 2018, respectively.

35. On or around January 20, 2018, a representative of one of the Modi-Controlled Entities solicited issuance of a new LOU from PNB. On January 22, 2018, PNB refused to issue the LOU without a 100% cash margin deposit, among other requirements. The Modi representative refused to furnish any margin on the grounds that PNB had never before required a margin to issue an LOU. PNB senior management immediately began investigating the borrowing practices of the Modi-Controlled Entities.

36. Also on January 22, 2018, the same day PNB refused to issue the LOU, Nirav Modi's longtime business partner Hemant Bhatt resigned as an authorized signatory for three LOU Entities and as director/designated partner of various Modi-Controlled Entities.

37. On January 29, 2018, PNB lodged a criminal complaint against Nirav Modi with India's Central Bureau of Investigation ("**CBI**"). On February 13, 2018, PNB lodged a complaint against Nirav Modi with India's Directorate of Enforcement ("**ED**"), which subsequently attached various movable and immovable properties belonging to Nirav Modi and various Modi-Controlled Entities.

38. The Bank Fraud orchestrated by Modi has resulted in several investigations and criminal enforcement actions against Modi, Bhansali, and others by Indian governmental authorities, including the CBI; the ED; the Income Tax Department; and the Serious Fraud Investigation Office.

39. On July 3, 2018, PNB filed Application No. 119/2018 in the Debts Recovery Tribunal No. I at Mumbai (the "**Indian Debt Tribunal**") against, Nirav Modi and certain of his family members, each LOU Entity, FIL, and FDIPL.

40.    On July 6, 2019, the presiding officer of the Indian Debt Tribunal issued a judgment against, Modi, Ami Modi, Nehal Modi, Neeshal Modi, Purvi Mehta, the LOU Entities, FIL, and others based on the following factual findings, among others (capitalized terms in original):

(i)     Nirav Modi has floated Overseas Companies in Hong Kong and U.A.E. which are dummy/shell Companies. The Directors and share-holders of these Companies are either ex-employees or employees acting under instructions of Nirav Modi.

(ii)    The Overseas Companies and Hong Kong and Dubai deals with the Firestar Group directly or indirectly owned by Nirav Modi who has full control over these Companies through the dummy Directors. The Enforcement Directorate in its Complaint has recorded that the list of top 8 borrowers and top 8 suppliers are none else but the ex-employees of Firestar Group and acting and implementing the instructions given by Nirav Modi and Mihir Bhansali.

(iii)   The fraud has been perpetrated by Nirav Modi in collusion, connivance and with the aid and assistance of the group companies i.e. Firestar International Limited and Firestar Diamond International Pvt. Ltd. along with their affiliates, subsidiaries, Nirav Family Trust, Nirav Modi Family Trust, directors and key managerial personnel.

(iv)    The investigation conducted by the Enforcement Directorate further reveals that the dummy Companies were set up in Hong Kong and Dubai along with the regular Firestar Group Companies [and] acted as nodes for circular transactions to layer and launder money generated by the fraudulent LOUs.

(v)     [Nirav Modi and his family members] are the mastermind[s] behind the perpetration of the fraud. Defendants have laid a complex structure or façade involving several layers of partnership Firms, companies and trusts for the purposes of perpetrating fraud and to isolate themselves from the liability that has arisen from unauthorized LOUs.

(vi)    All of the aforesaid dates and events reveal the systematic fraud was perpetrated by Nirav Modi and moving the US Court for insolvency to avoid the liability. Nirav Modi and his accomplishes [sic] have taken prompt steps before the US Court to avoid the seizer [sic] and attachment of the properties purchased and acquired by Nirav Modi from the proceeds of the fraudulent debt.

41.    The Bank Fraud resulted in a total loss to PNB and other banks in excess of $1 billion. As a result of the Bank Fraud, PNB has asserted claims against each of the Debtors in

excess of $1 billion on the grounds, among others, that a substantial portion of the proceeds of the Bank Fraud was transferred to the Debtors. In addition, the Bank Fraud and its exposure and the seizure by Indian authorities of Modi-controlled Entities in India resulted in the collapse of the Debtors' businesses and the filing of these chapter 11 cases.

### D. The Debtors' Role in the Bank Fraud

42.     Nirav Modi, Bhansali, Gandhi, and other co-conspirators funneled millions of dollars in funds and diamonds through the Debtors and their offices in furtherance of the Bank Fraud.

43.     In the early stages of the Bank Fraud scheme, from around 2010 to 2012 when the LOU Entities were still trading directly with Firestar Entities, the Debtors were directly involved in import and export transactions underlying fraudulently procured LOUs. For example, in 2011, FDI and Jaffe were the exporters under and direct beneficiaries of five LOUs and one LOU, respectively, totaling $10,192,303.

44.     As an example of the Debtors' involvement in circular transactions, from August 8, 2011 to September 13, 2011, a period of five weeks, the Debtors exported the same 3.27 carat Fancy Vivid Yellow Orange Cushion Cut SI1 diamond three times and imported it once to and from various LOU Entities and Shadow Entities at widely divergent prices.

45.     Later in 2011, the Debtors engaged in another circular trading of a diamond that was recorded as a 1.04 carat Fancy Intense Pink Emerald Cut SI2 diamond. The diamond appeared in the Debtors' records in three transactions within six weeks of each other and was valued at a different price each time.

46.     From around 2013 onward, the Shadow Entities were used as intermediaries between the Firestar Entities and LOU Entities. PNB and other banks were aware of Modi's

affiliation with the Firestar Entities and LOU Entities, but his affiliation with the Shadow Entities was hidden from them.

47.     During this period, the Debtors made numerous transfers to Shadow Entities linked to the repayment of outstanding LOUs so that the Bank Fraud could continue undiscovered.

48.     For example, on September 24, 2015, FDI transferred $1,840,969 to Auragem and $1,400,000 to Fancy Creations. A portion of these funds were used to repay an LOU issued to DRUS that became due on September 30, 2015.

49.     As another example, on February 26, 2016, FDI transferred $1,192,106 to Tri Color. On March 9, 2016, Tri Color transferred $1,647,000 to Solar. That same day, Solar transferred $2,087,000 to repay an LOU that became due on March 11, 2016.

50.     Consistent with these examples and others alleged herein, the Debtors' Shadow Entity-linked transactions from 2013 onwards were effectuated for purposes related the Bank Fraud including to: (i) facilitate repayment of LOUs and packing credit loans so that the Bank Fraud could continue undisturbed; (ii) provide Shadow Entities with the goods and funds the Shadow Entities needed to transact with the LOU Entities; (iii) clear the Shadow Entities', Firestar Entities', and LOU Entities' accounts receivable and accounts payable so as to avert questions from auditors, lenders, and other third parties; and (iv) divert the proceeds of the Bank Fraud for the benefit of Nirav Modi and Mihir Bhansali, their families, and other co-conspirators.

51.     The U.S. Entities' records reflect hundreds of millions of dollars in cash transfers and inventory shipments among the Debtors and the Shadow Entities during the Relevant Period.

**E.  Involvement of Debtors' Directors and Officers in the Bank Fraud**

52.     Certain of Debtors' directors and officers, including Bhansali and Gandhi, participated in and advanced the Bank Fraud. As described below, Bhansali and Gandhi, at the

direction of and in coordination with Nirav Modi, controlled all aspects of the Debtors' internal and external operations and affairs at all relevant times.

53.    As the ultimate controlling shareholder of all of the Firestar Entities, Modi, in coordination with Bhansali and Gandhi, orchestrated or oversaw fraudulent transactions among the U.S. Entities, Shadow Entities, and other Modi-Controlled Entities involving hundreds of millions of dollars in funds and diamonds. These transactions were integral to the Bank Fraud.

54.    As the sole director of each of the U.S. Entities, and as CEO of FDI, Fantasy, Synergies, FGI, and NMI, and in coordination with or at the direction of Modi, Bhansali coordinated and directed fraudulent transactions among the U.S. Entities, Shadow Entities, and other Modi-Controlled Entities involving hundreds of millions of dollars in funds and diamonds. These transactions were integral to the Bank Fraud.

55.    As CFO of each of the U.S. Entities, and in coordination with or at the direction of Modi and Bhansali, Gandhi coordinated and directed fraudulent transactions among the U.S. Entities, Shadow Entities, and other Modi-Controlled Entities involving hundreds of millions of dollars in funds and diamonds. These transactions were integral to the Bank Fraud.

56.    At all relevant times, Gandhi and Bhansali controlled the finances of the Debtors. Each had authority to approve loose diamond transactions among the U.S. Entities and the Shadow Entities totaling hundreds of millions of dollars. Gandhi and Bhansali were also each a signatory on each of the U.S. Entities' bank accounts, and their authorization was required to make transfers from the U.S. Entities' accounts.

*i.*    *Oversight and Control of Shadow Entities and LOU Entities*

57.    Modi and Bhansali, with the assistance of other co-conspirators coordinated and directed the operations of the Shadow Entities and LOU Entities to further the Bank Fraud. The following are some examples of that authority.

58.     Bhansali's prominent role in orchestrating the Bank Fraud is illustrated by several

spreadsheets recovered from his work computer. Each of these spreadsheets was saved by

Microsoft Excel's "AutoRecover" feature. Bhansali's computer did not contain any versions of

these spreadsheets, suggesting that he deleted them at some point. These spreadsheets are

summarized as follows:

(i)     One spreadsheet, last modified on February 16, 2018, tracked millions of
dollars in payables and receivables as between each of the LOU Entities,
Firestar Entities, and Shadow Entities.

(ii)    Another spreadsheet, last modified on February 18, 2018, appears to be a
step-by-step guide to the mechanics and economics of circular transactions
between Firstar Entities and Shadow Entities. Another auto-saved version
of this spreadsheet, saved eleven minutes earlier, contains only a portion
of the guide, demonstrating that Bhansali himself created the spreadsheet.

(iii)   Another spreadsheet created on February 12, 2018 and last modified on
February 13, 2018, appears to be a "to do" list for various co-conspirators
after the exposure of the Bank Fraud. The tasks included researching their
potential criminal liability, "cleaning up" outstanding A/R and A/P
balances among Firestar Entities and Shadow Entities and sending the
Dubai-based Shadow Entities' computers to Hong Kong.

(iv)    Another spreadsheet, last modified on January 8, 2018, shows, for the fiscal
years 2012 through 2017, each LOU Entity's (a) profits & losses, (b)
outstanding bank loans, (c) cash flow to trusts benefitting Nirav Modi's
family, and (d) volume of transactions with various Shadow Entities and
Firestar Entities.

59.     Bhansali personally oversaw the creation of the Shadow Entities and LOU Entities

and the selection of their principals, directors, officers, and employees.

60.     Bhansali also personally completed employee performance appraisals for

individuals involved in the operations of Shadow Entities and LOU Entities.

61.     Bhansali's electronic calendar contained several entries, which, upon information

and belief, refer to his discussions in the course of managing the LOU Entities' (i.e. **S**olar, **S**tellar,

and **D**iamonds R US) operations, including: (i) a meeting scheduled for April 4, 2016 with the

14

subject "SSD conversation;" and (ii) a meeting scheduled for April 6, 2016 with the subject "SSD infrastructure," with an invite to Saju Paulose.

62.     On January 19, 2010, Gandhi emailed Bhavesh Patel, copying Shyam Wadhwa, a request for an aging report for accounts receivables owed to FDI. In the email, Gandhi stated, "You can exclude affiliates such as FIPL, FS, FC, JS, Sandberg, Unique," demonstrating that Gandhi knew Unique was a related party.

63.     On May 27, 2010, Bhansali directed Aditya Nanivati, the Head of Asia Pacific in the global Firestar umbrella, to make Bhansali, Nanivati, Purvi Mehta, and Neeshal Modi authorized users of Firestar Diamond Ltd.'s ("**FDL**") Standard Chartered Bank account. With respect to the physical devises necessary to approve transfers, he instructed the employees to send Purvi Mehta's device to Hemant Bhatt and Neeshal Modi's device to Gandhi. These devices enabled Bhatt and Gandhi to transfer funds out of FDL's bank account even though neither had any role at FDL or any of the other Hong Kong Firestar Entities.

64.     On September 7, 2011, Kurian Mathews asked for Bhansali's approval of fee quotes from accountants for proposed audits of Shadow Entities Auragem and Fancy Creations.

65.     Bhansali required at least two of Kurian Mathews, Satyendra Shukla, and Saju Poulose to be present in Dubai at all times to monitor Shadow Entity operations. On April 27, 2013, Kurian Mathews asked Bhansali for permission to break this rule so that he could arrive in Hong Kong early to prepare for an audit of the Hong Kong Shadow Entities. Mathews explained, "We have to arrange all documents of 4 entities as Fancy's office which is very far from the offices of Brilliant and Eternal. After the same we have to check all of the purchases and sales documents with the book entries to see that correct documents are in place before the commencement of the audit." Bhansali replied, "Fine. Go ahead this time."

66.     On June 10, 2013, to hide their involvement in the Bank Fraud, Modi's personal assistant instructed Gandhi, from her personal email address to Gandhi's personal email address, to communicate with her regarding Shadow Entities only on Gmail or Panemail, a program that automatically deletes messages, rather than on the Firestar Entities' regular email system.

67.     On August 6, 2013, Gandhi sent an email to a back-office employee containing purchase and sales ledgers of four Shadow Entities—Fancy Creations, Brilliant, Eternal, and Unique—showing these entities' accounting for transactions with FDI.

68.     On April 3, 2017, an India-based consultant emailed Bhansali a spreadsheet summarizing sales from various foreign Firestar Entities, including FIPL and FDIPL, to Dubai-based Shadow Entities, including World Diamond, Universal, Empire, Vista, Unique, and Diagems. The spreadsheet reflected a total of $770,730,000 in sales of rough stones, polished stones, and jewelry by various foreign Firestar Entities to these six Shadow Entities during fiscal year 2015 to 2016, and a total of $454,910,000 in such sales from April 2016 to February 2017.

69.     On May 5, 2017, Gandhi sent a list of Shadow Entities, and contact information for each, to Altamash Ansari, a back office employee in India, and stated "Use names from attached for Eternal, Pacific & Tri Color. (Do not share this pdf with anyone.)."

70.     On July 1, 2017, FIPL CEO Ravi Gupta emailed Nirav Modi a spreadsheet containing fictitious biographical profiles for Brilliant, Eternal, Fancy Creations, Empire, Unique, Universal, Vista, and World Diamond and asked, "Last year someone had created the enclosed file for top 8 customers[.] Can u let me know who had helped in creation of this? We would like to do for few more customers like Augragen [sic], Eurostar, Diagem, Saumil, and Pannadium." Modi forwarded the email to Bhansali, who then directed Shyam Wadhwa, Aditya Nanivati, and Neeshal Modi to create additional fictitious profiles for Shadow Entities in their respective regions.

16

71.     On July 8, 2017, Satyendra Shukla asked for Bhansali's input on a proposed itinerary for FIPL CFO Ravi Gupta's and FIPL Independent Director Suresh Senapaty's upcoming visit to Dubai. The itinerary included multiple meetings with purported "owners" of Shadow Entities.

72.     Between July 31, 2017 and August 7, 2017, Satyendra Shukla and Kurian Mathews, copied Mihir Bhansali on numerous emails concerning the collection of know-your-customer and know-your-supplier documentation for Shadow Entities Unique, World Diamond, Unity, Himalayan, DG Brothers, and Hamilton. Bhansali advised, "Gentlemen – please avoid copying me on transactional emails. Thank you."

73.     On August 19, 2017, a manager of Universal emailed Bhansali enclosing a profile of three Shadow Entities—Universal, Empire, and Diagems—and asking Bhansali to "review and advice [sic]." The manager's email signature stated he was also the General Manager of a Firestar Entity in Dubai.

74.     On October 24, 2017, Saju Poulose advised Mihir Bhansali that an independent director of FIPL had asked about the variance in profit margins between the Firestar Entities' transactions with Shadow Entity as opposed to other customers. Bhansali instructed Poulose to warn Aditya Nanivati and Satyendra Shukla so that they could prepare an explanation. Nanavati then asked Bhansali, "How are we answering this? For me it is simple, some are higher volume wholesale clients and some are smaller clients/shops. Not sure if that's the right approach."

75.     On April 23, 2018, Gandhi asked a back-office employee to send him the open accounts receivable and accounts payable between Jaffe and Empire, Vista, Eternal, Tri Color, and Universal as of April 22, 2018. Gandhi referred to these parties as "overseas non-affiliates."

17

76.     During the Relevant Period, Modi, Bhansali, and Gandhi exercised direct oversight and control over numerous transactions between the Debtors and Shadow Entities as illustrated by the specific examples described in Appendix A-76.

*77.*     Gandhi regularly advised Modi, Miten Pandya, Manish Bosamiya, Amit Magia, and Shyam Wadhwa concerning wires of funds from the U.S. Entities to India in furtherance of the Bank Fraud, as illustrated by the specific examples described in Appendix A-77.

   *iii.*          *Suspicious Accounting, Finance, and Inventory Management Practices*

78.     Gandhi and Bhansali engaged in and oversaw suspicious accounting, corporate finance, and inventory management practices for the purpose of furthering and concealing the Bank Fraud.

79.     Gandhi and Bhansali maintained two sets of books and records for Jaffe: "core" financials, which did not include loose diamond transactions outside the normal course of Jaffe's business, and "regular" financials, which reflected transactions with Shadow Entities and other Firestar Entities to further the Bank Fraud.

80.     Jaffe's federal tax return for the fiscal year ending March 31, 2012 listed sales of $9,090,661. However, Jaffe's sales journal, as well as the Jaffe financial statements originally provided by Gandhi to the Examiner, indicates that, during that same time period, Jaffe's sales totaled $49,628,873.

81.     After Gandhi was questioned by the Examiner about the significant difference between the tax return sales of around $9 million and the "original" financial statements and sales journal which both reflected $49 million of sales, Gandhi produced a second set of financial statements, which he called the "core" set. This "core" set reflected sales at $10 million. Gandhi did not provide any real explanation as to why he maintained two sets of financial statements.

The difference between these financials was primarily loose diamond sales between Jaffe and various Shadow Entities.

82.     Bhansali managed the Debtors' "house accounts," the accounts in which proceeds of loose diamond sales were segregated from regular sales accounts for purposes of computing commissions. Upon information and belief, the difference between the amounts reported in the Jaffe's tax returns versus the amounts reflected in its sales journals primarily relates to such transactions.

83.     The secretive nature of the "regular" financials is further demonstrated by the communications between Modi, Gandhi, Bhansali, and other co-conspirators described in Appendix A-83.

84.     Bhansali and Gandhi also oversaw and directed the use of different sales and inventory practices for Debtors' transactions with Shadow Entities as compared to those used with retailer customers.

85.     For example, each diamond or gem received by the Debtors for use in an ordinary retail transaction would be unpacked, compared to its packing slip, scanned for quality control, and logged as "ready to ship."

86.     These practices were not employed with respect to Shadow Entity-related transactions. For those transactions, a Shadow Entity or foreign Firestar Entity would often send bulk shipments of loose diamonds accompanied by email instructions to export them immediately upon receipt to either another Firestar Entity or a Shadow Entity at specified prices and quantities. Packing slips and invoices for the subsequent exports often accompanied these email instructions. Consistent with instructions from overseas Modi-Controlled Entities, these goods were either immediately re-shipped without being opened or, if they were opened, they were inventoried in bulk, not individually.

19

> iv.     *Efforts to Manipulate or Deceive Auditors and Lenders*

87.     On numerous occasions, Bhansali and Gandhi sidestepped auditors' inquiries concerning the U.S. Entities' dealings with Shadow Entities by offering farfetched explanations, feigning ignorance, or, in some cases, ignoring the questions altogether.

88.     For example, on July 2, 2010, a banker asked Gandhi whether FDI and Eternal were related. Gandhi forwarded the email to Bhansali and stated, "I am ignoring that question but I may not be able to avoid the same." Bhansali replied, "Speak to Nirav when he is in NY next week." The next day, Gandhi falsely told the banker that Nirav Modi's father, Deepak Modi, owned Eternal.

89.     As another example, on June 16, 2011, an HSBC Bank representative asked Gandhi why Synergies would be wiring funds to Unique. Gandhi explained that Unique had loaned funds to Synergies, which loaned the same funds to Twin Fields, and that both loans were subsequently repaid. The representative then asked, "Unique is affiliated correct? Does Nirav own it? Is this why there are loans back and forth?" Gandhi replied, "Unique is not an affiliated company but Nirav has a very good relationship with them." The representative then asked, "Why is each company lending to the other?" Gandhi replied, "I am sure there were business reasons. What is the concern for the bank?"

90.     In another instance, on September 7, 2011, a banker at Standard Chartered Bank asked Gandhi, "We understand that Firestar in NY sales [sic] mostly to big retailers in the US but the recent A/R outstanding shows more concentration on companies such as Unique Diamond, Empire Gem and SDC Designs. Can we get YTD sales data of 2010 and 2011 of the top 10 accounts for each year on year comparison?" She further stated, "Also, in the AR ageing it shows Firstar has given Steller [sic] diamonds and Unique diamonds $11m limits each—and Brilliant, Fancy

creations $2m each. We understand that these foreign bills we are not discounting them, but we'd like to get more background info on these accounts given the size of exposures."

91.    On September 12, 2011, Gandhi replied, "Various overseas companies that you have mentioned are not our customers. We buy unique large diamonds/jewelry pieces from various vendors in India and sometimes these goods need to be returned, but due to the terms of the original sale, the vendors instruct us to ship these goods to another companies [sic], that they select, who are not located in India. We record these transfers as a reduction to purchases and an increase to accounts receivable at the original purchase cost of the diamonds/ jewelry."

92.    Bhansali, who was included on the email from Gandhi, forwarded this response to Modi, stating "Nirav, Please read this email below from SCB last week, and Ajay's reply. Just an FYI." Modi then forwarded the email to the former deputy managing director of Axis Bank's corporate banking division, and stated, "As SC is a common bank in India, Antwerp and NY. It might be a good idea that Ajay and you discuss all responses."

93.    As another example, on April 22, 2017, an auditor asked Gandhi why FDI had recorded a payable for an invoice issued by Fancy Creations to NMI. Gandhi replied, "Vendor error." A few minutes later, apparently deciding that excuse was not sufficient, he equivocated, "Also to save freight, they ship together as one invoice. Difficult to fight with them."

94.    And as yet another example, on April 26, 2017, Gandhi asked Bhansali how he should respond to an auditor's inquiries into the U.S. Entities' multi-million-dollar A/R and A/P balances with Shadow Entities Auragem and Fancy Creations. Bhansali directed Gandhi to discuss the issue with Shyam Wadhwa and asked when the Shadow Entity balances could be cleared.

95.    At least some of the coordination of the various Shadow Entities' involvement in manipulating audits, and the Bank Fraud more generally, was conducted through an

operation1@firestardiamond.com ("**Operation 1**") email address. The Operation 1 account was used by Sandeep Mistry and possibly others.

96.     As part of the audit process, auditors would email parties listed on the audited company's accounts receivable and accounts payable records to request written confirmation of the amounts reflected in the audited company's books and records. For audits of the U.S. entities, which were conducted together, Gandhi would be copied on the auditor's emails to Shadow Entities, which Gandhi would often forward to Operation 1 to ask that Operation 1 cause the Shadow Entity to provide confirmation the auditors. Specific examples of such emails are described in Appendix A-96.

97.     The Operation 1 account was also used to orchestrate transfers of funds and jewels among Firestar Entities and Shadow Entities, as demonstrated by the specific examples described in Appendix A-97.

> *v.      Use of Debtors' Funds and Proceeds of the Bank Fraud to Purchase Personal Assets*

98.     Just as he orchestrated the circular trades at the heart of the Bank Fraud, Modi also orchestrated transactions to divert assets from the Bank Fraud and the Debtors for the benefit of himself and his and Bhansali's family.

### The Ithaca Trust

99.     On August 23, 2017, Nirav Modi's sister Purvi Mehta ("**Mehta**") established the Ithaca Trust, an irrevocable trust for the benefit of Modi's wife, Ami Modi, and their three children. The Ithaca Trust's investment advisor was Abhay Dinesh Javeri, Ami Modi's brother. The trustee was Commonwealth Trust Corporation ("**Commonwealth**"). Attorneys from the law firm of Day Pitney LLP ("**Pitney**") were the principal drafters of the Ithaca Trust agreement and served as advisors for the creation of the trust.

100. Ostensibly, the Ithaca Trust was funded with $23 million in cash from Mehta, but Commonwealth's records show that Modi was behind the initial funding. In an August 24, 2017 email regarding the Ithaca Trust's formation, Modi informed Pitney attorneys that "[t]he funds are in place with Purvi [Mehta]. Please let me know account details to wire the money . . . ."

101. Commonwealth's records also show that those funds Modi placed with Mehta to establish the Ithaca Trust were funneled to Mehta from the Bank Fraud. Mehta revealed in disclosure forms to Commonwealth that she funded the Ithaca Trust using "dividends" she received from Fine Classic FZE ("**Fine Classic**"), a Shadow Entity of which Mehta was the 100% owner. Like the other Shadow Entities, Fine Classic operated as part of the Bank Fraud, and was a recipient of large amounts of fraudulently obtained funds.

102. Further, throughout 2017, tens of millions of dollars passed between the HSBC bank account of Ami Modi and Mehta's Bank of Singapore account. A bank statement for Ami Modi for September 2017 shows $31,506,701 disbursed, almost all of which went to Mehta.

**The Ritz Carlton Apartment**

103. The purpose of the Ithaca Trust was to hold Manhattan real estate for Modi and his family. The initial $23 million in trust funding was used to purchase an apartment at the Ritz Carlton residences, 50 Central Park South, Unit 33, New York, New York (the "**Ritz Carlton Apartment**") for the sole use of Modi and his family.

104. On August 30, 2017, Modi emailed Pitney attorneys and other professionals informing them that $23 million had been wired from Mehta to Commonwealth and directing Commonwealth to further wire the funds to attorneys at Katz Matz to execute the purchase of the Ritz Carlton Apartment. Mehta was not on the email thread.

105.    That same day, Katz Matz attorney Steven Matz emailed Modi and others with instructions for the September 7, 2017 closing of the Ithaca Trust's purchase of the Ritz Carlton Apartment. Once again, Mehta was not on the email thread.

106.    On September 7, 2017, the Ithaca Trust closed on the purchase of the Ritz Carlton Apartment. The Ithaca Trust paid $25 million to the seller through Central Park South 50 Properties LLC ("**CPS50**"), an entity the Ithaca Trust owns. Mehta signed the contract of sale. Of the purchase price, $2.5 million was wired from an Ami Modi HSBC account into an escrow account at the Katz Matz law firm, which handled the sale. The remaining $23 million came from funds that Modi had funneled to Mehta from the Bank Fraud.

## The Essex House Apartment

107.    Modi also used the Ithaca Trust to obtain real estate that previously had been owned indirectly by FDI.

108.    On February 15, 2007, Central Park Real Estate LLC ("**CPRE**") was formed under Delaware law. CPRE was owned by FDI until approximately the end of 2009, when it was transferred to FGI.

109.    On March 26, 2007, CPRE purchased an apartment at the Essex House, 160 Central Park South (the "**Essex House Apartment**"). Bhansali signed the deed on behalf of CPRE. The Essex House Apartment was used by Modi and as a personal residence.

110.    Based on direction from Modi and Gandhi, FDI funded $2 million of the approximately $5 million purchase price of the Essex House Apartment. The balance was financed by an approximately $3 million mortgage from HSBC. FDI also made at least $856,335 of the monthly payments on the mortgage between 2011 and 2018 and paid JW Marriott Essex House NY $15,828.35 in January 2018, after CPRE was transferred from FGI to the Ithaca Trust.

111.     On December 5, 2008, Modi emailed Bhansali and Gandhi that, "*I bought Essex House at $4,995,000 and took a loan of $3 million*" (emphasis added). Modi and Gandhi then discussed by email, with Bhansali copied, the fact that FDI had funded part of the Essex House purchase.

112.     In March 2017, Gandhi emailed Modi that HSBC requested more information on the ownership structure of CPRE "going up thru the ladder to FILP, India[,]" including the "Source of Wealth" of "Purvi Modi[.]" Gandhi relayed that he "avoided giving these [sic] information and told them that we may do restructuring of Central Park and may change ownership etc." but that the "only way, we can avoid is only if we pay-off the $ 3 m mortgage in next few months." Modi responded, "There will be a change in ownership in May end so better to explain that."

113.     On December 4, 2017, by email, Modi told Gandhi to pay off the HSBC mortgage in full. On December 5, 2017, FDI paid off the approximately $3 million balance on the Essex House Apartment mortgage, using funds originally from Jaffe and Fantasy as well as from FDI's own account and from a Firestar HSBC line of credit.

114.     On December 15, 2017, one of Modi's accountants emailed Modi with three potential options for minimizing transfer taxes on "the movement of CPRE." The first option was having Modi purchase CPRE directly from Group, the second was having Ami Modi purchase CPRE directly, and the third was using the Ithaca Trust to make the purchase by having Mehta contribute more cash to the trust. The accountant explained that, "since [Modi] prefer[red] to fast track the transaction," the existing trust could be used and then the trustee could "move the LLC to another trust in due time."

115.     Modi chose the third option. On December 29, 2017, the Ithaca Trust purchased CPRE from FGI for $6 million. On January 2, 2018, Mehta transferred $6 million to the

Commonwealth Trust Company, as trustee of the Ithaca Trust. The Ithaca Trust then wired $6 million to FGI's HSBC account for the purchase of CPRE.

116.     By this time, Commonwealth had flagged the Ithaca Trust as a "high risk trust" and internally expressed concern about serving as trustee. On March 13, 2018, Commonwealth emailed Pitney attorneys to inform them that its trust committee had decided that Commonwealth should resign as trustee of the Ithaca Trust.

117.     On May 25, 2018, Nehal Deepak Modi, the protector of the Ithaca Trust and Nirav Modi's brother, appointed Trident Trust Company (South Dakota) Inc., as successor trustee of the Ithaca Trust.

### Diversion of Funds to Purvi Mehta

118.     Throughout the Relevant Period, millions of dollars in proceeds of the Bank Fraud were funneled to Mehta in various ways.

119.     For example, between October 20, 2011 and March 11, 2011, Nirav Modi personally transferred a total of $14,575,000 to Synergies, which Synergies used to pay off purported loans to FIPL. On April 1, 2012, Modi assigned his interest in the loan to Mehta. This assignment was described as a gift in numerous emails. For example, on December 22, 2016, Shyam Wadhwa emailed Mehta's husband, Manish Modi, "Manish – Awaiting Completed gift deed documents from your end for both Synergy loan gift to Purvi and FHL Loan gift to Purvi. Please mail me scanned copy followed by original."

120.     On July 13, 2017, in connection with FHL's acquisition of Synergies as part of a broader restructuring of the Firestar Entities, FHL transferred $20 million to Synergies as a purported capital infusion. That same day, Synergies transferred $650,000 to Jaffe, $1,047,000 to Brilliant (as repayment of the loan alleged above), $3,694,000 to FIPL (as the purchase price for FGI, which Synergies acquired as part of the 2017 restructuring), and $14,575,000 to Mehta. The

$14,575,000 to Mehta was transferred under the pretext of paying off the loan Modi had assigned to Mehta.

121.    Additionally, at all relevant times, Mehta and her and Nirav Modi's father, Deepak Modi, indirectly owned 100% of the equity in Twin Fields Investments Ltd. ("**Twin Fields**"), which in turn owned 100% of the equity in BBB Group, Inc ("**BBB Group**").

122.    Gandhi, on behalf of Synergies, successfully bid on the intellectual property rights of Bailey Banks & Biddle at a bankruptcy auction in 2009. BBB Group was incorporated in 2010 to operate *Bailey Banks & Biddle*-branded retail stores. Upon information and belief, Nirav Modi's brother, Nehal Modi, was the *de jure* or *de facto* director of BBB Group and Bhansali was the *de jure* or *de facto* director of Twin Fields.

123.    Twin Fields' bank statements reflect a total of approximately $21.3 million in cash inflows from Jaffe and approximately $26.9 million in cash inflows from Fine Classic and a total of approximately $42.8 million in cash outflows to BBB Group.

<u>Diversion of Funds for the Benefit of Mihir Bhansali and His Family</u>

124.    Bhansali and his family also personally benefitted from the Bank Fraud and from Bhansali's breaches of his fiduciary duties.

125.    For example, upon information and belief, the M.R. Family Trust received INR 32.83 crore (approximately $4.57 million) from DRUS in fiscal year 2011-2012. Upon information and belief, the M.R. Family Trust was created by and for the benefit of members of Mihir Bhansali's family. For example, upon information and belief, Mihir Bhansali's father, Rashmikant K. Bhansali, is or was the trustee of the M.R. Family Trust. Upon information and belief, Rashmikant K. Bhansali, in his capacity as trustee of the M.R. Family Trust, served as a partner of DRUS from 2007 to 2011.

27

126. Upon information and belief, Mihir Bhansali holds or formerly held equity interests in various Modi-Controlled Entities, including without limitation, FDIPL and Jewelry Solutions International Private Limited (which is the name under which FDI was incorporated). As alleged in this Complaint, millions of dollars flowed through FDIPL and FDI during the Relevant Period.

127. Upon information and belief, Mihir Bhansali's wife, Rakhi Bhansali, holds or formerly held, 99.9% of the equity interests in Neeshal Marketing Private Limited ("**Neeshal Marketing**") and Neeshal Merchandising Private Limited ("**Neeshal Merchandising**").

128. During the Relevant Period, upon information and belief, millions of dollars in proceeds of the Bank Fraud flowed through Neeshal Merchandising. For example, upon information and belief, Neeshal Merchandising was the direct recipient of at least $11,475,127.67 in LOU funds sourced from PNB during the Relevant Period.

129. Additionally, Neeshal Merchandising received funds from Shadow Entities on numerous occasions. For example:

   (i)     On October 14, 2010, Fancy Creations transferred $841,944.64 to Neeshal Merchandising.

   (ii)    On December 10, 2010, Fancy Creations transferred $1,408,947.34 to Neeshal Merchandising.

  (iii)    On March 14, 2011, Fancy Creations transferred $1,132,309.59 to Neeshal Merchandising.

  (iv)    On October 18, 2011, Brilliant transferred $661,080.98 to Neeshal Merchandising.

   (v)    On April 25, 2012, Fancy Creations transferred $605,608.59 to Neeshal Merchandising.

130.    Additionally, Neeshal Merchandising received funds directly from the Debtors on at least one occasion. For example, on July 28, 2011, FDI transferred $420,478.58 to Neeshal Merchandising.

131.    Modi's personal financial statements reflect "advances" to Mihir Bhansali of $195,020 in 2016, $629,184 in 2012, and $776,574 in 2011.

132.    On February 24, 2017, Mehta wired $1,500,000 to Mihir Bhansali's personal checking account at HSBC.

133.    On March 22, 2017, Mihir and Rakhi Bhansali purchased apartment 24A at 50 Riverside Boulevard in New York City for approximately $7.1 million, of which approximately $5.3 million was paid in cash. On February 24, 2017, just weeks earlier, Bhansali had received a $1.5 million wire into his personal HSBC checking account from Mehta. Bhansali's annual salary from the Debtors was approximately $154,000. On June 29, 2017, Purvi Mehta wired $750,000 to Mihir Bhansali's personal checking account at HSBC.

134.    Only two days after the Debtors filed for bankruptcy, Bhansali transferred his interests in the apartment to his wife for nominal consideration.

135.    Based on, among other things, the timing of these transactions and Mehta's role as a primary conduit for proceeds of the Bank Fraud, it appears this apartment was purchased using proceeds of the Bank Fraud.

vi.    *Efforts to Cover Up and Frustrate Investigation of the Bank Fraud Before and After the Debtors' Bankruptcy Filing*

136.    Modi, Bhansali, and Gandhi researched and implemented various tactics to conceal and destroy evidence of their involvement in the Bank Fraud both prior to and after the Bank Fraud's exposure.

137.     On February 13, 2018, a Pitney attorney emailed Gandhi to suggest that bank statements for CPS50, which owned the 50 Central Park South property, be sent directly to Abhay Javeri as manager of CPS Properties LLC. Gandhi forwarded the email to "ajaycpa@yahoo.com," which upon information and belief is Gandhi's personal email address, and stated, "Niravbhai, OK to have CPS 50 Properties LLC bank statement from Citibank sent to Abhay Javeri to his email address or Abby's mailing address?" The fact that Gandhi addressed this email to "Niravbhai" shows that Modi and Gandhi were using Gandhi's personal email account to communicate in the weeks following the exposure of the Bank Fraud.

138.     On March 11, 2018, Gandhi ran internet searches on the Adelphia Communications fraud case and related bankruptcy. These searches included: "how did adelphia get caught"; "how rigas family were caught in the fraud of adelphia"; and "how adelphia fraud was discovered?"

139.     On March 9, 2018, Bhansali visited an internet article entitled "14 Signal App Tips for Secure Chats," which described tips for sending and erasing secure communications through Signal, an end-to-end encryption application.

140.     On March 12, 2018, Bhansali visited an internet article entitled "How to Clear Your Cache on Any Browser." The article described methods of deleting internet browsing history on various web browsers. That same day, Bhansali visited an internet article entitled "How to Hack Wi-Fi Passwords." This article described methods of obtaining access to wireless networks without the required password.

141.     Bhansali's laptop contained a software program called "Hide My Ass! Pro VPN." Upon information and belief, the purpose of this program is to facilitate anonymous internet usage through virtual private network technology. The software's logs indicate that the program was used as recently as February 11, 2018.

142.     Bhansali's laptop also contained a program called SecurStar DriveCrypt. Upon information and belief, the purpose of this program is to encrypt data on computers.

143.     As alleged above, Bhansali created what appears to be a "to-do" list for the various co-conspirators following exposure of the Bank Fraud. The list included instructions to "Send all non-Firestar Dubai comps to HK." Upon information and belief, "comps" refers to "computers."

144.     Upon information and belief, based on statements made by various Firestar Entity and Shadow Entity directors and employees to Indian authorities, around February or March 2018, Bhansali removed approximately 50 kilograms of gold and 2.5 Lac Dirhams (worth approximately $68,000) from a Dubai-based Firestar Entity; and Bhansali and Modi intimidated and coerced directors and employees of Shadow Entities not to cooperate with investigative authorities.

ix.     *Fraudulent Omissions, Misstatements, and Misrepresentations Made in Connection With The Debtors' Chapter 11 Cases*

145.     On February 26, 2018, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. During the early weeks of the chapter 11 cases, Bhansali and Gandhi, as the Debtors' CEO and CFO, respectively, made fraudulent omissions, misstatements, and misrepresentations, formally and informally, explicitly and implicitly, to this Court, to the United States Trustee, and to creditors, regarding the Debtors' involvement in the Bank Fraud and their relationship to various Shadow Entities.

146.     In his Declaration filed with this Court on February 28, 2018, Bhansali stated under penalty of perjury, "A list setting forth the twenty (20) largest unsecured creditors, of each of FDI, [Fantasy] and [Jaffe], excluding those persons who constitute 'insiders' under Bankruptcy Code section 101(31), is attached hereto as Exhibit B."

147.     Exhibit B to Bhansali's declaration, which purported to list the top 20 unsecured non-affiliated creditors of each Debtor, included: (i) World Diamond as a creditor of FDI in the amount of $79,918.70; (ii) Fancy Creations as a creditor of FDI in the amount of $19,617.50; (iii) Tri Color as a creditor of Jaffe in the amount of $3,356,165.99; (iv) Pacific as a creditor of Jaffe in the amount of $2,922,239.31; (v) Universal as a creditor of Jaffe in the amount of $42,905.00; and (vi) Eternal as a creditor of Jaffe in the amount of $31,645.39. Each of these entities was in fact an insider.

148.     Moreover, Bhansali led the bankruptcy court and other parties to believe that the Debtors were not involved in the Bank Fraud and that they were innocently caught up in an overseas matter. In a declaration filed shortly after the petition date, Bhansali declared under penalty of perjury: "The Debtors and their dedicated employees have worked tirelessly over the past week or so to … reassure their vendors and customers that they had no involvement in the alleged wrongful conduct."

149.     On March 27, 2018, the Debtors filed their bankruptcy schedules and statements of financial affairs ("**SOFA**"), all of which Gandhi signed under penalty of perjury. The Debtors' statements of financial affairs contained numerous misstatements, misrepresentations, and omissions.

150.     FDI's SOFA did not list any transfers to Shadow Entities in response to Question No. 3, which asks for payments made to creditors within 90 days prior to the petition date, Question No. 4, which asks for transfers of property to insiders of the debtor within 1 year prior to the petition date, or Question No. 13, which asks for any other transfers made outside the ordinary course of business within 2 years prior to the petition date.

151.     In truth, there were substantial transfers by FDI to Shadow Entities that Gandhi personally directed or otherwise participated in during the relevant periods. For example,

Gandhi did not disclose FDI's transfers of $483,620.05 and $2,188,769.43 and Jaffe's transfer of $530,000 to Pacific on January 3, 2018 — only a few weeks prior to the Petition Date. Nor did Gandhi disclose FDI's payment of $300,000 to Unique on March 22, 2017, less than a year prior to the Petition Date.

152.    Additionally, neither Jaffe's bankruptcy schedules nor SOFA disclosed any amounts owed by NMI to Jaffe.

153.    However, Jaffe's and NMI's books and records each reflected an $11,216,467 loan balance owed by NMI to Jaffe as of the Petition Date which have never been repaid.

154.    On March 23, 2018, the Debtors moved for approval of bidding and sale procedures for the sale of substantially all of their assets under section 363 of the Bankruptcy Code. On March 29, 2018, the Court approved the Debtors' bidding and sale procedures.

155.    On April 20, 2018, the Court appointed John J. Carney as examiner (the "**Examiner**") to investigate the nature and extent of the Debtors' involvement in the Bank Fraud.

156.    Shortly after the Examiner's appointment, the Examiner attempted to interview Bhansali. Bhansali flatly refused to cooperate. When pressed by the Examiner's counsel, Bhansali's counsel acknowledged that Bhansali was in communication with Modi as late as March 15, 2018, and that he and Modi discussed the Debtors' sale and bankruptcy process. As alleged above, Gandhi and Angelina Ypma also communicated with Modi in March 2018.

157.    On May 1, 2018, the Debtors adjourned the auction for FDI and Fantasy's assets indefinitely. On May 3, 2018, Parag Diamonds, Inc. was the successful bidder for Jaffe's assets.

158.    On May 15, 2018, at a hearing to approve the Jaffe sale, the Debtors' chief restructuring officer Mark Samson testified that Bhansali had been in communication with Modi between the commencement of the Debtors' chapter 11 cases and March 15, 2018, and that

Bhansali continued to be involved "on a daily basis" as "a key employee" in the sale process after that date.

159.    Following this revelation, the Court asked for the record to be supplemented with additional detail concerning the nature and extent of Bhansali's post-petition communications with Modi and adjourned the sale hearing to May 23, 2018. On May 19, 2018, the Debtors withdrew the sale motion without prejudice. (Dkt. 177.) At a hastily-arranged Chambers conference on May 18, 2018, Bhansali's counsel advised the Court that Bhansali resigned as director and officer of the Debtors that same day and that Bhansali refused to submit a declaration and appear for cross-examination concerning his post-petition communications with Modi.

160.    On May 17, 2018, Gandhi sat for an interview with the Examiner's team. In that interview, Gandhi stated that the only thing he knew about the Shadow Entities was that they were Bhansali's customers. In subsequent interviews, Gandhi continued to insist he was not aware that any Shadow Entity was owned or controlled by Modi. When confronted by the Examiner's team with emails indicating that Gandhi was aware that numerous Shadow Entities were related parties, Gandhi repeatedly maintained he did not remember these emails, nor that the Shadow Entities were in any way controlled by Modi.

161.    Additionally, in response to the Examiner's questions regarding Gandhi's involvement in hundreds of millions of dollars in loose diamond transactions, Gandhi told the Examiner that he merely signed packing slips with no verification of the contents of the shipment, its valuation, the profitability, or propriety of such transaction.

162.    Additionally, when the Examiner asked Gandhi whether he ever used his personal email address for Firestar business, Gandhi stated that he did not. In fact, during the Relevant Period, Gandhi sent numerous emails pertaining to the Debtors and other Modi-Controlled Entities to and from his myriad personal email addresses.

163.     On June 14, 2018, the Court approved the Trustee's appointment, at which time the Trustee assumed control of the Debtors' estates and operations.

164.     On August 7, 2018, the Examiner conducted a deposition of Bhansali, at which Bhansali invoked his Fifth Amendment right against self-incrimination in response to every question except his name.

*vi.*     *Looting of the Debtors, U.S. Affiliates, and Other Firestar Entities*

165.     Modi, Gandhi, and Bhansali and other co-conspirators diverted substantial amounts of the Debtors' cash and inventory to overseas Modi-Controlled Entities in the weeks leading up to the Debtors' bankruptcy filing. For example:

   (i)     On or around December 5, 2017, FDI shipped inventory with a declared value of $1,632,500.53 to World Diamond.

   (ii)     On January 3, 2018, FDI wired $2,672,389.48 to Pacific. That same day, Jaffe wired $530,000 to Pacific. Gandhi was directly involved in these transfers.

   (iii)     On or around January 23, 2018, FDI shipped 2,319.64 carats of loose diamonds with a declared value of $426,320.97 through Malca Amit to Eternal in Hong Kong. Bhansali and Gandhi were directly involved in this shipment.

   (iv)     On January 25, 2018, FDI wired $910,278.70 to Dubai-based Firestar Diamond FZE. Gandhi was again directly involved in this transfer.

   (v)     On January 26, 2018, FDI shipped inventory having a declared value of $85,150 to Nirav Modi Ltd. in Hong Kong.

   (vi)     On February 6, 2018, FDI wired $1,002,836.77 to FIPL, Jaffe wired $505,610.51 to FIPL and Fantasy wired $401,471.08 to FIPL. That same day, Subhash Parab emailed Gandhi, copying Shyam Wadhwa, "Please pay following bills to FIPL . . . We have some urgent re-payment from IDBI bank for that [sic] we require below bills in IDBI bank[.]"

   (vii)     On or around February 6, 2018, FDI shipped 4,474.15 carats of loose diamonds with a declared value of $789,140.42 through Malca Amit to Eternal in Hong Kong. Gandhi was directly involved in this shipment.

166.    Additionally, in the weeks leading up to and following the Petition Date, Modi, Bhansali, and Gandhi caused NMI and FDII to move significant amounts of cash and inventory overseas where their creditors, including the Debtors, could not reach them. For example:

(i)     On December 22, 2017, FDII shipped inventory with a declared value of $1,418,549 through Malca Amit to Fancy Creations in Hong Kong.

(ii)    On January 4, 2018, NMI shipped two packages of inventory, with declared values of $585,000 and $65,000, respectively, through Malca Amit to Nirav Modi Ltd. in Hong Kong.

(iii)   On January 10, 2018, NMI shipped inventory with a declared value of $108,550, through Malca Amit to Nirav Modi Ltd. in Hong Kong.

(iv)    On January 11, 2018, NMI shipped inventory with a declared value of $32,370, through Malca Amit to Nirav Modi Ltd. in Hong Kong.

(v)     On January 16, 2018, NMI shipped inventory with a declared value of $943,800, through Malca Amit to Nirav Modi Ltd. in Hong Kong.

(vi)    On January 19, 2018, NMI shipped three packages of inventory, with declared values of $273,000, $409,500, and $771,680, respectively, through Malca Amit to Nirav Modi Ltd. in Hong Kong.

(vii)   On January 24, 2018, NMI shipped inventory with a declared value of $1,075,200 through Malca Amit to FDIPL in India.

(viii)  On January 25, 2018, FDII shipped inventory with a declared value of $1,886,922.67 through Malca Amit to Fancy Creations in Hong Kong.

(ix)    On January 26, 2018, NMI shipped inventory with a declared value of $198,750 through Malca Amit to Nirav Modi Ltd. in Hong Kong.

(x)     On January 29, 2018, NMI shipped inventory with a declared value of $75,050 through Malca Amit to Nirav Modi Ltd. in Hong Kong.

(xi)    On January 30, 2018, FDII shipped inventory with a declared value of $570,104.37 through Malca Amit to Firestar Diamond Ltd. in Hong Kong.

(xii)   On January 31, 2018, NMI shipped inventory with a declared value of $660,500 through Malca Amit to Nirav Modi Ltd. in Hong Kong.

(xiii)  On January 31, 2018, FDII wired $2,466,015 and $525,000 to Fancy Creations. That same day, Ajay Gandhi forwarded the wire confirmations

to Shyam Wadhwa and stated, "Please let your vendor know of this payment and clear any AR from HK."

(xiv)   On February 2, 2018, FDII wired $400,000 to Fancy Creations. That same day, Ajay Gandhi emailed Avinash Oza and Kunal Patel, copying Shyam Wadhwa, "Please wire $400,000 to Fancy from Capital One – Advance Refund." Oza replied with the wire confirmation.

(xv)   On February 13, 2018, NMI shipped inventory with a declared value of $154,440 through Malca Amit to Nirav Modi Ltd. in Hong Kong.

(xvi)   On March 6, 2018, FDII shipped inventory with a declared value of $4,325,472.34 through Malca Amit to Firestar Diamond Ltd. in Hong Kong.

167.   Around this time, Bhansali promised to use the NMI inventory to repay FDI's secured creditors, including Israel Discount Bank of New York ("**IDB**"), after transferring it to the Debtors to offset NMI's debts to FDI and Jaffe. IDB's counsel attempted to enforce this promise during negotiations regarding the Debtors' use of cash collateral by seeking to require the Debtors to collect the amounts owed to them by NMI. As alleged below, however, this never occurred, and instead, Bhansali was involved in diverting those assets to Hong Kong, beyond the Debtors' reach.

168.   Between late February and early March 2018, the NMI boutiques in Las Vegas, Honolulu, Los Angeles, and New York shipped substantially all of their inventory to New York. The inventory, which had a total value of approximately $40 million, was held in storage by Malca Amit because its value exceeded the amount of available insurance coverage on items stored in FDI's vault.

169.   On April 5, 2018, Angelina Ypma, the global president of the *Nirav Modi* brand and a director of FIL, emailed Ajay Gandhi, copying Mihir Bhansali, "Nirav has instructed me to work with you to move all of NM US inventory (HJ and core back to HK ASAP.) HK will pay Malca in advance to move the jewels." Gandhi replied by noting that he and Bhansali had resigned from NMI, but that they were "happy to assist as needed should [Ypma] hit any bottleneck."

170.     Upon information and belief, Bhansali and Gandhi continued to exercise oversight and control over the NMI inventory after their formal resignation from NMI.

171.     On April 25, 2018, 45 pieces of NMI inventory with a total declared value of $6,315,615 were shipped via Malca Amit to NML in Hong Kong. Gandhi signed the packing lists included in the shipping instructions.

172.     On April 26, 2018, 93 pieces of NMI inventory, with a total declared value of $13,108.072, were shipped via Malca Amit to NML in Hong Kong. Gandhi signed the packing list included in the shipping instructions.

173.     On or around May 3, 2018, FDII inventory with a declared value of $3,200,000 was moved to Malca Amit to be held in storage.

174.     On May 4, 2018, Ypma emailed Gandhi, copying Bhansali, "I shall be coming to NY from Monday 7 till Thursday 10 May to review the NM inventory. Nirav told me that I can work with [FDI employee Shanna Singh] to count the inventory . . . Thank you to give me the support." Gandhi reiterated that he and Bhansali had resigned from NMI and directed Ypma to work with NMI's new management "on the logistics."

175.     During Ypma's visit to New York in May 2018, Gandhi and Bhansali gave her permission to remove several million dollars' worth of the inventory in storage at Malca Amit. According to an employee who accompanied Ypma to Malca Amit, Ypma selected approximately $5 million from various parcels. The pieces Angelina Ypma selected were then shipped to Hong Kong.

176.     On June 1, 2018, Rochelle Miller was appointed as CEO and sole director of each U.S. Affiliate, including NMI and FDII. That same day, Anthony Allicock, the director of FHL, introduced Ypma to Miller over email. On June 2, 2018, Miller, acting in her capacity as director/CEO of NMI, contacted Malca Amit to request shipment to Hong Kong of two lists of

38

NMI inventory: (i) 208 pieces at a declared value of $5,063,914.01; and (ii) 53 pieces at a declared value of $2,846,545.

177. On September 5 and 7, 2018, after confirming Miller's appointment as director and CEO of NMI and FDII, Malca Amit released nine parcels to the custody of Miller. Eight of these parcels contained NMI inventory and had a total declared value of $41,841,419. The remaining parcel contained the FDII inventory delivered to Malca Amit on May 3, 2018 with a declared value of $3,200,000. Upon information and belief, all of this inventory was subsequently shipped overseas to Modi-Controlled Entities.

178. The systematic diversion of the U.S. Entities' assets to overseas Modi-Controlled Entities described in the foregoing paragraphs, in combination with the fraudulent omissions and misrepresentations Gandhi and Bhansali made in the context of these chapter 11 cases, constituted millions of dollars in actual fraudulent transfers and impaired the recovery of loan receivables of the Debtors and the U.S. Affiliates.

**F.  Transfers by FDI and FDII Of Compensation to Bhansali and Gandhi**

179. The Trustee's investigation has to date uncovered $1,155,940.76 in transfers from FDI and Jaffe to Bhansali in the six years pre-petition that were made with actual intent to hinder, delay or defraud then-present or future creditors and which can be avoided under section 548(a)(1)(A) and New York law, made applicable by section 544(b) of the Bankruptcy Code. These transfers are set out in the attached Schedule A.

180. In summary, Bhansali received the following compensation from FDI as broken out by year (but for 2012, only those amounts transferred after February 26, 2012 and for 2018, the amounts paid pre-February 26):

| 2012 | $56,372.58 |

| 2013 | $93,580.75 |
| 2014 | $104,349.96 |
| 2015 | $104,349.96 |
| 2016 | $104,349.96 |
| 2017 | $154,350.04 |
| 2018 | $38,587.51 |

181.   Of note, on February 16, 2018, FDI paid Bhansali $20,777.89 reflecting 3.5x times his regular-bi-weekly salary of $5,936.54, purportedly in anticipation of the company's bankruptcy filing.

182.   In addition to the transfers of compensation broken out above, on August 23, 2013, Jaffe transferred $500,000 to Bhansali.

183.   Upon information and belief, Bhansali received transfers from other sources within the global Firestar enterprise, including individuals, in addition to the transfers summarized above.

184.   The Trustee's investigation has to date uncovered $1,359,669.30 in transfers from FDI to Gandhi in the six years pre-petition that were made with actual intent to hinder, delay or defraud then-present or future creditors and which can be avoided under section 548(a)(1)(A) and New York law, made applicable by section 544(b) of the Bankruptcy Code. These transfers are set out in the attached Schedule B.

185.   Of note, effective February 28, 2013, Gandhi resigned from his position as CFO of Firestar and other U.S. entities and noted in his resignation email "Compensation was never my key reason to leave but thanks for your generous offer that you gave me." Effective June 3, 2013, Gandhi agreed to return to Firestar at the same base salary as when he departed.

186.     In summary, Gandhi received the following total compensation from FDI as broken out by year:

| 2012 | $143,496.54 |
|------|-------------|
| 2013 | $177,423.06 |
| 2014 | $244,038.45 |
| 2015 | $217,211.48 |
| 2016 | $229,999.90 |
| 2017 | $289,999.90 |
| 2018 | $57,499.97  |

187.     Of note, on February 16, 2018, FDI paid Gandhi $30,961.52—350% of his regular-bi-weekly salary of $8,846.15—purportedly in anticipation of the company's bankruptcy filing.

188.     In addition to the transfers summarized above, on February 26, 2018, on the same day as the Petition Date, non-debtor U.S. Affiliate FDII transferred $115,000.00 to Gandhi as a purported "6 months severance payment." This payment was approved by Bhansali.

## CLAIMS FOR RELIEF

### COUNT 1

**Avoidance and Recovery of Actual Fraudulent Transfers
Under N.Y. DCL §§ 276, 278, and 279, and
11 U.S.C. §§ 544(b)(1) and 550(a)
(Mihir Bhansali)**

189.     Plaintiff restates and re-alleges paragraphs 1 through 188 of this Complaint as though fully set forth herein.

190.     The Debtors made numerous transfers to Mihir Bhansali, as identified on Schedule A, attached hereto (collectively, the "**Bhansali Transfers**").

41

191.    The Bhansali Transfers constituted transfers of interests of the Debtors in property.

192.    The Bhansali Transfers were made to or for the benefit of Bhansali.

193.    The Bhansali Transfers were made with the actual intent to hinder, delay, or defraud the Debtors' creditors. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Bhansali Transfers in order to perpetuate the Bank Fraud. The natural consequence of the Bhansali Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations. This result hindered, delayed, and defrauded the Debtors' creditors.

194.    Actual creditors, including but not limited to the Debtors' vendors and suppliers exist who could have the Bhansali Transfers set aside, or who could disregard the Bhansali Transfers and attach or levy execution upon the property conveyed, under section 278 of the New York Debtor & Creditor Law.

195.    Under section 276 if the NY Debtor & Creditor Law and section 544(b)(1) of the Bankruptcy Code, the Trustee may avoid the Bhansali Transfers made within six years before the commencement of the Debtors' chapter 11 cases.

196.    Under section 550(a) of the Bankruptcy Code, the Trustee may recover the value of the Bhansali Transfers for the benefit of the Debtors' estates from Bhansali, the entity to or for whose benefit the Bhansali Transfers were made, and from any subsequent transferees.

197.    The Trustee is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under section 276-a of the New York Debtor & Creditor Law, and as otherwise permitted by law.

## COUNT 2

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under 11 U.S.C. §§ 548(a)(1)(A) and 550(a)
### (Mihir Bhansali)

198.    Plaintiff restates and re-alleges paragraphs 1 through 188 of this Complaint as though fully set forth herein.

199.    The Debtors made numerous transfers to Bhansali within two years of the commencement of the Debtors' chapter 11 cases, including, but not limited to, certain transfers listed on Schedule A, attached hereto (collectively, the "**Two-Year Bhansali Transfers**").

200.    The Two-Year Bhansali Transfers constituted transfers of interests of the Debtors in property.

201.    The Two-Year Bhansali Transfers were made to or for the benefit of Bhansali.

202.    The Two-Year Bhansali Transfers were made with the actual intent to hinder, delay, or defraud FDI's creditors. Modi, Bhansali, Gandhi, and their co-conspirators approved the Two-Year Bhansali Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Two-Year Bhansali Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations.

203.    The Trustee may avoid the Two-Year Bhansali Transfers under section 548(a)(1)(A) of the Bankruptcy Code.

204.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Two-Year Bhansali Transfers for the benefit of the Debtors' estates from Bhansali, to or for whose benefit the Two-Year Bhansali Transfers were made, and from any subsequent transferees.

## COUNT 3

### Faithless Servant
### (Mihir Bhansali)

205.     Plaintiff restates and re-alleges paragraphs 1 through 188 of this Complaint as though fully set forth herein.

206.     During all relevant times herein, Bhansali was a highly compensated employee, insider, agent, and servant of the Debtors.

207.     As such, Bhansali owed the Debtors a duty of loyalty and fidelity, and was prohibited from acting in a manner inconsistent with his agency or trust.

208.     By knowingly, intentionally, and purposefully participating in the Firestar criminal enterprise, Bhansali acted in a manner adverse to and wholly inconsistent with his duties to the Debtors.

209.     Bhansali engaged in the foregoing acts of faithlessness, including his active participation in the Firestar criminal enterprise, intentionally, maliciously and/or with wanton and willful disregard for the Debtor's rights and interests.

210.     Bhansali's active participation in the Firestar criminal enterprise permeated all aspects of Bhansali's work for the Debtors.

211.     Because Bhansali acted as a faithless servant and violated his duties to the Debtors, Bhansali must disgorge, and the Estate is entitled to recover, all sums paid to or on behalf of Bhansali as compensation as set forth in <u>Schedule A</u>.

212.     By reason of the foregoing, the Estate is entitled to disgorgement of all compensation as set forth in <u>Schedule A</u>, plus prejudgment interest.

## COUNT 4

**Avoidance and Recovery of Actual Fraudulent Transfers
Under N.Y. DCL §§ 276, 278, and 279, and
11 U.S.C. §§ 544(b)(1) and 550(a)
(Ajay Gandhi)**

213.    Plaintiff restates and re-alleges paragraphs 1 through 188 of this Complaint as though fully set forth herein.

214.    The Debtors made numerous transfers to Ajay Gandhi, as identified on Schedule B, attached hereto (collectively, the "**Gandhi Transfers**").

215.    The Gandhi Transfers constituted transfers of interests of the Debtors in property.

216.    The Gandhi Transfers were made to or for the benefit of Gandhi.

217.    The Gandhi Transfers were made with the actual intent to hinder, delay, or defraud the Debtors' creditors. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Gandhi Transfers in order to perpetuate the Bank Fraud. The natural consequence of the Gandhi Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations. This result hindered, delayed, and defrauded the Debtors' creditors.

218.    Actual creditors, including but not limited to the Debtors' vendors and suppliers exist who could have the Gandhi Transfers set aside, or who could disregard the Gandhi Transfers and attach or levy execution upon the property conveyed, under section 278 and/or 279 of the New York Debtor & Creditor Law.

219.    Under section 276 of the NY Debtor & Creditor Law and section 544(b)(1) of the Bankruptcy Code, the Trustee may avoid the Gandhi Transfers made within six years before the commencement of the Debtors' chapter 11 cases.

220.    Under section 550(a) of the Bankruptcy Code, the Trustee may recover the value

of the Gandhi Transfers for the benefit of the Debtors' estates from Gandhi, the entity to or for

whose benefit the Gandhi Transfers were made, and from any subsequent transferees.

221.    The Trustee is entitled to his reasonable costs and expenses incurred pursuing this

claim, including counsel fees under section 276-a of the New York Debtor & Creditor Law, and

as otherwise permitted by law.

## COUNT 5

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under 11 U.S.C. §§ 548(a)(1)(A) and 550(a)
### (Ajay Gandhi)

222.    Plaintiff restates and re-alleges paragraphs 1 through 188 of this Complaint as

though fully set forth herein.

223.    The Debtors made numerous transfers to Gandhi within two years of the

commencement of the Debtors' chapter 11 cases, including, but not limited to, certain transfers

listed on Schedule B, attached hereto (collectively, the "**Two-Year Gandhi Transfers**").

224.    The Two-Year Gandhi Transfers constituted transfers of interests of the Debtors in

property.

225.    The Two-Year Gandhi Transfers were made to or for the benefit of Gandhi.

226.    The Two-Year Gandhi Transfers were made with the actual intent to hinder, delay,

or defraud FDI's creditors. Modi, Bhansali, Gandhi, and their co-conspirators approved the Two-

Year Gandhi Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit

proceeds for the benefit of Modi, his family, and others. The natural consequence of the Two-Year

Gandhi Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors'

legitimate obligations.

227.     The Trustee may avoid the Two-Year Gandhi Transfers under section 548(a)(1)(A) of the Bankruptcy Code.

228.     Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Two-Year Gandhi Transfers for the benefit of the Debtors' estates from Gandhi, to or for whose benefit the Two-Year Gandhi Transfers were made, and from any subsequent transferees.

**COUNT 6**
**Avoidance and Recovery of Actual Fraudulent Transfer**
**Under N.Y. DCL §§ 276, 278, and 279**
**(Ajay Gandhi)**

229.     Plaintiff restates and re-alleges paragraphs 1 through 188 of this Complaint as though fully set forth herein.

230.     On February 26, 2018, FDII made a transfer to Gandhi in the amount of $115,000 (the "**FDII Transfer**").

231.     The FDII Transfer constituted a transfer of interests of an interest in FDII's property.

232.     The FDII Transfer was made to or for the benefit of Gandhi.

233.     The Trustee is a judgment creditor of Synergies.

234.     The FDII Transfer was made with the actual intent to hinder, delay, or defraud the creditors of FDII, including the Debtors, within the meaning of section 276 of the N.Y. DCL. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the FDII Transfers in order to launder and siphon illicit proceeds of the Bank Fraud and other valuable assets for the benefit of Gandhi.

235.     The natural consequence of the FDII Transfer was to deplete the FDII's property and frustrate satisfaction of FDII's obligations. This result hindered, delayed, and defrauded the FDII's creditors, including the Debtors.

236.     The Trustee, as a creditor of FDII, may set aside the FDII Transfer, disregard the FDII Transfer, and attach or levy execution upon the property conveyed under sections 278 and 279 of the New York Debtor & Creditor Law.

237.     Alternatively, the Trustee is entitled to monetary damages in the amount of the FDII Transfer.

238.     The Trustee is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under section 276-a of the New York Debtor & Creditor Law, and as otherwise permitted by law.

## COUNT 7

### Faithless Servant
### (Ajay Gandhi)

239.     Plaintiff restates and re-alleges paragraphs 1 through 188 of this Complaint as though fully set forth herein.

240.     During all relevant times herein, Gandhi was a highly compensated employee, insider, agent, and servant of the Debtors.

241.     As such, Gandhi owed the Debtors a duty of loyalty and fidelity, and was prohibited from acting in a manner inconsistent with his agency or trust.

242.     By knowingly, intentionally, and purposefully participating in the Firestar criminal enterprise, Gandhi acted in a manner adverse to and wholly inconsistent with his duties to the Debtors.

243.     Gandhi engaged in the foregoing acts of faithlessness, including his active participation in the Firestar criminal enterprise, intentionally, maliciously and/or with wanton and willful disregard for the Debtor's rights and interests.

244.     Gandhi's active participation in the Firestar criminal enterprise permeated all aspects of Gandhi's work for the Debtors.

245.     Because Gandhi acted as a faithless servant and violated his duties to the Debtors, Gandhi must disgorge, and the Estate is entitled to recover, all sums paid to or on behalf of Gandhi as compensation as set forth in <u>Schedule B</u>.

246.     In addition, upon FDII's assignment of any and all claims to the Trustee, the Trustee seeks disgorgement of the FDII Transfer for the same reasons as set forth herein.

247.     By reason of the foregoing, the Estate is entitled to disgorgement of all compensation paid to Gandhi as set forth in <u>Schedule B</u>, the FDII Transfer, plus prejudgment interest.

WHEREFORE, Plaintiff, as chapter 11 trustee of the Debtors and assignee of claims held by FDII and judgment creditor of FDII, respectfully requests that the Court enter judgment:

   a.   On Count 1, enter judgment in favor of Plaintiff and against Bhansali avoiding each of the Bhansali Transfers in the amount of $1,155,940.76.

   b.   On Count 2, enter judgment in favor of Plaintiff and against Bhansali avoiding each of the Two-Year Bhansali Transfers in the amount of $281,233.67.

   c.   On Count 3, enter judgment in favor of Plaintiff and against Bhansali disgorging each of the Bhansali Transfers in the amount of $1,155,940.76.

   d.   On Count 4, enter judgment in favor of Plaintiff and against Gandhi avoiding each of the Gandhi Transfers in the amount of $1,359,669.30.

   e.   On Count 5, enter judgment in favor of Plaintiff and against Gandhi avoiding each of the Two-Year Gandhi Transfers in the amount of $542,115.17.

   f.   On Count 6, enter judgment in favor of Plaintiff, as judgment creditor of FDII, and against Gandhi, avoiding the FDII Transfer in the amount of $115,000.

   g.   On Count 7, enter judgment in favor of Plaintiff as Trustee of the estates of the Debtors, in addition to as assignee of claims held by FDII, disgorging each of the

Gandhi Transfers and the FDII Transfer in the amount of $1,474,669.30.

h.   Award Plaintiff his reasonable costs and expenses incurred in this action, including counsel fees pursuant to section 276-a of the New York Debtor & Creditor Law section 276-a, and as otherwise permitted by law.

Dated: February 25, 2020,
            New York, New York                         Respectfully submitted,

                                                                        **JENNER & BLOCK LLP**

                                                                        By:  /s/ Vincent E. Lazar
                                                                        Vincent E. Lazar
                                                                        Angela M. Allen (admitted *pro hac vice*)
                                                                        353 North Clark Street
                                                                        Chicago, Illinois 60654
                                                                        (312) 222-9350
                                                                        vlazar@jenner.com
                                                                        aallen@jenner.com

                                                                        Carl N. Wedoff
                                                                        919 Third Avenue
                                                                        New York, New York 10022
                                                                        (212) 891-1600
                                                                        cwedoff@jenner.com

                                                                        *Counsel for the Chapter 11 Trustee*

# APPENDIX A

## Appendix A-76

During the Relevant Period, Nirav Modi, Bhansali, and Gandhi exercised direct oversight and control over transactions between the U.S. Entities and Shadow Entities. For example:

(i) On June 8, 2012, Gandhi emailed Bhavesh Patel and Shyam Wadhwa, "Please email payables to HK and Dubai – all the companies. Firestar, Firestar Diamond Int'l and Jaffe. Need to pay $1m to HK or Dubai hence need name and amounts only." Bhavesh replied, "There is nothing open in Dubai however HK open payables attached herewith for your review." Gandhi replied, "It could be Pacific, World Diamond, etc too." That same day, FDI transferred $1,000,000 to Fancy Creations. This transaction is described as an "advance" in FDI's bank statement.

(ii) On July 23, 2012, Ajay Gandhi sent a message to Nirav Modi through Panemail, which is a web-based email service that automatically deletes messages, "Niravbhai, please see attached payment plan in 5 parts to clean-up AR and AP of [FDII] for HK, Dubai, Belgium and NY. Funds should come from respective companies. 1. $452k. 2. $1.129m. 3. $1.5m. 4. $828k. 5. $1.05m. If implemented, the attached AR and AP of $4.3 million can be cleaned up. Please let me know if you have different thought." On August 3, 2012, Gandhi forwarded the email to Hemant Bhatt, copying Bhansali, and stated, "I will call you Monday to discuss. We need to move funds in Firestar Diamond International, Inc. per attached. NM/MB is fine so long as money flows from SDC/Tristar and Diamlink to any of HK or Dubai entities." On August 14, 2012, Gandhi followed up, "Hemant, When can I expect payments for the below cycle that we spoke about?" On August 27, 2012, Bhatt replied to Gandhi, copying Bhansali, "Pacific and Unique paid as above. Please pay accordingly."

The message contained a list reflecting that Pacific and Unique owed FDII $779,579 and $418,498, respectively, in accounts receivable, and that FDII owed Fancy Creations, FDL, and Diagems $1,063,369, $121,129, and $14,033, respectively, in accounts payable. On August 28, 2012, Hemant Bhatt messaged Ajay Gandhi on Panemail, "Auragem paid $200,000.00 and Brilliant paid $231,175.03. Pleeasse [sic] confirm receipt and pay to Fancy." FDII's bank statements reflect: (a) incoming wires of $779,544.11 and $418,463.00 on August 27, 2012 from Pacific and Unique, respectively; (b) incoming wires of $231,150.03 from Brilliant and $199,975.00 from Auragem on August 28, 2012; and (c) outgoing wires of $1,063,369, $121,129.21, and $14,032.80 on August 28, 2012 to Fancy Creations, FDL, and Diagems, respectively.

(iii)     On August 28, 2012, Gandhi emailed Bhavesh Patel, "Tomorrow, please wire $431,175 to Fancy Creations from [FDII's] Capital Old Account." FDII's bank statement reflects an outgoing wire in the amount of $431,175 to Fancy Creations on August 29, 2012.

(iv)     On September 12, 2012, Gandhi emailed Bhavesh Patel, copying Hemant Bhatt, "Please wire $150,000 to Unique Diamond for back office expenses from January 2012 thru June 2012 – invoice #'s UD-FI-004 & UD-FI-001." That same day, Patel emailed Gandhi and Bhatt, "Please find attached wire from FSI to Unique as per new bank details for $150k." Gandhi replied solely to Patel, "Spoke to HB for return of funds?" Patel replied, "I called him today morning. He confirmed and told that, he will require invoice details if any / from which location amount will remit etc[.] so that he will arrange as per your requirement in NY." Gandhi replied, "Ask him from where he can remit and give him details. It could be in FS or Intl."

(v)     On December 4, 2012, Sridhar Krishnan of SDC Designs emailed Gandhi, "You shall receive payment of $1,737,155 . . . from Empire Gems FZE in Firestar Diamond International, part payment against your invoice # 73112 dt 7/31/12[.] Please make payment to SDC Designs LLC against their invoice # 629966 dt 7/30/12." Gandhi replied, "When?" Krishnan replied, "I am wiring today to Universal FZE, so I guess you would get it from Empire gems tomorrow." Gandhi then forwarded the email chain to Mihir Bhansali and asked, "Ok to proceed per below once funds are received?" That same day, Gandhi separately forwarded Krishnan's email to Hemant Bhatt and asked, "Is this OK once funds are received?" Gandhi followed up with Bhatt several hours later, "Do not send email. Please call me to confirm in the morning."

(vi)     On December 10, 2012, Gandhi emailed Bhavesh Patel, "Pay $1m against above invoice to Empire Gems tomorrow from HSBC per attached wire instruction. Also let HB know that $733k is already paid against this invoice. Upon information and belief, "HB" refers to Hemant Bhatt. On December 11, 2012, FDI wired $1,185,025.05 to Empire.

(vii)     On December 13, 2012, Gandhi instructed Bhavesh Patel to "prepare the following wires today: 1. Pay $231,000 to Unique for Back Office expenses from Firestar Diamond Inc. 2. Pay $391,611 to Synergies Corp from Firestar Diamond, Inc. for Interest. 3. Pay $300,000 to Unique from Synergies Corp. for Loan Repayment. 4. Pay $91,000 to Brilliant from Synergies Corp for Loan Repayment. 5. Balance amount tomorrow to Diagem once funds are here in Firestar Diamond, Inc." Later that day, Gandhi followed up, "Money is coming any minute hence wire $552,133.10 to Diagem from Firestar Diamond, Inc. (against open invoice) . . ." The next day, Patel replied, "Based o[n] HB's details, please find wire from FSI to Diagems for $552,133.10. Gandhi replied, "Please tell HB about wires from yesterday

2

and ask if he receives it. Upon information and belief, "HB" refers to Hemant Bhatt.

(viii)  On December 20, 2012, Bhavesh Patel emailed Ajay Gandhi, "Please find attached wire [from FDI] to Diagems ($119k) and Pacific ($652k) as per instructions." Gandhi replied, "Change Empire amount as discussed."

(ix)  In a 2012 email, Kurian Matthews relayed a conversation he had with Bhansali in which they set up a circular transaction starting at Fantasy, going through Radashir Jewelry Co. Pvt. Ltd. (a Modi-Controlled Entity that has been implicated in the Bank Fraud), FIL, and Firestar and ending back at Fantasy. The purpose was to "clear the old invoices of Radashir on FDC" because a bank was inquiring about the old invoices. Similarly, in December 2012, Bhansali and Kurian Mathews discussed wiring money to Radashir and back to the Debtors against Radashir's accounts payables to "use [the money] for NM [Modi]."

(x)  On February 4, 2013, Sridhar Krishnan, the manager of SDC Designs, LLC wrote to Bhansali and Modi partner Hemant Bhatt using personal email addresses. Krishman told Bhatt and Bhansali, "You should expect 1.4 million in Universal fze today. Please wire the same to A Jaffe." Two days later, Bhatt confirmed that Universal Fine Jewelry FZE had received the funds and that "Empire paid US $1,391,570 to A Jaffe value 05 Feb 13."

(xi)  On February 6, 2013, Ajay Gandhi emailed Nirav Modi, copying Mihir Bhansali, "Niravbhai, After keeping $3 million buffer, I can pay $1 million to India in February 2013. Please let me know if I should ask Manish/Amit for listing to pay." Modi replied, "Yes pls." One day earlier, Gandhi emailed Manish Bosamiya, Miten Pandya, and Amit Magia, "We can pay $1.0 million to India in the month of February 2013. Please email me a list to pay." As alleged above, Manish Bosamiya and Miten Pandya were among the individuals directly involved in obtaining LOU funding from PNB. Thus, upon information and belief, the purpose of Gandhi's emails was to inform Modi, Bosamiya, and Pandya the amount Gandhi would be able to send to facilitate repayment of LOUs.

(xii)  On February 19, 2013, Shyam Wadhwa emailed Ajay Gandhi, "Kindly clarify details of open vendor bills against which inward wire receipt of $2[,]006,987.25 on 29th May '12 has been applied. Gandhi replied, "$2m was received & wired back to FIPL and Radashir." His email included a table reflecting that, on May 19, 2012, $2,006,949.25 received from Pacific was sent to FIPL ($1,953,990) and Radashir ($126,010).

(xiii)    On February 22, 2013, Bhavesh Patel emailed Ajay Gandhi a wire confirmation reflecting a $503,501.41 transfer from FDI to Pacific.

(xiv)    On October 23, 2013, Ajay Gandhi emailed Bhavesh Patel, "Pay $150,000 to Pacific Diamonds per the attached from Firestar Diamond, Inc. – HSBC." Patel replied with the wire confirmation and stated, "Please find attached wire from FSI to Pacific as Professional Fees."

(xv)    On October 30, 2013, Bhavesh Patel emailed Ajay Gandhi, copying Altamash Ansari and Shyam Wadhwa, "Please find attached internal transfer as well as wire document for your reference. 1. FSI to Jaffe, Amount $1,768,385.00 (Internal) 2. Jaffe to Pacific, Amount $2,455,036.00 (Abu Dhabi Bank). A few hours later, Patel followed up to ask Gandhi to "please approve attached wires as discussed."

(xvi)    On December 31, 2013, Mihir Bhansali emailed Ajay Gandhi, "As discussed, FSI will pay to Sangam Diamonds Corp. on behalf of Fancy Creation Company Limited (HK) (Invoice # 100773 Dt. 19.12.2013). Attached are Invoice of Sangam Diamonds Corp Sale to Fancy and Sangam's bank info. Please make wire today." Gandhi replied, copying Bhavesh Patel, "Bhavesh, please set-up wire from Firestar to Sangam Diamond – NY." Patel then replied with the wire confirmation reflecting a $1,247,746 payment to Sangam Diamonds Corp. On January 8, 2014, Gandhi forwarded Bhansali's December 31, 2013 email to Hemant Bhatt, stating "I paid $1.24m on 12/31/13 to Fancy per attached. This funds never came back hence I will pay $575k today. Please call me if needed."

(xvii)    On February 5, 2014, Altamash Ansari emailed Ajay Gandhi, with a copy to Shyam Wadhwa and Bhavesh Patel, a table of "Receipts & Payments for the month in which [Jaffe] received money from Pacific." The table listed amounts Jaffe received from and paid to Pacific, Empire, Twin Fields, and various Firestar Entities. Replying solely to Shyam Wadhwa, Gandhi stated, "Pacific got paid more than they send funds !!!!!" Wadhwa replied, "Please ignore below email. To answer your question, A. Jaffe had received Funds through Pacific which were lying as ADVANCE in books. Post shipment of diamonds, advance has got adjusted." On February 12, 2014, Gandhi replied, "Anything I need to do?" Wadhwa replied, "Manish Bosamiya would be requiring $ 4M funds against India billing on A. Jaffe." As noted above, upon information and belief, Manish Bosamiya was one of the individuals directly involved in obtaining LOU funding from PNB, which suggests that the $4 million Wadhwa requested from Jaffe was directly related to repaying an LOU. Gandhi replied, "Spoke to MB [upon information and belief, Mihir Bhansali]. Let's talk tomorrow or Friday. He prefers outgoing shipment from Jaffe to Firestar BVBA as oppose to anywhere."

4

(xviii)    On March 18, 2014, Ajay Gandhi emailed Bhavesh Patel, copying Hemant Bhatt, instructions to wire $150,000 from FDI to Unique for "back office expenses," $123, 097 from FDI to Synergies for "Interest," and $123,000 from Synergies to Brilliant for "Loan repayment." Patel replied with the wire confirmations.

(xix)     On March 25, 2014, Shyam Wadhwa emailed Ajay Gandhi, copying Bhavesh Patel, "FHL has remitted sub-debt funds [of] USD [$]4,058,500 to Firestar Diamond Inc and USD [$]1,800,000 to Firestar Group Inc. Please remit funds to Brilliant from both companies and confirm." Patel then sent Gandhi wire confirmations reflecting a transfer of $4,058,500 from FDI to Brilliant and a transfer of $1,800,000 from FGI to Brilliant.

(xx)      On August 4, 2014, Sridhar Krishnan of SDC Designs emailed Ajay Gandhi, "Did you wire to Empire. Please advise." Gandhi replied, "I need to pay overseas. I have asked for a listing to pay. I will let you know once it is wired." Krishnan replied, "I need the funds by tomorrow. Please expedite."

(xxi)     On September 18, 2014, Manish Bosamiya emailed Ajay Gandhi, copying Bhavesh Patel, "Firestar Diamond Intl Inc will receive US $550,000.00 from Firestar Diamond Ltd (HK) in Capital One Bank." Patel then emailed Gandhi, "Please approve below wire from Capital Old [one of FDII's Capital One bank accounts] to Pacific for $550,000.00 as POA."

(xxii)    On December 16, 2014, Gandhi emailed Avinash Oza and Altamash Ansari, "Please pay $1,240,273.54 to Auragem, HK tomorrow for their invoice #2580001314 from Firestar Diamond, Inc. (Part payment)." Oza replied with the wire confirmation. Gandhi replied, "Bank information confirmed with Sandeep?" Upon information and belief, Gandhi was referring to Sandeep Mistry, one of the key co-conspirators in the Bank Fraud.

(xxiii)   On February 19, 2015, Ajay Gandhi emailed Hemant Bhatt, "I would like to pay $300k for back-office expenses. Pay to Unique? Please email me wire information. Also, I would like to pay $180k from Synergies to Brilliant. Please email me wire confirmation." On February 20, 2015, Ajay Gandhi emailed Arpan Doshi and Avinash Oza instructions to wire $186,871 from FDI to Synergies as "Interest", $300,000 from FDI to Eternal as "Back Office Expense," and $180,000 from Synergies to Brilliant as "Loan Repayment." Doshi replied with the wire confirmations.

(xxiv)    On March 2, 2015, Gandhi emailed Avinash Oza and Arpan Doshi instructions to wire $300,000 from FDI to Unique and $180,000 from Synergies to Brilliant. Doshi replied with the wire confirmations.

(xxv)  On June 26, 2015 Ajay Gandhi emailed Arpan Doshi and Avinash Oza instructions to wire $300,000 from FDI to Pacific. FDI's bank statement reflects a transfer from FDI to Pacific of $1,438,270.60 on that day.

(xxvi)  On September 28, 2015, Ajay Gandhi emailed Avinash Oza, "Please wire $1,017,000 from Firestar Diamond, Inc to Pacific Diamond – on account." Oza replied with the wire confirmation. Gandhi replied, please wire $54,000 to Pacific D from Firestar Diamond, Inc." Gandhi then emailed Operation 1, in reply to an email earlier that day in which Operation 1 sent Gandhi Pacific's bank details, "$1.017m wired. I thought it was $1.017m but I received $1.071m. Will wire balance tomorrow - $54k." FDI's bank statements reflect these transfers.

(xxvii)  On February 26, 2016, Ajay Gandhi emailed Avinash Oza and Arpan Doshi instructions to wire $1,192,105.55 from FDI to Tri Color. Doshi replied with the wire confirmation.

(xxviii)  In March 2016, Evelyn Kosiec, the Jaffe operations manager, asked Bhansali where to re-export loose diamonds, and an hour later she emailed Gandhi, "Mihir informed to ship this to Eternal diamonds in Hong Kong, the same price, rounded to the nearest 5 120 day terms."

(xxix)  On March 4, 2016, Gandhi emailed Avinash Oza and Arpan Doshi instructions to wire $300,000 from FDI to Unique. Oza replied with the wire confirmation.

(xxx)  On March 9, 2016, Ajay Gandhi emailed Avinash Oza and Arpan Doshi instructions to wire $247,551 from FDI to Synergies and $250,000 from Synergies to Brilliant. Doshi replied with the wire confirmations.

(xxxi)  On March 15, 2016, Ajay Gandhi emailed Avinash Oza and Arpan Doshi instructions to wire $700,000 from Jaffe to Pacific. Oza replied with the wire confirmation.

(xxxii)  On March 21, 2016, Ajay Gandhi emailed Avinash Oza and Arpan Doshi instructions to wire $1 million from Jaffe to Pacific. Doshi replied with the wire confirmation.

(xxxiii)  On March 24, 2016, Ajay Gandhi emailed Avinash Oza and Arpan Doshi instructions to wire $1 million from Jaffe to Pacific. Oza replied with the wire confirmation.

(xxxiv)  On March 25, 2016, Ajay Gandhi emailed Avinash Oza and Arpan Doshi instructions to wire $1.4 million from Jaffe to NMI, and then $613,069 from NMI to Auragem and $787,000 from NMI to Nirav Modi Ltd. Doshi replied with the wire confirmations.

(xxxv)    On March 31, 2016, Ajay Gandhi emailed Avinash Oza and Arpan Doshi instructions to wire $301,540 from Fantasy to Tri Color Gems. Oza replied with the wire confirmation.

(xxxvi)    On April 5, 2016, Gandhi emailed Avinash Oza and Arpan Doshi instructions to wire $500,000 from Jaffe to Pacific. Doshi replied with the wire confirmation.

(xxxvii)    On May 6, 2016, Gandhi emailed Avinash Oza, Arpan Doshi, and Altamash Ansari instructions to wire $2 million from Jaffe to Pacific. Oza replied with the wire confirmation.

(xxxviii)    On June 1, 2016, Gandhi emailed Avinash Oza and Arpan Doshi instructions to wire $815,000 from Jaffe to Pacific. Doshi replied with the wire confirmation. Jaffe's bank statements reflect this wire transfer.

(xxxix)    On June 29, 2016, Ajay Gandhi emailed Altamash Ansari and Vishal Popat a bank statement reflecting a $599,972 wire transfer from Pacific to Jaffe on June 29, 2016. Gandhi instructed them to "show as advance if no open AR from Pacific."

(xl)    On July 18, 2016, Ajay Gandhi emailed Avinash Oza instructions to wire $200,000 from FDI to Jaffe, $200,000 from Jaffe to Fancy Creations, $150,000 from FDI to FDII, and $150,000 from FDII to Fancy Creations. Oza replied with the wire confirmations.

(xli)    On July 19, 2016, Ajay Gandhi Emailed Avinash Oza instructions to wire $1,809,528 from FDI to Fancy Creations. Oza replied with the wire confirmation.

(xlii)    On July 22, 2016, Gandhi emailed Avinash Oza and Arpan Doshi instructions to wire "$715k from Firestar to Fancy – Purchases[;] $200k from Firestar to Jaffe[;] $200k from Jaffe to Fancy – Purchases[.]" Oza replied with the wire confirmations.

(xliii)    On March 22, 2017, Ajay Gandhi emailed Avinash Oza and Kunal Patel instructions to wire $300,000 from FDI to Unique for "Back-Office expenses" and $240,000 from Synergies to Brilliant for "Repayment of Loan." Oza replied with the wire confirmations.

(xliv)  On January 3, 2018, Gandhi emailed Avinash Oza instructions to wire $483,620.05 from FDI to Pacific, $2,188,769.43 from FDII to Pacific, and $530,000 from Jaffe to Pacific. Oza replied with the wire confirmations. Gandhi then forwarded this email to Subhash Parab and Shyam Wadhwa stating, with respect to the $2,188,769.43 transfer to Pacific, "We have wired these funds from FSI but please apply this amount to FSII (Pacific) due to bank error in Capital One." Consistent with Gandhi's email, FDI's bank statements confirm that FDI wired both $483,620.05 and $2,188,769.43 to Pacific on January 3, 2018.

(xlv)   On January 31, 2018, Avinash Oza emailed Ajay Gandhi wire confirmations reflecting transfers of $2,466,015 and $525,000 from FDII to Fancy Creations. Gandhi forwarded the wire confirmations to Shyam Wadhwa and stated, "Please let your vendor know of this payment and clear any AR from HK."

## Appendix A-77

Ajay Gandhi regularly advised Nirav Modi, Miten Pandya, Manish Bosamiya, Amit Magia, and Shyam Wadhwa of his ability to wire funds from the U.S. Entities to India in furtherance of the Bank Fraud throughout the Relevant Period. For example:

(i) On August 14, 2009, Nirav Modi directed Gandhi to make payments totaling $2,293,326 to Brilliant and Diagem. On June 16, 2010, Nirav Modi instructed Gandhi, "Unique has wired $250,000 today to Synergies. Please wire to the account Mehul bhai wants."

(ii) On August 26, 2010, Nirav Modi emailed Ajay Gandhi to ask, "What will be the week-by-week payment plan for September to India?" On August 27, 2010, Gandhi replied, attaching two spreadsheets containing two possible scenarios, and noting "to cover August borrowing base – I have asked India to remit $1 m for one day & I will remit back on September 1. Substantial amount of inventory was shipped to India & HK hence inventory & AR became ineligible." On August 29, 2010, Gandhi forwarded this email chain to Mihir Bhansali.

(iii) On October 21, 2010, in furtherance of a circular trade, Nirav Modi and Gandhi communicated by email about the shipment of a diamond to a Shadow Entity. Modi stated, "Send the 70 ct vivid yellow to Firestone Dubai @51,500 and not Firestone HK." Gandhi responded, "Firestone, Dubai confirmed (Not Unique)[,]" to which Modi clarified, "Sorry Unique[,]" in reference to the Shadow Entity. Gandhi responded with "Glad I asked!!!"

(iv) On December 20, 2013, Ajay Gandhi emailed Manish Bosamiya, Miten Pandya, and Amit Magia, "I can pay $600k from Capital One – Diamond Division or A. Jaffe – HSBC." On December 23, 2013, Bosamiya replied, "Please find attached open invoice of $602,761.39 from FSI." Patel replied to Gandhi, "They don't have anything most recent open from Jaffe or diamond division so they gave listing from FSI for $603k. Please let me know if we can pay from FSI so that I will prepare wires as per that." Gandhi replied, "Transfer to H[s]bc but do not pay from this list but pay other list [o]f Manish around $1.8m."

(v) On January 9, 2014, Ajay Gandhi emailed Miten Pandya, Manish Bosamiya, and Amit Magia, "I can pay $5 million in January 2014 to India. Please email me a listing of invoices so that I can wire funds on a weekly basis or so." Bosamiya replied with the allocation of the $5 million among various Firestar Entities. On January 13, 2014, Gandhi replied, "$5m wired per below. Please acknowledge receipt of these wires." On January 21, 2014, Bosamiya replied, copying Bhavesh Patel, "Boi – London [upon

1

information and belief, "Boi" refers to "Bank of India] informed yesterday that they have not received $2,157,359.90 as the concern [sic] person was on leave last week and they have only received the message that funds are coming but Nostro is not credited. Please provide the swift message." Later that day, Patel replied to Gandhi, "Manishbhai called me and they received fund." Gandhi then replied to Bosamiya, "Bhavesh emailed me that funds were received. Please let me know otherwise."

(vi)  On April 1, 2014, Gandhi emailed Manish Bosamiya, "I can pay $4 million in April 2014 to India. Please email me a listing of invoices so that I can wire funds on a weekly basis or so." Bosamiya replied with instructions to wire $1,763,644.60 from FDI to FIL and $2,250,858.36 from FDI to FDIPL. On April 2, 2014, Gandhi replied, "1.76m wired today." On April 14, 2014, Gandhi followed up, "$240k and $341k wired today."

(vii) On April 6, 2016, Shyam Wadhwa emailed Ajay Gandhi and Mihir Bhansali asking them to send $2.7 million from Jaffe to FIL to clear outstanding accounts receivable and stating "our fund position is tight in India, else would have wired funds to you against our payables of about USD 1M from FDIPL for clearing AR/AP between India and NY." Gandhi replied, copying Bhansali, "We have Overseas AR of around $8.5m in Firestar Diamond, Inc. – If I get funds in FD, Inc then we can wire funds to India this month." The next day, Gandhi followed up, "I can wire $1m this month from Jaffe thru FS. Can it come back to FS?

## Appendix A-83

The secretive nature of the "regular" financials is demonstrated by the communications between Nirav Modi, Ajay Gandhi, Mihir Bhansali, and other co-conspirators.  For example:

(i)   On September 24, 2009, Ajay Gandhi emailed Raghu Iyer, "I looked at cash flow totals and there are major differences in the total cash flow summary versus details by month. The main reason is that I am accounting for non-core cash receipts and non-core payments thru cash flow without increasing the corresponding sales & purchases (Loose diamonds)." Iyer replied, "Can u make this match pls[.] So we will get the annual cash flow properly[.]"

(ii)  On March 8, 2010, Deepak Gupta emailed Ajay Gandhi and Mihir Bhansali asking for Jaffe and FDI's financial statements. Gandhi forwarded the email to Bhansali and asked, "Who is Deepak Gupta and OK to send FS to him?" Bhansali replied, "Yes, ok to send to him. Will explain when we talk." Gandhi replied, "Should I send him both core and non-core?" Bhansali replied, "Yes, send him both, so that they correspond with the audited numbers. Speak to him on the phone and explain to him the difference."

(iii) On October 17, 2012, Ajay Gandhi emailed Nirav Modi, Mihir Bhansali, Raghu Iyer, and Saju Poulose the "Core Business and Regular Financial Statements as of September 30, 2012 for your review." On October 25, 2012, Saju Poulose emailed Ajay Gandhi, "Need your help to understand 'third' version 'sales' number of [FDII] as on Sep 2012 . . . 1. Josh Division Sales $4,898,257 - This is only Josh diamond sales from the financials[?] 2. September Financials $8,333,842 -This is including Josh + NDM larger/corporate sales[?] 3. September Financials Josh Division for Consolidation $9,599,627 = what are [sic] this numbers include?" Gandhi replied, "1. September Josh's division of HK will include sales made to inter-company such as Firestar Diamond, Inc., A. Jaffe, Firestar HK, Firestar Dubai and other affiliated companies in HK and Dubai ($9.55 million). 2. Josh's financial - $4.89 million will include any of the affiliated sales that he may be earning margins. All Pink sales and affiliated sales without margin are not included. 3. Corporate Sales - $8.33 million will not include AN[Y] affiliated sales but only sales to outside customers including Pink diamond sales."

(iv)  On September 16, 2013, Ajay Gandhi emailed Samir Shah and Rebecca Chow with the subject "Loose Diamond Sales", "$196k loss for the attached sales of August 2013. Please confirm ASAP." Shah replied, "The goods came in at the wrong prices from Sandeep. This is the reason it is showing as a loss." Gandhi forwarded the email to Mihir Bhansali and stated, "We need to stop this. I am losing control on the Core Financials. Whre do I

1

show such loss for August now – Core or Non-Core? Can we reverse in September 2013 please as it is affecting banks for 6 month financials…" Gandhi followed up, "$196k loss was excluded from Core Financials of August 2013 but it is part of Regular Financials." Bhansali replied, copying Saju Poulose, "Ok. Saju – pls speak to me."

(v)     On October 15, 2013, Ajay Gandhi emailed Saju Poulose, copying Kuntal Desai, "Core-Non-Core – Thru September 2013 – How much am I moving? $167k or $177k that we discussed last week?" Poulose replied, "Hi Ajaybhai, Have discussed with Kuntal and gone thru his working file in detail. He will sent [sic] you the detailed mail." Gandhi replied, "How much was the amount and Kuntal – did you sent [sic] it?" Desai replied, "Yes. Please check other mail."

As part of the audit process, the auditors would email parties listed on the audited company's accounts receivable and accounts payable records to request written confirmation of the amounts reflected in the audited company's books and records. For audits of the U.S. entities, which upon information and belief were conducted together, Ajay Gandhi would be copied on the auditor's emails to Shadow Entities, which Gandhi would often forward to Operation 1 to ask that Operation 1 cause the Shadow Entity to provide confirmation the auditors. For example:

(i)     On June 7, 2017, Ajay Gandhi forwarded to Operation 1 an auditor's request to Fancy Creations. Operation 1 replied, "Today or tomorrow customer will confirm as discussed." Gandhi replied, "There were several emails…" Gandhi was referencing the auditor's requests to several other Shadow Entities, which Gandhi had also forwarded to Operation 1.

(ii)    On July 11, 2017, Gandhi sent an email to Operation 1 asking "Can you please have your customer [Brilliant] sign the attached confirmation for Synergies Corp?" The attachment was not the typical auditor's confirmation request sheet; instead, it was a term sheet for an unsecured loan from Brilliant to Synergies in the amount of $1,287,000. The term sheet indicated that the loan would be interest free, repayable on demand, dated as of September 30, 2016—nearly one year earlier—and was to be used "for the business purpose of the Company." On July 19, 2017, Gandhi sent an email directly to "accounts@brilliantdiamonds.hk", copying Operation 1, stating, "Please see attached Synergies Confirmation and sign and email to me ASAP. You are holding up my audit. This is balance confirmation as of 9/30/16." Approximately an hour later, Gandhi forwarded the email to Kurian Matthews asking, "Kurian – can you please have your customer take care of it ASAP per below email?" On July 23, 2017, an employee of Brilliant replied to Gandhi's email, copying Operation 1, attaching the signed loan term sheet.

(iii)   On November 10, 2017, Gandhi forwarded to Operation 1 an auditor's request to Eternal and asked Operation 1 to "Please chase your vendor to confirmed [sic] it. Audit is on hold." That same day, Gandhi sent substantively identical emails to Operation 1 forwarding auditor requests to Fancy Creations and Sino Traders.

**Appendix A-97**

The Operation 1 account was used to orchestrate transfers of funds and jewels among

Firestar Entities and Shadow Entities. For example:

(i)    On March 6, 2015, Rebecca Chow emailed Sandeep Mistry, copying Samir Shah and Paresh Mehta, "Please be informed that 1.68.52cts of 1/2ct VS loose diamond that's ready to be shipped. Please provide shipping address so we can process." Later that day, Chow forwarded the email to Operation 1 and stated, "Hi Sandeep, Hope this email reach [sic] you! Please advise below and thanks."

(ii)    On September 28, 2015, Ajay Gandhi sent Operation 1 remittance instructions for Jaffe's HSBC bank account ending 2460. The next day, Operation 1 replied, "Universal made payment of 1.4 m Advance Against Invoice[.]" A few hours later, Gandhi replied, "Received and wired to SDC." Jaffe's bank statements reflect that, on September 29, 2015, Jaffe received $1,399,962 from Universal Fine Jewelry FZE. That same day, Jaffe transferred $464,050 to SDC Designs LLC and $950,000 to FDII. FDII's bank statements reflect that, on September 29, 2015, FDII transferred $943,827.50 to SDC Designs LLC. Thus, consistent with the email exchange between Ajay Gandhi and Operation 1, the entire approximately $1.4 million Jaffe received from Universal was ultimately paid to SDC Designs, LLC.

(iii)    On January 29, 2016, Dhinakaran Pillai, a finance manager at Firestar International Pvt. Ltd., emailed Ajay Gandhi, "We have remitted today US $405,180.83 in FSI from FIPL invoice details as listed below . . . Once the payment as has been realized in your account, kindly remit the overdue outstanding of US $650,880.00 against our invoices, details as attached for your reference." The email referenced two invoices from FIPL to FDI dated October 22, 2015 and October 23, 2015, respectively. On February 3, 2016, Subhash Parab, who was copied on Pillai's email to Gandhi, forwarded the email to Operation 1 with the note "FYI". Operation 1 then emailed Gandhi, "Ajaybhai, India Team conformed [sic] that $650k is against his plan $405k, so that Please send to Firestar Dubai $650k, which we yesterday talk [sic]. Regards, Sandeep[.]" Gandhi replied, copying Subhash Parab, "I will pay $425k. Please let me know where or what company."

(iv)    On February 1, 2016, Operation 1 emailed Rebecca Chow and Samir Shah, "You will be received [sic] the goods from Tricolor[.] Please coordinate with Samir Bhai in details[.]" The email included a table listing a total of 379.02 carats of mixed diamonds of varying specifications. FDI's purchase ledger reflects a February 22, 2016 purchase of 379.02 carats of loose diamonds from Tri Color Gems for a total price of $400,131.

(v)     On February 9, 2016, Rebecca Chow emailed Operation 1, copying Ajay Gandhi, "Hi Sandeep, as per our phone conversation, please be informed that package of RE-117 & RE-119 both has [sic] been received in NY. Additionally, there is one shipment received that has no paper work at all."

(vi)    On March 3, 2016, Subhash Parab emailed Ajay Gandhi, copying Operation 1 and Shyam Wadhwa, "Dear Ajaybhai, Kindly wire USD2.00 Mio [sic] payment from A. Jaffe to FIPL as per attached listing." The attachment was a spreadsheet listing several dozen invoices issued by FIPL to Jaffe between March 20, 2015 and September 9, 2015 totaling $2,004,879.70. Gandhi replied, "Just realized cannot pay to Jaffe (Part of $3 m) unless funds are coming in from overseas."

(vii)   On March 29, 2017, Operation 1 emailed Ajay Gandhi, "Ajaybhai, We sold goods to Pacific Diamond FZE, and party will wire advice $1.9m[.] Please send to them Proforma Invoice as below details . . . Regards[,] Sales". Gandhi replied with invoice no. 032017, dated March 20, 2017, reflecting a sale by Jaffe to Pacific of 1,691.25 carats of "Mix Diamonds" at a total price of $2,114,062.50. On April 3, 2017, Jaffe received a $1,499,972 transfer from Pacific with a wire reference of "ADVANCE AGAINST PROFORMA INV N032017." That same day, Jaffe transferred $1,510,267.77 to Firestar International Pvt. Ltd.

(viii)  On September 22, 2017, Gandhi sent an email to Operation 1 attaching a report reflecting accounts receivable owed by Brilliant, Unique, and World Diamond to FDI and asking Operation 1 to "Please have your customer clear these AR - $5.5m on or before September 30, 2017."

2

**Schedule A - Compensation Transfers from Debtors to Mihir Bhansali**

| Date / Payroll Date | Transferor | Property Transferred | Value / Gross Earnings Amount | Transferee |
|---|---|---|---|---|
| 3/6/2012 | Firestar Diamond, Inc. | Cash | $ 4,397.58 | Mihir Bhansali |
| 3/20/2012 | Firestar Diamond, Inc. | Cash | $ 2,475.00 | Mihir Bhansali |
| 4/3/2012 | Firestar Diamond, Inc. | Cash | $ 2,475.00 | Mihir Bhansali |
| 4/17/2012 | Firestar Diamond, Inc. | Cash | $ 2,475.00 | Mihir Bhansali |
| 5/1/2012 | Firestar Diamond, Inc. | Cash | $ 2,475.00 | Mihir Bhansali |
| 5/15/2012 | Firestar Diamond, Inc. | Cash | $ 2,475.00 | Mihir Bhansali |
| 5/29/2012 | Firestar Diamond, Inc. | Cash | $ 2,475.00 | Mihir Bhansali |
| 6/12/2012 | Firestar Diamond, Inc. | Cash | $ 2,475.00 | Mihir Bhansali |
| 6/26/2012 | Firestar Diamond, Inc. | Cash | $ 2,475.00 | Mihir Bhansali |
| 7/10/2012 | Firestar Diamond, Inc. | Cash | $ 2,475.00 | Mihir Bhansali |
| 7/24/2012 | Firestar Diamond, Inc. | Cash | $ 2,475.00 | Mihir Bhansali |
| 8/7/2012 | Firestar Diamond, Inc. | Cash | $ 2,475.00 | Mihir Bhansali |
| 8/21/2012 | Firestar Diamond, Inc. | Cash | $ 2,475.00 | Mihir Bhansali |
| 9/4/2012 | Firestar Diamond, Inc. | Cash | $ 2,475.00 | Mihir Bhansali |
| 9/18/2012 | Firestar Diamond, Inc. | Cash | $ 2,475.00 | Mihir Bhansali |
| 10/2/2012 | Firestar Diamond, Inc. | Cash | $ 2,475.00 | Mihir Bhansali |
| 10/16/2012 | Firestar Diamond, Inc. | Cash | $ 2,475.00 | Mihir Bhansali |
| 10/30/2012 | Firestar Diamond, Inc. | Cash | $ 2,475.00 | Mihir Bhansali |
| 11/13/2012 | Firestar Diamond, Inc. | Cash | $ 2,475.00 | Mihir Bhansali |
| 11/27/2012 | Firestar Diamond, Inc. | Cash | $ 2,475.00 | Mihir Bhansali |
| 12/11/2012 | Firestar Diamond, Inc. | Cash | $ 2,475.00 | Mihir Bhansali |
| 12/24/2012 | Firestar Diamond, Inc. | Cash | $ 2,475.00 | Mihir Bhansali |
| 1/8/2013 | Firestar Diamond, Inc. | Cash | $ 2,475.00 | Mihir Bhansali |
| 1/22/2013 | Firestar Diamond, Inc. | Cash | $ 2,475.00 | Mihir Bhansali |
| 2/5/2013 | Firestar Diamond, Inc. | Cash | $ 2,475.00 | Mihir Bhansali |
| 2/19/2013 | Firestar Diamond, Inc. | Cash | $ 2,475.00 | Mihir Bhansali |
| 3/5/2013 | Firestar Diamond, Inc. | Cash | $ 2,475.00 | Mihir Bhansali |
| 3/19/2013 | Firestar Diamond, Inc. | Cash | $ 2,475.00 | Mihir Bhansali |
| 4/2/2013 | Firestar Diamond, Inc. | Cash | $ 2,475.00 | Mihir Bhansali |
| 4/16/2013 | Firestar Diamond, Inc. | Cash | $ 2,475.00 | Mihir Bhansali |
| 4/30/2013 | Firestar Diamond, Inc. | Cash | $ 2,475.00 | Mihir Bhansali |
| 5/14/2013 | Firestar Diamond, Inc. | Cash | $ 2,475.00 | Mihir Bhansali |
| 5/28/2013 | Firestar Diamond, Inc. | Cash | $ 2,475.00 | Mihir Bhansali |
| 6/11/2013 | Firestar Diamond, Inc. | Cash | $ 2,475.00 | Mihir Bhansali |
| 6/25/2013 | Firestar Diamond, Inc. | Cash | $ 2,475.00 | Mihir Bhansali |
| 7/9/2013 | Firestar Diamond, Inc. | Cash | $ 2,475.00 | Mihir Bhansali |
| 7/23/2013 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 7/23/2013 | Firestar Diamond, Inc. | Cash | $ 10,769.23 | Mihir Bhansali |
| 8/6/2013 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 8/20/2013 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 8/23/2013 | A. Jaffe, Inc. | Cash | $ 500,000.00 | Mihir Bhansali |
| 9/3/2013 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 9/17/2013 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 10/1/2013 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 10/15/2013 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 10/29/2013 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 11/12/2013 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 11/26/2013 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 12/10/2013 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 12/24/2013 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 1/7/2014 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 1/21/2014 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 2/4/2014 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 2/18/2014 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 3/4/2014 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 3/18/2014 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 4/1/2014 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 4/15/2014 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 4/29/2014 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 5/13/2014 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 5/27/2014 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 6/10/2014 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 6/24/2014 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |

Firestar Diamond, Inc. et al Debtors

| Date / Payroll Date | Transferor | Property Transferred | Value / Gross Earnings Amount | Transferee |
|---|---|---|---|---|
| 7/8/2014 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 7/22/2014 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 8/5/2014 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 8/19/2014 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 9/2/2014 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 9/16/2014 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 9/30/2014 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 10/14/2014 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 10/28/2014 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 11/12/2014 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 11/25/2014 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 12/9/2014 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 12/23/2014 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 1/6/2015 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 1/20/2015 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 2/3/2015 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 2/17/2015 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 3/3/2015 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 3/17/2015 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 3/31/2015 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 4/14/2015 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 4/28/2015 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 5/12/2015 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 5/26/2015 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 6/9/2015 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 6/23/2015 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 7/7/2015 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 7/21/2015 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 8/4/2015 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 8/18/2015 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 9/1/2015 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 9/15/2015 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 9/29/2015 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 10/13/2015 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 10/27/2015 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 11/10/2015 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 11/24/2015 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 12/8/2015 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 12/22/2015 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 1/5/2016 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 1/19/2016 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 2/2/2016 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 2/16/2016 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 3/1/2016 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 3/15/2016 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 3/29/2016 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 4/12/2016 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 4/26/2016 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 5/10/2016 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 5/24/2016 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 6/7/2016 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 6/21/2016 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 7/5/2016 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 7/19/2016 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 8/2/2016 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 8/16/2016 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 8/30/2016 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 9/13/2016 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 9/27/2016 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 10/11/2016 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 10/25/2016 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 11/8/2016 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 11/22/2016 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 12/6/2016 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 12/20/2016 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |
| 1/18/2017 | Firestar Diamond, Inc. | Cash | $ 4,013.46 | Mihir Bhansali |

**Firestar Diamond, Inc. et al Debtors**

| Date / Payroll Date | Transferor | Property Transferred | Value / Gross Earnings Amount | | Transferee |
|---|---|---|---|---|---|
| 2/1/2017 | Firestar Diamond, Inc. | Cash | $ | 4,013.46 | Mihir Bhansali |
| 2/15/2017 | Firestar Diamond, Inc. | Cash | $ | 4,013.46 | Mihir Bhansali |
| 3/1/2017 | Firestar Diamond, Inc. | Cash | $ | 4,013.46 | Mihir Bhansali |
| 3/15/2017 | Firestar Diamond, Inc. | Cash | $ | 4,013.46 | Mihir Bhansali |
| 3/29/2017 | Firestar Diamond, Inc. | Cash | $ | 4,013.46 | Mihir Bhansali |
| 4/12/2017 | Firestar Diamond, Inc. | Cash | $ | 17,475.02 | Mihir Bhansali |
| 4/26/2017 | Firestar Diamond, Inc. | Cash | $ | 5,936.54 | Mihir Bhansali |
| 5/10/2017 | Firestar Diamond, Inc. | Cash | $ | 5,936.54 | Mihir Bhansali |
| 5/24/2017 | Firestar Diamond, Inc. | Cash | $ | 5,936.54 | Mihir Bhansali |
| 6/7/2017 | Firestar Diamond, Inc. | Cash | $ | 5,936.54 | Mihir Bhansali |
| 6/21/2017 | Firestar Diamond, Inc. | Cash | $ | 5,936.54 | Mihir Bhansali |
| 7/5/2017 | Firestar Diamond, Inc. | Cash | $ | 5,936.54 | Mihir Bhansali |
| 7/19/2017 | Firestar Diamond, Inc. | Cash | $ | 5,936.54 | Mihir Bhansali |
| 8/2/2017 | Firestar Diamond, Inc. | Cash | $ | 5,936.54 | Mihir Bhansali |
| 8/16/2017 | Firestar Diamond, Inc. | Cash | $ | 5,936.54 | Mihir Bhansali |
| 8/30/2017 | Firestar Diamond, Inc. | Cash | $ | 5,936.54 | Mihir Bhansali |
| 9/13/2017 | Firestar Diamond, Inc. | Cash | $ | 5,936.54 | Mihir Bhansali |
| 9/27/2017 | Firestar Diamond, Inc. | Cash | $ | 5,936.54 | Mihir Bhansali |
| 10/11/2017 | Firestar Diamond, Inc. | Cash | $ | 5,936.54 | Mihir Bhansali |
| 10/25/2017 | Firestar Diamond, Inc. | Cash | $ | 5,936.54 | Mihir Bhansali |
| 11/8/2017 | Firestar Diamond, Inc. | Cash | $ | 5,936.54 | Mihir Bhansali |
| 11/22/2017 | Firestar Diamond, Inc. | Cash | $ | 5,936.54 | Mihir Bhansali |
| 12/6/2017 | Firestar Diamond, Inc. | Cash | $ | 5,936.54 | Mihir Bhansali |
| 12/20/2017 | Firestar Diamond, Inc. | Cash | $ | 5,936.54 | Mihir Bhansali |
| 12/29/2017 | Firestar Diamond, Inc. | Cash | $ | 5,936.54 | Mihir Bhansali |
| 1/17/2018 | Firestar Diamond, Inc. | Cash | $ | 5,936.54 | Mihir Bhansali |
| 1/31/2018 | Firestar Diamond, Inc. | Cash | $ | 5,936.54 | Mihir Bhansali |
| 2/14/2018 | Firestar Diamond, Inc. | Cash | $ | 5,936.54 | Mihir Bhansali |
| 2/16/2018 | Firestar Diamond, Inc. | Cash | $ | 20,777.89 | Mihir Bhansali |

| | | |
|---|---|---|
| **Total Two-Year Mihir Bhansali Compensation Transfers** | **$** | **281,233.67** |
| **Total Six-Year Mihir Bhansali Compensation Transfers** | **$** | **1,155,940.76** |

**Schedule B - Compensation Transfers from Debtors to Ajay Gandhi**

| Date / Payroll Date | Transferor | Property Transferred | Value / Gross Earnings Amount | Transferee |
|---|---|---|---|---|
| 3/6/2012 | Firestar Diamond, Inc. | Cash | $ 6,522.57 | Ajay Gandhi |
| 3/20/2012 | Firestar Diamond, Inc. | Cash | $ 6,522.57 | Ajay Gandhi |
| 4/3/2012 | Firestar Diamond, Inc. | Cash | $ 6,522.57 | Ajay Gandhi |
| 4/17/2012 | Firestar Diamond, Inc. | Cash | $ 6,522.57 | Ajay Gandhi |
| 5/1/2012 | Firestar Diamond, Inc. | Cash | $ 6,522.57 | Ajay Gandhi |
| 5/15/2012 | Firestar Diamond, Inc. | Cash | $ 6,522.57 | Ajay Gandhi |
| 5/29/2012 | Firestar Diamond, Inc. | Cash | $ 6,522.57 | Ajay Gandhi |
| 6/12/2012 | Firestar Diamond, Inc. | Cash | $ 6,522.57 | Ajay Gandhi |
| 6/26/2012 | Firestar Diamond, Inc. | Cash | $ 6,522.57 | Ajay Gandhi |
| 7/10/2012 | Firestar Diamond, Inc. | Cash | $ 6,522.57 | Ajay Gandhi |
| 7/24/2012 | Firestar Diamond, Inc. | Cash | $ 6,522.57 | Ajay Gandhi |
| 8/7/2012 | Firestar Diamond, Inc. | Cash | $ 6,522.57 | Ajay Gandhi |
| 8/21/2012 | Firestar Diamond, Inc. | Cash | $ 6,522.57 | Ajay Gandhi |
| 9/4/2012 | Firestar Diamond, Inc. | Cash | $ 6,522.57 | Ajay Gandhi |
| 9/18/2012 | Firestar Diamond, Inc. | Cash | $ 6,522.57 | Ajay Gandhi |
| 10/2/2012 | Firestar Diamond, Inc. | Cash | $ 6,522.57 | Ajay Gandhi |
| 10/16/2012 | Firestar Diamond, Inc. | Cash | $ 6,522.57 | Ajay Gandhi |
| 10/30/2012 | Firestar Diamond, Inc. | Cash | $ 6,522.57 | Ajay Gandhi |
| 11/13/2012 | Firestar Diamond, Inc. | Cash | $ 6,522.57 | Ajay Gandhi |
| 11/27/2012 | Firestar Diamond, Inc. | Cash | $ 6,522.57 | Ajay Gandhi |
| 12/11/2012 | Firestar Diamond, Inc. | Cash | $ 6,522.57 | Ajay Gandhi |
| 12/24/2012 | Firestar Diamond, Inc. | Cash | $ 6,522.57 | Ajay Gandhi |
| 1/8/2013 | Firestar Diamond, Inc. | Cash | $ 6,522.57 | Ajay Gandhi |
| 1/9/2013 | Firestar Diamond, Inc. | Cash | $ 20,000.00 | Ajay Gandhi |
| 1/22/2013 | Firestar Diamond, Inc. | Cash | $ 6,522.57 | Ajay Gandhi |
| 2/5/2013 | Firestar Diamond, Inc. | Cash | $ 6,522.57 | Ajay Gandhi |
| 2/19/2013 | Firestar Diamond, Inc. | Cash | $ 6,522.57 | Ajay Gandhi |
| 2/28/2013 | Firestar Diamond, Inc. | Cash | $ 12,000.00 | Ajay Gandhi |
| 3/5/2013 | Firestar Diamond, Inc. | Cash | $ 13,371.27 | Ajay Gandhi |
| 6/11/2013 | Firestar Diamond, Inc. | Cash | $ 3,653.85 | Ajay Gandhi |
| 6/25/2013 | Firestar Diamond, Inc. | Cash | $ 7,307.69 | Ajay Gandhi |
| 7/9/2013 | Firestar Diamond, Inc. | Cash | $ 7,307.69 | Ajay Gandhi |
| 7/23/2013 | Firestar Diamond, Inc. | Cash | $ 7,307.69 | Ajay Gandhi |
| 8/6/2013 | Firestar Diamond, Inc. | Cash | $ 7,307.69 | Ajay Gandhi |
| 8/20/2013 | Firestar Diamond, Inc. | Cash | $ 7,307.69 | Ajay Gandhi |
| 9/3/2013 | Firestar Diamond, Inc. | Cash | $ 7,307.69 | Ajay Gandhi |
| 9/17/2013 | Firestar Diamond, Inc. | Cash | $ 7,307.69 | Ajay Gandhi |
| 10/1/2013 | Firestar Diamond, Inc. | Cash | $ 7,307.69 | Ajay Gandhi |
| 10/15/2013 | Firestar Diamond, Inc. | Cash | $ 7,307.69 | Ajay Gandhi |
| 10/29/2013 | Firestar Diamond, Inc. | Cash | $ 7,307.69 | Ajay Gandhi |
| 11/12/2013 | Firestar Diamond, Inc. | Cash | $ 7,307.69 | Ajay Gandhi |
| 11/26/2013 | Firestar Diamond, Inc. | Cash | $ 7,307.69 | Ajay Gandhi |
| 12/10/2013 | Firestar Diamond, Inc. | Cash | $ 7,307.69 | Ajay Gandhi |
| 12/24/2013 | Firestar Diamond, Inc. | Cash | $ 7,307.69 | Ajay Gandhi |
| 1/7/2014 | Firestar Diamond, Inc. | Cash | $ 7,307.69 | Ajay Gandhi |
| 1/21/2014 | Firestar Diamond, Inc. | Cash | $ 7,307.69 | Ajay Gandhi |
| 2/4/2014 | Firestar Diamond, Inc. | Cash | $ 7,307.69 | Ajay Gandhi |
| 2/18/2014 | Firestar Diamond, Inc. | Cash | $ 7,307.69 | Ajay Gandhi |
| 3/4/2014 | Firestar Diamond, Inc. | Cash | $ 7,307.69 | Ajay Gandhi |
| 3/18/2014 | Firestar Diamond, Inc. | Cash | $ 9,423.08 | Ajay Gandhi |
| 4/1/2014 | Firestar Diamond, Inc. | Cash | $ 5,576.92 | Ajay Gandhi |
| 4/15/2014 | Firestar Diamond, Inc. | Cash | $ 7,500.00 | Ajay Gandhi |
| 4/29/2014 | Firestar Diamond, Inc. | Cash | $ 7,500.00 | Ajay Gandhi |
| 4/29/2014 | Firestar Diamond, Inc. | Cash | $ 50,000.00 | Ajay Gandhi |
| 5/13/2014 | Firestar Diamond, Inc. | Cash | $ 7,500.00 | Ajay Gandhi |
| 5/27/2014 | Firestar Diamond, Inc. | Cash | $ 7,500.00 | Ajay Gandhi |
| 6/10/2014 | Firestar Diamond, Inc. | Cash | $ 7,500.00 | Ajay Gandhi |
| 6/24/2014 | Firestar Diamond, Inc. | Cash | $ 7,500.00 | Ajay Gandhi |
| 7/8/2014 | Firestar Diamond, Inc. | Cash | $ 7,500.00 | Ajay Gandhi |
| 7/22/2014 | Firestar Diamond, Inc. | Cash | $ 7,500.00 | Ajay Gandhi |
| 8/5/2014 | Firestar Diamond, Inc. | Cash | $ 7,500.00 | Ajay Gandhi |
| 8/19/2014 | Firestar Diamond, Inc. | Cash | $ 7,500.00 | Ajay Gandhi |
| 9/2/2014 | Firestar Diamond, Inc. | Cash | $ 7,500.00 | Ajay Gandhi |

| Date / Payroll Date | Transferor | Property Transferred | Value / Gross Earnings Amount | Transferee |
|---|---|---|---|---|
| 9/16/2014 | Firestar Diamond, Inc. | Cash | $ 7,500.00 | Ajay Gandhi |
| 9/30/2014 | Firestar Diamond, Inc. | Cash | $ 7,500.00 | Ajay Gandhi |
| 10/14/2014 | Firestar Diamond, Inc. | Cash | $ 7,500.00 | Ajay Gandhi |
| 10/28/2014 | Firestar Diamond, Inc. | Cash | $ 7,500.00 | Ajay Gandhi |
| 11/12/2014 | Firestar Diamond, Inc. | Cash | $ 7,500.00 | Ajay Gandhi |
| 11/25/2014 | Firestar Diamond, Inc. | Cash | $ 7,500.00 | Ajay Gandhi |
| 12/9/2014 | Firestar Diamond, Inc. | Cash | $ 7,500.00 | Ajay Gandhi |
| 12/23/2014 | Firestar Diamond, Inc. | Cash | $ 7,500.00 | Ajay Gandhi |
| 1/6/2015 | Firestar Diamond, Inc. | Cash | $ 7,500.00 | Ajay Gandhi |
| 1/20/2015 | Firestar Diamond, Inc. | Cash | $ 7,500.00 | Ajay Gandhi |
| 2/3/2015 | Firestar Diamond, Inc. | Cash | $ 7,500.00 | Ajay Gandhi |
| 2/17/2015 | Firestar Diamond, Inc. | Cash | $ 7,500.00 | Ajay Gandhi |
| 3/3/2015 | Firestar Diamond, Inc. | Cash | $ 7,500.00 | Ajay Gandhi |
| 3/17/2015 | Firestar Diamond, Inc. | Cash | $ 7,500.00 | Ajay Gandhi |
| 3/31/2015 | Firestar Diamond, Inc. | Cash | $ 7,500.00 | Ajay Gandhi |
| 4/14/2015 | Firestar Diamond, Inc. | Cash | $ 7,500.00 | Ajay Gandhi |
| 4/28/2015 | Firestar Diamond, Inc. | Cash | $ 7,500.00 | Ajay Gandhi |
| 5/12/2015 | Firestar Diamond, Inc. | Cash | $ 7,500.00 | Ajay Gandhi |
| 5/26/2015 | Firestar Diamond, Inc. | Cash | $ 7,500.00 | Ajay Gandhi |
| 6/9/2015 | Firestar Diamond, Inc. | Cash | $ 10,865.38 | Ajay Gandhi |
| 6/23/2015 | Firestar Diamond, Inc. | Cash | $ 8,846.15 | Ajay Gandhi |
| 7/7/2015 | Firestar Diamond, Inc. | Cash | $ 8,846.15 | Ajay Gandhi |
| 7/21/2015 | Firestar Diamond, Inc. | Cash | $ 8,846.15 | Ajay Gandhi |
| 8/4/2015 | Firestar Diamond, Inc. | Cash | $ 8,846.15 | Ajay Gandhi |
| 8/18/2015 | Firestar Diamond, Inc. | Cash | $ 8,846.15 | Ajay Gandhi |
| 9/1/2015 | Firestar Diamond, Inc. | Cash | $ 8,846.15 | Ajay Gandhi |
| 9/15/2015 | Firestar Diamond, Inc. | Cash | $ 8,846.15 | Ajay Gandhi |
| 9/29/2015 | Firestar Diamond, Inc. | Cash | $ 8,846.15 | Ajay Gandhi |
| 10/13/2015 | Firestar Diamond, Inc. | Cash | $ 8,846.15 | Ajay Gandhi |
| 10/27/2015 | Firestar Diamond, Inc. | Cash | $ 8,846.15 | Ajay Gandhi |
| 11/10/2015 | Firestar Diamond, Inc. | Cash | $ 8,846.15 | Ajay Gandhi |
| 11/24/2015 | Firestar Diamond, Inc. | Cash | $ 8,846.15 | Ajay Gandhi |
| 12/8/2015 | Firestar Diamond, Inc. | Cash | $ 8,846.15 | Ajay Gandhi |
| 12/22/2015 | Firestar Diamond, Inc. | Cash | $ 8,846.15 | Ajay Gandhi |
| 1/5/2016 | Firestar Diamond, Inc. | Cash | $ 8,846.15 | Ajay Gandhi |
| 1/19/2016 | Firestar Diamond, Inc. | Cash | $ 8,846.15 | Ajay Gandhi |
| 2/2/2016 | Firestar Diamond, Inc. | Cash | $ 8,846.15 | Ajay Gandhi |
| 2/16/2016 | Firestar Diamond, Inc. | Cash | $ 8,846.15 | Ajay Gandhi |
| 3/1/2016 | Firestar Diamond, Inc. | Cash | $ 8,846.15 | Ajay Gandhi |
| 3/15/2016 | Firestar Diamond, Inc. | Cash | $ 8,846.15 | Ajay Gandhi |
| 3/29/2016 | Firestar Diamond, Inc. | Cash | $ 8,846.15 | Ajay Gandhi |
| 4/12/2016 | Firestar Diamond, Inc. | Cash | $ 8,846.15 | Ajay Gandhi |
| 4/26/2016 | Firestar Diamond, Inc. | Cash | $ 8,846.15 | Ajay Gandhi |
| 5/10/2016 | Firestar Diamond, Inc. | Cash | $ 8,846.15 | Ajay Gandhi |
| 5/24/2016 | Firestar Diamond, Inc. | Cash | $ 8,846.15 | Ajay Gandhi |
| 6/7/2016 | Firestar Diamond, Inc. | Cash | $ 8,846.15 | Ajay Gandhi |
| 6/21/2016 | Firestar Diamond, Inc. | Cash | $ 8,846.15 | Ajay Gandhi |
| 7/5/2016 | Firestar Diamond, Inc. | Cash | $ 8,846.15 | Ajay Gandhi |
| 7/19/2016 | Firestar Diamond, Inc. | Cash | $ 8,846.15 | Ajay Gandhi |
| 8/2/2016 | Firestar Diamond, Inc. | Cash | $ 8,846.15 | Ajay Gandhi |
| 8/16/2016 | Firestar Diamond, Inc. | Cash | $ 8,846.15 | Ajay Gandhi |
| 8/30/2016 | Firestar Diamond, Inc. | Cash | $ 8,846.15 | Ajay Gandhi |
| 9/13/2016 | Firestar Diamond, Inc. | Cash | $ 8,846.15 | Ajay Gandhi |
| 9/27/2016 | Firestar Diamond, Inc. | Cash | $ 8,846.15 | Ajay Gandhi |
| 10/11/2016 | Firestar Diamond, Inc. | Cash | $ 8,846.15 | Ajay Gandhi |
| 10/25/2016 | Firestar Diamond, Inc. | Cash | $ 8,846.15 | Ajay Gandhi |
| 11/8/2016 | Firestar Diamond, Inc. | Cash | $ 8,846.15 | Ajay Gandhi |
| 11/22/2016 | Firestar Diamond, Inc. | Cash | $ 8,846.15 | Ajay Gandhi |
| 12/6/2016 | Firestar Diamond, Inc. | Cash | $ 8,846.15 | Ajay Gandhi |
| 12/20/2016 | Firestar Diamond, Inc. | Cash | $ 8,846.15 | Ajay Gandhi |
| 1/18/2017 | Firestar Diamond, Inc. | Cash | $ 8,846.15 | Ajay Gandhi |
| 2/1/2017 | Firestar Diamond, Inc. | Cash | $ 8,846.15 | Ajay Gandhi |
| 2/15/2017 | Firestar Diamond, Inc. | Cash | $ 8,846.15 | Ajay Gandhi |
| 3/1/2017 | Firestar Diamond, Inc. | Cash | $ 8,846.15 | Ajay Gandhi |
| 3/15/2017 | Firestar Diamond, Inc. | Cash | $ 8,846.15 | Ajay Gandhi |
| 3/29/2017 | Firestar Diamond, Inc. | Cash | $ 8,846.15 | Ajay Gandhi |

**Firestar Diamond, Inc. et al Debtors**

| Date / Payroll Date | Transferor | Property Transferred | Value / Gross Earnings Amount | Transferee |
|---|---|---|---|---|
| 4/12/2017 | Firestar Diamond, Inc. | Cash | $ 8,846.15 | Ajay Gandhi |
| 4/26/2017 | Firestar Diamond, Inc. | Cash | $ 8,846.15 | Ajay Gandhi |
| 5/10/2017 | Firestar Diamond, Inc. | Cash | $ 8,846.15 | Ajay Gandhi |
| 5/24/2017 | Firestar Diamond, Inc. | Cash | $ 8,846.15 | Ajay Gandhi |
| 6/7/2017 | Firestar Diamond, Inc. | Cash | $ 8,846.15 | Ajay Gandhi |
| 6/21/2017 | Firestar Diamond, Inc. | Cash | $ 8,846.15 | Ajay Gandhi |
| 7/5/2017 | Firestar Diamond, Inc. | Cash | $ 8,846.15 | Ajay Gandhi |
| 7/19/2017 | Firestar Diamond, Inc. | Cash | $ 8,846.15 | Ajay Gandhi |
| 8/2/2017 | Firestar Diamond, Inc. | Cash | $ 8,846.15 | Ajay Gandhi |
| 8/16/2017 | Firestar Diamond, Inc. | Cash | $ 8,846.15 | Ajay Gandhi |
| 8/30/2017 | Firestar Diamond, Inc. | Cash | $ 8,846.15 | Ajay Gandhi |
| 9/13/2017 | Firestar Diamond, Inc. | Cash | $ 8,846.15 | Ajay Gandhi |
| 9/27/2017 | Firestar Diamond, Inc. | Cash | $ 8,846.15 | Ajay Gandhi |
| 10/11/2017 | Firestar Diamond, Inc. | Cash | $ 68,846.15 | Ajay Gandhi |
| 10/25/2017 | Firestar Diamond, Inc. | Cash | $ 8,846.15 | Ajay Gandhi |
| 11/8/2017 | Firestar Diamond, Inc. | Cash | $ 8,846.15 | Ajay Gandhi |
| 11/22/2017 | Firestar Diamond, Inc. | Cash | $ 8,846.15 | Ajay Gandhi |
| 12/6/2017 | Firestar Diamond, Inc. | Cash | $ 8,846.15 | Ajay Gandhi |
| 12/20/2017 | Firestar Diamond, Inc. | Cash | $ 8,846.15 | Ajay Gandhi |
| 12/29/2017 | Firestar Diamond, Inc. | Cash | $ 8,846.15 | Ajay Gandhi |
| 1/17/2018 | Firestar Diamond, Inc. | Cash | $ 8,846.15 | Ajay Gandhi |
| 1/31/2018 | Firestar Diamond, Inc. | Cash | $ 8,846.15 | Ajay Gandhi |
| 2/14/2018 | Firestar Diamond, Inc. | Cash | $ 8,846.15 | Ajay Gandhi |
| 2/16/2018 | Firestar Diamond, Inc. | Cash | $ 30,961.52 | Ajay Gandhi |

| | | |
|---|---|---|
| **Total Two-Year Ajay Gandhi Compensation Transfers** | **$** | **542,115.17** |
| **Total Six-Year Ajay Gandhi Compensation Transfers** | **$** | **1,359,669.30** |